**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

THE CITY OF NEW YORK,

     *Plaintiff,*

  v.

JEFFERSON B. SESSIONS III, in his official
capacity as Attorney General of the United
States of America, and the UNITED STATES
DEPARTMENT OF JUSTICE,

     *Defendants.*

Case No. _____

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF**

Plaintiff the City of New York hereby alleges as follows:

## OVERVIEW

1.     The City of New York ("New York City" or "the City") brings this action to enjoin the Attorney General of the United States and the U.S. Department of Justice ("DOJ") from imposing new and unlawful conditions on congressionally approved federal funding for the Edward Byrne Memorial Justice Assistance Grant Program ("JAG Program"), and to seek a declaration that these new conditions are unlawful, unconstitutional, and arbitrary and capricious. The City further seeks a declaration that Section 1373 of Title 8 of the United States Code ("Section 1373") is unconstitutional, or, to the extent that Section 1373 lawfully applies to the JAG Program, a declaration that the City's laws and policies comply with Section 1373. The City also seeks a permanent injunction prohibiting DOJ from imposing the new conditions and accompanying mandamus relief, pursuant to 28 U.S.C. § 1361, to compel the immediate release of its funding.

2.     The JAG Program has long been an important source of funding for the City's criminal justice programs. JAG funds help finance the City's emergency response teams, diversion programs for nonviolent felony drug offenders, efforts to fight cybercrime and identity theft, and school safety initiatives, to name only a few initiatives. New York City has applied for and

1   received its local allocation under the federal grant formula every year since the JAG Program's

2   inception in 2005.

3       3.      That is all changing.  In connection with its fiscal year ("FY") 2016 JAG Program

4   award, DOJ demanded that New York City, along with eight other jurisdictions, certify its

5   compliance with Section 1373 by June 30, 2017.  Section 1373 is a statute that bars states and

6   localities from adopting policies that restrict communications regarding immigration and

7   citizenship status between state and local officials and the federal government.  DOJ's action

8   marked the first time since the enactment of Section 1373 roughly twenty years earlier that any

9   federal agency had required compliance with Section 1373 as a condition for receipt of federal

10  funding.  The City submitted a legal opinion validating its compliance with Section 1373, to the

11  extent that provision is constitutionally applicable, on June 27, 2017.

12      4.      Then, on July 25, 2017, DOJ announced that the City, along with all other FY 2017

13  JAG recipients, must comply with two new conditions, along with another mandatory certification

14  of compliance with Section 1373, in order to receive any JAG funds in FY 2017.  The City had to:

15  (1) certify that it complies with Section 1373 (the "Section 1373 condition"); (2) provide at least

16  48 hours' advance notice to the U.S. Department of Homeland Security ("DHS") regarding the

17  "scheduled release date and time" of an inmate for whom DHS requests such advance notice (the

18  "advance notification condition"); and (3) permit officials from DHS, which oversees U.S.

19  Immigration and Customs Enforcement ("ICE"), to access "any detention facility" maintained by

20  the City in order to meet with persons of interest to DHS (the "jail access condition").  The City

21  timely submitted its FY 2017 application on September 5, 2017.

22      5.      DOJ has never communicated to the City a final determination as to its compliance

23  with Section 1373 or a final decision on its FY 2017 application.  Meanwhile, on June 27, 2018,

24  DOJ announced that, although "reviews of some applications remain ongoing," it was distributing

25  nearly $200 million in JAG Program funds to jurisdictions that shared its commitment to "keeping

26  criminal aliens off our streets and our law abiding citizens safe."

27      6.      DOJ's abrupt shift in implementation of the JAG Program is not only unprecedented,

28

COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF

1   but also lacks statutory basis or authority.  No statute grants the Attorney General the authority to

2   impose the Section 1373, advance notification, and jail access conditions on the JAG Program.

3   And even if Congress had delegated the authority to impose these conditions, DOJ's requirement

4   that the City comply in order to receive JAG funding violates Congress's Spending Clause

5   powers, the Tenth Amendment, and principles of federalism, as well as the Administrative

6   Procedure Act.

7       7.      In short, the Attorney General and DOJ's imposition of these three conditions on FY

8   2017 JAG funds is unlawful, unconstitutional, and arbitrary and capricious.

9       8.      As the largest municipality in the United States, New York City is responsible for the

10   health, safety, and general welfare of its 8.6 million residents, in addition to millions of commuters

11   and tourists.  The City is also home to one of the most diverse populations in the United States.

12   More than 3 million of the City's residents were born outside of the United States.

13      9.      The City has adopted laws and policies that encourage people of all backgrounds to

14   access City services, especially those services dedicated to law enforcement and public safety.

15   The City's laws and policies, some of which have been in place for years before the JAG

16   Program's inception, protect the confidentiality of individuals' information, including but not

17   limited to immigration and citizenship status information, by restricting unnecessary collection

18   and disclosure to external parties.  Exceptions to this policy permit the City to communicate with

19   federal immigration authorities in connection with persons the City deems to be public safety

20   risks.

21      10.     These laws and policies are predicated on the understanding that: (1) the City as a

22   whole benefits when all individuals, regardless of personal attributes, feel safe reporting crimes,

23   cooperating with police investigations, accessing emergency medical treatment and public health

24   programs, and sending their children to school; and (2) residents, including members of the

25   immigrant community, may not seek out critical services if they fear that the sensitive personal

26   information they provide the City in order to obtain these services will be disclosed.

27      11.     The City has also adopted laws and policies clearly defining the terms on which it will

28

3

1   cooperate with federal immigration enforcement in order to protect public safety.

2       12.    New York City is now the safest big city in the nation.  The City has learned from

3   decades of experience that policies fostering cooperation with law enforcement and other City

4   officials by all residents, including members of the immigrant community, are integral to a

5   successful law enforcement strategy and to public health and safety.  Although the Attorney

6   General has asserted that New York City is "crumbling under the weight of illegal immigration

7   and violent crime" due to its "soft on crime stance," the City's historic streak of declining crime

8   paints a very different picture.  Crime in the City is at the lowest level since the City started

9   keeping reliable records in the 1950s, with decreases in every major felony category.  The City's

10  track record contradicts the Attorney General's repeated—and factually unsupported—claim that

11  "the lawless practices of so-called 'sanctuary' jurisdictions … make our country less safe."

