# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

STATES OF NEW YORK,
CONNECTICUT, NEW JERSEY,
RHODE ISLAND and WASHINGTON,
and COMMONWEALTHS OF
MASSACHUSETTS and VIRGINIA,

    Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
JUSTICE; and JEFFERSON B.
SESSIONS III, in his official capacity as
Attorney General of the United States,

    Defendants.

No. 18-cv-6471 (ER)

---

CITY OF NEW YORK

    Plaintiff,

    v.

JEFFERSON B. SESSIONS III, in his
official capacity as Attorney General of
the United States of America, and the
UNITED STATES DEPARTMENT OF
JUSTICE,

    Defendants.

No. 18-cv-6474 (ER)

## STATE AND CITY PLAINTIFFS' LOCAL RULE 56.1
## STATEMENT OF UNDISPUTED MATERIAL FACTS

    Pursuant to Local Rule 56.1 of the U.S. District Courts for the Southern and Eastern

Districts of New York, the Plaintiff States of New York, Connecticut, New Jersey, Rhode Island

and Washington, and the Plaintiff Commonwealths of Massachusetts and Virginia ("State Plaintiffs") and Plaintiff the City of New York ("City Plaintiff") submit the following statement of undisputed material facts.

## I.   PARTIES AND CLAIMS FOR RELIEF

1.    Plaintiff the State of New York, represented by and through its Attorney General, Barbara D. Underwood, is a sovereign State in the United States of America. The Attorney General is New York State's chief law enforcement officer, and is authorized to pursue this action pursuant to N.Y. Executive Law § 63. The New York State Division of Criminal Justice Services ("NYS DCJS") is the state agency responsible for applying for, obtaining, and disbursing funds to the State of New York and its subgrantees under the Byrne JAG program. (Green Decl. at ¶ 4.)

2.    Plaintiff the State of Connecticut, represented by and through its Attorney General, George Jepsen, is a sovereign State in the United States of America. The Connecticut Office of Policy Management ("CT OPM") serves as the liaison between Connecticut and the federal government on issues relating to criminal justice. (Lawlor Decl. at ¶ 2.)

3.    Plaintiff the Commonwealth of Massachusetts is a sovereign State in the United States of America. Massachusetts is represented by Attorney General Maura Healey, who is the chief law enforcement officer of Massachusetts. The Massachusetts Executive Office of Public Safety and Security ("EOPSS") is the state agency responsible for applying for, obtaining, and disbursing funds to subgrantees under the Byrne JAG program. (Bennett Decl. at ¶ 2.)

4.    Plaintiff the State of New Jersey, represented by and through its Attorney General, Gurbir S. Grewal, is a sovereign State in the United States of America. As the State's Attorney General, Grewal is the head of the New Jersey Department of Law and Public Safety, N.J. Stat. Ann. § 52:17B-2. The mission of the Department of Law and Public Safety ("NJ LPS") is to protect

the safety, security, and quality of life of the people of New Jersey through an integrated and coordinated structure of law enforcement and regulatory agencies. The Department of Law and Public Safety is also the agency responsible for applying for, obtaining, and disbursing funds to subgrantees under Byrne JAG. (Fradel Decl. ¶¶ 2-5.)

5.      Plaintiff the State of Rhode Island, represented by and through its Attorney General, Peter F. Kilmartin, is a sovereign State in the United States of America. Rhode Island's Public Safety Grant Administration Office is responsible for overseeing the planning, policy implementation, and direction of grants that support public safety programs throughout the State. (Hogan Decl. ¶ 2.)

6.      Plaintiff the Commonwealth of Virginia, represented by and through its Attorney General, Mark Herring, is a sovereign State in the United States of America. Virginia's Department of Criminal Justice Services ("VA DCJS") is the Commonwealth's entity responsible for applying for, receiving, and disbursing funds from the Byrne JAG program. (Dion Decl. at ¶ 3.)

7.      Plaintiff the State of Washington, represented by and through its Attorney General, Robert W. Ferguson, is a sovereign State in the United States of America. The Washington State Attorney General is the chief legal advisor to the State. The Attorney General's powers and duties include acting in federal court on matters of public concern. The Washington State Department of Commerce ("WA DC") is responsible for applying for, receiving, and disbursing Washington's Byrne JAG allocation. (Klontz Decl. at ¶ 2-4.)

8.      Plaintiff the City of New York, represented by and through its Corporation Counsel, Zachary W. Carter, is a municipal corporation organized pursuant to the laws of the State of New York. The City is a political subdivision of the State and derives its powers through the New York State Constitution, New York State laws, and the New York City Charter.  Cho Decl. ¶¶ 2-4. The

New York City Mayor's Office of Criminal Justice ("MOCJ") is responsible for managing and overseeing the City's participation in 26 State and federal grant programs, including the JAG program. MOCJ is the City entity that applies for and receives the Byrne JAG program's formula grant funds allocated to New York City. (Soler Decl. ¶ 3.)

9.      Defendant United States Department of Justice ("DOJ") is an agency of the United States government and is responsible for implementing the Byrne JAG program.

10.     Defendant Jefferson Beauregard Sessions III is the Attorney General of the United States and is the federal official in charge of the U.S. Department of Justice. The Attorney General is sued in his official capacity.

11.     Plaintiffs claim that Defendants Sessions and DOJ violated the United States Constitution, the Administrative Procedure Act, and other federal statutes. (State Plaintiffs' Am. Compl.; City Plaintiff's Am. Compl.)

12.     Plaintiffs seek mandamus relief, pursuant to 28 U.S.C. § 1361, as well as relief pursuant to the Administrative Procedure Act, 5 U.S.C. § 706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. (State Plaintiffs' Am. Compl. 42, ¶¶ 7, 116-173; City Plaintiff's Am. Compl. ¶¶ 14, 111-135, 142-148.)

## II.     THE BYRNE JAG PROGRAM AND DOJ'S FISCAL YEAR ("FY") 2017 IMMIGRATION-RELATED BYRNE JAG CONDITIONS

13.     The Byrne JAG program is the "primary provider of federal criminal justice funding to States and units of local government." (Trasande/Holt Decl. Ex. 17 at AR-00998.) Congress named the JAG Program after Edward Byrne, a New York City police officer killed while protecting an immigrant who was acting as a cooperating witness. (Soler Decl. ¶ 4.)

14.     States may use Byrne JAG funds for broad purposes related to criminal justice and State and local law enforcement, including:

> a.   law enforcement programs;
> b.   prosecution and court programs;
> c.   prevention and education programs;
> d.   corrections and community corrections programs;
> e.   drug treatment and enforcement programs;
> f.   planning, evaluation, and technology improvement programs;
> g.   crime victim and witness programs (other than compensation); and
> h.   mental health programs and related law enforcement and corrections programs, including behavioral programs and crisis intervention teams.

(Trasande/Holt Decl., Ex. 17 at AR-00998.)

15.     Byrne JAG awards are set by a statutory formula based on a State's population and crime rate, and a State is required to pass through a portion of its Byrne JAG funding to localities. (Trasande/Holt Decl. Ex. 17 at AR-01006.) Local governments are awarded a portion of their State's allocation based upon the ratio of violent crime in the locality versus that of the State as a whole. (*Id.*)

## A.  The Immigration–Related Conditions

16.     On July 25, 2017, DOJ announced that all Byrne JAG recipients, including Plaintiffs, must comply with two new conditions, along with another mandatory certification of compliance with Section 1373, in order to receive any Byrne JAG funds in FY 2017. (Trasande/Holt Decl. Ex. 17 at AR-00992). In DOJ's press release announcing the new immigration-related conditions, Attorney General Sessions targeted "[s]o-called 'sanctuary' policies" which, he claimed, "make all of us less safe because they intentionally undermine our laws and protect illegal aliens who have committed crimes." (*Id.*)

17.     Attorney General Sessions further justified the changes to the Byrne JAG program by stating that:

5

> From now on, the Department will only provide Byrne JAG grants to cities and states that comply with federal law, allow federal immigration access to detention facilities, and provide 48 hours notice before they release an illegal alien wanted by federal authorities. This is consistent with long-established cooperative principles among law enforcement agencies.

(*Id.*)

18.     DOJ did not release any report, study, or analysis explaining its July 25, 2017 announcement, but instead issued a one-page "Backgrounder on Grant Requirements" document. (Trasande/Holt Decl. Ex. 17 at AR-00993.)

19.     The Backgrounder stated that DOJ would require Byrne JAG recipients to:

    i.    "certify compliance with section 1373 [8 U.S.C. § 1373]" ("the Section 1373 condition")

    ii.   "permit personnel of the U.S. Department of Homeland Security…to access any detention facility in order to meet with an alien and inquire as to his or her right to be or remain in the United States" ("the access condition"); and

    iii.  "provide at least 48 hours advance notice to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien" ("the notice condition"). (*Id.*)

20.     The Backgrounder stated that the new immigration-related conditions would "improve the flow of information" between the federal government and States and localities. (Trasande/Holt Decl. Ex. 17 at AR-00993.) The Backgrounder also stated that the new conditions would "prevent the counterproductive use of federal funds for policies that frustrate federal immigration enforcement," adding that, "by refusing to communicate with the federal officials,

these jurisdictions jeopardize the safety of their residents and undermine the Department's ability to protect the public and reduce crime and violence." (*Id.*)

21.     On July 25, 2017, DOJ released the State solicitation for applications for the Byrne JAG program, (Trasande/Holt Decl. Ex. 17 at AR-00994-01037); DOJ released the local solicitation on August 3, 2017, (Trasande/Holt Decl. Ex. 33.) The FY 2017 Byrne JAG State solicitation contained the notice, access, and Section 1373 conditions. (Trasande/Holt Decl. Ex. 17 at AR-00994-01037.) The FY 2017 Byrne JAG State solicitation listed the so-called "access" and "notice" conditions as "two new express conditions" on Byrne JAG funding. (Trasande/Holt Decl. Ex. 17 at AR-001025.) The local solicitation contained the same features. (Trasande/Holt Decl. Ex. 33 at 30.)

22.     DOJ did not identify State or local information sharing with, or participation in, federal civil immigration enforcement as a goal, objective, or deliverable for the FY 2017 Byrne JAG program in its State solicitation for applications. (Trasande/Holt Decl. Ex. 17 at AR-01004) (stating in the FY 2017 State Solicitation section entitled "Goals, Objectives, and Deliverables" that "[i]n general, the FY 2017 JAG State program is designed to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice" and adding that "through pass-through (and similar) requirements, the JAG State program also is designed to assist units of local government with respect to criminal justice".)

23.     On August 23, 2017, DOJ further expanded the advance notification condition and the jail access condition. Under the revised advance notification condition, Byrne JAG grantees must have in place a "local ordinance, -rule, -regulation, -policy, or -practice … that is designed to ensure that, when a local-government … correctional facility receives from DHS a formal written request … [for] advance notice of the scheduled release date and time for a particular alien

7

in such facility, then such facility will honor such request and—as early as practicable … provide the requested notice to DHS." DOJ did not define or clarify the term "scheduled release date." (Soler Decl. ¶ 11.)

24.     Under the revised jail access condition, DOJ now requires Byrne JAG grantees to have in place a "local ordinance, -rule, -regulation, -policy, or -practice … that is designed to ensure that [any, not just DHS] agents of the United States … are given access [to] a local-government … correctional facility" to meet with and question individuals believed to be aliens. (Soler Decl. ¶ 12.)

