UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, CONNECTICUT, NEW JERSEY, RHODE ISLAND and WASHINGTON, and COMMONWEALTHS OF MASSACHUSETTS and VIRGINIA,<br><br>    Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE; and JEFFERSON B. SESSIONS III, in his official capacity as Attorney General of the United States,<br><br>    Defendants. | No. 18-cv-6471 (ER) |
| CITY OF NEW YORK<br><br>    Plaintiff,<br><br>v.<br><br>JEFFERSON B. SESSIONS III, in his official capacity as Attorney General of the United States of America, and the UNITED STATES DEPARTMENT OF JUSTICE,<br><br>    Defendants. | No. 18-cv-6474 (ER) |

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| STATE OF NEW YORK, ET AL. | : | No. _____ |
| *Plaintiffs*, | : | |
| | : | |
| v. | : | |
| | : | |
| U.S. DEPARTMENT OF JUSTICE | : | |
| and JEFFERSON B. SESSIONS, III, | : | |
| in his official capacity as | : | |
| Attorney General of the United States | : | |
| *Defendants.* | : | |

## DECLARATION OF MICHAEL P. LAWLOR

Pursuant to 28 U.S.C. § 1746, I, Michael P. Lawlor, hereby declare:

1. I am over eighteen years of age and understand the obligations of an oath. I make this affidavit based on personal knowledge.

2. I currently am employed as the Under Secretary for Criminal Justice Policy and Planning by the State of Connecticut Office of Policy Management ("OPM"), and have held that position since January 5, 2011. In that capacity I serve as the liaison for the State to the United States Department of Justice on criminal justice issues of interest to the state and federal government relating to data, information systems and research.

3. I am familiar with the Edward Byrne Memorial Justice Assistance Grant Program ("JAG"). The purpose of that program is to provide federal criminal justice funding to States and units of local government to assist in their efforts to prevent and reduce crime and violence. JAG funds typically are used by grant recipients to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice and law enforcement programs.

4. In addition to using JAG funds themselves, grant recipients may pass-through JAG funds to subgrantees for the same purposes.

1

5. The State of Connecticut first applied for Local Law Enforcement Block Grant funds in 1997, and first applied for and received a JAG grant in 2005. The State has continued to apply for and receive JAG grant awards since then.

6. The State typically passes-through most of the JAG funds it receives to subgrantees, including various state agencies and local jurisdictions. Most of the State-level JAG funds are committed to state agency projects focused on components of the criminal justice system other than law enforcement. By contrast, most pass-through funds to local jurisdictions are dedicated to local law enforcement functions, with priority focus on narcotics, violent crime reduction, technology improvements and equipment.

7. For the FY14 JAG award, the State passed-through funds to the Department of Emergency Services and Public Protection ("DESPP"), the Department of Correction ("DOC"), the Judicial Branch, and twenty-eight different local jurisdictions throughout Connecticut.

8. For the FY15 and FY16 JAG awards, the State similarly passed-through funds to DOC and the Department of Mental Health and Addiction Services ("DMHAS"), and has proposed to pass-through funds to numerous local jurisdictions.

9. The State timely applied for a FY17 JAG award. After a substantial delay due to pending litigation in other jurisdictions, the Department of Justice Office of Justice Programs belatedly issued a $1,711,049 grant award to the State on June 26, 2018 ("the award"). The State has forty-five days from the date of the award, until August 10, 2018, in which to decide whether to accept the award.

10. The award is subject to sixty-six "special conditions" that the State and all subgrantees must agree to and abide by to accept the award and obligate and spend funds from it. According to the award, failure to comply with any of the special conditions may result in the Office of Justice Programs "taking appropriate action with respect to the recipient," including but not limited to withholding award funds, disallowing costs, or suspending or terminating the award. In addition, the award expressly provides that "[t]he Department of Justice . . . also may take other legal action as appropriate" if the State or a subgrantee fails to comply with any special condition.

11. The award contains several unlawful special conditions that were not included in prior JAG grant awards, and that the Department of Justice has no constitutional or statutory authority to impose.

12. First, the award expressly requires the State and all subgrantees to comply with the requirements of 8 U.S.C. § 1373. To validly accept the award, moreover, the Attorney General must submit a "Certification of Compliance with 8 U.S.C. § 1373" attesting that the State is in compliance with the provisions of that statute. The State also must obtain a similar certification from the chief legal officer of any subgrantee before passing-through grant funds to the subgrantee. Similarly, any subgrantees likewise must obtain a certification from any additional subgrantees to whom they wish to make a subaward.