12      13.    Through this action, the City seeks declaratory, injunctive, and mandamus relief from

13  this Court.  Specifically, the City seeks a declaration that DOJ's imposition of the three conditions

14  on the JAG Program has no statutory basis, is contrary to the Constitution's Separation of Powers,

15  and is arbitrary and capricious.  Even if Congress had delegated authority to the Attorney General

16  to impose these conditions, they would violate the Spending Clause.  Moreover, the Section 1373

17  condition violates the Tenth Amendment.  The City therefore seeks a declaration that Section 1373

18  is unconstitutional, or, in the alternative, that the City is in full compliance with Section 1373 to

19  the extent that statute may be lawfully applied to it.  The City also asks this Court to permanently

20  enjoin DOJ from imposing the three conditions, as applicable, on FY 2016 and 2017 JAG funds,

21  as well as any future grants under this program.

22                      **PARTIES**

23      14.    Plaintiff New York City is a municipal corporation organized pursuant to the laws of

24  the State of New York.  The City is a political subdivision of the State and derives its powers

25  through the State Constitution, State laws, and the New York City Charter.

26      15.    New York City is the largest city in the United States and is home to more than 8.6

27  million people.  Nearly six out of every ten New York City residents are immigrants or the

28

COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF

1  children of immigrants, including an estimated undocumented population of 560,000.

2  Approximately one million residents live in a household where at least one member is

3  undocumented.

4      16.    Defendant Jefferson B. Sessions III is the Attorney General of the United States.  He

5  oversees DOJ, including the Office of Justice Programs ("OJP"), which administers JAG funding.

6  He is sued in his official capacity pursuant to 5 U.S.C. § 702.

7      17.    Defendant the U.S. Department of Justice is an executive department of the United

8  States pursuant to 5 U.S.C. § 101.  As such, it engages in agency action and is named as a

9  defendant in this action pursuant to 5 U.S.C. § 702.  DOJ is responsible for administering the JAG

10  funds appropriated by Congress.

11  **JURISDICTION AND VENUE**

12      18.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346.

13  The Court is authorized to issue the relief sought here under the Administrative Procedure Act,

14  5 U.S.C. §§ 702, 705, 706; the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202; and the

15  Mandamus Statute, 28 U.S.C. § 1361.

16      19.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e), because Plaintiff is

17  located in this District and a substantial part of the events or omissions giving rise to this action

18  occurred herein.

19  **FACTUAL ALLEGATIONS**

20  **I.**    **THE JAG PROGRAM AND GRANT CONDITIONS**

21  **A.**    **Background on the JAG Program**

22      20.    The JAG Program has its roots in the Omnibus Crime Control and Safe Streets Act of

23  1968, Pub. L. No. 90-351, Title I, 82 Stat. 197 (codified as amended at 34 U.S.C. § 10101 *et seq.*),

24  which created the first block grants for states and local governments to use for law enforcement

25  and criminal justice programs.  Congress created the JAG Program in its current form in 2005,

26  authorizing up to $1.1 billion per year in funding for criminal justice programming.  The JAG

27  Program aims to "give state and local governments more flexibility to spend money for programs

28

that work for them rather than to impose a 'one size fits all' solution." H.R. Rep. No. 109-233, at 89 (2005).  Congress named the JAG Program after Edward Byrne, a New York City police officer killed while protecting a Guyanese immigrant who was acting as a cooperating witness.

21.     Congress designed the JAG Program as a formula grant.  The JAG funding formula allocates money based upon states' population and the incidence of violent crime; local governments are awarded a portion of their state's allocation based upon the ratio of violent crime in the locality versus that of the state as a whole.  34 U.S.C. § 10156(a), (d) (formerly 42 U.S.C. § 3755).

22.     The program provides awardees with discretion to use funds for "any one or more" of eight types of programs, including law enforcement, crime prevention and education, drug treatment, and crime victim and witness programs.  *Id.* § 10152(a)(1).

23.     New York City has applied for and received JAG funds each and every year since 2005, as a direct grantee.  Awards have ranged from $2.2 million to $8.7 million.  In FY 2016, the City received $4.3 million under its direct JAG Program award.  Per the statutory formula, the City is entitled to a direct grant in the amount of $4.1 million for FY 2017.

24.     The City uses JAG funds to support critical public safety personnel and programs aimed at reducing crime and promoting fairness in the criminal justice system.  For instance, the New York City Police Department ("NYPD") has drawn upon JAG funding to pay the salaries of 911 emergency responders.  JAG funds are also used to help finance: diversion programs for nonviolent felony drug offenders run through the District Attorney's Offices; efforts to fight cybercrime and identity theft; drug prosecutions by the City's Office of the Special Narcotics Prosecutor; upgrades to the City's criminal justice data collection, organization, and evaluation systems; interventions for individuals with mental and behavioral health needs; and school safety initiatives.

**B.**     **Conditions for JAG Program Funding**

25.     The JAG authorizing statute provides that "the Attorney General shall allocate to each unit of local government" grant money based on the statutory formula.  34 U.S.C. § 10156(d)(2)(A).  Consequently, DOJ, as the administering agency, has limited discretion.

26.     The JAG statute provides the Attorney General with limited authority in administering the grant program.  First, the Attorney General can require that applicants supply information about their intended use of the grant funding and show that they will spend the money on purposes envisioned by the statute.  *See* 34 U.S.C. § 10153(a)(2), (5).  Second, the statute allows the Attorney General to require that applicants provide programmatic and financial information; the Attorney General can insist that a recipient "maintain and report such data, records, and information … as the Attorney General may reasonably require."  *Id.* § 10153(a)(4).  Third, the Attorney General can demand that localities certify, alongside their funding applications, that they "will comply with all provisions of this part and all other applicable Federal laws."  *Id.* § 10153(a)(5)(D).  Finally, the statute authorizes the Attorney General to "issue rules to carry out this part."  *Id.* § 10155.

27.     The JAG statute contains no express provision authorizing the Attorney General to impose new, generally-applicable substantive conditions.  Congress chose not to confer such agency discretion in awarding grants under the JAG Program.

28.     Further, provisions found elsewhere in the JAG statute demonstrate that Congress intended to limit the Attorney General's ability to deviate from the statutory formula.  For example, 34 U.S.C. § 10157(b) permits DOJ to reserve up to five percent of appropriated JAG funds and reallocate them to a state or locality if DOJ determines that reallocation is necessary to combat "extraordinary increases in crime" or to "mitigate significant programmatic harm resulting from" the formula.  This explicit limitation on DOJ's authority to redirect JAG funds speaks to Congress's intent that DOJ otherwise abide by the statutory formula.

**C.      Section 1373 Condition**

29.      Section 1373, which was enacted in 1996, provides, in relevant part, that a "[s]tate, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual."

30.      Section 1373 does not require localities receiving JAG grants to collect immigration status information or take any action upon receipt of immigration status information.  The statute also does not address ICE detainer requests or requests for notification of release and historically has been narrowly construed by DOJ.