25.     Neither the July 25, 2017 announcement nor the August 2017 revision included an explanation for the new conditions on Byrne JAG Program grants and DOJ did not explain how the conditions would operate in practice. (Soler Decl. ¶ 13; Trasande/Holt Decl. Ex. 17 at AR-00992-00993.)

**B.  State Plaintiffs' Byrne JAG Awards**

26.     On June 26, 2018, DOJ issued award letters to State Plaintiffs for over $25 million in FY 2017 Byrne JAG funding, allocated as follows:

     a.  $8,879,161 for the State of New York (Green Decl. ¶ 15);

     b.  $1,711,049 for the State of Connecticut (Lawlor Decl. ¶ 9);

     c.  $4,047,274 for the State of New Jersey (Fradel Decl. ¶ 12);

     d.  $767,114 for the State of Rhode Island  (Hogan Decl. ¶  7);

     e.  $3,277,891 for the State of Washington (Klontz Decl. ¶ 2);

     f.  $3,453,006 for the Commonwealth of Massachusetts (Bennett Decl. ¶ 11);

     g.  $3,353,534 for the Commonwealth of Virginia (Dion Decl. ¶ 23).

27.     On August 1, 2018, New York, Connecticut, Massachusetts, New Jersey, Virginia, and Washington agreed to a stipulation with Defendants that requires that for the duration of the stipulation, Defendants "shall not disburse, expend, or revert to the Treasury" the FY 2017 Byrne JAG funds allocated to the State Plaintiffs. (*See* Stipulation, 18-cv-06471 (ECF 29) ("State Plaintiffs Stipulation").) On August 2, 2018, that stipulation was so ordered by the Court. *Id*. On August 9, 2018, the State of Rhode Island entered into a stipulation with the Defendants that requires that for the duration of the stipulation, the Defendants "shall not disburse, expend, or revert to the Treasury" the FY 2017 Byrne JAG funds allocated to Rhode Island. (*See* Stipulation, 18-cv-06471 (ECF 41) ("Rhode Island Stipulation").)

28.     The FY 2017 State solicitation stated that DOJ's Office of Justice Programs (OJP) expected to "issue award notifications by September 30, 2017." (Trasande/Holt Decl. Ex. 17 at AR-01024.)

29.     The State Plaintiffs' award letters for FY 2017 were not issued until June 26, 2018. (*See* Trasande/Holt Decl. Exs. 1-7; ECF 32-1 through 32-7.)

30.     Pursuant to the award letters, a State must accept the notice, access, and Section 1373 certification requirements as special conditions prior to receiving or drawing-down on its FY 2017 Byrne JAG allocation. (*Id*.)

31.     The Section 1373 conditions on FY 2017 Byrne JAG funding require States to:

- Comply with Section 1373 throughout the duration of the award;

- Diligently monitor the compliance of all subgrantees with Section 1373; and

- Notify DOJ in writing if the State becomes aware of "credible evidence" that any subgrantee has violated Section 1373.

    (*See, e.g.*, New York State Award Letter at ¶¶ 52-54 (Trasande/Holt Decl. Ex. 1).)

32.     In particular, New York State's Byrne JAG award letter from DOJ for FY 2017 states:

> With respect to the "program or activity" funded in whole or part under this award (including any such "program or activity" of any subrecipient at any tier), throughout the period of performance for the award, no State or local government entity, -agency, or – official may prohibit or in any way restrict—(1) any government entity or-official from sending or receiving information regarding citizenship or immigration status as described in [Section 1373(a)]; or (2) a government entity or –agency from sending, requesting or receiving, maintaining, or exchanging information regarding immigration status as described in [Section 1373(b)].

The same paragraph adds:

> The recipient may not make a subaward to a State or local government or a "public" institution of higher education, unless it first obtains a certification of compliance with 8. U.S.C. 1373, properly executed by the chief legal officer of the jurisdiction or institution that would receive the subaward, using the appropriate form …. Similarly, the recipient must require that no subrecipient (at any tier) may make a further subaward to a State or local government or a "public" institution of higher education, unless it first obtains a certification of compliance with 8 U.S.C. 1373, properly executed by the chief legal officer of the jurisdiction or institution that would receive the further subaward, using the appropriate OJP [DOJ Office of Justice Programs] form.

(*Id*. at ¶ 53(1-2); *see also* State Plaintiffs' Award Letters (Trasande/Holt Decl. Exs. 2-7).)

33.     DOJ also requires three certifications from the States. The first, which must be executed by the Chief Executive, or Governor, attests to the State's compliance with Section 1373 and all of the other grant conditions. (Trasande/Holt Decl. Ex. 17 at AR-01031.) The second, which must be executed by the State's Chief Legal Officer, or Attorney General, certifies the State's compliance with Section 1373. (Trasande/Holt Decl. Ex. 17 at AR-01033.) The third certification requires the State employee who signs the grant award to certify the State's compliance with all grant conditions. (*See, e.g.*, New York State Award Letter at ¶ 1 (Trasande/Holt Decl. Ex. 1).)

34.     The Governor and Chief Legal Officer certifications, as they appeared in the Administrative Record, carried the risk of personal criminal prosecution, civil penalties, and

administrative remedies. (Trasande/Holt Decl. Ex. 17 at AR-01031 (2017 Governor Certification); AR-01033 (2017 Attorney General Certification).)

35.     On August 10, 2018, OJP sent an email to Byrne JAG applicants for FY 2017 notifying them of a change to the required Governor and Attorney General certifications. (Trasande/Holt Decl. Ex. 34.)

36.     OJP removed a paragraph in the new Governor certification that mentioned the potential risks of personal criminal prosecution, civil penalties, and administrative remedies for materially false, fictitious, or fraudulent statements. (*Compare* August 2018 CEO Certification (Trasande/Holt Decl. Ex. 34 at Ex. B) *with* 2017 Governor Certification (Trasande/Holt Decl. Ex. 17 at AR-01031).) OJP also changed the new Governor certification to require a Governor of an applicant State to "make the certification required by [34 U.S.C. §] 10153(a)(5), as to each of the items certified therein. (Trasande/Holt Decl. Ex. 34 at Ex. B.) That law requires a Governor to certify for Byrne JAG applications that, among other things, all of the information in the application is correct and that the applicant will comply with "all other applicable Federal Laws." (34 U.S.C. § 10153(a)(5).) Finally, OJP changed the Governor's representations regarding the Chief Legal Officer certification. (*Compare* 2017 Governor Certification (Trasande/Holt Decl. Ex. 17 at AR-01031) (stating "I hereby adopt [the Chief Legal Officer's Section 1373] certification as my own…) *with* August 2018 Governor Certification (Trasande/Holt Decl. Ex. 34 at Ex. B) (stating "I certify that I have no reason to believe that certification to be false or otherwise incorrect").)

37.     OJP also removed a paragraph in the new Attorney General certification that mentioned the potential risks of personal criminal prosecution, civil penalties, and administrative remedies for materially false, fictitious, or fraudulent statements. (*Compare* August 2018 Attorney

11

General Certification (Trasande/Holt Decl. Ex. 34 at Ex. A) *with* 2017 Attorney General Certification (Trasande/Holt Decl. Ex. 17 at AR-01033).) OJP also included in the new Attorney General certification changes regarding the "diligent inquiry" that was required as part of the Attorney General's Section 1373 certification, specifying that for the specific purpose of that paragraph the diligent inquiry "shall not be understood to include any "program or activity" of any subrecipient at any tier." (*Compare* August 2018 Attorney General Certification (Trasande/Holt Decl. Ex. 34 at Ex. A) *with* 2017 Attorney General Certification (Trasande/Holt Decl. Ex. 17 at AR-01033 at ¶ 5).) OJP has made no changes to the certification and monitoring requirements regarding the immigration-related conditions as they are described in the States' FY 2017 award letters. (Trasande/Holt Decl. Ex. 34.)

38.     In addition to the Section 1373 certification, the Byrne JAG FY2017 program also imposed the so-called access condition, which requires State and local grantees and State subgrantees to have "[a] Statute, or a State rule, -regulation, -policy, or –practice" in place "that is designed to ensure that agents of the United States acting under color of federal law in fact are given to access any State (or State-contracted) correctional facility for the purpose of permitting such agents to meet with individuals who are (or are believed by such agents to be) aliens and to inquire as to such individuals' right to be or remain in the United States." (*See, e.g.*, New York State Award Letter at ¶¶ 55-56 (Trasande/Holt Decl. Ex. 1).)

39.     In addition, the so-called notice condition on Byrne JAG funding requires States to have "[a] State statute, or a State rule, -regulation, -policy, or –practice," in place "that is designed to ensure that, when a State (or State-contracted) correctional facility receives from DHS [the U.S. Department of Homeland Security] a formal written request authorized by the Immigration and Nationality Act that seeks advance notice of the scheduled release date and time for a particular

alien in such a facility, then such facility will honor such request and – as early as practicable …
provide the requested notice to DHS." (*Id.*)

40.     The other State Plaintiffs' FY 2017 award letters for the Byrne JAG program
impose identical requirements to those in New York's award letter on the receipt of their funding.
*Compare* New York State Award Letter (Trasande/Holt Decl. Ex. 1) with State Plaintiffs' Award
Letters (Trasande/Holt Decl. Exs. 2-7.)

### C.  City Plaintiff's Byrne JAG Applications

41.     In connection with its FY 2016 Byrne JAG Program award, DOJ required that New
York City certify its compliance with Section 1373 by June 30, 2017. DOJ had never before
required compliance with Section 1373 as a condition for receipt of Byrne JAG funds. (Soler Decl.
¶ 6.)

42.     On October 6, 2016, OJP released a document entitled "Additional Guidance
Regarding Compliance with 8 U.S.C. § 1373," which addressed the question: "Does OJP's
guidance on 8 U.S.C. § 1373 impact FY 2016 funding?" The response: "No FY 2016 or prior year
[JAG Program] funding will be impacted." (Soler Decl. ¶ 7.)

43.     Accordingly, on June 27, 2017, the City submitted to DOJ a legal opinion
explaining that the City's laws, policies, and practices complied with and operated within the
constitutional bounds of Section 1373. The City reserved its right to challenge the Section 1373
condition. (Soler Decl. ¶ 8, Ex. A.)

44.     New York City filed a timely application for the FY 2017 Byrne JAG grant on
September 5, 2017. (Soler Decl. ¶ 14.)

45.     On October 11, 2017, DOJ formally responded to the City's June 27, 2017 legal
opinion, stating that, "based on a preliminary review, the Department has determined that your

jurisdiction appears to have laws, policies, or practices that violate 8 U.S.C. § 1373." DOJ directed the City to change its policies and to "certify that it has communicated this interpretation to its officers and employees." (Soler Decl. ¶ 15, Ex. B.)

46.    DOJ nevertheless stated that it had yet to reach a "final" determination as to the City's compliance or non-compliance with Section 1373. (Soler Decl. ¶ 16.)

47.    On October 27, 2017, New York City replied to DOJ's "preliminary" assessment of its compliance with Section 1373 and reiterated its legal opinion that its laws, policies, and practices complied with Section 1373, as lawfully applied. (Soler Decl. ¶ 17, Ex. C.)