13. Second, the award requires that the State must have in place "[a] State statute, or a State rule, -regulation, -policy, or –practice . . . that is designed to ensure that agents of the United States acting under color of federal law in fact are given to access any State (or State-contracted) correctional facility for the purpose of permitting such agents to meet with individuals who are (or are believed by such agents to be) aliens and to inquire as to such individuals' right to be or remain in the United States" ("the Access Condition").

14. Third, the State must have in place "[a] State statute, or a State rule, -regulation, -policy, or –practice . . . that is designed to ensure that, when a State (or State-contracted) correctional facility receives from DHS a formal written request authorized by the Immigration and Nationality Act that seeks advance notice of the scheduled release date and time for a particular alien in such facility, then such facility will honor such request and -- as early as practicable . . . provide the requested notice to DHS" ("the Notice Condition").

15. Fourth, the award requires the State to "monitor subawards under this JAG award in accordance with all applicable statutes, regulations, award conditions . . . ." The award specifically provides that this requirement includes monitoring all subgrantees (and any subgrantees to whom an initial subgrantee issues a subaward) for compliance with § 1373 and the Notice and Access Conditions. The award does not specify what the required "monitoring" entails, and does not provide any guidance about what the

Department of Justice believes the nature and scope of the State's monitoring obligations to be. Moreover, representatives of the Office of Justice Programs have indicated that even they do not currently know type of monitoring is required, or how the State is expected to comply with this requirement.

16. The special conditions discussed above will impose substantial hardships on the State whether the State chooses to comply with them or not.

17. For example, if the State chooses to accept the award and comply with the special conditions, it will incur substantial financial and administrative costs to comply with the monitoring requirements that the award imposes. The State already has identified numerous local jurisdictions as proposed subgrantees for the FY17 JAG award. The State does not currently know whether and to what extent those local jurisdictions comply with § 1373 or the Notice and Access Conditions, and will have to expend significant time and resources to determine whether they do. Even after making that initial determination, moreover, if the State accepts the award it will be required to continue monitoring each jurisdiction's compliance with those conditions on an ongoing basis. Although it is not possible to determine the exact amount of costs associated with that prospective monitoring—because the award does not specify what "monitoring" entails and because the Department of Justice itself does not even know what the term means—the costs undoubtedly will be substantial. For example, if the State is required to conduct in-field monitoring and auditing of records and reports by each subgrantee, it will have to hire and pay for several additional employees to handle the burdens associated with those tasks. And if "monitoring" involves a more burdensome process similar to the one that currently exists for the Prison Rape Elimination Act of 2003 ("PREA") carve out from JAG, the State will have to hire and pay for even more administrative staffing above current levels.

18. Just as the State will be harmed if it chooses to accept the award and comply with the special conditions, it also will be harmed if it declines the award and the $1,711,049 in federal funding that goes along with it. By way of example only, JAG funds currently are used to provide a stipend to local police officers for their time spent assisting the DESPP Statewide Narcotic Task Force ("SNTF"), which cannot operate without the assistance of local police. A loss of FY17 JAG funds will eliminate those stipends to local police, and thereby substantially and detrimentally impact the SNTF's ability to function. Similarly, JAG funds currently support substance abuse treatment services

and other re-entry services in prisons and Connecticut communities. A reduction in FY17 JAG funding will have a substantial impact on those programs' ability to operate. It also will negatively impact the DMHAS opioid intervention project for local police departments, the purpose of which is to reduce opioid-related deaths and reduce opioid-related crime and incarceration. Loss of FY17 JAG funds will force the State to either accept the negative consequences associated with the impairment of these vital programs, or to instead incur the cost of appropriating additional state funds to cover the lost federal funding.

19. Further, a loss of FY17 JAG funds will have a direct impact on OPM itself. The State currently uses money from the JAG program to fund a portion of the salary of four OPM staff members, or the equivalent of 1.125 full-time positions. Those grant funds account for approximately $110,320 of payroll and $104,804 of fringe benefits for those employees, for an annual total of $215,124. The grant also funds approximately $47,427 of annual overhead cost at OPM. If FY17 JAG funds are not received, therefore, the State will incur a total annual loss of funding in the amount of approximately $262,551.

20. Finally, putting aside all of these financial harms, the fact of the matter is that the special conditions discussed above are unlawful, and the Department of Justice has no constitutional or statutory authority to impose them as conditions to the State's acceptance of the award. Further, the State is unwilling to comply with these conditions, and it cannot lawfully be required to do so in order to accept the award. The State is thus harmed by the special conditions because they put the State to the Hobson's choice of either foregoing the award and incurring the financial and programmatic harms discussed above, or alternatively, complying with unlawful conditions that State does not want, and cannot be required, to abide by.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: 7/13/2018

MICHAEL P. LAWLOR