31.      In response to a February 2016 inquiry from a member of Congress regarding whether DOJ grant recipients complied with Section 1373, DOJ's Office of the Inspector General ("OIG") conducted a review of ten state and local jurisdictions, including New York City.  OIG's report, dated May 31, 2016, noted "concerns" with several of the localities' laws and policies in connection with Section 1373.  The report identified New York City as having "policies and ordinances that raised such concerns."

32.      This report apparently triggered DOJ's unprecedented announcement that Section 1373 is an applicable federal law for purposes of the JAG Program.  This marked the first time since the enactment of Section 1373 twenty years earlier that any federal agency imposed compliance with Section 1373 as a condition for receipt of federal funding.

**D.      Advance Notification and Jail Access Conditions**

33.      DOJ announced on July 25, 2017 that, in order to receive FY 2017 JAG funds, recipients would have to agree to comply with two *additional* conditions it unilaterally decided to impose.  Beyond requiring that recipients of the FY 2017 JAG award certify compliance with Section 1373, recipients would have to adhere to two new conditions related to civil immigration enforcement: (1) the advance notification condition and (2) the jail access condition.

34.      On August 24, 2017, DOJ revised—and expanded—what the advance notification

condition and the jail access condition, neither of which are statutorily prescribed, would actually entail.  Under the revised advance notification condition, JAG grantees must have in place a "local ordinance, -rule, -regulation, -policy, or -practice … that is designed to ensure that, when a local-government … correctional facility receives from DHS a formal written request … [for] advance notice of the scheduled release date and time for a particular alien in such facility, then such facility will honor such request and—as early as practicable … provide the requested notice to DHS."  DOJ did not define or clarify the term "scheduled release date," which could on its face be interpreted as applying to inmates in pre-trial detention in addition to those convicted of crimes and serving sentences.

35.     Under the revised jail access condition, DOJ now requires JAG grantees to have in place a "local ordinance, -rule, -regulation, -policy, or -practice … that is designed to ensure that [any, not just DHS] agents of the United States … are given access [to] a local-government … correctional facility" to meet with and question individuals believed to be aliens.  Like the advance notification condition, the jail access condition is vague and ambiguous; it gives no indication of what "access" means, nor does it specify whether jurisdictions will be deemed compliant as long as they permit ICE personnel to access their facilities in order to meet with inmates who have consented to such meetings.  According to its broadest construction, this condition appears to mandate that federal immigration agents be given unprecedented and unfettered access to local correctional or detention facilities, including to meet with and to question inmates on a non-consensual basis and/or without notice that they may have counsel present.

36.     Neither the July 25, 2017 announcement nor the August 24, 2017 revision was accompanied by any explanation for the imposition of these new conditions on JAG Program grants, including how the newly-imposed conditions, which were characterized as "common-sense measures," relate to, let alone serve to advance, the interests of the JAG Program.  DOJ also failed to provide grantees with any guidance as to how the conditions will operate in practice.

37.     On September 15, 2017, Judge Harry Leinenweber of the Northern District of Illinois issued a nationwide preliminary injunction against the advance notification and jail access

1  conditions. *See City of Chicago v. Sessions*, No. 1:17-cv-05720 (N.D. Ill. Sept. 15, 2017).  A

2  panel of the Seventh Circuit affirmed. *City of Chicago v. Sessions,* 888 F.3d 272 (7th Cir. 2018).

3  The Seventh Circuit then voted to consider the appropriateness of the nationwide scope of the

4  remedy *en banc*, and to stay the nationwide element of the injunction pending that consideration,

5  while leaving intact the holding that the conditions are unlawful and were properly enjoined as to

6  the plaintiff, the City of Chicago. *City of Chicago v. Sessions*, No. 17-2991 (7th Cir. June 26,

7  2018).

8      38.      On June 6, 2018, Judge Michael Baylson of the Eastern District of Pennsylvania issued

9  a decision finding that all three of the new conditions on the JAG Program grants were unlawful.

10  *City of Philadelphia v. Sessions*, No. 17-3894 (E.D. Pa. June 6, 2018).  The court also declared

11  Section 1373 unconstitutional, in violation of the Tenth Amendment.  On June 28, 2018, the court

12  issued a permanent injunction as to the three conditions and ordered mandamus relief for the City

13  of Philadelphia.

14      39.      On June 27, 2018, immediately after the Seventh Circuit stayed the nationwide element

15  of the *City of Chicago* injunction, DOJ announced that it was distributing JAG funds and released

16  a list of awardees that did not include New York City.

17  **II.      NEW YORK CITY'S LAWS AND POLICIES**

18      40.      The City is home to over 8.6 million people, more than 3 million of whom were born

19  outside of the United States but have chosen to work, study, and raise families in the City.  Over

20  half a million more people travel to the City every day to work, and 50 million tourists visit every

21  year.  The City has the enormous responsibility of protecting the health, safety, and general

22  welfare of all of these people.

23      41.      Over decades, the City's laws and policies have developed to ensure that all residents

24  seek out and obtain essential services.  The City as a whole benefits when residents seek treatment

25  and medical attention for contagious diseases, report crime when they are victims, assist the police

26  as witnesses, and come forward when they have information about potential crimes, unsafe

27  conditions, or other threats to public safety and welfare.  It is clear that this approach works.  New

28

COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF

York City is now the safest big city in the nation.

42.    Five main categories of laws and policies are germane for purposes of this Complaint, namely the City's: (1) General Confidentiality Policy, (2) Identifying Information Laws, (3) laws and policies regarding ICE detainer and notification requests, (4) laws and policies on access to jails, and (5) law regarding the use of City resources for immigration enforcement.

**A.       General Confidentiality Policy**

43.    In 2001, New York City voters recognized the need for a general confidentiality policy that protects information obtained and collected by City employees, in order to allow the City to perform its legitimate municipal functions.  Voters therefore enacted a revision to the New York City Charter authorizing the Mayor to "promulgate rules requiring that information obtained by city employees be kept confidential to the extent necessary to preserve the trust of individuals who have business with city agencies."  N.Y.C. Charter § 8(g).

44.    Then-Mayor Michael R. Bloomberg acted on this Charter revision in 2003 by issuing Executive Orders Nos. 34 and 41, which together form the "General Confidentiality Policy."  The General Confidentiality Policy generally bars City employees from affirmatively seeking "confidential information" from individuals in the first instance, and, if such information is nevertheless acquired, from disclosing it to third parties, with limited exceptions.  Confidential information is broadly defined to include an individual's sexual orientation, status as a victim of domestic violence, status as a victim of sexual assault, status as a crime witness, receipt of public assistance, immigration status, and information contained in income tax records.  Exec. Order No. 41 § 1 (Sept. 17, 2003).