48.    On January 24, 2018, DOJ sent the City a letter reiterating that it "remains concerned that your jurisdiction's laws, policies, or practices may violate 1373" and requesting, under threat of subpoena, "[a]ll documents reflecting any orders, directives, instructions, or guidance to your law enforcement employees … regarding whether and how these employees may, or may not, communicate with the Department of Justice, the Department of Homeland Security, and/or Immigration and Customs Enforcement, or their agents, whether directly or indirectly." (Soler Decl. ¶ 18, Ex. D.)

49.    This letter further stated that, if DOJ determined the City was not in compliance with Section 1373, it might claw back FY 2016 grant funds, require additional conditions for receipt of any FY 2017 funding, and/or deem the City ineligible for FY 2017 Byrne JAG funds. (Soler Decl. ¶ 19.)

50.    The City sent DOJ a timely submission with responsive materials on February 23, 2018. (Soler Decl. ¶ 20, Ex. E.)

51.    On June 27, 2018, DOJ began to announce FY 2017 Byrne JAG grant awards to State and local recipients. New York City was not listed among the awardees. The City has

received no formal denial from DOJ, but has been informed that it is on hold. (Soler Decl. ¶ 21.)

52.     On August 14, 2018, City entered into a stipulation with the Defendants that requires that for the duration of the stipulation, the Defendants "shall not disburse, expend, or revert to the Treasury" the FY 2017 Byrne JAG funds allocated to the City. (*See* Stipulation, 18-cv-06474 (ECF 19) (City Stipulation).)

### D.  The Administrative Record

53.     The Administrative Record for the FY 2017 Byrne JAG program's immigration-related conditions cited herein was produced by DOJ and is applicable to Plaintiffs' claims regarding the FY 2017 Byrne JAG program. (*See* Transcript of Pre-motion Conference at 5, 27, *New York, et al., v. DOJ, et al.,* 18-cv-6471 (ER).)

54.     The Administrative Record produced by DOJ does not contain any study, report, or analysis to support the Attorney General's assertion of a link between so-called sanctuary policies and increased rates of crime. (*See, e.g.*, DOJ-BJA Byrne JAG FY 2017 Administrative Record produced *in California ex rel. Becerra v. Sessions*, No. 17-cv-4701 (WHO) (N.D. Cal. Mar. 5, 2018) (Trasande/Holt Decl. Exs. 9-17 at AR 00001-01037).)

55.     The Administrative Record produced by DOJ includes statements finding that local involvement in federal civil immigration enforcement efforts could harm trust in law enforcement and frustrate the reporting of crime and crime-solving efforts. (*See, e.g.,* (Trasande/Holt Decl. Ex. 9 at AR-00040) (observation of the Major Cities Chiefs of Police cited in DOJ's July 2007 Audit Report); (Trasande/Holt Decl. Ex. 14 at AR-00640) (City of Philadelphia statement that "gain[ing] the trust and cooperation of … residents, crime victims and witnesses … regardless of their immigration status" makes "the community stronger and … streets safer.").)

56. The Administrative Record produced by DOJ does not include any legal analysis of the Byrne JAG statute to justify why DOJ concluded that Section 1373 is an applicable federal law that must be complied with in order for a State or locality to receive its Byrne JAG award. (*See, e.g.*, Trasande/Holt Decl. Exs. 9-17 at AR 00001-01037.)

57. The Administrative Record produced by DOJ does not provide any legal or other analysis concerning the imposition of the so-called notice and access conditions. (*Id*.)

58. The Administrative Record produced by DOJ does not provide any analysis, study, or report regarding the effect that the notice, access, and Section 1373 conditions would have on Byrne JAG grantees or whether the notice, access, and Section 1373 conditions would further the purposes of the Byrne JAG program. (*Id*; *but see* (Trasande/Holt Decl. Ex. 9 at AR-00113) (September 10, 2015 letter from Assistant Attorney General Peter J. Kadzik to Senator Richard Shelby in response to a request that DOJ withhold Byrne JAG and other funds for immigration-related purposes stating that "[w]itholding the funding would have a significant, and unintended, impact on the underserved local population who benefit from these programs" and adding that "many Department grant funds are formula-based, with the eligibility criteria … set firmly by statute.").)

59. DOJ has suggested that Section 1373 prevents jurisdictions from enacting policies that define the time and manner in which their employees exchange immigration-status information with federal officials. (*See* Soler Decl. Ex. B (October 11, 2017 letter from Alan Hanson, Acting Assistant Attorney General, to Elizabeth Glazer, Director, N.Y.C. Mayor's Office of Criminal Justice).)

60. DOJ also has also suggested that Section 1373 requires jurisdictions to facilitate transfers from State and local jails to federal immigration authorities. (*See* Def.'s Proposed

Findings of Fact 8-11, *City of Philadelphia v. Sessions*, No. 17-cv-3894 (E.D. Pa. May 17, 2018), (ECF No. 200) (Trasande/Holt Decl. Ex. 38); *see also* Pl.'s Mot. for Prelim. Inj. and Mem. of Law in Support 24-26, *United States v. California*, No. 18-cv-00490 (E.D. Cal. Mar. 6, 2018), (ECF No. 2-1) (Trasande/Holt Decl. Ex. 42).)

61.     DOJ has further suggested that Section 1373 requires jurisdictions to share individuals' home and work addresses and their scheduled release dates from incarceration. (*See* Soler Decl. Ex. B (October 11, 2017 letter from Alan Hanson stating "to comply with 8 U.S.C. § 1373, the Department has determined that New York [City] would need to certify that it interprets and applies Section 9-131(b) and (d) to not restrict New York officers from sharing information regarding the date and time of an alien's release from custody.").)

62.     DOJ has also taken the position that jurisdictions have an affirmative obligation to communicate DOJ's interpretation of Section 1373 to their employees. (*Id.* (stating that "[i]n order to comply with 8 U.S.C. § 1373, the Department has determined that … New York would need to certify that it has communicated this interpretation to its officers and employees.").)

## III.   THE PLAINTIFFS' USE OF BYRNE JAG FUNDING

### A.  State Plaintiffs' Use of Byrne JAG Funding

63.     The State Plaintiffs have received Byrne JAG awards every year since the program was created. (*See* Green Decl. ¶ 5 (NY); Lawlor Decl. ¶ 5 (CT); Fradel Decl. ¶ 6 (NJ); Hogan Decl. ¶ 5 (RI); Klontz Decl. ¶ 3 (WA); Bennett Decl. ¶ 3 (MA); Dion Decl. ¶ 6 (VA).)

64.     The States and their subgrantees have used funds under Byrne JAG and its predecessor grant programs to support a broad array of critical law enforcement, criminal justice, drug treatment, and other programs tailored to local needs. (*See, e.g.*, Klontz Decl. ¶ 3 (WA); Fradel Decl. ¶¶ 8-9 (NJ); Green Decl. ¶¶ 8-9 (NY).)

17

65.     State Plaintiffs apply Byrne JAG Program funds to a concentrated number of initiatives that apply statewide, and that do not have another primary funding stream, in an effort to maximize the impact of these funds. (*See, e.g.*, Klontz Decl. ¶ 16 (CT), Green Decl. ¶ 12 (NY).) If fiscal year 2017 Byrne JAG funds are not made available to Plaintiffs, many of these programs will go without funding or with reduced funding as there are no alternative State funds currently budgeted for these programs. (Bennett Decl. ¶ 13 (MA); Klotnz Decl. ¶16-18 (WA); Fradel Decl. ¶ 23 (NJ); Lawlor Decl. ¶¶ 18-19 (CT).)

   **i.     New York**

66.     New York has received law enforcement block grants for over fifty years and Byrne JAG funding since the creation of that program. (Green Decl. ¶¶ 5-6.) New York applies for and receives its Byrne JAG allocations through its relevant state agency, the New York State Division of Criminal Justice Services (DCJS). (*Id.* at ¶ 4.)

67.     DCJS subgrants a portion of its Byrne JAG allocation to localities within the State pursuant to program requirements; DCJS also dedicates a portion of its Byrne JAG award to fund State criminal justice and related projects. (*Id.* at ¶¶ 5-7.)

68.     In prior years, New York has used Byrne JAG funding for a variety of purposes, including to partially fund Crime Analysis Centers across the State and to provide funding to the Buffalo Veterans Treatment Court, among other projects. (*Id.* at ¶¶ 8-9.)

69.     On June 26, 2018, New York was notified that it received a Byrne JAG award for FY 2017 in the amount of $8,879,161. (*Id.* at ¶ 15. For FY 2017, DCJS will allocate at least $5,254,667 in Byrne JAG funding to localities. *Id.* at ¶ 13.)

70.     New York's award letter from DOJ included a number of special conditions, including the so-called notice and access conditions, and conditions pertaining to compliance with

18

8. U.S.C. § 1373. (*Id*. at ¶¶ 15-18.)

71.     For the FY 2017 grant cycle, New York plans to use its Byrne JAG funding to support a number of criminal justice, law enforcement, and drug treatment priorities. Among other things, New York will use its FY 2017 Byrne JAG allocation to continue to fund a number of projects and programs that previous Byrne JAG allocations have supported, including specific positions for which current funding will expire on September 30, 2018. (*Id*. at ¶ 12.)

72.     In particular, New York plans to use FY 2017 Byrne JAG funding to:

a.   continue "to fund roughly one-half of the cost of approximately 30 crime analyst positions in the four CACs that serve the Buffalo, Rochester, Syracuse, and Capital (Albany) regions";

b.   administer and to continue to fund positions in support of a strategic gun violence prevention effort (the "SNUG" program—GUNS spelled backwards) active in eleven jurisdictions throughout the State;

c.   build upon a project focused on prosecutions of non-fatal shootings by funding staff positions dedicated to these cases at police and prosecutorial agencies;

d.   provide annual subgrants to district attorney and public defender offices in numerous counties to enhance the quality and effectiveness of prosecution and defense services, including efforts to combat illegal gun trafficking and improve defense services for individuals processed through specialty courts, such as domestic violence courts, veterans courts, and drug courts;

e.   support the creation of a New York State Criminal Justice Research Consortium to connect criminal justice practitioners to academic researchers to expand the use of evidence-based practices;

    f.   partially or fully fund twenty-nine staff positions at the New York State Office of Information Technology dedicated to maintaining critical public information technology systems and platforms such as the State's fingerprint identification system and criminal history database;

    g.   purchase and install video equipment for recording custodial interrogations at local law enforcement agencies; and

    h.   continue to provide funding to local law enforcement agencies to support 50% of the cost of the purchase and installation of Livescan fingerprint equipment. (*Id.* at ¶¶ 11-12.)

73.    In addition to these planned programs, New York has already identified over 50 subgrantees that would receive FY 2017 Byrne JAG funds. (*Id.* at ¶ 19.) In previous years, DCJS had provided over 100 subgrantees with Byrne JAG funds—and these subgrantees have included jurisdictions (such as Albany, New York City, and Rochester) that maintain policies preventing the diversion of their law enforcement and other resources for Federal civil immigration enforcement. (*Id.*)

74.    New York's 2017-18 enacted budget included $10 million in appropriation authority to support State and local projects funded from the State's FY 2017 Byrne JAG award. These funds were reappropriated in the 2018-19 enacted state budget. (*Id.* at ¶ 14.)