45.    Executive Order No. 41 states that one of the overarching goals is to assure residents "that they may seek and obtain the assistance of City agencies regardless of personal or private attributes, without negative consequences to their personal lives."  The order further notes that "the obtaining of pertinent information, which is essential to the performance of a wide variety of government functions, may in some cases be difficult or impossible if some expectation of confidentiality is not preserved, and preserving confidentiality in turn requires that governments

1    regulate the use of such information by their employees."

2        46.        The General Confidentiality Policy restricts when City officers and employees may

3    inquire about a person's immigration status. *Id.* § 3(a). Specifically, it provides that law

4    enforcement officers "shall not inquire about a person's immigration status unless investigating

5    illegal activity other than mere status as an undocumented alien." *Id.* § 4(a). The Policy also

6    prohibits law enforcement officers from inquiring "about the immigration status of crime victims,

7    witnesses, or others who call or approach the police seeking assistance." *Id.* § 4(c).

8        47.        In the event that officers and employees come into possession of confidential

9    information, the General Confidentiality Policy limits disclosure of such information to the

10   following situations: (1) disclosure has been authorized in writing by the individual to whom such

11   information pertains; (2) disclosure is required by law; (3) disclosure is to another City officer or

12   employee and is necessary to fulfill the purpose or achieve the mission of any City agency; (4) for

13   confidential information other than information related to immigration status, disclosure is to a

14   third party and is necessary to fulfill the purpose or achieve the mission of any City agency; and,

15   (5) for information relating to immigration status, (a) the individual to whom such information

16   pertains is suspected of engaging in illegal activity, (b) the information is necessary to apprehend

17   someone suspected of engaging in illegal activity, or (c) disclosure is necessary in furtherance of

18   an investigation of potential terrorist activity. *Id.* § 2. "Illegal activity" is defined as unlawful

19   activity, other than "mere status as an undocumented alien." *Id.* § 3(d).

20   **B.        Identifying Information Laws**

21       48.        In December 2017, the City augmented the New York City Charter and New York

22   City Administrative Code to further protect the vast scope of sensitive, personal information

23   collected by the City and the non-government agencies with which it contracts to provide human

24   services. *See* N.Y.C. Charter § 8(h); N.Y.C. Admin. Code §§ 23-1201 – 1205 (collectively, the

25   "Identifying Information Laws").

26       49.        The Identifying Information Laws, which became effective June 15, 2018, set out a

27   uniform, City-wide approach to the collection, disclosure, and retention of any information that

28

12

1  "may be used on its own or with other information to identify or locate an individual." N.Y.C.

2  Admin. Code § 23-1201. Such "identifying information" includes but is not limited to an

3  individual's "name, sexual orientation, gender identity, race, marital or partnership status, status as

4  a victim of domestic violence or sexual assault, status as a crime victim or witness, citizenship or

5  immigration status, eligibility for or receipt of public assistance or city services, all information

6  obtained from an individual's income tax records, information obtained from any surveillance

7  system operated by, for the benefit of, or at the direction of the police department, motor vehicle

8  information or license plate number, biometrics such as fingerprints and photographs, languages

9  spoken, religion, nationality, country of origin, place of birth, arrest record or criminal conviction,

10  employment status, employer information, current and previous home and work addresses, contact

11  information such as phone number and email address, information concerning social media

12  accounts, date and/or time of release from the custody of the administration for children's services,

13  the department of correction, or the police department, any scheduled court appearances, or any

14  scheduled appointments with any employee, contractor, or subcontractor." *Id.*

15       50.    Under the Identifying Information Laws, the City has designated a chief privacy

16  officer to issue policies and protocols and provide guidance to City agencies regarding the

17  collection, retention, and disclosure of identifying information. N.Y.C. Charter § 8(h); N.Y.C.

18  Admin. Code § 23-1203; *see also* Exec. Order 34 of 2018 (Apr. 12, 2018). Each City agency also

19  has its own agency-specific privacy officer, to oversee implementation as well as monitor and

20  approve routine and non-routine disclosures. *See* N.Y.C. Admin. Code §§ 23-1201 – 1202.

21  Unauthorized disclosures must be reported to the City's chief privacy officer and, in certain

22  circumstances, reasonable efforts must be made to notify the individual in writing of the

23  identifying information disclosed and to whom it was disclosed as soon as practicable. *Id.* § 23-

24  1202(c)(4).

25       51.    In general, City employees may not collect or disclose identifying information unless:

26  (1) there are exigent circumstances; (2) the agency-specific privacy officer approves in advance

27  certain routine collections or disclosures, or approves on a case-by-case basis certain collections or

28

COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF

disclosures; (3) the City's chief privacy officer determines in advance that a collection of such information is in the City's best interest; or (4) the individual to whom the identifying information pertains—or, where the individual lacks capacity, a parent or legal representative—provides written authorization. *Id.* §§ 23-1202(b)(1), 23-1202(b)(2)(b), 23-1202(c)(1), 23-1202(c)(2)(b).

52.     The Identifying Information Laws allow the NYPD to collect and disclose identifying information in connection with the investigation of a crime or an attempted or impending crime. Collection or disclosure is also permitted by City employees in connection with an investigation concerning the welfare of a minor or individual who is otherwise not legally competent. *Id.* §§ 23-1202(b)(2)(c), 23-1202(c)(2)(c).

**C.     Laws and Policies Regarding ICE Detainer and Notification Requests**

53.     Consistent with its Fourth Amendment obligations, the City has a policy of cooperating with "civil immigration detainers"—requests sent by ICE to maintain custody of a person beyond the time the person would otherwise be released, so that ICE can assume custody—for persons the City considers to be public safety risks and where those requests are accompanied by a judicial warrant establishing probable cause. *See Galarza v. Szalczyk*, 745 F.3d 634 (3rd Cir. 2014).

54.     Specifically, Local Laws 58 and 59 of 2014, as well as Local Law 226 of 2017 (the "City's detainer laws"), generally provide that the New York City Department of Correction ("DOC"), NYPD, and the New York City Department of Probation ("DOP") may detain an individual for additional time pursuant to an ICE request where the individual has been convicted of a violent or serious crime—one of approximately 170 felonies defined in New York State law, or their equivalents under federal law or the law of another state—or is identified as a possible match in the terrorist screening database. *See* N.Y.C. Admin. Code §§ 9-131(b)(2), 9-205(b)(2), 14-154(b)(2). Additionally, ICE must present a judicial warrant, issued by a federal district or magistrate judge, authorizing federal immigration authorities to take the person into custody. *See id.* §§ 9-131(b)(1), 9-205(b)(1), 14-154(b)(1).