    **ii.   Connecticut**

75.    Connecticut typically distributes most of its funds to its subgrantees, including various State agencies and local jurisdictions. (Lawlor Decl. ¶ 6.) Most of the State-level funds are committed to State agency projects focused on enhancing components of the criminal justice system, while most subgrants to local jurisdictions are dedicated to local law enforcement

functions, with a priority given to projects focusing on narcotics, violent crime reduction, technology improvements and equipment. (*Id.*)

76.     In prior years, Connecticut has allocated Byrne JAG funds to various departments of the State, including the Department of Emergency Services and Public Protection, Department of Correction, Judicial Branch, Department of Mental Health, and to numerous localities, including twenty-eight jurisdictions in the FY 2014 grant cycle. (*Id.* at ¶¶ 7-8.)

77.     On June 26, 2018, Connecticut was notified that it received a Byrne JAG award for FY 2017 in the amount of $1,711,049. *Id.* at ¶ 9. DOJ's award letter to Connecticut contains a number of special conditions on the Byrne JAG funding, including the notice, access, and Section 1373 certification and compliance conditions. (*Id.* at ¶¶ 10-15.)

78.     Connecticut has already identified a number of proposed subgrantees for its FY 2017 Byrne JAG allocation. (*Id.* at ¶ 17.)

79.     Moreover, if Connecticut accepts the FY 2017 Byrne JAG award, it intends to use its allocation to fund stipends for local police to ensure their continued participation in, and support of, Connecticut's Statewide Narcotic Task Force (SNTF). According to Connecticut's Under Secretary for Criminal Justice Policy and Planning, "a loss of FY [20]17 [Byrne] JAG funds will eliminate those stipends to local police, and thereby substantially and detrimentally impact the SNTF's ability to function." (*Id.* at ¶ 18.)

80.     Connecticut further intends to use FY 2017 Byrne JAG funding to pay for substance abuse treatment services and other re-entry services in Connecticut prisons and communities, as well as the State's opioid intervention project for local police departments, the purpose of which is to reduce opioid-related deaths and reduce opioid-related crime and incarceration. (*Id.* at ¶ 18.)

81.     Connecticut also uses Byrne JAG funding to fund a portion of the salary of four staff members of its State Office of Policy Management. (*Id*. at ¶ 19.) Byrne JAG funds account for approximately $110,320 of payroll and $104,804 of fringe benefits for those employees, for the annual total of $215,124. (*Id*.)

82.     Connecticut's Under Secretary for Criminal Justice Policy has stated that a loss of Connecticut's FY 2017 JAG funding will negatively affect a number of that State's programs and staffing levels, including an "opioid intervention project for local police departments, the purpose of which is to reduce opioid-related deaths and reduce opioid-related crime and incarceration." (*Id*. at ¶ 18-19.)

### iii.     Massachusetts

83.     The Commonwealth of Massachusetts has applied for, and received, Byrne JAG allocations since 2006. (Bennett Decl. ¶ 3.) Massachusetts also received grants under the Byrne JAG predecessor program prior to 2006. (*Id*. at ¶ 4.)

84.     Massachusetts has spent or will spend funds received from its Byrne JAG award to create or support various law enforcement programs and initiatives, such as programs that provide wrap-around services to high-risk youth, including through faith-based and community-based efforts; programs aimed at reducing heroin and other opioid use through prevention, intervention, treatment, interdiction, and system readiness; collaborative projects that promote efforts of local agencies to provide and ensure comprehensive reintegration programs for juvenile and adult offenders reentering the community; and projects that promote the collaboration of law enforcement, the courts, and local victim service agencies in responding to domestic violence and sexual assault incidents. (*Id*. at ¶ 5.)

85.     The various subgrantees of Massachusetts have spent or will spend funds received

from Massachusetts' Byrne JAG award to create or support various law enforcement programs and initiatives, such as hiring case managers with expertise in substance abuse and counseling to serve as a liaison between law enforcement and the treatment centers where individuals are referred for care; increasing community outreach in high-risk areas; implementing training and early intervention tools for at-risk youth; and implementing data and analysis to drive strategies to reduce crime and improve operational effectiveness. (*Id*. at ¶ 6.)

86.     On June 26, 2018, Massachusetts was notified that it received a Byrne JAG award for FY 2017 in the amount of $3,453,006. (*Id*. at ¶ 11.) Massachusetts' award letter from DOJ contained the notice, access, and Section 1373 certification and compliance conditions. (Trasande/Holt Decl. Ex. 6.)

87.     Massachusetts has planned on using its FY 2017 Byrne JAG award to fund programs focused on reducing gun, gang, and youth violence; evidence-based reentry programs to reduce recidivism; programs targeting domestic violence and sexual assault offenders; efforts geared toward combating heroin, opioids, and other illegal drugs; and collaborative prosecution and prevention programs. (Bennett Decl. ¶ 12.)

88.     Without its FY 2017 Byrne JAG funding, many of the programs to which Massachusetts intends to dedicate that funding to will go without funding or need to operate on reduced funding because there are not alternative State funds budgeted for those programs. (*Id*. at ¶ 13.)

### iv.    New Jersey

89.     The State of New Jersey has applied for and been awarded Byrne JAG awards every year since 2006. (Fradel Decl. ¶ 6.) Prior to the Byrne JAG program, New Jersey received grants under Byrne JAG's predecessor since at least 1996. (*Id*. at ¶ 7.)

23

90. New Jersey has typically used its Byrne JAG funding to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice and law enforcement programs. (*Id*. at ¶ 3.)

91. In recent years, New Jersey has used its Byrne JAG allocation to:

    a. support the State's Multi-Jurisdictional Gangs, Organized Crime and Narcotics Task Force, which investigates and prosecutes members of criminal gang organizations, gun traffickers, and gun trafficking organizations;

    b. fund its Atlantic City Organized Crime Task Force, which supplements local law enforcement activities within Atlantic City by focusing on the apprehension and prosecution of weapons traffickers and narcotics distributors among others;

    c. provide additional funding to local prosecutors' offices;

    d. fund its State Police Organized Crime, Gangs, and Guns Task Force;

    e. fund the salary for a ballistics laboratory technician;

    f. study the effectiveness of re-entry initiatives; and

    g. enable 26 municipal police departments to purchase body worn camera equipment. (*Id.* at ¶¶ 10-11.)

92. On June 26, 2018, New Jersey was notified that it received a Byrne JAG award for FY 2017 in the amount of $4,047,274. (*Id.* at ¶ 12.) New Jersey's Byrne JAG award for FY 2017 is subject to various grant conditions, including the notice, access, and Section 1373 certification and compliance conditions. (*Id.* at ¶ 13-18.)

93. The New Jersey legislature anticipated receiving, and accounted for, the Byrne JAG award for FY 2017 as a "federal resource" when it passed the State's most recent appropriations act. (*Id.* at ¶ 23.)

24

94.     In addition to planning to continue to fund many of the programs New Jersey has funded with Byrne JAG in recent years, New Jersey plans to use its FY 2017 Byrne JAG funding to support its Prosecutor Supervision Training Initiative and to enhance its statewide criminal justice information sharing networks. (*Id.* at ¶ 23.)

### v.     Rhode Island

95.     The State of Rhode Island has applied for and received Byrne JAG funds every year since the program was created. (Hogan Decl. ¶ 5.)

96.     Rhode Island has used its Byrne JAG funding to support various statewide criminal justice and law enforcement programs, including residential substance abuse treatment program for State prisoners, targeted joint-jurisdictional efforts to reduce the rates of serious criminal activity in high-crime areas, the State's drug courts, and providing mental health evaluations to juveniles. (*Id.*)

97.     Rhode Island also passes through Byrne JAG funds to local jurisdictions to support local law enforcement functions, including narcotics enforcement, violent crime reduction, technology improvements, and equipment funding. (*Id.* at ¶ 6.)

98.     Rhode Island timely applied for FY 2017 Byrne JAG funding and received an award letter in the amount of $766,003. (*Id.* at ¶ 7.)

99.     If Rhode Island does not receive its FY 2017 Byrne JAG allocation it will need to downsize or disband the multi-jurisdictional joint patrol teams that the Byrne JAG award supports. (*Id.* at ¶ 16.)

100.     Rhode Island's Byrne JAG subgrantees will also be negatively affected by a loss of Byrne JAG funding, as the local municipality subgrantees that receive a portion of the State's

Byrne JAG award "have limited resources and are unable to effectively combat drug and gun offenses without this federal support." (*Id*.)

      **vi.**    **Virginia**

101.    The Commonwealth of Virginia has applied for and received Byrne JAG funds every year since the program was created. (Dion Decl. ¶ 7.)

102.    Virginia has used Byrne JAG funding to cover the administrative costs that support the salaries of critical staff in various divisions within the Virginia Department of Criminal Justice Services (VA-DCJS), including its Division of Law Enforcement, and to supplement essential staffing needs within the VA-DCJS Director's Criminal Justice Research Center. (*Id.* at ¶¶ 4, 8.)

103.    In recent years, Virginia's subgrantees have used Byrne JAG funding to support various local law enforcement programs and initiatives, including crime reduction and prevention efforts, initiatives to upgrade law enforcement equipment, initiatives to support specialized law enforcement training, and the use of body cameras and life-saving naloxone. (*Id.* at ¶ 24.)

104.    On June 26, 2018, DOJ notified Virginia that it had been awarded $3,353,534 in Byrne JAG monies for FY 2017. (*Id.* at ¶ 9.) Virginia's Byrne JAG award is subject to the notice, access, and Section 1373 conditions. (*Id*. at ¶¶ 13-20.)

105.    Virginia intends to use its FY 2017 Byrne JAG funding to make subgrants to localities and to continue funding to various law enforcement agencies and criminal justice partners. (*Id*. at ¶ 24.)Virginia also plans to use Byrne JAG funds to continue to support the critical staffing and administrative needs at the VA-DCJS. (*Id*.) A loss of Byrne JAG funding would affect Virginia's ability to provide resources to already identified priorities, such as projects to help agencies identify and respond to heroin and opioid drug abuse and reduce overdose-related deaths. (*Id*. at ¶ 23.)

106.    Virginia, through its state budget process, has also set aside funding to support long-term and ongoing law enforcement projects in anticipation of receiving FY 2017 Byrne JAG monies. (*Id.* at ¶¶ 11-12.)

### vii.    Washington

107.    The State of Washington has received funding from the Byrne JAG program every year since the program's creation—and prior to the current-day Byrne JAG program, Washington regularly applied for and received a variety of Federal law enforcement grants. (Klontz Decl. ¶ 3.)

108.    Washington applies for, receives, and disburses its Byrne JAG funding through its Department of Commerce. (*Id.* at ¶¶ 2-3.)

109.    Washington has used Byrne JAG funding to support a number of criminal justice and law enforcement programs, including narcotics task forces, drug courts, and youth intervention programs. Washington also has used this funding to support high-impact offender prosecution and tribal law enforcement efforts, and to improve its criminal history records. In addition, Byrne JAG funding has supported domestic violence legal advocacy and efforts to combat sexual abuse. Funds also have been directed to mitigate the gang threat in prisons and to support the Governor's Council on Substance Abuse. (*Id.* at ¶ 3.)

110.    For FY 2014 through FY 2016, Washington provided Byrne JAG subgrants to an average of eighteen city and county jurisdictions. (*Id.* at ¶ 4.)

111.    On June 26, 2018, DOJ notified Washington that it had been awarded $3,277,891 in Byrne JAG funding for FY 2017. (*Id.* at ¶ 2.) DOJ's award letter to Washington imposes a number of special conditions on Washington and its subgrantees, including the notice, access, and Section 1373 certification and compliance requirements. (Klontz Decl. Exhibit B.)