55.     The City's detainer laws specify that "[n]othing … shall be construed to prohibit any

14

city agency from cooperating with federal immigration authorities when required under federal law." *Id.* §§ 9-131(d), 14-154(d); *see also* § 9-205(d) ("Nothing in this section shall be interpreted or applied so as to create any power, duty or obligation in conflict with any applicable law.").

56.    DOC and NYPD similarly cooperate with ICE's requests for notification of release information relating to persons the City considers to be public safety risks by providing ICE with the release date and time for any individual who has been convicted of a violent or serious crime or is identified as a possible match in the terrorist screening database. *See* N.Y.C. Admin. Code § 9-131(h)(1). Unlike the detainer requests, for which ICE must produce a judicial warrant, the agencies require an administrative warrant before cooperating with notification requests and transfers of custody to ICE without additional detention by the City.

57.    New York City's policies concerning ICE detainer requests and requests for notification prior to release of individuals in City custody are calibrated to advance public safety, foster community trust in local law enforcement, safeguard individuals' civil rights, and protect the City's finances.

**D.    Laws and Policies on Access to Jails**

58.    New York City's DOC manages 12 inmate facilities.  For the first three months of FY 2018, the average daily population was roughly 9,100 inmates.

59.    Since December 2009, DOC's policy has permitted ICE to interview an inmate where the inmate provides written consent.  DOC implements this policy by providing to the inmate a written notice and form stating that ICE would like to interview the inmate and that the inmate may either consent or decline to be interviewed.

60.    The purpose of DOC's consent-based policy is to ensure that inmates are made aware that they may decline to speak with federal immigration enforcement authorities, or request the presence of counsel at their own expense should they consent to such an interview.

61.    Under Local Law 246 of 2017, the City also limits access to non-public areas of City property, including DOC inmate facilities, to personnel of the City, the City's Department of Education, or a local public benefit corporation or local public authority, subject to enumerated

1   exceptions.  N.Y.C. Admin. Code § 4-210(b).  Other governmental personnel empowered to

2   enforce civil or criminal laws, including but not limited to federal immigration authorities, may

3   gain access to non-public areas of City property where: such personnel are authorized to have

4   access pursuant to an agreement or contract; such personnel present a judicial warrant; access is

5   otherwise required by law; such personnel are accessing the property as part of a cooperative

6   arrangement involving City, state, or federal agencies; access furthers the purpose or mission of a

7   City agency; or exigent circumstances exist.  *Id.*

8        **E.      Law on Use of City Resources for Immigration Enforcement**

9        62.     Local Law 228 of 2017 sets forth the circumstances under which the City may use its

10  own resources for federal immigration enforcement.  The law permits City resources to be used to

11  support federal immigration enforcement where City officers and employees are acting in

12  accordance with their duties under state and local law; for example, DOC and NYPD may take

13  actions consistent with the City's laws and policies related to detainer requests, and NYPD

14  officers may act in furtherance of public safety.  N.Y.C. Admin. Code § 10-178(c), (e).

15  Furthermore, nothing in the law "shall prevent any city officer or employee from complying with

16  federal law or restrict their discretion to take any action if such restriction is prohibited by federal

17  law."  *Id.* § 10-178(e).

18       63.     The law also forbids City agencies from entering into agreements under which local

19  officers are deputized by ICE to perform immigration enforcement, or otherwise subjecting City

20  employees to the supervision of DHS primarily in furtherance of immigration enforcement.  *Id.*

21  § 10-178(b).

22  **III.    NEW YORK CITY'S JAG APPLICATIONS**

23       64.     New York City's General Confidentiality Policy was in place years before the City

24  applied and qualified for its first JAG grant in 2005, and it continued to be City policy over the

25  next 11 years during which the City applied for and was awarded 11 subsequent JAG grants.

26  During this time, which extended over two presidential administrations, no one ever suggested that

27  the City's policies failed to comply with "applicable Federal laws," including Section 1373's

28

COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF

provision that a local government may not prohibit "any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status" of any individual.

65.     The cloud of uncertainty hanging over the City's policies did not emerge until July 7, 2016, when OJP first issued guidance asserting, without explanation or legal support, its determination that Section 1373 is an applicable federal law for purposes of the JAG Program. Two months later, on September 6, 2016, OJP notified New York City that its application for funding under the FY 2016 JAG program had been approved subject to "Special Condition 53," which stated that, as a recipient, New York City "agrees to undertake a review to validate its compliance with [Section] 1373" and submit a legal opinion supporting such validation by June 30, 2017.

66.     On October 6, 2016, OJP released a document entitled "Additional Guidance Regarding Compliance with 8 U.S.C. § 1373," which addressed the question: "Does OJP's guidance on 8 U.S.C. § 1373 impact FY 2016 funding?"  The response: "No FY 2016 or prior year [JAG Program] funding will be impacted."

67.     On April 21, 2017, DOJ sent letters to New York City and eight other jurisdictions with a reminder that "under the terms of your FY 2016 Byrne JAG grant … your jurisdiction is required to submit documentation to OJP that validates your jurisdiction is in compliance with 8 U.S.C. § 1373."  The letter instructed recipients to provide an "official legal opinion from counsel" by June 30, 2017, and warned that "[f]ailure to comply with this condition could result in the withholding of grant funds, suspension, or termination of the grant, ineligibility for future OJP grants or subgrants, or other action, as appropriate."

68.     New York City submitted a legal opinion signed by Corporation Counsel Zachary W. Carter to DOJ on June 27, 2017.  The City certified that its laws and policies comply with and operate within the constitutional bounds of Section 1373.

69.     Specifically, the City explained that its detainer laws are consistent with Section 1373, as Section 1373 does not speak to the issue of civil immigration detainer requests, local

1  compliance with which is voluntary.

2      70.    The City also explained that its General Confidentiality Policy complies with Section

3  1373 because that statute may not be read to abrogate a state or local confidentiality policy that is

4  general both as to information covered and disclosures regulated.  The City further explained that

5  to interpret Section 1373 otherwise would improperly undermine state and local governments'

6  control over their own employees in a manner that is impermissible under principles of federalism.

7  Moreover, the City noted that Section 1373's prohibition on states' and localities' adoption of

8  policies that restrict immigration-related communications between state and local officials and the

9  federal government violates the Tenth Amendment and the Constitution's federalist structure.

10      71.    In the June 27, 2017 legal opinion, the City reserved its right to challenge the Section

11  1373 condition.  The City notified DOJ of its position that Section 1373 is not an applicable

12  federal law for the purposes of the JAG Program, and that it had identified significant

13  constitutional limits on the application of this statute to its General Confidentiality Policy.