112.    Among other initiatives with statewide applicability, (Klontz Decl. at ¶¶ 13-16),

Washington intends to use its FY 2017 Byrne JAG award to support multi-jurisdictional drug and gang task forces. (*Id.* at ¶ 6.) These task forces fight gangs and other criminal organizations by integrating enforcement activities across jurisdictions. (*Id.*) Washington's Byrne JAG funded task forces serve over seven million of the State's residents and operate in regions that frequently have limited law enforcement resources. (*Id.* at ¶¶ 10-11.)

113.   If Washington does not receive its Byrne JAG FY 2017 award, its multi-jurisdictional drug and gang task forces will either downsize or disband. (*Id.* at ¶ 17.)

## B. City Plaintiff's Use of Byrne JAG Funding

114.   New York City has applied for Byrne JAG funds every year since 2005, as a direct grantee. Until FY 2017, the City was awarded Byrne JAG funds each and every year. Awards have ranged from $2.2 million to $8.7 million. In FY 2016, the City received $4.3 million under its direct Byrne JAG Program award. Per the statutory formula, the City is entitled to a direct grant in the amount of $4.1 million for FY 2017. (Soler Decl. ¶ 5.)

115.   The City uses Byrne JAG funds to support critical public safety personnel and programs aimed at reducing crime and promoting fairness in the criminal justice system. Collectively, the staff and programs supported by JAG funds have led to lasting positive impacts for many of the City's law enforcement, prosecution, and planning programs, and have helped fund many innovative public safety ventures that would not otherwise be supported through traditional funding streams. The City expects to continue this important work with FY 2017 Byrne JAG funds. (Soler Decl. ¶ 22.)

116.   For instance, the New York City Police Department ("NYPD") has drawn upon JAG funding to pay the salaries of twelve 911 emergency responders. (Soler Decl. ¶ 23.)

117.   JAG funds are also used to help finance diversion programs for nonviolent felony

28

drug offenders run through the District Attorney's Offices. The Kings County District Attorney's Office has utilized past funding to support programs that provide substance abuse treatment, academic and vocational training, and individual and group counseling to justice involved individuals. (Soler Decl. ¶ 24.)

118.    The Bronx County District Attorney's Office has directed JAG funds towards specialized efforts for the adjudication of violent offenders. The Queens County District Attorney has used JAG funds to support prosecution efforts for repeat offenders with lengthy and violent histories and to track patterns of gang development in the city. The Richmond County District Attorney's Office has used JAG funds to address issues of gang, illegal firearm, and drug related crimes. (Soler Decl. ¶ 25.)

119.    In addition, the City has used JAG funds to support efforts to fight cybercrime and identity theft; drug prosecutions by the City's Office of the Special Narcotics Prosecutor; upgrades to the City's criminal justice data collection, organization, and evaluation systems; interventions for individuals with mental and behavioral health needs; programs that lower incarceration by reducing case processing times and diverting individuals from jail or an institutional setting; and school safety initiatives that target reducing suspension rates and improving discipline policies and procedures. (Soler Decl. ¶ 26.)

## IV.    HARMS TO PLAINTIFFS RESULTING FROM DEFENDANTS' IMPOSITION OF THE IMMIGRATION-RELATED CONDITIONS

### A.  Impact on State Plaintiffs

120.    Representatives from the State Plaintiffs or from jurisdictions within those States and others have stated that requiring local authorities to enforce federal civil immigration law could harm the interests of promoting public safety in immigrant communities. (*See, e.g.*, Torrance

Decl. ¶¶ 6-10 (WA); Diaz Decl. ¶¶ 4-6 (WA); Kelly Decl. (Albany, NY); Wang Decl. (NJ).)

121.     An officer with the Seattle Police Department ("SPD") in Seattle, Washington, Lieutenant Adrian Diaz, has stated that requiring local authorities to enforce federal immigration laws "will significantly impede [the] SPD's ability to police the City of Seattle," which, in turn, will make "law enforcement more difficult." (Diaz Decl. ¶ 4.) Lieutenant Diaz has stated that the fear of detention or deportation among Seattle's immigrant communities affects both undocumented immigrants as well as legal residents and others who share communities, neighborhoods, and schools with those who are undocumented. (*Id*.) These fears, according to Lieutenant Diaz, "cause crime victims in immigrant communities to become more reluctant to report crime and more reluctant to cooperate with law enforcement," resulting in "communities that are less safe." (*Id*.)

122.     Lieutenant Diaz has further stated that "tying local law enforcement to federal immigration policy" discourages certain witnesses of crimes from cooperating out of fear of detention or deportation due to immigration status. (*Id*. at ¶ 5.)

123.     Lieutenant Diaz has stated that these concerns regarding federal immigration policy and local law enforcement "are shared by numerous law enforcement organizations" such as the Major Cities Chiefs Association, the Law Enforcement Immigration Task Force, and the National Fraternal Order of Police and the Major County Sheriffs' Association. (*Id*. at ¶ 7.)

124.     Moreover, according to the Managing Director of the Washington State Office of Crime Victims Advocacy ("OCVA"), Richard Torrance, "[l]inking Byrne JAG … funds to cooperation with federal immigration enforcement will significant impact the quality and accessibility of OCVA's services and undermine OCVA policies," because crime victims in immigrant communities will become "more reluctant to report crime, more reluctant to cooperate

with law enforcement and prosecution, and less likely to seek out OCVA's services." (Torrance Decl. at ¶ 6.)

125.     According to Chia-Chia Wang, the Organizing and Advocacy Director for the American Friends Service Committee Immigrant Rights Project, a New Jersey legal services provider, "countless immigrants" have expressed trepidation about reporting crimes and collaborating with local law enforcement for fear that their information will be shared with Immigration and Customs Enforcement ("ICE"). (Wang Decl. at ¶ 5.)

126.     Ms. Wang's organization represents immigrant domestic violence survivors and she has stated that one of her clients "endured 6 years of violence from her partner until he put a knife on her neck and she finally called the police", and that she "had not called prior to that because she was afraid of being turned over to ICE." (*Id.* at ¶¶ 6-7.)

127.     According to the City of Albany, New York's Corporation Counsel, the imposition of DOJ's immigration-related conditions require jurisdictions that receive Byrne JAG funding and maintain policies that prevent the diversion of their law enforcement and other resources for federal civil immigration enforcement efforts to decide to either discard their "deliberate policies to promote community trust and public safety or risk losing funding for important public safety and law enforcement programs." (Kelly Decl. ¶ 20.)

128.     Representatives from the State Plaintiffs have also expressed concerns regarding the burdens to the States' that will be caused by having to comply with the new immigration related conditions will cause. (*See, e.g.*, Lawlor Decl. ¶ 17 (CT); Green Decl. ¶ 20 (NY); Dion Decl. ¶¶ 21-22 (VA); Fradel Decl. ¶¶ 18-22 (NJ); Hogan Decl. ¶¶ 14-17 (RI); Torrance Decl. ¶¶ 11-12 (WA).)

129.     In particular, New York's DCJS avers, through its Executive Deputy

Commissioner, that the immigration-related conditions on Byrne funding "will impose substantial burdens on New York and its Byrne JAG subgrantees." (Green Decl. ¶ 20.) For example, New York "would need to implement a monitoring and oversight process and incur potentially significant administrative and financial costs," because of the notice, access, and Section 1373 conditions. (*Id.*)

130.    There are several jurisdictions in New York that maintain policies preventing the diversion of their law enforcement and other resources for federal civil immigration enforcement that the State will be required to "continuously monitor" for compliance with Section 1373 as a result of the new certification and compliance requirements included in the FY 2017 Byrne JAG program. (*Id.* at ¶¶19-20.)

131.    For example, the City of Albany, New York has adopted an Executive Order which, among other things:

    a.  prohibits its law enforcement officers from asking about an individual's immigration status unless it is necessary to investigate criminal activity by that individual;

    b.  prohibits its law enforcement officers form performing the functions of a federal immigration officer;

    c.  prohibits its law enforcement officers from collecting, using, or disclosing information regarding immigration or citizenship status except as required by law; and

    d.  prohibits its law enforcement officers from responding to a U.S. Immigration and Customs Enforcement (ICE) or U.S. Customs and Border Protection (CBP) request for non-public information about an individual, including but not limited to non-public information about an individual's release, home address, or work address, unless the request is otherwise permitted by law.

(Kelly Decl. at ¶¶ 8-13.)

132.    The City of Rochester has adopted several resolutions, which among other things:

    a.  recognizes that "a policy that assures immigrants and refugees that they can contact the police and other City agencies without fear of adverse immigration consequences will enhance public safety for all citizens";

     b.   provides that the City's "Police Department shall not engage in certain activities solely for the purpose of enforcing federal immigration laws, including not inquiring about the immigration status of an individual, including a crime victim, a witness, or a person who calls or approaches the police seeking assistance" and the Police Department also "shall not stop, question, interrogate, investigate, or arrest an individual based solely on actual or suspected immigration or citizenship status";

     c.   provides that "City personnel shall not inquire about or request proof of immigration status or citizenship when providing services or benefits"; however, police are permitted to inquire about the immigration status of an individual if it is necessary to investigate criminal activity or where such information is needed for a criminal investigation and City personnel are permitted to inquire where the receipt of services or benefits are contingent upon one's immigration or citizenship status, or where such information is needed for a criminal investigation.

(Warren Decl. ¶¶ 6-12.)

133.    Rhode Island, through  its Administrative Manager for the State's Public Safety Grant Administration Office, avers that the State "does not currently know whether and to what extent" the local jurisdictions it plans to subgrant to comply with the Section 1373, notice, and access conditions. (Hogan Decl. ¶ 14.) Because of this, Rhode Island states that it will incur substantial administrative and financial costs if it accepts its Byrne JAG allocation for FY 2017 as the State will be required to monitor each subgrantee jurisdiction's compliance with the immigration-related conditions on an ongoing basis. (*Id.*)

134.    Connecticut, through its Under Secretary for Criminal Justice Policy and Planning, avers that the State will "incur substantial financial and administrative costs to comply with the monitoring requirements that the [FY 2017] award imposes. (Lawlor Decl. ¶ 17.) For example, if Connecticut "is required to conduct in-field monitoring and auditing of records and reports by each subgrantee, it will have to hire and pay for several additional employees to handle the burdens associated with those tasks." (*Id.*)

135.    Massachusetts states that its funding for monitoring related to the Byrne JAG

program is derived directly from its Byrne JAG award; therefore, the additional conditions included in the FY 2017 Byrne JAG, which require additional monitoring and compliance, award place additional burdens on both Massachusetts' relevant state agency (EOPSS) and on its subgrantees. (Bennett Decl. ¶ 14.)

136.   The State of New Jersey is aware that "at least some" of the counties that it subgrants to under the Byrne JAG program maintain "policies that may conflict with the recently added "notice" and "access" conditions or DOJ's current interpretation of what compliance with [Section] 1373 entails." (Fradel Decl. ¶ 21.) For instance, Middlesex County, NJ received a letter from DOJ on November 15, 2017, informing it that its policy regarding 48 hour civil immigration detainers and warrants (indicating the limited circumstances under which such detainers will be honored and information to be provided to a detainee when ICE requests an in-custody interview) may be in violation of Section 1373 according to DOJ. (*Id.* at ¶¶ 21-22.)