14      72.    Days after receiving certifications from jurisdictions including New York City, DOJ

15  issued a press release stating: "[S]ome of these jurisdictions have boldly asserted that they will not

16  comply with requests from federal immigration authorities," and "[i]t is not enough to assert

17  compliance, the jurisdictions must actually be in compliance."

18      73.    New York City filed a timely application for the FY 2017 JAG grant on September 5,

19  2017.  The City was not required to and did not certify compliance with the Section 1373, advance

20  notification, and jail access conditions.

21      74.    On October 11, 2017, DOJ formally responded to the City's legal opinion, stating that,

22  "based on a preliminary review, the Department has determined that your jurisdiction appears to

23  have laws, policies, or practices that violate 8 U.S.C. § 1373."  DOJ directed the City to change its

24  policies and to "certify that it has communicated this interpretation to its officers and employees."

25      75.    DOJ nevertheless asserted that it had yet to reach a "final" determination as to the

26  City's compliance or non-compliance with Section 1373.

27      76.    On October 27, 2017, New York City replied to DOJ's "preliminary" assessment of its

28

non-compliance with Section 1373 and reiterated its legal opinion that its laws, policies, and practices complied with Section 1373, as lawfully applied. The City also reasserted its position that DOJ's required certification with respect to Section 1373 is unlawful.

77.     Most recently, on January 24, 2018, DOJ sent the City a letter reiterating that it "remains concerned that your jurisdiction's laws, policies, or practices may violate 1373" and requesting, under threat of subpoena, "[a]ll documents reflecting any orders, directives, instructions, or guidance to your law enforcement employees … regarding whether and how these employees may, or may not, communicate with the Department of Justice, the Department of Homeland Security, and/or Immigration and Customs Enforcement, or their agents, whether directly or indirectly." This letter further warned that, should DOJ determine that the City is out of compliance with Section 1373, it might claw back FY 2016 grant funds (contrary to prior representations), require additional conditions for receipt of any FY 2017 funding, and/or deem the City ineligible for FY 2017 JAG funds.

78.     The City sent DOJ a timely submission with responsive materials on February 23, 2018.

79.     Since then, the City has received no further communications from DOJ with respect to its JAG funding or its compliance with Section 1373—even though DOJ has processed and distributed FY 2017 JAG funds to a list of state and local awardees.

## IV.     EFFECT OF THE NEW, UNLAWFUL JAG CONDITIONS ON NEW YORK CITY

80.     All three of DOJ's newly-imposed conditions on the JAG Program are unlawful. None of these conditions fits within the authority Congress delegated to the Attorney General to administer and oversee the program and funding provided to grantees, or expressly applies to grantees under the JAG authorizing statute. Moreover, Congress has repeatedly considered and failed to enact bills that would have conditioned federal grants on compliance with Section 1373.

81.     The new conditions are not only unauthorized, but unprecedented. DOJ has never attached any conditions of this nature to JAG funds, consistent with the formula grant structure under the statute.

COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF

82.     DOJ's actions violate the Separation of Powers by usurping authority reserved to Congress.  They also exceed limits on the federal government's ability to place conditions on federal funds under the Spending Clause, as Congress did not impose these conditions.  Moreover, the conditions, which relate to civil immigration enforcement, do not reasonably relate to the criminal justice purpose of the JAG Program.

83.     Further, the Section 1373 condition violates the anti-commandeering principle by seeking to unequivocally dictate what the City may and may not do.  Under the Tenth Amendment, the federal government does not have the power to issue orders directly to the states, nor can it conscript state officers or those of their political subdivisions.

84.     The Section 1373 condition effectively strips New York City of its authority to control its workforce by insisting that the City allow its employees to, at their own discretion, share residents' personal information with federal immigration authorities.

85.     The Section 1373 condition also purports to force New York City to substantially alter laws and policies the City has enacted for the benefit of its residents based on the City's priorities.  Moreover, complying with these conditions would jeopardize historic improvements in public safety, health, and welfare.

86.     In cities where immigrant communities believe that local authorities operate in concert with federal immigration enforcement, residents have retreated into the shadows, to the detriment of their own safety and that of the public.  Crime reporting in many immigrant communities dropped precipitously in the wake of the current administration's sweeping executive order instructing law enforcement agencies to target more immigrants for deportation, encouraging state and local government participation in federal immigration enforcement, and unilaterally withdrawing all federal funding from whatever jurisdictions the Attorney General deemed "sanctuary jurisdictions," Exec. Order No. 13,768, 82 Fed. Reg. 8799 (Jan. 25, 2017) (that order has already been found unconstitutional as an unprecedented attempt to coerce local governments into serving as federal immigration agents, *Cnty. of Santa Clara v. Trump*, 275 F. Supp. 3d 1196 (N.D. Cal. 2017)).

COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF

87.     By contrast, New York City has seen no decline in crime reporting associated with ZIP codes with the highest foreign-born and non-citizen populations.  This encouraging trend extends to crimes like harassment and rape, where a greater chilling effect would be expected if residents were afraid to contact the police because of immigration concerns.  Crimes continue to be reported—and, therefore, dangerous criminals continue to be arrested and prosecuted.  Similarly, New York City's system of public clinics and hospitals found no chilling effect in utilization, including for hospitals in the neighborhoods with the largest foreign-born and non-citizen populations, and there was no decrease in New York City school attendance, including when controlling for neighborhood.

88.     New York City officials attribute these successes to the City's policies protecting confidential information and to the City's ability to demonstrate its independence from federal immigration authorities.  While the City cooperates with ICE and other federal agencies, immigrant communities clearly understand that the City does so in accordance with its own policies.  That understanding is the basis for the trust built up over decades between immigrant communities and City agencies.

89.     The Attorney General's imposition of the new conditions would destroy that trust by forcing City officials to act as instruments of federal immigration efforts in order to receive the critical public safety funding to which the City is already entitled.  Unlike now, immigrant communities would blame local officials for federal policy choices.

90.     If the City's application for the FY 2017 JAG award is rejected or withheld, or if awards from earlier years are clawed back, based on a finding of non-compliance by DOJ, the City faces a significant risk of harm to its criminal justice programming and longstanding approach to protecting public safety.

COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**Violation of the Administrative Procedure Act Through *Ultra Vires* Conduct**

91.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

92.     As an agency pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1), DOJ may only exercise authority conferred by statute. *See, e.g., City of Arlington v. FCC*, 569 U.S. 290, 297-98 (2013).

93.     The JAG statute provides no authority to the Attorney General to impose conditions on the receipt of JAG funds that are neither reflected in "applicable Federal laws" nor concern the administration of the JAG program itself. No other statute provides the Attorney General with this authority.