137.   New Jersey states that the special conditions related to federal civil immigration enforcement and information sharing "will impose substantial hardships" on the State. (*Id.* at ¶ 19.) New Jersey's LPS currently has $300,000 of JAG funding set aside for the costs associated with monitoring compliance with administering the various programs and subgrantees in its State, but these costs anticipate covering the oversight and monitoring related to JAG programs "without the addition of the new special conditions" that DOJ has placed on receipt of the FY 17 Byrne JAG allocations. (*Id.*) As a result, New Jersey finds that "it is not clear how much more in funds would be needed to monitor compliance with the additional conditions by all of [New Jersey's] subgrantees." (*Id.*)

138.   And though Washington already maintains a monitoring program to ensure compliance with the Byrne JAG requirements, the imposition of the new, immigration-related

conditions on Byrne JAG funding "will necessarily increase [the Washington Department of Commerce's] expenses to monitor subgrantee compliance"—that will in turn "result in less funding available for distribution directly to the drug and gang task forces." (Klontz Decl. ¶ 14.)

139.    Moreover, a Washington official has also stated that on an August 8, 2018 conference call between officials from DOJ's Bureau of Justice Assistance (BJA), representatives from the National Criminal Justice Association, and various representatives from state agency Byrne JAG grant recipients, when asked what constitutes a "diligent inquiry" and sufficient monitoring of subrecipients regarding the Section 1373 certification, "BJA was unable to provide any clarification." (Torrance Decl. ¶ 12.)

140.    State officials have also expressed concerns about certifying compliance with Section 1373 given DOJ's recent and shifting interpretations of that statute. (*See, e.g.,* Fradel Decl. ¶ 20 (NJ) ("DOJ appears to be broadening its interpretation of what constitutes compliance with the statutory conditions in 8 U.S.C. § 1373. As such, [NJ] LPS cannot effectively monitor subgrantees, and ensure their compliance with, what are no longer sufficiently definable conditions"); *see also* Green Decl. ¶ 20.)

**B.  Impact on City Plaintiff**

141.    Representatives from the City and others have stated that requiring local authorities to enforce federal civil immigration law would be contrary to the City's existing laws and policies and would harm the City's interests of promoting public health and safety in the City as a whole. (*See generally,* Negron Decl., Cho Decl., Royster Decl., and Bassett Decl.)

**i.    New York City's Laws and Policies**

**(a) General Confidentiality Policy**

142.    In 2001, voters recognized that to perform its legitimate municipal functions, the

City needed a general confidentiality policy to protect information obtained and collected by City employees. Voters enacted a revision to the New York City Charter authorizing the Mayor to "promulgate rules requiring that information obtained by city employees be kept confidential to the extent necessary to preserve the trust of individuals who have business with city agencies." (N.Y.C. Charter § 8(g). *See also* Negron Decl. ¶ 4.)

143.     Then-Mayor Michael Bloomberg acted on this Charter revision in 2003 by issuing Executive Orders Nos. 34 and 41 of 2003, which together form the "General Confidentiality Policy." Upon issuing the General Confidentiality Policy, then-Mayor Bloomberg formally repealed Executive Order No. 124 of 1989, which had prohibited any City officer or employee from transmitting information regarding any immigrant to federal immigration authorities, except in limited circumstances. (Exec. Order No. 34 of 2003 §1; Negron Decl. ¶ 5, Exs. A, B and C.)

144.     The City's General Confidentiality Policy, in effect since 2003, generally bars City employees from affirmatively seeking "confidential information" from individuals in the first instance. If confidential information is nevertheless acquired from a member of the public, the General Confidentiality Policy bars City employees from disclosing it to third parties, with limited exceptions. (Negron Decl. ¶ 6.)

145.     Under the General Confidential Policy, confidential information is broadly defined to include an individual's sexual orientation, status as a victim of domestic violence, status as a victim of sexual assault, status as a crime witness, receipt of public assistance, immigration status, and information contained in income tax records. (Exec. Order No. 41 § 1. Negron Decl. ¶ 7.)

146.     The General Confidentiality Policy, *inter alia,* restricts when City officers and employees may inquire about a person's immigration status. (*Id.* §4.) Specifically, it provides that law enforcement officers "shall not inquire about a person's immigration status unless

36

investigating illegal activity other than mere status as an undocumented alien." (*Id*. § 4(a). Negron Decl. ¶ 8.)

147.    This policy also prohibits law enforcement officers from inquiring "about the immigration status of crime victims, witnesses, or others who call or approach the police seeking assistance." (*Id*. § 4(c). Negron Decl. ¶ 9.)

148.    In the event that officers and employees come into possession of confidential information, the General Confidentiality Policy limits disclosure of such information to the following situations: (1) disclosure has been authorized in writing by the individual to whom such information pertains; (2) disclosure is required by law; (3) disclosure is to another City officer or employee and is necessary to fulfill the purpose or achieve the mission of any City agency; (4) for confidential information other than information related to immigration status, disclosure is to a third party and is necessary to fulfill the purpose or achieve the mission of any City agency; or (5) for information relating to immigration status, (a) the individual to whom such information pertains is suspected of engaging in illegal activity, (b) the information is necessary to apprehend someone suspected of engaging in illegal activity, or (c) disclosure is necessary in furtherance of an investigation of potential terrorist activity. (*Id*. § 2. Negron Decl. ¶ 10.)

149.    Under the General Confidentiality Policy, "illegal activity" is defined as unlawful activity, other than "mere status as an undocumented alien." (*Id*. § 3. Negron Decl. ¶ 11.)

150.    The overarching goals of the General Confidentiality Policy include assuring residents "that they may seek and obtain the assistance of City agencies regardless of personal or private attributes, without negative consequences to their personal lives" and ensuring that the City's work will not be impeded by privacy concerns. (*Id*.) As Executive Order 41 explains, "the obtaining of pertinent information, which is essential to the performance of a wide variety of

government functions, may in some cases be difficult or impossible if some expectation of confidentiality is not preserved, and preserving confidentiality in turn requires that governments regulate the use of such information by their employees." (Negron Decl. ¶ 12.)

### (b) Identifying Information Law

151.    In December 2017, the City substantially augmented confidentiality protections set forth in the New York City Charter and New York City Administrative Code to further protect the privacy of the vast scope of sensitive, personal information collected by the City, and the non-government agencies with which it contracts to provide human services. (*See* N.Y.C. Charter § 8(h); N.Y.C. Admin. Code §§ 23-1201 – 1205 (collectively, the "Identifying Information Law"). Negron Decl. ¶ 13, Exs. D, E.)

152.    The Identifying Information Law, which became effective June 15, 2018, sets forth a uniform, citywide framework that governs the collection, disclosure, and retention of any information that "may be used on its own or with other information to identify or locate an individual." (N.Y.C. Admin. Code § 23-1201. Negron Decl. ¶ 14.)

153.    Under the Identifying Information Law, "identifying information" is very broadly defined, and includes but is not limited to an individual's "name, sexual orientation, gender identity, race, marital or partnership status, status as a victim of domestic violence or sexual assault, status as a crime victim or witness, citizenship or immigration status, eligibility for or receipt of public assistance or city services, all information obtained from an individual's income tax records, information obtained from any surveillance system operated by, for the benefit of, or at the direction of the police department, motor vehicle information or license plate number, biometrics such as fingerprints and photographs, languages spoken, religion, nationality, country of origin, place of birth, arrest record or criminal conviction, employment status, employer

38

information, current and previous home and work addresses, contact information such as phone number and email address, information concerning social media accounts, date and/or time of release from the custody of the administration for children's services, the department of correction, or the police department, any scheduled court appearances, or any scheduled appointments with any employee, contractor, or subcontractor." The Chief Privacy Officer may designate additional types of identifying information. (*Id*.) To date, the Chief Privacy Officer has designated an individual's social security number and date of birth as enumerated types of identifying information. (*Id*. Negron Decl. ¶ 16.)

154.    The Identifying Information Law requires the City to designate a Chief Privacy Officer for the City and an agency specific privacy officer for each City agency. (N.Y.C. Charter § 8(h); N.Y.C. Admin. Code § 23-1201.) The Mayor designated Laura Negron as the City's Chief Privacy Officer on March 15, 2018. (Negron Decl. ¶ 15.)

155.    In general, the Identifying Information Law prohibits City employees from collecting or disclosing identifying information to any party outside such employee's agency, including an employee of another City agency, unless one of the limited exceptions applies: (1) exigent circumstances exist; (2) the agency privacy officer pre-approves the collection or disclosure as "routine", meaning that the collection or disclosure is made during the normal course of agency business and furthers the purpose or mission of the agency; (3) agency privacy officers from different City agencies each agree that the collection or disclosure between their respective agencies is routine; (4) the agency privacy officer approves the collection or disclosure, in writing, on a case-by-case basis, and the collection or disclosure furthers the purpose or mission of the agency or is required by law; (5) the City's Chief Privacy Officer determines in advance that the collection or the disclosure to another City agency is in the best interests of the City; or (6) the

individual to whom the identifying information pertains—or, where the individual lacks capacity, a parent or legal representative—provides written authorization for disclosure of the identifying information. (*Id.* §§ 23-1201, 23-1202(b)(1), 23-1202(b)(2)(a) and (b), 23-1202(c)(1), 23-1202(c)(2). Negron Decl. ¶ 17.)

156.    An additional exception to the Identifying Information Law's restrictions on the collection and disclosure of identifying information applies to investigations. Specifically, the Identifying Information Law allows the police department to collect and disclose identifying information in connection with the investigation of a crime or an attempted or impending crime. Collection or disclosure of identifying information is also permitted by a City agency in connection with an open investigation concerning the welfare of a minor or individual who is otherwise not legally competent. (*Id.* §§ 23-1202(b)(2)(c), 23-1202(c)(2)(c). Negron Decl. ¶ 18.)

157.    Unauthorized disclosures of identifying information and collections and disclosures made under exigent circumstances must be reported to the City's Chief Privacy Officer and, in certain circumstances, reasonable efforts must be made as soon as practicable to notify in writing the individual whose identifying information was disclosed and to whom it was disclosed. (*Id.* § 23-1202(c)(4). Negron Decl. ¶ 19.)

(c)  **Mayor's Office of Information Privacy and Citywide Privacy Protection Committee**

158.    In April 2018 Mayor Bill de Blasio issued Executive Order No. 34 of 2018. This Executive Order established the Office of Information Privacy, headed by the Chief Privacy Officer, to coordinate a centralized privacy protection function citywide and strengthen privacy best practices, as well as a citywide privacy protection committee, also within the Office of the Mayor, comprised of City agency representatives having relevant subject matter expertise

necessary to advise on and generally support the development of citywide privacy protection policies and protocols and best practices. (Negron Decl. ¶ 20, Ex. F.)

### (d) Laws and Policies Regarding ICE Detainer and Notification Requests

159.   The City has a policy of cooperating with requests from ICE for detention and advance notice of release of persons in City custody, where the City considers the person to be a risk to public safety and the request is accompanied by the appropriate documentation establishing probable cause. This policy is calibrated to advance public safety, foster community trust in local law enforcement, safeguard individuals' civil rights, and protect the City's finances. (Cho Decl. ¶ 5.)

160.   A civil immigration detainer is a written request from ICE to a State or local law enforcement agency asking the agency to retain custody of a person beyond the time the person would otherwise be released, so that ICE can assume custody of the person. (Cho Decl. ¶ 6.)