94.     The three conditions added to the FY 2017 JAG grant by Defendants are neither "applicable Federal laws" nor conditions that deal with the administration and expenditure of JAG funds.

95.     Defendants' imposition of the new conditions is unauthorized by statute.

96.     Defendants' imposition of the new conditions also contradicts the JAG Program's formula grant structure. *See* 34 U.S.C. § 10156(d)(2)(A).

97.     Under the APA, agency action is unlawful and must be set aside where it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

98.     The APA also calls upon courts to "compel agency action [that is] unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

99.     Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that Defendants are without the statutory authority to impose the Section 1373, advance notification, and jail access conditions, as applicable, on FY 2016 and FY 2017 JAG funds, and in

COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF

1   doing so, has acted contrary to law under the APA.  Plaintiff is also entitled to a permanent

2   injunction preventing Defendants from putting those conditions into effect.

3       100.     Pursuant to 28 U.S.C. § 1361 and 5 U.S.C. § 706(1), Plaintiff is further entitled to a

4   writ of mandamus to compel Defendants to disburse New York City's FY 2017 JAG award as the

5   agency is unreasonably delaying its issuance and doing so for reasons that are contrary to law.

6   **SECOND CAUSE OF ACTION**

7   **Violation of the Administrative Procedure Act by Infringement on Separation of Powers**

8       101.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

9       102.     Article I of the Constitution vests Congress with the power to appropriate funding to

10  "provide for the … general Welfare of the United States." U.S. Const. art I, § 8, cl. 1.  Congress

11  must set forth the conditions of funding for states and local governments explicitly and

12  unambiguously.

13      103.     An Executive Branch agency may exercise only the authority conferred upon it by

14  Congress.  Thus, absent a clear Congressional directive, the Executive cannot redirect or impose

15  additional conditions on funds that have been appropriated by Congress for a particular purpose.

16      104.     The JAG statute does not condition participation in the program on compliance with

17  Section 1373, the advance notification, and jail access conditions, or civil immigration

18  enforcement more generally. *See* 34 U.S.C. § 10151 *et seq.*  Additionally, there is nothing in

19  either the text or legislative history of Section 1373 that conditions federal funding on compliance

20  with Section 1373.

21      105.     Defendants' imposition of new funding conditions that Congress did not explicitly and

22  unambiguously enact or authorize impermissibly arrogates to the Executive Branch power that is

23  reserved to Congress.

24      106.     As the imposition of these three conditions amounts to an improper usurpation of

25  Congress's Spending Power by the Executive Branch, Plaintiff is entitled to a declaration that

26  Defendants are without the statutory authority to impose the Section 1373, advance notification,

27  and jail access conditions, as applicable, on FY 2016 and 2017 JAG funds, and in doing so, has

28

COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF

1    acted contrary to law under the APA.  *See* 28 U.S.C. § 2201.  Plaintiff is also entitled to a

2    permanent injunction preventing Defendants from putting those conditions into effect.

3        107.    Pursuant to 28 U.S.C. § 1361 and 5 U.S.C. § 706(1), Plaintiff is further entitled to a

4    writ of mandamus to compel Defendants to disburse New York City's FY 2017 JAG award as the

5    agency is unreasonably delaying its issuance and doing so for reasons that are contrary to law.

6                            **THIRD CAUSE OF ACTION**

7    **Violation of the Administrative Procedure Act Through Arbitrary and Capricious Agency
     Action**

8        108.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

9        109.    Even if Defendants had a statutory basis to impose the three new conditions, which

10   they do not, Defendants' decision to impose the conditions on recipients of JAG funds was

11   arbitrary and capricious.

12       110.    First, DOJ deviated from its prior practice of imposing only limited programmatic and

13   grant-related conditions on JAG funds, as opposed to immigration enforcement mandates, without

14   reasoned explanation or justification.  Since the enactment of Section 1373 in 1996, neither DOJ

15   nor any other agency has made compliance with the statute a requirement of receiving a federal

16   grant.  Moreover, until 2016 and 2017, DOJ has never made Section 1373, jail access, or advance

17   notification a condition for receiving JAG funds, or remotely indicated that it viewed those types

18   of conditions as related to the purpose of JAG funding.

19       111.    Second, the new conditions bear no relation to the administration or goals of the JAG

20   Program.  The purpose of the JAG Program is to provide funding to state and local governments

21   for: local law enforcement initiatives; prosecution and court programs; prevention and education

22   programs; corrections and community corrections programs; drug treatment and enforcement;

23   mental health programs; crime victim and witness initiatives; and planning, evaluation, and

24   technology improvement programs.  34 U.S.C. § 10152.  None of the three conditions has a

25   reasonable relationship to the program areas that the JAG Program supports.

26       112.    Third, to the extent DOJ justifies the three new conditions as promoting public safety,

27   there is a glaring disconnect between DOJ's stated reasons for imposing the three new conditions

28

COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF

1    and the actual effects of the conditions.  Far from promoting public safety, compliance with the

2    conditions would deter City residents from interacting with local law enforcement and harm the

3    City's efforts to reduce crime.

4         113.    Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that Defendants'

5    imposition of the three conditions is arbitrary and capricious. Plaintiff is also entitled to a

6    permanent injunction preventing Defendants from implementing these conditions.

7         114.    Pursuant to 28 U.S.C. § 1361 and 5 U.S.C. § 706(1), Plaintiff is further entitled to a

8    writ of mandamus to compel Defendants to disburse New York City's FY 2017 JAG award as the

9    agency is unreasonably delaying its issuance and doing so for reasons that are contrary to law.

10   **FOURTH CAUSE OF ACTION**

11   **Violation of the Spending Clause**

12        115.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

13        116.    In order to satisfy the requirements of the Spending Clause under the Constitution, the

14   conditions for receipt must be stated clearly and the funding condition must be reasonably related

15   to the federal interest in the project or program that the federal government is funding.

16        117.    Even if Congress had clearly conditioned receipt of JAG Program funds on the three

17   new conditions, which it did not, all three of Defendants' conditions violate the Spending Clause

18   because they are not reasonably related to the federal interest in the JAG Program.

19        118.    The three new conditions relate to civil immigration enforcement, and therefore do not

20   reasonably relate to the criminal justice purpose of the JAG Program, which is intended to provide

21   funding to states and localities for local law enforcement initiatives.

22        119.    Under 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that Defendants'

23   imposition of the three immigration-related conditions for the FY 2017 JAG Program, including

24   the condition requiring compliance with Section 1373 that was first imposed in relation to the FY

25   2016 JAG Program, violates the Constitution's Spending Clause.  Plaintiff is further entitled to an

26   injunction preventing these conditions from going into effect.