161.   Local Laws 58 and 59 of 2014 generally provide that the New York City Department of Correction ("DOC") and New York Police Department ("NYPD") may detain an individual pursuant to a civil immigration detainer where ICE presents a judicial warrant establishing probable cause and the individual has been convicted of a violent or serious crime within a specified period of time or is identified as a possible match in the terrorist screening database. (Cho Decl. ¶ 7, Ex. A.)

162.   NYPD may detain an individual without a judicial warrant pursuant to a civil immigration detainer only if the individual has been convicted of a violent or serious crime and illegally re-entered the country after a previous removal or return; or is identified as a possible match in the terrorist screening database. (*See* N.Y.C. Admin. Code § 14-154(b)(2). This exception is intended to give ICE time to obtain a judicial warrant in these limited but serious circumstances.

Cho Decl. ¶ 8.)

163.    A violent or serious crime is defined as one of approximately 170 felonies defined in New York State law, or their equivalents under federal law or the law of another State. (*See* N.Y.C. Admin. Code §§ 9-131(a), 14-154(a). Cho Decl. ¶ 9.)

164.    The City also has a policy of cooperating with ICE's requests for advance notice regarding the date and time of a person's release and for transfer of custody of the person to ICE without additional detention, when certain conditions are met. (Cho Decl. ¶ 10.)

165.    Specifically, DOC and NYPD will provide ICE with, where practicable, the release date, time, and location for a person who has been convicted of a violent or serious crime within a specified period of time or is identified as a possible match in the terrorist screening database, where ICE's request is accompanied by an administrative warrant. (*See* N.Y.C. Admin. Code § 9-131(h)(1).) If the release date and time are not known, NYPD will provide ICE with whatever information it has about where the person in custody is going next, such as arraignment. (Cho Decl. ¶ 11.)

166.    In addition to complying with these requests, DOC voluntarily shares certain information with ICE related to persons entering its custody, when certain conditions are met. ICE may use this information to conduct further investigation for purposes of issuing requests for detention and advance notice of release. (Cho Decl. ¶ 13.)

167.    Specifically, DOC conducts a screen of newly admitted inmates to identify individuals who report a foreign place of birth, answer no to the question of U.S. citizenship, and have been convicted of a violent or serious crime within a specified period of time or identified as a possible match in the terrorist screening database. A violent or serious crime is one of approximately 170 felonies defined in New York State law, or their equivalents under federal law

or the law of another State. (Cho Decl. ¶¶ 14-15.)

168.    DOC shares with ICE on a daily basis a list of inmates, if any, who meet all three criteria. Based on this information, ICE may conduct a further investigation and issue a request for detention or advance notice of release, which DOC will honor consistent with the laws and policies described above. (Cho Decl. ¶ 16.)

169.    Agency privacy officers at DOC and NYPD have approved in advance as routine the disclosures permitted in connection with the foregoing laws and policies. (*See* N.Y.C. Admin. Code §§ 23-1201, 23-1202(c)(2)(a). Cho. Decl. ¶¶ 19-21.)

### (e) Other City Laws and Policies

170.    Under Local Law 246 of 2017, the City generally limits access to non-public areas of City property by government personnel empowered to enforce civil or criminal laws, including but not limited to federal immigration authorities. (*See* N.Y.C. Admin. Code § 4-210. Cho Decl. ¶22, Ex. B.)

171.    These personnel may gain access to non-public areas of City property where: such personnel are authorized to have access pursuant to an agreement or contract; such personnel present a judicial warrant; access is otherwise required by law; such personnel are accessing the property as part of a cooperative arrangement involving City, State, or federal agencies; access furthers the purpose or mission of a City agency; or exigent circumstances exist. (*See id*. § 4-210(b). Cho Decl. ¶ 23.)

172.    When ICE requests to interview a person in DOC custody, DOC provides the inmate with a written notice and form stating that ICE would like to conduct an interview. The inmate may either consent or decline to be interviewed. (Cho. Decl. ¶ 18.)

173.    Local Law 246 of 2017 permits ICE to interview an inmate who provides voluntary

written consent, consistent with the foregoing policy of DOC, in a non-public area. (Cho Decl. ¶¶ 17-24.)

174.    Local Law 228 of 2017 prohibits the use of City resources for federal immigration enforcement. N.Y.C. Admin. Code § 10-178(c). An exception to this law allows DOC and NYPD to comply with the foregoing City laws and policies. (*See* N.Y.C. Admin. Code § 10-178(e). Cho Decl. ¶ 25, Ex. C.)

> ### ii.    The Importance of the City's Laws and Policies and the Impact of Requiring the City to Enforce Federal Immigration Laws

175.    Ms. Laura Negron is the City's Chief Privacy Officer. Her public interest career as a whole spans nearly forty years and encompasses various executive and leadership positions serving City residents. Her responsibilities as Chief Privacy Officer include enhancing and coordinating responsible citywide data-sharing practices; improving how the City uses data to inform responsible and equitable policies; developing and adopting citywide protocols relating to the protection of individually identifiable information; and providing guidance to City agencies. (Negron Decl. ¶¶ 1-2.)

176.    The City is home to over 8.5 million people, more than 3 million of whom were born outside of the United States but have chosen to work, study, and raise families in the City. Over half a million more people travel to the City every day to work, and 50 million tourists visit every year. The City has the enormous responsibility of protecting the health, safety, and general welfare of all of these people, and facilitating equal access to needed services across its diverse populations and communities. (Negron Decl. ¶ 22.)

177.    Ms. Negron avers that, as a practical matter, the City and its populace benefit when residents seek treatment and medical attention for contagious diseases, report crime when they are

victims, assist the police as witnesses, and come forward when they have information about potential crimes, unsafe conditions, or other threats to public safety and welfare. The existence of the City's General Confidentiality Policy and Identifying Information Laws, together with the Mayor's Office of Information Privacy, encourage City residents and visitors to take these important steps—which benefit everyone—because residents and visitors can trust that the City will appropriately and responsibly protect their personal information. (Negron Decl. ¶ 23.)

178.    In addition, the City employs hundreds of thousands of people. The City needs uniform laws and policies to ensure that the information that all City employees and officials collect, maintain and disclose every day is handled properly, consistently, and in the best interests of the City and its people. It is thus essential that the City – as an employer and as a municipal government – controls how its employees handle identifying information gained through their official functions as public servants, particularly sensitive and confidential information. The City cannot allow City agencies or individual employees to make *ad hoc* decisions about how to handle confidential or identifying information. The General Confidentiality Policy, Identifying Information Law, and Mayor's Office of Information Privacy collectively provide the legal and operational framework that agencies and their employees need in order to responsibly perform their jobs, while ensuring that identifying information that City employees collect, disclose, and maintain is consistently protected and utilized for the best interests of its residents and the City as a whole. (Negron Decl. ¶ 24.)

179.    Ms. Negron states that the City's privacy laws and policies as a whole equally safeguard all New Yorkers' identifying information to the greatest extent permitted by law. Allowing City officials and employees to act as federal informants by disclosing identifying information relating to immigration status alone not only contravenes the City's generalized

privacy framework, but also prompts confusion at the City's myriad agencies as their employees struggle to reconcile differing standards for protecting residents' personal information and, importantly, will betray residents' trust and confidence in their City's government. Such disclosures will ultimately have a chilling effect upon many vulnerable residents' ability to access necessary health, safety, and other services for fear that their personal information may be used for purposes that may bring harm to themselves and their loved ones. (Negron Decl. ¶ 25.)

180.    Assistant Chief Kim Y. Royster states that she is employed by the NYPD as an Assistant Chief in the Community Affairs Bureau. She has served in this position since February 21, 2017 and has 31 years of experience at the NYPD. Assistant Chief Royster is responsible for fostering productive police/community partnerships to reduce fear of crime and public disorder. (Royster Decl. at ¶¶ 1-2.)

181.    The NYPD is the largest municipal police department in the United States, with approximately 36,000 officers and 19,000 civilian employees. It is responsible for policing an 8.5-million-person city, by performing a wide variety of public safety, law enforcement, traffic management, counterterror, and emergency response roles. In the past 25 years, the NYPD has achieved massive declines in both violent and property crime, ensuring that New York City has the lowest overall rate of major crimes in the 25 largest cities in the country. (Royster Decl. at ¶ 3.)

182.    In 1993, there were 1,946 murders in New York City, an average of more than five murders each day. In 2017, there were 290 murders, a decrease of 85%. Rapes dropped almost 50% in the same period, from 2,818 in 1993 to 1,446 in 2017. Robberies went from 86,001 in 1993 to 13,950 in 2017. By every measure, New Yorkers today enjoy historically low crime rates. (Royster Decl. at ¶ 4.)

183.    Assistant Chief Royster avers that maintaining good police-community relations is a vital priority for the NYPD. Law enforcement is more effective in solving crime and keeping residents safe when everyone in the community is willing to report crimes to the police and cooperate with police investigations. The NYPD encourages the public to be the eyes and ears for law enforcement and her 31 years of experience at the NYPD have taught her that trust is crucial to ensuring that the public communicates what it sees and hears to the NYPD. (Royster Decl. at ¶ 5.)

184.    Assistant Chief Royster avers that City laws and policies promoting trust between the NYPD and the public are instrumental in improving public safety and maintaining the historically low crime rates the City now enjoys. The NYPD cannot successfully cultivate relationships with residents, particularly those in immigrant communities, if residents believe the NYPD is an arm of Immigrant Customs Enforcement. Residents, particularly those in immigrant communities, may retreat into the shadows if they believe that the NYPD has a policy or practice of generally sharing identifying information about them or their family members with ICE or other federal immigration authorities. (Royster Decl. at ¶ 6.)

185.    Assistant Chief Royster states that as a result of the NYPD's efforts to educate the public on its policies towards the non-citizen population, NYPD officials have been able to engage more frequently with immigrant advocacy organizations. Over the last two years, a number of representatives have been invited to participate in and present at community events, meetings, and symposia on the topic of immigration and local law enforcement. These have served as valuable opportunities for NYPD personnel to gain insight into the issues and concerns that this community faces. This makes the NYPD more effective and, as a result, the City is a safer place. (Royster Decl. at ¶ 7.)

186.    As a general matter, the NYPD protects confidential and identifying information, such as a person's status as a victim of domestic violence, sexual orientation, and immigration status. Assistant Chief Royster states that this promotes trust between the NYPD and the public. The NYPD does not ask residents about their immigration status, unless investigating the resident for committing a crime. NYPD does not need to know a person's immigration status to investigate and solve a crime the person reports, witnesses, or about which the person possesses information. NYPD does not investigate federal crimes penalizing illegal entry or reentry into the country. (Royster Decl. at ¶ 8.)

187.    Assistant Chief Royster avers that in her 31 years of service with the NYPD, she has spoken with many crime victims and their families, witnesses, and fellow officers. It has been her personal experience that it is helpful to policing when community members feel their confidentiality is protected. Confidentiality promotes cooperation between the community and the police. The ability to reassure members of the public that their personal information will not be compromised because of the City's laws and policies is invaluable – and, very effective. (Royster Decl. at ¶ 9.)

188.    Assistant Chief Royster states that the whole City benefits when City residents, regardless of their immigration status or other personal attributes, step forward and report to the police when they had been a victim of a crime or witnessed a crime. These reports—whether made to tip lines, precincts or police officers—can lead to arrests and getting dangerous people off the street. (Royster Decl. at ¶ 10.)

189.    Assistant Chief Royster states that immigrant communities understand that the NYPD acts in accordance with its own policies and local laws and not as an agent of federal

48

enforcement. That understanding is one of the bases for the trust built up over decades between immigrant communities and the NYPD. (Royster Decl. at ¶ 11.)

190.    Dr. Mary Travis Bassett is the Commissioner of the New York City Department of Health and Mental Hygiene ("DOHMH" or "Department"). She has served in this position since February 2014. Dr. Bassett holds an M.D. from Columbia College of Physicians and Surgeons and an M.P.H. from the University of Washington. She has decades of experience in public health as a leader, educator, researcher, and clinician. (Bassett Decl. ¶ 1, Ex. A.)

191.    DOHMH is one of the largest public health agencies in the world. It is responsible for protecting and promoting the health of everyone who lives in, works in or visits New York City. Dr. Bassett avers that the federal government's attempt to force the City to cooperate with its immigration enforcement efforts and to allow City employees, at their own discretion, on City time, and based on information obtained in the course of their jobs, to share information about people's immigration status with federal immigration authorities compromises DOHMH's ability to fulfill this responsibility. (Bassett Decl. ¶ 2.)

192.    Dr. Bassett states that there are federal, State and City laws, rules, and regulations governing the confidentiality of information regarding the individuals DOHMH serves. Any risk to the assurance of confidentiality that DOHMH provides to patients and clients creates enormous risk that these individuals will no longer seek the care they need, or share information necessary to protect the public health. (Bassett Decl. ¶ 3.)

193.    Dr. Bassett avers that DOHMH takes many steps to train its employees about the importance of maintaining the confidentiality of the information it obtains regarding patients and clients. Any suspected breach of such confidentiality is taken very seriously by DOHMH,

investigated thoroughly and appropriate action taken (which could include disciplinary action against an employee). (Bassett Decl. ¶ 4.)

194.    Dr. Bassett states she has visited many of DOHMH's clinics and programs throughout the City and has spoken with staff and people who use DOHMH's services. Based on these observations and conversations, she has seen that the protection of confidential information, including sexual orientation, status as a victim of domestic violence, gender identity, and immigration status, is very important to the New Yorkers who use DOHMH services and interact with public health workers. People will be afraid to interact with DOHMH if they believe that their confidential information, including immigration status, may be disclosed to others, such as the federal immigration authorities, without their consent or knowledge. Some people will in fact refuse services, including services like immunizations, if they believe that DOHMH employees may disclose their information to Immigration and Customs Enforcement. Others will refuse to cooperate with public health investigations or will refuse to provide complete information if they fear that cooperating could lead to disclosures to federal immigration authorities. By contrast, when people understand the confidentiality policies that apply to DOHMH, they are more willing to interact with DOHMH. If people refuse services or refuse to cooperate with DOHMH out of fear, there is a negative impact on the City's health as a whole. (Bassett Decl. ¶ 4.)

195.    DOHMH is responsible for controlling communicable and chronic diseases and conditions. It often must investigate and stop potential outbreaks of communicable diseases. Dr. Bassett states that cooperation from the community is key to the success of these investigations; the people whom DOHMH interviews must feel confident that cooperating with the Department's disease investigators will not adversely affect them, and they must know that any information they share with DOHMH will be maintained with the utmost confidentiality. (Bassett Decl. ¶ 5.)

196. Dr. Bassett avers that if City employees, including the Department's disease investigators, are permitted to report confidential information such as immigration status to ICE—contrary to City policy and law—DOHMH's ability to investigate outbreaks and to trace the possible contacts of disease cases will be compromised. Instead of assuring people that the critical information they are sharing with the health department will be kept confidential in the course of a public health investigation, City workers would have to inform people that some information may be disclosed to ICE. People will be less likely to share information with DOHMH in public health emergency situations if the confidentiality of their information cannot be assured. (Bassett Decl. ¶ 6.)

197. DOHMH maintains and operates public health centers and clinics that offer diagnosis, treatment and referral for individuals with sexually transmissible diseases, HIV and tuberculosis. Dr. Bassett states that it is frequently necessary that DOHMH learn the identities of persons with whom a patient has been in contact. These patients must know that the information they are being asked to provide will be kept confidential and used for public health purposes only, otherwise the histories DOHMH collects are likely not to be complete or accurate. For example, if patients fear that DOHMH employees may share immigration status information with ICE, they are likely to omit from their contacts any persons they believe or assume, correctly or not, could be undocumented. (Bassett Decl. ¶ 7.)

198. DOHMH also provides many services to children and other vulnerable people in the community that advance the City's public health across the board. Dr. Bassett avers that the public benefit of these programs will not be fully realized if City residents avoid engaging with public health authorities due to fears about confidentiality or concerns about the City's role in immigration enforcement. (Bassett Decl. ¶ 8.)

51

199.    DOHMH oversees the Early Intervention program in New York City. It supports infants and children with developmental delays and helps them realize their full potential. It reduces the likelihood of delays among at-risk children, assists and empowers families to meet their child's needs and entitles children—regardless of race, ethnicity or income—to services through the program. Dr. Bassett states that, fearing that confidential information including documentation status may be reported by a City employee, families are less likely to use the advantage of the program even for children who were born in the United States. (Bassett Decl. ¶ 9.)

200.    The Office of School Health is a joint program of the Department of Education and DOHMH. It promotes the health of the 1.3 million schoolchildren enrolled in approximately 1,800 public and non-public schools in New York City. Services to students include management of chronic health problems, preventive health screenings, urgent care, medication administration, preventive counseling and health education. Dr. Bassett avers that these services, too, are less likely to be accessed if families believe that their utilization of them may lead to the disclosure of confidential information, including immigration status. (Bassett Decl. ¶ 10.)

201.    DOHMH offers immunizations to adults and children who cannot otherwise access them. Increasing the number of people who are immunized protects the health of all New Yorkers. Yet, Dr. Bassett asserts, fewer people are likely to come forward to be immunized if they believe that DOHMH employees might report their confidential information or documentation status to others. Similarly, DOHMH provides services for newborns and pregnant women through its Newborn Home Visiting Program and Nurse Family Partnership Program. These programs, too, are less likely to be utilized if a recipient believes that accepting the service might result in their immigration status being disclosed. (Bassett Decl. ¶ 11.)

202.    DOHMH has made advancing health equity central to its mission and as part of its work it has strengthened efforts to engage immigrant communities in addressing public health issues. DOHMH knows the importance of tailoring its services based on the linguistic and cultural needs of New Yorkers. Evaluations of DOHMH programs have shown that outreach to and engagement with immigrant communities can lead to improved and increased access to health care, which benefits immigrant communities and all City residents. (Bassett Decl. ¶ 12.)

203.    Dr. Bassett asserts that any perception that the City is enforcing immigration laws on behalf of the federal government or is allowing its employees to communicate confidential information to federal immigration authorities, such as immigration status, could likely lead residents who would otherwise participate in DOHMH programs to avoid contact with DOHMH. This will hurt not only the health of the City residents who fail to seek care, but City residents as a whole. (Bassett Decl. ¶ 13.)

New York, NY
Dated: August 17, 2018

Respectfully submitted,

Anisha S. Dasgupta,
Deputy Solicitor General

Caroline A. Olsen,[†]
Assistant Solicitor General

Eric R. Haren,
Special Counsel & Senior Advisor

*Of Counsel*

**BARBARA D. UNDERWOOD**
*Attorney General*
*State of New York*

By: /s/ Nancy Trasande
Lourdes M. Rosado,[†] Bureau Chief
Jessica Attie,[†] Special Counsel
Lilia Toson,[†] Assistant Attorney General
Nancy Trasande,[†] Assistant Attorney General
Conor Duffy,[*] Assistant Attorney General
Civil Rights Bureau
28 Liberty St., 20th Floor
New York, NY 10005
Lourdes.Rosado@ag.ny.gov
Jessica.Attie@ag.ny.gov

Lilia.Toson@ag.ny.gov
Nancy.Trasande@ag.ny.gov
Conor.Duffy@ag.ny.gov
Phone: (212) 416-6438

**DEBEVOISE & PLIMPTON LLP**
919 Third Avenue
New York, NY 10022
Tel: (212) 909-6077
mfishbein@debevoise.com

By:  /s/ Matthew E. Fishbein
Matthew E. Fishbein[†]
Meryl Holt[†]

Of Counsel
Dana Rehnquist

*Attorneys for Plaintiff the City of New York*

**ZACHARY W. CARTER**
Corporation Counsel of the City of New York
100 Church Street
New York, NY 10007
Tel: (212) 356-2296
tjeneret@law.nyc.gov

By:  /s/  Doris Bernhardt
Doris Bernhardt[†]
Tonya Jenerette[†]
Sabita Krishnan[†]
Gail Rubin[†]

<table>
<tbody>
<tr><td>

**MAURA HEALEY**
*Attorney General*
*Commonwealth of Massachusetts*

By:  /s/Jonathan Miller
Jonathan Miller,[†] Chief, Public Protection
and Advocacy Bureau
Genevieve C. Nadeau,[†] Chief, Civil Rights
Division
One Ashburton Place
Boston, MA 02108
Jonathan.Miller@state.ma.us
Genevieve.Nadeau@state.ma.us
Phone: (617) 727-2200

</td><td>

**GEORGE JEPSEN**
*Attorney General*
*State of Connecticut*

By:  /s/ Mark F. Kohler
Mark F. Kohler,[‡] Assistant Attorney General
Michael Skold,[‡] Assistant Attorney General
55 Elm St., P.O. Box 120
Hartford, CT 06141-0120
Mark.Kohler@ct.gov
Michael.Skold@ct.gov
Phone: (860) 808-5020

</td></tr>
<tr><td>

**GURBIR S. GREWAL**
*Attorney General*
*State of New Jersey*

By:  /s/ Rachel Wainer Apter
Rachel Wainer Apter,[‡]
Assistant Attorney General
Richard J. Hughes Justice Complex
25 Market Street, 8th Floor
Trenton, NJ 08625-0116
Phone: (609) 376-2702
Rachel.Apter@njoag.gov

</td><td>

**PETER F. KILMARTIN**
*Attorney General*
*State of Rhode Island*

By:  /s/ Michael W. Field
Michael W. Field,[‡] Assistant Attorney General
The State of Rhode Island
Office of the Attorney General
150 South Main Street
Providence, Rhode Island 02903
Phone: (401) 274-4400, Ext: 2380
mfield@riag.ri.gov

</td></tr>
<tr><td>

**MARK R. HERRING**
*Attorney General*
*Commonwealth of Virginia*

By:  /s/ Victoria Pearson
Victoria Pearson,[**]
Deputy Attorney General
202 North 9th Street
Richmond, VA 23219
Phone: (804) 786-4319
VPearson@oag.state.va.us

</td><td>

**ROBERT W. FERGUSON**
*Attorney General*
*State of Washington*

By:  /s/ Luke Eaton
Luke Eaton[‡]
Assistant Attorney General
P.O. Box 40100
Olympia, WA 98504-0100
Phone: (360) 753-6200
LukeE1@atg.wa.gov

</td></tr>
</tbody>
</table>

[†]Admitted in the S.D.N.Y.
[‡]Admitted *pro hac vice*
[*] S.D.N.Y. application pending
[**]*Pro hac vice* motion forthcoming