27

28

COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF

120.     Under 28 U.S.C. § 1361 and 5 U.S.C. § 706(1), Plaintiff is further entitled to a writ of mandamus to compel Defendants to disburse New York City's FY 2017 JAG award as the agency is unreasonably delaying its issuance and doing so for reasons that are contrary to law.

### FIFTH CAUSE OF ACTION

### Violation of the Tenth Amendment and Constitutional Principles of Federalism

121.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

122.     The Section 1373 condition violates the Tenth Amendment by requiring City personnel to perform federal functions and compelling changes to the City's policies and laws. The Tenth Amendment prohibits the federal government from requiring states and localities to govern according to Congress's instructions and from commanding local officers to administer or enforce a federal regulatory program.  This anti-commandeering principle applies to situations in which Congress compels a State to enact, or prohibits a State from enacting, legislation. *Murphy v. NCAA*, 138 S. Ct. 1461, 1478 (2018).  A balance between the powers of the federal government and the states is grounded in the structure of the Constitution.

123.     Defendants' interpretation of Section 1373 blocks the City from enacting a policy that controls the time, manner, and instances in which its employees exchange immigration status information with federal officials.  The City's effective local strategies to protect public safety and public health would be subordinated to the federal government's immigration efforts, and local officers and employees would be free to turn their time and attention to the latter.  As a result, the City's personnel would be commandeered to perform federal functions rather than to pursue local priorities.  This is precisely the sort of prohibition on state and local policymaking that is forbidden under the Tenth Amendment.

124.     Moreover, as read by DOJ, Section 1373 would impose upon the City significant fiscal and political burdens: immigrant communities would come to distrust and disengage from local government because of choices made by the federal government, blaming the former for the policies of the latter and blurring lines of political accountability between federal and local authorities.

COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF

125.     Further, the Section 1373 condition is unconstitutional as its primary objective is to direct the functioning of state and local governments.  Section 1373 directly governs the actions of a "[s]tate, or local government entity or official" and prohibits them from enacting certain rules or policies and from controlling their own work force.  Such interference poses a direct affront to state sovereignty under the Tenth Amendment.  Thus, Section 1373 is unconstitutional.

126.     Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that Section 1373 violates the Tenth Amendment.  Plaintiff is entitled to a permanent injunction preventing Defendants from imposing the Section 1373 condition or otherwise enforcing Section 1373 against the City.

127.     Pursuant to 28 U.S.C. § 1361 and 5 U.S.C. § 706(1), Plaintiff is further entitled to a writ of mandamus to compel Defendants to disburse New York City's FY 2017 JAG award as the agency is unreasonably delaying its issuance and doing so for reasons that are contrary to law.[1]

## SIXTH CAUSE OF ACTION

### Declaratory Judgment that New York City Complies with 8 U.S.C. § 1373

128.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

129.     To the extent that Section 1373 can constitutionally be applied to New York City, if at all, New York City's laws and policies comply with and operate within the proper constitutional bounds of Section 1373.

130.     The City's laws and policies broadly restrict the collection of sensitive, personal information by City officers and employees and protect such information from unauthorized disclosure.  Protected information is defined broadly to include an individual's sexual orientation,

---

[1] The Second Circuit rejected a prior Tenth Amendment challenge to Section 1373 involving different policies of the City. *See City of New York v. United States*, 179 F.3d 29, 36 (2d Cir. 1999).  That decision explicitly left open whether Section 1373 would be constitutional as applied to "generalized confidentiality policies that are necessary to the performance of legitimate municipal functions," 179 F.3d at 37, such as the New York City laws and policies at issue now. Moreover, the Supreme Court's intervening ruling in *Murphy* has undermined the core reasoning of *City of New York* by making clear that a federal law may run afoul of the anti-commandeering principle even if it does not affirmatively compel state or local action.

1    status as a victim of domestic violence, status as a victim of sexual assault, status as a crime

2    witness, receipt of public assistance, and immigration status, to name only a few.  These laws and

3    policies are designed to assure residents that their information will be protected, unless disclosure

4    is authorized, and are deeply embedded in the City's regular business practices and day-to-day

5    operations.

6        131.    The City's generalized laws and policies not only are necessary to the performance of

7    its legitimate municipal functions, but also do not contravene Section 1373 as they are not

8    designed to bar disclosures to federal immigration authorities, but to third parties generally.

9        132.    Moreover, the City's laws and policies authorize local law enforcement to cooperate

10   with federal authorities in situations that the City determines legitimately implicate public safety,

11   such as exigent circumstances or where an individual has been convicted of a violent or serious

12   crime or is identified as a possible match in a terrorist screening database.

13       133.    The City's overarching posture of non-disclosure with respect to sensitive, personal

14   information, especially where that information pertains to residents seeking City services to which

15   they are entitled, is consistent with Section 1373, to the extent DOJ can apply Section 1373 to

16   JAG funds—notwithstanding that it lacks a statutory basis, its imposition was arbitrary and

17   capricious, and the condition violates the Separation of Powers, Spending Clause, and the Tenth

18   Amendment.

19       134.    Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that Section 1373 is

20   unconstitutional, or, in the alternative, that the City complies with Section 1373.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court enter judgment as follows:

a.   Declare that all three conditions imposed, as applicable, upon the FY 2016 and FY 2017 JAG Program are unlawful;

b.   Declare that 8 U.S.C. § 1373 is unconstitutional;

c.   Declare that New York City complies with 8 U.S.C. § 1373, as that statute is properly read in light of the Constitution;

d.   Permanently enjoin Defendants from imposing compliance with 8 U.S.C. § 1373, as well as the advance notification and jail access conditions, upon recipients of JAG funds;

e.   Issue a writ of mandamus compelling Defendants to immediately disburse New York City's FY 2017 JAG award, without further delay; and

f.   Award such other relief as this Court may deem just and proper.

COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF

1

Dated:  July 18, 2018

2

Respectfully submitted,

ZACHARY W. CARTER
Corporation Counsel of the City of New York
100 Church Street
New York, NY 10007
Tel: (212) 356-2296

3

4

5

6

By: _____

7

Tonya Jenerette
Sabita Krishnan
Doris Bernhardt

8

Of Counsel
Noah Kazis

9

10

11

DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
Tel: (212) 909-6889

12

13

14

15

By: _____/s/_____

16

Matthew E. Fishbein
Meryl Holt

Of Counsel
Dana Rehnquist

17

18

Attorneys for Plaintiff The City of New York

19

20

21

22

23

24

25

26

27

28

30

COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF