# Exhibit 9

REDACTED – PUBLIC VERSION





# COOPERATION OF SCAAP RECIPIENTS IN THE REMOVAL OF CRIMINAL ALIENS FROM THE UNITED STATES

U.S. Department of Justice
Office of the Inspector General
Audit Division

Audit Report 07-07

January 2007

REDACTED – PUBLIC VERSION

AR-00001

# COOPERATION OF SCAAP RECIPIENTS IN THE REMOVAL OF CRIMINAL ALIENS FROM THE UNITED STATES*

## EXECUTIVE SUMMARY

As required by Congress (Public Law 109-162), the United States Department of Justice (DOJ) Office of the Inspector General (OIG) conducted an audit of the Office of Justice Programs' (OJP) State Criminal Alien Assistance Program (SCAAP). The congressional mandate required the OIG to provide answers to four questions involving jurisdictions that receive SCAAP funding:

*Whether there are States, or political subdivisions of a State, that have received compensation under Section 241(i) of the Immigration and Nationality Act (8 U.S.C. 1231(i)) and are not fully cooperating in the Department of Homeland Security's efforts to remove from the United States undocumented criminal aliens (as defined in paragraph (3) of such section).*

*Whether there are States, or political subdivisions of a State, that have received compensation under section 241(1) of the Immigration and Nationality Act (8 U.S.C. 1231(i)) and that have in effect a policy that violates section 642 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1373).*

*The number of criminal offenses that have been committed by aliens unlawfully present in the United States after having been apprehended by States or local law enforcement officials for a criminal offense and subsequently being released without being referred to the Department of Homeland Security for removal from the United States.*

*The number of [criminal] aliens . . . who were released because the State or political subdivision lacked space or funds for detention of the alien.*[1]

SCAAP is a payment program administered by OJP, through its component the Bureau of Justice Assistance (BJA), in conjunction with the Immigration and Customs Enforcement (ICE) bureau within the Department

---

\* The full version of this report included information that the Department of Homeland Security considered to be Law Enforcement Sensitive information. To create this public version of the report, the OIG redacted (deleted) the sensitive portions and noted that the information was redacted.

[1] See Appendix II of this report for Public Law No. 109-162, section 1196 (c), (2006).

AR-00002

of Homeland Security (DHS).[2]  SCAAP was authorized by the Violent Crime Control and Law Enforcement Act of 1994 to provide federal assistance to states and localities for the costs of incarcerating certain criminal aliens who are in custody based on state or local charges or convictions.[3]  In fiscal year (FY) 2005, BJA distributed $287.1 million in SCAAP payments to 752 state, county, and local jurisdictions.[4]

The following table displays the 10 jurisdictions that received the largest SCAAP payments from the FY 2005 appropriation.  Collectively, they accounted for nearly 69 percent of the SCAAP payments made from that appropriation.

| TOP TEN SCAAP RECIPIENTS – FY 2005 | | |
|---|---|---|
| **State** | **Jurisdiction** | **Amount** |
| California | State of California[5] | $ 85,953,191 |
| New York | State of New York | 24,022,356 |
| Texas | State of Texas | 18,582,484 |
| New York | City of New York | 15,893,255 |
| Florida | State of Florida | 12,806,110 |
| California | Los Angeles County[6] | 12,530,034 |
| Arizona | State of Arizona | 12,139,791 |
| California | Orange County | 6,562,437 |
| Illinois | State of Illinois | 4,731,269 |
| Massachusetts | State of Massachusetts | 4,728,549 |
| | TOTAL | $197,949,476 |

Source:  Bureau of Justice Assistance (BJA)

Although 752 jurisdictions received SCAAP payments from the FY 2005 appropriation, the vast majority of them received relatively small amounts. The following chart summarizes the number of recipients by dollar amount.

---

[2]  Prior to creation of the DHS in 2003, the functions currently performed by ICE were performed by the Immigration and Naturalization Service, which at the time was part of DOJ.

[3]  Public Law No. 103-322 (1994).

[4]  FY 2005 is the most recent year for which payment information was available.  See Appendix III for payment information for FYs 2005 and 2004.

[5]  When we define a jurisdiction as the "state," we are referring to the state department of corrections.  We are not including all the counties and municipalities within the state that may have separately received SCAAP payments.

[6]  This refers to the Los Angeles County Sheriff's Department.

AR-00003



Source: OIG analysis of BJA data

The program reimburses states and localities that incur correctional officer salary costs for incarcerating undocumented criminal aliens who: (1) have at least one felony or two misdemeanor convictions for violations of state or local law, and (2) are incarcerated for at least four consecutive days during the established reporting period.[7] Applicants for funding are required to provide correctional officer salary costs, the total of all inmate days, and details about eligible inmates housed in their correctional facilities during that period.

For the applications received, ICE assists BJA by checking the inmate data submitted by the jurisdictions that seek SCAAP payments to determine the immigration status of those inmates. This process is described as "vetting" the data.[8]

---

[7] The reporting period does not coincide with the fiscal year for which SCAAP funds are appropriated. For example, the reporting period for FY 2006 funds was July 1, 2004, through June 30, 2005. Similarly, the reporting period for FY 2005 funds was July 1, 2003, through June 30, 2004.

[8] According to a July 2003 Memorandum of Understanding between ICE and OJP, ICE agreed to determine, by SCAAP applicant, the number of eligible inmates.

- ii –

Historically, congressional appropriations for SCAAP have been less than the total amount sought by all the jurisdictions applying for SCAAP payments.  As a result, BJA pays a *pro rata* amount of the jurisdictions' submitted expenses.  In April 2005, the Government Accountability Office (GAO) issued a report stating that 80 percent of the SCAAP aliens were incarcerated in the five states of Arizona, California, Florida, New York, and Texas in FY 2003.  GAO found that SCAAP payments to four of those states were less than 25 percent of the estimated cost to incarcerate SCAAP criminal aliens.  The FY 2003 SCAAP payments amounted to 12 percent of the estimated incarceration costs for California, 24 percent for New York, 17 percent for Florida, and 14 percent for Arizona.[9]

## SCAAP RECIPIENTS' COOPERATION WITH ICE

The first congressional question asked us to determine whether there are recipients of SCAAP funds that do not fully cooperate with the efforts of DHS to remove undocumented criminal aliens from the United States.  Congress did not define "fully cooperate," nor did our review of immigration legislation disclose any specific steps that localities are required to take to help effect the removal of criminal aliens from the United States.

To respond to this question, we interviewed ICE officials to obtain their views, distributed a questionnaire to 164 SCAAP recipients, and conducted independent testing in 7 jurisdictions that received SCAAP funding.[10]  Our field testing included interviews with local officials and review of local files.[11]

---

[9]  Government Accountability Office. *Information on Criminal Aliens in Federal and State Prisons and Local Jails*, GAO-05-337R, April 7, 2005.  GAO reported that data on the cost of incarceration for the State of Texas were not available.

[10]  See Appendix IV for a list of the jurisdictions we surveyed and those that responded.  The 164 agencies in the sample received $264.8 million, or 92.2 percent of the FY 2005 SCAAP payments.  The 99 respondents to our questionnaire received $205.4 million, or 71.6 percent of the FY 2005 SCAAP payments.

[11]  We performed field work at the State of California Department of Corrections and Rehabilitation; State of Oregon Department of Corrections; State of Texas Department of Criminal Justice; Clark County, Nevada; Cook County, Illinois; City of New York, New York; and the City and County of San Francisco, California.  We selected these sites to have a mix of state, county, and local jurisdictions that received SCAAP payments of at least $1 million each.  Collectively, these seven jurisdictions received $128.3 million, or 44.7 percent of the SCAAP payments issued from the FY 2005 appropriation.

AR-00005

*Views of ICE Officials*

We asked ICE officials to identify SCAAP recipients that they believe do not fully cooperate with ICE in the removal of undocumented criminal aliens from the United States.  Because ICE does not maintain records describing SCAAP recipients that do not cooperate in the effort to remove criminal aliens, they noted that any information they might provide us would be anecdotal.

We also contacted officials at ICE headquarters and solicited their views first about the cooperativeness of SCAAP recipients generally and later about the seven jurisdictions where we performed field work.  ICE officials commented favorably with respect to the entities' cooperation about every jurisdiction except the City and County of San Francisco, and they declined to suggest alternative sites for our field work.

According to an agent working at ICE headquarters, the ICE San Francisco Field Office has encountered difficulties, which they attributed to a "bare minimum" of cooperation.  Specifically, we were told that ICE agents are not permitted to access San Francisco County jail records without the authorization and approval of the Sheriff.  ICE agents are authorized to enter the jails to interview prisoners and to access the "all-jail alphabetical list" of inmates but they do not have authorization to access booking cards, housing cards or other jail records.  ICE officials commented on this situation as being different from other localities that have allowed ICE agents such access.  Despite these views expressed by ICE officials, San Francisco officials believe they are cooperating sufficiently with ICE.

In the absence of a congressional definition of "fully cooperating" to guide us, we developed specific tests to measure the degree to which SCAAP recipients assisted ICE in the effort to remove criminal aliens from the United States.  We looked at whether SCAAP recipients:  (1) inquire into the immigration status of individuals in custody; (2) notify ICE when criminal aliens are in custody; (3) accept detainers from ICE; and (4) notify ICE when criminal aliens are about to be released from custody.[12]

Our review did not disclose any instances of outright failure to cooperate with ICE in the removal of criminal aliens from the United States.  Instead, we found that local jurisdictions often set the enforcement of state and local law as a priority, while sometimes permitting or encouraging law

---

[12]  A detainer is a notice from ICE asking officials at the detention facility to notify ICE before releasing a detainee.

AR-00006

enforcement agencies and officers to work with ICE to some degree on immigration matters.

In addition to answering our questions on the level of cooperation received by state and local agencies, ICE officials also made suggestions on how to improve the SCAAP program. Some ICE headquarters officials expressed a desire to have responsibility for SCAAP transferred from BJA to ICE and to make SCAAP payments contingent upon participation in the "287(g)" program. Section 287(g) of the Immigration and Nationality Act provides that ICE may enter into a written agreement with a state or locality enabling qualified state or local law enforcement agents to carry out certain functions relating to immigration enforcement, including investigation, apprehension, or detention of aliens in the United States.[13]

Other ICE officials expressed the view that SCAAP is "misguided" primarily because SCAAP applications are based on a custody period in the year prior to the one in which payments are sought. In the view of those officials, payment for the past costs of incarceration does nothing to further the removal of undocumented criminal aliens currently in the United States.

Some ICE headquarters officials also stated they would like to have graduated payments based on the SCAAP recipient taking steps toward the removal of criminal aliens from the United States. Larger payments could be provided to a jurisdiction when a final order of removal is obtained and for participating in the "Section 287(g)" program. This would result in payment for assisting ICE in identifying and removing criminal aliens rather than merely housing them.

*Results of Survey*

We also surveyed 164 of the 752 state, county, and local agencies that received SCAAP funding from the FY 2005 appropriation and received responses from 99 jurisdictions. Our questionnaire included the following four questions designed to assess their cooperation with ICE:[14]

---

[13] 8 U.S.C. § 1357(g) (1996).

[14] Our questionnaire included boxes where the respondent could check "yes" or "no." However, some respondents wrote in "not applicable," or "unknown," and, in some cases, the respondent chose not to answer a particular question. Our questionnaire also included spaces where the respondent could add explanatory comments.

AR-00007

- *If law enforcement officers from your jurisdiction arrest an individual on state or local charges, do they generally ask the subject about his or her immigration status?*

- *If law enforcement officers from your jurisdiction have reason to believe that someone they arrest may be an undocumented alien, do they generally inform ICE that the individual is in their custody?*

- *Do the detention facilities in your jurisdiction generally accept detainers from ICE for undocumented criminal aliens in their custody?*

- *Do the detention facilities in your jurisdiction generally alert ICE prior to releasing any undocumented criminal aliens in their custody?*

None of the respondents answered negatively to all four questions. Fourteen respondents answered "no" to 2 questions and 5 respondents answered "no" to 3 questions.[15]

- Thirty jurisdictions reported they do not generally ask arrestees about their immigration status. However, some jurisdictions explained that arrestees are asked about their country of birth rather than immigration status, and others stated that immigration status is determined during the booking process rather than at the time of arrest.[16]

- Seventeen respondents reported they do not inform ICE when they have someone in custody who they believe may be an undocumented alien. However, many of those 17 jurisdictions added qualifying remarks. For example, some agencies stated that ICE agents come to the state or local institution to review files, which would obviate the need to inform ICE. Other jurisdictions criticized ICE and stated they do not inform ICE about possible undocumented aliens in their custody because they believe ICE will not respond.

---

[15] See Appendix X for additional details about the responses that contained more than one negative answer.

[16] Thirty-four jurisdictions checked the "no" box on the questionnaire, but 4 of those 34 jurisdictions added comments stating that they are custodial institutions and their officers do not have arrest authority.

AR-00008

- Eighteen jurisdictions reported they do not alert ICE prior to releasing undocumented criminal aliens from custody. However, several of those jurisdictions added clarifying remarks. For example, one respondent stated they are generally not aware of the immigration status of individuals in custody. Another reported that releases of inmates must occur within a very short time after a local court orders the release. Another jurisdiction stated its officials do not alert ICE prior to releasing an undocumented criminal alien from custody "unless ICE asks us to."

*Results of Field Work*

In addition, we interviewed officials and reviewed files at seven jurisdictions that received funding from the FY 2005 appropriation for SCAAP. The officials whom we interviewed included local officials knowledgeable in the areas of SCAAP and detention, as well as ICE officials who had dealings with the state, county, or locality. Local officials from all seven jurisdictions reported that their detention facilities: (1) accept ICE detainers for undocumented criminal aliens in their custody; and (2) alert ICE before releasing undocumented criminal aliens from custody.

To test these assertions, we reviewed a total of 76 files relating to criminal aliens who had been recently discharged from local custody at the 7 locations where we performed field work. We found that:

- ICE was notified in a timely manner that the 76 criminal aliens were in custody;

- ICE detainers were accepted for all 76 individuals;

- 70 criminal aliens were transferred to ICE, all in a timely manner.[17]

We further examined the issue of cooperation between SCAAP recipients and ICE by researching the policies of localities that may have laws, resolutions, or other policies limiting the role of local agencies in the enforcement of immigration legislation. In some cases, localities have designated themselves with terms such as "sanctuary city" or "civil liberties safe zone." ICE officials expressed dissatisfaction with the level of cooperation provided by some of these "sanctuary" sites.

---

[17] Five of the remaining six individuals were transferred to other jurisdictions, such as a state prison, and one, a Cuban, was paroled because repatriation to Cuba was not possible.

- vii –

We were able to locate an official "sanctuary" policy for only two jurisdictions that received at least $1 million in SCAAP funding, the State of Oregon, which received $3.4 million, and the City and County of San Francisco, which received $1.1 million and has designated itself as a "City and County of Refuge." We also located an Executive Order issued by the Mayor of the City of New York limiting the activities of local law enforcement agencies and officers in the enforcement of immigration law.[18] However, in each instance the local policy either did not preclude cooperation with ICE or else included a statement to the effect that those agencies and officers will assist ICE or share information with ICE as required by federal law.

The results of our review were inconclusive in identifying SCAAP recipients that were not fully cooperating with ICE in its efforts to remove undocumented criminal aliens from the United States. We found conflicting views between ICE and local jurisdictions as to what actions constitute full cooperation. In addition, our fieldwork at select locations found that the SCAAP recipients notified ICE in a timely manner of aliens in custody, accepted detainers from ICE, and promptly notified ICE of an impending release from local custody.

## COMMUNICATION BETWEEN SCAAP RECIPIENTS AND ICE

The second congressional question asked us to determine whether any SCAAP recipients have in effect a policy that violates section 642 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. § 1373). Two key provisions of this statute provide:

- *Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, or any individual.*

- *Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:*

  - *Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.*

---

[18]  See Appendix VII.

- viii –

AR-00010

        ○  *Maintaining such information.*

        ○  *Exchanging such information with any other Federal, State, or local government entity.*[19]

*Views of ICE Officials*

ICE officials objected to provisions of the administrative code of the City and County of San Francisco that limit the ability of local agencies and officers to communicate immigration information to ICE.

*Results of Survey*

We included a question in our survey asking about laws, regulations, or policies affecting each organization that might restrict the free exchange of immigration-related information between local law enforcement agencies and ICE. The 99 jurisdictions that responded to the questionnaire stated almost unanimously that there was no legislation or policy impeding the ability of local officers and agencies to communicate with ICE on immigration-enforcement matters.

Only the City and County of San Francisco gave a qualified "yes" in response to our queries about the existence of a local ordinance or a departmental policy limiting the ability of local law enforcement officers or agencies to exchange information with ICE relating to immigration enforcement. The response included a copy of Chapter 12H of the City Administrative Code, which contains a provision stating "no department, agency, commission, officer or employee . . . shall use any City funds or resources to assist in the enforcement of federal immigration law or to gather or disseminate information regarding the immigration status of individuals in the City and County of San Francisco *unless such assistance is required by federal or state statute, regulation, or court decision.*" [Emphasis added.] The Code also states "nothing in this Chapter shall prohibit, or be construed as prohibiting, a law enforcement officer from identifying or reporting any person pursuant to a state or federal law or regulation who is in custody after being booked for the alleged commission of a felony and is suspected of violating the civil provisions of the immigration laws." Finally, the Code states that "nothing in this chapter shall preclude any . . . department, agency, commission, officer or employee from (a) reporting information to the INS regarding an individual who has

---

[19] The statutory references to the Immigration and Naturalization Service now apply to ICE.

AR-00011

been booked at any county jail facility, and who has previously been convicted of a felony committed in violation of the laws of the State of California, which is still considered a felony under state law; (b) cooperating with an INS request for information regarding an individual who has been convicted of a felony committed in violation of the laws of the State of California, which is still considered a felony under state law; or (c) reporting information as required by federal or state statute, regulation or court decision, regarding an individual who has been convicted of a felony committed in violation of the laws of the State of California, which is still considered a felony under state law." [20]

San Francisco city officials also cited provisions of a police department General Order, which states that generally "a member [of the police department] shall not inquire into an individual's immigration status or release or threaten to release information to the INS regarding an individual's identity or immigration status."  However, the General Order makes exceptions that parallel those enumerated in the City Administrative Code.

*Results of Field Work*

In our interviews with local officials at the seven sites, we asked if their jurisdictions currently have in effect any statute, ordinance, executive order, or other legislation or official policy prohibiting local law enforcement agencies and officers from freely exchanging information with ICE on the citizenship or immigration status of individuals.  Officials at four of the seven sites we visited replied unequivocally, "no," while officials at the other three sites gave qualified answers.

- The State of Oregon has a state "sanctuary" statute, but the officials whom we interviewed believe it does not infringe on the exchange of information with ICE. [21]

- Officials from the City of New York informed us there is no prohibition on exchanging information with ICE on individuals who have been arrested.  Executive Order No. 41, issued by the Mayor, defines "immigration status" as "confidential information" and forbids disclosure except when "such disclosure is required by law."  The Executive Order also provides exceptions to the prohibition against disclosure when "the individual to whom [immigration]

---

[20]  The San Francisco City Administrative Code references to INS now apply to ICE.

[21]  The State of Oregon "sanctuary" statute is located in Appendix VI.

AR-00012

information pertains is suspected . . . of engaging in illegal activity, other than mere status as an undocumented alien" or "the dissemination of such information is necessary to apprehend a person suspected of illegal activity, other than mere status as an undocumented alien" or "such disclosure is necessary in furtherance of an investigation of potential terrorist activity."[22]

- Local officials stated the City of San Francisco Police Department's policy is "consistent with its obligations under state and federal law, to adhere to the City of Refuge Ordinance.  This ordinance prohibits the use of city resources to assist in the enforcement of federal immigration laws except in certain limited circumstances consistent with state and federal law."

As previously mentioned, ICE officials objected to San Francisco's policies but they did not raise any concerns about the flow of information to and from any of the other six sites where we performed field work.

## RECIDIVISM OF CRIMINAL ALIENS RELEASED FROM LOCAL CUSTODY

The third congressional question asked us to determine how many criminal offenses were committed by criminal aliens who were released from state or local custody without a referral to DHS for removal from the United States.

To address this question, we performed limited testing to determine the number of subsequent *arrests* of criminal aliens who were released from state or local custody.  We based our testing on information from the vetted FY 2004 SCAAP database, which was the last year when ICE reported to BJA on the status of every person identified in support of applications for SCAAP funding.[23]  There were 262,105 records in that database.  We requested assistance from the Federal Bureau of Investigation (FBI) to have those records compared to arrest data in the FBI's National Crime Information Center (NCIC).[24]

---

[22]  A copy of the Executive Order may be found in Appendix VII.

[23]  FY 2004 SCAAP funding was based on the incarceration of criminal aliens between July 1, 2002, and June 30, 2003.

[24]  NCIC is a computerized database of criminal justice information available to law enforcement agencies nationwide.  The NCIC database consists of millions of records arranged in 18 files, including one relating to immigration violators.

AR-00013

After querying NCIC, the FBI provided us with nearly 433,000 text files that could not be searched by automated means. The volume of files was too great to search manually and quantify the results. Consequently, we judgmentally selected a sample of 100 criminal histories, which we reviewed for evidence of arrests of criminal aliens subsequent to June 30, 2003. The criminal histories for 73 of the 100 individuals documented at least one arrest after that date. Those 73 individuals accounted for a total of 429 arrests, with 878 charges and 241 convictions. These figures represent an average of nearly six arrests per individual.

The charges for the 73 individuals ranged from traffic violations and trespassing to more serious crimes, such as burglary or assault. Some of those charges included:

- 166 drug-related;

- 37 immigration-related;

- 213 burglary, robbery, or theft;

- 40 assault;

- 10 property damage;

- 3 terrorist threat;[25] and

- 13 weapons charges.

Based on this limited sample, we cannot statistically extrapolate the number of offenses committed by undocumented criminal aliens who were released from local custody without a referral to ICE. Based on the information available to us in the criminal histories, we could not determine the number of the criminal aliens in our sample that were deported, if any, and later arrested after reentering the United States. We also could not determine if ICE was notified before the criminal aliens in our sample were released from custody. But if this data is indicative of the full population of 262,105 criminal histories, the rate at which released criminal aliens are rearrested is extremely high.

---

[25] The "terrorist threat" cases related to misdemeanor charges based on domestic disputes.

AR-00014

## CRIMINAL ALIENS RELEASED DUE TO LACK OF RESOURCES

The fourth congressional question asked us to determine how many of the criminal aliens who were released from state or local custody were released for lack of sufficient detention space or funding to hold them. While we believe it likely that this occurs regularly, our review could not identify specific instances of such releases because ICE does not track the number of aliens released from local custody due to lack of the necessary resources to detain them.

In an effort to address this issue, the questionnaire that we sent to 164 SCAAP recipients included a request that the respondents provide the number of criminal aliens who were released from custody between October 1, 2004, and June 30, 2006, because the respondent lacked the space or funds to detain those aliens. None of the respondents reported having released criminal aliens from custody due to lack of resources.

Even though the respondents to our questionnaire did not report releasing undocumented criminal aliens because of insufficient local resources, we noted an issue regarding the lack of space available to ICE to detain aliens in custody. In an April 2006 report, the Inspector General of the Department of Homeland Security reported, "[the Detention and Removal Operations (DRO)] estimates that in FY 2007 there will be 605,000 foreign-born individuals admitted to state correctional facilities and local jails during the year for committing crimes in the U.S.[26] Of this number, DRO estimates half (302,500) will be removable aliens. Most of these incarcerated aliens are being released into the U.S. at the conclusion of their respective sentences because DRO does not have the resources to identify, detain, and remove these aliens under its Criminal Alien Program (CAP). It is estimated that DRO would need an additional 34,653 detention beds, at an estimated cost of $1.1 billion, to detain and remove [them]."[27]

The DHS Inspector General went on to state, "additionally, DRO's ability to detain and remove illegal aliens with final orders of removal is impacted by: (1) the propensity of illegal aliens to disobey orders to appear in immigration court; (2) the penchant of released illegal aliens with final orders to abscond; (3) the practice of some countries to block or inhibit the repatriation of its citizens; and (4) two recent U.S. Supreme Court decisions

---

[26] At our exit conference, representatives of DRO stated that references to "DRO" in the DHS OIG report would in this context be more appropriately read as "ICE."

[27] Department of Homeland Security, Office of the Inspector General. *Detention and Removal of Illegal Aliens: U.S. Immigration and Customs Enforcement (ICE)*, OIG-06-033, April 2006, p. 2.

AR-00015

which mandate the release of criminal and other high-risk aliens 180 days after the issuance of the final removal order except in 'Special Circumstances.'  Collectively, the bed space, personnel and funding shortages coupled with the other factors, has created an unofficial 'mini-amnesty' program for criminal and other high-risk aliens."

The DHS Inspector General reported that 345,006 criminal aliens were apprehended between FYs 2001 and 2004, of which 27,947 (8 percent) were released.  However, the DHS Inspector General could not determine whether they were released because of a lack of detention space or for other reasons, because ICE does not track that information.

AR-00016

# TABLE OF CONTENTS

**Page**

**CHAPTER 1 – INTRODUCTION** ......................................................... 1

Background.................................................................................... 1
Legal Authority for SCAAP ............................................................ 3
Application Process......................................................................... 3
Prior Audits.................................................................................. 6
OIG Audit Approach....................................................................... 7

**CHAPTER 2 – SCAAP RECIPIENTS' COOPERATION WITH ICE** ............ 8

Views of ICE Officials.................................................................... 8
Results of OIG Survey ................................................................. 10
Results of Field Work .................................................................. 18
Statement of Major Cities Chiefs of Police ..................................... 22
Additional Research .................................................................... 23

**CHAPTER 3 – COMMUNICATION BETWEEN SCAAP RECIPIENTS AND
ICE** ....................................................................................... 25

Views of ICE Officials.................................................................. 25
Results of OIG Survey ................................................................. 26
Results of Field Work .................................................................. 27

**CHAPTER 4 – RECIDIVISM OF CRIMINAL ALIENS RELEASED FROM
LOCAL CUSTODY** ................................................................... 29

NCIC Query................................................................................ 29

**CHAPTER 5 – CRIMINAL ALIENS RELEASED DUE TO LACK OF
RESOURCES** ........................................................................... 31

Results of OIG Survey ................................................................. 31
DHS Inspector General Report ..................................................... 32

AR-00017

**STATEMENT ON COMPLIANCE WITH LAWS AND REGULATIONS**............................................... 33

**STATEMENT ON INTERNAL CONTROL STRUCTURE** ........................... 34

**APPENDICES:**

    I.    **AUDIT OBJECTIVES, SCOPE, AND METHODOLOGY** .............. 35

    II.    **PUBLIC LAW 109-162** ....................................................... 37

    III.    **SCAAP RECIPIENTS – FYs 2004 AND 2005** ......................... 39

    IV.    **OIG SURVEY RECIPIENTS**.................................................. 62

    V.    **MAJOR CITIES CHIEFS OF POLICE POLICY** ......................... 66

    VI.    **STATE OF OREGON POLICY** ............................................... 68

    VII.    **CITY OF NEW YORK POLICY** ............................................. 69

    VIII.    **SAN FRANCISCO CITY ADMINISTRATIVE CODE** ................. 72

    IX.    **CALIFORNIA ATTORNEY GENERAL'S OPINION #01-213** ..... 75

    X.    **JURISDICTIONS WITH MULTIPLE "NO" ANSWERS TO THE OIG SURVEY** ...................................................................... 85

    XI.    **BUREAU OF JUSTICE ASSISTANCE RESPONSE TO THE DRAFT AUDIT REPORT** ...................................................... 91

AR-00018

# CHAPTER 1 – INTRODUCTION

As required by Congress (Public Law 109-162), the United States Department of Justice (DOJ) Office of the Inspector General (OIG) conducted an audit of the Office of Justice Programs' (OJP) State Criminal Alien Assistance Program (SCAAP). The congressional mandate required the OIG to perform a study and report to the Judiciary Committees of the United States Senate and the United States House of Representatives on the following matters pertaining to recipients of SCAAP payments:

*Whether there are States, or political subdivisions of a State, that have received compensation under Section 241(i) of the Immigration and Nationality Act (8 U.S.C. 1231(i)) and are not fully cooperating in the Department of Homeland Security's efforts to remove from the United States undocumented criminal aliens (as defined in paragraph (3) of such section).*

*Whether there are States, or political subdivisions of a State, that have received compensation under section 241(1) of the Immigration and Nationality Act (8 U.S.C. 1231(i)) and that have in effect a policy that violates section 642 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1373).*

*The number of criminal offenses that have been committed by aliens unlawfully present in the United States after having been apprehended by States or local law enforcement officials for a criminal offense and subsequently being released without being referred to the Department of Homeland Security for removal from the United States.*

*The number of [criminal] aliens . . . who were released because the State or political subdivision lacked space or funds for detention of the alien.*[28]

## Background

SCAAP is a payment program administered by OJP through the Bureau of Justice Assistance (BJA) and in conjunction with the Immigration and Customs Enforcement (ICE) bureau within DHS.[29] SCAAP was authorized by

---

[28] See Appendix II of this report for Public Law No. 109-162, section 1196 (c) (2006).

[29] Prior to creation of the DHS in 2003, the functions currently performed by ICE were performed by the Immigration and Naturalization Service, which at the time was part of DOJ.

AR-00019

the Violent Crime Control and Law Enforcement Act of 1994 to provide federal assistance to states and localities for the costs of incarcerating certain criminal aliens who are in custody based on state or local charges or convictions.[30]  Since SCAAP is a payment program rather than a grant program, jurisdictions that are eligible to receive funds simply provide OJP with their accounting information and accept payment through OJP's Grants Management System.  They do not have to submit program progress reports or financial status reports.

The program pays states and localities that incur correctional officer salary costs for incarcerating undocumented criminal aliens who:  (1) have at least one felony or two misdemeanor convictions for violations of state or local law, and (2) are incarcerated for at least four consecutive days during the established reporting period.[31]  Applicants for funding are required to provide correctional officer salary costs, the total of all inmate days, and details about eligible inmates housed in their correctional facilities during that period.

For the applications received, ICE assists BJA by checking the inmate data submitted by the jurisdictions that seek SCAAP payments to determine the immigration status of those inmates.  This process is described as "vetting" the data.  In FY 2005, BJA distributed $287.1 million in SCAAP payments to 752 state, county, and local jurisdictions.[32]  Individual payments ranged from a high of $85.9 million (State of California) to a low of $40 (Polk County, Minnesota).  In FY 2004, BJA distributed $281.6 million to 741 jurisdictions in amounts ranging from $77.4 million (State of California) to $35 (Louisville Jefferson County Metro Government, Kentucky).[33]

Historically, congressional appropriations for SCAAP have been less than the total amount sought by all the jurisdictions applying for SCAAP payments.  As a result, BJA pays a *pro rata* amount of a jurisdiction's submitted expenses.  In April 2005, the Government Accountability Office (GAO) reported that 80 percent of the SCAAP aliens were incarcerated in the

---

[30]  Pub. L. No. 103-322 (1994).

[31]  The reporting period does not coincide with the FY for which SCAAP funds are appropriated.  For example, the reporting period for FY 2006 funds was July 1, 2004, through June 30, 2005.  Similarly, the reporting period for FY 2005 funds was July 1, 2003, through June 30, 2004.

[32]  FY 2005 was the most recent year for which payment information was available.

[33]  See Appendix III for details of the SCAAP payments made from the FY 2005 and FY 2004 appropriations.

AR-00020

5 states of Arizona, California, Florida, New York, and Texas in FY 2003, but payments to 4 of those states were less than 25 percent of the estimated cost to incarcerate SCAAP criminal aliens.  The FY 2003 SCAAP payments amounted to 12 percent of the estimated incarceration costs for California, 24 percent for New York, 17 percent for Florida, and 14 percent for Arizona.[34]

Prior to FY 2006, there were no restrictions on how SCAAP funds could be used.  In the FY 2006 re-authorization Congress required that SCAAP payments be used by the recipients for correctional purposes.

## Legal Authority for SCAAP

The legislation governing SCAAP includes the Immigration and Nationality Act and the Violent Crime Control and Law Enforcement Act of 1994.[35]  According to BJA's SCAAP program guidelines, these statutes provide that "in general terms, if a chief executive officer of a state or a political division exercises authority over the incarceration of undocumented criminal aliens and submits a written request to the U.S. Attorney General, the Attorney General may provide compensation to that jurisdiction for those incarceration costs.  SCAAP is subject to additional terms and conditions of yearly congressional appropriations."  BJA states that eligibility for SCAAP payments extends to all 50 state governments, the District of Columbia, Guam, Puerto Rico, the U.S. Virgin Islands, and more than 3,000 counties and cities with correctional facilities.[36]

## Application Process

BJA's annual guidelines alert potential SCAAP applicants of the deadline for applying for SCAAP funding and describe the application process.  Applications for SCAAP payments are accepted electronically and "must provide all required information on undocumented criminal aliens for the prescribed reporting period, the total reporting period salary information for their full and part-time permanent and contracted correctional officers,

---

[34] Government Accountability Office.  *Information on Criminal Aliens in Federal and State Prisons and Local Jails*, GAO-05-337R, April 7, 2005.  GAO reported that data on the cost of incarceration for the State of Texas were not available.

[35] 8 U.S.C. § 1231(i), as amended, (1996).

[36] Bureau of Justice Assistance.  *State Criminal Alien Assistance Program:  FY 2006 Guidelines*, pp. 1 and 2.  The incarceration costs for which BJA pays states and localities are the salary costs of correctional officers.

- 3 –

and the total of all inmate days."[37]  The "required information on undocumented criminal aliens" includes the alien registration number, name, date of birth, unique inmate identification number assigned by the local jurisdiction, country of birth, date taken into custody, date released from custody, and Federal Bureau of Investigation (FBI) number.[38]

BJA forwards the submitted information about aliens to ICE for a determination of whether each purportedly undocumented criminal alien is indeed illegally present in the United States[39]  Confirmation of each individual's immigration status is crucial in determining whether payment for detention-related expenses would be allowable under SCAAP.

In the past, ICE reported back to BJA on the eligibility for SCAAP payments using three categories:  eligible, not eligible, and unknown.  If ICE determined an individual was a qualifying undocumented criminal alien, ICE categorized that individual as eligible.  If ICE determined an individual was not an undocumented criminal alien, ICE would categorize the individual as ineligible.  The immigration status of the remaining individuals would be categorized as unknown.  After receiving the results of the ICE vetting process, BJA determined the amounts to be paid each jurisdiction using a formula based:  on (1) the number of jail days for eligible inmates, (2) an allowance for a percentage of the jail days of inmates whose eligibility was unknown, and (3) the amount of appropriated funds available for distribution.

However, FY 2004 was the last year for which ICE reported to BJA on the status of every person identified in support of applications for SCAAP funding.[40]  In that year, the applicants for SCAAP payments provided data on a total of 270,807 inmates.  After vetting those records, ICE determined that 96,085 were eligible and 49,210 were ineligible as a basis for SCAAP payment.  ICE categorized the immigration status of the remaining 125,512 inmates as unknown.

The following table displays the 10 jurisdictions that received the largest SCAAP payments from the FY 2005 appropriation.  Collectively, they

---

[37]  *State Criminal Alien Assistance Program:  FY 2006 Guidelines*, p. 2.

[38]  The FBI number is issued by the FBI to track arrests and fingerprint records.

[39]  According to a July 2003 Memorandum of Understanding between ICE and OJP, ICE agreed to determine, by SCAAP applicant, the number of eligible inmates.

[40]  In the FY 2005 SCAAP funding process, ICE merely reported the number of qualifying jail days for each applicant locality.

AR-00022

accounted for nearly 69 percent of the SCAAP payments made from that appropriation.

| TOP TEN SCAAP RECIPIENTS – FY 2005 | | |
|---|---|---|
| **State** | **Jurisdiction** | **Amount** |
| California | State of California[41] | $   85,953,191 |
| New York | State of New York | 24,022,356 |
| Texas | State of Texas | 18,582,484 |
| New York | City of New York | 15,893,255 |
| Florida | State of Florida | 12,806,110 |
| California | Los Angeles County[42] | 12,530,034 |
| Arizona | State of Arizona | 12,139,791 |
| California | Orange County | 6,562,437 |
| Illinois | State of Illinois | 4,731,269 |
| Massachusetts | State of Massachusetts | 4,728,549 |
| | TOTAL | $197,949,476 |

Source:  Bureau of Justice Assistance (BJA)

Although 752 jurisdictions received SCAAP payments from the FY 2005 appropriation, the vast majority of them received relatively small amounts. The following chart summarizes the number of recipients by dollar amount.

---

[41]  When we define a jurisdiction as the "state" we are referring to the state department of corrections.  We are not including all the counties and municipalities within the state that may have received SCAAP payments.

[42]  This refers to the Los Angeles County Sheriff's department.

AR-00023



Source: OIG analysis of BJA Data

## Prior Audits

**Department of Justice, Office of the Inspector General,** ***Office of Justice Programs State Criminal Alien Assistance Program*, 00-13, May 2000.**  Our audit reviewed FY 1996 SCAAP payments to the states of California, Texas, New York, Florida, and Illinois to determine whether the payments were appropriate based on incarceration costs and the number of undocumented criminal aliens.  The five jurisdictions collectively received 76 percent of the FY 1996 SCAAP funding.  The audit concluded that they were over-compensated by $19.3 million for unallowable inmate costs and ineligible inmates included in the SCAAP applications.  The audit also found that OJP's compensation methodology was over-inclusive in the degree to which it paid SCAAP applicants for inmates whose immigration status was "unknown."

**Department of Justice, Office of the Inspector General,** ***Immigration and Naturalization Service Institutional Removal Program*, 02-41, September 2002.**  The Institutional Removal Program (IRP) is a national program that aims to:  (1) identify removable criminal aliens in federal, state, and local correctional facilities, (2) ensure that they are not released into the community, and (3) remove them from the United States upon completion of their sentences.  In our audit report on this

- 6 –

AR-00024

program, we noted "the whole IRP process is predicated on the cooperation of the institutions in which criminal aliens are incarcerated. Without that cooperation, the IRP cannot function effectively. Interestingly, states and counties throughout the United States have received hundreds of millions of dollars annually through . . . SCAAP, yet there are no provisions in the program requiring state and county recipients to cooperate with the INS in its removal efforts." Our report recommended that INS request that OJP change SCAAP provisions to require the full cooperation of state and local governments "in the INS's efforts to process and deport incarcerated criminal aliens." The current SCAAP guidelines do not contain any such requirement.

**Government Accountability Office, *Information on Criminal Aliens in Federal and State Prisons and Local Jails*, GAO-05-337R, April 7, 2005.** GAO reported a variety of statistical data regarding the criminal alien population of federal, state, and local custodial facilities.

**Department of Homeland Security, Office of the Inspector General, *Detention and Removal of Illegal Aliens: Immigration and Customs Enforcement*, OIG-06-33, April 2006.** The DHS Inspector General reported that many criminal aliens in state and local custody will be released at the conclusion of their sentences because ICE lacks the resources to identify, detain, and remove them from the United States.

**OIG Audit Approach**

We organized our audit of SCAAP to answer the four questions Congress posed in Public Law 109-162. To answer these questions, we interviewed officials at ICE; sent an OIG-developed questionnaire to 164 SCAAP recipients; visited seven locations that received SCAAP funding from the FY 2005 appropriation;[43] reviewed files at those seven sites; interviewed local officials; and performed research on the policies of SCAAP recipients that may have designated themselves as immigration "sanctuary" sites.[44]

---

[43] We performed field work at the State of California Department of Corrections and Rehabilitation; State of Oregon Department of Corrections; State of Texas Department of Criminal Justice; Clark County, Nevada; Cook County, Illinois; City of New York, New York; and the City and County of San Francisco, California. We selected these sites to have a mix of state, county, and local jurisdictions that received SCAAP payments of at least $1 million each. Collectively, these seven jurisdictions received $128.3 million, or 44.7 percent of the SCAAP payments issued from the FY 2005 appropriation.

[44] In this report, we use the term "sanctuary" site to refer to jurisdictions that may have state laws, local ordinances, or departmental policies limiting the role of local law enforcement agencies and officers in the enforcement of immigration laws.

AR-00025

## CHAPTER 2 – SCAAP RECIPIENTS' COOPERATION WITH ICE

The first congressional question asked us to determine whether there are recipients of SCAAP funds that do not fully cooperate with the efforts of DHS to remove undocumented criminal aliens from the United States. Congress did not define "fully cooperate," nor did our review of immigration legislation disclose any specific steps that localities are required to take to help effect the removal of criminal aliens from the United States.

**Views of ICE Officials**

We asked ICE officials to identify SCAAP recipients that they believe do not fully cooperate with ICE in the removal of undocumented criminal aliens from the United States. Because ICE does not maintain any records describing SCAAP recipients that do not cooperate in the effort to remove criminal aliens, they noted that any information they might provide us would be anecdotal.

We also contacted officials at ICE headquarters on several occasions and solicited their views first about the cooperativeness of SCAAP recipients generally and later about the seven jurisdictions where we performed field work.

Some ICE headquarters officials expressed the opinion that jurisdiction over SCAAP should rest with ICE rather than BJA and that payments should be contingent upon the recipient's taking of certain affirmative steps, such as participation in the "287(g)" program, to assist immigration enforcement. Section 287(g) of the Immigration and Nationality Act provides that ICE "may enter into a written agreement with a state, or any political subdivision of a state, pursuant to which an officer or employee of the state or subdivision, who is determined . . . to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States (including the transportation of such aliens across state lines to detention centers), may carry out such function at the expense of the state or political subdivision and to the extent consistent with state and local law."[45]

Enforcing immigration law remains primarily a federal responsibility, but Section 287(g) provides a mechanism for enlisting the help of state and local law enforcement entities in this effort. Under Section 287(g), ICE provides participating state and local law enforcement officers with the training and subsequent authorization to identify, process, and when

---

[45] 8 U.S.C. § 1357(g) (1996).

AR-00026

appropriate, detain immigration offenders who are encountered during regular, daily law-enforcement activity.  States or localities that wish to participate in the program enter into a Memorandum of Understanding (MOU) with ICE.

Other ICE officials questioned why SCAAP applications are based on a custody period in the year prior to the one in which payments are sought. In the view of those officials, this payment for the past costs of incarceration does not further the removal of undocumented criminal aliens currently in the United States.

ICE headquarters officials also stated they would like to have graduated payments based on the SCAAP recipient taking steps toward the removal of criminal aliens from the United States.  Larger payments could be provided to a jurisdiction when a final order of removal is obtained and for participating in the "Section 287(g)" program to determine alienage.  Those officials believe this would result in payment for assisting ICE in identifying and removing criminal aliens rather than merely housing them.

When we asked ICE headquarters officials specifically about the seven sites where we intended to perform field work, they declined to suggest alternative sites.  They also commented favorably about the cooperation ICE received from every jurisdiction, except the City and County of San Francisco. The ICE responses on the seven sites we visited included the following observations:

*Clark County, Nevada* – ICE has a very good working relationship with the Clark County Sheriff's Office, including the county jail.  The jail sends information about foreign-born subjects to ICE on a 24-hour a day basis. This information is processed, and, if appropriate, a detainer is placed on the subject.

*Cook County, Illinois* – The ICE Office of Investigations Special Agent in Charge of the Chicago field office has had a good working relationship with the Cook County jail for the last several years.

*New York, New York* – The ICE Detention and Removal Operations (DRO), New York Field Office, has received full cooperation from the participating SCAAP local and state entities.

*State of California Department of Corrections and Rehabilitation* – In 1994, the State of California amended the Penal Code to include Section 834(b), which requires all cities and localities within the State of California to

- 9 –

AR-00027

verify the immigration status of individuals arrested and to contact [ICE] when appropriate.

*State of Oregon Department of Corrections* – All state facilities have been very cooperative with respect to identifying, holding, and transferring foreign nationals to ICE custody.

*State of Texas Department of Criminal Justice* – The DRO Houston Field Office reports significant cooperation with the Texas Department of Criminal Justice in both the Texas Prison System and the Texas state jail system.  The Texas Department of Criminal Justice works closely with ICE in assisting in identifying foreign-born aliens within the Texas prison and state jail system and transports the prisoners to one central location in [SENSITIVE INFORMATION REDACTED], Texas, where they can be interviewed as well as presented for court proceedings.  ICE has received cooperation from operations at [SENSITIVE INFORMATION REDACTED] regarding the state prisoners system.  In addition to providing transportation and identification assistance, the Texas Department of Criminal Justice provides an entire facility for exclusive use by ICE.

*City and County of San Francisco* – The San Francisco ICE Field Office has encountered difficulties in its attempt to expand the Criminal Alien Program (CAP).  According to an agent working at ICE headquarters, the San Francisco County Jail and its administration appear to have implemented a "bare minimum of cooperation with ICE and the CAP to ensure they are compliant with state rules and the SCAAP regulations."  Agents employed by ICE are not permitted to access jail records without the authorization and approval of the Sheriff.  ICE agents are authorized to enter the jails to interview prisoners and to access the "all-jail alphabetical list" of inmates. However, ICE agents do not have the authorization to access booking cards, housing cards or other jail records, including computers.

**Results of OIG Survey**

We also surveyed 164 of the 752 state, county, and local agencies that received SCAAP funding from the FY 2005 appropriation.[46]

Our criteria for selecting the SCAAP recipients we surveyed involved grouping them into three categories:  those that received at least $500,000,

---

[46]  The sample was selected judgmentally, and the results cannot be projected to the universe of SCAAP recipients.  See Appendix IV for a list of the jurisdictions we surveyed and those that responded.

AR-00028

those that received between $50,000 and $499,999, and those that received less than $50,000.

There were 59 entities that received at least $500,000, and we selected all of them for our sample. Collectively, those 59 jurisdictions received $256.9 million, or approximately 90 percent of all the SCAAP payments made from FY 2005 funds. There were 157 entities that received between $50,000 and $499,999 and 536 that received less than $50,000. We judgmentally selected and surveyed 50 of the former group and 55 of the latter. Together these groups received $7.9 million, or nearly 3 percent of the SCAAP payments from FY 2005 funds.

Our survey inquired whether the state or local agency asked arrestees about their immigration status, informed ICE about criminal aliens in local custody, accepted detainers from ICE, or alerted ICE prior to releasing criminal aliens from local custody.[47] In our judgment, affirmative answers to these questions would indicate a degree of cooperation in the effort to remove criminal aliens from the United States. However, it is important to note that a negative response by itself to one or more questions would not necessarily establish a lack of cooperation on the part of the SCAAP recipient.

Survey responses were received from 99 (60 percent) of the 164 SCAAP recipients that we surveyed. The respondents received a total of $205.4 million, or 71.6 percent of the SCAAP payments from FY 2005 funds.

*Immigration Status of Arrested Individuals*

| Survey Results | | | | |
|---|---|---|---|---|
| *Legend: N/A=Not Applicable; DNR=Did Not Respond to this Question.* | | | | |
| *If law enforcement officers from your jurisdiction arrest an individual on state or local charges, do they generally ask the subject about his or her immigration status?* | | | | |
| Yes | No | N/A | Unknown | DNR |
| 59 | 34 | 4 | 0 | 2 |

Source: Responses from SCAAP recipients to the OIG questionnaire

Thirty-four respondents reported that they do not generally ask the subject of an arrest about his or her immigration status. However, many of

---

[47] A detainer is a notice from ICE asking officials at the detention facility of notify ICE before releasing a detainee.

AR-00029

those jurisdictions qualified their response.  The following comments were
offered by some of the respondents who replied "no."

- "[The [SENSITIVE INFORMATION REDACTED] Department of
  Corrections] does not have arrest authority; however every
  adjudicated offender is asked about his or her immigration status
  during in-processing."

- "Each person arrested is asked their country of origin, not
  necessarily about immigration status."  [SENSITIVE INFORMATION
  REDACTED]

- "Generally no, unless there is reason to believe [the] individual has
  been involved in certain criminal activities such as arrested for, or
  has been convicted of a felony, violent crime, etc."  [SENSITIVE
  INFORMATION REDACTED]

- ". . . Pursuant to [state legislation] 'a peace officer who has
  probable cause that an arrestee for a criminal offense is not legally
  present in the U.S. shall report such arrestee to the U.S. ICE office.
  . . .'"  [SENSITIVE INFORMATION REDACTED]

- "It is not the Police Department's policy to ask, however, some
  officers ask voluntarily.  It is not the Police Department's policy to
  take proactive enforcement action against undocumented aliens.
  However, if an encounter with an undocumented alien yields a
  wanted status for an immigration violation listed by another
  agency, the Police Department will confirm extradition before
  arrest."  [SENSITIVE INFORMATION REDACTED]

- ". . . Only on domestic battery and felonies, because on other
  charges ICE does not respond . . . anymore."  [SENSITIVE
  INFORMATION REDACTED]

- "The [[SENSITIVE INFORMATION REDACTED] Department of
  Corrections] is tasked with housing inmates after arrest and
  sentencing."

The responses from several localities emphasized the absence of
federal or state law requiring them to inquire into the immigration status of
arrestees.

- "There is no local ordinance or regulation from the County's Board
  of Supervisors authorizing the Department of Corrections to ask

- 12 –

AR-00030

arrestees about their immigration status." [SENSITIVE
INFORMATION REDACTED]

- "Not required under state or federal law." [SENSITIVE
INFORMATION REDACTED]

- "We do not ask the question for two reasons.  First, some time
back, the local law chiefs agreed to not engage in this type of
behavior in the field.  Second, a recent opinion by the California
Attorney General states local and state law enforcement is not
obligated to abide by the federal immigration statutes."[48]
[SENSITIVE INFORMATION REDACTED]

- "Currently there are no policies or procedures in place requiring
such action." [SENSITIVE INFORMATION REDACTED]

- "Only if the investigation points to the fact that the individual(s)
may be an undocumented alien." [SENSITIVE INFORMATION
REDACTED]

*Informing ICE About Aliens in Custody*

| Survey Results | | | | |
|---|---|---|---|---|
| *Legend:  N/A=Not Applicable; DNR=Did Not Respond to this Question.* | | | | |
| *If law enforcement officers from your jurisdiction have reason to believe that someone they arrest may be an undocumented alien, do they generally inform the ICE that the individual is in their custody?* | | | | |
| Yes | No | N/A | Unknown | DNR |
| 78 | 17 | 3 | 0 | 1 |

Source:  Responses from SCAAP recipients to the OIG questionnaire

    Seventeen respondents reported they do not generally inform ICE
when they have someone in custody who they believe may be an
undocumented criminal alien.  However, many of those 17 jurisdictions
added qualifying remarks.  In some instances, they were critical of a

---

[48]  We believe the respondent from [SENSITIVE INFORMATION REDACTED]
misinterpreted the California Attorney General's opinion, which clearly states that federal
law preempts state law and requires state and local government entities to cooperate with
federal immigration agents.  During a follow-up interview, the county official who gave this
response confirmed that he may have misinterpreted the opinion.  See Appendix IX for the
opinion.

- 13 –

AR-00031

perceived lack of response on the part of ICE, but there were other explanatory factors as well.

- "Our experience has shown that ICE is not going to respond anyway." [SENSITIVE INFORMATION REDACTED]

- "On every occasion we attempt to inform ICE but ICE does not always respond." [SENSITIVE INFORMATION REDACTED]

- "Past history has shown that they will rarely pick the subjects up for transport." [SENSITIVE INFORMATION REDACTED]

- "Depends on nature of crime." [SENSITIVE INFORMATION REDACTED]

- "ICE agents come into our facility on a regular basis and review our records of undocumented aliens." [SENSITIVE INFORMATION REDACTED]

- "Sheriff's deputies do not inform ICE.  Detention staff will notify ICE if information obtained from a criminal history rap sheet or information obtained from our local database alerts [our] Department of previous contacts with ICE (releases to ICE or previously deported criminal alien)." [SENSITIVE INFORMATION REDACTED]

- "This is a sheriff's department function." [SENSITIVE INFORMATION REDACTED]

- "Law enforcement officers may contact ICE but jail staff do not.  We have an ICE employee [who] regularly reviews inmate rosters." [SENSITIVE INFORMATION REDACTED]

- "Most patrol officers do not have the time or know the number in order to inform ICE." [SENSITIVE INFORMATION REDACTED]

AR-00032

*Accepting Detainers from ICE*

| Survey Results | | | | |
|---|---|---|---|---|
| *Legend:  N/A=Not Applicable; DNR=Did Not Respond to this Question.* | | | | |
| *Do the detention facilities in your jurisdiction generally accept detainers from ICE for undocumented criminal aliens in their custody?* | | | | |
| Yes | No | N/A | Unknown | DNR |
| 94 | 3 | 1 | 0 | 1 |

Source:  Responses from SCAAP recipients to the OIG questionnaire

One possible measure of cooperation with ICE would be if the respondent accepted detainers from ICE and continuing to hold criminal aliens until ICE agents can take physical custody of them.  The responses to our questionnaire disclosed a widespread willingness to accept detainers from ICE.  Ninety-four of the 99 respondents reported that they accept such detainers and the 3 that responded negatively added comments indicating that they may have misinterpreted the question as asking about the lodging of ICE prisoners.

*Alerting ICE Before Releasing Aliens from Custody*

| Survey Results | | | | |
|---|---|---|---|---|
| *Legend:  N/A=Not Applicable; DNR=Did Not Respond to this Question.* | | | | |
| *Do the detention facilities in your jurisdiction generally alert ICE prior to releasing any undocumented criminal aliens in their custody?* | | | | |
| Yes | No | N/A | Unknown | DNR |
| 78 | 18 | 1 | 1 | 1 |

Source:  Responses from SCAAP recipients to the OIG questionnaire

In answer to our question about alerting ICE before releasing undocumented criminal aliens from local custody, 78 respondents reported that they notify ICE and 18 stated they do not.  We asked those that alert ICE to report how much advance notice they provide and the responses ranged from the date of release to substantially longer periods, as the following comments illustrate:

- "At least 45 days in advance."  [SENSITIVE INFORMATION REDACTED]

- "Six months."  [SENSITIVE INFORMATION REDACTED]

AR-00033

- "At any time between 6 and 30 days, depending on the type of release." [SENSITIVE INFORMATION REDACTED]

- "ICE is informed of all foreign born state sentenced inmates and their earliest possible release dates when the inmate is processed in the county or Reception." [SENSITIVE INFORMATION REDACTED]

- "As early in the sentence as possible." [SENSITIVE INFORMATION REDACTED]

- "Upon initial booking." [SENSITIVE INFORMATION REDACTED]

- "Only when ICE has placed a 'hold' on the person." [SENSITIVE INFORMATION REDACTED]

The jurisdictions that stated they do not notify ICE offered varying explanations. For example, [SENSITIVE INFORMATION REDACTED], stated it does not notify ICE in advance, "unless ICE asks us to." However, as previously noted, the county also reported that ICE agents regularly visit the county facility and review the records of undocumented aliens. That being the case, it would appear that additional notification by [SENSITIVE INFORMATION REDACTED] may not be necessary. The [SENSITIVE INFORMATION REDACTED] reported that "releases must occur on a timeline of minutes and hours after the court issues the ruling." [SENSITIVE INFORMATION REDACTED], stated "in most cases we are unaware of [the] status."

We asked two additional questions related to the cooperativeness of SCAAP recipients in the effort to remove criminal aliens from the United States. These questions deal with the transportation of criminal aliens to ICE offices and participation in the Section 287(g) program.

*Transporting Undocumented Criminal Aliens to the Nearest ICE Office*

| Survey Results | | | | |
|---|---|---|---|---|
| *Legend:  N/A=Not Applicable; DNR=Did Not Respond to this Question.* | | | | |
| *If ICE agents cannot transport an undocumented criminal alien from your facility, do your officers transport the alien to the nearest ICE office?* | | | | |
| Yes | No | N/A | Unknown | DNR |
| 23 | 70 | 2 | 0 | 4 |

Source:  Responses from SCAAP recipients to the OIG questionnaire

- 16 –

AR-00034

We are not aware of any requirement for states, counties, or localities to transport undocumented criminal aliens to an ICE office. Therefore, an answer of "no" to our question does not imply any lack of cooperation on the part of the locality. However, we included this question because an answer of "yes" may be reasonably considered an indicator of cooperation. In response to the questionnaire, 23 respondents stated they would transport undocumented criminal aliens to the nearest ICE office if ICE agents could not do so, and 70 respondents reported they would not.

The comments provided in reply to our question included the following.

- "We have never been in the position where ICE does not transport the alien from the state correctional facility to the ICE office. In the event ICE could not transport the alien, the [SENSITIVE INFORMATION REDACTED] would not transport the alien back to the nearest ICE office." [SENSITIVE INFORMATION REDACTED]

- "Has not happened, though we would assist." [SENSITIVE INFORMATION REDACTED]

*Participation in the 287(g) Program*

| Survey Results | | | | |
|---|---|---|---|---|
| *Legend:  N/A=Not Applicable; DNR=Did Not Respond to this Question.* | | | | |
| *Are you aware of the program under Section 287(g) of the Immigration and Nationality Act by which local officers may be trained and authorized to perform certain immigration enforcement tasks?* | | | | |
| Yes | No | N/A | Unknown | DNR |
| 50 | 45 | 1 | 0 | 3 |
| *Is your jurisdiction currently participating in the Section 287(g) program?* | | | | |
| Yes | No | N/A | Unknown | DNR |
| 11[49] | 84 | 1 | 1 | 2 |
| *If your jurisdiction does not currently participate in the Section 287(g) program, are you interested in entering into a Memorandum of Understanding with ICE to participate in the Section 287(g) program?* | | | | |
| Yes | No | N/A | Unknown | DNR |
| 33 | 41 | 6 | 6 | 13 |

Source:  Responses from SCAAP Recipients to OIG Questionnaire

As mentioned previously, some ICE officials expressed a desire to place SCAAP under the control of ICE and make SCAAP payments contingent

---

[49]  Although 11 respondents stated they participate in the "287(g)" program, ICE officials told us only 7 jurisdictions have current MOUs.  Other jurisdictions are negotiating with ICE to participate in the "287(g)" program.

- 17 –

AR-00035

upon participation in the "287(g)" program.  Regardless of which agency has responsibility for SCAAP, we believe that participation in the "287(g)" program may be considered evidence of cooperation with ICE in the removal of criminal aliens from the United States.  For this reason we included questions about the "287(g)" program in a questionnaire we sent to 164 recipients of FY 2005 SCAAP funding.  We received responses from 99 jurisdictions and 33 of them indicated an interest in entering into an MOU to participate in the "287(g)" program.

Our questionnaire asked if the respondents were aware of the "287(g)" program, whether they participated in it, and, if not, whether they were interested in receiving information about it.  In response to our three questions, we received very few comments.  The following are examples of the comments provided by respondents.

- "We are currently in discussion with ICE officials in order to learn more about the Section 287(g) program; no decision has been made regarding participation in the program."  [SENSITIVE INFORMATION REDACTED]

- "Not sure - more information is needed."  [SENSITIVE INFORMATION REDACTED]

- "We are unfamiliar.  We require additional information in order to answer correctly."  [SENSITIVE INFORMATION REDACTED]

- "We are in the approval process."  [SENSITIVE INFORMATION REDACTED]

- "This matter must be referred to a higher legal authority than what the respondent has."  [SENSITIVE INFORMATION REDACTED]

## Results of Field Work

*Interviews with Local ICE Officials*

At each of the sites where we performed field work, we asked local ICE officials about the cooperativeness of the SCAAP recipient in question.  The views of those officials mirrored the views previously obtained from ICE headquarters.  Local ICE officials offered favorable comments about each of the jurisdictions, except the City and County of San Francisco.  Those ICE officials stated that the San Francisco Sheriff's Department accepts detainers from ICE and promptly notifies ICE when criminal aliens are about to be released from custody, but neither the Sheriff's Department nor the Police

- 18 –

Department [SENSITIVE INFORMATION REDACTED]. Moreover, the process for interviewing aliens in the jail was described as "uncooperative" by the local ICE officials, who also characterized relations with the Sheriff's Department as unfriendly and marked by "much animosity."

*Interviews with State and Local Officials*

We interviewed officials and reviewed files at seven jurisdictions that received funding from the FY 2005 appropriation for SCAAP. The officials whom we interviewed included local officials knowledgeable in the areas of SCAAP and detention. Local officials from all seven jurisdictions reported that their detention facilities: (1) accept ICE detainers for undocumented criminal aliens in their custody; and (2) alert ICE before releasing undocumented criminal aliens from custody.

We asked whether law enforcement officers ask arrestees about their immigration status and received mixed responses, but none that indicated an unwillingness to cooperate with ICE in the removal of criminal aliens from the United States. For example:

- At institutions in the [SENSITIVE INFORMATION REDACTED], correctional officers generally ask an inmate's place of birth rather than immigration status. They defer the determination of an individual's immigration status to ICE.

- At corrections facilities in the [SENSITIVE INFORMATION REDACTED], individuals are asked about their immigration status.

- In [SENSITIVE INFORMATION REDACTED], it is not considered the arresting officer's mission to determine immigration status. Research into a detainee's place of birth occurs during the booking process. Similarly, in the [SENSITIVE INFORMATION REDACTED], arrestees are asked about their place of birth rather than their immigration status during the booking process.

- In [SENSITIVE INFORMATION REDACTED], neither the city police nor personnel in the county sheriff's office [SENSITIVE INFORMATION REDACTED]. However, the immigration status of a detainee is often determined during the classification process either by: (1) self-identification of the detainee as foreign-born; (2) queries of databases, including NCIC, the [SENSITIVE INFORMATION REDACTED] Law Enforcement Telecommunications System, and ICE's Law Enforcement Support Center; and

AR-00037

(3) submission of fingerprints through the Automated Fingerprint Identification System.

We also asked about notification of ICE when local jurisdictions have someone in custody who may be an undocumented alien.  The following are some responses:

- If [SENSITIVE INFORMATION REDACTED] enforcement officers have reason to believe someone they arrest may be an undocumented alien, they inform ICE and seek further advice.

- [SENSITIVE INFORMATION REDACTED] facilities determine whether inmates are "foreign born" during the intake process.  Biographical information sheets and a fingerprint cards for foreign born inmates are sent to ICE for review, usually during the first week of incarceration.

- The [SENSITIVE INFORMATION REDACTED] Department of Corrections sends ICE a referral if the booking process determines an inmate may have a foreign place of birth.

- [SENSITIVE INFORMATION REDACTED], sends a notice to ICE with a request for a prompt response.  The county tries not to hold any inmate more than four hours past the scheduled release unless ICE places a detainer on that individual.

- When officers from the [SENSITIVE INFORMATION REDACTED] arrest an alien for a criminal offense, the police department notifies ICE based on information entered into the booking system.

Local officials at two jurisdictions indicated a willingness to transport criminal aliens from their facilities to the nearest ICE office if ICE agents could not do so.

- [SENSITIVE INFORMATION REDACTED] corrections officials said inmates are transported without charge to an ICE facility or to an ICE contract facility if ICE transportation is not available.

- [SENSITIVE INFORMATION REDACTED] corrections officials state their officers transport alien inmates if necessary, but they added this happens only on rare occasions because releases are coordinated with ICE.

AR-00038

Officials at all seven of the sites we visited were aware of the "287(g)" program, but none of the jurisdictions were participating in it. When asked if they were interested in participating in the program, local officials offered the following comments.

- The [SENSITIVE INFORMATION REDACTED] legislature is still evaluating the overall benefits to the [SENSITIVE INFORMATION REDACTED], whose mission is directed more toward rehabilitation of inmates than to immigration enforcement. At this time, officials do not believe the benefits are clear.

- [SENSITIVE INFORMATION REDACTED] officials believe participation in the "287(g)" program would probably conflict with state law.

- The [SENSITIVE INFORMATION REDACTED] is exploring participation in the program. Officials are awaiting more information so they can weigh the pros and cons. They are particularly concerned about who will pay for the state officers while engaged in "287(g)" activities, how many days officers would be required to participate, the reporting structure, and personnel issues.

- Officials from [SENSITIVE INFORMATION REDACTED]; [SENSITIVE INFORMATION REDACTED]; [SENSITIVE INFORMATION REDACTED], and the [SENSITIVE INFORMATION REDACTED] all stated their jurisdictions were not interested in participating in the "287(g)" program.

*File Reviews*

We reviewed a total of 76 files relating to criminal aliens who had been recently discharged from local custody at the 7 locations where we performed field work. Our review disclosed that:

- ICE was notified in a timely manner that the 76 criminal aliens were in custody;

- ICE detainers were accepted for all 76 individuals;

- Seventy criminal aliens were transferred to ICE, all in a timely manner. Five of the remaining six individuals were transferred to other jurisdictions, such as a state prison, and one, a Cuban, was paroled because repatriation to Cuba was not possible.

- 21 –

AR-00039

This limited review of local files did not disclose evidence of any local policy or procedure that we would consider less than fully cooperative with ICE in the removal of criminal aliens.

## Statement of Major Cities Chiefs of Police

The complexity of determining whether jurisdictions fully cooperate with ICE is further illustrated by a statement issued in June 2006, by the Major Cities Chiefs of Police (MCC) organization.[50]  This document describes illegal immigration as a problem that "must be dealt with at the national level" and details certain concerns that local agencies have.  A key paragraph states, "local police agencies must balance any decision to enforce immigration laws with their daily mission of protecting and serving diverse communities, while taking into account:  limited resources; the complexity of immigration laws; limitations on authority to enforce; risk of civil liability for immigration enforcement activities and the clear need to foster the trust and cooperation from the public including members of immigrant communities."

The MCC statement also observes that "assistance and cooperation from immigrant communities is especially important when an immigrant, whether documented or undocumented, is the victim of or witness to a crime.  These persons must be encouraged to file reports and come forward with information.  Their cooperation is needed to prevent and solve crimes and maintain public order, safety, and security in the whole community. . . .  Immigration enforcement by local police would likely negatively effect (*sic*) and undermine the level of trust and cooperation between local police and immigrant communities.  If the undocumented immigrant's primary concern is that they will be deported or subjected to an immigration status investigation, then they will not come forward and provide needed assistance and cooperation.  Distrust and fear of contacting or assisting the police would develop among legal immigrants as well."

The MCC statement taken as a whole articulates a two-pronged position that we frequently encountered in our review, namely that many state, county, and local law enforcement agencies are unwilling to initiate immigration enforcement but have policies that suggest they are willing to

---

[50]  See Appendix V for the MCC's "Nine-Point Position Statement."  The MCC describes its membership as the 57 Chief Executive Officers of police departments located within metropolitan areas with a population of more than 1.5 million population and that employ more than 1,000 law enforcement officers.

AR-00040

cooperate with ICE when they arrest individuals on state or local charges and learn that those individuals may be criminal aliens.

**Additional Research**

We further examined the issue of cooperation between SCAAP recipients and ICE by researching the policies of localities that may have laws, resolutions, or other policies limiting the role of local agencies in the enforcement of immigration legislation.  In some cases, those localities have designated themselves with terms such as a "sanctuary city" or a "civil liberties safe zone." Our research revealed much anecdotal information, but little in the way of formal policies.

We were guided initially in our research by listings of sanctuary cities posted on the websites of several organizations.[51]  Later, we focused our search on jurisdictions that received SCAAP funding of at least $1 million from the FY 2005 appropriation.  We searched the websites for those jurisdictions in an effort to locate policy statements affecting how local law enforcement agencies interact with ICE in the effort to remove criminal aliens from the United States.

We were able to locate an official "sanctuary" policy for only two jurisdictions that received at least $1 million in SCAAP funding, the State of Oregon, which received $3.4 million, and the City and County of San Francisco, which received $1.1 million and has designated itself as a "City and County of Refuge."  We also located an Executive Order issued by the Mayor of New York limiting the activities of local law enforcement agencies and officers in the enforcement of immigration law.[52]  However, in each instance, the local policy either did not preclude cooperation with ICE or else included a statement to the effect that those agencies and officers must assist ICE or share information with ICE as required by federal law.

The Oregon policy begins by stating, "No law enforcement agency of the State of Oregon or of any political subdivision of the state shall use agency moneys, equipment or personnel for the purpose of detecting or apprehending persons whose only violation of law is that they are persons of foreign citizenship present in the United States in violation of federal immigration laws."  However, the policy goes on to state that a law

---

[51]  In using the information posted by these organizations, we do not endorse any position they may advocate regarding immigration enforcement.  We simply used their lists as leads pointing toward jurisdictions that may have policies such as those described in our congressional mandate.

[52]  See Appendix VII.

AR-00041

enforcement agency may exchange information with federal immigration authorities to "verify the immigration status of a person if the person is arrested for any criminal offense;" or to "request criminal investigation information with reference to persons named in [federal] records."[53]

San Francisco has designated itself as a "City and County of Refuge" and has limited the extent to which municipal agencies and employees may assist in immigration enforcement.  The City Administrative Code states that "no department, agency, commission, officer or employee . . . shall use any City funds or resources to assist in the enforcement of federal immigration law or to gather or disseminate information regarding the immigration status of individuals . . . *unless such assistance is required by federal or state statute, regulation or court decision*."  [Emphasis added.]  The proviso requiring compliance with federal law reinforces our view that there is insufficient evidence to conclude that San Francisco fails to cooperate with ICE's efforts to remove undocumented aliens.

We did not locate a "sanctuary city" designation for the City of New York, which received $15.9 million in SCAAP funding.  However, we located a Mayor's Executive Order that enunciates a policy that local law enforcement officers will not initiate immigration enforcement but will cooperate with federal immigration authorities in some respects.  The Mayor's Executive Order 41 addresses local law enforcement as it relates to immigration matters and states, "Law enforcement officers shall not inquire about a person's immigration status unless investigating illegal activity other than mere status as an undocumented alien."  However, in the next paragraph it states, "Police officers and peace officers, including members of the Police Department and the Department of Correction, shall continue to cooperate with federal authorities in investigating and apprehending aliens suspected of criminal activity."[54]

---

[53]  See Appendix VI.

[54]  See Appendix VII.

- 24 –

AR-00042

## CHAPTER 3 – COMMUNICATION BETWEEN SCAAP RECIPIENTS AND ICE

The second congressional question asked us to determine whether any SCAAP recipients have in effect a policy that violates section 642 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. § 1373). This statute, in effect, prohibits any interference in the free exchange of immigration-related information between state or local law enforcement and federal immigration authorities. Two key provisions of the statute are 8 U.S.C. § 1373 (a) and (b), which state:

- *Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, or any individual.*

- *Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:*

  - *Sending such information to, or requesting or receiving such information from, Immigration and Naturalization Service.*

  - *Maintaining such information.*

  - *Exchanging such information with any other Federal, State, or local government entity.*[55]

### Views of ICE Officials

ICE officials objected to provisions of the administrative code of the City and County of San Francisco that limit the ability of local agencies and officers to communicate immigration information to ICE.

The City Administrative Code states "no department, agency, commission, officer or employee . . . shall use any City funds or resources to assist in the enforcement of federal immigration law or to gather or

---

[55] The statutory references to the Immigration and Naturalization Service now apply to ICE.

AR-00043

disseminate information regarding the immigration status of individuals in the City and County of San Francisco *unless such assistance is required by federal or state statute, regulation, or court decision.*"  [Emphasis added.]

The Code also states "nothing in this Chapter shall prohibit, or be construed as prohibiting, a law enforcement officer from identifying or reporting any person pursuant to a state or federal law or regulation who is in custody after being booked for the alleged commission of a felony and is suspected of violating the civil provisions of the immigration laws."  Finally, the Code states that "nothing in this chapter shall preclude any . . . department, agency, commission, officer or employee from (a) reporting information to the INS regarding an individual who has been booked at any county jail facility, and who has been previously been convicted of a felony committed in violation of the laws of the State of California, which is still considered a felony under state law; (b) cooperating with an INS request for information regarding an individual who has been convicted of a felony committed in violation of the laws of the State of California, which is still considered a felony under state law; or (c) reporting information as required by federal or state statute, regulation or court decision, regarding an individual who has been convicted of a felony committed in violation of the laws of the State of California, which is still considered a felony under state law."[56]

As mentioned in the preceding chapter, ICE officials considered these policies of the City and County of San Francisco as the "bare minimum" of cooperation.  However, in light of the specific provisions requiring compliance with federal law, we cannot conclude that San Francisco's policies are contrary to 8 U.S.C. § 1373.

**Results of OIG Survey**

We included a question in our survey asking about laws, regulations, or policies affecting each organization that might restrict the free exchange of immigration-related information between local law enforcement agencies and ICE.  The 99 jurisdictions that responded to the questionnaire stated almost unanimously that there was no legislation or policy impeding the ability of local officers and agencies to communicate with ICE on immigration-enforcement matters.  The detailed results are displayed in the following table.

---

[56] See Appendix VIII.  The San Francisco City Administrative Code references to INS now apply to ICE.

AR-00044

| Survey Results | | | | |
|---|---|---|---|---|
| *Legend: N/A=Not Applicable; DNR=Did Not Respond to this Question.* | | | | |
| *In your jurisdiction, is there currently in effect any limitation on the ability of local law enforcement officers or agencies to exchange information relating to immigration enforcement due to:* | | | | |
| *State law?* | | | | |
| Yes | No | N/A | Unknown | DNR |
| 0 | 96 | 1 | 2 | 0 |
| *Local ordinance?* | | | | |
| Yes | No | N/A | Unknown | DNR |
| 1 | 94 | 1 | 0 | 3 |
| *Executive order?* | | | | |
| Yes | No | N/A | Unknown | DNR |
| 0 | 96 | 1 | 0 | 2 |
| *Departmental policy?* | | | | |
| Yes | No | N/A | Unknown | DNR |
| 1 | 96 | 1 | 0 | 1 |

Source:  Responses from SCAAP recipients to the OIG questionnaire

The City and County of San Francisco gave a qualified "yes" in response to our queries about the existence of a local ordinance or a departmental policy limiting the ability of local law enforcement officers or agencies to exchange information with ICE relating to immigration enforcement.  The response to the survey included a copy of the previously cited sections of the City Administrative Code and a police department General Order, which states that generally "a member [of the police department] shall not inquire into an individual's immigration status or release or threaten to release information to the INS regarding an individual's identity or immigration status."  However, the General Order makes exceptions that parallel those enumerated in the City Administrative Code.

**Results of Field Work**

In our interviews with local officials at the seven sites, we asked if their jurisdictions currently have in effect any statute, ordinance, executive order, or other legislation or official policy prohibiting local law enforcement agencies and officers from freely exchanging information with ICE on the citizenship or immigration status of individuals.  Officials at four of the seven sites we visited replied unequivocally, "no," while officials at the other three sites gave qualified answers.

- The State of Oregon has a state "sanctuary" statute, but the officials whom we interviewed believe it does not infringe on the exchange of information with ICE.

- 27 –

AR-00045

- Officials from the City of New York informed us there is no prohibition on exchanging information with ICE on individuals who have been arrested.

- Local officials stated the City of San Francisco Police Department's policy is "consistent with its obligations under state and federal law, to adhere to the City of Refuge Ordinance. This ordinance prohibits the use of City resources to assist in the enforcement of federal immigration laws except in certain limited circumstances consistent with state and federal law."

As discussed in the preceding chapter, our examination of official policies published by those jurisdictions confirmed the views expressed by local officials.

- 28 –

AR-00046

# CHAPTER 4 – RECIDIVISM OF CRIMINAL ALIENS RELEASED FROM LOCAL CUSTODY

The third congressional question asked us to determine how many criminal offenses were committed by criminal aliens who were released from local custody without a referral to DHS for removal from the United States.

To address this question, we performed limited testing to determine the number of subsequent *arrests* of criminal aliens who were released from state or local custody. We based our testing on information from the vetted FY 2004 SCAAP database, which was the last year when ICE reported to BJA on the status of every person identified in support of applications for SCAAP funding.[57] The vetted database included 262,105 criminal histories.

## NCIC Query

We requested assistance from the Federal Bureau of Investigation (FBI) to have the vetted FY 2004 SCAAP database compared to arrest data in the FBI's National Crime Information Center (NCIC).[58]

The FBI ran two queries, one for SCAAP records that included an FBI number, and another for those records that lacked an FBI number. For the latter group, the FBI queried NCIC using the name and date of birth for each individual listed in the vetted data.

The FBI provided us with nearly 433,000 individual text files that were not searchable by automated means. Because the files were not in a searchable format, we were not able to quantify all the arrests that occurred subsequent to the cutoff date for FY 2004 funding, June 30, 2003. Instead, we reviewed a judgmental sample of 100 criminal histories for evidence of arrests of individuals subsequent to the time when their incarceration was used to support an application for SCAAP funding.

We sampled 53 from records that had FBI numbers and 47 from records that lacked such numbers.[59] The criminal histories for 73 individuals documented at least one arrest after June 30, 2003. Those 73 individuals

---

[57] FY 2004 SCAAP funding was based on the incarceration of criminal aliens between July 1, 2002, and June 30, 2003.

[58] NCIC is a computerized database of criminal justice information available to law enforcement agencies nationwide. The NCIC database consists of millions of records arranged in 18 files, including one relating to immigration violators.

[59] This number is issued by the FBI to track arrests and fingerprint records.

- 29 –

AR-00047

accounted for a total of 429 arrests based on 878 charges and included 241 convictions.  These figures represent an average of nearly six arrests per individual.

The charges for the 73 individuals ranged from traffic violations and trespassing to more serious crimes, such as burglary or assault.  Some of those charges included:

- 166 drug-related;

- 37 immigration-related;

- 213 burglary, robbery, or theft;

- 40 assault;

- 10 property damage;

- 3 terrorist threat;[60] and

- 13 weapons charges.

Based on this limited sample, we cannot statistically extrapolate the number of offenses committed by undocumented criminal aliens who were released from local custody without a referral to ICE.  Based on the information available to us in the criminal histories, we could not determine the number of the criminal aliens in our sample that were deported, if any, and later arrested after reentering the United States.  We also could not determine if ICE was notified before the criminal aliens in our sample were released from custody.  But if this data is indicative of the full population of nearly 262,105 criminal histories, the rate at which released criminal aliens are rearrested is extremely high.

---

[60]  The "terrorist threat" cases related to misdemeanor charges based on domestic disputes.

AR-00048

## CHAPTER 5 – CRIMINAL ALIENS RELEASED DUE TO LACK OF RESOURCES

The fourth congressional question asked us to determine how many of the criminal aliens who were released from custody without a referral to ICE were released for lack of sufficient detention space or funding to hold them. While we believe this happens regularly, our review could not identify specific instances of such releases because ICE does not track the number of aliens released from local custody due to lack of the necessary resources to detain them. While our review did not identify any instances of such releases, it is important to note that the Inspector General of the Department of Homeland Security has reported: (1) a shortage of space available for housing aliens in ICE custody; and (2) the possible release in FY 2007 of a substantial number of removable criminal aliens from state or local custody because ICE does not have the resources to identify, detain, and remove them.

### Results of OIG Survey

To examine this question we relied on responses to the questionnaire that we sent to 164 SCAAP recipients. Our questionnaire included a request that the respondents provide the number of criminal aliens who were released from custody between October 1, 2004, and June 30, 2006, because the respondent lacked the space or funds to detain those aliens. None of the respondents reported having released criminal aliens from custody due to lack of resources. Specifically, 9 replied "none," 78 replied "not applicable," 7 replied "unknown," and 5 did not answer the question. Some jurisdictions added comments such as the following.

- "No, ICE was always contacted." [SENSITIVE INFORMATION REDACTED]

- "Any arrestees without local charges or holds are released by law." [SENSITIVE INFORMATION REDACTED]

- "None; again, referral was made but ICE did not place detainer on subjects." [SENSITIVE INFORMATION REDACTED]

- "None – primarily due to ICE [being] unable or unwilling to transport." [SENSITIVE INFORMATION REDACTED]

- 31 –

## DHS Inspector General Report

Even though the state, county, and local respondents to our questionnaire did not report releasing undocumented criminal aliens because of insufficient local resources, we noted an issue regarding the lack of space available to ICE to detain aliens in custody.  In an April 2006 report, the Inspector General of the Department of Homeland Security stated, "[the Detention and Removal Operations (DRO)] estimates that in FY 2007 there will be 605,000 foreign-born individuals admitted to state correctional facilities and local jails during the year for committing crimes in the U.S.[61] Of this number, DRO estimates half (302,500) will be removable aliens. Most of these incarcerated aliens are being released into the U.S. at the conclusion of their respective sentences because DRO does not have the resources to identify, detain, and remove these aliens under its Criminal Alien Program (CAP).  It is estimated that DRO would need an additional 34,653 detention beds, at an estimated cost of $1.1 billion, to detain and remove [them]."[62]

The DHS Inspector General went on to state, "additionally, DRO's ability to detain and remove illegal aliens with final orders of removal is impacted by:  (1) the propensity of illegal aliens to disobey orders to appear in immigration court; (2) the penchant of released illegal aliens with final orders to abscond; (3) the practice of some countries to block or inhibit the repatriation of its citizens; and (4) two recent U.S. Supreme Court decisions which mandate the release of criminal and other high-risk aliens 180 days after the issuance of the final removal order except in 'Special Circumstances.'  Collectively, the bed space, personnel and funding shortages coupled with the other factors, has created an unofficial 'mini-amnesty' program for criminal and other high-risk aliens."

The DHS Inspector General reported that 345,006 criminal aliens were apprehended between FYs 2001 and 2004, of which 27,947 (8 percent) were released.  However, the DHS Inspector General could not determine whether they were released for lack of detention space or for other reasons because ICE does not track that information.

---

[61]  At our exit conference, representatives of DRO stated that references to "DRO" in the DHS OIG report would in this context be more appropriately read as "ICE."

[62]  Department of Homeland Security, Office of the Inspector General. *Detention and Removal of Illegal Aliens: U.S. Immigration and Customs Enforcement (ICE)*, OIG-06-033, April 2006, p. 2.

AR-00050

## STATEMENT ON COMPLIANCE WITH LAWS AND REGULATIONS

We have performed a congressionally mandated audit of the State Criminal Alien Assistance Program (SCAAP). The audit generally covered FYs 2004 and 2005, included a review of selected activities, and was conducted in accordance with the *Government Auditing Standards*.

In connection with this audit, and as required by the standards, we reviewed the laws and regulations relating to SCAAP, including:

- 8 U.S.C. § 1231(i) (1996), which authorized SCAAP;

- 8 U.S.C. § 1373 (1996), which relates to open communication between local law enforcement and ICE on immigration matters; and

- 8 U.S.C. § 1357(g) (1996), which authorizes the training of local law enforcement agents in immigration enforcement.

Our audit did not disclose any non-compliance on the part of BJA or ICE with provisions of the applicable laws and regulations.

AR-00051

## STATEMENT ON INTERNAL CONTROL STRUCTURE

In planning and performing our audit of the SCAAP payment program, we considered the internal control structure of BJA to the extent necessary for the purpose of determining our procedures. Because the scope of our audit was defined by congressional mandate, we did not evaluate BJA's overall internal control structure. Through interviews with officials from OJP, BJA, and ICE, we gained an understanding of the process of applying for, vetting, and awarding SCAAP payments. Our review did not identify any material internal control weaknesses.

AR-00052

**APPENDIX I**

## AUDIT OBJECTIVES, SCOPE, AND METHODOLOGY

In Public Law 109-162, Congress directed us to "perform a study, and report to the Committee on the Judiciary of the United States House of Representatives and the Committee on the Judiciary of the United States Senate" on four questions regarding SCAAP.  The objective of our audit was to respond to those questions by determining:

(1)  *Whether there are States, or political subdivisions of a State, that have received compensation under Section 241(i) of the Immigration and Nationality Act (8 U.S.C. § 1231(i)) and are not fully cooperating in the Department of Homeland Security's efforts to remove from the United States undocumented criminal aliens (as defined in paragraph (3) of such section.*

(2)  *Whether there are States, or political subdivisions of a State, that have received compensation under section 241(1) of the Immigration and Nationality Act (8 U.S.C. § 1231(i)) and that have in effect a policy that violates section 642 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. § 1373).*

(3)  *The number of criminal offenses that have been committed by aliens unlawfully present in the United States after having been apprehended by States of local law enforcement officials for a criminal offense and subsequently being released without being referred to the Department of Homeland Security for removal from the United States.*

(4)  *The number of [criminal] aliens . . . who were released because the State or political subdivision lacked space or funds for detention of the alien.*

We conducted our audit in accordance with the *Government Auditing Standards* and, accordingly, included such tests of records and procedures as we considered necessary to respond to the congressional mandate.  The scope of our work generally covered the state, county, and local law enforcement agencies that received SCAAP funding from the FY 2004 and FY 2005 appropriations.

Our methodology included interviews with officials, distribution of an OIG-developed questionnaire, review of files, queries of automated systems and other research.  We interviewed BJA and ICE officials at their respective headquarters in Washington, D.C.  In addition, we:

- 35 –

- analyzed BJA records relating to the recipients of SCAAP funding;

- submitted a questionnaire to 164 selected recipients of SCAAP funding;

- researched other relevant information, especially relating to localities that have designated themselves as sanctuary cities;

- performed field work, including interviews and file reviews at the offices of SCAAP recipients in Austin, Texas; Chicago, Illinois; Las Vegas, Nevada; New York, New York; Sacramento, California; Salem, Oregon; and San Francisco, California;

- interviewed local ICE officials whose area of responsibility covered the jurisdictions mentioned above; and

- arranged for the Federal Bureau of Investigation to query the National Crime Information Center database using SCAAP data sets in an effort to identify repeat arrests of criminal aliens.

AR-00054

APPENDIX II

# PUBLIC LAW 109-162

119 STAT. 3130        PUBLIC LAW 109–162—JAN. 5, 2006

to evidence of postage payment approved by the United States
Postal Service.".

Grants.

**SEC. 1193. AUTHORIZATION OF ADDITIONAL APPROPRIATIONS.**

In addition to any other amounts authorized by law, there
are authorized to be appropriated for grants to the American
Prosecutors Research Institute under section 214A of the Victims
of Child Abuse Act of 1990 (42 U.S.C. 13003) $7,500,000 for each
of fiscal years 2006 through 2010.

Hurricanes
Katrina and Rita.

**SEC. 1194. ASSISTANCE TO COURTS.**

The chief judge of each United States district court is encour-
aged to cooperate with requests from State and local authorities
whose operations have been significantly disrupted as a result
of Hurricane Katrina or Hurricane Rita to provide accommodations
in Federal facilities for State and local courts to conduct their
proceedings.

**SEC. 1195. STUDY AND REPORT ON CORRELATION BETWEEN SUB-
STANCE ABUSE AND DOMESTIC VIOLENCE AT DOMESTIC
VIOLENCE SHELTERS.**

The Secretary of Health and Human Services shall carry out
a study on the correlation between a perpetrator's drug and alcohol
abuse and the reported incidence of domestic violence at domestic
violence shelters. The study shall cover fiscal years 2006 through
2008. Not later than February 2009, the Secretary shall submit
to Congress a report on the results of the study.

**SEC. 1196. REAUTHORIZATION OF STATE CRIMINAL ALIEN ASSISTANCE
PROGRAM.**

(a) AUTHORIZATION OF APPROPRIATIONS.—Section 241(i)(5) of
the Immigration and Nationality Act (8 U.S.C. 1231(i)(5)) is
amended by striking "appropriated" and all that follows through
the period and inserting the following: "appropriated to carry out
this subsection—

"(A) $750,000,000 for fiscal year 2006;
"(B) $850,000,000 for fiscal year 2007; and
"(C) $950,000,000 for each of the fiscal years 2008
through 2011.".

(b) LIMITATION ON USE OF FUNDS.—Section 241(i)(6) of the
Immigration and Nationality Act (8 U.S.C. 1231(i)(6)) is amended
to read as follows:

"(6) Amounts appropriated pursuant to the authorization
of appropriations in paragraph (5) that are distributed to a
State or political subdivision of a State, including a munici-
pality, may be used only for correctional purposes.".

(c) STUDY AND REPORT ON STATE AND LOCAL ASSISTANCE IN
INCARCERATING UNDOCUMENTED CRIMINAL ALIENS.—

(1) IN GENERAL.—Not later than 1 year after the date
of the enactment of this Act, the Inspector General of the
United States Department of Justice shall perform a study,
and report to the Committee on the Judiciary of the United
States House of Representatives and the Committee on the
Judiciary of the United States Senate on the following:

"(A) Whether there are States, or political subdivisions
of a State, that have received compensation under section
241(i) of the Immigration and Nationality Act (8 U.S.C.
1231(i)) and are not fully cooperating in the Department

– 37 –

AR-00055

of Homeland Security's efforts to remove from the United States undocumented criminal aliens (as defined in paragraph (3) of such section).

(B) Whether there are States, or political subdivisions of a State, that have received compensation under section 241(i) of the Immigration and Nationality Act (8 U.S.C. 1231(i)) and that have in effect a policy that violates section 642 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1373).

(C) The number of criminal offenses that have been committed by aliens unlawfully present in the United States after having been apprehended by States or local law enforcement officials for a criminal offense and subsequently being released without being referred to the Department of Homeland Security for removal from the United States.

(D) The number of aliens described in subparagraph (C) who were released because the State or political subdivision lacked space or funds for detention of the alien.

(2) IDENTIFICATION.—In the report submitted under paragraph (1), the Inspector General of the United States Department of Justice—

(A) shall include a list identifying each State or political subdivision of a State that is determined to be described in subparagraph (A) or (B) of paragraph (1); and

(B) shall include a copy of any written policy determined to be described in subparagraph (B).

**SEC. 1197. EXTENSION OF CHILD SAFETY PILOT PROGRAM.**

Section 108 of the PROTECT Act (42 U.S.C. 5119a note) is amended—

(1) in subsection (a)—

(A) in paragraph (2)(B), by striking "A volunteer organization in a participating State may not submit background check requests under paragraph (3).";

(B) in paragraph (3)—

(i) in subparagraph (A), by striking "a 30-month" and inserting "a 60-month";

(ii) in subparagraph (A), by striking "100,000" and inserting "200,000"; and

(iii) by striking subparagraph (B) and inserting the following:

"(B) PARTICIPATING ORGANIZATIONS.—

"(i) ELIGIBLE ORGANIZATIONS.—Eligible organizations include—

"(I) the Boys and Girls Clubs of America;

"(II) the MENTOR/National Mentoring Partnership;

"(III) the National Council of Youth Sports; and

"(IV) any nonprofit organization that provides care, as that term is defined in section 5 of the National Child Protection Act of 1993 (42 U.S.C. 5119c), for children.

"(ii) PILOT PROGRAM.—The eligibility of an organization described in clause (i)(IV) to participate in the pilot program established under this section

AR-00056

APPENDIX III

| | | FY 2005 | FY 2004 |
|---|---|---|---|
| | **SCAAP Recipients – FYs 2005 and 2004** | | |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| AK | Alaska Department of Corrections | $26,553 | $33,417 |
| AL | State of Alabama | 45,747 | 61,085 |
| AL | Montgomery County | 8,709 | 7,404 |
| AL | De Kalb County | 4,482 | 1,009 |
| AL | Coffee County | | 2,454 |
| AR | State of Arkansas | 148,764 | 106,382 |
| AR | Washington County | 50,329 | 25,915 |
| AR | Benton County | 29,991 | 28,348 |
| AR | Carroll County | 9,153 | 4,526 |
| AR | Sebastian County | 8,420 | 12,577 |
| AR | Pope County | 6,412 | 12,295 |
| AR | Polk County | 1,561 | 2,718 |
| AR | Hempstead County | 996 | |
| AR | Boone County | 403 | |
| AR | Independence County | | 3,211 |
| AZ | State of Arizona | 12,139,791 | 6,808,219 |
| AZ | Maricopa County | 1,297,752 | 922,938 |
| AZ | Pima County | 407,301 | 747,878 |
| AZ | Yuma County | 220,339 | 217,921 |
| AZ | Yavapai County | 93,802 | 114,615 |
| AZ | Cochise County | 72,681 | 133,904 |
| AZ | Pinal County | 55,072 | 70,660 |
| AZ | Santa Cruz County | 31,453 | |
| AZ | Gila County | 23,623 | 21,675 |
| AZ | Mohave County | 12,307 | 32,947 |
| AZ | Greenlee County | 7,503 | 581 |
| AZ | Navajo County | 6,021 | 8,733 |
| AZ | Graham County | 2,844 | 3,296 |
| CA | State of California | 85,953,191 | 77,356,015 |
| CA | Los Angeles County | 12,530,034 | 13,876,508 |
| CA | Orange County | 6,562,437 | 4,593,198 |
| CA | San Diego County | 2,346,881 | 795,416 |
| CA | Santa Clara County | 1,616,147 | 1,382,031 |
| CA | Riverside County | 1,254,534 | 1,349,430 |
| CA | San Francisco City & County | 1,087,199 | 1,405,674 |

– 39 –

AR-00057

| SCAAP Recipients – FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | **FY 2005** | **FY 2004** |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| CA | Fresno County | 1,045,772 | 1,025,096 |
| CA | San Mateo County | 955,843 | 1,185,621 |
| CA | Sacramento County | 873,005 | 1,168,675 |
| CA | Monterey County | 735,201 | 925,407 |
| CA | Kern County | 613,980 | 882,708 |
| CA | Sonoma County | 604,578 | 784,290 |
| CA | Contra Costa County | 592,346 | 520,503 |
| CA | Ventura County | 564,332 | 355,127 |
| CA | San Bernardino County | 407,580 | 487,145 |
| CA | Alameda County | 403,662 | 223,619 |
| CA | Tulare County | 402,655 | 502,577 |
| CA | Santa Barbara County | 380,622 | 516,480 |
| CA | Solano County | 273,742 | 23,266 |
| CA | Marin County | 204,748 | 310,219 |
| CA | Napa County | 184,611 | 201,916 |
| CA | San Joaquin County | 181,990 | 193,916 |
| CA | Santa Cruz County | 173,291 | 212,435 |
| CA | Stanislaus County | 161,626 | 227,381 |
| CA | Merced County | 124,493 | 134,847 |
| CA | El Dorado County | 114,379 | 92,035 |
| CA | Kings County | 114,174 | 203,337 |
| CA | San Luis Obispo County | 94,654 | 140,418 |
| CA | Mendocino County | 76,388 | 55,543 |
| CA | Placer County | 71,636 | 89,111 |
| CA | Imperial County | 56,370 | 136,356 |
| CA | Yolo County | 55,703 | 94,262 |
| CA | Nevada County | 34,847 | 58,273 |
| CA | Sutter County | 34,570 | 39,722 |
| CA | Tehama County | 32,942 | 46,980 |
| CA | Mono County | 28,913 | 22,585 |
| CA | Humboldt County | 27,626 | 49,656 |
| CA | City of Santa Ana | 21,202 | 41,524 |
| CA | Glenn County | 16,559 | 19,235 |
| CA | Yuba County | 16,472 | 19,257 |
| CA | City of Anaheim | 16,259 | 33,306 |
| CA | Colusa County | 11,836 | |

AR-00058

| SCAAP Recipients – FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | **FY 2005** | **FY 2004** |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| CA | Inyo County | 10,678 | 13,302 |
| CA | Butte County | 9,790 | 19,934 |
| CA | Lake County | 8,055 | 12,626 |
| CA | Siskiyou County | 7,823 | 7,117 |
| CA | Tuolomne County | 5,591 | 6,063 |
| CA | Plumas County | 4,595 | 2,437 |
| CA | Madera County | 2,785 | 8,209 |
| CA | Calaveras County | 1,558 | 5,331 |
| CA | Amador County | 733 | 2,754 |
| CA | Shasta County | | 40,342 |
| CO | State of Colorado | 2,358,707 | 3,104,425 |
| CO | Denver City & County | 950,665 | 997,382 |
| CO | Arapahoe County | 389,607 | 332,753 |
| CO | Boulder County | 267,084 | 241,687 |
| CO | Jefferson County | 139,824 | |
| CO | Weld County | 127,640 | 217,172 |
| CO | Adams County | 115,259 | 128,316 |
| CO | El Paso County | 100,370 | 198,068 |
| CO | Garfield County | 100,232 | 88,553 |
| CO | Eagle County | 78,319 | 71,649 |
| CO | Pueblo County | 71,749 | 58,963 |
| CO | Larimer County | 64,679 | 46,613 |
| CO | Douglas County | 63,949 | 92,396 |
| CO | Pitkin County | 50,679 | 46,151 |
| CO | Morgan County | 49,935 | 66,802 |
| CO | Mesa County | 18,356 | 43,365 |
| CO | Summit County | 14,885 | |
| CO | Delta County | 12,964 | 9,606 |
| CO | Lincoln County | 9,442 | 7,374 |
| CO | San Miguel County | 8,625 | 33,548 |
| CO | Moffat County | 7,631 | |
| CO | Sedgwick County | 7,418 | 4,541 |
| CO | Bent County | 1,967 | 343 |
| CO | Baca County | | 1,941 |
| CT | State of Connecticut | 779,697 | 900,356 |
| DC | District of Columbia | 81,762 | 44,472 |

– 41 –

AR-00059

| SCAAP Recipients – FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | **FY 2005** | **FY 2004** |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| DE | State of Delaware | 132,951 | 131,263 |
| FL | State of Florida | 12,806,110 | 11,778,031 |
| FL | Collier County | 597,409 | 236,938 |
| FL | Hillsborough County | 233,499 | 248,223 |
| FL | Pinellas County | 194,285 | 180,266 |
| FL | Lee County | 186,685 | 142,645 |
| FL | Sarasota County | 148,472 | 60,064 |
| FL | Martin County | 145,025 | 130,554 |
| FL | Orange County | 139,138 | 173,276 |
| FL | Osceola County | 89,780 | |
| FL | Seminole County | 88,956 | 132,497 |
| FL | Miami Dade County | 78,587 | 140,309 |
| FL | Broward County | 75,320 | 171,361 |
| FL | Brevard County | 66,355 | 60,660 |
| FL | Lake County | 61,813 | 70,897 |
| FL | Volusia County | 55,833 | 79,046 |
| FL | Indian River County | 54,704 | 61,934 |
| FL | St. Lucie County | 50,793 | 5,771 |
| FL | Okeechobee County | 43,124 | 67,629 |
| FL | Pasco County | 32,848 | 46,722 |
| FL | Polk County | 31,815 | 84,703 |
| FL | Leon County | 31,721 | 47,624 |
| FL | Palm Beach County | 29,817 | 138,714 |
| FL | DeSoto County | 29,569 | 43,104 |
| FL | Alachua County | 26,783 | 18,252 |
| FL | Clay County | 24,970 | 10,585 |
| FL | Hendry County | 23,393 | |
| FL | Hardee County | 22,887 | 36,953 |
| FL | Marion County | 19,490 | 29,065 |
| FL | Glades County | 17,801 | |
| FL | Highlands County | 14,940 | 35,240 |
| FL | Putnam County | 13,111 | |
| FL | Levy County | 7,341 | 6,097 |
| FL | Suwannee County | 6,944 | 9,184 |
| FL | Taylor County | 3,012 | |
| FL | Gilchrist County | 1,661 | 2,483 |

– 42 –

AR-00060

| SCAAP Recipients – FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | **FY 2005** | **FY 2004** |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| FL | Bradford County | 1,203 | 160 |
| FL | Santa Rosa County | | 9,816 |
| FL | Sumter County | | 8,596 |
| FL | Madison County | | 146 |
| GA | State of Georgia | 1,393,149 | 1,885,056 |
| GA | Cherokee County | 113,614 | 41,410 |
| GA | DeKalb County | 79,948 | |
| GA | Hall County | 36,833 | 71,524 |
| GA | Forsyth County | 32,322 | 28,847 |
| GA | Chatham County | 31,561 | 42,292 |
| GA | Houston County | 25,028 | 14,342 |
| GA | Cobb County | 22,301 | |
| GA | Augusta Richmond County | 19,559 | 17,809 |
| GA | Muscogee County | 19,357 | 12,518 |
| GA | Habersham | 19,081 | |
| GA | Floyd County | 17,323 | 23,854 |
| GA | Toombs County | 13,811 | 25,454 |
| GA | Walton County | 9,028 | 1,813 |
| GA | Newton County | 8,684 | 4,081 |
| GA | Carroll County | 6,556 | |
| GA | Gilmer County | 5,359 | 5,250 |
| GA | Monroe County | 2,577 | |
| GA | Lee County | 2,104 | 8,487 |
| GA | Crisp County | 1,291 | 1,519 |
| GA | Walker County | 1,257 | |
| GA | Grady County | 1,209 | |
| GA | Decatur County | | 5,790 |
| GA | Kennesaw County | | 1,141 |
| GU | Government of Guam | 204,042 | |
| HI | State of Hawaii | 195,595 | 171,317 |
| IA | State of Iowa | 344,266 | 477,575 |
| IA | Woodbury County | 57,725 | 94,146 |
| IA | Johnson County | 22,293 | 21,568 |
| IA | Polk County | 16,332 | 23,040 |
| IA | Story County | 13,740 | 21,376 |
| IA | Black Hawk County | 8,844 | 13,792 |

– 43 –

| SCAAP Recipients – FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | **FY 2005** | **FY 2004** |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| IA | Crawford County | 7,033 | 5,322 |
| IA | Mahaska County | 2,611 | 1,607 |
| IA | Louisa County | 2,178 | 3,642 |
| IA | Davis County | 1,673 | 764 |
| IA | Jefferson County | 362 | 163 |
| IA | Wright County | | 10,319 |
| ID | Idaho Department of Correction | 258,458 | 350,299 |
| ID | Canyon County | 112,759 | 79,581 |
| ID | Ada County | 92,502 | 70,057 |
| ID | Cassia County | 25,601 | 30,238 |
| ID | Madison County | 20,508 | 17,841 |
| ID | Blaine County | 17,612 | 38,904 |
| ID | Bonneville County | 16,719 | 24,957 |
| ID | Washington County | 9,794 | 11,170 |
| ID | Elmore County | 9,273 | 10,222 |
| ID | Bannock County | 8,830 | 10,584 |
| ID | Bingham County | 8,076 | 19,041 |
| ID | Gooding County | 7,369 | 4,239 |
| ID | Twin Falls County | 7,103 | 9,091 |
| ID | Jefferson County | 6,191 | 11,821 |
| ID | Power County | 2,873 | 3,889 |
| ID | Owyhee County | 1,987 | 4,475 |
| ID | Teton County | 1,582 | 2,390 |
| ID | Latah County | | 891 |
| IL | State of Illinois | 4,731,269 | |
| IL | Cook County | 1,926,114 | 1,957,320 |
| IL | Lake County | 262,713 | 497,325 |
| IL | Kane County | 189,347 | 187,952 |
| IL | DuPage County | 168,975 | 349,826 |
| IL | McHenry County | 129,710 | 119,588 |
| IL | Winnebago County | 32,827 | 76,726 |
| IL | Will County | 17,029 | 69,160 |
| IL | DeKalb County | 14,869 | 4,514 |
| IL | Rock Island County | 12,496 | 23,042 |
| IL | Kendall County | 10,870 | 6,455 |
| IL | LaSalle County | 7,208 | 10,580 |

– 44 –

AR-00062

| SCAAP Recipients – FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | **FY 2005** | **FY 2004** |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| IL | McLean County | 7,007 | 5,986 |
| IL | Tazewell County | 6,784 | |
| IL | Peoria County | 5,321 | 3,378 |
| IL | Champaign County | 5,284 | 13,797 |
| IL | Ogle County | 4,506 | 1,165 |
| IL | Henry County | 4,180 | |
| IL | Bureau County | 1,253 | |
| IL | Dewitt County | 710 | |
| IL | Jo Daviess County | 442 | 1,030 |
| IL | Livingston County | 439 | 1,820 |
| IL | Williamson County | 250 | |
| IL | Kankakee County | | 7,094 |
| IL | Knox County | | 935 |
| IL | Woodford County | | 568 |
| IN | State of Indiana | 263,919 | 423,469 |
| IN | Marion County | 74,287 | |
| IN | Hamilton County | 21,260 | 17,499 |
| IN | St. Joseph County | 9,261 | |
| IN | Hendricks County | 5,544 | |
| IN | Johnson County | 4,649 | 4,938 |
| IN | Allen County | 4,437 | |
| IN | Porter County | 3,868 | 4,301 |
| IN | Grant County | 3,686 | 3,048 |
| IN | Monroe County | 3,476 | 5,349 |
| IN | Jackson County | 3,426 | 8,049 |
| IN | Clark County | 1,520 | 3,079 |
| IN | Cass County | 527 | 1,918 |
| KS | State of Kansas | 290,269 | 378,600 |
| KS | Johnson County | 130,457 | 161,398 |
| KS | Sedgwick County | 85,691 | 105,520 |
| KS | Wyandotte County | 68,384 | 49,538 |
| KS | Shawnee County | 22,896 | 22,292 |
| KS | Finney County | 12,421 | 13,300 |
| KS | Saline County | 12,165 | 18,181 |
| KS | Douglas County | 5,946 | 8,962 |
| KS | Butler County | 1,572 | |

– 45 –

AR-00063

| | | FY 2005 | FY 2004 |
|---|---|---|---|
| **SCAAP Recipients – FYs 2005 and 2004** | | | |
| | | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| KS | Montgomery County | 730 | 49 |
| KY | Shelby County | 113,902 | 100,320 |
| KY | Lexington Fayette Urban County | 69,269 | 54,531 |
| KY | State of Kentucky | 51,142 | 60,005 |
| KY | Kenton County | 1,605 | 12,875 |
| KY | Carroll County | 1,041 | 4,531 |
| KY | Louisville Jefferson County | | 35 |
| LA | State of Louisiana | 106,834 | 143,000 |
| LA | Bossier Parish | 6,789 | 13,959 |
| LA | Rapides Parish | 6,462 | 5,223 |
| LA | Orleans Parish | 4,932 | 4,965 |
| LA | Claiborne Parish | 2,019 | 1,136 |
| LA | Lincoln Parish Police Jury | 417 | 1,424 |
| LA | Avoyelles Parish | | 6,249 |
| LA | St. Tammany Parish | | 4,007 |
| LA | St. James Parish | | 40 |
| MA | State of Massachusetts | 4,728,549 | 5,362,497 |
| MA | Suffolk County | 790,048 | 455,191 |
| MA | Middlesex County | 703,111 | 29,084 |
| MA | Plymouth County | 517,480 | 466,190 |
| MA | Bristol County | 218,130 | 326,016 |
| MA | Hampden County | 130,922 | 160,323 |
| MA | Barnstable County | 121,844 | 107,802 |
| MA | Norfolk County | 27,531 | 84,051 |
| MD | State of Maryland | 985,416 | 1,122,300 |
| MD | Montgomery County | 964,401 | 1,356,919 |
| MD | Prince Georges County | 64,396 | 44,772 |
| MD | Anne Arundel County | 36,607 | 7,287 |
| MD | Frederick County | 27,527 | 42,616 |
| MD | Washington County | 5,197 | 10,561 |
| MD | Charles County | 4,693 | 2,778 |
| MD | Carroll County | 2,733 | 10,019 |
| ME | State of Maine | 36,840 | 37,955 |
| ME | Cumberland County | 18,539 | 5,831 |
| ME | Lincoln County | 6,611 | |
| ME | York County | 6,343 | |

– 46 –

AR-00064

| SCAAP Recipients – FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | **FY 2005** | **FY 2004** |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| ME | Piscataquis County | 866 | 991 |
| ME | Androscoggin County | | 3,405 |
| ME | Aroostook County | | 2,494 |
| MI | State of Michigan | 884,639 | 1,059,552 |
| MI | Oakland County | 82,052 | 127,681 |
| MI | Macomb County | 66,873 | 45,536 |
| MI | Ottawa County | 46,670 | 63,786 |
| MI | Wayne County | 41,587 | 5,910 |
| MI | Kent County | 37,783 | 202,160 |
| MI | Kalamazoo County | 19,192 | 9,197 |
| MI | Berrien County | 15,920 | 18,908 |
| MI | Calhoun County | 15,582 | 20,042 |
| MI | St. Clair County | 13,977 | 18,011 |
| MI | Chippewa County | 12,345 | 9,131 |
| MI | Allegan County | 10,198 | 11,780 |
| MI | Eaton County | 9,897 | 11,764 |
| MI | Lapeer County | 9,348 | |
| MI | St. Joseph County | 8,909 | 10,742 |
| MI | Muskegon County | 7,942 | 16,513 |
| MI | Saginaw County | 7,339 | 12,254 |
| MI | Jackson County | 6,069 | 5,050 |
| MI | Ionia County | 5,429 | 17,343 |
| MI | Branch County | 4,806 | 5,362 |
| MI | Lenawee County | 4,155 | 3,568 |
| MI | Van Buren County | 3,697 | 1,428 |
| MI | Cass County | 3,613 | |
| MI | Livingston County | 3,520 | 6,299 |
| MI | Shiawassee County | 2,742 | 2,418 |
| MI | Tuscola County | 738 | |
| MI | Sanilac County | 605 | 1,361 |
| MI | Gratiot County | 170 | 1,693 |
| MI | Ingham County | | 17,041 |
| MI | Washtenaw County | | 14,964 |
| MI | Huron County | | 343 |
| MN | State of Minnesota | 934,384 | 1,205,072 |
| MN | Hennepin County | 144,355 | 236,438 |

AR-00065

| SCAAP Recipients – FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | **FY 2005** | **FY 2004** |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| MN | Ramsey County | 113,181 | 135,525 |
| MN | Dakota County | 44,959 | 47,095 |
| MN | Stearns County | 38,207 | 36,406 |
| MN | Anoka County | 19,342 | 34,444 |
| MN | McLeod County | 13,201 | 12,387 |
| MN | Washington County | 10,570 | 25,158 |
| MN | Watonwan County | 4,690 | 4,215 |
| MN | Chippewa County | 4,273 | 3,654 |
| MN | Polk County | 40 | 966 |
| MN | Olmsted County | | 41,399 |
| MO | State of Missouri | 310,513 | 331,509 |
| MO | Greene County | 28,582 | 75,355 |
| MO | Jackson County | 25,070 | 17,219 |
| MO | St. Charles County | 24,795 | 19,518 |
| MO | St. Louis County | 8,145 | 17,411 |
| MO | Pike County | 4,582 | 237 |
| MO | Newton County | 4,279 | 1,789 |
| MO | St. Louis Metropolitan | 3,594 | |
| MO | St. Francois County | 3,079 | 9,173 |
| MO | Platte County | 2,383 | 2,431 |
| MO | Phelps County | 1,524 | 2,689 |
| MO | Lafayette County | | 1,451 |
| MO | Franklin County | | 566 |
| MS | State of Mississippi | 20,548 | 38,471 |
| MS | Lauderdale County | 2,580 | 687 |
| MS | Pike County | 2,451 | 1,002 |
| MT | Yellowstone County | 9,542 | 2,792 |
| MT | Cascade County | 1,832 | |
| NC | State of North Carolina | 2,527,797 | 2,380,105 |
| NC | Mecklenburg County | 255,020 | 281,159 |
| NC | Wake County | 143,724 | 5,402 |
| NC | Guilford County | 107,266 | 72,118 |
| NC | Durham County | 82,967 | 35,320 |
| NC | Forsyth County | 69,285 | 147,230 |
| NC | Orange County | 46,570 | 27,614 |
| NC | Pitt County | 44,896 | 35,338 |

AR-00066

| SCAAP Recipients – FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | **FY 2005** | **FY 2004** |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| NC | New Hanover County | 36,132 | 33,922 |
| NC | Cumberland County | 31,780 | 48,623 |
| NC | Buncombe County | 30,113 | 27,476 |
| NC | Rockingham County | 25,132 | 24,190 |
| NC | Alamance County | 24,653 | 26,413 |
| NC | Davidson County | 24,586 | 25,197 |
| NC | Gaston County | 23,987 | 37,456 |
| NC | Rowan County | 19,730 | 8,989 |
| NC | Sampson County | 18,507 | 16,694 |
| NC | Wilson County | 17,520 | 11,585 |
| NC | Henderson County | 15,301 | 22,930 |
| NC | Union County | 14,723 | 23,851 |
| NC | Lee County | 14,497 | 10,584 |
| NC | Duplin County | 13,395 | 6,462 |
| NC | Iredell County | 12,445 | 21,923 |
| NC | Randolph County | 12,184 | 30,573 |
| NC | Moore County | 12,022 | 15,345 |
| NC | Chatham County | 9,588 | 9,926 |
| NC | Wilkes County | 9,476 | 14,693 |
| NC | Stokes County | 9,249 | 5,731 |
| NC | Burke County | 8,818 | 11,208 |
| NC | Cleveland County | 7,741 | |
| NC | Catawba County | 7,605 | 5,966 |
| NC | Wayne County | 7,465 | 23,716 |
| NC | Surry County | 5,601 | |
| NC | Franklin County | 4,424 | 6,772 |
| NC | Vance County | 4,279 | 136,328 |
| NC | Davie County | 4,175 | 5,673 |
| NC | Robeson County | 4,091 | 4,815 |
| NC | Haywood County | 3,578 | 4,658 |
| NC | Lincoln County | 2,664 | |
| NC | Montgomery County | 2,373 | |
| NC | Pender County | 2,130 | 1,869 |
| NC | Jackson County | 1,441 | 2,654 |
| NC | Lenoir County | 1,423 | |
| NC | Washington County | 1,376 | 1,788 |

– 49 –

AR-00067

| SCAAP Recipients – FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | **FY 2005** | **FY 2004** |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| NC | Beaufort County | 1,315 | 9,238 |
| NC | Watauga County | 1,096 | 3,901 |
| NC | Anson County | 595 | |
| NC | Bladen County | 456 | 5,452 |
| NC | Columbus County | | 1,963 |
| NC | Cabarrus County | | 19,042 |
| NC | Johnston County | | 17,950 |
| NC | Scotland County | | 2,156 |
| NC | Caldwell County | | 1,896 |
| ND | Cass County | 25,367 | 9,663 |
| ND | State of North Dakota | 11,560 | 15,682 |
| NE | Douglas County | 456,968 | 560,878 |
| NE | State of Nebraska | 354,507 | 315,258 |
| NE | Lancaster County | 54,585 | 56,168 |
| NE | Sarpy County | 42,219 | 34,424 |
| NE | Saline County | 18,762 | 13,958 |
| NE | Dawson County | 15,394 | 20,818 |
| NE | Dakota County | 12,407 | 18,713 |
| NE | Platte County | 8,930 | 26,858 |
| NE | Phelps County | 3,593 | 448 |
| NE | Lincoln County | 2,917 | 5,838 |
| NE | Dixon County | 2,667 | 4,968 |
| NE | Buffalo County | 2,337 | 10,086 |
| NE | Gage County | 954 | 4,410 |
| NE | Thurston County | 75 | 157 |
| NH | State of New Hampshire | 127,641 | 167,264 |
| NH | Hillsborough County | 34,162 | 15,365 |
| NH | Grafton County | 7,078 | 2,141 |
| NH | Merrimack County | 4,168 | 15,848 |
| NH | Strafford County | 929 | 7,103 |
| NJ | State of New Jersey | 3,472,389 | 4,061,667 |
| NJ | Passaic County | 1,224,817 | 1,203,054 |
| NJ | Hudson County | 321,758 | 416,468 |
| NJ | Monmouth County | 145,362 | 143,831 |
| NJ | Union County | 135,118 | 73,012 |
| NJ | Essex County | 129,745 | 346,587 |

AR-00068

| SCAAP Recipients – FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | **FY 2005** | **FY 2004** |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| NJ | Morris County | 115,598 | 256,959 |
| NJ | Burlington County | 113,337 | 56,622 |
| NJ | Somerset County | 105,965 | 141,237 |
| NJ | Atlantic County | 103,295 | 105,337 |
| NJ | Ocean County | 95,431 | 101,591 |
| NJ | Camden County | 86,583 | 156,954 |
| NJ | Middlesex County | 82,747 | 692,327 |
| NJ | Cape May County | 27,591 | 20,307 |
| NJ | Cumberland County | 25,717 | 30,205 |
| NJ | Warren County | 19,759 | 26,837 |
| NJ | Sussex County | 12,362 | 26,203 |
| NJ | Hunterdon County | 10,241 | 11,764 |
| NJ | Mercer County | 8,303 | 30,660 |
| NM | State of New Mexico | 650,877 | 193,023 |
| NM | City of Albuquerque | 225,367 | |
| NM | Dona Ana County | 85,519 | 63,669 |
| NM | Lea County | 31,502 | 35,807 |
| NM | Otero County | 19,252 | 25,532 |
| NM | Santa Fe County | 15,897 | 19,813 |
| NM | Rio Arriba County | 15,520 | 22,264 |
| NM | Chaves County | 11,259 | 16,920 |
| NM | Eddy County | 7,542 | |
| NM | Valencia County | 5,618 | 18,650 |
| NM | Luna County | 4,914 | 4,549 |
| NM | Roosevelt County | 4,730 | 5,107 |
| NM | Sierra | 4,238 | 4,720 |
| NM | Taos County | 1,634 | 4,641 |
| NM | Quay County | 1,310 | 1,397 |
| NM | Colfax County | 1,009 | 5,556 |
| NM | Bernalillo County | | 248,295 |
| NM | Grant County | | 5,955 |
| NM | De Baca County | | 1,759 |
| NM | Hidalgo County | | 1,742 |
| NV | State of Nevada | 2,412,064 | 1,383,439 |
| NV | Clark County | 1,456,722 | 1,486,607 |
| NV | Washoe County | 286,440 | 477,898 |

- 51 –

| SCAAP Recipients – FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | **FY 2005** | **FY 2004** |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| NV | City of Las Vegas | 70,837 | 55,835 |
| NV | City of North Las Vegas | 49,739 | 66,221 |
| NV | Carson City County | 19,866 | 31,104 |
| NV | Elko County | 15,765 | 21,463 |
| NV | Nye County | 12,601 | 9,612 |
| NV | Douglas County | 12,371 | 4,871 |
| NV | Churchill County | 11,816 | 12,465 |
| NV | Humboldt County | 5,121 | 18,506 |
| NV | Lyon County | 4,586 | 9,471 |
| NV | Pershing County | 2,464 | 6,790 |
| NV | Esmeralda County | 1,652 | 4,182 |
| NV | Eureka County | 1,025 | 3,240 |
| NV | Mineral County | 117 | |
| NY | State of New York | 24,022,356 | 30,859,709 |
| NY | City of New York | 15,893,255 | 20,667,392 |
| NY | Nassau County | 1,970,809 | 2,584,492 |
| NY | Westchester County | 366,356 | 489,256 |
| NY | Rockland County | 231,136 | 251,515 |
| NY | Monroe County | 65,079 | 46,565 |
| NY | Dutchess County | 37,346 | 65,050 |
| NY | Ulster County | 20,454 | 45,036 |
| NY | Jefferson County | 18,659 | 4,204 |
| NY | Niagara County | 18,531 | 27,469 |
| NY | Erie County | 17,697 | 54,067 |
| NY | Franklin County | 17,081 | 17,480 |
| NY | Onondaga County | 15,784 | 14,016 |
| NY | Albany County | 14,937 | 23,195 |
| NY | Broome County | 13,060 | 39,129 |
| NY | Oswego County | 11,045 | 8,306 |
| NY | Schenectady County | 9,621 | 38,668 |
| NY | Wayne County | 8,940 | 15,611 |
| NY | Oneida County | 7,553 | 9,014 |
| NY | Greene County | 7,422 | 10,278 |
| NY | Rensselaer County | 6,732 | 6,266 |
| NY | Ontario County | 6,724 | 15,237 |
| NY | Chemung County | 5,904 | 4,724 |

- 52 –

AR-00070

| SCAAP Recipients – FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | **FY 2005** | **FY 2004** |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| NY | Schuyler County | 5,705 | 3,035 |
| NY | Washington County | 5,356 | |
| NY | Putnam County | 5,210 | 34,594 |
| NY | Genesee County | 4,098 | 2,614 |
| NY | Herkimer County | 2,859 | 145 |
| NY | Yates County | 1,588 | 1,301 |
| NY | Chautauqua County | 974 | 5,611 |
| NY | Fulton County | 785 | |
| NY | Columbia County | 764 | |
| NY | Wyoming County | 490 | 463 |
| NY | St. Lawrence County | 278 | 1,707 |
| NY | Steuben County | 225 | 2,222 |
| NY | Livingston County | | 1,273 |
| NY | Suffolk County | | 1,489,818 |
| NY | Orange County | | 142,163 |
| NY | Orleans County | | 6,699 |
| NY | Clinton County | | 3,453 |
| NY | Cayuga County | | 2,559 |
| NY | Montgomery County | | 1,099 |
| OH | State of Ohio | 664,897 | 766,829 |
| OH | Cuyahoga County | 49,216 | 70,357 |
| OH | Summit County | 17,579 | 14,729 |
| OH | Greene County | 12,192 | 8,531 |
| OH | Erie County | 2,345 | 881 |
| OH | Licking County | 1,730 | 1,542 |
| OH | Medina County | | 5,335 |
| OK | State of Oklahoma | 622,173 | 649,583 |
| OK | Oklahoma County | 65,864 | 84,623 |
| OK | Texas County | 34,926 | 44,741 |
| OK | Tulsa County | 6,843 | 21,120 |
| OK | Kay County | 4,737 | 2,526 |
| OK | Cleveland County | 3,744 | 2,912 |
| OK | Caddo County | 2,883 | 652 |
| OK | Grady County | 2,854 | 3,413 |
| OK | Carter County | 2,092 | 2,336 |
| OK | Okfuskee County | 1,507 | 270 |

– 53 –

AR-00071

| SCAAP Recipients – FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | **FY 2005** | **FY 2004** |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| OK | Pottawatomie County | 438 | 1,223 |
| OK | Cimarron County | 407 | |
| OK | Harper County | 175 | 5,304 |
| OK | Lincoln County | | 619 |
| OK | Ottawa County | | 596 |
| OK | Delaware County | | 77 |
| OR | State of Oregon | 3,417,250 | |
| OR | Multnomah County | 290,987 | 444,322 |
| OR | Lane County | 201,052 | 224,088 |
| OR | Marion County | 172,017 | |
| OR | Washington County | 158,052 | 283,682 |
| OR | Linn County | 25,166 | 28,346 |
| OR | Jackson County | 23,373 | 50,619 |
| OR | Malheur County | 21,187 | 18,496 |
| OR | Benton County | 20,856 | 22,759 |
| OR | Umatilla County | 16,857 | 30,722 |
| OR | Deschutes County | 16,797 | 10,393 |
| OR | Lincoln County | 16,776 | 29,776 |
| OR | Polk County | 14,061 | 24,536 |
| OR | Yamhill County | 13,773 | 8,963 |
| OR | Douglas County | 12,827 | 3,389 |
| OR | Clatsop County | 12,620 | 21,368 |
| OR | Hood River County | 12,488 | 16,527 |
| OR | Tillamook County | 6,601 | 8,240 |
| OR | Jefferson County | 6,405 | 8,307 |
| OR | Coos County | 6,272 | 6,725 |
| OR | Wasco County | 4,610 | 7,800 |
| OR | Columbia County | 1,888 | 1,111 |
| OR | Union County | 1,688 | 13,473 |
| OR | Gilliam County | 596 | 842 |
| OR | Clackamas County | | 75,733 |
| OR | Sherman County | | 1,546 |
| PA | Pennsylvania Department of Corrections | 908,520 | 1,156,505 |
| PA | City of Philadelphia | 132,061 | 87,983 |
| PA | Bucks County | 119,894 | 109,352 |
| PA | Lehigh County | 43,199 | 87,135 |

– 54 –

AR-00072

| SCAAP Recipients – FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | **FY 2005** | **FY 2004** |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| PA | Dauphin County | 35,147 | 35,406 |
| PA | Lancaster County | 32,861 | 28,366 |
| PA | Luzerne County | 29,323 | 37,074 |
| PA | Lebanon County | 23,099 | 20,484 |
| PA | Berks County | 22,396 | 43,246 |
| PA | Monroe County | 20,038 | 24,924 |
| PA | Westmoreland County | 10,357 | 653 |
| PA | Franklin County | 9,856 | 10,042 |
| PA | Erie County | 8,055 | 13,815 |
| PA | Crawford County | 2,763 | 1,215 |
| PA | Pike County | 1,852 | 3,430 |
| PA | Beaver County | 635 | 2,727 |
| PA | Cambria County | | 20,479 |
| PA | Schuylkill County | | 6,923 |
| PA | Centre County | | 4,037 |
| PA | Fayette County | | 116 |
| PR | Commonwealth of Puerto Rico | 319,429 | 158,903 |
| RI | State of Rhode Island | 863,995 | 760,584 |
| SC | South Carolina Department of Corrections | 283,452 | 323,486 |
| SC | Horry County | 30,754 | 29,503 |
| SC | Lexington County | 27,521 | |
| SC | Charleston County | 25,823 | 29,919 |
| SC | York County | 22,240 | 16,190 |
| SC | Dorchester County | 6,774 | 14,539 |
| SC | Aiken County | 5,173 | 1,969 |
| SC | Colleton County | 3,199 | 3,208 |
| SC | Berkeley County | 2,849 | 4,263 |
| SC | Georgetown County | 540 | 1,675 |
| SC | Cherokee County | 457 | 1,186 |
| SC | Florence County | | 6,490 |
| SD | Minnehaha County | 51,927 | 41,493 |
| SD | State of South Dakota | 24,955 | 74,470 |
| SD | Pennington County | 6,332 | 8,553 |
| TN | State of Tennessee | 212,435 | 228,289 |
| TN | Metropolitan Nashville & Davidson County | 159,174 | 124,738 |

– 55 –

AR-00073

| SCAAP Recipients – FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | **FY 2005** | **FY 2004** |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| TN | Shelby County | 57,152 | 104,153 |
| TN | Hamilton County | 15,404 | |
| TN | Knox County | 6,375 | 6,623 |
| TN | Maury County | 1,069 | 11,145 |
| TX | State of Texas | 18,582,484 | 17,126,820 |
| TX | Harris County | 2,693,977 | 2,795,228 |
| TX | Hidalgo County | 714,808 | 48,291 |
| TX | Travis County | 658,636 | 842,159 |
| TX | Dallas County | 636,166 | |
| TX | Bexar County | 547,366 | 640,506 |
| TX | Tarrant County | 403,123 | 535,507 |
| TX | El Paso County | 357,084 | 218,179 |
| TX | Collin County | 303,305 | 257,672 |
| TX | Denton County | 163,183 | 205,350 |
| TX | Fort Bend County | 118,802 | 117,111 |
| TX | Williamson County | 107,402 | 167,020 |
| TX | Brazos County | 87,090 | 63,854 |
| TX | Galveston County | 67,131 | 41,065 |
| TX | Webb County | 64,069 | 81,443 |
| TX | Ellis County | 54,735 | 49,537 |
| TX | Montgomery County | 44,935 | 64,333 |
| TX | Hays County | 44,497 | 53,830 |
| TX | Nueces County | 42,501 | 14,979 |
| TX | Smith County | 39,542 | 53,635 |
| TX | Bell County | 35,258 | 57,193 |
| TX | Gillespie County | 34,806 | 4,828 |
| TX | Midland County | 33,738 | 177,045 |
| TX | Cameron County | 29,936 | 460,229 |
| TX | McLennan County | 28,213 | 18,607 |
| TX | Brazoria County | 27,436 | 35,670 |
| TX | Jefferson County | 26,646 | 50,789 |
| TX | Johnson County | 26,433 | 27,273 |
| TX | Rockwall County | 22,703 | 25,888 |
| TX | Ector County | 21,859 | 32,311 |
| TX | Maverick County | 20,643 | |
| TX | Moore County | 20,582 | 26,638 |

AR-00074

| SCAAP Recipients – FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | **FY 2005** | **FY 2004** |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| TX | Nacogdoches County | 20,239 | |
| TX | Dallam County | 18,909 | |
| TX | Tom Green County | 17,670 | 18,096 |
| TX | Lubbock County | 15,500 | 13,616 |
| TX | Victoria County | 12,915 | 25,053 |
| TX | Navarro County | 12,897 | 15,758 |
| TX | Kaufman County | 12,326 | 13,137 |
| TX | Kerr County | 11,376 | 11,983 |
| TX | Hill County | 11,342 | 10,155 |
| TX | Grayson County | 11,327 | 23,750 |
| TX | Randall County | 11,122 | 16,368 |
| TX | Comal County | 10,898 | 27,947 |
| TX | Guadalupe County | 10,469 | 9,578 |
| TX | Hopkins County | 10,020 | |
| TX | Angelina County | 9,959 | |
| TX | Taylor County | 8,902 | 12,614 |
| TX | Wise County | 8,476 | 12,639 |
| TX | Andrews County | 8,379 | 11,616 |
| TX | Harrison County | 8,015 | 9,753 |
| TX | Henderson County | 7,727 | 16,810 |
| TX | Parker County | 7,400 | 18,210 |
| TX | Starr County | 7,026 | |
| TX | Val Verde County | 6,713 | 7,138 |
| TX | Limestone County | 6,399 | 5,247 |
| TX | Matagorda County | 6,257 | 18,739 |
| TX | Cherokee County | 6,017 | 10,454 |
| TX | Deaf Smith County | 5,847 | 11,477 |
| TX | Upshur County | 5,514 | 6,279 |
| TX | Comanche County | 5,463 | 6,979 |
| TX | Crane County | 5,019 | 2,625 |
| TX | Castro County | 4,817 | 53 |
| TX | Crockett County | 4,438 | 10,784 |
| TX | Caldwell County | 4,335 | 4,915 |
| TX | Hudspeth County | 4,299 | 2,704 |
| TX | Uvalde County | 4,284 | 4,977 |
| TX | Hutchinson County | 4,123 | 3,760 |

– 57 –

AR-00075

| SCAAP Recipients – FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | **FY 2005** | **FY 2004** |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| TX | Wood County | 3,967 | 4,201 |
| TX | Milam County | 3,912 | 947 |
| TX | Parmer County | 3,910 | 6,707 |
| TX | Pecos County | 3,870 | |
| TX | Kinney County | 3,795 | 462 |
| TX | Van Zandt County | 3,747 | 5,262 |
| TX | Bowie County | 3,600 | 2,991 |
| TX | Walker County | 3,504 | 3,715 |
| TX | Zapata County | 3,426 | 6,841 |
| TX | Polk County | 3,392 | 6,200 |
| TX | Ochiltree County | 3,356 | 5,497 |
| TX | Burnet County | 2,769 | 6,641 |
| TX | Edwards County | 2,610 | |
| TX | Atascosa | 2,476 | |
| TX | Fayette County | 2,326 | 3,872 |
| TX | Calhoun County | 2,251 | 1,033 |
| TX | Lamar County | 2,091 | 964 |
| TX | Live Oak County | 2,038 | 2,736 |
| TX | Duval County | 1,915 | 5,155 |
| TX | Palo Pinto County | 1,658 | |
| TX | Fannin County | 1,566 | 5,247 |
| TX | Bosque County | 1,195 | |
| TX | Nolan County | 1,154 | 2,349 |
| TX | Lee County | 1,069 | 1,701 |
| TX | Lynn County | 1,005 | 1,747 |
| TX | Medina County | 947 | 184 |
| TX | Orange County | 537 | 3,767 |
| TX | Eastland County | 391 | 945 |
| TX | Atascosa County | | 3,122 |
| TX | Brown County | | 2,346 |
| UT | Salt Lake County | 623,692 | 596,712 |
| UT | State of Utah | 368,037 | 460,181 |
| UT | Davis County | 139,849 | 151,106 |
| UT | Utah County | 65,608 | 46,737 |
| UT | Weber County | 35,784 | 58,075 |
| UT | Cache County | 24,986 | 38,177 |

– 58 –

AR-00076

| SCAAP Recipients – FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | FY 2005 | FY 2004 |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| UT | Washington County | 16,032 | 21,234 |
| UT | Box Elder County | 9,867 | 5,416 |
| UT | Sevier County | 4,415 | 8,323 |
| VA | Commonwealth of Virginia | 1,011,172 | 1,300,673 |
| VA | Fairfax County | 708,545 | 618,920 |
| VA | Prince William County | 251,223 | 296,786 |
| VA | Arlington County | 235,996 | 223,125 |
| VA | City of Alexandria | 165,141 | |
| VA | Rockingham County | 65,030 | 55,401 |
| VA | Chesterfield County | 35,251 | 78,388 |
| VA | Loudoun County | 31,463 | 72,846 |
| VA | City of Chesapeake | 24,103 | 26,154 |
| VA | Henrico County | 16,860 | 17,340 |
| VA | Albemarle County | 12,386 | |
| VA | City of Newport News | 10,589 | 18,874 |
| VA | Shenandoah County | 8,226 | 13,696 |
| VA | Henry County | 7,862 | 7,023 |
| VA | York County | 4,763 | 15,427 |
| VA | Stafford County | 4,742 | 7,545 |
| VA | City of Charlottesville | 4,480 | |
| VA | City of Hampton | 3,528 | 4,912 |
| VA | James City County | 3,287 | 5,891 |
| VA | City of Danville | 2,458 | 7,401 |
| VA | City of Martinsville | 2,365 | 2,995 |
| VA | Lunenburg County | 1,478 | 730 |
| VA | City of Fredericksburg | 1,257 | 5,646 |
| VA | Williamsburg County | 1,059 | |
| VA | City of Suffolk | 907 | 3,109 |
| VA | Spotsylvania County | 658 | 3,573 |
| VA | Nottaway County | 594 | 519 |
| VA | Nelson County | | |
| VA | City of Portsmouth | | 2,581 |
| VA | City of Virginia Beach | | 1,724 |
| VA | King George County | | 1,450 |
| VA | City of Williamsburg | | 582 |
| VA | Isle of Wight County | | 54 |

AR-00077

| SCAAP Recipients – FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | **FY 2005** | **FY 2004** |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| VI | Virgin Islands | 269,825 | 408,132 |
| VT | State of Vermont | 14,437 | 32,118 |
| WA | State of Washington | 1,723,823 | 2,206,930 |
| WA | King County | 812,270 | 971,560 |
| WA | Pierce County | 138,288 | 139,048 |
| WA | Yakima County | 116,702 | 126,711 |
| WA | Snohomish County | 92,252 | 84,953 |
| WA | Franklin County | 85,130 | 84,519 |
| WA | Thurston County | 59,461 | 51,904 |
| WA | Benton County | 53,641 | 52,208 |
| WA | Whatcom County | 51,368 | 67,618 |
| WA | Grant County | 47,635 | 51,790 |
| WA | Chelan County | 44,389 | 40,540 |
| WA | Spokane County | 38,004 | 39,990 |
| WA | Cowlitz County | 37,382 | 30,977 |
| WA | Skagit County | 35,484 | 42,272 |
| WA | Lewis County | 33,229 | 36,370 |
| WA | Walla Walla County | 25,095 | 15,569 |
| WA | Douglas County | 23,444 | 23,729 |
| WA | City of Yakima | 20,360 | 19,551 |
| WA | City of Wapato | 19,964 | |
| WA | City of Wenatchee | 16,325 | 22,516 |
| WA | Grays Harbor County | 12,947 | 27,962 |
| WA | Kitsap County | 10,640 | 12,782 |
| WA | Okanogan County | 10,623 | 25,186 |
| WA | Kittitas County | 10,458 | 7,749 |
| WA | Adams County | 8,320 | 7,626 |
| WA | Mason County | 6,202 | 16,833 |
| WA | Clallam County | 6,178 | 6,053 |
| WA | City of Aberdeen | 5,216 | 6,085 |
| WA | Whitman County | 1,944 | 1,370 |
| WA | City of Sunnyside | 1,329 | 1,504 |
| WA | Clark County | | 78,530 |
| WI | State of Wisconsin | 1,243,892 | 1,473,682 |
| WI | Dane County | 96,180 | 105,253 |
| WI | Milwaukee County | 84,781 | 183,468 |

AR-00078

| SCAAP Recipients – FYs 2005 and 2004 | | | |
|---|---|---|---|
| | | **FY 2005** | **FY 2004** |
| | Total | $287,143,095 | $281,605,292 |
| State | Jurisdiction | Amount | Amount |
| WI | Kenosha County | 59,611 | 79,239 |
| WI | Walworth County | 59,177 | 8,240 |
| WI | Sheboygan County | 54,033 | |
| WI | Brown County | 49,206 | 63,337 |
| WI | Waukesha County | 46,060 | 56,222 |
| WI | Jefferson County | 31,723 | 19,426 |
| WI | Racine County | 29,192 | 19,895 |
| WI | Rock County | 23,700 | 37,951 |
| WI | Outagamie County | 23,121 | 43,449 |
| WI | Sauk County | 14,446 | 12,277 |
| WI | Ozaukee County | 11,278 | 10,323 |
| WI | Manitowoc County | 11,011 | 8,477 |
| WI | Columbia County | 9,346 | 3,568 |
| WI | Waupaca County | 8,480 | 6,693 |
| WI | Calumet County | 7,953 | 6,471 |
| WI | Shawano County | 6,890 | 5,136 |
| WI | Winnebago County | 6,133 | 30,203 |
| WI | Waushara County | 4,733 | |
| WI | Dodge County | 4,575 | |
| WI | Portage County | 3,317 | 2,292 |
| WI | Green County | 1,030 | 1,680 |
| WI | Lafayette County | 205 | 1,780 |
| WI | Fond du Lac County | | 9,361 |
| WI | La Crosse County | | 4,604 |
| WI | Sawyer County | | 1,966 |
| WV | State of West Virginia | 6,495 | 5,824 |
| WY | State of Wyoming | 79,074 | 121,529 |

Source:  OJP

- 61 –

AR-00079

**APPENDIX IV**

| | | OIG Survey Recipients | |
|---|---|---|---|
| | | Green highlighted text indicates survey respondent.  99 jurisdictions with total SCAAP awards for FY 2005 totaling $205,455,783 responded to our survey. | |
| | **State** | **Jurisdiction** | **FY 2005 Total Amount** |
| 1 | CA | State of California | $ 85,953,191 |
| 2 | NY | State of New York | 24,022,356 |
| 3 | TX | State of Texas | 18,582,484 |
| 4 | NY | New York City | 15,893,255 |
| 5 | FL | State of Florida | 12,806,110 |
| 6 | CA | County of Los Angeles | 12,530,034 |
| 7 | AZ | State of Arizona | 12,139,791 |
| 8 | CA | County of Orange | 6,562,437 |
| 9 | IL | State of Illinois | 4,731,269 |
| 10 | MA | State of Massachusetts | 4,728,549 |
| 11 | NJ | State of New Jersey | 3,472,389 |
| 12 | OR | State of Oregon | 3,417,250 |
| 13 | TX | County of Harris | 2,693,977 |
| 14 | NC | State of North Carolina | 2,527,797 |
| 15 | NV | State of Nevada | 2,412,064 |
| 16 | CO | State of Colorado | 2,358,707 |
| 17 | CA | County of San Diego | 2,346,881 |
| 18 | NY | Nassau County | 1,970,809 |
| 19 | IL | County of Cook | 1,926,114 |
| 20 | WA | State of Washington | 1,723,823 |
| 21 | CA | County of Santa Clara | 1,616,147 |
| 22 | NV | Clark County | 1,456,722 |
| 23 | GA | State of Georgia | 1,393,149 |
| 24 | AZ | Maricopa County | 1,297,752 |
| 25 | CA | County of Riverside | 1,254,534 |
| 26 | WI | State of Wisconsin | 1,243,892 |
| 27 | NJ | Passaic County | 1,224,817 |
| 28 | CA | City and County of San Francisco | 1,087,199 |
| 29 | CA | County of Fresno | 1,045,772 |
| 30 | VA | Commonwealth of Virginia | 1,011,172 |
| 31 | MD | State of Maryland | 985,416 |
| 32 | MD | Montgomery County | 964,401 |
| 33 | CA | San Mateo County | 955,843 |
| 34 | CO | City and County of Denver | 950,665 |
| 35 | MN | State of Minnesota | 934,384 |
| 36 | PA | Pennsylvania Department of Corrections | 908,520 |
| 37 | MI | State of Michigan | 884,639 |
| 38 | CA | Sacramento County | 873,005 |
| 39 | RI | State of Rhode Island | 863,995 |
| 40 | WA | King County | 812,270 |
| 41 | MA | County of Suffolk | 790,048 |
| 42 | CT | State of Connecticut | 779,697 |
| 43 | CA | County of Monterey | 735,201 |
| 44 | TX | County of Hidalgo | 714,808 |
| 45 | VA | County of Fairfax | 708,545 |

AR-00080

| | | OIG Survey Recipients | |
|---|---|---|---|
| | | Green highlighted text indicates survey respondent. 99 jurisdictions with total SCAAP awards for FY 2005 totaling $205,455,783 responded to our survey. | |
| | **State** | **Jurisdiction** | **FY 2005 Total Amount** |
| 46 | MA | County of Middlesex | 703,111 |
| 47 | OH | State of Ohio | 664,897 |
| 48 | TX | Travis County | 658,636 |
| 49 | NM | State of New Mexico | 650,877 |
| 50 | TX | County of Dallas | 636,166 |
| 51 | UT | Salt Lake County | 623,692 |
| 52 | OK | State of Oklahoma | 622,173 |
| 53 | CA | County of Kern | 613,980 |
| 54 | CA | County of Sonoma | 604,578 |
| 55 | FL | Collier County | 597,409 |
| 56 | CA | Contra Costa County | 592,346 |
| 57 | CA | County of Ventura | 564,332 |
| 58 | TX | County of Bexar | 547,366 |
| 59 | MA | County of Plymouth | 517,480 |
| 60 | NE | Douglas County | 456,968 |
| 61 | CA | County of San Bernardino | 407,580 |
| 62 | AZ | County of Pima | 407,301 |
| 63 | NY | Westchester County | 366,356 |
| 64 | NC | Mecklenburg County | 255,020 |
| 65 | VA | County of Prince William | 251,223 |
| 66 | FL | County of Hillsborough | 233,499 |
| 67 | NY | County of Rockland | 231,136 |
| 68 | AZ | Yuma County | 220,339 |
| 69 | OR | Lane County | 201,052 |
| 70 | HI | State of Hawaii | 195,595 |
| 71 | FL | Pinellas County | 194,285 |
| 72 | IL | County of Kane | 189,347 |
| 73 | FL | County of Lee | 186,685 |
| 74 | CA | Napa County | 184,611 |
| 75 | CA | San Joaquin County | 181,990 |
| 76 | VA | City of Alexandria | 165,141 |
| 77 | FL | County of Sarasota | 148,472 |
| 78 | NC | Wake County | 143,724 |
| 79 | FL | Orange County | 139,138 |
| 80 | WA | County of Pierce | 138,288 |
| 81 | NJ | County of Essex | 129,745 |
| 82 | MA | Barnstable County | 121,844 |
| 83 | TX | County of Fort Bend | 118,802 |
| 84 | GA | County of Cherokee | 113,614 |
| 85 | CO | El Paso County | 100,370 |
| 86 | NJ | Ocean County | 95,431 |
| 87 | AZ | County of Yavapai | 93,802 |
| 88 | FL | County of Osceola | 89,780 |
| 89 | FL | Seminole County | 88,956 |
| 90 | NM | Dona Ana County | 85,519 |
| 91 | WA | County of Franklin | 85,130 |
| 92 | WI | County of Milwaukee | 84,781 |

– 63 –

| | | **OIG Survey Recipients** | |
|---|---|---|---|
| | | Green highlighted text indicates survey respondent.  99 jurisdictions with total SCAAP awards for FY 2005 totaling $205,455,783 responded to our survey. | |
| | **State** | **Jurisdiction** | **FY 2005 Total Amount** |
| 93 | NC | County of Durham | 82,967 |
| 94 | MI | County of Oakland | 82,052 |
| 95 | DC | District of Columbia | 81,762 |
| 96 | GA | De Kalb County Georgia | 79,948 |
| 97 | FL | Miami Dade County | 78,587 |
| 98 | CO | County of Eagle | 78,319 |
| 99 | NC | Forsyth County | 69,285 |
| 100 | KY | Lexington Fayette Urban County Government | 69,269 |
| 101 | KS | Unified Government of Wyandotte County | 68,384 |
| 102 | VA | Rockingham County | 65,030 |
| 103 | TX | County of Webb | 64,069 |
| 104 | WI | County of Kenosha | 59,611 |
| 105 | IA | Woodbury County | 57,725 |
| 106 | CA | Imperial County | 56,370 |
| 107 | FL | County of Indian River | 54,704 |
| 108 | WI | County of Sheboygan | 54,033 |
| 109 | CO | County of Pitkin | 50,679 |
| 110 | WI | County of Brown | 49,206 |
| 111 | GA | Hall County | 36,833 |
| 112 | MD | County of Anne Arundel | 36,607 |
| 113 | NC | County of Cumberland | 31,780 |
| 114 | SC | County of Horry | 30,754 |
| 115 | NC | County of Buncombe | 30,113 |
| 116 | TX | County of Cameron | 29,936 |
| 117 | OR | County of Linn | 25,166 |
| 118 | UT | County of Cache | 24,986 |
| 119 | MO | County of St Charles | 24,795 |
| 120 | OR | County of Jackson | 23,373 |
| 121 | SC | County of York | 22,240 |
| 122 | IA | County of Polk | 16,332 |
| 123 | IL | De kalb County | 14,869 |
| 124 | NC | County of Duplin | 13,395 |
| 125 | IL | County of Rock Island | 12,496 |
| 126 | NC | Iredell County | 12,445 |
| 127 | NC | County of Randolph | 12,184 |
| 128 | TX | County of Hill | 11,342 |
| 129 | IL | County of Kendall | 10,870 |
| 130 | WA | Kittitas County | 10,458 |
| 131 | NJ | Hunterdon County | 10,241 |
| 132 | ID | Washington County | 9,794 |
| 133 | MT | County of Yellowstone | 9,542 |
| 134 | MI | County of St. Joseph | 8,909 |
| 135 | GA | County Of Newton | 8,684 |
| 136 | TX | County of Andrews | 8,379 |
| 137 | WA | Adams County | 8,320 |
| 138 | ID | County Of Bingham | 8,076 |
| 139 | ID | County of Twin Falls | 7,103 |

AR-00082

| | | **OIG Survey Recipients** | |
|---|---|---|---|
| | | Green highlighted text indicates survey respondent. 99 jurisdictions with total SCAAP awards for FY 2005 totaling $205,455,783 responded to our survey. | |
| | **State** | **Jurisdiction** | **FY 2005 Total Amount** |
| 140 | FL | County of Suwannee | 6,944 |
| 141 | OK | County of Tulsa | 6,843 |
| 142 | NM | County of Valencia | 5,618 |
| 143 | NV | County of Humboldt | 5,121 |
| 144 | TX | County of Castro | 4,817 |
| 145 | NH | County of Merrimack | 4,168 |
| 146 | MI | Livingston County | 3,520 |
| 147 | TX | County of Zapata | 3,426 |
| 148 | NE | County of Lincoln | 2,917 |
| 149 | OK | Grady County | 2,854 |
| 150 | GA | County Of Monroe | 2,577 |
| 151 | TX | County of Atascosa | 2,476 |
| 152 | NV | County of Pershing | 2,464 |
| 153 | OH | Erie County | 2,345 |
| 154 | GA | County of Lee | 2,104 |
| 155 | OK | County of Carter | 2,092 |
| 156 | TX | County of Lamar | 2,091 |
| 157 | OK | County of Okfuskee | 1,507 |
| 158 | NM | Quay County | 1,310 |
| 159 | WI | Green County | 1,030 |
| 160 | VA | City of Suffolk | 907 |
| 161 | MI | County of Tuscola | 738 |
| 162 | KS | County of Montgomery | 730 |
| 163 | NC | County of Anson | 595 |
| 164 | NY | County of Wyoming | 490 |
| | | Total | $264,776,153 |

Source: OIG and OJP data

AR-00083

## Major Cities Chiefs of Police Statement

(From a document entitled *M.C.C. Immigration Committee Recommendations*, June 2006.)

### D.   M.C.C. NINE (9) POINT POSITION STATEMENT

Based upon a review, evaluation and deliberation regarding the important and complex issue of local enforcement of federal immigration laws, the members of M.C.C., who are the 57 Chief Executive Officers of police departments located within a metropolitan area of more than 1.5 million population and which employs more than 1,000 law enforcement officers, hereby set forth our consensus position statement, which is comprised of nine crucial components.

1)   SECURE THE BORDERS

Illegal immigration is a national issue and the federal government should first act to secure the national borders to prevent illegal entry into the United States. We support further and adequate funding of the federal agencies responsible for border security and immigration enforcement so they can accomplish this goal. We also support consideration of all possible solutions including construction of border fences where appropriate, use of surveillance technologies and increases in the number of border patrol agents. Only when the federal government takes the necessary steps to close the revolving door that exists at our national borders will it be possible for local police agencies to even begin to consider dedicating limited local resources to immigration enforcement.

2)   ENFORCE LAWS PROHIBITING THE HIRING OF ILLEGAL IMMIGRANTS

The federal government and its agencies should vigorously enforce existing immigration laws prohibiting employers from hiring illegal immigrants. Enforcement and prosecution of employers who illegally seek out and hire undocumented immigrants or turn a blind eye to the undocumented status of their employees will help to eliminate one of the major incentives for illegal immigration.

3)   CONSULT AND INVOLVE LOCAL POLICE AGENCIES IN DECISION MAKING

Major Cities Chiefs and other representatives of the local law enforcement community such as the International Association of Chiefs of Police and local district attorneys and prosecutors should be consulted and brought in at the beginning of any process to develop a national initiative to involve local police agencies in the enforcement of federal immigration laws.  The inclusion of local law enforcement at every level of development would utilize their perspective and experience in local policing, address their concerns and likely result in a better program that would be more effectively implemented.

4)   COMPLETELY VOLUNTARY

Any initiative to involve local police agencies in the enforcement of immigration laws should be completely voluntary.  The decisions related to how local law enforcement agencies allocate their resources, direct their workforce and define the duties of their employees to best serve and protect their communities should be left in the control of state and local governments.  The decision to enter this area of enforcement should be left to the local government and not mandated or forced upon them by the federal government through the threat of sanctions or the withholding of existing police assistance funding.

5)   INCENTIVE BASED APPROACH WITH FULL FEDERAL FUNDING

AR-00084

Any initiative to involve local police agencies in the enforcement of immigration laws should be an incentive based approach with full federal funding to provide the necessary resources to the local agencies that choose to enforce immigration laws. Federal funds should be available to participating local agencies to cover the costs associated with enforcement such as expenditures on equipment and technology, training and educational programs and costs of housing, caring for and transporting immigrants prior to their release to federal authorities.

6)     NO REDUCTION OR SHIFTING OF CURRENT ASSISTANCE FUNDING

The funding of any initiative to involve local police agencies in the enforcement of immigration laws should not be at the detriment or reduction directly or indirectly of any current federal funding or programs focused on assisting local police agencies with local policing or homeland security activities. Local police agencies are currently working on strained budgets and limited resources to meet local policing needs and strengthening homeland security and in fact need increased funding and grant assistance in these areas. Merely shifting or diverting federal funding currently available for local policing and homeland security activities to any new immigration enforcement initiative would only result in a detrimental net loss of total resources available to local police agencies to police their neighborhoods and strengthen homeland security.

7)     CLARIFICATION OF AUTHORITY AND LIMITATION OF LIABILITY

The authority of local police agencies and their officers to become involved in the enforcement of immigration laws should be clearly stated and defined. The statement of authority should also establish liability protection and an immunity shield for police officers and police agencies that take part in immigration enforcement as authorized by clear federal legislation.

8)     REMOVAL OF CIVIL IMMIGRATION DETAINERS
        FROM THE N.C.I.C. SYSTEM

Until the borders are secured and vigorous enforcement against employers who hire illegal immigrants has taken place and the concerns regarding lack of authority and confusion over the authority of local agencies to enforce immigration laws and the risk of civil liabilities are adequately addressed, M.C.C. strongly requests that the federal agencies cease placing civil immigration detainers on N.C.I.C. and remove any existing civil detainers currently on the system. The integrity of the system as a notice system for criminal warrants and/or criminal matters must be maintained. The inclusion of civil detainers on the system has created confusion for local police agencies and subjected them to possible liability for exceeding their authority by arresting a person upon the basis of a mere civil detainer.

M.C.C. would encourage the federal agencies to seek federal criminal warrants for any person they have charged criminally with violations of immigration laws and submit those criminal warrants on the N.C.I.C. system so the warrants can be acted upon by local police officers within their established criminal enforcement authority and training.

9)     COMMITMENT OF CONTINUED ENFORCEMNT AGAINST CRIMINAL
        VIOLATORS REGARDLESS OF IMMIGRATION STATUS

M.C.C. member agencies are united in their commitment to continue arresting anyone who violates the criminal laws of their jurisdictions regardless of the immigration status of the perpetrator. Those immigrants, documented and/or undocumented, who commit criminal acts will find no safe harbor or sanctuary from their criminal violations of the law within any major city but will instead face the full force of criminal prosecution.

- 67 -

AR-00085

# State of Oregon Policy

The text appearing in this database was produced from material provided by the Legislative Counsel Committee of the Oregon Legislative Assembly. The official record copy is the printed published copy of the Oregon Revised Statutes. The text in the database is not the official text of Oregon law.

Although efforts have been made to match the database text to the official legal text they represent, substantive errors or differences may remain. It is the user's responsibility to verify the legal accuracy of all legal text. The Legislative Counsel Committee claims copyright protection in those parts of Oregon Revised Statutes that are legally subject to copyright protection. The State of Oregon is not liable for any loss or damage resulting from errors introduced into the materials supplied by the Legislative Counsel Committee, by a user or any third party, or resulting from any defect in or misuse of any search software, drivers or other equipment.

Hint: Use your browser's Find feature (usually found in the Edit menu) to get to a section more quickly.

Chapter 181 — State Police; Crime Reporting and Records;
Public Safety Standards and Training

2005 EDITION

**181.850 Enforcement of federal immigration laws.** (1) No law enforcement agency of the State of Oregon or of any political subdivision of the state shall use agency moneys, equipment or personnel for the purpose of detecting or apprehending persons whose only violation of law is that they are persons of foreign citizenship present in the United States in violation of federal immigration laws.

(2) Notwithstanding subsection (1) of this section, a law enforcement agency may exchange information with the United States Bureau of Immigration and Customs Enforcement, the United States Bureau of Citizenship and Immigration Services and the United States Bureau of Customs and Border Protection in order to:

(a) Verify the immigration status of a person if the person is arrested for any criminal offense; or

(b) Request criminal investigation information with reference to persons named in records of the United States Bureau of Immigration and Customs Enforcement, the United States Bureau of Citizenship and Immigration Services or the United States Bureau of Customs and Border Protection.

(3) Notwithstanding subsection (1) of this section, a law enforcement agency may arrest any person who:

(a) Is charged by the United States with a criminal violation of federal immigration laws under Title II of the Immigration and Nationality Act or 18 U.S.C. 1015, 1422 to 1429 or 1505; and

(b) Is subject to arrest for the crime pursuant to a warrant of arrest issued by a federal magistrate.

(4) For purposes of subsection (1) of this section, the Bureau of Labor and Industries is not a law enforcement agency.

(5) As used in this section, "warrant of arrest" has the meaning given that term in ORS 131.005. [1987 c.467 §1; 2003 c.571 §1]

AR-00086

**APPENDIX VII**

# City of New York Policy



THE CITY OF NEW YORK
OFFICE OF THE MAYOR
NEW YORK, N.Y. 10007

EXECUTIVE ORDER No. 41

September 17, 2003

**CITY-WIDE PRIVACY POLICY AND AMENDMENT OF EXECUTIVE ORDER
NO. 34 RELATING TO CITY POLICY CONCERNING IMMIGRANT ACCESS TO
CITY SERVICES**

WHEREAS, it is the policy of the City of New York to promote the utilization of its services by all of its residents who are entitled to and in need of them; and

WHEREAS, individuals should know that they may seek and obtain the assistance of City agencies regardless of personal or private attributes, without negative consequences to their personal lives; and

WHEREAS, the obtaining of pertinent information, which is essential to the performance of a wide variety of governmental functions, may in some cases be difficult or impossible if some expectation of confidentiality is not preserved, and preserving confidentiality in turn requires that governments regulate the use of such information by their employees; and

WHEREAS, in furtherance of this policy, confidential information in the possession of City agencies relating to immigration status or other personal or private attributes should be disclosed only as provided herein;

NOW, THEREFORE, by virtue of the power vested in me as Mayor of the City of New York, it is hereby ordered:

Section 1. As used herein, "confidential information" means any information obtained and maintained by a City agency relating to an individual's sexual orientation, status as a victim of domestic violence, status as a victim of sexual assault, status as a crime witness, receipt of public assistance, or immigration status, and shall include all information contained in any individual's income tax records.

Section 2. No City officer or employee shall disclose confidential information, unless

– 69 –

AR-00087

(a)    such disclosure has been authorized in writing by the individual to whom such information pertains, or if such individual is a minor or is otherwise not legally competent, by such individual's parent or legal guardian; or

(b)    such disclosure is required by law; or

(c)    such disclosure is to another City officer or employee and is necessary to fulfill the purpose or achieve the mission of any City agency; or

(d)    in the case of confidential information other than information relating to immigration status, such disclosure is necessary to fulfill the purpose or achieve the mission of any City agency; or

(e)    in the case of information relating to immigration status, (i) the individual to whom such information pertains is suspected by such officer or employee or such officer's or employee's agency of engaging in illegal activity, other than mere status as an undocumented alien or (ii) the dissemination of such information is necessary to apprehend a person suspected of engaging in illegal activity, other than mere status as an undocumented alien or (iii) such disclosure is necessary in furtherance of an investigation of potential terrorist activity.

Agencies shall promulgate such rules as may be appropriate to detail circumstances in which confidential information may or may not be disclosed pursuant to this executive order. Any City officer or employee with a question relating to the disclosure of confidential information under this section shall consult with the general counsel of such officer's or employee's agency.

Section 3. Section 2 of Executive Order No. 34, dated May 13, 2003, is amended by adding a new subdivision d to read as follow:

d.    "Illegal activity" means unlawful activity but shall not include mere status as an undocumented alien.

Section 4. Sections 3 and 4 of such Executive Order are amended to read as follows:

Section 3. Information respecting aliens.

a.    A City officer or employee, other than law enforcement officers, shall not inquire about a person's immigration status unless:

(1)    Such person's immigration status is necessary for the determination of program, service or benefit eligibility or the provision of City services; or

(2)    Such officer or employee is required by law to inquire about such person's immigration status.

2

– 70 –

AR-00088

Section 4. Law Enforcement Officers.

a.  Law enforcement officers shall not inquire about a person's immigration status unless investigating illegal activity other than mere status as an undocumented alien.

b   Police officers and peace officers, including members of the Police Department and the Department of Correction, shall continue to cooperate with federal authorities in investigating and apprehending aliens suspected of criminal activity.

c.  It shall be the policy of the Police Department not to inquire about the immigration status of crime victims, witnesses, or others who call or approach the police seeking assistance.

Section 5. This Order shall take effect immediately.

_Michael R. Bloomberg_
MICHAEL R. BLOOMBERG
MAYOR

AR-00089

APPENDIX VIII

## San Francisco City Administrative Code



## CHAPTER 12H: IMMIGRATION STATUS

Sec. 12H.1. City and County of Refuge.

Sec. 12H.2. Use of City Funds Prohibited.

Sec. 12H.2-1. Chapter Provisions Inapplicable to Persons Convicted of Certain Crimes.

Sec. 12H.3. Clerk of Board to Transmit Copies of This Chapter; Informing City Employees.

Sec. 12H.4. Enforcement.

Sec. 12H.5. City Undertaking Limited to Promotion of General Welfare.

Sec. 12H.6. Severability.

**SEC. 12H.1. CITY AND COUNTY OF REFUGE.**

It is hereby affirmed that the City and County of San Francisco is a City and County of Refuge.

(Added by Ord. 375-89, App. 10/24/89)

**SEC. 12H.2. USE OF CITY FUNDS PROHIBITED.**

No department, agency, commission, officer or employee of the City and County of San Francisco shall use any City funds or resources to assist in the enforcement of federal immigration law or to gather or disseminate information regarding the immigration status of individuals in the City and County of San Francisco unless such assistance is required by federal or State statute, regulation or court decision. The prohibition set forth in this Chapter shall include, but shall not be limited to:

(a) Assisting or cooperating, in one's official capacity, with any Immigration and Naturalization Service (INS) investigation, detention, or arrest procedures, public or clandestine, relating to alleged violations of the civil provisions of the federal immigration law.

(b) Assisting or cooperating, in one's official capacity, with any investigation, surveillance or gathering of information conducted by foreign governments, except for cooperation related to an alleged violation of City and County, State or federal criminal laws.

(c) Requesting information about, or disseminating information regarding, the immigration status of any individual, or conditioning the provision of services or benefits by the City and County of San Francisco upon immigration status, except as required by federal or State statute or regulation, City and County public assistance criteria, or court decision.

(d) Including on any application, questionnaire or interview form used in relation to benefits, services or opportunities provided by the City and County of San Francisco any question regarding immigration status other than those required by federal or State statute, regulation or court decision. Any such questions existing or being used by the City and County at the time this Chapter is adopted shall be deleted within sixty days of the adoption of this Chapter.

(Added by Ord. 375-89, App. 10/24/89)

**SEC. 12H.2-1. CHAPTER PROVISIONS INAPPLICABLE TO PERSONS CONVICTED OF CERTAIN CRIMES.**

AR-00090

Nothing in this Chapter shall prohibit, or be construed as prohibiting, a law enforcement officer from identifying and reporting any person pursuant to State or federal law or regulation who is in custody after being booked for the alleged commission of a felony and is suspected of violating the civil provisions of the immigration laws. In addition, nothing in this Chapter shall preclude any City and County department, agency, commission, officer or employee from (a) reporting information to the INS regarding an individual who has been booked at any county jail facility, and who has previously been convicted of a felony committed in violation of the laws of the State of California, which is still considered a felony under State law; (b) cooperating with an INS request for information regarding an individual who has been convicted of a felony committed in violation of the laws of the State of California, which is still considered a felony under state law; or (c) reporting information as required by federal or state statute, regulation or court decision, regarding an individual who has been convicted of a felony committed in violation of the laws of the State of California, which is still considered a felony under state law. For purposes of this Section, an individual has been "convicted" of a felony when: (a) there has been a conviction by a court of competent jurisdiction; and (b) all direct appeal rights have been exhausted or waived; or (c) the appeal period has lapsed.

However, no officer, employee or law enforcement agency of the City and County of San Francisco shall stop, question, arrest or detain any individual solely because of the individual's national origin or immigration status. In addition, in deciding whether to report an individual to the INS under the circumstances described in this Section, an officer, employee or law enforcement agency of the City and County of San Francisco shall not discriminate among individuals on the basis of their ability to speak English or perceived or actual national origin.

This Section shall not apply in cases where an individual is arrested and/or convicted for failing to obey a lawful order of a police officer during a public assembly or for failing to disperse after a police officer has declared an assembly to be unlawful and has ordered dispersal.

Nothing herein shall be construed or implemented so as to discourage any person, regardless of immigration status, from reporting criminal activity to law enforcement agencies.

(Added by Ord. 282-92, App. 9/4/92; amended by Ord. 238-93, App. 8/4/93)

### SEC. 12H.3. CLERK OF BOARD TO TRANSMIT COPIES OF THIS CHAPTER; INFORMING CITY EMPLOYEES.

The Clerk of the Board of Supervisors shall send copies of this Chapter, including any future amendments thereto that may be made, to every department, agency and commission of the City and County of San Francisco, to California's United States Senators, and to the California Congressional delegation, the Commissioner of the INS, the United States Attorney General, and the Secretary of State and the President of the United States. Each appointing officer of the City and County of San Francisco shall inform all employees under her or his jurisdiction of the prohibitions in this ordinance, the duty of all of her or his employees to comply with the prohibitions in this ordinance, and that employees who fail to comply with the prohibitions of the ordinance shall be subject to appropriate disciplinary action. Each city and county employee shall be given a written directive with instructions for implementing the provisions of this Chapter.

(Added by Ord. 375-89, App. 10/24/89)

### SEC. 12H.4. ENFORCEMENT.

The Human Rights Commission shall review the compliance of the City and County departments, agencies, commissions and employees with the mandates of this ordinance in particular instances in which there is question of noncompliance or when a complaint alleging noncompliance has been lodged.

(Added by Ord. 375-89, App. 10/24/89)

### SEC. 12H.5. CITY UNDERTAKING LIMITED TO PROMOTION OF GENERAL WELFARE.

In undertaking the adoption and enforcement of this Chapter, the City is assuming an undertaking only to promote the general welfare. This Chapter is not intended to create any new rights for breach of which the City is liable in money damages to any person who claims that such breach proximately caused injury. This section shall not be construed to limit or proscribe any other existing rights or remedies possessed by such person.

AR-00091

CHAPTER 12H: IMMIGRATION STATUS

(Added by Ord. 375-89, App. 10/24/89)

**SEC. 12H.6. SEVERABILITY.**

If any part of this ordinance, or the application thereof, is held to be invalid, the remainder of this ordinance shall not be affected thereby, and this ordinance shall otherwise continue in full force and effect. To this end, the provisions of this ordinance, and each of them, are severable.

(Added by Ord. 375-89, App. 10/24/89)

AR-00092

# California Attorney General's Opinion #01-213

TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

BILL LOCKYER
Attorney General

---

| | | |
|---|---|---|
| OPINION | : | No. 01-213 |
| of | : | November 16, 2001 |
| BILL LOCKYER | : | |
| Attorney General | : | |
| ANTHONY S. DA VIGO | : | |
| Deputy Attorney General | : | |

---

THE HONORABLE LOU CORREA, MEMBER OF THE STATE ASSEMBLY, has requested an opinion on the following questions:

1. Are the mandatory provisions of Penal Code section 834b concerning cooperation, verification, and notification with respect to persons arrested who are suspected of being present in the United States in violation of federal immigration laws subject to enforcement by local law enforcement officers?

2. May a local law enforcement officer, during a detention of a Spanish-speaking person for otherwise valid purposes, question the person as to his or her immigration status?

3. May an arrested person's immigration status be investigated by local law enforcement officers prior to arraignment?

1                                                    01-213

AR-00093

CONCLUSIONS

      1.  The mandatory provisions of Penal Code section 834b concerning cooperation, verification, and notification with respect to persons arrested who are suspected of being present in the United States in violation of federal immigration laws are not subject to enforcement by local law enforcement officers.

      2. A local law enforcement officer, during a detention of a Spanish-speaking person for otherwise valid purposes, may question the person as to his or her immigration status. However, a local officer may not question an individual as to immigration status solely because the individual speaks Spanish or other non-English language.

      3. An arrested person's immigration status may be investigated by local law enforcement officers prior to arraignment.

ANALYSIS

      The three questions presented for resolution concern the procedures under which local police officers may ascertain whether a person is in the United States in violation of federal immigration laws and the consequences that may arise with respect to such determination.

      1.  Mandatory Provisions of Penal Code Section 834b

      The first inquiry is whether law enforcement officers in California must comply with the mandatory provisions of Penal Code section 834b[1] regarding persons who are suspected of being in the United States in violation of federal immigration laws. Section 834b states:

      "(a) Every law enforcement agency in California shall fully cooperate with the United States Immigration and Naturalization Service regarding any person who is arrested if he or she is suspected of being present in the United States in violation of federal immigration laws.

      "(b) With respect to any such person who is arrested, and suspected of being present in the United States in violation of federal immigration laws, every law enforcement agency shall do the following:

---

[1] All references hereafter to the Penal Code are by section number only.

2                       01-213

AR-00094

"(1) Attempt to verify the legal status of such person as a citizen of the United States, an alien lawfully admitted as a permanent resident, an alien lawfully admitted for a temporary period of time or as an alien who is present in the United States in violation of immigration laws. The verification process may include, but shall not be limited to, questioning the person regarding his or her date and place of birth, and entry into the United States, and demanding documentation to indicate his or her legal status.

"(2) Notify the person of his or her apparent status as an alien who is present in the United States in violation of federal immigration laws and inform him or her that, apart from any criminal justice proceedings, he or she must either obtain legal status or leave the United States.

"(3) Notify the Attorney General of California and the United States Immigration and Naturalization Service of the apparent illegal status and provide any additional information that may be requested by any other public entity.

"(c) Any legislative, administrative, or other action by a city, county, or other legally authorized local governmental entity with jurisdictional boundaries, or by a law enforcement agency, to prevent or limit the cooperation required by subdivision (a) is expressly prohibited."

The provisions of section 834b are mandatory and prohibitory. Local law enforcement officers are to "fully cooperate with the United States Immigration and Naturalization Service," shall attempt to verify the legal status of certain arrested persons, and make certain notifications regarding violations of federal immigration laws.

Section 834b's terms, however, have been declared preempted by federal law and their enforcement has been permanently enjoined by a federal court. (*League of United Latin American Citizens v. Wilson* (C.D.Cal. 1995) 908 F.Supp. 755, 771, 776, sub. opn. (C.D.Cal. 1997) 997 F.Supp. 1244, 1250, 1252, 1261.) Accordingly, the statute's provisions are not subject to enforcement by local law enforcement officers.

Nevertheless, do the federal court's rulings prohibit local law enforcement officers from *voluntarily* engaging in the conduct described in section 834b? In *League of United Latin American Citizens v. Wilson, supra,* 997 F.Supp. 1244, the court stated that not only *could* state and local government entities cooperate with federal immigration agents, federal law *required* them to do so and that "[n]othing in the Court's decision should be interpreted to proscribe cooperation between state officials and the I.N.S. *pursuant to the*

AR-00095

*[federal Personal Responsibility and Work Opportunity Reconciliation Act of 1996].*" (*Id.* at p. 1252, fn. 9; see *City of New York v. U.S.* (2d Cir. 1999) 179 F.3d 29, 31-33.)

Hence, local law enforcement officers are not prohibited from cooperating with federal agents in the discharge of their duties. (See 75 Ops.Cal.Atty.Gen. 270 (1992).) Federal statutes provide that state and local governments may not be prohibited from cooperating with the Immigration and Naturalization Service. The Personal Responsibility and Work Opportunity Reconciliation Act of 1996, noted by the court in the 1997 *Wilson, supra,* decision, provides in part:

> "Notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States." (8 U.S.C. § 1644.)

Similarly, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 provides in part:

> "Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual." (8 U.S.C. § 1373(a).)

In answer to the first question, we conclude that the mandatory provisions of section 834b concerning cooperation, verification, and notification with respect to persons arrested who are suspected of being present in the United States in violation of federal immigration laws are not subject to enforcement by local law enforcement agencies.

2. Questioning a Spanish-speaking Person's Immigration Status

The second inquiry is whether a local law enforcement officer who has stopped a Spanish-speaking person for otherwise valid purposes, such as for a driving infraction, may inquire during the detention as to the person's immigration status. We may assume that the stop was not made at or in the vicinity of a border station or known point of illegal entry. We do not consider it significant that the language spoken by the person is Spanish as distinguished from some other foreign language. The focus here is upon what a local peace officer may do during a lawful detention to ascertain the individual's immigration status.

4                                                                 01-213

AR-00096

An officer making such an inquiry would be engaged in the exercise of a federal power. (*DeCanas v. Bica* (1976) 424 U.S. 351, 354.) This characterization, however, would not resolve, but merely raise, the issue of whether the exercise of such local authority would be preempted by federal law. (*Id.* at p. 355.) As previously noted, Congress has expressly recognized the authority of state and local officers "to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." (8 U.S.C. § 1357(g)(10)(B).) Such provisions evince "a clear invitation from Congress for state and local agencies to participate in the process of enforcing federal immigration laws." (*U. S. v. Vasquez-Alvarez* (10th Cir. 1999) 176 F.3d 1294, 1300.)

While Congress may invite local law enforcement officers to establish a person's immigration status, may the inquiry be made during a detention for an unrelated purpose such as a traffic violation?[2] The Fourth Amendment to the Constitution of the United States provides: "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." Ordinarily, a judicial warrant issued on probable cause is necessary to render either a search or seizure of one's person or possessions reasonable. (*United States v. Place* (1983) 462 U.S. 696, 701.)[3] This right of personal security is inherent in the concept of due process, and therefore applies as well to state officers through the Fourteenth Amendment. (*Vernonia School Dist. 47J v. Acton* (1995) 515 U.S. 646, 652; *Elkins v. United States* (1960) 364 U.S. 206, 213; 80 Ops.Cal.Atty.Gen. 354, 355 (1997).)

In addition, section 1 of article I of the California Constitution, as amended by the 1972 "privacy initiative," provides: "[a]ll people are by nature free and independent and have inalienable rights. Among these are . . . pursuing and obtaining safety, happiness, and privacy." The state's privacy guarantee operates separately and in addition to the Fourth Amendment's protections against unreasonable searches and seizures. For our purposes, however, we need not distinguish between the state and federal constitutional guarantees. (See *In re Williams G.* (1985) 40 Cal. 3d 550, 557, fn. 4.)

---

[2] We do not have the issue of whether the stop itself may be justified because the person is heard speaking a foreign language. (See, e.g., *United States v. Cortez* (1981) 449 U.S. 411, 417; *State v. Kettlewell* (Vt. 1987) 544 A.2d 591; *Cheung Tin Wong v. United States Immigration & Nat. Serv.* (D.C. Cir. 1972) 468 F.2d 1123; *Hon Keung Kung v. District Dir., Immigration & Nat. Serv.* (E.D. Mo. 1973) 356 F.Supp. 571.)

[3] The warrant clause of the Fourth Amendment states that ". . . no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

AR-00097

The protections of the Fourth Amendment apply to brief investigatory stops made by law enforcement officers. In *United States v. Cortez* (1981) 449 U.S. 411, 417, the court observed:

> "The Fourth Amendment applies to seizures of the person, including brief investigatory stops such as the stop of the vehicle here. [Citations.] An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity. [Citations.]" (Fn. omitted.)

Here, we have a valid stop and detention of a person who does not speak English. In *I.N.S. v. Delgado* (1984) 466 U.S. 210, 215-217, the court stated with regard to the questioning of persons as to their immigration status:

> "The Fourth Amendment does not proscribe all contact between the police and citizens, but is designed 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.' [Citation.] Given the diversity of encounters between police officers and citizens, however, the Court has been cautious in defining the limits imposed by the Fourth Amendment on encounters between the police and citizens. As we have noted elsewhere: 'Obviously, not all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the officer, by means of physical force or show of authority, has restrained the liberty of a citizen may we conclude that a "seizure" has occurred.' [Citation.] While applying such a test is relatively straightforward in a situation resembling a traditional arrest, [citation], the protection against unreasonable seizures also extends to 'seizures that involve only a brief detention short of traditional arrest.' [Citation.] What has evolved from our cases is a determination that an initially consensual encounter between a police officer and a citizen can be transformed into a seizure or detention within the meaning of the Fourth Amendment, 'if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' [Citation]; see *Florida v. Royer*, 460 U.S. 491, 502 (1983) (plurality opinion).

> "Although we have yet to rule directly on whether mere questioning of an individual by a police official, without more, can amount to a seizure under the Fourth Amendment, our recent decision in *Royer, supra*, plainly implies that interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure. In *Royer*, when Drug Enforcement Administration agents found that the respondent

01-213

– 80 –

AR-00098

matched a drug courier profile, the agents approached the defendant and asked him for his airplane ticket and driver's license, which the agents then examined. A majority of the Court believed that the request and examination of the documents were 'permissible in themselves.' [Citations.] In contrast, a much different situation prevailed in *Brown v. Texas*, 443 U.S. 47 (1979), when two policemen physically detained the defendant to determine his identity, after the defendant refused the officers' request to identify himself. The Court held that absent some reasonable suspicion of misconduct, the detention of the defendant to determine his identity violated the defendant's Fourth Amendment right to be free from an unreasonable seizure. [Citation.]

"What is apparent from *Royer* and *Brown* is that police questioning, by itself, is unlikely to result in a Fourth Amendment violation. While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response. [Citation.] Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment. But if the person refuses to answer and the police take additional steps–such as those taken in *Brown*–to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure. [Citations.]"

In *Delgado*, federal immigration agents questioned employees at a factory regarding their immigration status. During the survey, which lasted from one to two hours, the agents positioned themselves near the factory exits while others moved systematically through the factory, approaching employees and, after identifying themselves, asking the employees from one to three questions relating to their citizenship. Meanwhile, employees continued their work and were free to walk around within the factory. Certain employees, who were citizens or permanent resident aliens, contended that the surveys violated their rights under the Fourth Amendment. The employees argued that the element of surprise, the systematic questioning of individual workers, the stationing of agents near the exits of the factory, and the failure to inform workers that they were free to leave created an intimidating psychological environment which negated any reasonable impression that they were free to leave without answering the questions. Nevertheless, the United States Supreme Court ruled that the conduct of the immigration agents, consisting simply of questioning employees and arresting those they had probable cause to believe were unlawfully present in the United States, "should have given respondents no reason to believe that they would be detained if they gave truthful answers to the questions put to them or if they simply refused to answer." (*Id.* at p. 218.)

7          01-213

- 81 -

AR-00099

Here, we note that the authority of state and local law enforcement officers to investigate and arrest for violations of federal law is determined by reference to state law. (*U. S. v. Vasquez-Alvarez, supra,* 176 F.3d at pp. 1295-1296; *Gates v. Superior Court* (1987) 193 Cal.App.3d 205, 215; see, e.g., 8 U.S.C. § 1252c [". . . to the extent permitted by relevant State and local law, State and local law enforcement officials are authorized to arrest and detain an individual who . . . is an alien illegally present in the United States. . . ."].)  In California, a peace officer may make an arrest when an individual has committed a felony, or where reasonable cause exists to suspect that a person has committed a felony, whether or not a felony has been committed.  (§ 836, subd. (2), (3).)[4]  Therefore, a local officer may arrest for a felony violation of federal immigration law any time the officer has reasonable cause to believe such a violation has occurred. (*Gates v. Superior Court, supra,* 193 Cal.App.3d at p. 215.) Inasmuch as a local law enforcement officer is authorized under state and federal law to make such an arrest, and to exchange information pertaining to immigration status with federal authorities (*id.* at p. 219), it follows that a local law enforcement officer may question an individual as to his or her immigration status.

In answer to the second question, therefore, we conclude that a local law enforcement officer who has detained a Spanish-speaking person for otherwise valid purposes may question such person as to his or her immigration status.  It is emphasized, however, that for purposes of the question here considered, the inquiry as to alienage was not posited *because* the individual spoke Spanish. A contrary supposition would produce an entirely different result.  Thus, it has been held that ethnic appearance is not, in general, an appropriate factor in the reasonable suspicion calculus. (*United States v. Montero-Camargo* (9th Cir. 2000) 208 F.3d 1122, 1132.)  While suspicion is not a constitutional prerequisite for inquiry as to alienage, such an inquiry directed selectively to individuals who speak a language other than English would be tantamount to an aspect of the practice commonly referred to as racial profiling, where sound is substituted for appearance or other indicia of ethnicity.  It has been noted that primary language skill flows generally from one's national origin. (*Berke v. Ohio Department of Public Welfare* (6th Cir. 1980) 628 F.2d 980, 981; *Yu Cong Eng v. Trinidad* (1926) 271 U.S. 500, 517.)  In the context presented here, therefore, a non-English speaking classification is, for all practical purposes, a classification based on national origin.  Such a selective enforcement would clearly violate the equal protection clause of the Fourteenth Amendment of the United States Constitution.

---

[4] In the case of both felonies and misdemeanors, a California peace officer is further authorized to make an arrest either in obedience to a warrant, or without a warrant where the officer has probable cause to believe that a public offense has been committed in the officer's presence. (Pen. Code, § 836, subd. (a), (a)(1).) Civil violations of immigration law are not cognizable under this formula.

8                                                                                          01-213

– 82 –

AR-00100

### 3. Investigations of Arrested Persons Prior to Arraignment

The third inquiry is whether an arrested person's immigration status may be investigated by local law enforcement officers prior to arraignment. This inquiry is based upon a federal program established by Congress in 1997. (Pub.L. No. 105-141 (Dec. 5, 1997) 111 Stat. 2647 [see note under 8 U.S.C.A. § 1226].) The legislation provides as follows:

"(a) . . . [T]he Attorney General shall establish and implement a program to identify, from among the individuals who are incarcerated in local governmental incarceration facilities prior to arraignment on criminal charges, those individuals who are within 1 or more of the following classes of deportable aliens:

"(1) Aliens unlawfully present in the United States.

"(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(b) The program authorized by subsection (a) shall include -

"(1)  the detail, to each incarceration facility selected under subsection (c), of at least one employee of the Immigration and Naturalization Service who has expertise in the identification of aliens described in subsection (a); and

"(2)  provision of funds sufficient to provide for -

"(A) the detail of such employees to each selected facility on a full time basis, including the portions of the day or night when the greatest number of individuals are incarcerated prior to arraignment;

"(B) access for such employees to records of the Service and other Federal law enforcement agencies that are necessary to identify such aliens; and

"(C) in the case of an individual identified as such an alien, pre-arraignment reporting to the court regarding the Service's intention to remove the alien from the United States.

"
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. . ."

9                                                                01-213

– 83 –

AR-00101

We are not apprised as to the manner in which this federal program is being implemented by federal immigration agents at any particular local incarceration facility. It will be assumed, therefore, that the selection criteria are constitutionally sufficient. The actual arraignment of an individual on formal charges is clearly not a prerequisite for an otherwise proper investigation of immigration status under the federal law. In the case of an individual who is determined to be present in the United States unlawfully, the local magistrate will be apprised of the true identification of the person and will receive a report regarding the intention of the federal Immigration and Naturalization Service to remove the alien from the United States.

Consistent with our conclusions to questions one and two and in answer to the third question, we conclude that an arrested person's immigration status may be investigated by local law enforcement officers prior to arraignment.

*****

10                                                          01-213

AR-00102

APPENDIX X

| | | JURISDICTIONS WITH MULTIPLE "NO" ANSWERS TO THE OIG SURVEY | | | | |
|---|---|---|---|---|---|
| **JURISDICTION** | **STATE** [SENSITIVE INFORMATION REDACTED] | *If law enforcement officers from your jurisdiction arrest an individual on state or local charges, do they generally ask the subject about his or her immigration status?* | *If law enforcement officers from your jurisdiction have reason to believe that someone may be an undocumented alien, do they generally inform ICE that the individual is in their custody?* | *Do the detention facilities in your jurisdiction generally accept detainers from ICE for undocumented criminal aliens in their custody?* | *Do the detention facilities in your jurisdiction generally alert ICE prior to releasing any undocumented criminal aliens in their custody?* |
| [SENSITIVE INFORMATION REDACTED] | | No | No | | No |
| [SENSITIVE INFORMATION REDACTED] | | No | No | | No |
| [SENSITIVE INFORMATION REDACTED] | | No | No | No | |
| [SENSITIVE INFORMATION REDACTED] | | No | No | | No |
| [SENSITIVE INFORMATION REDACTED] | | No | No | | No |
| [SENSITIVE INFORMATION REDACTED] | | No | No | | |
| [SENSITIVE INFORMATION REDACTED] | | No | | | No |
| [SENSITIVE INFORMATION REDACTED] | | No | No | | |
| [SENSITIVE INFORMATION REDACTED] | | No | | | No |
| [SENSITIVE INFORMATION REDACTED] | | No | No | | |
| [SENSITIVE INFORMATION REDACTED] | | No | No | | |
| [SENSITIVE INFORMATION REDACTED] | | | No | | No |
| [SENSITIVE INFORMATION REDACTED] | | No | No | | |
| [SENSITIVE INFORMATION REDACTED] | | No | No | | |
| [SENSITIVE INFORMATION REDACTED] | | No | No | | |
| [SENSITIVE INFORMATION REDACTED] | | | No | | No |

- 85 –

AR-00103

| JURISDICTIONS WITH MULTIPLE "NO" ANSWERS TO THE OIG SURVEY | | | | | |
|---|---|---|---|---|---|
| **JURISDICTION** | **STATE** [SENSITIVE INFORMATION REDACTED] | *If law enforcement officers from your jurisdiction arrest an individual on state or local charges, do they generally ask the subject about his or her immigration status?* | *If law enforcement officers from your jurisdiction have reason to believe that someone they arrest may be an undocumented alien, do they generally inform ICE that the individual is in their custody?* | *Do the detention facilities in your jurisdiction generally accept detainers from ICE for undocumented criminal aliens in their custody?* | *Do the detention facilities in your jurisdiction generally alert ICE prior to releasing any undocumented criminal aliens in their custody?* |
| [SENSITIVE INFORMATION REDACTED] | | No | No | | |
| [SENSITIVE INFORMATION REDACTED] | | | | No | No |
| [SENSITIVE INFORMATION REDACTED] | | No | | | No |

Source:  Responses to OIG survey

The following explanatory comments were offered by respondents listed in this table.  The respondents did not necessarily offer an explanation for each negative answer.

*(1)  If law enforcement officers from your jurisdiction arrest an individual on state or local charges, do they generally ask the subject about his or her immigration status?*

- [SENSITIVE INFORMATION REDACTED] – "Generally, if an individual does not appear to be foreign they will not be asked.  Now if an individual has no proper identification and it is apparent that they may be foreign then they will ask."

- [SENSITIVE INFORMATION REDACTED] – "Not everyone arrested would prompt an arresting officer to inquire about a person's immigration status.  It is unknown as to how many times a day an arresting officer would have cause to ask an arrestee about their immigration status."

- [SENSITIVE INFORMATION REDACTED]a – "The [SENSITIVE INFORMATION REDACTED] does not generally ask immigration status. We may if need be, but not generally."

– 86 –

AR-00104

- [SENSITIVE INFORMATION REDACTED] – "There is no local ordinance or regulation from the County's Board of Supervisors authorizing the Department of Correction to ask arrestees about their immigration status."

- [SENSITIVE INFORMATION REDACTED] – "It is not the Police Department's policy to ask, however, some officers ask voluntarily. It is not the Police Department's policy to take proactive enforcement action against undocumented aliens. However, if an encounter with an undocumented alien yields a wanted status for an immigration violation listed by another agency, the Police Dept. will confirm extradition before arrest."

- [SENSITIVE INFORMATION REDACTED] – "Since [SENSITIVE INFORMATION REDACTED] is a home rule city the Sheriff Dept doesn't 'arrest' persons as part of our normal duties. When persons are brought to us or we take someone into our custody we do ask for place of birth. Anyone who self reports as being born outside the USA is forwarded to ICE."

- [SENSITIVE INFORMATION REDACTED] – "No means they don't generally ask, since their immigration status has no bearing on the local charge. Additionally, if they did ask and the defendant said he was illegal, who would we tell?"

- [SENSITIVE INFORMATION REDACTED] – "Not unless there is a reason to believe there would be an issue with the status."

- [SENSITIVE INFORMATION REDACTED] – "Not Applicable."

- [SENSITIVE INFORMATION REDACTED] – "We complete an NCIC check on all arrestees, and we report those with a history of deportation."

- [SENSITIVE INFORMATION REDACTED] – "Ask where born but don't check immigration status."

- [SENSITIVE INFORMATION REDACTED] – "Generally no, unless there is reason to believe individual has been involved in certain criminal activities such as: arrested for, or has been convicted of a felony, violent crime, etc."

- [SENSITIVE INFORMATION REDACTED] – "Deputies working patrol within [SENSITIVE INFORMATION REDACTED] do not generally ask arrestees their immigration status."

AR-00105

- [SENSITIVE INFORMATION REDACTED] – "Immigration status is determined during the Booking process."

- [SENSITIVE INFORMATION REDACTED] – "Only if the investigation points to the fact that the individual(s) may be an undocumented alien."

*(2)  If law enforcement officers from your jurisdiction have reason to believe that someone they arrest may be an undocumented alien, do they generally inform ICE that the individual is in their custody?*

- [SENSITIVE INFORMATION REDACTED] – "Notification may occur in felony offenses, but not usually for minor offenses."

- [SENSITIVE INFORMATION REDACTED] – "From my experience it is difficult to contact these agencies."

- [SENSITIVE INFORMATION REDACTED] – "Unknown.  However, the [SENSITIVE INFORMATION REDACTED] Custody Division is implementing an automated inquiry and notification process for consular notifications as part of the booking process."

- [SENSITIVE INFORMATION REDACTED] – "ICE agents come into our facility on a regular basis and review our records of undocumented aliens."

- [SENSITIVE INFORMATION REDACTED] – "There is no policy or local regulation from the County's Board of Supervisors that allows Department of Correction officers to inform ICE that an individual is in custody."

- [SENSITIVE INFORMATION REDACTED] – "This is a Sheriff's [Department] function."

- [SENSITIVE INFORMATION REDACTED] – "Our experience has shown that ICE is not going to respond anyway."

- [SENSITIVE INFORMATION REDACTED] – "Not Applicable."

- [SENSITIVE INFORMATION REDACTED] – "All arrestees in [SENSITIVE INFORMATION REDACTED] are brought to the [SENSITIVE INFORMATION REDACTED] County Jail; this is when the NCIC [check] is done."

- 88 –

- [SENSITIVE INFORMATION REDACTED] – "Depends on nature of crime."

- [SENSITIVE INFORMATION REDACTED] – "Law enforcement officers may contact ICE but jail staff do not. We have an ICE employee that regularly reviews inmate rosters."

- [SENSITIVE INFORMATION REDACTED] – "No, unless certain conditions are met such as: if individual is reasonably suspected of participating in certain criminal activity, arrested for using a firearm during commission of a crime, involvement in violent crime. Etc."

- [SENSITIVE INFORMATION REDACTED] – "Deputies working patrol within [SENSITIVE INFORMATION REDACTED] do not generally inform the DHS/ICE that the individual they have in custody may be undocumented. However, on occasion deputies will advise the 287(g) Officers of the undocumented arrestee."

- [SENSITIVE INFORMATION REDACTED] – "Past history has shown that they will rarely pick the subjects up for transport."

- [SENSITIVE INFORMATION REDACTED] – "Sheriff's Deputies do not inform ICE. Detention staff will notify ICE if information obtained from a criminal history rap sheet or information obtained from our local database alerts [this] Department of previous contacts with ICE (releases to ICE or previously deported criminal alien)."

*(3) Do the detention facilities in your jurisdiction generally accept detainers from ICE for undocumented criminal aliens in their custody?*

- [SENSITIVE INFORMATION REDACTED] – "ICE does not bring people (inmates) to our facility."

- [SENSITIVE INFORMATION REDACTED] – "The [SENSITIVE INFORMATION REDACTED] has a contract to have ICE inmates."

*(4) Do the detention facilities in your jurisdiction generally alert ICE prior to releasing any undocumented criminal aliens in their custody?*

- [SENSITIVE INFORMATION REDACTED] – "[No.] Unless ICE asks us to."

- 89 –

- [SENSITIVE INFORMATION REDACTED] – "In most cases we are unaware of status."

AR-00108

**Bureau of Justice Assistance Response to the Draft Audit Report**

MEMORANDUM TO:    Glenn A. Fine
                              Inspector General
                              United States Department of Justice

THROUGH:            Guy K. Zimmerman
                              Assistant Inspector General for Audit
                              Office of the Inspector General
                              United States Department of Justice

FROM:                Regina B. Schofield
                              Assistant Attorney General

SUBJECT:            Response to Office of the Inspector General's Draft Audit
                              Report, *Cooperation of SCAAP Recipients in the Removal
                              of Criminal Aliens from the United States*

      This memorandum responds to the Office of the Inspector General's (OIG's) draft audit report entitled "*Cooperation of SCAAP Recipients in the Removal of Criminal Aliens from the United States.*"  The draft report does not contain any recommendations.   The Office of Justice Programs has reviewed the draft audit report and does not have any comments.

      Thank you for the opportunity to review and respond to the draft audit report.  If you have any questions regarding this response, please feel free to contact me on (202) 307-5933, or LeToya Johnson, Director, Program Review Office, on (202) 514-0692.

cc:   Beth McGarry
       Deputy Assistant Attorney General
         for Operations and Management

       Domingo Herraiz
       Director, Bureau of Justice Assistance

       LeToya A. Johnson
       Director, Program Review Office

       Richard P. Theis
       DOJ Audit Liaison

AR-00109

**RICHARD SHELBY**
ALABAMA

CHAIRMAN—COMMITTEE ON BANKING, HOUSING,
& URBAN AFFAIRS

COMMITTEE ON APPROPRIATIONS
CHAIRMAN—SUBCOMMITTEE ON COMMERCE,
JUSTICE, SCIENCE, & RELATED AGENCIES

COMMITTEE ON RULES & ADMINISTRATION

304 RUSSELL SENATE OFFICE BUILDING
WASHINGTON, DC 20510–0103
(202) 224–5744

# United States Senate
WASHINGTON, DC 20510–0103

STATE OFFICES:

○ 1800 FIFTH AVENUE NORTH
321 FEDERAL BUILDING
BIRMINGHAM, AL 35203
(205) 731–1384

○ HUNTSVILLE INTERNATIONAL AIRPORT
1000 GLENN HEARN BOULEVARD
BOX 20127
HUNTSVILLE, AL 35824
(256) 772–0460

○ 113 SAINT JOSEPH STREET
445 U.S. COURTHOUSE
MOBILE, AL 36602
(251) 694–4164

○ 15 LEE STREET
FMJ FEDERAL BLDG., SUITE 208
MONTGOMERY, AL 36104
(334) 223–7303

○ 2005 UNIVERSITY BOULEVARD, SUITE 2100
TUSCALOOSA, AL 35401
(205) 759–5047

July 9, 2015

The Honorable Loretta E. Lynch
Attorney General
U.S. Department of Justice
Robert F. Kennedy Building
950 Pennsylvania Avenue, N.W.
Washington, DC, 20530-2000

Dear Attorney General Lynch,

I read with great concern about the heartbreaking murder of Kathryn Steinle in San Francisco last week. Any violent crime is tragic, but the fact that this senseless death arises directly from municipal policies that obstruct cooperation with the Department of Homeland Security to remove illegal immigrants who have committed crimes is especially odious. This senseless crime comes on the heels of daily reports of illegal immigrants committing crimes from drug and alcohol offenses to violent murder and rape.

The discussion on immigration reform crisscrosses government. While I disagree with President Obama on his immigration policies and enforcement of existing laws, I have supported his efforts to remove criminal illegal immigrants. One recurring problem in our country is that local law enforcement in some cities consciously fails to inform federal authorities about illegal immigrants who they choose to let go free after these individuals have committed crimes. To be clear, this failure is not due to negligence, but instead is a result of municipal policies that are deliberately crafted to circumvent federal removal policies.

These obstructions of federal law enforcement agents occur in so-called "sanctuary cities," such as San Francisco, which short-circuit prudent policies by U.S. Immigrations and Customs Enforcement officials to focus deportation and removal efforts first on illegal immigrants who commit crimes in the United States. While misguided, the municipalities and governments that support amnesty and relaxation of immigration policies are entitled to their opinions; however, I strongly believe that interfering in routine coordination of enforcement of federal law is intolerable and, as we saw last week, potentially deadly to law-abiding American families.

You and I both know that the definitions of what constitutes a "sanctuary city" are difficult to reconcile, and that the Department would be challenged to compile a definitive list for Congress. My goal for writing to you is to not to debate the larger bureaucracies and ideologies of these cities. Rather, as families like the Steinles suffer such fully avoidable tragedies, I believe that it is time to work together to address this issue in a straightforward way as it relates to federal funding.

AR-00110

As Chairman of the Appropriations Subcommittee that provides vital funding to state and local law enforcement efforts, I have a simple and urgent request specific to the Department of Justice. Last year, our Subcommittee appropriated more than $2 billion in grants for state and local law enforcement agencies through Justice Assistance Grants and the COPS programs. I ask that you use the Department's administrative authorities as the grant-making agency to limit the availability of these taxpayer funds only to states and local agencies that affirmatively certify that they will follow the law and identify and hold criminal illegal immigrants in their custody when requested by the appropriate federal agency.

Simply put: municipalities that refuse to cooperate with federal immigration laws should not receive the Department of Justice's federal law enforcement assistance funding. The Department is able to place conditions and certifications on the grants it makes for public safety. I ask that you implement such a certification for any and all Department of Justice grants from this point forward. Taxpayer dollars are precious, and the agencies that utilize these grants for law enforcement assistance should at the very least be able to certify that the enforcement of the law is their primary goal – not political accommodation of those who break the laws of this country.

I appreciate the hard and diligent work that the agents and attorneys of your Department undertake every day to protect the security and freedoms of every American. I know that we can agree that the freedoms we enjoy – like strolling on a San Francisco pier with our children – are possible only when we are willing to enforce the federal laws that keep our families and our freedoms safe. The simple truth is this: federal grants to assist local and state public safety efforts should only go to jurisdictions that are committed to enforcing the law and cooperating with federal law enforcement.

I look forward to hearing back from you on how you plan to expeditiously address the reckless policies of these "sanctuary cities" and working with you on this issue in fiscal year 2015, fiscal year 2016, and beyond.

Sincerely,

Richard Shelby

Richard Shelby



**U.S. Department of Justice**

Office of Legislative Affairs

_Office of the Assistant Attorney General_          _Washington, D.C. 20530_

September 10, 2015

The Honorable Richard Shelby
United States Senate
Washington, DC 20510

Dear Senator Shelby:

This responds to your letter to the Attorney General dated July 9, 2015, regarding federal funding provided to states and localities that do not fully cooperate with Federal immigration laws.

We share your concern over the tragic death of Kathryn Steinle, and your concern about the very complex issue of immigration reform. The Department of Justice's (the Department) top priority is ensuring public safety, and we are committed to enforcing our criminal and immigration laws effectively and sensibly. However, we are concerned that efforts as you recommend to administratively prohibit funding to states and localities that do not certify specific actions regarding immigration would not necessarily resolve the issues that led to the tragic death of Kathryn Steinle that prompted your letter, and in fact could have the unintended effect of impeding our shared goal of keeping the public safe.

The Department administers a wide range of grant programs to provide criminal justice funding to state, local and tribal governments to reduce crime, address significant gaps in local funding, and respond to emerging criminal justice issues. A leading source of federal justice funding for law enforcement agencies is the Edward Byrne Memorial Justice Assistance Grant (JAG) program, which is administered by the Department's Bureau of Justice Assistance within the Department's Office of Justice Programs. To effectively administer the JAG program, as established by the statute, the Department uses an allocation formula when making awards to jurisdictions. The allocation formula is calculated by the Department's Bureau of Justice Statistics each year for states, territories, local and tribal jurisdictions. Our Office of Community Oriented Policing Services (COPS) also provides grant funds to advance public safety through the practice of community policing.

Your letter requests that the Department use its administrative authorities to limit the availability of JAG and COPS grants to only those state and local agencies that affirmatively certify that "they will follow the law and identify and hold criminal illegal immigrants in their custody when requested by the appropriate federal agency." In general, the purpose of the Department's grant programs is to provide criminal justice funding to state, local and tribal governments to reduce crime, address significant gaps in local funding, and respond to emerging criminal justice issues. The law enforcement assistance funding is used to build capacity across

The Honorable Richard Shelby
Page Two

state and local criminal justice systems, including re-entry services, justice system reform, information systems, and drug courts. Withholding the funding would have a significant, and unintended, impact on the underserved local populations who benefit from these programs, most of whom have no connection to immigration policy. Additionally, many Department grant funds are formula-based, with the eligibility criteria (and related penalties, if any) set firmly by statute. In many cases, therefore, the Department does not have the discretion to suspend funding at all.

Further, the grant certification process you propose raises multiple administrative challenges. This certification would require the Department to go into an in-depth review of the laws, policies, and procedures of any State or locality whenever any question is raised about the state's compliance. Such an extensive review process would greatly hamper the Department's ability to provide grants and other assistance mandated by Congress in a cost-effective manner.

We are actively considering additional ways in which we can most effectively carry out our public safety mission as it regards enforcing the nation's criminal and immigration laws. For instance, the Department has been working with the Department of Homeland Security to determine if agency policies should be revised to give priority to Immigration and Customs Enforcement detainers in certain cases. We will keep you apprised of any policy changes we make. We remain grateful for your and the Committee's support for the Department in the pursuit of our shared goal of protecting and serving the American people. To this end, we look forward to continuing to work with you to find ways to investigate and punish those who break federal laws and harm innocent citizens.

We hope this information is helpful. Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

Sincerely,

Peter J. Kadzik
Assistant Attorney General

# REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

CQ Transcriptions

November 17, 2015 Tuesday

Copyright  2015 CQ-Roll Call, Inc      All Rights Reserved

All materials herein are protected by United States copyright law and may not be reproduced, distributed, transmitted, displayed, published or broadcast without the prior written permission of CQ Transcriptions. You may not alter or remove any trademark, copyright or other notice from copies of the content.

## Body

**EVENT DATE:** November 17, 2015

**TYPE:** COMMITTEE HEARING

**LOCATION:** WASHINGTON, D.C.

**COMMITTEE:** HOUSE COMMITTEE ON THE JUDICIARY

**SPEAKER:** REP. ROBERT W. GOODLATTE, CHAIRMAN

**WITNESSES:**

REP. ROBERT W. GOODLATTE, R-VA. CHAIRMAN

REP. JOHN CONYERS JR., D-MICH. RANKING MEMBER

WITNESS: ATTORNEY GENERAL LORETTA E. LYNCH

REP. JIM SENSENBRENNER, R-WIS.

REP. JERROLD NADLER, D-N.Y.

REP. LAMAR SMITH, R-TEXAS

REP. ZOE LOFGREN, D-CALIF.

REP. DARRELL ISSA, R-CALIF.

REP. SHEILA JACKSON LEE, D-TEXAS

REP. J. RANDY FORBES, R-VA.

REP. STEVE COHEN, D-TENN.

REP. JIM JORDAN, R-OHIO

REP. HANK JOHNSON, D-GA. RES. CMMSR. PEDRO R. PIERLUISI, D-P.R.

REP. LOUIE GOHMERT, R-TEXAS

REP. HANK JOHNSON, D-GA. RES. CMMSR. PEDRO R. PIERLUISI, D-P.R.

REP. TRENT FRANKS, R-ARIZ.

AR-00114

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

REP. JUDY CHU, D-CALIF.

REP. TOM MARINO, R-PA.

REP. TED DEUTCH, D-FLA.

REP. TREY GOWDY, R-S.C.

REP. LUIS V. GUTIERREZ, D-ILL.

REP. JASON CHAFFETZ, R-UTAH

REP. KAREN BASS, D-CALIF.

REP. MIMI WALTERS, R-CALIF.

REP. CEDRIC L. RICHMOND, D-LA.

REP. SUZAN DELBENE, D-WASH.

REP. RON DESANTIS, R-FLA.

REP. HAKEEM JEFFRIES, D-N.Y.

REP. MIKE BISHOP, R-MICH.

REP. DAVID CICILLINE, D-R.I.

REP. RAUL R. LABRADOR, R-IDAHO

REP. DAVE TROTT, R-MICH.

REP. STEVE KING, R-IOWA

REP. JOHN RATCLIFFE, R-TEXAS

**GOODLATTE**:  The Judiciary Committee will come to order.  And without objection, the chair is authorized to declare recesses of the committee at any time.

We welcome everyone to this morning's hearing on the oversight of the U.S. Department of Justice, and I'll begin by recognizing myself for an opening statement.

Welcome, Attorney General Lynch, to your first appearance before the House Judiciary Committee since your confirmation earlier this year and we're very pleased to have you here with us.

Last week, we witnessed horrific terrorist attacks in Paris which claimed the lives of over 120 innocent civilians and for which ISIS has taken credit.  Our thoughts and prayers remain with the French people and we mourn with them.  At the same time, these terrorist attacks are a stark reminder that ISIS poses a threat to our allies and America.

Yet this reality is not clearly seen by our president.  Just hours before the attack, President Obama boasted that ISIS is contained.  ISIS is not contained in Syria.  It is not contained in Europe.  And we know ISIS is continuing its campaign of propaganda here in the U.S.  We know from the Paris attacks that at least one of the perpetrators was registered as a refugee from Syria in countries through which he traveled on his way to France.

Just last month, FBI Director Comey told this committee that the U.S. refugee vetting process is not adequate to guarantee that Syrians referred for resettlement in the U.S. are not terrorists who plan to harm us.  Yet the president presses on with his plan to resettle at least 10,000 Syrian refugees during this fiscal year alone.

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

**GOODLATTE**:  I look forward to hearing your thoughts on this issue, considering that the top counterterrorism investigator in the U.S. consistently states that the databases and law enforcement resources are not available to properly vet Syrians.

Further more, reports indicate that despite repeated congressional action to the contrary, this administration thinks terrorists at Guantanamo Bay, who are cut from the same cloth as the Paris attackers and many of whom are deemed too dangerous for release to foreign countries, should be brought to the United States.

Transferring these combatants to the United States will only increase their odds of being released inside the U.S.  These public and national security concerns, coupled with unanswered questions about the cost and logistics of bringing detainees into the U.S., should cause the administration to hit pause on its reckless decision to close the Guantanamo Detention Facility. Enemy combatants should remain outside of the United States, where they can be detained away from our communities and without needlessly jeopardizing the safety and security of the American people.

In addition to the mounting national security threats facing the Department Of Justice, I would also like to focus on the need for an impartial Justice Department.  Americans have become more and more suspicious that their government agencies are biased.

To understand this, one need look no further than the well- founded allegations that the IRS targeted conservative groups for extra scrutiny.  After numerous appeals to appoint a special council to investigate this, last month, the Justice Department announced that no criminal prosecution would be brought against IRS personnel in connection with this matter.

It is not difficult to understand why a special council was needed, given that only those organizations opposed to the president's overreaching agenda were targeted by high-ranking IRS officials. Apparently, officials at the IRS share Secretary Clinton's abhorrent notion that Republicans are, quote, "the enemy."

I am profoundly disturbed by the administration's handling of this matter.  At every turn, President Obama and administration officials repeatedly and publicly undermine the investigation.  When the House Of Representatives took the responsible step of calling for the appointment of a special council to investigate the matter, our concerns and those of the individuals targeted by the IRS, went unresolved by the administration.

Madam Attorney General, now that your department has concluded its investigation, I look forward to discussing the department's decision with you in greater detail.  Given the controversy surrounding the administration's mishandling of the IRS targeting scandal, it is critical that the Justice Department clearly demonstrate to the American people that it will handle, with impartiality, its investigation surrounding former Secretary of State Hillary Clinton's use of a private e-mail server for official purposes.

Earlier this year, two inspectors general reported that classified information was contained within the private e-mails of former Secretary Of State Hillary Clinton, and have referred the matter to the Justice Department.

During his appearance before the committee last month, Fbi Director Comey vowed this investigation will be conducted, quote, "promptly, professionally and independently."

Rest assured, Congress and the American people will hold both the bureau and the department to this standard.  The committee also remains concerned that the department is subverting Congress's budget authority by using settlements to funnel money to third party interest groups.  The concern is institutional and non-partisan, yet rather than suspend the practice, DOJ has expanded it, while quietly obstructing the committee's investigation.

Last week, the department finally produced a small subset of relevant documents that the committee requested 11 months ago.

I would like to know, Madam Attorney General, what you and -- as an experienced prosecutor would do if a large corporation behaved this way in an investigation?

As we sit with you today, Attorney General Lynch, law enforcement agencies across the country face profound challenges. Thirty-one police officers have been shot to death this year alone.  In many places, officers are understandably asking whether

it is worth pursuing violent criminals, or otherwise putting themselves in harm's way, lest they be the targets of intentional violence or community backlash.

Force must be used appropriately, and police officers must take proper steps to protect innocent civilians. However, irresponsible anti-police activity from many in the advocacy community and the Justice Department's ongoing efforts to micromanage state and local police agencies have only served to exacerbate the divide between police and citizens.

**GOODLATTE**: This trend cannot continue.

Many American cities have seen a spike in violent crime. In Baltimore, homicides are up 71 percent. In August of this year, the number of murders here in Washington, D.C. already matched the number for all of 2014. Other cities have seen similar increases in violent crime.

Despite these grim statistics, however, the Obama administration has continued to support initiatives that will only exacerbate this violence. On November 1 of this year, nearly 6,000 federal drug offenders were released from prison pursuant to a 2014 sentencing commission amendment, which the Justice Department supported. Over the next two years, some additional 10,000 offenders will be released early.

This ill-advised amendment applies without regard to an inmate's criminal history and will result in the release of some dangerous, violent criminals, as well as illegal criminal aliens. As you know, the committee has introduced bipartisan legislation to institute meaningful sentencing reform while preventing release of serious violent criminals.

Speaking of releasing violent individuals, the murder of Kate Steinle is San Francisco earlier this year is a tragic reminder that the lack of appropriate immigration enforcement in our nation today and the reckless sanctuary policies in many cities across the country can have deadly consequences. It is not enough for administration officials to pay lip service to the problems presented by sanctuary cities. Federal agencies, including the Justice Department, must take meaningful steps to ensure that criminal aliens released from federal custody are promptly deported.

Attorney General Lynch, I look forward to hearing your views on all these important topics today, as well as on other issues of significance to the Justice Department and to our nation.

Thank you and now I am pleased to recognize the ranking member of the committee, the gentlemen from Michigan, Mr. Conyers for his (inaudible).

**CONYERS**: Thank you, Chairman Goodlatte. Your opening statement could be the basis of a hearing all of its own and I appreciate your views.

Madam Attorney General, welcome to the House Judiciary Committee. Nearly seven months ago, after much delay in the Senate, you took over the Department of Justice with not one, but two tours of duty at the U.S. attorney for the eastern district of New York. You are unquestionably the right leader at the right time for the important work of the Department of Justice.

Nowhere is your leadership more important than in national security. The attacks on Paris, France leave no doubt that our most pressing mission, yours and ours, remains protecting the American people. And unfortunately, history shows that tragic events like these that are followed by calls for drastic action. Already, we have heard proposals to undo encryption, to roll back surveillance reform and deport some of the most vulnerable among us. I urge restraint in these matters, Madam Attorney General.

At this time, we have very little information about how the attacks were carried out. Rather than use these events as an excuse to advance policies that otherwise betray our values, I urge the intelligence community, including the Department of Justice, to focus on the most effective tools in our toolbox: targeted surveillance, targeted investigation and smart policing.

Back at home, you have cultivated strong relationships in the police community. But you are not afraid to call out bad behavior or to prosecute police officers when circumstances warrant. That experience will prove invaluable as the department, along with this committee, takes its next steps on criminal justice reform.

AR-00117

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

Under your leadership, the civil rights division continues its work with police departments around the country to ensure that state and local policing practices comport with the Constitution.

The Office of Juvenile Justice is also working hard to disrupt what you have called the cycle of criminality and incarceration. I commend you for your work on this front, and I look forward to our partnership as this committee moves forward with its own package of criminal justice reforms.

Another area where we look to you for leadership is enforcement of voting rights. Earlier this year, observing the 50th anniversary of the Voting Rights Act, you remarked, "It is the lesson of every generation that the price of freedom is constant vigilance because opponents of free and fair access to the voting booth have neither retreated nor surrendered."

The unfortunate truth of that statement plays out across the country today, no place more vividly than in the state of Alabama where officials plan to close 31 drivers license offices across the state, including those in every county in which African-Americans make up more than 75 percent of registered voters. Coupled with Alabama's strict new voter I.D. law, these closings will make it even harder for many citizens to obtain the identification now required to cast a vote.

The discriminatory impact of this plan plays out in other ways, too. Imagine having to drive hundreds of miles across rural Alabama to renew your driver's license. We know that this burden will weigh heaviest on the state's poorest citizens. Borrowing again from your words, "It is incumbent on all of us to stand up, to speak out and to make clear that no end is worth the means of disenfranchisement. No small-minded policy is worth the cheapening of our democracy."

Finally, Madam Attorney General, I want to comment on the virtue of your being a new leader at the Department of Justice, ready to make a fresh start with this committee. Today, you will hear questions, no doubt, about Benghazi, Planned Parenthood, Solyndra, Operation Fast and Furious and Lois Lerner at the IRS. These are not matters that affect a whole lot of our constituents, but you will hear questions about them and comments anyway.

My advise to you that you don't need is stick to the facts and the law, and you will be fine. We know that some members are displeased with the outcome of the department's investigation into the Lois Lerner matter, but we also know that your investigators were as thorough as can be. They conducted over 100 interviews, collected more than one million pages of documents and closely analyzed almost 500 applications for tax exempt status.

Some members may wish your predecessor had appointed a special counsel to investigate the matter, but both the plain text of the applicable regulations and the congressional research tell us otherwise. The facts of the case did not involve senior administration officials. They did not present a conflict of interest to the Department of Justice. So the appointment of a special counsel was simply not appropriate in this matter.

Too often your predecessor, who I still admire, found himself the target of personal insults in this committee and elsewhere, and I like to think that all of us in this room and on this committee regret the frequent attacks on his character or at least realize that those attacks were almost entirely unproductive.

**CONYERS**: We have a chance to start over today. We can do better. Progressives and conservatives, Congress and the administration, there is so much common ground between us to be explored, particularly in the work of the Department Of Justice.

And so, I am so glad that you are here with us today. And I look forward to your testimony.

Thank you, Mr. Chairman.

**GOODLATTE**: Thank you, Mr. Conyers. And without objection, all other members' opening statements will be made a part of the record.

And we again welcome our distinguished witness. If you would please rise, we will begin by swearing you in.

Do you swear that the testimony you are about to give shall be the truth, the whole truth and nothing but the truth, so help you God?

**LYNCH**:  I do.

**GOODLATTE**:  Thank you very much and please be seated.  Let the record reflect that the witness has responded in the affirmative.

I will now begin by introducing our sole witness today.  The Attorney General of the United States, Ms. Loretta Lynch.  Attorney General Lynch was sworn in as the 83rd attorney general of the United States on April 27, 2015.

She began her career in public service by joining the United States Attorney's Office for the Eastern District of New York.  After nine years, Ms. Lynch was appointed by President Bill Clinton to lead that office as United States attorney, a post she held until 2001.

Ms. Lynch then worked in private practice until 2010, when President Obama asked her to resume leadership of the United States Attorney's Office in Brooklyn.  Ms. Lynch is a graduate of Harvard College and Harvard Law School.

Attorney General Lynch, we welcome your first appearance before the judiciary committee and look forward to your testimony.  Your entire written statement will be made a part of the record.

And we ask that you summarize your testimony in five minutes.

Thank you, and please begin at your convenience.

**LYNCH**:  Thank you, sir.  Good morning, Chairman Goodlatte, Ranking Member Conyers and distinguished members of this committee.

I am very grateful for the opportunity to appear before you today to share some of the recent accomplishments of the U.S. Department of Justice, to discuss some of my top priorities as attorney general, and to explore ways that we can continue to work together.

I do want to begin, however, by commenting on Friday's reprehensible and heartbreaking attacks in Paris.  The Department of Justice and indeed, the entire Obama administration stand in solidarity with France, just as France has so often stood with us.

As President Obama said, this is not just an attack on Paris or the people of France.  It is an attack on all of humanity and the universal values that we share.

We are committed to doing everything within our power to assist our French law enforcement colleagues in bringing those responsible for this monstrous act of terror to justice.  And as we go forward, our thoughts and our prayers, of course, remain with the victims and their loved ones.

Now, as this distinguished committee well knows, our nation faces a host of serious, varied and evolving challenges.  Our highest priority must always be the security of our homeland, and we are acting aggressively to diffuse threats.  We are working around the clock to uncover and disrupt plots that take aim at our people, our infrastructure and our way of life.

We continue to investigate and apprehend those who seek to harm us, including upwards of 70 individuals charged since 2013 for conduct related to foreign fighter activity, and home grown violent extremism. And of course, we remain focused on the threat posed by domestic extremists as well.

At the same time, we are placing particular emphasis on countering security threats in cyberspace.  We are perpetually on guard against individuals, organized groups, terrorists and state actors who might attempt to steal other data, endanger our economy, compromise our privacy and threaten our security.

In recognition of the need for strong public-private partnerships, we have treated a cyber-security unit within our criminal divisions, computer crime and intellectual property section, and announced a national security division outreach initiative designed to promote information sharing and resilience as part of the division's National Asset Protection program.

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

I have also been meeting personally with corporate executives and general counsel around the country to spread our message of cyber awareness, to encourage strategic collaboration and to find new ways to protect American consumers.

Now, of course, to bring about the stronger nation that we all seek, we must also empower the communities within our borders. Across this country, brave police officers risk their lives every day to protect our neighborhoods and serve the residents of their jurisdictions. And we are tremendously grateful for their dedication and their valor.

But we have seen the devastating results of mistrust between law enforcement officers and the citizens we serve. And we have experienced the consequences when decades of tension erupt into unrest.

During the first 100 days of my tenure, I conducted a six-city community policing tour to engage with communities that have made significant progress in this area. In each city, I convened round table discussions that included law enforcement officers, public officials, civic leaders and young people, where participants share some of the most effective ways that citizens and law enforcement officers could join forces to foster trust, to build respect and to spread mutual understanding.

Restoring that essential trust between communities and law enforcement is one of my top priorities as attorney general. And the department intends to do everything we can to foster those bonds, and to create safer and fairer communities across the country.

Now, we are also paying special attention to vulnerable victims in our communities, particularly those caught in the clutches of human trafficking.

In September, I announced that the department would be extending $44 million in new grant funding to help support research, bring more traffickers to justice and care for survivors.

And at this moment, I really want to thank our partners in Congress for their efforts. By tripling human trafficking-related funding for our Office Of Justice programs in fiscal year 2015, Congress has instrumental in allowing us to increase our grant funding in this critical area.

This October marks the 15th anniversary of the Trafficking Victims Protection Act, which is certainly a fitting occasion to redouble our commitment to eradicating this pernicious practice.

And finally, I would like to address our efforts on criminal justice reform at the federal level. I commend the committee members who have come together to help chart a new course on criminal justice that will make our society both stronger and more secure.

It is, of course, built in part on the success of the Smart On Crime initiative that my predecessor, Attorney General Eric Holder, launched in 2013, which shifted our approach away from harsh mandatory sentences for low-level drug offenses, and enabled us to focus on more significant, violent defendants, while better supporting rehabilitation and reentry programs that can reduce recidivism and promote public safety.

But more must be done. Prison spending has increasingly displaced other critical public safety investments. And to make our sentencing laws more efficient, more effective and more just, congressional action is needed. Reform has been embraced by prosecutors, law enforcement and policy makers of all stripes.

And the Justice Department is eager to see meaningful sentencing reform enacted during this Congress.

And we thank you for the chance to work with you on that.

Mr. Chairman, ranking member, thank you so much for the chance to speak with you today, and thank you all for your ongoing support of the Justice Department's efforts.

I look forward to working closely with you to advance the objectives that we all share. And I'm pleased to answer questions from this body at this time.

Thank you.

AR-00120

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

**GOODLATTE**:  Thank you, General Lynch.  We will proceed under the five minute rule, with questions for witness.  And I will begin by recognizing myself.

Yesterday, a video reportedly linked to ISIS was posted, stating that, "as we struck France in the center of its abode in Paris, then we swear that we will strike America at its center in Washington."

Now, there's little doubt that ISIS views the United States and the West as a strategic enemy.  And there's little doubt that our immigration laws, our lawful immigration laws have been abused on a number of occasions by people intending to perpetrate harm against the United States.

Do you agree with what your own Fbi Director James Comey told this committee, regarding the inability to adequately vet and confirm the true identity, because of the lack of information, databases, law enforcement resources, intelligence resources and military resources available to us in Syria, of Syrians who have applied for refugee resettlement in the United States?

**LYNCH**:  Thank you, Mr. Chairman.

With respect to that important issue, as I have indicated, the most important priority of the Department Of Justice is the protection of the American people.  And certainly, national security and terrorism are one of my own top priorities, and certainly an area of concern for all of us.

That is certainly our main concern.

At the same time, we do have a system for allowing not just immigration, but refugee, entrance into the country.

**LYNCH**:  As the FBI director has noted, there is a process in place that allows for significant vetting of refugees from all countries.

**GOODLATTE**:  But let me interrupt because he said something contrary with regard to the situation with the Syrians.  He said, "We can query our database until the cows come home, but there will be nothing to show up because we have no record on that person."

**LYNCH**:  Certainly with respect to the databases that the director was referring to, as he noted I believe before this committee, there is a screening process that has data from several difference agencies, the FBI participates, Department of defense, Department of Homeland Security, national terrorism counter -- National Counterterrorism Center.  And much information is vetted and quarried.  Certainly, a lot of the information that is vetted does have to be inputted into the system, where...

**GOODLATTE**:  In the case of Syria, there's -- you can't go to the government offices in that country.  They're in disarray.  You can't go interview people who know people who are applying for this status. Do you disagree with the FBI director when he says that vetting Syrian refugees is extremely difficult, if not impossible?

**LYNCH**:  Well, Mr. Chairman, I'm not sure he said it was impossible.  Certainly, the -- the -- not only the Department of Justice, but all of our agencies will make every effort to vet every refugee coming into this country from the databases to the interviews that those individuals are subject to, to the biometric screening as well.

**GOODLATTE**:  Let me go on to...

**LYNCH**:  Certainly, there are challenges to that process because of the situation in Syria.  But I would note, however, that we do have the benefit of having that significant and robust screening process in place, a process that Europe has not been able to set up, which renders them more vulnerable.

**GOODLATTE**:  Well, I think we'll be vulnerable too when it comes to people from Syria when we can't get access to those databases because the country is in disarray and we can't even gather information fresh, new because we can't access the people that we could talk to.

AR-00121

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

Let me move on to another topic. The latest available data from the Justice Department shows that during fiscal year 2015, the government reported 6,002 new weapons convictions. This number is down 5.8 percent from the previous fiscal year, when the number of convictions totaled 6,373.

Compared to five years ago, when there were 7,101 weapons convictions, the number for fiscal year 2015 is down 15.5 percent. Convictions over the past are lower than they were ten years ago. Overall, the data show that convictions of this type, weapons violations, are down 34.8 percent from the level of 9,206 reported in 2005.

The president has repeatedly called for new gun control laws. Yet, your department has seen weapons prosecutions and convictions fall to levels not seen in over a decade. How do you explain such a precipitous drop in weapon prosecutions and convictions under this administration? And why is such little emphasis placed on these types of prosecutions when the president has called for yet more laws when the current laws when the current laws are not being enforced?

LYNCH: Mr. Chairman, thank you for the question. With regard to the Department of Justice enforcement of the gun laws, we take those gun laws very seriously and are committed to using the full panoply of laws and regulations on the books. We typically use those laws at the federal level in conjunction with our many and numerous violent crime initiatives.

For example, in my former position as U.S. attorney in the eastern district of New York, many of our gang cases also carried with them firearms charges. They would not necessarily be the lead charge, they may not be reflected in the data you have, but they certainly are an important tool in every prosecutor's arsenal in combating violent crime. In the discussion...

GOODLATTE: Then why aren't they be being prosecuted for those violations?

LYNCH: I'm sorry, sir?

GOODLATTE: Then why aren't they being prosecuted for those violations related to firearms? And by the way, this doesn't just mean using a firearm in the commission of a crime. It means illegal sales of firearms, it means lying on the instant check system of which the last year for which we have complete data, 76,000 people were found to have committed the felony of swearing to false information on that form, 5,000 were referred for prosecution. but the 94 U.S. Attorneys offices across the country could only find time to prosecute 62 out of 76,000.

So somebody going into a gun store to buy a weapon knows that even if they are caught -- and often they are not caught because the system doesn't have all the information it needs in it, but even if they are caught, they often find that the odds are one in 1,000 that they'll be prosecuted, even when they're caught. What -- what are you doing about that? What should be done about it? Why has this decline been so precipitous over the last several years?

LYNCH: Well, Congressman, with respect to the types of cases that are prosecuted, as I indicated, a lot of the firearms prosecutions are done in conjunction with our violent crime program and they may not show up in your statistics as the lead charges. They are significant part of the arsenal that every federal prosecutor utilizes.

Most recently, I have convened a summit with the top elected officials, police chiefs and leaders of major cities to talk about violent crime that's currently taking place in several major cities with the focus on finding the causes and finding the best ways to direct federal resources to those particular cities.

GOODLATTE: And we expect these prosecutions to go up as a result of that?

LYNCH: Congressman, what we do is we look at the root causes of violence in a particular area. If, for example, the firearms were the issue -- main issue there, we would focus our efforts there. We follow the facts...

GOODLATTE: Not necessarily prosecution for the gun violation. So if that's the case, would you agree with me then that it doesn't make sense to add new gun laws when we already have hundreds of them that are not being enforced today and you don't seem to anticipate an increase in the use of those current laws to prosecute people who misuse firearms?

LYNCH: I think at this point, it would be difficult to speculate as to what numbers would look like in a year with respect to any particular criminal program. What I would say is the Department of Justice is committed to using the full panoply of laws

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

that are currently on the books as part of our violent crime initiative, as part of our desire to keep all communities safe. That does include our firearms laws.

**GOODLATTE**: I want to cover one more topic that concerns me greatly. During the FBI's investigation of the IRS matter, the president stated on Super Bowl Sunday that there was not, quote, "even a smidgen of corruption at the IRS." At the end of that investigation, no charges were filed.

Two weeks ago, the president stated with respect to Secretary Clinton's e-mails, quote, "This is not a situation in which America's national security was endangered," end quote. Should we expect that when the FBI finishes its investigation of this matter that no charges will be filed? Does the department allow statements by the president to dictate its investigative practices?

**LYNCH**: Mr. Chairman, the department reviews facts and evidence submitted before it. We apply the law to those facts and evidence. We take all the appropriate steps in every matter that we review. That is how we will essentially manage every matter under our purview, whether it relates to the IRS, to an e-mail matter or every matter that comes before us. And with respect to the president's comments, they have no influence or bearing on how the department manages these matters, and I would have to refer you to him for a review of those.

**GOODLATTE**: I'm glad to hear you say that. In your view, wasn't it inappropriate for the president to once again inject his personal views into an ongoing FBI investigation?

**LYNCH**: Mr. Chairman, I really don't have a comment on the president's expression of his views.

**GOODLATTE**: He's a chief executive officer of the United States and everything that operates within the executive branch is under his purview, including the very important independent nature of the FBI in conducting its investigations. Wouldn't it be better if the president of the United States did not comment on the merits of the those investigations while they're going on?

**LYNCH**: Mr. Chairman, I really don't have a comment on the president's statements.

**GOODLATTE**: Thank you very much.

The chair recognizes the ranking member, the gentleman from Michigan for his questions.

**CONYERS**: Thank you very much, Chairman Goodlatte.

Attorney General Lynch, I want to thank you again for speaking at my panel at this year's congressional black caucus legislative forum. It was marvelous. At that event, you spoke about the breakdown in trust between law enforcement and the communities they serve.

You also spoke about getting to the root of the problem with a comprehensive approach to training, to policy and to research. Many of the law enforcement officers in attendance agreed with your comments. How are you planning on reaching out to the broader law enforcement community to promote these ideas?

**LYNCH**: Thank you, Mr. Conyers -- Congressman Conyers. This is, in fact, one of my top priorities as Attorney General and I'm incredibly proud to say that the Department of Justice has already begun the type of outreach that I was discussing at that particular event. Through our COPS office in particular, the Community Oriented Policing Service Office, we reach out directly to police departments cross the country and offer technical assistance. We offer training. We offer peer-to-peer support.

**LYNCH**: We have found that an incredibly effective way to share information within the law enforcement community is peer-to-peer, police officer-to-police officer, chief-to-chief.

And so, we work with the departments that have, in fact, made great strides in area of police-community relations, and seek to match them up with other departments who are having challenges in this area, and who would be receptive to their input.

AR-00123

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

I also, as I noted in my opening statement, have been a six-city community policing tour, and as I talked with residents, with young people, elected leaders, I also talked with police officers. I do meet with the chiefs and supervisors, but I talk with the rank and file, the officers who are on the beats of our cities, to get their ideas as to what has worked in their city, as to why a positive relationship has developed in the cities where they have had challenges and where they have had struggles.

I have listened to their stories of commitment, and dedication and to their embrace of community policing and concern for residents, as a program and policy that makes policing more efficient and that makes communities safer.

And I'm incredibly proud to support those efforts.

**CONYERS**: Thank you.

In recent weeks there have been some suggestions, some from within your department, that our dialogue on these issues have somehow reduced the willingness of some police officers to perform their duties.

I know of no real evidence to substantiate this claim. But in your opinion, does our conversation about civil rights and the appropriate use of force by police somehow make us less safe?

**LYNCH**: Mr. Congressman, our discussion about civil rights, and the appropriate use of force and all police tactics can only serve to make all of us, community members and police officers, safer.

In my discussions with police officers around the country, I have found a positive engagement on these issues. I have found them to have some of the best thoughts and best practices to share with other departments on these issues. Issues like the best practices for de- escalation of certain situations, issues like the best practices for maintaining a relationship with community organizations and citizens' councils. Issues on police safety.

They have provided us valuable input such as providing bulletproof vests, body-worn cameras. They are focusing on the best ways to use these new technologies. So, while certainly, there may be anecdotal evidence there, as all have noted, there is no data to support it. And what I have seen in my travels across this country is the dedication, the commitment, and the resolve of our brave men and women in law enforcement to improving policing, to embracing the 21st century task force recommendations and to continuing to have a dialogue that makes our country safer for all.

**CONYERS**: Thank you. The state of Alabama's plan to close 31 driver's license offices demonstrates how one policy decision can have wide-ranging discriminatory effects. The media has picked up on this. And this will make it harder for citizens of these rural counties to vote.

And I'm just as concerned about the discriminatory economic effects of this decision, which will fall hardest on rural, poor, and African-American communities. I imagine a black farmer driving hundreds of miles across rural Alabama to renew an expired driver's license.

And on this committee, we know what might happen to such a young man. What tools does the department have to combat discrimination in all of the ways that manifests itself? And how are you going to be using these tools in this case?

**LYNCH**: Thank you, Congressman. With respect to the department's enforcement of our various civil rights statutes, it is certainly robust and will continue to be so.

While we no longer have the advantage of the pre-clearance provisions that were in the Voting Rights Act, we still have sufficient provisions of the Voting Rights Act that allow us to review actions and decisions taken, albeit after the fact, that determine whether there has been either a discriminatory intent or, as is very often the case, a discriminatory result.

We can engage in negotiation and conversations. Many times, we do that before we even move to litigation, in an attempt to reason with or have a discussion with entities that are making significant changes. And often, those discussions are very productive.

I was pleased to see that the -- after discussions with members of Congress, that the state of Alabama may be making some modifications to those changes. And certainly those types of discussions are an efficient way to bring about change and raise these important issues.

But I will reiterate, Congressman, that the Department Of Justice is committed to enforcing the civil rights laws that we do have on the books. And we are committed to a vigorous review of matters that are brought to our attention, and will ensure full, and fair and efficient review of those matters and take the action that is appropriate.

**CONYERS**: Thank you so much. Last question.

More than 30,000 people die from gun violence in this country every year. What can this committee, the Committee on the Judiciary, right now do that would save at least some of those lives?

**LYNCH**: Well, Mr. Congressman, I think there is a significant debate and discussion going on as to how to best save lives in that situation. And I think that all voices are necessary in that debate and discussion.

And certainly if Congress were to consider new laws, I'm sure this committee would be deeply involved in discussions. And that is, of course, up to Congress as part of your purview. And the department would be happy to work with you with regard to that.

I think we also have to look at the root causes of the violence. As I indicated in response to an earlier question, just last month, I convened a summit on violence of several of the leaders of our major cities, police chiefs and mayors, as well as police executives.

And what the department is doing is looking for ways to identify the root causes of so much of the violence that we are seeing. Even as violence is at historic lows nationwide, we still have some communities that struggle with this issue.

In some instances, it is gun violence. Some instances, we see an increase in drug use, methamphetamine, heroin, opioids. And so, we are trying to find our best ways to focus our resources there.

Just yesterday, I met with representatives from the national conference of mayors and had discussions on these very issues about the differences that all communities present, and the need to have a full and robust discussion about these issues.

**CONYERS**: Thank you so much for your testimony and your views.

**LYNCH**: Thank you, sir.

**GOODLATTE**: Thank you, Mr. Conyers. The chair recognizes the gentleman from Wisconsin, Mr. Sensenbrenner, for five minutes.

**SENSENBRENNER**: Thank you very much, Madam Attorney General. Welcome.

We hope to be seeing you for a bit, at least for the next 14 months. I have a question relative to the issue of the Guantanamo detainees.

Congress recently passed -- the president is expected to sign into law -- legislation that explicitly prohibits the use of federal funds to move detainees from Guantanamo Bay to the United States.

Former White House Counsel Gregory Craig recently wrote an op-ed arguing that the law is unconstitutional, and that President Obama can legally ignore it.

Since you are America's top lawyer, do you believe that President Obama could legally ignore legislation prohibiting the transfer of detainees to American soil?

**LYNCH**: Thank you, Mr. Congressman. What I would say on this issue certainly is, as the administration has stated, the closure of Guantanamo Bay is something that is part of the administration's policy and the Department Of Justice supports that as well.

At this point in time I believe the current state of the law is that individuals are not transferred from Guantanamo to U.S. shores. That position is reiterated by the legislation that you mentioned.

And my understanding, as you indicated, is that I do believe the president has indicated that he would sign that. And certainly it's the position of the Department of Justice that we would follow the law of the land in regard to that issue.

**SENSENBRENNER**: Well, the question I had is, do you believe that the law is unconstitutional, as Mr. Craig has opined in last week's Washington Post? And would you ignore the law based upon that argument?

**LYNCH**: Well, Mr. Congressman, I'm actually not familiar enough on Mr. Craig's analysis to comment about that. So, I am not able to comment on his views about the statute.

Certainly with respect to the existing side of the law, the Department of Justice is committed to fully following that. And the closure of Guantanamo Bay is being carried out in compliance with that law.

And so, I believe that it is the view of the department that we would certainly observe the laws as passed by Congress and signed by the president. Only very rarely would we take the step of -- of finding that an unconstitutional provision was something that we could not manage.

**LYNCH**: We would, of course, seek to work with Congress and the administration to resolve that issue.

**SENSENBRENNER**: Now, you know, does this mean that you think it's OK for the president to transfer these people who are some of the world's most dangerous terrorists to countries other than the United States, but it would not be OK for him to transfer them to the United States?

**LYNCH**: Well, Mr. Congressman, the current state of the law allows for the transfer of certain detainees from Guantanamo Bay, those that after a vigorous review process,are placed in that transfer category to countries, that after significant vetting and promises of management, can accept them. With respect to individuals being transferred to the United States, the law currently does not allow for that. And that is not, as I am aware of, going to be contemplated given the legal prescriptions.

**SENSENBRENNER**: OK. Let me ask one question on an unrelated matter. As you may know, the House last month passed a bill called the Judicial Redress Act, which, in my opinion, is essential to enforcing an umbrella agreement to transfer law enforcement information from certain European countries to the United States and vice versa. If the Senate fails to pass this bill, in your opinion, what will be the effect on the sharing of law enforcement data with certain of our European allies?

**LYNCH**: Thank you, Congressman. We fully support the Judicial Redress Act, and I actually would like to thank you and the other members of this committee for the important work that you've done on this issue. As you have noted, this legislation is critical to continued law enforcement sharing of information from the U.S. and the European union. In fact, I have been involved in discussions with ministers from the European Union on the Data Protection Act, often called the umbrella act, as well as the Judicial Redress Act.

It is certainly our view that this important legislation should be passed. It would provide, as you know, redress for European Union citizens should there be an unauthorized or misuse of their data here in the U.S., which is a privilege enjoyed by U.S. citizens within the European Union. Without this, we do have a grave risk of not having the completion of the Data Protection or Umbrella Agreement, and I think sadly, recent events has shown us the importance, the critical nature of making sure that we have the safe and secure portals for transferring information from one law enforcement entity to another.

**SENSENBRENNER**: Let me make one point, as my time is expiring. While the Judicial Redress Act does not deal with the sharing of counterterrorism information, there frequently is an interface between those who want to commit terrorist activity and those who do commit petty crimes which would end up being in the law enforcement file.

And I would just look at today's New York times where comments relative to the attack in Paris and what apparently happened at a neighborhood in Brussels, where is says, "In a neighborhood known for extremists, a trail of petty crimes and missed plots." The Judicial Redress Act might be able to put the pieces of the puzzle together for petty crimes so there can be missed plots.

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

Thank you for your support.

**LYNCH**: Thank you, Mr. Congressman.

**GOODLATTE**: Thank you. The chair recognizes the gentleman from New York, Mr. Nadler, for five minutes.

**NADLER**: I thank you, chairman and I thank you, Attorney General.

Madam Attorney General, in the immediate aftermath of the terrorist attacks on September 11, 2001, the Department of Justice established and oversaw a Victim's Compensation Fund that provided $7 billion to families who lost loved ones on that day. In the years after the attacks, it became clear that thousands of first responders and survivors continued to suffer major health consequences from the attacks and their aftermath.

Thousands of lawsuits were filed against contractors and others by these victims. In 2010, Congress enacted the -- the James Zadroga Act, which provided essential health care services to those in need and reopened the Victims Compensation Fund for those families whose losses became apparent after September 11, providing them an alternative to litigation.

In the last five years, the Victims Compensation Fund has provided nearly 6,300 first responders and survivors with $1.4 billion in compensation determinations. Since we enacted the bill, I am aware of no further 9/11 related lawsuits.

Despite its current success, on September 30, 2015, Congress allowed the VCF and the World Trade Center Health Program to expire. Fortunately, there is legislation pending in the House to permanently reauthorize the Victims Compensation Fund and the World Trade Center Health Program. The bill now has the cosponsorship of 247 cosponsors of majority of the House, including more than 50 Republicans, and a filibuster-proof majority in the Senate was 65 cosponsors.

If Congress fails to act, thousands of first responders and survivors will lose access to compensation on which they depend to support their families when they are tragically gone. The VCF is preparing to shutter its operations once is has processed existing claims. If VCF is not fully funded and reauthorized, the first responders and survivors who have already received a notice of their compensation could actually see that amount cut by up to 50 percent.

We are literally talking about taking money out of the hands of a sick police officer. I am deeply saddened to think that is how Congress plans to remember the heroes of 9/11. Attorney General Lynch, do you agree that this is not the proper way to honor the heroes of 9/11? Don't you think that 9/11 survivors and firefighters and police officers who risked their own lives and to save them have suffered health consequences because of it deserve the full support of the American people and a fully funded Victims Compensation Fund?

**LYNCH**: Thank you, Mr. Congressman. This is indeed an important issue. Of course, we will always be deeply indebted to those first responders and brave men and women who risked their lives to search for and recover victims, to remove debris at the site, to carry out the recovery efforts at Ground Zero at 9/11. Certainly, it is an important issue both to me -- both as Attorney General and as someone who was in New York on 9/11 and who had friends and former colleagues who were in that group of those who were on the scene and who were involved in those activities.

This is -- this is in fact a serious issue for those who were affected by it. And I greatly appreciate your expression of compassion for those who have fallen ill. With respect to the bill that is currently pending, certainly on behalf of the Department of Justice, we would do all that we could to work with you to make sure that if there were any questions or issues, they could be addressed and we hope that there would be none.

This is indeed an important issue, and again, I think it is something that is -- that deserves certainly strong review, serious consideration. Please let us know how the department can be of assistance to any of the members as they consider this important issue.

**NADLER**: Well, thank you. As you may know, Chairman Goodlatte and others on the Judiciary Committee have introduced legislation to reopen the VCF. Unfortunately, their bill would open the fund only temporarily and would authorize very limited funding. It was heavily criticized as a result.

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

The Zadroga Bill, however, is a permanent reauthorization and has brought bipartisan support. Again, 247 House cosponsors and 65 Senate cosponsors. The Zadroga Bill, like the Black Lung Program we have for black lung survivors, like the nuclear program we have for people who were irradiated as a result of nuclear tests, is permanent, recognizing the permanent nature of the disabilities.

I hope you will thank the president for signing the original Zadroga Bill into law in 2010 and do everything you can to see that this legislation is permanently reauthorized and fully funded as soon as possible.

LYNCH: Yes. Thank you, sir.

NADLER: Thank you. I have another question on a different topic. Mr. Sensenbrenner referred, and you referred to the statute that says that you can't bring Guantanamo detainees to the United States. I think the chairman, in his opening remarks, commented bleakly that this might be dangerous to do so, et cetera.

My question is the following. If -- forgetting the legality for the moment, if Guantanamo were closed, if detainees were brought to supermax security facilities -- prisons in the United States, in what conceivable way could this threaten anyone's safety? In what conceivable way could housing someone in a supermax federal prison affect the local community, especially when you're talking about 60 or 70 people, not 7,000 people, throughout the country. And has anyone ever escaped from a supermax federal facility?

LYNCH: Well, certainly as a tribute to the strong efforts of the Bureau of Prisons, I do not believe anyone has escaped from supermax.

NADLER: Ever?

LYNCH: As far as I know, they have never escaped from supermax. And certainly, the men and women at the Bureau of Prisons are dedicated professionals and do everything in their power to run that institution in a way that protects the American people but also contains the security issues therein.

LYNCH: With respect to your question, Congressman, it is certainly is difficult to say. Obviously, I have the greatest pride and respect for the brave men and women of the Bureau of Prisons. Indeed, I feel that the men and women of the entire Department of Justice can do anything. So certainly, I think that they are up to any task that is assigned to them. And of course, we look forward to working with Congress to consider these issues, should such a change be made.

NADLER: And so, in other words, some of your testimony is that bringing people to super-max prisons would pose no danger to anyone in communities or in the United States?

LYNCH: Well, Mr. Congressman, I am not in a position to say that any prisoner poses no danger, ever. We certainly have the security regulations over a host of dangerous inmates for very, very significant reasons.

But I am, of course, tremendously proud of the work of the men and women of the Bureau of Prisons.

And of course, this issue is one that is before Congress. I believe it is going up, as has been indicated to the White House. And we would work with Congress with respect to whatever decisions are made in providing information that could best inform its decisions.

NADLER: Thank you. I see my time has expired.

GOODLATTE: Time of the gentleman has expired. The chair recognizes the gentleman from Mr. Texas, Mr. Smith, for his questions.

SMITH: Thank you, Mr. Chairman.

Madam Attorney General, under this administration, the number of sanctuary cities has doubled to about 340, 340 jurisdiction. As a result, many innocent Americans have been killed.

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

What are you doing to discourage jurisdictions from claiming sanctuary status?

LYNCH: I'm sorry. The last part of your question?

SMITH: What -- the number of sanctuary jurisdictions has doubled under this administration. What are you doing to discourage municipalities from asserting sanctuary status?

By not -- by doing so, of course, they are endangering Americans because people are released who commit crimes, including murder, rape, and so forth. But what are you doing to discourage sanctuary cities?

LYNCH: Well, Congressman, with respect to the issues that you raised, certainly they are very serious. We are committed to enforces our criminal and immigration laws here...

SMITH: But there is a law on the books said -- that prohibits sanctuary cities. What are you doing to enforce that law?

LYNCH: I believe the designation of a sanctuary city is something that was in the -- within the purview of...

SMITH: No. It is actually in an act I introduced that because law in 1996.

LYNCH: I'm sorry, sir. I'm having trouble hearing you.

SMITH: OK. There is clearly a law in existence that prohibits jurisdictions from refusing to cooperate with the federal government when it comes to detaining criminal aliens, criminal immigrants.

What are you doing to enforce that law?

LYNCH: Well, where we have a situation where that situation occurs, we certainly would talk with that jurisdiction. We would reach directly in and enforce the criminal laws against the individuals themselves.

SMITH: But you are not doing so. Give me one example where you have enforced the current law that prohibits jurisdictions from claiming sanctuary status?

LYNCH: Well, what I would like to do, sir, is study that issue and provide information to you on that point.

SMITH: I would hope that you would have more knowledge about enforcing immigration laws than that. But I will await your report as to what you have done.

Next question is, a recent I.G. report found that Chairman Chaffetz's Secret Service file was improperly accessed and publicly disclosed by Secret Service managers. This may have violated the Privacy Act, the Computer Abuse Act, and perhaps amount to obstruction of justice.

Have you taken any disciplinary action whatsoever against the Secret Service managers involved with the disclosure of that file?

LYNCH: Congressman, my understanding is that matter is being handled by the inspector general. The Secret Service is part of the Department of Homeland Security. With respect to those specific administrative or disciplinary actions, my understanding is their inspector general...

SMITH: Some of the laws that may have been violated come under your jurisdiction. Are you aware of any investigation by DOJ into that matter or not?

LYNCH: I'm not able to comment at this time. I will certainly provide information to you.

SMITH: OK. And you would certainly let the member involved know of any investigation, would you not?

LYNCH: I'm sorry, sir?

SMITH: You would certainly let the member involved know of any investigation, would you not?

**LYNCH**:  Well, typically we do not comment whether an investigation is open or not.  With respect to whether...

**SMITH**:  I know.  I'm not asking publicly on the details.  I'm asking you if you would alert the member if there was an investigation ongoing?

**LYNCH**:  You're referring to the member of the Secret Service?

**SMITH**:  No, the member of Congress whose files were made public and...

**LYNCH**:  Member of Congress.  Thank you, sir.  We would certainly do everything we could to provide what information we could, consistent with our law enforcement obligations.

**SMITH**:  OK, thank you.

And then, let me ask one more question about the FBI.  And that is, to your knowledge, has the president or any White House staff, or you or any of your staff, attempted to influence the FBI's investigation of former Secretary Clinton?

**LYNCH**:  No, sir.

**SMITH**:  OK.  Do you have any idea when that investigation will be completed?

**LYNCH**:  Well, I'm not able to comment on the status of that matter.  And we typically do not comment.  And also, it's impossible to predict when any matter will be concluded, so I'm not able to give you information on that.

**SMITH**:  Right.  And I'm not asking for a comment on the contents of the investigation, just an idea when it might be finished.  Or have you heard when it might be finished?

**LYNCH**:  Sir, again, I'm not able to comment on the timing of the conclusion of any matter.

**SMITH**:  OK.  Thank you.

Thank you, Mr. Chairman.

**LYNCH**:  Thank you, sir.

**GOODLATTE**:  Chair thanks the gentleman.  Recognizes the gentlewoman from California, Ms. Lofgren, for five minutes.

**LOFGREN**:  Thank you, Mr. Chairman, and thank you, Attorney General.  It's a pleasure to have you here.  And I look forward to working with you not only today, but as -- in the months ahead.

As you likely know, I am on the Immigration Subcommittee and I follow closely what your department is doing in that arena.

Your predecessor, Attorney General Holder, testified in 2013 before the Senate.  And this is a direct quote, "It is inexcusable that young kids, 6, 7-year-olds, 14-year-olds have immigration decisions made on their behalf against them, and they're not represented by counsel."

Now, in July of this year, the American Immigration Council and several other organizations filed a class action lawsuit in district court in the western district of Washington, challenging the validity of removal proceedings for children without appointed counsel.

And their argument was that the -- that an 8-year-old couldn't receive a full and fair hearing in the immigration court without representation.

As you know, I'm sure the administration has made efforts to provide counsel to small children, by funding nonprofit groups.  But the assistant attorney general, who argued, I think a Mr. Leon Fresco, actually argued contrary to that in the district court.

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

And I'm wondering, you know, if the department's position has changed since Mr. Holder left the department. And whether you think it could meet due process to have an 8-year-old, who speaks only Spanish, appear in immigration court without a lawyer, and be able to argue the nuances of immigration law and asylum?

Do you think that meets due process requirements?

LYNCH: Thank you, Congressman. With respect to the argument that was on the issue, of course, I would have to review those pleadings to understand the specific context, and whether or not there was an appropriations issue involved as to whether or not...

LOFGREN: Fair enough. What do you think about the due process issue?

LYNCH: And, again, thank you for that issue. Because it is an important one.

And as you noted, certainly it's the department's position that as a general matter, all who appear before tribunals, whether they be courts, administrative bodies, tend to have a more efficient process and a fairer process if they are represented counsel.

Certainly, we have statutes and laws to that effect with regard to adults, criminal matters and the like.

For those children, also it would certainly seem to increase efficiency of the entire process to have counsel. And as you have noted, I believe through our grant process we have supported nonprofit or NGO organizations that have provided counsel there for those children.

LOFGREN: So you are not willing to say it doesn't meet due process requirements at this point?

LYNCH: Well, what I would like to do is look at the procedures that are in place before a made I made constitutional determination about due process. But I certainly do agree that it is an area of concern, and as a general matter, we support counsel in proceedings for litigants, particularly children.

LOFGREN: Let me ask you this. The Department of Homeland Security Office of Inspector General has done an analysis. We have many people, from Central America in particular, who are seeking asylum. And what he reports, that there is a review called Operation Streamline, that found that the Department of Justice has actually prosecuted asylum seekers for illegal entry before their asylum case is heard.

And it seems to me that -- well, not only does that violate the requirements of international law, but it doesn't seem like an efficient use of resources. If someone gains asylum under the law, then, you know, their prosecution would not be very pertinent.

And I'm wondering, have you reviewed that I.G.'s report yet?

LYNCH: I have not reviewed that specific I.G.'s report.

What I can tell you is that the prosecution and apprehension of individuals at the border is one to which the -- not just the department, but the specific U.S. attorneys in those border states devote significant time and attention. And steps are taken at the initial level to try and ensure that those who are seeking asylum are handled appropriately and that those who are coming in for other intents and purposes are handled through the immigration law system and often the criminal law system.

LOFGREN: Well, what I -- can I ask you whether you would please take a look at that report and make sure that we're actually using our resources in a sensible way relative to asylum seekers?

LYNCH: Certainly. We're always happy to review the way in which we use our resources.

LOFGREN: Finally, I want to mention a situation. We've had a class action complaint that's now moot because the individuals who filed the complaint have been released from detention. They are mothers who were being held at the -- in prison with their children in Karnes. And they had a demonstration. And in response, they were put in solitary confinement with their children. And their argument was that they have free speech rights.

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

Here's my question. Do you think immigrants in detention are entitled to constitutional rights of due process and the First Amendment and the like?

**LYNCH**: Well, I certainly think that when it comes to the conditions in detention centers, we need to do all that we can to ensure that treatment is fair, humane, and cognizant of the individual rights of all of those who come through those systems. I think that we have recognized certain rights for those within our borders, certain rights for citizens, and in varying degrees with respect to the Constitution.

But barring that, or even taking it into consideration, certainly I believe that all of our detention centers should be run efficiently, fairly and humanely.

**LOFGREN**: I see that my time has expired, Mr. Chairman. Thank you for allowing me to go a little bit over.

**GOODLATTE**: The chair recognizes the gentleman from California, Mr. Issa, for five minutes.

**ISSA**: Thank you, Mr. Chairman.

General Lynch, as you may recall, a woman working for the IRS named Lois Lerner was held in contempt by the Oversight and Government Reform Committee and the full House, and referred to the Department of Justice under your predecessor. Do you recall that?

**LYNCH**: Certainly, I'm aware of the reports of that. Thank you, sir.

**ISSA**: Speaking of those reports, the committee reviewed more than a million documents; did approximately 50 interviews, and produced a report. Are you familiar -- have you read that report?

**LYNCH**: I have not had occasion to read the committee's report, sir.

**ISSA**: Well, the Senate Finance Committee released a bipartisan report in August of this year finding that the IRS abused conservative applicants for nonprofit status. I repeat, abused applicants. Did you read that report?

**LYNCH**: I have not had occasion to read that report, Congressman.

**ISSA**: Well, the gentleman sitting behind you signed on your behalf about an eight-page report explaining to us why nothing went wrong legally at the IRS. Are you familiar with that letter to Congress?

**LYNCH**: Yes, I am familiar with the letter that the department has provided to Congress on this matter, sir.

**ISSA**: And in that case, you didn't just indicate that in fact no laws were broken, you indicated that it was just mismanagement and that you found no laws broken. Isn't that correct?

**LYNCH**: Actually, Congressman, I believe that our review found that the management of the process by which tax exempt applications were handled at the IRS was characterized by mismanagement and inefficiency in numerous circumstances.

**ISSA**: Right. So you -- you found that there was an administrative problem, not a legal problem.

Madam General, are you familiar with 2 USC 194?

**LYNCH**: I'm sorry, sir?

**ISSA**: 2 USC 194, and I'll refresh your memory. It states, a statute covering congressional contempt, states that it shall be the duty of the relevant U.S. attorney to bring the matter before the grand jury. In the case of the referral of Lois Lerner, for contempt, the U.S. attorney failed to comply with that law under your predecessor.

Are you willing to comply with that law? Are you willing to have the current U.S. attorney comply with 2 USC 194, which very clearly says "shall have the duty," not "may," not could make an independent decision about whether or not that individual has done wrong or should be held in contempt.

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

Will you comply with 2 USC 194 and instruct your U.S. attorney to bring that contempt before Congress...

**LYNCH**: Congressman...

**ISSA**: ... before the grand jury.

**LYNCH**: The grand jury.

Congressman, I believe that matter has been reviewed by the U.S. attorney at the time and a prosecutorial decision was made...

(CROSSTALK)

**ISSA**: OK, again, 2 USC 194 states that it shall be the duty of the relevant U.S. attorney to bring before the grand jury. The U.S. attorney did not do so. Is it your opinion that "shall do" in a law passed by both houses of the Congress and signed by the president is a discretion?

**LYNCH**: Congressman, I believe that the matter was reviewed by the former U.S. attorney...

(CROSSTALK)

**ISSA**: No, ma'am. I'm asking you for a decision. When something says that you or your employee shall do something, do you believe that that's discretion?

**LYNCH**: Sir, as I indicated, I believe that in the exercise of prosecutorial discretion, the matter was handled and resolved.

**ISSA**: OK. Well, then, we simply disagree on what the meaning of "shall" is. And I guess for your purposes, "shall" and "may" in the thesaurus are synonyms. Is that correct -- that "shall" and "may" are equally able to be decided by your choice?

I'm not trying to be argumentative, but you're telling me "shall" is something that has discretion. What part of discretion is in "shall do"? "Shall" is "you will do," isn't it?

**LYNCH**: Congressman, in the exercise of prosecutorial discretion, that decision was made.

**ISSA**: OK. So, you have no respect for laws passed. If you don't like them, you think you have discretion when something says "shall" is what you're testifying to today.

My question to you is, during your predecessor, the Committee on Oversight and others asked for a woman working for you, Ms. Bosserman. And wanted to do a transcribed interview. At that time, the Department of Justice said she would not be made available because there was an ongoing investigation.

Since you have now dismissed that investigation, are you prepared to make her available to committees for a transcribed interview?

**LYNCH**: Congressman, it's the practice of the department not to provide line attorneys for congressional testimony. We seek to provide the information that will help you in your oversight duties...

**ISSA**: Mr. Conyers is still sitting here at the dais. Mr. Conyers very bravely took on the Bush administration, where relevant U.S. attorneys and case law effectively now is, that in fact if a committee of Congress wants somebody, it is not a discretion to say no. In the case of Harriet Miers, that was pretty well adjudicated. And Mr. Conyers as chair made it very clear that Congress has a right to have someone.

Again, I'll ask you finally. Previously, the reason was not that you would not make a line attorney available, but Ms. Bosserman was part of an ongoing investigation. Since that investigation is done, are you saying today that you refuse to have her available under any conditions?

**LYNCH**: I'm saying that we -- I'm being consistent to the policy of the Department of Justice that...

AR-00133

(CROSSTALK)

**ISSA**: I'm not asking a policy question. I'm asking about one individual, when there is no ongoing investigation. They would like to talk about a past investigation. If she is requested, will you make her available?

**LYNCH**: Congressman, as I've indicated, we provide information to the committee and we seek to do so through a number of means. As indicated, we've provided a letter and we are certainly happy to continue with our offer of a briefing to the full committee on this matter.

With respect to line attorneys of any investigation, it is not the policy of the Department of Justice to have the line attorneys testify because they do their work independently and focusing solely on the facts and the law. And we do not want them having to deal with the issue of a political review of their work. They are focused solely on the facts and the law, and they follow the evidence where it leads.

As I've indicated, with respect to the letter, and as I believe the previous deputy attorney general indicated, in this matter we're happy to provide information to this committee. And I believe we have offered a briefing to members of the committee on the matter as well. And we do certainly stand by the offer.

**ISSA**: Mr. Chairman, I appreciate the indulgence for her answer as insufficient as it was.

**GOODLATTE**: The chair thanks the gentleman, and recognizes the gentlewoman from Texas, Ms. Jackson Lee, for five minutes.

**JACKSON LEE**: Mr. Chairman and Ranking Member, thank you so very much.

General Lynch, thank you so very much for your service. And might I as well thank your staff who have always been responsive to me in particular, and to the members of this committee as we've tried to work toward justice for the people of the United States.

A moment, I just want to as I begin my questioning, say to you I apologize. There are going to be pointed questions that if I can get yes or no, or we'll work on it, it would be helpful so that I can get through them.

As I do so, let me offer to the people of France again our deepest sympathy. This committee in particular is well aware of the impact of terrorism. Our Subcommittee on Crime is a subcommittee -- that is Crime, Terrorism, Homeland Security and Investigations. And so I offer to the people of France, and certainly we stand united with them as the Justice Department through the president of the United States have been already working.

**JACKSON LEE**: To that point, I have a headline that says U.S. Justice Department Working with French Authorities After Attacks, which is a good thing. And I say that because there's has been a massive race by various states to make pronouncements of blocking Syrian refugees, people seeking asylum. And I understand the fear. I hope that we do not operate under fear.

But my question is is your confidence in procedures? And I would suggest that there be an interagency task force, as I hope that we will have a task force either out of this committee, Judiciary Committee, on Paris or either -- I know that there's one recommended by the majority that we will have one that is bipartisan on this issue to be helpful to the administration.

Do you feel confident in our processes as a partner to this process of being able to discern who amongst those suffering people would be a bad guy? I understand we're doing 10,000; I think that's the number the president has offered. Do you perceive your processes to be assured and sure?

**LYNCH**: Thank you, Congressman. And I do look forward to continuing this dialogue with you on this important point.

We do have robust screening measures in place. They include not just databases, but also individual interviews, biometric data. We gather all relevant information about refugees from all countries because our first goal is the protection and safety of the American people as well as carrying out the compassionate nature also of the American people.

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

**JACKSON LEE**: And you feel comfortable if a terminology was used that you could certify that you could be confident on those that you processed, that you would use every measure to certify their non- intent to do harm in this country?

**LYNCH**: Certainly, we would -- we would use every measure, as we always do, to ensure those who were allowed into the country would not pose a threat to the American citizens.

**JACKSON LEE**: I look forward to working with you. Let me move on to law enforcement and emphasize that obviously they become more important in these times, and we thank them for their service.

But we also know -- and I think your testimony earlier said that we are better when they are better. What is your thought -- we introduced the Law Enforcement Trust and Integrity Act which includes a provision on data collection, but it also includes provisions on accreditation that the National Association of Police Chiefs have always supported.

What is your -- what do you think the importance of having departments subject themselves to accreditation, determining best practices and helping them as well as the American public?

**LYNCH**: Congresswoman, in my discussions with law enforcement across the country, I have found them eager for assistance in sharing best practices. I have also found them eager for recognition of their professionalism, and accreditation is one way to do that.

I think there are a number of ways to do that. Certainly, we in the department are working with a number of the police organizations to try and develop consistent and national standards on data collection, and we rely on their expertise for guiding those standards. And we would look to start with that same process with regard to any move towards accreditation also.

I have found that law enforcement, frankly, is focused on professionalism and focused on spreading those best practices as best they can.

**JACKSON LEE**: Let me do this so that my chairman will not gavel me. Let me quickly raise three points. Sentencing reform and the value of reducing mass incarceration; legislation that will reduce the treatment of juveniles and put it in a positive light. I'd like you just to make overall comment on that. And then the idea of no-fly for foreign terrorists, meaning those who have gone to the fight being particularly discerned before coming back into the United States. If I -- if I could get that.

And let me close on these three points if I could please, which are very important. I know that I'm leaving out some important points that I wanted to make. The voting rights, you already had a question on that. But isn't it more efficient on a pre-clearance approach such that it might be more helpful for us to reinstate that pre-clearance because it will be more efficient? And I'm going to give you these three cases, if I could meet with your staff on them are really a blatant miscarriage of justice.

Sandra Bland case, we have not had a response from the Justice Department. The case of Robby Tolan that went all the way up to the Supreme Court and indicated he had been mistreated. He lived and was shot by an officer on his driveway. And then a nonviolent person that is in the state prison of Texas with a life sentence for a nonviolent drug offense, first offense. It's almost unbelievable.

So I would like you to just answer the questions that I just gave you. And these ones about the cases I would like to meet as soon as possible with your staff on these issues.

**LYNCH**: I look forward to having -- to continuing to work with you on those important issues. Certainly with respect to voting rights, the preclearance remedy was one that we found to be not just effective but efficient, and we felt that it was a way in which to engage with jurisdictions as they contemplated changes to their laws and prevent them from going down on a road that would have disenfranchised their citizens.

Certainly, we felt that it was efficient and much less costly than litigation. It is an important part of the Voting Rights Act, and we certainly support the efforts to restore the preclearance remedy to the Voting Rights Act.

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

**JACKSON LEE**: And you -- I said juvenile justice, clemency, and -- I'm sorry, juvenile justice. I had asked you to do juvenile justice, prison reform and the sentencing reform, reducing mass incarceration, the value of that.

**LYNCH**: Certainly. With respect to...

**GOODLATTE**: The time of the gentlewoman has expired but the witness can answer the question.

**JACKSON LEE**: I thank the chairman for his indulgence.

**LYNCH**: Thank you, Mr. Chairman. With respect to sentencing reform, we feel it is a vital measure that recognizes that while we put measures in place several years ago designed to protect the American people, as we look back on those measures, we see the collateral consequences that it did not just to citizens but to communities. And we also are able to evaluate with the passage of time whether or not those lengthy sentences were the most effective way to deal with the offenders that they tended to sweep up.

So certainly as part of an overall review of our criminal justice system to make sure it is always as efficient and fair as possible, sentencing reform has an important role to play in that and the department is supportive of not just this committee's efforts, but Congress' efforts in that regard.

**JACKSON LEE**: And we will look forward to meeting with your staff, hopefully this week, about these cases that I mentioned, including Sharonda Jones. Thank you.

**LYNCH**: Thank you, Congresswoman.

**JACKSON LEE**: Thank you.

**GOODLATTE**: The chair recognizes the gentleman from Virginia, Mr. Forbes, for five minutes.

**FORBES**: Mr. Chairman, thank you. Madame Attorney General, thank you for being here today.

And I know you know well that the mission -- one of the parts of the mission of the U.S. Department of Justice is to ensure public safety against threats foreign and domestic. And I have a couple of news articles, and I know that we don't treat them for the truth of what's always in them but we have to pay attention to them.

One of them was Fox News that talked about ISIS having certain terror cells in 15 states and targeting those states. And then one where we're told by CBS that their -- CBS News national security correspondent was reporting that the Pentagon was notifying various soldiers who had appeared on lists and neighborhoods and cities that had been targeted by ISIS throughout Virginia. And we're actually trying to get the police to increase patrols in these particular neighborhoods of these cities.

And my question to you is would you not conclude that it would be reasonable to conclude that if terrorists were brought from Guantanamo Bay to a particular city in the United States that it would be reasonable to conclude that that could increase the likelihood that one of those cities could be placed on one of these lists be it from ISIS leadership or some domestic ISIS copycat in the United States?

**LYNCH**: Well, Congressman, I'm not -- certainly not able to speculate as to what a detainee may or may not do if they were in the U.S....

**FORBES**: Let me -- let me correct that, Madam Attorney General, because you apparently didn't understand my question. I'm not talking about what the detainee would do, I'm talking about if you brought terrorists from Guantanamo Bay and located them in a particular city in the United States, would it not be reasonable to conclude that that might enhance the likelihood that that city could be placed on one of these targeted lists?

**LYNCH**: With respect to the lists that you refer to, I'm not aware of the source of the...

**FORBES**: I'm not asking that. I'm saying you know that there are lists that are around. Do you not -- are you disputing that you have no knowledge there are even any of these allegations of lists around the country today?

AR-00136

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

**LYNCH**:  Well, Congressman, with respect to the matters that you have mentioned regarding the Fox News report, as I indicated, I'm not aware of the...

**FORBES**:  So you're not aware that there are any lists in the United States today that target particular cities or states by ISIS or someone claiming to be representative of ISIS?

**LYNCH**:  As I indicated, with respect to the first article that you mentioned...

**FORBES**:  No, no.  Any of them.  I'm talking about any of the lists, Madam Attorney General.  You're not aware of any of these lists?

**LYNCH**:  Congressman, with respect to the lists that you mentioned, I thought that you mentioned two.  And perhaps I'm just not...

**FORBES**:  I'm saying any of these lists...

**LYNCH**:  ... understanding the question.

**FORBES**:  My question for you is, wouldn't it be reasonable to conclude if you brought terrorists from Guantanamo Bay and located them in the city that it could very well enhance that city's being on one of these targeted lists?  Yes or no?

That's a pretty easy question.  If you disagree with that, you can say now.  If you agree with it, yes.

**LYNCH**:  Well, congressman, I thought you were referring to the service members who were on the...

**FORBES**:  I'm making it clear:  any list that targets a city or state in the United States.  If you bring terrorists from Guantanamo Bay wouldn't it be reasonable to conclude that that can enhance that city's ability to be on one of those targeted lists?

**LYNCH**:  I think there are any number of factors...

**FORBES**:  Would you not agree that that would be a factor that would enhance that ability?

**LYNCH**:  I think there are any number of factors...

**FORBES**:  Would that be a factor?

**LYNCH**:  There are any number of factors...

**FORBES**:  But you would disagree that that would be one of those many number of factors?

**LYNCH**:  Congressman, I don't agree or disagree.  I said that there would be any...

**FORBES**:  So you as the attorney general of the United States, you do not have an opinion whether or not bringing terrorists from Guantanamo Bay and locating them in a city would have any capability at all of putting that city on a hit list for ISIS?  You don't have an opinion on that?

**LYNCH**:  Congressman, I think there are any number of factors...

**FORBES**:  I'm asking you would that be one of those factors.

**LYNCH**:  I believe I've indicated there'd be any number of factors...

**FORBES**:  No.  You've indicated that you wouldn't answer the question.  And, Madam Attorney General, I think that's atrocious that you don't even have an opinion of that.

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

Let me ask you this then in the limited time that I have, if you'll answer this question. You talk about data. We have certain of these events in Ferguson and Baltimore that you'll have an event and that will escalate into violence. And you talked about the police.

Have you attempted to gather any information about outside organizations that may come from outside the community that may come into those communities and also escalate that violence?

LYNCH: We do gather information on individuals as well as organizations...

(CROSSTALK)

FORBES: Do you have a report that you can provide to this committee of your investigation and what that has included with a list of those organizations?

LYNCH: Congressman, we do not generate a report. What I was indicating was that in our review if a matter is referred to us, particularly if there was a violent issue...

FORBES: I'm not talking about whether it was a crime...

(CROSSTALK)

LYNCH: (Inaudible).

FORBES: Do you have any information as to whether or not -- you talked about police escalating the violence. Do you have any information you can supply this committee that these outside groups may be coming in and also escalating that violence?

LYNCH: Congressman, the reports that we do would not focus solely on one factor...

FORBES: So you haven't focused at all on outside groups that could come in and escalate the violence?

LYNCH: Sir, if the matter is brought to our attention, it would come under our review.

FORBES: But you haven't done any?

LYNCH: We don't have a report for you on that, sir.

FORBES: But have you done any investigation?

LYNCH: Sir, if a matter's come to our attention, it would come under our review.

FORBES: Well, Mr. Chairman, with that I yield back without getting a single answer to a single question we've posed.

GOODLATTE: The chair recognizes the gentleman from Tennessee, Mr. Cohen, for five minutes.

COHEN: Thank you, Mr. Chair. And I'm going to be like Ms. Lee and ask you a lot of questions because there's a lot on my mind.

LYNCH: I'm sorry, sir, I can't...

COHEN: I said I'm going to ask you a lot of questions because there's a lot on my mind and we have limited time.

In July a young man named Darrius Stewart was shot and killed by Memphis police. He was a passenger in a motor vehicle stopped for a traffic citation. Yet he was asked to get out of the car. They looked at him. They put him in the car. A tussle occurred. He was shot and killed.

The D.A. asked the grand jury to indict voluntary manslaughter. The grand jury chose not to. How that was presented, who knows? Obviously not as well as a ham sandwich could've been presented.

I've asked the Department of Justice to look into it. Your first response is you'd monitor the case.

Now that the case has gone through the grand jury process and not gotten the result that the D.A. wanted, I would like to ask, as I've asked in writing before, for the Department of Justice to look into this case and see if civil rights violations may have occurred.

**LYNCH**: I would like to have my staff reach out to you and get that information, sir.

**COHEN**: Are you familiar with the case?

**LYNCH**: I'm not currently familiar with the case, although we have a number of similar matters under review.

**COHEN**: Well, I hope you'll become familiar because this is a situation many people in the city of Memphis, including myself, feel was a miscarriage of justice equal to any of those others in the United States. And for some reason it hasn't risen to the radar of the United States Attorney General. And I hope it will.

The DEA took a 2015 National Drug Assessment Summary. And at that particular summary or study, most agents said marijuana was like at 5 percent in total risk to the society, and meth and heroin were the most serious drugs challenging them and the American people.

Do you agree that we should spend more time, our law enforcement, working against meth, heroin and opiods, and not marijuana?

**LYNCH**: Congressman, I think that with respect to our narcotics laws what we try and do with both throughout the entire Department of Justice and at the DEA is focus on the specific problem in a specific region and devote resources to that.

We currently have a crisis regarding heroin use and opioid abuse in the country. And some communities have been consumed by that particular problem. There are unfortunately some communities that still have problems with methamphetamine.

So there might be a different focus on the different type of...

**COHEN**: Right. But marijuana's not a place for...

**LYNCH**: ... issue.

**COHEN**: Marijuana's not where cities have people needing marijuana and knocking off 7-Elevens to get some money to buy their marijuana. They're doing that for meth and heroin. Is that not right?

**LYNCH**: Certainly we've seen violence associated with meth, with heroin, with prescription drugs as well. They type of violence associated with the marijuana trade typically occurs at the dealer level, at the import level. And I certainly have seen cases where there's been significant violence at that level.

**COHEN**: There is. And the reason there's that violence because just like prohibition we made it illegal. It's not because of the marijuana and the need to have it on the street level basis where people need to commit violence to get money to buy a drug.

It's because we did the same mistake with marijuana that we did in the 1920s with alcohol. The public demanded it. The racketeers -- the criminals got involved. We made them rich. And they used guns to protect their properties. That was a mistake.

Do you agree marijuana should not be Schedule I in the same category as LSD and heroin?

**LYNCH**: Well, with respect to the issue of scheduling, that is typically determined based on whether or not there is another use for the product. And I think that there would have to be studies by the FDA, among others, to determine whether or not a scheduling change in any drug is necessary.

AR-00139

**COHEN**:  But don't you agree that you have to change the scheduling from I to get the studies?  I mean there are lots of young people like one of my constituents, Chloe Grauer, who died waiting for the opportunity to get Charlotte's Web.

Lots of people who'd like to get cannabinoids.  You could talk to Montel Williams and what it does for multiple sclerosis, or any number of cancer patients who it helps with nausea or allows them to eat and have an appetite.

Don't you agree, unlike Chuck Rosenberg, that medical marijuana's nothing serious and should be looked at as an aid to people in our society to get through difficult problems, and not considered a joke?

**LYNCH**:  Well, certainly the issue of medical marijuana is significantly different from the criminal enforcement or use of marijuana.  And certainly the department supports the FDA studies in the use of cannabidiols or the substance within marijuana that...

(CROSSTALK)

**COHEN**:  We're about to run out of time.  I hate to cut you off. I would hope you would look into initiating what you can, taking it off the Schedule I.  It's crazy to have it with LSD and heroin.  It should not be there and it should be studied.

RFRA has been used to allow groups to discriminate against LGBT people.  It has been based on a 2007 DOJ Office of Legal Counsel opinion that said it could be used to grant exemptions to federal discrimination laws governing federal programs.

Will you commit today to instruct the Office of Legal Counsel to review and reconsider the 2007 OLC legal opinion that's being used today to justify taxpayer-funded discrimination counter to the president's executive order?

**LYNCH**:  I would like to look into that issue.  If I could have my staff reach out to you and get more information on that, I would appreciate that.

**COHEN**:  On that same issue, holdovers from the Bush team -- there was a holdover from Bush and the Commutation Office (ph) for six years.  That's why the president got hardly any recommendations for commutations.

Can I have a commitment from you to give more resources to people to study prison records and to facilitate the expeditious -- sending expeditiously recommendations to president for commutations of the thousands of people whose sentences should be commuted who are serving time for long-term drug offenses, nonviolent drug offenses that aren't serving the American people by having them be in federal prison?

**LYNCH**:  Congressman, over the last 18 months the department has in fact taken a significant look at the staffing and resource needs of the Office of the Pardon Attorney and sought to provide additional resources so that every application that comes through, whether it be for a pardon or clemency, can be considered quickly and efficiently.

**COHEN**:  But it hasn't done that.

And let me remind you what Dr. King said.  "Justice denied -- justice delayed is justice denied."  Every single one of those people serving a day in prison who will eventually get a recommendation is having their justice delayed and denied.

**GOODLATTE**:  And on that note, the gentleman's time is expired. And we will recognize the gentleman from Ohio, Mr. Jordan.

**JORDAN**:  Thank you, Mr. Chairman.

Attorney General Lynch, on February 2, 2014, Kate Duval, chief counsel to IRS Commissioner John Koskinen, learned that Ms. Lois Lerner's hard drive had crashed and they didn't have all her e-mails. Mr. Koskinen and the IRS waited until June of that year, June of 2014 to tell Congress.

AR-00140

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

**JORDAN**: In that four-month time period between when they learned that her hard drive had crashed and they didn't have all her e-mails, and June when they told us, in that four-month time period, Mr. Koskinen testified twice in front of Congress and did not disclose the fact that they knew her hard drive had crashed.

One month later after they learned her hard drive had crashed, in March of 2014 -- March 4th of 2014 -- the IRS destroys 422 backup tapes. So, just so you understand the fact pattern, they know on February 2nd, Lois Lerner's hard drive has crashed, they don't have all her e-mails, 30 days later they destroy 422 backup tapes. And they destroy those 422 backup tapes with three preservation orders in place.

In fact, one of those preservation orders came from the Justice Department. Ten months before that, you had told them, hey, preserve all the documents, preserve all the e-mails, we've got an investigation going on. There were two other preservation orders, as well. So three preservation orders and two subpoenas.

Now, that sure looks like, John Koskinen and the Internal Revenue Service concealed information and destroyed information. But just last month, you guys send us a letter telling us you're not going to prosecute anyone in the IRS targeting scandal. And you specifically say in that letter, our investigation revealed no evidence to deliberately conceal or destroy information.

But here's what I can't figure out. They learn on February 2nd, 2014 that Lois Lerner's hard drive had crashed and they don't have all her e-mails, 30 days later with three preservation orders and two subpoenas in place, they destroy the backup tapes. So, if that's not evidence of deliberating concealing and destroying information, what is it?

**LYNCH**: Thank you, Congressman. With respect to the matter that you've raised, as we set forth in our letter, we did review the issues surrounding the -- Ms. Lerner's e-mails and the backup tapes.

As with every criminal investigation, we are looking for evidence of criminal intent and we are looking for evidence of the specific reasons for why the actions that you note...

**JORDAN**: How many times do you have direct evidence of intent in any type of other fraud investigation? I mean, you weren't gonna get something -- what were you looking for an e-mail where John Koskinen sends an e-mail to the guys in the tape room and he says, destroy the tapes? You had a -- three preservation orders, one of them came from the Justice Department. They knew there were problems with the hardrive and that they didn't have all her e-mails. And 30 days after that, they destroy 422 backup tapes. That's not enough to take it to a grand jury?

**LYNCH**: Certainly, congressman it certainly was a matter that was under review. And as we've outlined in our letter, the findings of that review.

**JORDAN**: If it wasn't deliberate intent to destroy and conceal, what was it?

**LYNCH**: Congressman, as we've outlined in our letter the findings that we had, based on those actions...

**JORDAN**: Here's what you said in your letter. Justice Department's investigation uncovered substantial evidence of mismanagement and poor judgment.

What I just described, was that evidence of mismanagement by John Koskinen?

**LYNCH**: Congressman, I'm not gonna attribute it to just one individual because I believe that, certainly there would be others that would have been...

**JORDAN**: Was it evidence of poor judgment when Mr. Koskinen's chief counsel knew that Lerner's hard drive crashed. He comes and testifies in front of Congress and doesn't tell us that, and waits four months to tell us? Was that evidence of poor judgment?

**LYNCH**: I can't speak to what was in his mind when he testified before you. What I can speak to is the information that we provided to this committee outlining the steps that were taken in the Department of Justice investigation...

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

**JORDAN**: What was it gonna take?

**LYNCH**: ... And the conclusions that were drawn. And as we've indicated...

**JORDAN**: Here's what the American people want to know, Attorney General. What was it going to take before you would take this to a grand jury?

Would Mr. Koskinen, would he have had to wait five months before he told us, six months before he told us, eight months before he told us? Would they have had to destroy 423 backup tapes, 450 backup tapes? Would they have to destroy every single backup -- would they have to destroy more evidence?

What was it going to take before you were going to take this to a grand jury, with three preservation orders in place, two subpoenas in place -- they have knowledge that there's problems with their hard drive, that they don't have all her e-mails. And they destroy the backup tapes. I -- I mean, if that fact pattern doesn't warrant going to a grand jury and prosecuting, tell me what would.

**LYNCH**: Certainly, Congressman, that fact pattern was a part of the investigation, as were a number of other facts in there. And as we outlined in our letter, we outline not only the investigative steps that were taken, but the conclusions that we drew from it.

**JORDAN**: So who were you referring to when you say substantial evidence of mismanagement and poor judgment? Who? Seems to me the guy at the top is the guy responsible.

So are you saying Mr. Koskinen had substantial evidence of mismanagement when had informed Congress and when he destroyed 422 backup tapes? Is that -- is that substantial evidence of mismanagement on the part of John Koskinen?

**LYNCH**: I'm not gonna attribute it to a specific individual.

**JORDAN**: Who would you attribute it to? Someone's got to be responsible, because -- let me ask you one last question, if I could Mr. Chairman.

If a -- so, you sent a preservation order to the IRS in May of 2013. March of 2014, they destroy 422 backup tapes. Now if -- if a private citizen gets an audit notice from the IRS, and then 10 months later they destroy the evidence, are they gonna be prosecuted?

**LYNCH**: It would depend upon the evidence of intent and why they...

**JORDAN**: Really? I bet the average American says, of course they're gonna be prosecuted and yet, you guys with that fact pattern wouldn't take it to a grand jury.

Who mismanaged what? That's the question I want answered. Who is responsible? Someone has to be...

**LYNCH**: If (sic) we've outlined in our letter ...

**JORDAN**: No, you haven't. You said "Some." I want to know if it's Mr. Koskinen, the guy at the top, the guy who runs the IRS. The guy who was presiding over the IRS when we destroyed the 422 backup tapes.

Is he responsible?

**LYNCH**: As we've indicated in our letter, there was substantial mismanagements. As we've outlined previous, and when we indicated we would provide this information to the committee. We're also happy to provide a briefing to the committee on other questions you may have about this matter.

**GOODLATTE**: The gentleman's time has expired. The chair would now recognize the gentleman from Georgia, Mr. Johnson.

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

**JOHNSON**:  Thank you, Mr. Chairman.  General Lynch, I want to commend you and the Department of Justice on the fact that 70 individuals have been charged since 2013 for conduct related to foreign fighter activity and home-grown violent extremism.

General Lynch, this committee has previously heard how ISIL and other terrorist organizations feel potential recruits in publicly accessible social networking sites via encrypted messaging platforms, and also over voice over Internet apps.  Are these encrypted private messaging platforms and also voice over Internet apps hampering the ability of the department to quickly ascertain and address threats to national security?  And if so, in what ways?

**LYNCH**:  Well Congressman, thank you for the question.  Certainly when individuals choose to move from open means of communication to those that are encrypted, it can cause a disruption in our ability to use lawful legal process to intercept those communications and does give us concern about being able to gather the evidence that we need to continue in our ongoing mission for the protection of the American people.

**JOHNSON**:  How so?

**LYNCH**:  Well, with respect to individuals in this country, what we -- what we have seen is communications -- this is in regard to specific cases -- we've seen communications between them and individuals urging them to commit acts of violence, acts of terrorism.  And then those individuals dropping from one type of communication to an encrypted method of communication.  And we -- we no longer have visibility into those discussions.  And so...

**JOHNSON**:  Well when you say no longer have visibility into those discussions, can you break that down and explain exactly what you mean?

**LYNCH**:  Certainly.  Typically we would, with a lawful court order, go to a communications provider and, focusing specifically on individuals against whom we had probable cause to believe were involved in criminal activity, including terrorist activity, obtain the authorization to review their communications in the past as well as on an ongoing bases.

When individuals move to an encrypted platform, one that is not accessible by the provider themselves, then we have a situation where we're not able to have our court orders handled in the typical way.  That is to say, we're not able to receive that information and ascertain what these individuals are planning, and also, just as importantly, with whom they're planning these actions.  And so we rely on other methods and means.  But that is a loss of an important means, an important law enforcement tool.

**JOHNSON**:  Is there any way that the department can overcome the use of encrypted data and voice communications by terrorists who are trying to recruit within the borders of the United States, or a terrorist plot taking place between persons inside the United States?

Take, for example, the terrorist incident in Paris this past weekend, where I heard one expert say that he would be shocked if the terrorists were not using encrypted communications, perhaps even during the terrorist events.

How can the department thwart that kind of activity taking place here on United States soil, given the fact that we have these encrypted communications?

**LYNCH**:  Well, certainly it makes it very challenging.

Our approach has been to work with the electronic companies, the Internet providers, on a case by case basis, and help them find a way, or work with them to find a way to allow them to respond to the valid legal process.

And certainly we're having conversations with the industry as a whole to make sure that they can in fact comply with legal process and provide us the information that we need.

We rely on other means of surveillance, other means of gathering intelligence about those individuals and their associates.  But it does cause us the loss of a very valuable source of information.

**JOHNSON**:  Okay.  With that I will yield back, and thank you for your testimony.

AR-00143

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

**LYNCH**:  Thank you.

**GOODLATTE**:  The gentleman from Georgia yields back.  The chair will now recognize the gentleman from Texas.  Mr. Gohmert?

**GOHMERT**:  Thank you, Mr. Chair, and thank you, Attorney General. I appreciate your being here.

Obviously, people are rather sensitive to potential terrorism, especially since ISIS is known for keeping their word when they make threats, at least as often as they can.

And we had a witness some time back, the FBI director at that time -- Director Mueller.  And I was asking him about investigations at the mosque in Boston where the Tsarnaevs attended.  And he -- he indicated that the FBI had an outreach program with that mosque where they would commune together.

But they never actually investigated at the mosque whether or not the -- the Tsarnaevs had been radicalized, even after Russia gave the FBI a heads-up that the older Tsarnaev had been radicalized.  They never asked any questions of the people there.

And it's -- I know I've been through materials with FBI agents that had been cleaned out from the teaching materials at the Justice Department, and, for some ridiculous reason, they were classified, so we had to do it in a closed setting.

But it appears to me that FBI agents, justice officials, are not even being allowed to be taught what it is that radical Islamists believe, not even perhaps that -- Osama bin Laden indicated that the Egyptian martyr Muslim Brotherhood member Qutb wrote milestones that -- that actually helped radicalize him.

Nobody knew enough to go to the mosque and ask, "Has Tsarnaev been reading Qutb?  Have you seen him talking about or heard him talking about milestone?"  It seems like we blinded, as one intelligence official told me, we blinded ourselves of the ability to see our enemy.

So I was also surprised, since Director Mueller was FBI director after Alamoudi was arrested based on, as understand it, information that Britain gave us.  But he's doing 23 years for supporting terrorism.  He didn't know Alamoudi as the one -- was at the bottom of starting that mosque.

We -- we know that apparently Alamoudi helped, in both the Clinton and Bush White House, find Muslims that Alamoudi said can be trusted to work in those White Houses.

And I'm just wondering, since we now know that Alamoudi supported terrorism, we know that at least Tsarnaevs, perhaps others, who've been radicalized worshipped at that mosque.  Has the outreach program been terminated with the Alamoudi-begun mosque in Boston?

And has there been any investigation into people that Alamoudi placed in the Clinton and Bush White House, now that we know he supported terrorism?  He's doing 23 years.  Do you know of any such investigations?

**LYNCH**:  Mr. Congressman, I don't have the information that you're requesting.  But certainly what I can say is that you have touched upon the issue that all of us in law enforcement deal with as we work not only to protect the American people but to counter violent extremism that does pull in young people like the...

**GOHMERT**:  Well -- and I appreciate your calling it violent extremism.  Did you have a degree in Islamic studies?

**LYNCH**:  I'm sorry, sir?

**GOHMERT**:  I really don't know.  Do you have any degrees in -- in the Islamic studies?

**LYNCH**:  No, sir.

**GOHMERT**:  Well, there's a guy named Al Baghdadi who happens to be head of ISIS, who has a bachelor's, a master's, and a Ph.D. in Islamic studies from the University of Baghdad.  He perhaps is a better expert than you and I.  And he says ISIS is Islamic.  And so I think we should take the word of an expert.

It certainly doesn't represent the views of all Muslims, thank God, but I would encourage you to take another look at the Justice Department training materials, take another look at your outreach program, and look back and investigate who Alamoudi placed in those White Houses to see if they're still around.

The FBI completely dropped the ball on Tsarnaev, and it concerns Americans they may be dropping the ball on the Syrians as we speak.

I -- my time's expired.  I yield back.

**GOODLATTE**:  Gentleman yields back.  Chair will now recognize my friend from Puerto Rico.  Mr. Pierluisi?

**PIERLUISI**:  Thank you, Mr. Chairman.

Welcome, General Lynch.  I would like to address DOJ's mission to prevent and prosecute violent crime.  And naturally, as Puerto Rico's only representative in Congress, I want to concentrate on the U.S. territory.

This is the same topic I raised with General Holder each time he appeared before this committee.  Broadly speaking, when it comes to violent crime, the narrative in Puerto Rico has been positive lately.

In 2011, there were 1,136 murders in Puerto Rico -- over three a day, the highest in our history.  Most of these homicides were related to the drug trade.

So I pushed DHS and DOJ extremely hard to dedicate more personnel and resources to Puerto Rico.  DHS, including the Coast Guard, ICVP, responded to the pressure.  DOJ responded, too, but to a lesser extent than DHS.

These enhanced federal efforts have borne -- borne fruit.  The number of homicides in Puerto Rico has decreased significantly every year.  In 2015 to date, there have been 508 murders.  If the current trends continues, there will be half as many homicides in Puerto Rico this year versus four years ago.

That is a remarkable statistic.  We should be proud of it.  But we're fighting a determined enemy, and the gains we have achieved can be easily reversed unless our efforts are sustained and strengthened.

And the fact is, despite recent improvements, Puerto Rico still has a homicide rate far higher than any state.  Yet my staff and I have found it difficult to obtain answers to basic questions about DOJ efforts in the territory.

So I want a member-level briefing on this subject as soon as possible.  In the meantime, I have three specific questions for you today.  I will ask them all at once and then give you the time to answer them.

First, the U.S. Attorney's Office in Puerto Rico has a very high criminal case load.  Part of the reason is that they are prosecuting a number of cases that, in the states, would likely be prosecuted in state or local courts as opposed to the federal court.

I'm aware that the U.S. Attorney's Office in Puerto Rico has entered an MOU -- into an MOU with the Puerto Rico Department of Justice so that state prosecutors can be detailed to the U.S. attorney's office to work on federal cases.

While I support this arrangement, I'm a former A.G., and in my time, in the '90s, I did something similar.  I'm concerned there are not enough federal prosecutors assigned to Puerto Rico in light of the case load.

Have you looked at this issue?  And if not, could you please look at it and have your staff brief me on your specific findings?  Again, number of assistant U.S. attorneys in Puerto Rico.

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

Second, as you have stated here today, DOJ has a comprehensive program called the Violence Reduction Network. They reduce violence in some of our most violent cities. I believe there are cities in Puerto Rico that are suitable candidates for this program and I urge the DOJ to select a Puerto Rico site in 2016.

Can you assure me that Puerto Rico will receive due consideration for inclusion in the VRN program, or any other DOJ program designed to combat violent crime?

Finally, the New York Times just reported -- or recently reported -- that in 2014, more guns used to commit crimes in Puerto Rico were purchased in Florida than in Puerto Rico itself.

**PIERLUISI**: What is DOJ doing to reduce the number of guns being unlawfully transported from Florida and other states to Puerto Rico and being used to commit crimes in my turf? Thank you.

**LYNCH**: Thank you, Congressman. And I am happy indeed to have my staff arrange to provide further information for you on all of these points.

I can certainly tell you that we are looking to expand our efforts under that MOU. And with respect to specific numbers I would like to have the opportunity to look into that and provide you with a briefing on that.

With respect to the firearms trafficking between the mainland Florida and Puerto Rico, we do have a very strong presence on the island of ATF, along with, as you know, a host of other agencies. And we are looking at ways to deal with that as well.

We also certainly will give Puerto Rican cities due consideration in the Violence Reduction Network selections for the upcoming year. I would note, however, that we are also committed even beyond the Violence Reduction Network to working with local authorities in Puerto Rico, as well as the U.S. Attorney, to deal with the situation there.

As you note, the homicide rate is down significantly. But it is still far too high. And that places the residents of Puerto Rico in an unreasonable and untenable situation. And we feel it is our obligation and responsibility to do all we can to ameliorate that.

**PIERLUISI**: Thank you.

**GOODLATTE**: Chair thanks the gentleman from Puerto Rico. I now recognize the gentleman from Arizona, Mr. Franks.

**FRANKS**: Well, thank you, Mr. Chairman. And thank you, Attorney General Lynch, for being here.

General Lynch, several videos, as you know, have been talked about quite a bit that have been released that show corporate officers and employees of Planned Parenthood casually discussing their practice of harvesting little baby parts from the many hundreds of thousands of innocent babies they kill in their clinics across this nation every year.

And the videos reveal that some babies are born intact, which is the most, I understand, desirable and marketable state of the baby's body for people in that business because the little body parts haven't been damaged by the abortion procedure. And because of that incentive, some of these little babies are born alive.

And I'm wondering has the department investigated or enforced any cases of born alive children being killed from their abortion survivors?

**LYNCH**: Congressman, with respect to the issue that you raise, you're asking about born alive...?

**FRANKS**: Born alive, yes, these born-alive abortion survivors. In other words, babies that were victims of abortion were born alive, much like the situation with Kermit Gosnell.

You know there's some legislation on the books that extensively protect born-alive children. Has the department ever enforced that or had any investigations for protecting born-alive abortion survivors?

**LYNCH**: Congressman, it's my understanding that since the relevant statute was passed some time ago there have been some few cases that dealt with certain issues about -- I believe the statute is the National Organ Transplant Act.

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

There've been a few cases under that statute. I'd have to get those facts for you. I don't believe they fit the factual scenario that you just outlined. But I can provide that information to you on that.

**FRANKS**: OK. Well, let me shift gears then just slightly.

You know there's legislation here in the Congress that's passed the House that would give definitive protection to born alive -- now I'm not talking about unborn children, but born alive babies that have survived the abortion process. Would you support that legislation? And would you enforce it if it were in statute?

**LYNCH**: Well, congressman, I have not seen those drafts. Certainly with respect to any draft legislation proposed by this body, the Department of Justice will review it and provide the relevant input to you for your help and for your use.

**FRANKS**: But generally would you support legislation supporting born-alive abortion survivors?

**LYNCH**: Having not seen the drafts I'm not able to comment...

**FRANKS**: Just generally.

**LYNCH**: ... specifics. We would look at whatever...

(CROSSTALK)

**FRANKS**: Born alive.

**LYNCH**: ... you had.

**FRANKS**: Born alive.

**LYNCH**: We would look at whatever proposals you have, congressman.

**FRANKS**: All right. Well, that's too bad you can't answer a question like that. So let me shift gears on you again then.

Is the Department of Justice currently investigating Planned Parenthood based on the footage released by the Center for Medical Progress? And if so, what's the status of that investigation? And if not, why not?

**LYNCH**: Well, we have received and number of requests for information as well as congressional requests and referrals on this matter. Because we are still reviewing it, I am not able to comment on the nature or status of that at this time, sir.

**FRANKS**: All right.

In light of DOJ's recent public praise of the Southern Poverty Law Center, this is an organization that's implicated in the domestic terrorism conviction. Floyd Corkins, as you know, who used the Southern Poverty Law Center publications to identify and attempt to kill employees of pro-family organizations in D.C. It is important for us to know the DOJ's level of involvement with SPLC.

Can you tell us about DOJ's relationship with the Southern Poverty Law Center and its employees, publications and events? Can you give us any insight into that at all?

**LYNCH**: Well, I certainly am aware of the organization, but I'm not able to give you specifics on the department's involvement, if any, in the Southern Poverty Law Center at this time. I certainly would appreciate the opportunity to have my staff reach out to yours.

**FRANKS**: Well, I hope that you would respond in writing to these questions, general, because you certainly haven't answered them here. In all due deference to you, you haven't answered them. And the last person that held your position didn't answer them either, and promised to respond in writing and didn't do that either.

AR-00147

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

Have you personally reviewed any of the videos released by the Center for Medical Progress?  If so, was there anything in those videos that you found disturbing?

**LYNCH**:  Congressman, I have not undertaken a review of the videos.  I'm of course aware of the news reports about them.  And as I indicated, all of the information that's been received by the department is currently under review.  So I don't have any further comment on it at this time.

**FRANKS**:  Yes, ma'am.  Thank you.

**GOODLATTE**:  Gentleman yields.  Chair will now recognize the gentlelady from California, Ms. Chu.

**CHU**:  Attorney general, I want to bring your attention to the cases of Chinese-American scientists Guoqing Cao, Shuyu Li, Sherry Chen and Xiaoxing Xi.

All of these named individuals, despite their ethnic names, are American citizens.  And all of them have been profiled, suspected and treated as spies by our nation's government within the past two years, only to have all charges dropped.  And these are only the cases that actually reached national headlines.  There could be countless more.

Two of these individuals, Sherry Chen and Xiaoxing Xi, are here at today's hearing, sitting two rows behind you.  I want to take a moment to share their stories with you.

Dr. Xioaxing Xi is a professor and the interim chairman of the physics department of Temple University.  In May of this year, on a day that seemed like any other ordinary day, Dr. Xi and his family were woken up at the break of dawn by almost a dozen armed FBI agents in his home pointing guns at him.  In his pajamas he was handcuffed and arrested in front of his wife, two young daughters, and neighbors.

After months of investigation, after losing his position as chair of the physics department, after the emotional trauma that he and all his family endured, all of the charges against him were dropped.  It turns out that the technology that the government thought Professor Xi was sharing with China wasn't the right technology to begin with.

We also have Sherry Chen, who like Dr. Xi was wrongfully profiled and suspected of being a spy for China.  She was arrested by six FBI officers and humiliatingly handcuffed in her own office at the National Weather Service.

After months of investigation and having a reputation smeared, all the charges against her were dropped.  Not only is she suffering from mental and emotional turmoil that the -- turmoil that this investigation has caused, she is now fighting for her job as a hydrologist within the Department of Commerce.

These Chinese-Americans were wrongfully suspected as spies and paraded as criminals through their arrests, only to have the charges later dropped.  But not before they were traumatized and their lives nearly ruined.  And that leads to the question, are all Chinese- American scientists suspect because they are Chinese-Americans?

So my question to you is what went wrong in these cases?  And how are you addressing this internally, especially with the FBI, to prevent this from happening in the future?

**LYNCH**:  Thank you, congressman.  I can say to you unequivocally that the Department of Justice does not focus an investigation on any individual on the basis of their race or their national origin.  With respect to the specific case that you mentioned, I'm not able to comment on those specifics at this time.

**CHU**:  Even if you can't comment on the specifics of the cases, I will follow up with you personally on the details of these cases.

There is no question that we must fight against espionage and threats to American innovation.  But in this process we must not ensnare innocent Americans that make this nation great, or undermine our fundamental values of liberty, due process and equality under the law.

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

This is especially true in light of the horrendous Paris attacks which senselessly took over 120 lives in an act of terror. While we must combat terrorism and protect our national security, we must also not impinge upon fundamental rights. We must ensure that we do not see an increase in profiling against Muslims because of these events.

**CHU**: We have seen what happens when we compromise our fundamental values. In fact, it wasn't too long ago that 120,000 people of Japanese ancestry were removed from their homes, rounded up and incarcerated during World War II, accused of having spies amongst them. They were proud Americans, but their citizenship meant nothing. In the eyes of our government, all of them were potential spies, outsiders and enemies.

Yet, over 60 years later, not a single case of espionage has ever been proven. Today, when we profile Chinese-American scientists in this matter or any American on the basis of their race, ethnicity, religion or country of origin, our government is telling our own citizens, our own communities that they are un-American and that it's OK to fear or even hate them.

When this happens, in my opinion, we have failed as a government and as Americans. I yield back.

**GOODLATTE**: The gentlelady yields back. The chair will now recognize the former United States Attorney from Pennsylvania, Mr. Marino.

**MARINO**: Thank you, chairman. Good afternoon, General, welcome.

**LYNCH**: Good afternoon.

**MARINO**: I'm going to talk briefly about drug diversion.

**LYNCH**: I'm sorry, I can't hear...

**MARION**: I'm going to talk briefly about drug diversion -- it's not a question, really. It has been a priority of mine to encourage the DEA to collaborate with companies in the pharmaceutical supply chain to address prescription drug abuse. In the past, DEA officials used ambiguities in the law to treat businesses like suspected criminals.

With the support of this committee, the House passed my legislation to clear up the relevant provisions of the Controlled Substance Act. That bill is now pending in the Senate and it appears likely to be enacted. The department's response to my recent questions on the subject, that the department, quote, "recently made some important changes that demonstrate its commitment to work more closely with the drug supply chain and registrants," is very encouraging to me.

I will closely keep an eye on this, but I'm optimistic that progress is being made and I thank you for pursuing that.

**LYNCH**: Thank you, sir.

**MARINO**: I'm going to switch gears now to the Bureau of Prison and oversight, and I do have some questions pursuant. My district has three high security federal penitentiaries. I'm in Pennsylvania 10th district, Canaan, Lewisburg and Allenwood.

Three correction officers have died in recent years in the line of duty: Eric Williams was working alone and unarmed on a cell block with over 100 inmate at Canaan. He was stabbed 129 times. A BOP pilot program was put into place to provide officers with pepper spray, which I think Eric and others would have had a chance to survive. Will you promise and give your word to me that you will support this program and make it permanent to all the personnel?

**LYNCH**: Congressman, with -- I'm aware of the death that you mentioned, as well as the deaths of several of our other brave men and women in correctional facilities. I do support additional measures to increase their safety. I recently actually had a meeting with the heads of the correctional officers unions and spoke about these issues. I look forward to working with them and with this body to make sure that they have all of the tools that they need to have a safe working environment.

**MARINO**: Do you believe that pepper spray is one of these protection devices that would help officers, but yet not have a weapon that the inmates could take?

**LYNCH**: Yes, I certainly think that pepper spray is a viable option. I would like to see the results of the pilot study.

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

**MARINO**:  OK.

**LYNCH**:  And -- but I also would like to make sure that we include every possible option for protecting our correctional officers.

**MARINO**:  Thank you.  Still, in the Bureau of Prisons -- we're going to talk about staffing for a moment, many of our federal prisons are understaffed, significantly below their authorized levels.  I constantly check on this.  In some cases, counselors, not corrections officers, fill in to guard inmates.  Counselors.  Would you fully staff corrections officers' positions with trained officers?

**LYNCH**:  Congressman, I can tell you that certainly not only is the safety and security of correctional officers a priority of mine, but ensuring that they have the appropriate staffing is a priority of mine.  It has certainly been a challenge for us from a budgetary perspective.  We are certainly looking forward to meeting those challenges in the future and trying to ensure that every facility is fully staffed with professional officers.

**MARINO**:  And almost one year ago, the committee requested all communication relating to mandatory donation provisions in certain DOJ settlements.

**LYNCH**:  I'm sorry.  Mandatory?

**MARINO**:  Mandatory donation...

**LYNCH**:  Thank you.

**MARINO**:  provisions...

**LYNCH**:  Thank you.

**MARINO**:  ... in DOJ settlements.  Last week, your staff advised that they did not realize that we wanted internal documents.  We were very, very clear, both via letter and in live questioning, that we were specifically seeking internal documents.  There always seemed to be some jockeying between Congress and this administration over oversight matters.  This is unacceptable.  It's a continual problem. When will we receive the internal documents we requested almost exactly a year ago?

**LYNCH**:  Congressman, with respect to the requests that have been made, to the extent that we receive requests that ask for internal deliberative documents that typically we do not disclose, that may have been the reason for that.  What we try and do is work with either staff or the entire committee to provide the information that you need to carry out your oversight function, consistent with our law enforcement and privilege objections and we certainly look forward to working with you to do that.

**MARINO**:  I just hope we do not have to continue as we have in the past, splitting hairs over a particular word.  Thank you and I yield back.

**GOODLATTE**:  The gentleman yields back.  The chair will now recognize the gentleman from Florida, Mr. Deutch.

**DEUTCH**:  Thank you, Mr. Chairman.

Attorney General Lynch, thanks so much for joining us, especially in light of the horrific attacks in Paris.  I know that the Department of Justice is doing everything that it can to help its French counterparts do their part to bring all of those responsible for these heinous terrorist acts to justice.

I also want to acknowledge the importance of the work that the Department of Justice does in keeping the American people safe.  And as we mourn with Paris, it's moments like these where we pull our own loved ones closer.  We trust that the administration, including the Justice Department and law enforcement and our intelligence community, and the men and women who serve our country in uniform, are doing all that they can to keep our people safe from the threat of terrorism, home-grown and abroad.

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

We're grateful for that. We do face daily threats of another kind here at home, however, and I want to talk to you about the daily gun violence that claims nearly one American's life every hour of every day and over 32,000 per year. Every day, dangerous individuals in the United States buy guns without completing any background check at all.

And whether it's Dylann Roof, whose approval went through who wound up murdering nine Americans at worship in Charleston during the summer, or whether it's gang members in Chicago, where more than 400 people have been killed by gun violence this year. I've served, Madam Attorney General, on the House Judiciary Committee, for over five and a half years, and in that time, gun violence has claimed the lives of over 150,000 Americans. We haven't had a hearing on this gun violence, not on this committee, not after Tucson, not after Aurora, not after Newtown, not after Roseburg.

The majority says, as the chairman said just today, again, that there's no reason to have a hearing. All we need to do is simply enforce the existing laws, we're told that everything will get better. Before going on to my specific question for you, I'm sure you would acknowledge that it was I think helpful to hear the chairman say earlier that sometimes the National Instant Criminal Background Check doesn't have all the information that it needs and I would point out that after the Virginia Tech massacre, where that gunman's mental health record wasn't accessible, the court had declared him a danger to himself, he should never have been allowed to purchase a gun, Congress acted -- Congress acted and passed legislation, signed by President Bush, that authorized over a billion dollars to states and territories to improve recordkeeping and reporting to the National Instant Criminal Background Check System.

Congress, however, has only allocated about 11 percent of that money. So I would ask the chairman, consistent with his views that there are some problems with existing law, that we work together to fund -- allocate the funds so that all of the information gets to the National Instant Criminal Background Check System so that it can actually work to keep guns out of the hands of dangerous people.

That doesn't require a new law. It simply requires making sure we allocate the money, that we spend the money that Congress has authorized over the past several years.

**DEUTCH**: Now, I do want to ask you, Madam Attorney General, about steps that can be taken. As you know, the gun lobby has made it nearly impossible for the federal government to enforce some of our existing government laws; the federal government is barred from keeping records of gun sales for more than 24 hours; it's barred from denying a gun sales if a background check can't be completed within 72 hours; it's barred from electronically managing trace data, information about guns recovered at crime scenes and who sold them.

Investigations into corrupt gun dealers, therefore, take months instead of minutes. It's barred from requiring gun dealers to keep inventories logged and their books in order; and it's barred from seeking assistance from other agencies like the FBI and the DEA. So I reject the assertion that there's no room for improvement. Clearly there is. And I'll continue to push for sensible gun safety measures like preventing suspects on our terrorist watch list from buying guns, making interstate gun trafficking a federal crime.

But General Lynch, there may be ways, real ways to strengthen background checks through executive action, executive action that could save lives. Every Town Against Gun Violence recently issued a report on such one potential action. Under current law, only people in the business of selling firearms have to conduct background checks. People who aren't in the business of selling firearms don't have to. But some of these people who technically aren't sellers and don't work in the business sell hundreds of guns a year without background checks at gun shows, online or out of car trunks.

We have to better define the language. Couldn't we set a number for how many gun sales it takes to be in the business of selling guns? And has your office explored that possibility and are you considering a threshold like that to define who would be technically engaged in the business?

**LYNCH**: Well Congressman, with respect to the serious issue of gun violence, the Department is certainly pursuing all of our enforcement actions that we do have under existing law. And certainly, it would always be useful to have additional resources for our ATF to allow them to fully investigate everything that we need and that comes under our purview.

With respect to the question that you've raised as to a statutory definition, I believe the statute is going to define that at this time. But certainly the Department of Justice and ATF are committed to rigorous enforcement of that statute.

AR-00151

**DEUTCH**:  To the extent that there is an opportunity for executive action that can be taken to help define something that is undefined in statute, is that something that you're looking at?  Or let me just simply, since I'm out of time, encourage you to take a hard look at that because that would -- that would be a meaningful step that could help, again, ensure that the background checks that should be completed, even without additional legislation, are in fact completed. I hope you'll consider that seriously.

And I yield back, Mr. Chairman.  Thank you.

**GOWDY**:  The gentleman yields back.  The chair will now recognize himself.

Madam Attorney General, I want to tell you I enjoyed visiting with recently and I want to thank you for DAG Sally Yates' recent trip to South Carolina which was very well-received.

There are three areas I want to cover with you.  First would be Mr. Kadzik's letter to Congress recently.  And I'm going to paraphrase one of the paragraphs but it's a pretty close paraphrase.  The IRS mishandled tax exempt applications in a manner that disproportionately impacted conservative groups.  I read that to mean that he found a discriminatory effect.  In other words, there were similarly situated people but there was a disparate impact on conservative groups. That's the only way, I think, to read the paragraph in Mr. Kadzik's letter.

He then wrote it left the appearance that the IRS conduct was motivated by political, discriminator, corrupt or other inappropriate motives.  So you have a discriminatory effect, but he said the cause, the motive was mismanagement as opposed to a crime.

And then that got me thinking, if my sheriff stopped only red cars for speeding, at what point is it not mismanagement but it actually is circumstantial evidence of intent?

**LYNCH**:  Well, with respect to the actions that you referred to, Congressman, I think you certainly are accurate when you indicate that our letter noted that the groups that had complained were treated differently from other groups, and they were also treated in a way that did not advance their applications.  They were treated badly.  So one can understand their concerns and the -- and the issues that they raised.

With respect to the investigation, as we outlined in our letter, under the relevant statutes that we were reviewing, we needed to find evidence of criminal intent.  That intent was not there.  With respect to the example that you raise, certainly there are certain statutes that take into effect a discriminatory impact.  But again, even in our civil rights laws, if one had a discriminatory impact, you would not necessarily be able to prove a discriminatory intent.

**GOWDY**:  It's really hard to prove intent.  Really hard.  Which is why usually you use circumstantial evidence.  And if female voters were required to show two forms of ID but male voters were only required to show one, how many voters would have to pass through the prompter before you would say that's circumstantial evidence of an intent to discriminate?  I mean, I -- never do you have direct evidence of intent.  It's really hard to prove intent, which is why we typically use circumstantial evidence. And I noted in Mr. Kadzik's letter, he didn't say there was insufficient evidence, he said there was no evidence.

Would you agree with me that there's a very big difference between saying insufficient evidence and absolutely no evidence, which is what he wrote?  He found no evidence of any intent to discriminate, despite the fact that there's a discriminatory effect.

**LYNCH**:  Well, I think the letter does speaks for itself in that regard.  What I would say is that, Congressman, as a general matter in how we handle our criminal investigations, we do look for evidence of intent, and it comes in a number of ways. Some circumstantial, some direct.  Every case is different.  IN every investigation, as in this investigation, we gather all the evidence.  We gather all the facts. And we apply the law to those facts and let that determine the answer.

**GOWDY**:  I'm with you, Madam Attorney General, but you can see the discriminatory effect.  So that's half of what you have to prove, and it's already there; you concede that.  And we've got e-mails from Ms. Lerner that we need a plan but we have to be cautious that it's not per se a political project.  I think a jury would find that to be an interesting e-mail.

AR-00152

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

She worried mightily that Republican control of the Senate might be tantamount to a Republican president, and she wasn't thrilled about that. That might be circumstantial evidence of a political motivation. She referred to the Tea Party as very dangerous. I mean, how many pieces of circumstantial evidence, keeping in mind the author of the letter didn't say insufficient.

I could have lived with it if you had said, look, our prosecutors just couldn't make the case. It's a close call, it's a jump ball, we can't make the case. That's not what he said. He said there is no evidence. I just cited three e-mails that I think would be evidence of some intent. Don't you think?

**LYNCH**: Well, Congressman, as I said, I think the letter in its full entirety speaks for itself and does outline not only all of the issues that you raise but a host of other things that were reviewed and looked at in the course of the investigation and does explain the conclusions to which the department came.

With respect to the referral, the issue was whether or not there was evidence of a criminal intent. That is to say, did one act on certain views, was that the reason for the actions. And as we've noted in our letter and we've offered to have in further briefings with you, we did not find investigation of that through the millions of pages of documents and hundreds of witnesses that were interviewed.

**GOWDY**: I would love to take you up on that offer for a private briefing because I need somebody to explain to me the difference between specific intent and general intent because as I read her e- mails, even some of the mediocre prosecutors on this panel I think could get to a jury given the evidence that they have.

I want to touch on two other issues, and then -- because there's a trend of going over. I would invite you at some point -- and this is going to be a bipartisan comment because this goes back to 2004, and 2004, there was a Republican administration. If you look at the firearms prosecutions from 2004 to 2012, you're going to be shocked at how few prosecutions there were, not for 924-c, not for firearms offenses that happen during a crime of violence, but I mean, lying and buying, selling a gun to somebody who has been adjudicated mentally ill, somebody who's been committed.

There were 22 guilty adjudications over the course of nine years for people possessing firearms who were users or addicts of drugs; 22 in nine years.

So when I hear my friend from Florida talk about the need for more gun laws, yes, we're going to say how are you doing with the ones you currently have.

**GOWDY**: And I would invite your attention to this chart which came from -- former Attorney General Holder provided it to us. I think you're going to be shocked at how few -- and I get that there's not much jury appeal. I -- trust me, I get that it is a hard to go in front of a jury in a lying and buying case.

But -- but you noted earlier the focus on firearms cases in the context of violent crime. And I think we would all agree, the objective is to prevent a violent crime, not to do a really good job prosecuting it afterward, but to keep it from happening in the first place. Which is why I would invite your attention to this.

My last point is simply this. You have been asked repeatedly this morning to comment on ongoing investigations. And you always give the same answer. And it's the exact same answer that Marino (ph) gave me in the back, as a former U.S. attorney, and the exact same answer Mr. Radcliffe (ph) gave me in the back, who is a former U.S. attorney, which is you can neither confirm nor deny the existence of an ongoing investigation, and if we happen to know about one, you're not going to comment on it.

That's exactly what you should say. I'm just wondering why the President didn't get that memo. And you may in your well of souls believe it does not impact Director Comey or you, and it may not. But I promise you, it impacts the perception of my fellow citizens when the person who is responsible for executing the laws in this country prejudges the outcome of investigations. It may not impact the reality. I promise you it impacts the perception, and that's equally dangerous.

And with that I would recognize the gentleman from Illinois, Mr. Gutierrez.

**GUTIERREZ**: Thank you very much, Mr. Chairman. Welcome, Attorney General.

AR-00153

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

**LYNCH**:  Thank you, sir.

**GUTIERREZ**:  I posed the same question to the FIB Director.  I want your advice, and I'd like to work with you.

In my hometown of Chicago, there are 40, 50 shootings any given weekend.  That's a whole classroom of children.  And it's unacceptable.  And we need more federal action, I think, because whatever we do in Chicago, according to a city report from the mayor's office and the Chicago Police Department, 60 percent of the guns are coming from Wisconsin, Indiana, and Mississippi.  All states that have weaker gun laws than the city of Chicago does.

We know this thanks to the Chicago Police Department's tracking of trace data, meaning that the Chicago Police Department traces every single gun it recovers to determine where it was originally sold and how it may have entered the illegal market.

So given that the majority party in Congress refuses to take up, despite widespread and robust support, for gun control legislation, a couple of questions.

What's your advice to me as an individual member of Congress who supports gun control and how can I help curb gun violence in Chicago? And second, will the Justice Department encourage the police departments everywhere in the nation to collect trace data on illegal gun trafficking like we do in Chicago?

So first, you're in Chicago, you're a member of Congress, what's your advice?  And second, trace the guns.  We're doing it in Chicago. What do you think about across the nation?

**LYNCH**:  Congressman, thank you for the question.  You certainly raise an area of concern and priority for the Department of Justice, which is of course violence, be it gun violence or any type of violence in our cities as it affects our children.  Not only those who are the actual victims, but children who are exposed to violence, of course, suffer greatly, as we know, in their later development as well.

We feel that the city of Chicago is certainly taking a concerted look at this problem.  And I'm extremely proud to note that the federal government through the U.S. Attorney's Office in Chicago is working very closely with local law enforcement on this issue. Focusing on the issue of not just firearms but also the gang violence in Chicago as well.

We also have a very strong presence with our federal agencies, FBI as well as ATF, who works closely with the Chicago Police Department on the e-trace program that you mentioned.

We do find it to be a very useful program.  We do find it to be something that arms us with the data to trace the source of weapons into neighborhoods who suffer so grievously from them.  And certainly, it's an example that, certainly, we would hope could be -- could be exported to other cities as well, as you have noted.

And I can tell you we're committed to continuing to work with the city of Chicago and all of our major cities in violence reduction programs.  In fact, Chicago was represented at the violence reduction summit that I held just last month with the mayor and the police chief.  And we had a very robust discussion about the causes of violence, some of the ways in which the department could be helpful -- in very targeted ways.  Whether it is increasing our task force presence, whether it is on focusing on dangerous fugitives in the area, whether it is focusing on violence prevention efforts as well.

So we -- we remain committed to working not just with Chicago but all of our cities who are experiencing these troubling issues.

**GUTIERREZ**:  So, if you were to suffer something as egregious as a demotion to a member of Congress from your high position as Attorney General, what do you think?  What would you do?  You're back in Chicago.  You've got the motive.  You're not the Attorney General, you're just one of us 430...

**LYNCH**:  Well, I certainly would not -- would not call that a demotion.  I think all of us in public service have a great opportunity to serve our people...

**GUTIERREZ**:  What would you do?

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

**LYNCH**: ... To serve our people. And certainly I think that within this body, there's a lot of significant discussion going on. Obviously the resources to fund the programs that we have on the ground are essential in funding the department's budget that focuses on the smart-on-crime initiative, which does focus on violence reduction, as well as re-entry and recidivism, because of course a grave concern is, as people return home to their communities, that they not return to violence as well.

So certainly, the resources that would be useful for the department's overall budget, and particularly when it comes to firearms, the resources for ATF to continue as a vigorous enforcement of the firearms laws and the e-trace program would be very beneficial.

**GUTIERREZ**: Lastly, I wanna -- so there is a letter from my colleagues, Congressman Ruben Gallego and Robin Kelly from Chicago, and they've asked to meet with you with a group of members of the Congressional Hispanic Caucus and Black Caucus.

And I want to put it in some context for all the members, and why we would invite you to meet, particularly with that group. Because African-Americans are 13 percent of the population, but they constitute over half of all the homicides. Over half. So 13 percent, 55 percent of all the deaths, given firearms.

And interestingly, Latinos are relatively less likely to own a firearm than the general population, and yet again, they disproportionately die due to gun violence. So you have a population that doesn't own guns but dies of guns, and 13 percent, the black population, and over half of the deaths.

So, I just -- I know -- I hope you got the letter. And so I'm -- I'm -- I love working with those two colleagues of mine. I was wondering if you would accept an invitation to come and meet with us.

**LYNCH**: I look forward to meeting with the caucus. Thank you so much.

**GUTIERREZ**: Thank you very much, Attorney General.

**GOWDY**: The gentleman yields back. The Chair will now recognize the gentleman from Utah, Mr. Chaffetz.

**CHAFFETZ**: I thank the Chairman. And I thank you for -- for being here.

The Inspector General Act which is currently on the books, says that inspectors general, in carrying out their provisions under the act, is authorized, and I quote, "to have access to all records, reports, audits, reviews, documents, papers, recommendations, and other material available to the applicable establishment which relate to programs and operations with respect to which the inspector general has responsibilities under the act."

Somehow the office of legal counsel indicated on July 20th that despite longstanding tradition within the FBI, specifically, the Department of Justice Inspector General is no longer allowed access to grand jury testimony, wiretap information, credit information.

We disagree with that conclusion, but at this point we have worked with the inspector general, worked with this committee, and we're still waiting for full input from the Department of Justice to try to rectify this.

I -- I was hoping that I would get some commitment from you to work with us and spend time with us on the proposed piece of legislation. I think the current law is sufficient. But you don't. We're trying to come up with something that -- that would rectify this. Would you be willing, is somebody from the Department of Justice give us guidance and input on this?

**LYNCH**: Thank you, Congressman. I think that you certainly raise the important issue of the important work of all agencies inspectors general -- in particular the Department of Justice...

**CHAFFETZ**: I just want to get a commitment that you will work with us on this -- on this proposal...

**LYNCH**: We have sent legislation up. We feel that would clarify it and, in fact, ensure that the inspector general would receive all the information he needed...

AR-00155

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

**CHAFFETZ**: Would you -- would you meet with us, not you specifically. Somebody within the Department of Justice to give it input on the piece of legislation that I'm drafting in a bipartisan way with -- with Mr. Cummings to try to -- to resolve this.

**LYNCH**: We're happy to meet with you.

**CHAFFETZ**: OK. And hopefully, soon? Soon, I hope?

**LYNCH**: We will -- I will have my staff reach out to yours. We're happy go meet with you and work with you on that issue.

**CHAFFETZ**: Thank you.

I've also been -- have had great concern on geolocation. In July, the Oversight Committee, we sent a letter seeking the so-called Jones memos. This relates to a Supreme Court case from a number of years ago. On October 26th, I issued -- I did a bipartisan, bicameral letter -- six representatives, five senators, including the ranking member from -- from both Judiciary Committees in the House and the Senate, calling on the Department of Justice to share with Congress these letters. I still don't understand why you won't share this -- this information with us.

**LYNCH**: Well, certainly with respect to the request that you refer to, to the extent that it -- that it refers to the internal deliberative process of the department, we typically do not provide those specific memos. However, we do -- certainly do look forward to working with you to share the information that...

(CROSSTALK)

**CHAFFETZ**: You don't think that the House Judiciary Committee, the Senate Judiciary Committee, should understand your approach in tracking people through geolocation?

**LYNCH**: We certainly are willing to sit and work with you to convey what we can and as much as we can about...

(CROSSTALK)

**CHAFFETZ**: That would be -- that's a huge step forward, because thus far the Department of Justice has not been willing to share with us any information or have such a meeting. So I look forward to that meeting.

I need to ask one more topic. I'm trying to go quick just because of the time.

Share with me your thoughts and perspectives on subpoenas. You know, subpoenas are often issued from a variety of different places. But Congress also issues subpoenas. Do you feel a duty and obligation to help enforce those subpoenas as well?

**LYNCH**: Certainly that's part of the obligation of the Department of Justice in terms of its general law enforcement obligations.

**CHAFFETZ**: When would you not enforce a subpoena?

**LYNCH**: You know, I would have to know more specific facts and context to provide an answer as to whether or not we would not be able to for some reason, or whether there would be a reason not to. I would have to have more...

**CHAFFETZ**: Do you feel a duty and obligation to enforce, then, a congressionally issued subpoena?

**LYNCH**: Certainly, with respect to a subpoena issued by anybody, be it Congress or be it court -- be it a court. The decision as to whether to enforce it or not would be one that we would review and determine the best course of action to take. But I would certainly like to have more facts about the specific issue, if I could.

**GOODLATTE**: I think what the gentleman is asking is a subpoena goes out, and someone does not comply with the subpoena. How do you view the department's obligations to enforce compliance? A subpoena is only as good as your ability to enforce compliance and we don't have access to a police force, which is a good thing. So we're reliant upon you to enforce

them. And I -- I take the gentleman's question to be: How do you view your obligation to back up this branch of government when it needs access to documents or witnesses?

**LYNCH**: Again, Mr. Chairman, I certainly, with respect to a subpoena from this body or any other that would come to the Department of Justice for enforcement, we would review all of the information about that. Certainly in my career as a prosecutor and as a U.S. attorney, we've had -- I've had occasion to issue subpoenas and then work on alternate means of compliance both as a prosecutor and as a private attorney. So there are a number of ways in which we can obtain compliance. And I would certainly need to know more of the factual predicate before I could provide you with any specific guidance.

**GOODLATTE**: Yes, ma'am.

The gentleman yields back. The chair will now recognize the gentlelady from California, Ms. Bass.

**BASS**: Thank you, Mr. Chair.

And thank you, Attorney General Lynch, for your time today, and also for your patience.

It seems as though many people on the committee would like to have some of your time. And I listened to my colleague a minute ago, as well as my colleague Gutierrez, and he mentioned the letter. There's a letter also that I sent to your staff requesting a meeting with you. And perhaps what we could do is just join forces, because I didn't realize there were multiple letters.

Because the -- the concern is really the increase in homicides in a number of cities, and specifically the desire to sit down with you personally, as well as members of your staff, to look at various programs that the agency has that might be allocated in a -- more of an emergency fashion considering there has been a spike in specific cities. So I would definitely like to continue following up and perhaps if by the middle of next month, we could have the meeting, it would be very good, since we've been asking for a while.

I wanted to know if you would tell us about some of the programs from a more global perspective. For example, the federal-local partnership like B-FED, which I believe is the partnership between the federal law enforcement and local police in Baltimore, if you could talk about how those efforts are helping to address a spike in Baltimore.

As well as you mentioned your summit -- the summit that you had in Detroit. And I wanted to know if you could perhaps share some of the lessons from that summit in terms of how cities are able to address the spike.

And then after that, I want to ask you a question about sex trafficking.

**LYNCH**: Thank you for those questions on topics of great importance to me as attorney general, to the Department of Justice, and to the American people.

With respect to the violent crime issues that we're facing, while we -- as we have noted for -- in a number -- for a number of months and even the last year or so, we're fortunate in that crime in general is down across the country. And in all of our major cities, crime generally is down. But we have neighborhoods where there is a persistent issue of violence. And we have neighborhoods where we either have not seen similar decreases or we have seen increases in violent crime.

In my former role as U.S. attorney in Brooklyn, I had many of those neighborhoods within my district. So I dealt with those on a daily basis and I know the importance of a partnership in terms of dealing with that issue.

Baltimore is an excellent example of some of the resources the federal government is looking to bring to bear to deal with specific situations. We've partnered with the police department in Baltimore to provide an influx of federal agents focusing on the violent crime problem, to aid with the investigation and literally making those cases so that we can remove the violent offenders from the streets of Baltimore and allow the citizens to continue to flourish in that great city.

With respect to the summit that I had, because we -- we're looking at this issue from a host of perspectives, actually this summer I asked my United States attorneys in cities that had seen an increase in violence in some neighborhoods to meet directly with their local partners and counterparts -- district attorneys, police officers, sheriffs -- and discuss the nature of the

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

crime increase and -- and try and focus on the reasons to the extent that they could be gleaned from those discussions, for those increases.

We were able to -- to essentially accumulate a great body of information there. And as one can imagine, the crime -- the reasons for crime differ depending upon the neighborhood. With that, we built on that and convened our violent crime summit in October, where we had mayors and police chiefs and U.S. attorneys from those cities here in Washington speaking together, sharing best practices for crime reduction.

**BASS**: Great. If there are -- and I want to get to my last point, and would ask the chair's patience with this. Perhaps we could get the information from that summit that happened in October? If we could get those proceedings, it would be very helpful.

Finally, I wanted to ask you about sex trafficking, which I know is a high priority with you. And I wanted to know if you could mention any specific collaboration that is taking place with the Department of Health and Human Services? In particular, because we know that a percentage of the girls involved in trafficking are in the foster care system. So the question is: Is there collaboration between DOJ and DHHS and can you speak to that?

**LYNCH**: Yes, certainly. We have -- we have a number of collaborations across different agencies. I cannot recall the specific ones with HHS, but I would certainly like to provide you with that information. We also are working with the Department of Labor and we're working with state and local law enforcement in many ways to not only improve enforcement, but to provide services for the survivors. The services range from housing services to treatment, to therapy and the like.

**BASS**: OK. And I will follow up with you. Specifically, getting these girls back into the foster care system is really critical. So I'll specifically look for that collaboration.

Thank you, Mr. Chair.

**GOODLATTE**: Yes, ma'am. The gentlelady yields back.

Madam Attorney General, you've been sitting there for three hours. Votes are coming, which will provide a break, but I am happy to break now, given the fact that you've been sitting there three hours. If you would like five minutes, or we can march on until they call votes. It is totally up to you.

**LYNCH**: I would appreciate five minutes, if that's possible.

**GOODLATTE**: Done.

**LYNCH**: Thank you, sir.

(RECESS)

**GOODLATTE**: Committee will come to order. Welcome back. Thank you for the break and allowing us to go vote. And at this time we'll continue questions. And the chair recognizes Ms. Walters from California.

**WALTERS**: Thank you, Mr. Chairman.

Attorney General Lynch, last year I followed the various scandals that plagued the Department of Veteran Affairs. And like many Americans I was appalled at the manipulation of patient wait times at numerous V.A. facilities. You know our veterans risk life and limb to serve this nation and the V.A. failed them.

FBI Director James Comey confirmed on June 11, 2014 that the FBI was investigating criminal allegations within the Veterans Affairs related to the manipulation of patient wait times. Can you provide to us the status of an update regarding the investigation?

**LYNCH**: Thank you for the question. I certainly share your concern and regard for our nation's veterans, having several of them in my own family.

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

With respect to that matter, I'm not able to provide you an update at this time.  I would like to have my staff reach out to you after we see what information we'd be able to provide to your office.

**WALTERS**:  OK.  Are there any cases in which the Department of Justice has decided to pursue charges against V.A. employees for manipulating wait times?  And if not, why not?

**LYNCH**:  You know I'm not aware at this point in time of the status of that matter.  So again, I would not be able to give you that information.

What I can say, congresswoman, not to delay the time, is that certainly the service of our veterans is of great importance to us and we support them in a number of ways, not just through the investigation that you referred to, but through our Service Members Initiative Act and our work protecting their right to vote overseas, as well as our implementation of services such as Veterans Courts and working too with local municipalities to alleviate homelessness in veterans.  All of these things, all of these issues plague our veterans and is something that we as a nation need to be engaged in.

**WALTERS**:  Do you happen to know how many V.A. medical facilities are under active investigation for manipulating wait times?

**LYNCH**:  I'm not able to give you that...

**WALTERS**:  OK.

**LYNCH**:  ... information at this time.

**WALTERS**:  OK.  So you wouldn't know when the investigations are planned to be concluded?

**LYNCH**:  No.  But I certainly would appreciate the chance to get back to you with that.

**WALTERS**:  OK.  Just a couple more questions.  How many cases has the DOJ declined to prosecute or press charges against the V.A. employees for manipulating wait times?

**LYNCH**:  I'm not able to give you that information.

**WALTERS**:  OK.  OK.  Thank you.

I yield back.

**GOODLATTE**:  Gentlelady yields back.  Chair now recognizes Mr. Richmond from Louisiana.

**RICHMOND**:  Thank you for coming, and thank you for enduring several hours of testimony.  So I will try to be very brief.

What I wanted to do in the beginning, Mr. Chairman, is ask unanimous consent to enter into the record a report from The Clemency Report, which talks about 25 women deserving of clemency.

Of interest to me would be of course Sharanda Jones and Danielle Metz.  And I'd like to give it to you so that -- a copy to you so that we can talk about it in the future.  But there are cases where...

**GOODLATTE**:  Without objection it'll be entered in the record.

**RICHMOND**:  Thank you.

There are cases where women were sentenced to either natural life in jail or a really large number of years when they were not actual kingpin.  They were just either following their boyfriend or other things.  And I would really like the department to do something on that as we talk about criminal justice reform and move forward.

I represent the 2nd Congressional District of Louisiana, which is New Orleans.  And we're under a very unique situation in which we have a consent decree for both our police department and our sheriff's department.

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

And the costs of the implementation of those consent decrees are a large part of our city budget. And in an effort to make the police department more constitutional and the jail more constitutional, which are both laudable goals, we are sacrificing city services that will keep people from having to deal with the police or the sheriff's department.

So it's almost -- you know we're doing something on our left hand to help, but we're depleting our resources on the right. So it's not helping. And we now have an increase in police response time that's almost an hour when you call 911.

So the question is, as you guys decide Byrne Grants and others, and look at consent decrees, when you have a unique instance where you are -- you have more than one consent decree in a small jurisdiction, can you all help to provide resources so that we can, one, comply with the consent decree, but two, not lose critical services for our youth and our public to keep them safe at the same time?

LYNCH: Well, congressman, I appreciate the question. Certainly our practice of being involved with local law enforcement jurisdictions in a host of areas, not just consent decrees, but collaborative reform and technical assistance, is an important way in which we provide assistance to our colleague there.

With respect to the New Orleans situation, again, I think every municipality does see these as a financial challenge, and we certainly understand that. We view it as an investment in the future of constitutional policing and constitutional jails.

When a jurisdiction is involved with a consent decree, they still are able to apply for grants and other programs and other portions of the department or any other agency. So it would not preclude the kind of assistance that you are talking about. And certainly I'm happy to have someone from our grant making arm reach out to your staff and talk about options there.

RICHMOND: Well, I would just say that because it's taking up such a disproportionate and large part of our city budget, we're having to raise taxes and we're having to cut services such as youth recreation and other things that will keep kids out of trouble in the first place.

So we don't want to overstress constitutionality and then at the same time take opportunity away from kids. So to the extent that you all can help, whether it's grants or other things, we'd appreciate it.

Another thing is the Attorney General Holder and Secretary Duncan sent out an advisory on the school-to-prison pipeline. And I would just hope that that's something that you all are going to follow up with.

We had a bill, but it seems like school districts are still not getting the word that police are not the answer to a school discipline problem. So what are you all doing in that effort?

LYNCH: With respect to the school-to-prison pipeline, it is still a very important focus of the department's civil rights efforts. We provide guidance to school districts and law enforcement organizations.

We actually have a number of cases that were brought up approximately two, two-and-a-half years ago by the Civil Rights Division challenging school districts' disciplinary policies. And we are trying to provide assistance to reduce the zero tolerance policies that tend to be the start of this problem.

That, in conjunction with providing appropriate training to law enforcement officers should schools choose to have school resource officers, is a way in which we hope will be helpful to every school district in dealing with these issues.

Obviously school districts have to have discipline. But just as obviously, the education and the future of the children really is the first priority.

RICHMOND: Two things as I close. One is to stress the importance of the COPS Program and additional funding for community policing and other initiatives that would help.

The second two are requests. One would be to urge you to continue to work with the different district courts to push specialty courts, whether it's drug courts or reentry courts or other things that could help would be very, very important.

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

And the other one was -- is a request as can your office get to me the statistics on the adjudicated deferral of convictions, the diversion program.  How many people get accepted and what those demographics look like?

Because I am very concerned that diversion programs are usually used for those who have means and those who have some sort of political connections or community connections.  And that people who really need it don't get the benefit of the doubt to get accepted in it.

So if I could get a year or two worth of data on diversion programs, who's admitted and what those demographics look like, who's rejected and what those demographics look like, I'd appreciate it.

**GOODLATTE**:  The gentleman's time is expired.  But it's a good question if Ms. -- witness would like to answer or provide the information requested.

**LYNCH**:  I look forward to providing you information on those points.  With respect to diversion courts, because they are often run by the court system and not by the relevant U.S. Attorney's Offices, we would have -- would look for ways to get you information from the Office of Court Administration also.  But certainly we do have a wealth of information on the success of those programs.

**GOODLATTE**:  Thank you.  The chair now recognizes myself for questions.

On Sept. 28, 2015 the VA Office of Inspector General report recommended the U.S. Attorney's Office District of Columbia pursue criminal charges against two VA executives it found to abuse their position and ordered fake jobs with less responsibility while keeping higher salaries.  The report detailed how the VA executives pressured subordinates to accept positions, transfers, only to volunteer for the vacated jobs while keeping their original salaries and having the VA pay them for more than $400,000 in taxpayer funded reallocation benefits.

Will the DOJ pursue charges against these employees?  And if not, why not?

**LYNCH**:  Thank you for the question, Mr. Chairman.  With respect to a matter that's been recently referred to the department is the matter that's -- that is currently under review and so I'm not able to comment on it at this time.

**GOODLATTE**:  Well, I think -- one of the things the issue is, and I think the gentlelady from California also talked about this as well. The VA issue is something that has been ongoing.  And I think you made a rifle (ph) statement that there -- that our veterans deserve that support of help.

And I think we're seeing vast -- we've seen it in Georgia where people are just transferred and not held accountable.  And there's some that have been held accountable.

I think coming to this conclusion is more than just words. Actions have to be taken here.  And to simply say we're going to look into this and look into this, it's frankly the American people on both sides of the aisle are not satisfied with that kind of a response.

I do appreciate your mention of Veteran's courts.  Veteran's courts are working in my home county in Georgia. And we're expanding that process. Gov. Deal as well as local D.A.s and judicial circuits have worked well in that regard.  So I would commend that and continue the process as we look forward.

I want to move to an area that is coming up a little bit is some trade secrets issues.  And we recognize that trade secrets is a form of intellectual property.  And companies in America, however, increasingly targets of sophisticated efforts to steal proprietary information, harming our global competitiveness.

There are many in Congress, including myself, who believe we need to create a federal civil remedy for the misappropriation of trade secrets, keeping and harmonizing the legal frameworks so the companies can protect.

The administration threw out that recommendation and supported a call for private right on the action on trade secrets.  Do you join them in recognizing that such a private right of action would be beneficial?

AR-00161

**LYNCH**:  Certainly, congressman.  You've raised an important issue and one of great priority to both me and the entire Department of Justice.  We are committed to prosecuting cyber criminals who do seek to steal our intellectual property.

I believe the last recent estimate was that we are losing possibly up to $250 billion worth of intellectual property a year through hacks and crimes and the likes.  And we look forward to working with you on the proposed legislation that you mentioned, that you discussed.

**GOODLATTE**:  So you do believe the civil -- private right of action would complement your efforts, would -- given the resources and limited actions many times that you have, that would be something that would complement your actions that you currently...

**LYNCH**:  I'd like to see the language.  But certainly we look forward to working with you on that.

**GOODLATTE**: OK.

Also I want to -- and we're jumping to several different issues. And one I want to come back to that was brought up earlier. And it has to do with sanctuary cities.  And it goes back to a question.

Then I want to know has DOJ taken any action to withhold law enforcement grants or other funding to sanctuary jurisdictions?  If not, why not?

**LYNCH**:  Well, the grant process under which DOJ operates is a formula-based grant making process.  And different organizations and entities within cities apply.

Certainly with respect to our grant making process in general, we're always cognizant of concerns that have come up within certain jurisdictions.  We have found that through our grant making process we can effectuate great change in a host of very significant...

(CROSSTALK)

**GOODLATTE**:  But Madam Attorney General, if I don't mind interrupting here.  But shouldn't following the law be a prerequisite for a grant?

**LYNCH**:  Certainly we work to enforce not only the laws that you were referring to, but all the laws with the cities with whom we work.

**GOODLATTE**:  But getting a grant, if you're not following the law, have no intention of following the law.  Why should -- I mean at that point in time the application should be just set aside.  Follow the law, we'll talk to you about your grant.  Why can't we get to that?

**LYNCH**:  Well, thank you for the question, congressman.  Certainly it's been raised in a number of contexts.  We do find that our grants are very focused on specific areas.  For example, providing more police officers on the ground...

**GOODLATTE**:  Again...

**LYNCH**:  Providing...

**GOODLATTE**:  You've got great talking points.  I appreciate that. That's not my question.

How can you -- if you're using money to circumvent the law, as you just basically implied, that's even worse.  You don't incentivize this kind of behavior.  Why would it just not be a permanent stop to the grant making process until a city or a municipality or a government entity complied with the law?

**LYNCH**:  Well, congressman, with respect to our grant making process, we do make very discrete focused grants to specific portions of city government.

AR-00162

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

**GOODLATTE**:  So in essence you will subsidize lawless behavior. That's what the attorney general of the United States of America has just testified to.

And you can sit and -- I mean that's what you just testified to. You'll give money to a locality that is not following the law because you want to use your grant in discreet, private ways.  Is that what you just said?

**LYNCH**:  We use our grants to incentivize better behavior in a host of ways.  And our grant making policy is focused on a very rigorous application...

**GOODLATTE**:  So you're telling the people of the 9th District of Georgia that taxpayer dollars that come to them is being used and will not even be considered.  If a locality is not complying with the law, you will still give their tax dollars to a locality that is not complying with the law.  Is that your testimony?

**LYNCH**:  We look at a host of factors...

**GOODLATTE**:  So the answer's yes.

**LYNCH**:  We look at a host of factors...

**GOODLATTE**:  Not your host of factors.  It is yes.  I mean this is the part that -- and the ranking member made a great point earlier when he first started.

And I'm going to finish up with this.  I've had these hearings, and you'll be back before us at another time and I look forward to those hearings.  But what is amazing to me and the American people watching here is he said tell the truth and work those, but also being prepared for questions.

You're going to get VA questions here.  You're going to get sanctuary city questions here.  You're going to get you know a lot of host of questions.  And even the ranking member listed those off.

Coming and giving an answer that we're looking for that we're not being -- you know, basically a set up where the people don't understand that is a fling (ph) that very much frustrates most people of Washington, D.C.  You've been very well prepared for this by those who want to prepare you for these hearings.

There's just a big disconnect at a certain point of time when the attorney general of the United States will not say that they will not want to give money to an organization or to a locality that is not following the law.  We're still going to give taxpayer money.  That is unacceptable and what most people find abhorrent.

And with that, I recognize the gentlelady from Washington, Ms. Delbene.

**DELBENE**:  Thank you, Mr. Chair.  Thank you, attorney general, for being here with us today and for all of your time.

As you are no doubt aware, 2012 voters in my home state of Washington passed Initiative 502, which legalized the sale, consumption and taxation of marijuana products.  Including Washington, 23 states and the District of Columbia have legalized some form of marijuana.  And in 2016 several more states are expected to consider marijuana legislation on ballot initiatives.

Washington's already collected over $80 million in tax revenue from sales.  And since the passage of Initiative 502, court filings in Washington for low level marijuana offenses have dropped by 98 percent, saving the state millions of dollars in enforcement and in judicial expenses.

As you also may know, there are a wide variety of marijuana reform measures that have been introduced in Congress.  And there's still the ongoing concerns about the conflict between state and federal law in many areas, particularly in banking, for example.  And they range from legalization to rescheduling.

And a bill that I recently introduced, the SMART Enforcement Act. My bill would give you, the attorney general, the authority to waive the Controlled Substances Act for states that are effectively regulating marijuana themselves, such as Washington State.

AR-00163

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

So it authorizes a waiver from the Controlled Substances Act for states that meet requirements preventing the distribution of marijuana to minors, violence or use of firearms in cultivation and distribution of marijuana, and drugged driving. And I want to thank your team for answering many questions that my office had as we were in the drafting process.

I wanted to hear from you your thoughts on this type of legislation and this approach to reform. And about how the enforcement priorities that were outlined in the Cole Memo have been working.

**LYNCH**: Thank you, congressman, for the question. And we're happy to provide information and assistance as needed by your staff as you review this important issue.

Certainly the factors that have been outlined in the Cole Memo and that have been stressed in further discussions with the U.S. attorney community remain consistent. Our concerns are the areas that you mentioned.

Where a state chooses to have a legalized marijuana structure, we will review that structure and look at that. But our concern is frankly that marijuana getting into the hands of minors and also being trafficked out of state where a state may have not mad the same choice.

We also have grave concerns about the areas of the edible products that are so appealing to children and expose them to this product, which I don't believe is the goal of the regime that you're talking about, but is a concern of ours.

We're also concerned as well about the violence that is still associated with the higher levels of the marijuana trafficking industry.

And so at the federal level we are focusing our resources on that type of enforcement action. And we continue to do so.

In my former office, we prosecuted cases involving importation of large amounts of marijuana, utilizing an Indian reservation on the Canadian border, and also utilizing organized crime connections.

So, we certainly still have a robust practice. Again, we focused limited federal resources on those types of cases...

**DELBENE**: But we know that we have states like ours that have challenges, banking in particular, because they're still -- even while there may not be, you know, active activity against states who have legalized, we still have situations where banks are not able to serve these types of businesses because of the conflict between state and federal law.

My legislation would allow you to issue waivers to states that meet and provide effective regulatory regime, and these would be three-year waivers, so that you're able to give those states a waiver from the Controlled Substances Act, and establish the requirements they were going to meet.

Is that a type of legislation that you think would help address the issues that we have between federal law and state law today?

**LYNCH**: Well, and we're certainly happy to review any proposal that you think would be helpful and to provide comment on that. I'd have to look further at that proposal before I could respond.

**DELBENE**: It is -- it is a bill we've introduced, and we worked to get feedback from your office, too. So I'd welcome any feedback there.

I also just wanted to ask quickly -- you talked about a -- creating a new cyber security unit within the criminal division, and I wanted to ask exactly, you know, what made you decide to do that, and what are the goals of the -- of that particular new unit?

**LYNCH**: That is within our computer crime unit. We have a cyber security unit focusing on computer intrusions, computer hacking, and the sophisticated types of computer activity that hackers, many of whom are based overseas, are using, to infiltrate our computer systems.

The types of activity that we're looking at involve not just the wholesale theft of private information, which can be so challenging at a very basic level of identity theft, but also the theft of personal information such as health care information,

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

which raises significant privacy concerns, and also intellectual property. We find that private industry is being targeted, particularly our financial services are being targeted at an increasing level by cyber intruders who are seeking to essentially take advantage of American technology and ingenuity and siphon it overseas for production there without the benefit of the work that we put into it.

As I indicated in response to Mr. Chairman's question, that recent estimates indicate that approximately up to $250 billion worth a year worth of our intellectual property is being lost to us through that. This is a grave concern, as all of us seek to make sure that our economy is as strong as possible. That we get the benefit of American ingenuity and American technology. And that we protect what our protected secrets. Many of these -- many of the matters that are being stolen are not only sensitive, but very, very unique to particular industries, and important to the growth of particular discrete industries.

We felt that we needed to increase the resources to this because the problem is increasing. In addition, however, it is working very, very well.

One way in which it's working very well is through our connections to private industry. We, along with the FBI and the Secret Service have made extensive contacts and discussions with private industry, general council, CEOs, CIOs about cyber secret, and the need to share information about breaches when they occur.

We are also ramping up within the Federal Government our own efforts to provide information to companies when we determine that they have been the subject of a breach or a hack. We are working to reduce our response time, to get information to them as quickly as possible, so they can also begin protecting their data and protecting their information. So it's been a very positive effort.

**DELBENE**: Thank you so much. I yield back.

**GOWDY**: General lady's time has expired. You yield back?

Thank you. The chair now recognizes the gentleman from Florida, Mr. Desantis.

**DESANTIS**: Thank you, Mr. Chairman. Welcome, Madam Attorney General.

When you were the U.S. attorney and you received inquiries about an ongoing investigation, how would you respond to those inquiries typically?

**LYNCH**: Well, as you -- Mr. Congressman, thank you for the question. It is department policy and certainly my own view as a career prosecutor, but typically our response would be that we're not able to comment on an ongoing matter.

**DESANTIS**: And part of the reason for that is because if you're out making statements in the press, that detracts from the public's confidence that you're doing it by the facts, if you're trying to prejudice the investigation. Is that fair to say?

**LYNCH**: That is certainly one of the reasons, congressman.

**DESANTIS**: Let me ask you this, when you were an AUSA -- a line prosecutor -- did you ever prosecute a case against someone with whom you had either a relationship on a personal or professional basis?

**LYNCH**: Can you be more specific?

**DESANTIS**: Did you ever get assigned a case where the defendant was somebody that you knew, either personally or professionally that had a private relationship?

**LYNCH**: That did not occur in my experience.

**DESANTIS**: Would it have been appropriate, do you think, for you to have had a case of someone who, you know, maybe you worked with prior to taking the position as a prosecutor, would that case likely have been sent to a prosecutor who did not have that relationship?

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

**LYNCH**: It depends entirely on the facts and circumstances of the case. What type of case it was. Whether it involved an individual, an entity. Every case is looked at on its own merits.

**DESANTIS**: And so here's why I'm kind of asking these questions because I delivered a letter, you probably haven't had a chance to read it yet, from a number of my colleagues, over 40 of us, requesting that you appoint a special counsel to look into the situation with former Secretary of State Hillary Clinton's e-mails.

And the applicable regulations say that that's warranted if there's a conflict of interest for GOJ or there are other extraordinary circumstances, and it would be in the public interest to appoint an outside special counsel.

So, here's why I think it makes sense. You were appointed the U.S. attorney in 1999 by President Bill Clinton. And I've had a chance to meet a lot of people who have served as ambassadors different -- I've never met anybody who doesn't have esteem for the person that appointed them to high office, I mean, it's a tremendous honor.

Your current boss, who appointed you to your current job, President Obama, appointed you again to the U.S. Attorney's Office and to your current job as the attorney general, and it's been said, made statements saying that -- that somehow there's no damage to national security. And then you have the presumptive presidential nominee of your party is subject to this investigation.

So, to me, that would meet any definition of extraordinary circumstances. I don't think we could probably find a similar fact pattern in American history where such an investigation was put up. So why not -- so that the public has confidence that this is done in an apolitical manner -- assign somebody who's trustworthy to serve as a special counsel, and then this way, however the investigation goes out, the public's going to have much more confidence in the outcome.

**LYNCH**: Well, Congressman, thank you for your letter. I look forward to reviewing it and will provide a response.

**DESANTIS**: But why not -- this -- forget about the letter. Why -- why aren't these extraordinary circumstances?

**LYNCH**: Well, I would never forget about your letter, first of all. And we will provide a response to that. Certainly, we'll review the issues that you raise and we'll provide you with a response.

**DESANTIS**: Do you think, though, that you as the attorney general, that having the investigation that -- that concerns the spouse of somebody that's appointed you previously to a very important position -- and, I mean, and it's not saying that somehow you're not going to try to do a good job. But it's just -- it's human nature, I think, and then the appearance of whether there's a conflict of interest at stake is something that I think a lot of people are concerned about.

And I appreciate that you're going to review the letter. But -- do you not see why that would cause people a little bit of pause?

**LYNCH**: Congressman, we will review everything raised in your letter and provide you with a response.

**DESANTIS**: Well, we look forward to doing that and hopefully you will do that in a timely fashion. Your predecessor usually did not respond in a timely fashion.

The vetting of the refugees. The testimony you gave is different from the testimony that we had from the FBI director a couple weeks ago about our capacity to vet.

And he, I think, said that you're getting better at it but that you can't guarantee. I think you are confident that -- that they'll be able to vet.

Well, let me ask you this. Your department brought terrorism charges against a number of Bosnian immigrants, some of whom, at least one of whom was a refugee. So if our vetting is good, what happened in that case involving the Bosnian who was indicted on material support for terrorism charges in February 2015?

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

**LYNCH**:  Well, I'd have to look at that specific case before I can provide you with an answer about that, Congressman.  And, of course, if it were an ongoing case, I wouldn't be able to comment about it, so, again, I'm not able to give you that answer at this time.

And we'll see what information we can provide about that -- about that matter.  As I indicated, we have a robust screening mechanism for refugees from all countries.

It relies upon efforts of not just the FBI, but the Department of Homeland Security, Department of Defense, State Department.  It uses interviews, it uses biometric data.

It is, as I indicated earlier, a challenging process.  As is everything we do in law enforcement.  But that does not mean that we're not committed to doing everything that we can to make sure that the process is as robust as possible and that we do everything that we can to protect the American people.

**DESANTIS**:  I think the -- the concern, though, is that you can do everything right, but given the lack of data, the lack of information about we have (sic) on people who are being pulled out of a very, very difficult circumstance, essentially an Islamic civil war, that you can do everything right and you can still have people come into the country who mean to do us harm.  This Bosnian was able to get in, and probably circumstances that it would have been easier to vet than with Syrians, and so I know a lot of us have concerns, but I appreciate your testimony and I yield back.

**GOODLATTE**:  The gentleman yields back.  The chair now recognizes the gentleman from New York, Mr. Jeffries.

**JEFFRIES**:  Thank the chairman.  And I thank the attorney general for your presence and your testimony here today and your leadership.

One of my colleagues from Illinois mentioned earlier that in the city of Chicago approximately 60 percent of the instances of gun violence can be traced to weapons that were initially purchased in either the neighboring states of Wisconsin or Indiana, as well as I believe from Mississippi.  It's also the case that many of the weapons that are used to commit crime in South Central Los Angeles can be traced initially to the neighboring state of Arizona.

We've got a similar problem in New York in terms of the weapons that are used often to commit crime in the city.  And in fact this has been illustrated.

Recently we've experienced the deaths of four officers in the line of duty over the last 10 months: Detective Ramos, Detective Liu, Brian Moore and Randolph Holder.  It was a very diverse group, sort of emblematic of the increased diversity of the New York City Police Department.  One was African-American, one was white, one was Asian, one was Latino.  They all paid the ultimate price.

One of the things that they had in common was that the weapons that were used to kill each of these officers came from outside of the state.  Detective Ramos and Detective Liu were killed by a weapon that came from Georgia.  Officer Moore a weapon that came from Georgia. Officer Holder a weapon that came from South Carolina.

And so it seems that even as certain states see fit to tighten their gun violence prevention laws, because there's no national legislative effort, many states have been subjected to closing the front door, but guns being able to come into those states through the back door.

And so my question is do you think that the gun trafficking laws that currently exist on the books are adequate for the ATF, the FBI, the Department of Justice to do its job in combating gun violence?

**LYNCH**:  Well, certainly, congressman, the protection of the American people, particularly when it comes to gun violence is one of our highest priorities.  And we are committed to making every effort to carry out that goal and that responsibility.

We look to vigorously enforce all the laws on the books.  There are a number of cases I recall when I was still in Brooklyn that my colleague in the Brooklyn D.A.'s Office was able to essentially closedown a firearm trafficking ring that was bringing guns, as you indicated, from Georgia to New York.

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

So it's something that all levels of law enforcement take very seriously. We work closely with our state and local colleagues on this issue. And we will continue to do so.

Certainly should Congress consider additional legislation, we'd be happy to provide input and comment on that. That is certainly something that I think there is a debate about. And I think all voices should be part of that debate.

**JEFFRIES**: Has the Department of Justice taken a position, for instance, as to whether universal background checks or comprehensive background checks would be something that Congress should look to do as it relates to tightening our gun violence prevention laws?

**LYNCH**: Well, certainly I think as we've been asked that question, we've provided information about cases and about trends that we have seen that we hope would be helpful to the analysis here in Congress on that. And if that were something that Congress were to consider, we would work to implement that as well.

**JEFFRIES**: It's my understanding that the Department of Justice is currently investigating whether the civil rights of Eric Garner were violated when he died as the result of a chokehold that was deployed in July of 2014 by an NYPD Officer Daniel Pantaleo. Is that correct?

**LYNCH**: Yes. That was -- that tragic incident did occur in 2014 and it was on Staten Island, my former district.

**JEFFRIES**: And in December of 2014 I believe the Department of Justice publicly announced that it was considering whether civil rights prosecution would be appropriate. Is that correct?

**LYNCH**: Yes. Essentially, as you may be aware, the Staten Island district attorney initially undertook an investigation and grand jury presentation. As is commonly our practice, we awaited the results of that investigation, and after the conclusion of the state matter began our own federal review, which is ongoing.

**JEFFRIES**: OK. And in the context of the federal review as ongoing, Eric Garner obviously has been killed. The individual who I think courageously recorded the incident is currently being prosecuted at the state level in a manner that many of us view as retaliatory. It remains to be seen.

But the officer who deployed a chokehold that had been administratively prohibited by the NYPD for the previous 20 years remains on the force, on desk duty, still receiving a salary. At any point did the Department of Justice communicate to the city of New York that it should refrain from proceeding with disciplinary action against this officer during the pendency of your investigation?

**GOODLATTE**: The gentleman's time is expired. But the attorney general can answer.

**LYNCH**: Thank you, sir.

Mr. Congressman, I'm really -- I'm not able to go into the specifics of the discussions that we may or may not have had with the NYPD except to say that it is common practice that during the pendency of the investigation officers are placed on a modified duty assignment consistent with the internal practices of the NYPD. And that but they still retain the right to take action.

They often do await the results of a federal investigation also. That has been my experience in the past with the cases that I have personally prosecuted and seen prosecuted.

**GOODLATTE**: The gentleman's time's expired. The chair now recognizes the gentleman from Michigan, Mr. Bishop.

**BISHOP**: Well, thank you, Mr. Chair. And thank you, Madam Attorney General, for being here today, and for your patience in sitting through this long testimony.

I -- the primary function of any prosecutor is to enforce the law and the Constitution and to ensure justice. And as I listen to some of the questions this can be applied in several different areas that we have been discussing today.

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

The chairman took you down the path of talking about sanctuary cities. And to me the idea of sanctuary cities is really antithetical to what prosecutors believe, and that is the -- is justice because it is the selective application of laws.

And I'm wondering what your opinion is of sanctuary cities, given all that's been happening in this country. We have cities that have decided to enforce their own brand of law, to ignore law. We have constituents that we represent that don't understand that.

And there are members that do not understand how we can have a law enforcement community that does not enforce the law. It just is -- it's inexplicable.

I think it's important that we have some clarity to this answer. But federal law prohibits, specifically Section 642 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, any state or local government from prohibiting their officials from communicating with DHS information regarding the immigration status of any purpose. Yet it happens.

And I'm just wondering. Your predecessor didn't address this issue. I'm wondering if you can address it. And if you can give the American people some clarity as to why sanctuary cities are still allowed to exit in this country.

**LYNCH**: Well, congressman, I have to tell you. It is not an issue on which I'm able to give you clarity. But the history of sanctuary cities at this point, I'm happy to look into the issue and provide you with what information we can.

I know that it is an issue of intense debate. And of course the Department of Justice is able to provide not only the information, but to help in that debate.

I'm not able to give you the history of how they came about or explain that to you. I do understand the challenges that you note, however.

**BISHOP**: Well, you -- that is exactly why Americans are frustrated because that's the answer that they're getting.

Selective enforcement of the law is not justice. It is in fact lawlessness. And we live in a country that we require our citizens to obey the law. Yet our own law enforcement is being directed not to follow the law.

So you have to wonder at what point in time do the citizens of this country begin to say, why in the world am I following the law if my own government doesn't apply it in a fair way? I do believe that we are fast approaching a point in time in this country when people will just ignore the law.

And we wonder why the crime continues to proliferate. We have -- you have your Violence Reduction Summit that you had. I would think this would be a really good conversation piece to have.

Why is it that we allow cities to ignore the law? And why law enforcement refuses to talk to each other. And why we allow some of these glaring examples of violence to occur in our inner cities.

We complain about it. I've heard it here today. Yet we're not doing what we could do to ensure that it doesn't happen in the future. It causes me great anxiety to sit here and not hear someone -- a public official say, we will not stand for lawlessness. We will not allow cities to circumvent or ignore the law. We are going to use the power and weight of our office to ensure that justice is done.

And I say that with conviction, because I believe it's common sense. It has nothing to do with politics. It's common sense.

And I'd let you respond to that if you have any response to that.

**LYNCH**: Well, thank you, Congressman. I do understand the frustration that you outlined. And certainly, with respect to the statutory regime that you inquired about, as I indicated, I'm not able to give you that historical information now, but I look forward to providing you what information we can.

**BISHOP (?)**: Oh, I yield back.

**GOODLATTE**: The gentleman yields back. Gentleman, Mr. Cicilline, is recognized.

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

**CICILLINE**: Thank you, Mr. Chairman, and thank you, Madam Attorney General for being here, particularly at a moment when I know you and the entire Justice Department is offering full assistance to your counterparts in France to respond to this horrific terrorist attack.

I want to focus my questions, really, on gun violence in our country. And specifically, as you know, under federal law, a gun seller may transfer a firearm to a purchaser after 72 business hours, even if a criminal background check has not been completed. And because of that -- it's called default proceed policy within the department, and because of that, gun dealers went forward with almost 16,000 sales to people who turned out to be prohibited purchasers between 2010 and 2014.

So my first question is, do you think that the default proceed policy should be changed to a policy that says, firearm sales may only occur if the background check has been completed and the transfer approved?

**LYNCH**: Certainly, you raise an important issue about gun safety and our background system.

We have been looking specifically at this issue. Given the unfortunate tragic circumstances that allowed Dylann Roof to purchase a firearm.

And what I will say, though, is that while it does make it challenging and make it difficult to ensure that we keep firearms out of those who are prohibited, that is the current state of the law.

**CICILLINE**: Yeah, no, I understand that, but you agree, do you not, Madam Attorney General that if the law, in fact, said that background check has to be completed and the transfer approved, we would reduce the live likelihood that people who are ineligible, 16,000 in that four-year period, it's -- from purchasing fire arms, correct?

**LYNCH**: Certainly it would provide law enforcement with another tool to make sure that firearms are out of the hands of prohibited persons and should Congress consider something, we'd be happy to provide input and comment on that.

**CICILLINE**: So, when that information is determined, when it's determined that a person is a prohibited purchaser, the agency sends out a retrieval notice to the Bureau of Alcohol, Tobacco and Firearms, correct?

**LYNCH**: Yes. If a prohibited person does obtain a weapon, there's a retrieval notice.

**CICILLINE**: And so, do you know what happens to those cases in which the ATF is directed to retrieve a firearm?

Do you track that?

**LYNCH**: With respect to retrieval notices, ATF will designate an agent to investigate the location and whereabouts of the individual and the firearm, and retrieve that firearm from that person.

**CICILLINE**: So, under current law and practice, no notice is provided to local law enforcement or to the U.S. attorney's office in that jurisdiction, is that correct?

**LYNCH**: It is done through ATF, that is correct.

**CICILLINE**: So that we have information that in, at least some of these cases, someone who is ineligible because they're a convicted felon, has purchased a firearm, but we don't provide notice to local law enforcement or to the U.S. attorney's office, only to ATF.

**LYNCH**: That's the current system. Yes, sir.

**CICILLINE**: OK. You would agree that providing that information to local law enforcement, or to the U.S. attorney's office would allow them to prosecute some number of individuals who, criminally and in violation of federal law, bought a gun with a criminal record?

**LYNCH**: Congressman, I agree that certainly the sharing of all relevant information helps all law enforcement. Every case would have to be looked at differently, and with respect with the individual facts of each case.

AR-00170

**CICILLINE**:  In addition, I want to just focus your attention for a moment, Madam Attorney General, on the NICS system.  Director Comey testified before our committee that receiving timely records from state and local law enforcements was a potential area for improvement.

Are there legislative efforts we can undertake to increase compliance by state and local governments?  Is it your sense that it's a lack of federal standards, general administrative difficulties?

Or is it just non-compliance, and what can we do, as members of Congress to try to encourage or require compliance with the NICS system, because it's only as good as the information that's contained within it?

**LYNCH**:  Thank you, Congressman.  Yes, the nix (ph) system is an important part of our background checks system, and we do rely very heavily on information from our state and local counterparts.  In many instances, we have excellent reporting from those counterparts, and some instances, it is not as robust as we need.

And anything that could be done to improve that would be useful. Certainly, the -- you could consider legislation.  We also have been working directly -- speaking directly with those localities to encourage them to improve their reporting to the current system.

**CICILLINE**:   And one final question, Madam Attorney General. Congressman Deutch made reference to this.   This challenging issue of the definition of engaged in the business of dealing firearms.  Even the ATF has said that this very vague standard frustrates prosecutions.  It allows people who regularly sell guns to avoid the requirements of background checks. And some have suggested that you could issue a regulation that would provide greater clarity and define that.

We recognize that legislation is also possible.  But will you agree to at least look at whether or not you have the ability to issue clarifying legislation that will attempt to reach these individuals who are regularly engaged in the sale of firearms, but are not determined to be engaged in the business of dealing firearms, and thereby go free from any of the constraints that exist for firearm sales and present significant dangers as a result?

**GOODLATTE (?)**:  The gentleman's time has expired.  The attorney general can answer.

**LYNCH**:   Thank you, sir.  Congressman, with respect to the important issue of our firearm statutes, obviously, significant changes would have to be considered and implemented by Congress, and should they be considered, we'd be happy to provide input and guidance there.

In the current statutory scheme, we always do everything that we can to ensure robust enforcement under the current statutes.  It involves, for example, outreach on the part of ATF to gun dealers to provide guidance to them as to their activities. That goes on on a regular basis so that we can, in fact, increase and encourage compliance on the part of dealers.

**CICILLINE**:  Mr. Chairman, I'd ask unanimous consent that this first report -- the FBI data shows thousands of gun sales beat checks be introduced as part of the record.

**GOODLATTE (?)**:  Without objection, so ordered.

**CICILLINE**:  I'd ask unanimous consent that this article, entitled "Walmart Has Tougher Policies for Background Checks Than the U.S. Government Does."

**GOODLATTE (?)**:  Without objection.

**CICILLINE**:   And finally, a report entitled "Businesses As Usual," prepared by Everytown for gun safety, how unlicensed high volume gun sellers fuel the criminal market.

**GOODLATTE (?)**:  Without objection.

The gentleman -- the chair now recognizes the gentleman from Idaho, Mr. Labrador.

**LABRADOR**:  Thank you, Attorney General Lynch, for being here.  I know it's been a long day.

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

I'm -- as you -- I'm deeply, deeply troubled by recent events taking place on the global stage. I know that you have shared your concern about what happened in Paris, attacks in Beirut and the current crisis in Syria. These events, both singular and ongoing, have reinforced and further impressed on us the very harsh realities of our world, and now we are confronted with a duty to respond here in Congress.

I hope that the administration will take the necessary steps to ensure our nation's security to the greatest extent possible in these uncertain times. We -- as you know, Director Comey was here just a couple of weeks ago and we asked him some questions. He testified before this committee that the FBI cannot offer absolute assurance that there is no risk associated with the current Syrian refugee crisis.

In fact, when I asked him specifically about the security gaps in Syria, he said the challenge we face with Syria is that we don't have that rich a set of data, so even though we've gotten better at querying what we have, we certainly will have overall. So in other words, he's saying we have the ability to query the information that we have, but we don't have a good set of data. We don't have a good set of intelligence. Do you agree with that assessment?

**LYNCH**: Certainly, with respect to the information coming into our databases from Syria, as the director has noted, it does present challenges to law enforcement. However, that does not mean we will stop trying to obtain data and utilize that screening system and I certainly want to convey our commitment to doing that. But certainly, as the director has indicated, there are challenges to a system based upon the amount and type of data that one can obtain.

**LABRADOR**: So when you hear the media out there, they've spent the last two days saying that we are vetting these Syrian rebels. But the reality is that we don't have sufficient information to know. Obviously, your administration is doing everything possible to gather the information that we have, but the problem is that we don't know what we don't have, especially because the intelligence on -- on these people is -- is not as fast as it was in Iraq, for example. Isn't that correct?

**LYNCH**: Well, certainly, every -- every country presents a different scenario in terms of the information that we can gather from them. And certainly, while Syria does present its challenges, I'm not able to unequivocally say that we obtain no data from them. I don't believe...

**LABRADOR**: I don't think that's what I said.

**LYNCH**: ... that we have that information at this point.

**LABRADOR**: I don't think that's what I said. I just said that -- that we have some problems. In fact, he said, "I would say we have a less robust data set dramatically than we had with Iraq, so it is difficult." Would you agree with that assessment?

**LYNCH**: It certainly does present challenges, yes, Congressman.

**LABRADOR**: So he said dramatically, he said -- he didn't say just there's a small difference between the two countries, but between Iraq and Syria, that's a dramatic difference in the type of intelligence that we have. Then when I asked the FBI director, I asked him what the FBI can do to improve security checks. This is one of the things that scared me the most. He said, "That's one I don't have a good answer for."

So, do you have a good answer for what we could do right now to improve dramatically, the intelligence that we have on these Syrian refugees?

**LYNCH**: Well, Congressman, what I can tell you that both the FBI director and I will do everything in our power to continue to protect...

**LABRADOR**: I know you will do everything in your power. And I appreciate your answer, but what specifically are you going to do, so I can go back to the people of Idaho and let them know that the Syrian refugees that may be coming to the state of Idaho had been properly vetted? Not just vetted, but properly vetted, so we know exactly what their backgrounds are.

**LYNCH**: Well, certainly, Congressman, we can provide you information on the type of vetting that is done. As I've mentioned before, the FBI...

AR-00172

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

**LABRADOR**: But we know already that the vetting that is done is not sufficient. I mean, Director Comey already said that. So your answer is insufficient at this time. What -- how can I give assurances to the people of my district that we will have the intelligence that is necessary to know whether they are going to be harmful or not, to our communities, to our nation and to the families in my district?

**LYNCH**: Well Congressman, as I indicated, we can in fact provide you information on the nature of the vetting. We can in fact, provide information, as I indicated that is done by the FBI. But also, in conjunction with the Department of Defense, State, Homeland Security.

We also rule on more than just the databases. Every refugee from whatever country who chooses to come here or to try and come here is also subject to a robust interview process, as well as a biometric analysis of -- of the individual who is literally in front of that interviewer. Something that unfortunately, Europe does not have the ability to do at this time, placing them in a dramatically different situation than us. And certainly, we're happy to keep you updated on developments there.

**LABRADOR**: So you -- you think that biometric information that's provided for Syrians, which the FBI director said was not sufficient -- you think that it is sufficient?

**LYNCH**: Congressman, I can indicate to you the types of measures that are in place and provide you the information on the type of screening that is done, so that information can be be conveyed to the people your district.

**GOODLATTE (?)**: The gentleman's time has expired. The chair recognizes Mr. Trott.

**TROTT**: Thank you Mr. Chairman. Thank you Madam General for testifying today.

I want to talk a little bit about the mortgage settlements and -- you know, in 2013, activist groups met with then Deputy Attorney General Tony West and urged him to, in my opinion, create a slush fund to fund their activities in connection with the J.P. Morgan-Chase settlement. Then in 2014, the same groups came back to the deputy attorney general, and in connection with the Citi and Wells Fargo settlements, really pushed and accomplished mandatory donations to activist groups, specifically IAF, with enhanced credits for donations to those groups.

And I wondered if you could comment on whether you think that those discussions occurred, number one, and if the they, why?

**LYNCH**: Congressman, with respect to those settlements involving residential mortgage-backed securities frauds, they are an important part of the department's work to not only protect the American people, but provide relief from the financial crisis and the housing crisis that has occurred from 2008 on.

In connection with your specific question, I'm not aware of the meetings that you were talking about. I was not involved in them. But what I can tell you, as a former U.S. attorney who was involved in the settlements of two of those matters, negotiations were between the banks and the governments. And that is certainly how those matters were handled and how they were resolved.

With respect to the consumer relief portions of those settlements, with -- the money there comes from the banks and it is specifically designed in the wake of the widespread and detailed admissions of wrongdoing on the part of the banks that led to thousands, if not hundreds of thousands of homeowners losing, not only their homes, but the value of their homes and their savings.

We also instituted consumer relief to provide direct relief to people. That went above and beyond the statutory penalties of the FIRREA statute under which these cases were brought. Where are able to provide, for example, were the main forms of relief, is principal reduction. Were there other entities involved, the banks would make a selection, and they would have to be an entity from a preapproved HUD (ph) list that focuses specifically on relief, for example, foreclosure...

**TROTT**: No, I -- I understand how the money was -- and how the settlements and the money in -- in connection with the settlements was supposed to be used.

AR-00173

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

What I'm concerned about, is IAF which is, specifically, an activist group which focuses on community organizing, got tens of millions of dollars with the intent, I believe, of training high school students about the importance of debt management and financial management.

And I can't, for the life of me, understand why that -- if you're really looking at trying to curtail future mortgage defaults, why that money wasn't given to the mortgage bankers of America, or the different state bar associations that were doing very good work in terms of loan modifications.  Instead, it went to some group that had a different agenda, in my opinion, unrelated to mortgage default activity, and -- and then, I guess the larger question is how are we doing on the discovery with respect to what really on happened in connection with these settlements?

LYNCH:  You can be more specific about that...

TROTT:  11 months ago, this committee asked for the e-mails relating to discussions between DOJ and outside groups as it relates to mandatory donations to these activist groups.  That was 11 months ago, and you're a former and very accomplished prosecutor, I mean, how would you feel if a corporation took you 11 months to send you 10 e- mails, what would you do?

LYNCH:  It would depend upon the context of the request, the discovery and any negotiation.  So I'm not able to comment on that.

TROTT:  Is 11 months a good return time for discovery?

LYNCH:  It depends totally on the facts of those -- of the specific circumstances.

TROTT:  Let's -- let's -- let's move in my last minute here to sanctuary cities for just a moment.

So earlier today, Chairman Smith asked you about the Immigration Reform Act of 1996, which bars state and local governments from prohibiting their officials from communicating information regarding immigration status to DHS.

And your response to Chairman Smith's question was, that we're talking with the different jurisdictions about their compliance with this act.  So what are you talking with them about?

LYNCH:  Congressman, I don't believe that that was my specific response.  I -- I would have to go back and look at that response.

What I can tell you is that -- is that I believe my response was that I was not familiar enough with the specific statutory terms that we were discussing to provide a specific answer to this question.  And I'd be happy to look into...

TROTT:  Sure.  Let me -- the section that Chairman Smith was referring to, he didn't reference it, but section 642A (ph), which specifically gives you the ability to enjoin jurisdictions from deciding not to comply with this act.

Have you -- have you sought other than talking with -- the jurisdictions, have you sought any enforcement actions or any injunctive relief to try and make sure the different cities that have decided to go rogue are following federal law?

GOWDY:  The gentleman's time has expired.  The attorney general can answer the question.

LYNCH:  Thank you, Mr. Chairman.  I'm not aware of those actions, but certainly I'm happy to look into that and provide a response to you.

GOWDY:  Thank you for your time today.

LYNCH:  Thank you, sir.

GOWDY:  At this time the chair recognizes the gentleman from Iowa, Mr. King.

KING:  Thank you, Mr. Chairman.  And I want to thank you, attorney general for a long day today, and I hope you had a break for lunch.  I did.

AR-00174

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

A number of things come to mind, I'd like to pick up on the sanctuary city side of this, and that is that this is -- this statute that prohibits the political -- the local jurisdictions, the law enforcement jurisdictions, from having a policy that prohibits our law enforcement officers from engaging with, supporting with or helping immigration enforcement officials from the federal government.

And I'm -- I'm of the understanding that some of these communities prohibit their law enforcement officers from gathering information. And in that way, they circumvent the text of 642A (ph), as the gentleman referenced.

And -- so, I think it's important that you know that section and enforce that section. I've not yet seen an attorney general that does enforce that section of the law. And if you read that, and it reads to you as literally as I have described it to you, would you be prepared then to withhold law enforcement grants from those local jurisdictions?

LYNCH: Well, thank you for the question, congressman. And for the specific factual predicate to it. Again, it's not a statute that I'm familiar with now to give you a specific response to, but I am happy to look into that and provide you with information on that.

KING: I would urge you to do that, and I'm asking you in this record, to please send that to me, at my office, as well as to the committee. I would like to know directly what your response is on that.

This is -- it's very frustrating to be engaged in passing legislation here in this Congress and then seeing that it's ignored. That's the sanctuary city part of this.

I wanted to go back, though, to the background check piece of this. And I understand the distinctions between Iraq and Syria, and the more difficulty in Syria.

But do we have biometrics on the Syrian refugees or the migrants? Do we have fingerprints, do we have digital photographs of those? And is that part of the background check?

LYNCH: It depends on the individual circumstance. I mean, a number of people do come in and do have that information, and a number of people do not. If they come in, as I've indicated before, as part of the process that information would be gathered and also stored in a database (ph).

KING: But you can't do background on information you have just gathered as far as fingerprints or digital photographs are concerned, and so it would have to be part of their record prior to that, say, coming out of Iraq or Syria.

I just came back from there last week. And not only that but I traveled over much of Europe and I tracked with the migrants, and I saw tens of thousands of them, and I met with the State Department in a number of countries.

And they tell me that they're granting -- they're giving our expertise to local countries in the European Union, because as you said, we're ahead of them. So I said, "Well, as some of that, are they fingerprinting, are they taken digital photographs?" Their answer was, well, no, they aren't. Did we give them that advice? Well, no, we aren't?

And so I'm very troubled about the level of confidence you seem to exude here, or the president exudes, on an ability to do background checks when I see a huge haystack of humanity. And in that haystack are the needles that are terrorists.

And also in that haystack are the pieces of hay that will become the needles of terrorists. And so, do you actually believe that the administration altogether can ensure America with any degree of confidence that they can identify someone who will be radicalized because of their association, especially with their religion and their family members, that they will be transferred into here in this country?

LYNCH: Well, Congressman, as I indicated, we do have a robust screening mechanism? As I also indicated...

KING: But how is robust?

LYNCH: ... it's a challenging circumstance in order to ensure that we have the information that we need to make the determinations on who can come into the country and who cannot come into the country.

AR-00175

**KING**: Let me suggest, it doesn't seem at all robust to me. Not if it's not robust enough that we have already identified them in their home country. If they don't have a legal existence in their home country, then how in the world can we possibly do a background check on people that, from a legal perspective, didn't exist before they showed up here at the borders of the United States? We're faced with that constantly.

How about this, are you under any kind of directive by the administration not to say "Islamic jihad" or "radicalism?" Is that a memo that has come out?

**LYNCH**: I've seen no memo on vocabulary, Congressman. Can you can say that or describe the enemies we have that are killing Western civilization in that fashion. Are they Islamic jihad? Are they Islamic radicals?

**LYNCH**: I call them murderers, sir.

**KING**: But you can't say "Islam" in conjunction in that.

**LYNCH**: I'm sorry?

**KING**: How do we understand them if you can't say that? I mean, I want to read to you then -- you can't say it, can you? You can't say it any more than Hillary Clinton can say the word "Islamic jihad," "radical Islamic jihad."

If we can't understand our enemy, if we don't why they are, if we don't know what motivates them -- do you know what the term "hijrah," mean"?

**LYNCH**: I'm sorry, I can't...

**KING**: Hijrah -- H-I-J-R-A-H? An Islamic term for peaceful migration to invade other countries and start your civilization there, and don't assimilate in the broader culture of civilization? And that's being preached in mosques around the Middle East, and they're rising up and moving into Europe and moving into the -- into the United States, and they're resisting the idea that they could ever assimilate into the American culture of civilization, and we're sitting here acting like we can vet them, without even understanding what the word "hijrah" is, and not being able to say, "radical Islam," "radical Islamic jihad," and having a president out of your party that can't say that either.

And I'm flabbergasted, I'm listening -- it will be my last question, honest...

**GOWDY**: The gentleman's time has expired.

**KING**: And I do -- if I'd ask unanimous consent to ask the last question, Mr. Chairman?

**GOWDY**: Finish your question.

**KING**: Did you ever think -- this is actually a little bit of levity -- a little bit of levity actually. Did you ever think that you'd be sitting here, testifying about the House Judiciary Committee hearing so many people of the other party advocating for legalizing marijuana? It's purely rhetorical, and I yield back the balance of my time..

**GOWDY**: The gentleman yield back.

At this time the chair recognizes the gentleman from Texas, Mr. Ratcliffe.

**RATCLIFFE**: Thank you, Mr. Chairman.

Madam Attorney General, in my district, there's quite a large number of law abiding gun owners who also happen to be hunters. I can't tell you how many times I've heard complaints from those hunters about the availability of ammunition, especially at the start of deer season.

As you may know, hunters are being forced to use alternative non-lead ammunition, because manufacturers can't make brass or steel core ammunition for a 30 off six or a 270 deer hunting rifle, unless they get a waiver saying it's primarily intended for sporting purposes and that waiver has to come from the attorney general.

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

Now, in the last four years, there have been at least 32 petitions that have been submitted by manufacturers seeking that designation. Not a single one of those petitions has been granted. But what really begs an explanation, I think, is that in the last four years, not a single response has been sent to any manufacturer with regard to those petitions. So, my question to you is a two-part question. Why haven't those been responded to? And when can a response be expected?

**LYNCH**: Thank you for the question, Congressman. I'm not aware of the request that you have noted. But I thank you for raising them and I would like the opportunity to look into that matter and provide you some information.

**RATCLIFFE**: Well so, can you tell me in the last four years, have you discussed the existence of those petitions with anyone at the Department of Justice?

**LYNCH**: Well, Congressman, certainly for the last four years in my prior position for U.S. attorney for Brooklyn, that matter would not have been within my purview. As I indicated, while I'm not aware of the situation now, I'd appreciate the opportunity to speak with your staff and provide you with that information.

**RATCLIFFE**: OK. Well, are you aware though that there's a statute, 18 U.S.C. 9-21 which says that -- it is, it says which the attorney general finds as primarily intended to be used for sporting purposes. So do you understand that it's your responsibility to make that designation?

**LYNCH**: Yes, it's certainly included in the panoply of responsibilities for the Office of Attorney General.

**RATCLIFFE**: OK. So do you have any idea for why there hasn't been any response at all in the last four years to folks making petitions for the United States Department of Justice?

**LYNCH**: Happy to look into that and provide information to you on that.

**RATCLIFFE**: OK. Well, let me then turn to another troubling issue as the nation's top law enforcement official, I want to get your reaction, to growing anti-police sentiment and actions of certain public groups out there in this country. I'm hoping that you'll agree with me.

I am also a former United States attorney. I took the same oath that you did. I'm hoping that you'll agree with me that police officers and law enforcement are an important part of the backbone of our criminal justice system.

And in fact, I would hope that you would agree that the work that they do is vital to your ability as the attorney general and to the thousands of lawyers that work for you at the Department of Justice to be able to prosecutor violations of law, we can agree on that.

**LYNCH**: I would call them essential Congressman.

**RATCLIFFE**: Right. Well, with that in mind, what is the status of your investigation into Karla Dobinski?

**LYNCH**: Can you give me some context for the question?

**RATCLIFFE**: Sure, let me refresh your recollection. Karla Dobinski was the DOJ taint (ph) lawyer for the New Orleans police officers that were charged in connection with shootings of civilians in the aftermath of Hurricane Katrina.

And as you know, Madam Attorney General, the role of the taint (ph) officer is to make sure that the constitutional rights of police officers are protected from the disclosure of privileged information.

Now it was subsequently established in federal court that rather than protecting those police officers, Ms. Dobinski, who is the DOJ deputy chief, actually rather than protecting their constitutional rights, went online to anonymously leak evidence from the case and to mock the actual defendant police officers that she was supposed to be protecting.

Now, the federal judge in that case called it reckless. He called it wanton. And a new term that I'd not heard, he called it grotesque misconduct and found that she had personally fanned the flames of those burning to see the defendants convicted.

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

So, the reason I raise this, is ten months ago at your confirmation hearing before the Senate Judiciary Committee, you deferred answering questions from Chairman Grassley until you could fully investigate the matter of Ms. Dobinski.

But you responded to his question in writing by stating, if confirmed, I will commit to ensure that the department holds accountable any employees who are found to have committed misconduct. And so, please, please tell me that you've in fact done as promised and you've held Ms. Dobinski accountable for that outrageous conduct?

**LYNCH**: So, Congressman, my understanding of the matter, to the extent that I'm aware of the specifics of it, is that the matter was referred and reviewed by our Office of Professional Responsibility and that the department followed the applicable civil service laws in conjunction with that. But I don't have further specifics on that for you.

**RATCLIFFE**: So, can you tell me whether or not, Ms. Dobinski who engaged in the conduct of trying to help convict the defendants she was sworn to protect, can you tell me whether or not she's still employed it Department of Justice?

**GOODLATTE**: Gentleman's time has expired. The attorney general can answer.

**LYNCH**: Thank you sir. I believe that she is.

**RATCLIFFE**: Well, it would seem to me -- beg the chairman's indulgence here with the appalling targeting of the police that's going on in this country right now. I hope that that's not the message that you want to send to the men and brave and women that wear the uniform to protect us.

If police officer and other law enforcement officials can't count on the top federal law enforcement official to back them up, who can they count on? Thank you for being here. I yield back.

**GOODLATTE**: Gentleman's time has expired. Seeing no other witnesses, we'll close today's hearings. Thanks to the attorney general for your patience and your time today.

Without objection, all members have about five legislative days to submit additional written questions for the witnesses and additional materials for the record. With that, this hearing is adjourned.

END

## Classification

**Language:** ENGLISH

**Subject:** US REPUBLICAN PARTY (90%); WITNESSES (90%); US DEMOCRATIC PARTY (90%); ATTORNEYS GENERAL (89%); ISLAMIC STATE IN IRAQ & THE LEVANT (84%); NOVEMBER 2015 PARIS ATTACKS (84%); US FEDERAL GOVERNMENT (78%); US PRESIDENTS (78%); JUSTICE DEPARTMENTS (72%); TERRORIST ATTACKS (65%); TERRORISM (65%); LAW ENFORCEMENT (62%); REFUGEES (60%)

**Person:** PEDRO PIERLUISI (92%); LORETTA LYNCH (90%); TED DEUTCH (79%); JUDY CHU (79%); HAKEEM JEFFRIES (79%); MIKE BISHOP (79%); DAVID TROTT (79%); SUZAN DELBENE (79%); RON DESANTIS (79%); MIMI WALTERS (79%); JOHN RATCLIFFE (79%); JAMES COMEY (78%); BOB GOODLATTE (78%); F JAMES SENSENBRENNER JR (73%); HANK JOHNSON (73%); JIM JORDAN (73%); JASON CHAFFETZ (58%); TREY GOWDY (58%); STEVE KING (58%); ZOE LOFGREN (58%); LAMAR SMITH (58%); STEVE COHEN (58%); LOUIE GOHMERT (58%); SHEILA JACKSON-LEE (58%); TOM MARINO (58%); TRENT FRANKS (58%); JERROLD NADLER (58%); J RANDY FORBES (58%); DARRELL E ISSA (58%); RAUL LABRADOR (58%); LUIS V GUTIERREZ (58%); JOHN CONYERS (58%); KAREN BASS (56%); BARACK OBAMA (51%); DAVID CICILLINE (50%)

**Geographic:** PARIS, FRANCE (67%); RICHMOND, VA, USA (58%); TEXAS, USA (94%); VIRGINIA, USA (92%);

AR-00178

REP. ROBERT W. GOODLATTE HOLDS A HEARING ON DEPARTMENT OF JUSTICE OVERSIGHT

IDAHO, USA (79%); IOWA, USA (79%); ILLINOIS, USA (79%); RHODE ISLAND, USA (79%); DISTRICT OF COLUMBIA, USA (79%); UNITED STATES (94%); FRANCE (90%); SYRIA (90%); EUROPE (65%)

**Load-Date:** November 17, 2015

---

End of Document

**HAROLD ROGERS, KENTUCKY,** CHAIRMAN
RODNEY P. FRELINGHUYSEN, NEW JERSEY
ROBERT B. ADERHOLT, ALABAMA
KAY GRANGER, TEXAS
MICHAEL K. SIMPSON, IDAHO
JOHN ABNEY CULBERSON, TEXAS
ANDER CRENSHAW, FLORIDA
JOHN R. CARTER, TEXAS
KEN CALVERT, CALIFORNIA
TOM COLE, OKLAHOMA
MARIO DIAZ-BALART, FLORIDA
CHARLES W. DENT, PENNSYLVANIA
TOM GRAVES, GEORGIA
KEVIN YODER, KANSAS
STEVE WOMACK, ARKANSAS
JEFF FORTENBERRY, NEBRASKA
THOMAS J. ROONEY, FLORIDA
CHARLES J. FLEISCHMANN, TENNESSEE
JAIME HERRERA BEUTLER, WASHINGTON
DAVID P. JOYCE, OHIO
DAVID G. VALADAO, CALIFORNIA
ANDY HARRIS, MARYLAND
MARTHA ROBY, ALABAMA
MARK E. AMODEI, NEVADA
CHRIS STEWART, UTAH
E. SCOTT RIGELL, VIRGINIA
DAVID W. JOLLY, FLORIDA
DAVID YOUNG, IOWA
EVAN H. JENKINS, WEST VIRGINIA
STEVEN M. PALAZZO, MISSISSIPPI

NITA M. LOWEY, NEW YORK
MARCY KAPTUR, OHIO
PETER J. VISCLOSKY, INDIANA
JOSÉ E. SERRANO, NEW YORK
ROSA L. DeLAURO, CONNECTICUT
DAVID E. PRICE, NORTH CAROLINA
LUCILLE ROYBAL-ALLARD, CALIFORNIA
SAM FARR, CALIFORNIA
CHAKA FATTAH, PENNSYLVANIA
SANFORD D. BISHOP, JR., GEORGIA
BARBARA LEE, CALIFORNIA
MICHAEL M. HONDA, CALIFORNIA
BETTY McCOLLUM, MINNESOTA
STEVE ISRAEL, NEW YORK
TIM RYAN, OHIO
C. A. DUTCH RUPPERSBERGER, MARYLAND
DEBBIE WASSERMAN SCHULTZ, FLORIDA
HENRY CUELLAR, TEXAS
CHELLIE PINGREE, MAINE
MIKE QUIGLEY, ILLINOIS
DEREK KILMER, WASHINGTON

## Congress of the United States
### House of Representatives
### Committee on Appropriations
### Washington, DC 20515–6015

WILLIAM E. SMITH
CLERK AND STAFF DIRECTOR

TELEPHONE:
(202) 225-2771

February 1, 2016

The Honorable Loretta E. Lynch
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Dear Attorney General Lynch:

I look forward to your fiscal year 2016 spending plan, as required by section 534 of the Consolidated Appropriations Act, and the President's fiscal year 2017 budget request. I want to express the Committee's expectation that the Department of Justice will allocate its resources to the enforcement of existing Federal law.

In particular, I want to focus your attention on the 2016 grant application process for State and local law enforcement agencies. One of the first and most important principles behind successful law enforcement is cooperation and timely information sharing. Congress created the law enforcement grant programs administered by your department for the primary purpose of enhancing the law enforcement capabilities of State and local law enforcement agencies, and my subcommittee has the duty to ensure that these State and local law enforcement agencies are following Federal law before they become eligible to receive Federal grants.

To ensure complete cooperation and information sharing among law enforcement agencies, I expect your office to enforce section 1373 of title 8 of the United States Code in the course of the upcoming 2016 grant application process. This law states that local governments may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Department of Homeland Security information regarding the citizenship or immigration status, lawful or unlawful, of any individual. It is well known that numerous jurisdictions across the country have "sanctuary policies" that prevent State and local law enforcement agencies from releasing criminal illegal aliens into Federal custody for deportation, and prevent State and local law enforcement officers from sharing information with Department of Homeland Security officials regarding the detention status of criminal illegal aliens or when or if those criminal illegal aliens will be released onto American streets in violation of Federal detainers.

AR-00180

If these sanctuary city jurisdictions expect to receive Federal law enforcement grant dollars, they must comply with existing Federal law. I believe there are several actions that you should take to ensure compliance with section 1373 of title 8 of the United States Code and to help prevent the release of dangerous criminal aliens into our communities. These include:

1. The Department should work with State and local jurisdictions to change their illegal sanctuary policies. If they refuse, the Department should seek injunctive relief to compel the jurisdiction to comply with Federal law.

2. For the fiscal year 2016 and future grant application processes, you should amend the application process for the Edward Byrne Memorial Justice Assistance Grant program (Byrne JAG) to require grantees to certify under oath that they are in compliance with section 1373 of title 8 of the United States Code. A statutory requirement of the Byrne JAG program is for applicants to certify that they are in compliance with "applicable Federal laws". The Byrne JAG program was created to help protect public safety, and section 1373 of title 8 of the United States Code was created to protect public safety by ensuring the free flow of information between Federal, State, and local law enforcement. Therefore, section 1373 of title 8 of the United States Code is clearly "an applicable Federal law" for purposes of awarding Byrne JAG funding.

3. In addition to amending the Byrne JAG grant process, I also believe you should apply the same standard to the Community Oriented Policing Services (COPS) program, and the State Criminal Alien Assistance Program (SCAAP) to require grantees to certify under oath that they are in compliance with section 1373 of title 8 of the United States Code.

4. For these self-evident reasons, I expect the Department to deny the award of law enforcement grants (Byrne JAG, COPS, and SCAAP) to jurisdictions that refuse to comply with section 1373 of title 8 of the United States Code.

I expect you to work with the Department of Homeland Security to ensure that the Federal government is not using the SCAAP program to send Federal dollars to jurisdictions that refuse to cooperate with the Federal government. The fact that a jurisdiction can prohibit sharing immigration related information with the Department of Homeland Security in violation of Federal law but can be compensated by the Department of Justice for incarceration costs of criminal aliens is nonsensical.

I also ask you to examine whether jurisdictions that knowingly release criminal aliens into their communities are in violation of section 1324 of title 8 of the United States Code. This section of law prohibits a person from shielding from detection an alien who remains in the United States in violation of law. I believe sanctuary jurisdictions that refuse to honor Federal detainers and that release criminal illegal aliens onto our streets are clearly in violation of this Federal law and have also rendered themselves ineligible for Federal law enforcement grant funding until they change their policies to enforce Federal law.

The bottom line is very simple, State or local law enforcement agencies are expected to work cooperatively with Federal law enforcement agencies. Communities that do not work with Federal law enforcement officials, in violation of Federal law, should not expect to receive Federal grant funding from the Department of Justice.

AR-00181

I appreciate the hard work and dedication of Federal law enforcement and look forward to reviewing a fiscal year 2016 spending plan and fiscal year 2017 budget request that enforce existing Federal law.

Sincerely,

John A. Culberson
Chairman
Subcommittee on Commerce, Justice,
    Science and Related Agencies



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

February 23, 2016

The Honorable John A. Culberson
Chairman
Subcommittee on Commerce, Justice,
    Science and Related Agencies
Committee on Appropriations
U.S. House of Representatives
Washington, DC  20515

Dear Chairman Culberson:

Thank you for your letter dated February 1, 2016, regarding the allocation of resources in the enforcement of existing federal law, specifically regarding the grant application process for state and local law enforcement agencies.

Your letter correctly states that "[a] statutory requirement of the Byrne JAG program is for applicants to certify that they are in compliance with 'applicable federal laws,'" and goes on to ask that we "apply the same standard to the Community Oriented Policing Services (COPS) program and the State Criminal Alien Assistance Program (SCAAP)." We can advise that all applicants for Byrne JAG, COPS, and SCAAP funds already are required to assure and certify that they are in compliance with all applicable federal laws, and will continue to be required to do so in FY2016 (and presumably thereafter). Where the Department of Justice (the Department) receives a credible allegation that an entity receiving funds under a Department grant or reimbursement program has, after assuring or certifying compliance with applicable federal laws, violated a specific applicable federal law, the Department can potentially seek criminal or civil enforcement options against the entity.

In addition, we are actively considering ways in which we may most effectively carry out our public safety mission as it regards enforcing the nation's criminal and immigration laws. In an effort to ensure that criminal aliens are not improperly released onto American streets, we have implemented new procedures when federal inmates with Immigration and Customs Enforcement (ICE) detainers are released from Bureau of Prisons (BOP) custody. Now, BOP offers ICE, instead of the states and municipalities, the first opportunity to take into custody and remove an individual. ICE's decision to exercise this right of first refusal is informed, in part, by the state or municipality's willingness to cooperate with federal authorities on ICE detainers. Thus far, we are pleased with the way in which the new policy is being implemented and are happy to share further developments with you in the coming weeks and months. We are grateful for your and the Committee's support for the Department in the pursuit of our shared goal of protecting and serving the American people.

AR-00183

The Honorable John A. Culberson
Page Two

    We hope this information is helpful.  Please do not hesitate to contact this office if we may provide additional information regarding this or any other matter.

           Sincerely,

           for

           Peter J. Kadzik
           Assistant Attorney General

cc:    The Honorable Mike Honda
       Ranking Member

# REP. JOHN CULBERSON HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

CQ Transcriptions

February 24, 2016 Wednesday

Copyright  2016 CQ-Roll Call, Inc          All Rights Reserved

All materials herein are protected by United States copyright law and may not be reproduced, distributed, transmitted, displayed, published or broadcast without the prior written permission of CQ Transcriptions. You may not alter or remove any trademark, copyright or other notice from copies of the content.

## Body

**EVENT DATE:** February 24, 2016

**TYPE:** COMMITTEE HEARING

**LOCATION:** WASHINGTON, D.C.

**COMMITTEE:** HOUSE COMMITTEE ON APPROPRIATIONS, SUBCOMMITTEE ON COMMERCE, JUSTICE, SCIENCE, AND RELATED AGENCIES

**SPEAKER:** REP. JOHN CULBERSON, CHAIRMAN

**WITNESSES:**

REP. JOHN CULBERSON, R-TEXAS CHAIRMAN

REP. MICHAEL M. HONDA, D-CALIF.

WITNESSES: ATTORNEY GENERAL LORETTA E. LYNCH

REP. DAVID JOLLY, R-FLA.

REP. HAROLD ROGERS, R-KY. EX OFFICIO

REP. DEREK KILMER, D-WASH.

REP. JOHN CARTER, R-TEXAS

REP. NITA M. LOWEY, D-N.Y. EX OFFICIO

REP. JOSE E. SERRANO, D-N.Y.

**CULBERSON**:  The Appropriations Subcommittee for Commerce, Justice and Science will come to order.  It's a privilege to have you with us here today, Attorney General Lynch, our first hearing together as -- with me as the new chairman and you as the new attorney general.

We deeply appreciate your service to the country, and on behalf of the law enforcement community across America and for all of us as Americans who depend on the good work that you and your officers and every law enforcement officer at the state and local level do, we want to thank you.  As America's chief law enforcement officer, we're counting on you to keep us safe, to ensure that the laws are enforced as written by Congress.  We're just immensely grateful for the sacrifice that you and everyone that wears the uniform make on behalf of our -- of our great country.

AR-00185

REP. JOHN CULBERSON HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

We in this years fiscal year 2017 we'll be working to ensure the Department of Justice has the resources that it needs to do its job and not only enforcing our laws as written by Congress but to combat cyber crime, gangs, terrorism, even trafficking and espionage.

The -- of course, our subcommittee has the responsibility to ensure that our constituents' hard-earned tax dollars are spent wisely and frugally in compliance with federal law as written by Congress, and we are confident that the relationship that you and I and your staff have already developed, that we're moving in the right direction which I deeply appreciate. And we'll find ways to continue that cooperation in ensuring that the money that is -- the hard-earned money that our constituents pay to the IRS and the federal government is used to keep our streets safe and is spent wisely and frugally.

We -- it's very important, and I know you as the new attorney general will do all you can to ensure that we don't hear that any of our hard-earned tax dollars are spent for lavish parties, unnecessary expenses or unauthorized activities. And in our hearing today, and in the weeks and months to come throughout the remainder of the -- President Obama's term in office, I know you will work to convince this committee that the Department of Justice is working to diligently enforce federal law and spend our hard-earned tax dollars wisely and frugally to protect us and even those federal laws that the administration wants to change but does not have Congressional support to change, that's an important part of this, it's our responsibility as good stewards of the constituents' dollars.

I would like to hear in particular today how your department is protecting Americans' 2nd Amendment rights, ensuring that state and local governments are not refusing to cooperate with the Department of Homeland security in releasing violent alien criminals into communities. As the new chairman of this subcommittee, the rule is that if a federal agency or a state or local government expects to receive federal money, they have to comply with federal law and I'm delighted with the letter you sent me. It looks like we're on the same page. Very, very pleased to hear that.

The -- we also want to talk about how -- what the Department of Justice is doing to combat cyber crime and espionage, and above all protecting the United States from terrorism. I look forward to working with you throughout the year as the appropriations process moves forward, and before I proceed I would like to recognize our ranking member, Mr. Honda from California, for any remarks he would like to make.

HONDA: Thank you, Mr. Chairman. I also would like to thank you for your leadership and fostering really a collegial open atmosphere amongst the members of our subcommittee. And I also would like to welcome to our subcommittee Attorney General Lynch, and thank you for coming here to testify today.

As our nation's chief law enforcement officer, we are all grateful to you for your service to our country and your commitment to upholding the rule of law. We're also especially thankful for the thousands of hard working men and women at the Department of Justice who work around the clock to keep us safe.

I look forward to building upon last year's successes by putting together a strong CJS appropriations that supports the mission of our law enforcement agencies in protecting the American people especially the most vulnerable among us and those communities that have been neglected in the past.

HONDA: I'm pleased that the president's budget provides for a healthy increase law enforcement agencies in protecting the American people, especially the most vulnerable among us and those communities that have been investigated in the past.

I'm pleased that the president's budget provides for a healthy increase for what has been a relatively stagnant Department of Justice budget over the past few fiscal years. This year's request includes desperately-needed resources for law enforcement at the federal, state and local levels to help keep up in combating new and evolving threats to the American people. It also provides resources to those in distress such as victims of sexual assault and human trafficking as well as tribal crime victims.

I think we all agree that the mission of your department is critical to our country and that it is vitally important that the Department of Justice has the resources it needs to effectively enforce our nation's laws.

With that, I want to thank you again for joining us this morning. I look forward to hearing your testimony and response to the questions from the members of our subcommittee. Mr. Chairman?

REP. JOHN CULBERSON HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

**CULBERSON**: Thank you, Mr. Honda. Madam Attorney General, the -- you're certainly -- you're recognized for your opening statement, and without objection, your written statement will be entered into the record in its entirety. And if we could, I'd encourage to you keep your statement to five minutes to summarize, and that will give us additional time for questions.

But again, welcome, look forward to hearing your opening statement and we'll proceed. Thank you.

**LYNCH**: Thank you so much, Mr. Chairman. Good morning and also good morning and thank you also to Ranking Member Honda, all the distinguished members of the committee, the hard working staff. It's an honor to appear before you today.

I'm grateful for this opportunity to discuss the president's fiscal year 2017 budget for the Department of Justice, which reflects our enduring commitment to creating the stronger nation and the more empowered communities that every American deserves.

In the last year, thanks to the thousands of dedicated men and women who serve the Department of Justice and thanks to the ongoing support of this distinguished committee, we have taken tremendous steps toward that goal. We have prosecuted violent extremists and dangerous criminals, we have defended the integrity of our markets and the beauty of our natural resources.

We also worked to end human trafficking, to disrupt the flow of illegal drugs and weapons and to eradicate international corruption. And we've created new opportunities for second chances in our justice system and new foundations of trust in our cities and towns. These are real and meaningful achievements, and the request set forth in the president's 2017 budget request will allow us to build upon this encouraging progress.

Now as always, the Department of Justice's first priority is the safety and the security of the American people. The president's budget would invest an additional $781 million in our national security capabilities, including in critical measures to address evolving challenges like home grown extremism, online radicalization and increasingly sophisticated encryption.

Among other items, that request contains funds for a new state- of-the-art FBI headquarters which would reduce inefficiencies and streamline communications and also significantly boost our ability to thwart emerging criminal and terrorist threats. It devotes an increase of $63 million to reinforcing our intelligence-sharing capabilities. This would allow us to more rapidly coordinate with both our federal partners and our counterparts overseas, and it directs $38 million towards developing the tools we need to lawfully access encrypted data and communications so that we can successfully investigate and prosecute criminals and terrorists who attempt to hide the evidence of their crimes.

As we've seen recently, this is not a theoretical issue. As we've made clear, the going dark problem is a very real threat to law enforcement's mission to protect public safety and ensure that criminals are caught and held accountable.

It's a longstanding principle in our justice system that if an independent judge finds reason to believe that a certain item contains evidence of a crime, then that judge can authorize the government to conduct a limited search for that evidence. And if the government needs the assistance of third parties to ensure that the search is actually conducted, judges all over the country and on the Supreme Court have said that those parties must assist if it is reasonably within their power to do so. And that is what we have been asking, and we owe it to the victims and to the public whose safety we must protect to ensure that we have done everything under the law to fully investigate terrorist attacks on American soil.

Now as technology continues to evolve, we are also focused on stepping up our work against those who attempt to use the Internet to attack America's infrastructure, to steal trade secrets and to jeopardize the privacy and the property of everyday citizens.

Accordingly, the fiscal year 2017 budget would dedicate $121 million in additional resources to investigating cyber crimes and fortifying the Justice Department's vital information network. The majority of those resources, $85 million, will be used to enhance the FBI's ability and capacity to collect and analyze digital evidence and to increase the overall number of cyber investigations. Together, this important funding will allow us to keep pace with the fast changing landscape of cyber crime.

REP. JOHN CULBERSON HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

Now, our commitment to protecting the American people is matched by our dedication to ensuring that they benefit from a criminal justice system that is fair, efficient and responsive. The F.Y. 2017 budget requests an increase of $247 million for one of our most successful and groundbreaking undertakings in that area, the Smart on Crime Initiative, which encourages incarceration for low level nonviolent offenders, eases overcrowding in correctional facilities and frees precious resources for the prevention and deterrence of the most serious crimes.

Of that total Smart on Crime request, $184 million will go to the Bureau of Prisons re-entry, rehabilitation and mental health programming, which are all essential components of our work to help formally incarcerated individuals make the most of their second chance while ensuring that our communities are strong and safe. Those are the kind of communities that we seek for every American and they require bonds of trust and respect between law enforcement officers and the people we serve.

Helping to repair those bonds where they have frayed is one of my top priorities as attorney general, and the president's request reflects that focus with an increase of $25 million in a number of programs designed to foster collaboration between residents and law enforcement, including racial reconciliation and restorative justice initiatives as well as improved data collection.

It includes additional funds for the department's smart policing program which encourages local jurisdictions to improve police/citizen interactions while developing cost effective solutions to crime in their communities, and it enlarges our investment in the Community- Oriented Policing Services hiring program, which extends funding to state and local departments to hire or retain officers so that they can continue to meet the full range of their constituents' needs.

Those of us who work in law enforcement have a special responsibility to protect the most vulnerable among us, and few crimes prey more savagely on the vulnerable than human trafficking, which destroys families, it weakens communities and it erodes our society's basic foundations of decency and security. The F.Y. 2017 budget sets aside $89.3 million for the department's efforts to combat this scourge, including $45 million for efforts to help victims of trafficking rebuild their lives and reclaim their futures.

We also resolved that each and every one of our young people should grow up in safety and security, which is why the budget includes a net increase of over $64 million for Office of Justice Program grants focused on juvenile justice and at-risk youth, including an increase of $25 million for the Delinquency Prevention Program which seeks to prevent young people from entering the criminal justice system by providing assistance and guidance as early as possible.

Mr. Chairman, Ranking Member, I look forward to working with this committee and with Congress to secure the timely passage of the president's budget, which asks for a total of $29 billion in discretionary funding for the department, including $27 billion for federal programs and $2 billion for state, local and tribal assistance programs. This level of funding will ensure that the outstanding men and women of the Department of Justice, whom I am so proud to lead, can continue their tireless work to protect America's citizens, to defend America's values and strengthen America's communities in the days and months ahead.

I thank you once again for the opportunity to appear before you today, and I'm happy to answer any questions. Thank you, Mr. Chairman and Mr. Ranking Member.

**CULBERSON**: Thank you very much.

Madam Attorney General, there's been a lot of concern expressed by our constituents and citizens across the country about a proposal just released yesterday that the Department of Defense released to close the military detention facility at the U.S. Naval Station in Guantanamo Bay that at present holds 91 detainees.

And as you note in the fiscal year 2016 appropriations act for the Department of Justice, it includes two very specific provisions that prohibit funds from being used to transfer, release or assist in the transfer of detainees to the United States or its territories, and that prohibits the Department of Justice from acquiring, building or modifying any facility of the U.S. or its territories to house those detainees and I just wanted to ask -- make sure that -- to reassure the country and the Congress -- would you agree that the federal government is prohibited from establishing such facilities and from transferring Guantanamo detainees into the United States or its territories?

REP. JOHN CULBERSON HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

**LYNCH**:  Thank you, Mr. Chairman.

Certainly that is the state of the law most recently passed in the NDAA and certainly as it respects the department's appropriations, we also do not participate in any efforts to do so.

I believe the President's plan reflects the administration's ongoing goal to close Guantanamo Bay because of the ongoing problems it causes our country, particularly abroad, as a terrorist recruiting center.  And certainly in our national security work we do see the effects of that.  The administration's committed to closing that and, of course, we support those efforts.

I would note that the administration is committed to working with Congress to make that happen.  And certainly in light of this current statutory framework, we anticipate that that is what will occur.  So if there's any request of the department in connection with that effort, of course we'll be happy to help in that regard.

**CULBERSON**:  But obviously you will not take any action of any kind to assist in the transfer of Guantanamo detainees in the United States until Congress changed (ph) the law?

**LYNCH**:  Well, certainly that we'll be prohibited from doing so...

**CULBERSON**:  Right.

**LYNCH**:  I'm not aware of any -- of any efforts to do so at this time in any event.

**CULBERSON**:  Thank you very much.

In -- in January, the Obama administration announced new executive action dealing with Americans' right to keep and bear arms and that's a source of great concern to Americans across the country. Certainly the Second Amendment is an absolute right guaranteed to all Americans and, as the subcommittee chairman, it's vitally important that I -- I'll do everything in -- in -- in my power to ensure that that right to keep and bear arms is protected.

I was particularly concerned with the guidance on firearms that -- on licensing that was published as a part of this executive action and it is -- I wanted to ask, in particular, if the guidance -- will the guidance in any way impact or affect hobbyists who may engage in -- in just ordinary, lawful transfers?

**LYNCH**:  Well, thank you for the question, Mr. Chairman.  And I agree with you that's a very important issue and worthy of debate.

The guidance recently published by ATF, which is going to be distributed at gun shows and to individuals who have questions about whether or not they are required to obtain a license to sell firearms, is designed to gather existing law in one place in a clear, easily understandable version of the various court cases that have opined on this issue.

So that individuals who have those questions who routinely come to ATF -- either the ATF booths at gun shows or, frankly, even by calling ATF headquarters -- will now be able to have at their fingertips an outline of what the current law requires. And, of course, the current law does contain the -- it be (ph) exception if one is a hobbyist or a collector, you are not engaged in the business of dealing in firearms...

**CULBERSON**:  Right.

**LYNCH**:  ... and a license is not required for those types of transfers.

Similarly, if one is a family member in giving a gift, again, a license is not required for those types of transfers.

**CULBERSON**:  Terrific.

**LYNCH**:  (Inaudible)

REP. JOHN CULBERSON HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

**CULBERSON**: That's what I'm aiming at. I just want to reassure people are listening today that they know that if you're a hobbyist, you're a family, you're transferring a gun to a family member as a part of an inheritance, for example, or -- or a gift, if you're a hobbyist or a collector, you don't need to worry about this new guidance.

**LYNCH**: That...

**CULBERSON**: Is that what you're telling Americans?

**LYNCH**: That is correct. And what I would encourage people to do is to look at the guidance because we -- what we've tried to do is have clear examples of the typical situations where activities fall within the category of being engaged in the business and also where they typically fall in the category of a hobbyist transfer, a collector's transfer, and I think people will see in those examples the types of everyday activities that are typically not covered by the law that requires them to get a license, and it would distinguish them from those individuals who are engaged in the business.

**CULBERSON**: So for Americans listening today, they need to know that if they're -- unless they're engaged in the regular buying and selling of firearms for a profit as a part of their daily life, that's what they do as a part of their living, obviously those folks need to have a license. But, otherwise, you're not -- you're not targeting or going after individual Americans' right to keep and bear arms or transfer them to family members or buy and sell them casually or occasionally.

**LYNCH**: Well, what I...

**CULBERSON**: They're not on your radar screen.

**LYNCH**: Well, what I would say is that -- is that, while that is generally the case, there are situations where the courts, in reviewing this -- the statute, have found that even the sale of a few weapons, even if it's not someone's everyday livelihood, if there's other factors, they hold themselves out, they have a business card, for example, they -- they may go to not even a gun show but even a flea market, the courts have held that the individuals in those situations can be considered as being engaged in the business.

And so our concern is that, again, as I noted, a number of people do reach out to ATF for guidance in this. These are generally individuals who want to comply with the law, and we felt that it would be helpful to provide them with clear examples of situations where the courts have found that individuals with certain activities are engaged in the business of dealing in firearms and provide the assistance to help them gain a license if they -- if they want to continue making certain types of sales. The number of guns is not the only factor and, in fact, it need not be someone whose only job or only source of economic income is the selling of firearms because the courts have found that also.

We also felt that, as much as I enjoy being a lawyer, we shouldn't impose that on everyone else to seek out these cases and do the research and try and find on their own what the courts have said about these particular situations. And so we felt that it would be useful, frankly and in response to a request, to gather this information in one clear, easily understandable format.

**CULBERSON**: I appreciate the response I got back from the director of the ATF and I know went through your office, as well, but it's just important to reassure average Americans that they can relax and there's no need to be concerned unless you're doing this to make a profit on a regular basis. That's -- that's very important, I think for all of us.

I deeply appreciate your answer, and I recognize Mr. Honda. Thank you.

**HONDA**: Thank you, Mr. Chairman.

Last year we -- we -- we dealt with sexual assault kit -- kit testing and today there are estimated over 400,000 untested rape kits still collecting dust in the evidence room of law enforcement crime labs across this country.

We have the technology and the means to process these samples but we must provide adequate resources (inaudible) and collaborative efforts to ensure that the testing actually occurs to reduce the existing rape kit backlogs.

REP. JOHN CULBERSON HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

The F.Y. '16 omnibus included $45 million for reducing this sexual assault kit backlog nationwide. Now, this is in addition to $41 million included in F.Y. '15. And the President's F.Y. '17 budget request included another $41 million for the program.

So are there any best practices that have come out of this work so far and would you share with us communities that are implementing these policies and their progress?

LYNCH: Well, thank you for that, Congressman. Thank you for your commitment to this important issue as well.

You certainly are correct in noting that the current budget request includes $41 million for community grant program to ensure the resolution of these sexual assault cases to get these kits tested, and these are, in fact, kits that have never been submitted to crime labs. And the numbers across the country are literally staggering; 10,000 in some cities, 11,000 in other cities. And these, of course, represent victims. They -- they represent individual women who have suffered one of the most heinous crimes that we can.

With respect to this, we have, in fact, funded the different laboratories who are working with a DNA-related forensic program to reduce the backlog also. And so we are looking to enhance that capacity and that capability. Since 2009 we've been working with this effort, and the labs were funded by our DNA Capacity Enhancement and Backlog Reduction Program have processed almost half a million cases, over 550,000 cases.

As a result of just this work alone, over a quarter of a million cases, about 240,000 cases, have been uploaded to CODIS and we have gotten almost 100,000 hits so far, 92,000 hits, meaning we've connected the information from the -- from the rape kit with someone already in the system.

This has allowed us to close numerous cases. I don't have those figures for you. Certainly it has allowed us to close cases and to further investigations. When we -- we announced the -- the recent grant last September, I was privileged to be in New York with the Vice President at the New York forensic laboratory announcing that in conjunction with the Manhattan District Attorney Cy Vance.

At the same time, we received communication from other district attorneys across the country that money that the federal government had provided and also money that the Manhattan D.A.'s office had provided was allowing them to close open rape cases and provide comfort to those victims who were living without knowing whether they would ever find justice.

HONDA: Thank you. And, as -- as we proceed it would be very informative for us to know the progress that's being made and its -- its impact on our -- on our system because like, as you said, if they're untested, then we have victims and perpetrators who are being denied the -- our justice system's process.

LYNCH: Yes.

HONDA: So, be very important if we could be kept up to date on the progress of that.

LYNCH: Yes, sir. And we will -- we will do that.

HONDA: Thank you. On parts of tribal justice and victims of crimes, Native Americans are 2.5 times more likely to experience violent crimes than other Americans, yet tribes have not been receiving necessary funds from the Crime Victims Fund.

Between 2010 and '14, only 16 states passed through money to tribal victims, totaling 25 percent, or one half of 1 percent of available CVF funds.

The department's F.Y. '17 request for the Office of Justice programs, that request of $25 million to support tribal assistance for victims of violence from the Crime Victim's funds.

Could you describe the ways in which you anticipate this funding will help provide tribal members with crime victim services that they're going to need?

REP. JOHN CULBERSON HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

**LYNCH**:  Yes.  Thank you for the opportunity to talk about this important work that the Department of Justice is involved in.

We take our obligations in Indian Country very seriously -- in fact, we have, as you know, we have a trust relationship with tribal nations, and that is a special obligation and a special bond.  And in fact, it's a commitment that we look forward to living up to and enhancing.

As you note, Congressman, we are requesting $25 million for the Crime Victims Fund for tribal assistance.

I would simply note that the other funding request that connect with our obligations to work with our tribal partners are also the Office of Justice programs is requesting $71 million, as part of a flexible tribal grant set-aside program, and also the COPS program, Community (inaudible) Policing.  We are requesting $3 million for that program that will support the tribal access program, because we have found it's very helpful if tribal law enforcement has the same access to the NICs system and computerized crime information, as law enforcement agencies, as well as money for the Environmental Natural Resources division to address environmental problems in Indian Country, and money for the Office of Tribal Justice.

For the crime victims in particular, we're focused on the victims of violent crime in Indian Country, who tend to be, statistically, more often women and children, particularly sexual assault victims. And unfortunately, that includes children as well.

So, funds will go toward creating programs for counseling these survivors, as well as enhancing tribal justice to ensure that their perpetrators are caught.

As I'm sure that these members are aware, two years ago in the Violence Against Women Act, an amendment of that act allowed tribal nations for the first time to have jurisdiction over non-Indian perpetrators of violence against Indian women on the reservation. This had been a gap that prevented justice for a number of victims.

This year, we are also including grant money to help tribal law enforcement agencies and tribal courts with their court programs to actually focus on prosecuting those cases as well.  So, it is our hope and intent to deal with the issue of victims of crime on Indian land, both with a view toward focusing on dealing with victim trauma, particularly that of children, and also strengthening the tribal justice systems that allow for prosecution of those crimes on the actual reservation.

**HONDA**:  So, Mr. Chairman, the sexual assault kit testing issue, is there an issue there on Indian Country, and are the programs and the fundings that we're making available, are they also available to the tribal -- Indian Country?

**LYNCH**:  Yes, indeed.

**HONDA**:  OK.  Thank you.

Thank you, Mr. Chairman.

**CULBERSON**:  Thank you very much, Mr. Honda.

Mr. Jolly.

**JOLLY**:  Thank you, Mr. Chairman, and Ms. Lynch, thank you.

**LYNCH**:  Good morning.

**JOLLY**:  And my apologies for -- I was delayed on the floor.  I apologize.  I missed part of your opening statement.  A couple of questions this morning.

I work very closely with our local law enforcement leadership back in Pinellas County, Florida.  And as I think many members of this panel and other members of Congress heard regarding the asset forfeiture program, when the memo went out in December, essentially announcing a suspension of reimbursement of some of the (inaudible) requests.

REP. JOHN CULBERSON HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

Obviously, that created a lot of concern and consternation among local law enforcement. I'm aware of the rescission requests that had came up. Some of the additional rescission that had come through as well that led to the decision. But my understanding, an we had a constructive meeting with your senior leadership on this about a month ago is that the department anticipates renewing the -- the equitable sharing of the asset forfeiture program, sometime in the few coming months.

Could you comment on your perspective on where that is, and the anticipation of when it might be restarted?

**LYNCH**: Yes. Thank you, Congressman and thank you for the opportunity to address this issue, because it has been one of great concern to our state and local colleagues, and also to those of us in the Department of Justice who rely upon them so heavily for the important work that they do in the task forces.

If you look at the task forces throughout the Department of Justice law enforcement agencies, they are 50 to sometimes 60 percent local law enforcement, because they have the best information and we found it to be an incredibly helpful partnership and one that has saved lives and built cases.

When the rescissions were give to the department late last year, of an amount greater than, I think, had been anticipated, certainly the $1.2 billion was larger than we had anticipated or ever received before, we were forced to temporarily suspend those payments. I had been in contact with the leaders of the law enforcement groups, including police and the national sheriffs groups as well, to discuss the situation with them and advised them -- as I am happy to advise you -- that this is a temporary deferral of payments.

We anticipate that, through the course of our work over the year, that the asset forfeiture fund will be able to be replenished to an amount where we can resume those payments.

**JOLLY**: Sure.

**LYNCH**: We initially promised our law enforcement partners an update about a month after the actions. So, I spoke to them at the end of the January. We have promised to update them also on a monthly basis and a promise, I think, to update this body by mid-March as well. We essentially are looking at the fund to make sure that, as we look at the obligations that it sustains to victims, et cetera, that we have the ability to start those payments.

But it is our intent, and we have, in fact, made the request of our law enforcement partners to remain in the task forces and to continue submitting their requests to us, so that we can process them as funds are available.

And we have noted that we've also made sure they are aware that even though the equitable sharing payments are temporarily deferred, what is called the JLEO, the Joint Law Enforcement Operation payments, have not been.

**JOLLY**: Right.

**LYNCH**: Because so much of that money goes to support the incredible amounts of overtime and the equipment that they use in supporting these joint efforts. And so, we are essentially prioritizing those, so that in the immediate term, they will be able to cover those expenses. But we asked them to continue, and I have received commitments from many of them that they will continue working with us.

**JOLLY**: All right, thanks. And I appreciate that answer, and I suppose, just for the record -- and I do want to work constructively with you on this, and your team.

But I think there is a little bit of a disagreement on how we got there. Because yes, the rescission was larger than anticipated, but as you are aware, there is the anticipated settlement of roughly $900 million coming into the fund. This committee also provided flexibility as to when your department could execute the rescission.

And while I look forward to working in a constructive manner, I do want to make sure this committee stays on top of ensuring it is restarted, equitable sharing is restarted, and that some of the decisions regarding the accounting of the fund weren't made for political purposes, but in the best judgment of the department.

REP. JOHN CULBERSON HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

Because, in the estimation of some on the committee, the rescission could have been held off for several months and perhaps prevented a delay.

Obviously, at the end of the day, we appreciate the partnership, as you have said, between local law enforcement and your department. It is critical to many communities, including ours, particularly in the area of human trafficking, which I know has been a priority of yours. And I thank you for that.

I'm about out of time. But I would ask for just one more question. If you could provide your perspective on the 1033 program? I know it is largely a Department of Defense program that shares surplus equipment with local law enforcement. But it has been a program that, in some ways, has been under scrutiny from the very top, the president of the United States himself on down.

Could you provide your perspective, as the attorney general, in terms of the role that surplus equipment provides in supporting local law enforcement leadership? Or your concerns about it?

LYNCH: Well, certainly, I think that this has been a topic of concern. And I hope constructive discussion over the last year, certainly since I have been in this chair.

I've had the opportunity to talk about it again with my state and local colleagues, as well as my law enforcement officers and sheriffs about this issue. And as I'm sure the group is aware, essentially the administration did issue guidelines on the acquisition of surplus DOD equipment, using federal funds.

JOLLY: Right.

LYNCH: Of course departments using other funds wouldn't have to deal with those particular guidelines, but we hope that they would be instructive. And the focus was on making sure the equipment was not only appropriately sourced, but that appropriate training was provided...

JOLLY: Right.

LYNCH: ... for the equipment.

So, we see great value and great benefit in having that partnership, again, where state and local law enforcement entities, our police officers, our sheriff's departments, can obtain surplus equipment. Certainly, it's been very effective in specific operations that we can all come to mind.

It's been very effective, for example, with helping ensure that SWAT teams are adequately sourced and resourced. And so we want to make sure that, again, the appropriate training is set in place and that the equipment is accounted for.

So the initial review was to determine what types of equipment worked best and essentially where federal funds were involved to come up with a list that would, at least in the administration's view, continue to meet local law enforcement needs but also deal with the issues of perhaps over use of equipment or use of the equipment by departments that were not as well trained as others and where the use of it, rather than being in the sense of protecting the community, SWAT-type situations, was used in ways that inflamed tensions which is not the intent of anyone.

So I've had an ongoing dialogue, as I -- as I noted, with the law enforcement groups as well as my sheriffs about this program. And it's our hope that as we work through it, they will find that they can still obtain the equipment they need using federal funds -- our grants, for example -- and that it can be put to good use -- good use, effective use in terms of public safety without the intended -- the unintended collateral consequences of having the more open program that existed before.

JOLLY: I appreciate that. I know the full committee chairman came in. I would just offer for your consideration -- I've shared this with folks in the White House as well. This is also an interest of mine given my relationship with local law enforcement.

AR-00194

REP. JOHN CULBERSON HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

My approach is pretty simple. I have it in draft -- in legislation that's been introduced. Keeps the 1033 program in place, but does require local law enforcement to certify that they have personnel capable or trained on the equipment they are receiving. It leaves the decision as to which equipment is most appropriate for local law enforcement -- in the hands of local law enforcement, but it does requires the training to ensure that any equipment is operated within the means of their mission.

I appreciate your comments this morning. Thank you, Mr. Chairman. I know I'm over my time. I yield back.

**CULBERSON**: Thank you, Mr. Jolly. It's my privilege now to recognize the former district attorney from Polaski in Rock County, Kentucky, the gentleman from Kentucky and chairman of the full committee, Mr. Hal Rogers.

**ROGER**: Thank you very much. Thanks for the recognition of a former life. But I enjoyed my -- enjoy is not the word. I appreciated the time that I served as D.A. and law enforcement. Thank you, Madam Attorney General, for being here.

Your request total is $29.5 billion. That's a 3 percent increase over current levels. This system has a responsibility to prioritize the administration of justice and support for our men and women in law enforcement, and I believe we can do so without spending away our financial integrity.

Though it highlights some important programs, your budget request doesn't reflect the very real budget constraints that we are faced with. And we look forward to working with you to meet the challenge that we both face in that regard together.

That being said, let me specifically mention a couple of concerns that I have especially. First, I'm disappointed that you proposed to slash BERN Justice Assistance grants by $39.6 million. I've heard from law enforcement people around the country about the importance of the very flexible grant program to their crime prevention and drug enforcement activities. Such a drastic reduction in federal support will be devastating for my state and local partners, particularly as we work collaboratively to address the terrible and magnifying opioid epidemic facing the country.

We're losing 100 people a day now to that scourge, epidemic by the CDC's definition. And speaking of opioids, I'm also concerned that you proposed to cut money from the national prescription drug monitoring program. It may seem insignificant, a million dollars, but that's nearly 8 percent of the funding of that whole program, and that's where we are -- states are able to catch people who are abusing prescriptions.

I can't imagine you would want to do any kind of harm to that kind of program. It's been extremely successful. Every state has a program except one, Missouri, and they're coming around, but boy, are they slow. But it works. It's reduced prescription abuse in 49 states, and yet you are trying to shave it away.

There's still progress to be made. This grant program is, I think, part of the solution to the opioid epidemic that's facing our country. A hundred families a day are losing a member to death. My district at one time was leading the way. And I hate going to those emergency rooms and seeing a dead young teenager with a family surrounding them. But this program is critical to stopping just that. And I'd appreciate your telling me what you're going to do about it.

Now those PDMPs in each state are learning to link up with each other so that if a person in Kentucky, for example, goes off to Tennessee thinking they can defeat the system, Tennessee's PDMP picks it up and tells our PDMP we've got a problem. So we're getting interoperability and we're trying to make it now real-time. It's been days of delay, but if we can make it real-time, we've got a real thing going. So I would hope you could help us.

I'm highly concerned with the Department's suspension of equitable sharing payments from the proceeds of the asset forfeiture program. Those funds are essential in helping law enforcement fight drug trafficking among other things. The men and women working at these state and local agencies are your partners, often working side- by-side with federal agents, and DOJ must find a way to restore those payments as soon as possible to avoid permanent harm to public safety around the country. That one is critical, and I can't believe the action of the department in regard to it.

I'm also troubled by your continued tacit approval of marijuana legalization efforts around the country in clear violation of federal law. Four states and our nation's capital legalized recreational use of this drug without any federal response. Casting

REP. JOHN CULBERSON HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

aside the fact that marijuana is a known gateway drug for young people, and its long- term effects on their intellectual development is unknown.

The bottom line is this. Congress makes the laws of the country, the executive branch enforces those laws. You're tasked with enforcing federal law as our nation's chief law enforcement officer. And I hope you'll seize 0-17 as an opportunity to fulfill your mandate given to you by the Congress in this regard. We thank you for being here.

I want to ask you briefly about prison construction. As you know, overcrowding in our penitentiaries poses significant problems for both inmates and guards, not to mention prisoners. In overcrowded facilities, inmate misconduct increases, availability of vocational training and meaningful work opportunities diminish, and the risk of disease, mental health and substance abuse increase.

Overcrowding also poses a significant security threat to guards who are already vastly outnumbered by inmates. It's especially dangerous in medium-and high-security prisons where the majority of inmates are serving sentences for violent crimes. With this in mind, I'm highly concerned to see your request slash the Bureau of Prisons construction funding by a whopping $417 million, nearly 80 percent in a time of such need of these crowded federal penitentiaries.

It's a -- it's a headline in tomorrow's newspaper, the overcrowding in federal prisons and the treatment that we're subjecting people to, including guards and the staff. That's going to be a story. I hope you'll help us keep it from being a story.

ROGERS: Casting aside any conversation about criminal justice reform, how do you intend to deal with the short-term problem of prisoner and guard safety with such a dramatic reduction in necessary resources to build new facilities and renovate old? Can you help me?

LYNCH: Thank you, Mr. Chairman, for the opportunity to speak on what you certainly have accurately described as one of the challenges facing our prison system today and the Bureau of Prisons is certainly not immune from that.

And I also thank you, not only for your attention and interest in this, but for your support for the department over the years. This committee was instrumental, certainly in prior years up to and including 2016, for providing the department with funds, approximately $444 million -- excuse me, million dollars in F.Y. 2016 and that -- those funds are going to build a new prison and I believe it's going to be in Letcher County in -- in Kentucky.

And so that's one -- that is certainly an important part of reducing our issues of overcrowding as you so accurately note. Issues of correction officer safety as well as inmate safety are -- certainly implicated by that.

The reason why that same number was not reflected in the 2017 request is because we did receive that money in 2016. We have begun to utilize those funds -- it's a multi-year process as I know you are aware -- to build the prison and do the studies and, therefore, we did not need those funds to recur in F.Y. 2017.

But I do want to assure you that the funds that were appropriated to specifically deal with this important issue are, in fact, being put to good use as we speak. And so the -- the -- the fact that you do not see that same number repeated in the budget is not a reflection of a cessation of work -- certainly not a cessation of commitment -- but simply that having been given those funds, we are now working towards utilizing them, and would not ask for those -- those same funds again.

ROGERS: (inaudible)

LYNCH: And so that's going to help us tremendously with that.

And the other initiatives that we have in dealing with the Bureau of Prisons, as you mentioned, the overcrowding issues result not only in harm but exacerbation of health issues for the inmates. You mentioned mental health in particular, and you will see within the Bureau of Prisons a portion of our budget funding to deal with those issues also. Because where we can deal with those issues, we will have safer institutions for the inmates and for the correctional officers who work there.

ROGERS: I thank you for that statement.

REP. JOHN CULBERSON HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

I'm over my time, Mr. Chairman. Thank you.

**CULBERSON**: Thank you, Mr. Chairman.

I'll now recognize the gentleman from Washington State, Mr. Kilmer.

**KILMER**: Thank you, Mr. Chairman, and thanks for being with us. I've got a bunch of questions and I'll try to get to as many as I can.

I share the Chairman's concern about -- about opioid abuse. It's certainly in a number the communities, and in my neck of the woods I have a lot of rural communities including the town where I grew up and small towns. And, you know, I understand the need to balance prevention and treatment and enforcement to stop the spread here.

I know the Office of Justice Programs provides grant funding for state and local law enforcement assistance. I guess I'm hoping you could speak to how -- how those funds are distributed and whether communities like the ones I'm talking about -- rural towns, small towns -- whether they're able to benefit adequately from this and what -- what this committee can do to improve the ability of rural communities and small communities that are really struggling with this opioid epidemic, what they can do to -- to realize the support?

**LYNCH**: Well, Congressman, I thank you for raising that issue. Frankly, it is becoming the law enforcement issue of our time. And, of course, the opioid issue is a precursor to the heroin epidemic that we are seeing as well because we -- we're finding that, as we look at the heroin epidemic, so many of those individuals begin with prescription drug abuse and they move onto heroin. And, unfortunately, also, the opioid abuse -- the prescription drug abuse -- is leading to increasing levels of violence, particularly in the rural -- in the rural areas.

So we do have -- we do have a request in our budget of about $383 million for the JAG funding which is an increase over F.Y. 2016. Now, OJP doesn't have programs that specifically address the opioid abuse in rural areas. But the grants are available to all law enforcement agencies, particularly to -- for the purchase of Naloxone.

Over the last year, we have spent a great deal of time in discussion with our local partners and this particular tool we find is extremely helpful. It's the -- it's the rapid response overdose treatment, and using grant money to make sure that while we may not be able to fund a clinic, we can make sure that the small police departments and sheriffs' offices have access to Naloxone can go a long way towards literally saving a life and getting someone to the hospital on time. And so that is something that -- that we're hoping is going to be helpful with regard to that.

I will also say that when it comes to this problem generally, you know, the administration's taking a whole of administration approach, not just the Department of Justice but a number of other agencies are involved in looking at this issue; Health and Human Services, Veterans' Affairs, for example. All of us focus on finding the best way to deal with this and certainly I think what has emerged from our discussions is that we have to view this as a public health crisis as well as a law enforcement issue and not just focus on law enforcement but have a public health component to improve treatment and resources as well for the families and for those people who fall victim to this.

**KILMER**: Thank you. I appreciate the focus on that.

I -- I want to switch gears. You know, too -- too often we hear stories around distrust between neighborhoods and the police who -- who protect them. But there are some good news stories out there, that one of the cities I represent, Tacoma and communities like them, are working very hard to try to foster a good relationship between law enforcement and -- and the populations that they serve.

We saw a great effort by the city's leadership and the law enforcement leadership called Project Peace which was trying to bring people together to see how they can improve ties between the community and the police. I -- I guess I'd point out those sorts of efforts are costly and -- and programs like Project Peace often can be limited in their success simply due to -- to resources being spread thin, you know, in a large city.

REP. JOHN CULBERSON HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

I -- I know that the department's budget proposed doubling the community policing development program, and I'm grateful for that, but I'm concerned as to whether that's even still enough to meet the demand in our nation.  I -- I just want to get a sense from you, how confident are you that the additional funds that are requested in the budget will actually meet the needs of -- of our communities?

LYNCH:  Well, Congressman, I think that's -- that's an excellent question; I think those needs are deep and certainly I've spent a -- a great deal of time working on this issue.

In 2015 I was engaged in a six-city community policing tour.  I did travel to the Pacific Northwest also, and this year I'll travel to six more cities focusing on cities that had had a very challenged relationship with the police, the shooting, pattern and practice investigation, even a lawsuit, but have found a way to create a dialog between law enforcement and the community and include young people in that to restore those bonds of trust and build those bridges again.

And this year I'm focusing on cities that are exemplifying the six pillars in the 21st Century Policing task force that was the product of last year's work.  So I'm familiar with some of the programs that you mentioned.  I'm always happy to -- to pull more into our ambit.

We do have, in fact, as you know, key increases for building community trust and community policing, for body-worn cameras, for smart policing, collaborative reform, and I think also our community relations service is going to be very important in this.  We are asking for $3.5 million for law enforcement reconciliation work. Community relations services not law enforcement officers but they essentially go into the community and work to build those bridges. They work with community leaders in particular and law enforcement and the local elected officials, as well, to foster dialogue around these important problems.

They are not investigators, they're not gathering evidence for our law enforcement components at all.  And so we are requesting additional funding for them.  And so I -- I think that that will be helpful.

I will tell you that I think the most promising efforts that I have seen, as I've traveled the country, are those that come from the community as you mentioned such as Project Peace.  And so we -- again, we're looking for ways to continue to support them through our grant programs.  It is -- it is a deep need; it is an ongoing need and I'm incredibly impressed with the work that I have seen going on across the country.  And we're hopeful that the -- that the funds that we request for a host of issues involving community policing will help in that regard.

As I talk to police departments, for example, we're supporting a number of them with body-worn -- the body-worn camera initiative and this is an area that I think people have different opinions on but as these body-worn cameras come into use, I think people on both sides of the debate are seeing the utility in providing for accountability and a level of trust in the types of interactions that law enforcement has with civilians.  So we see civilian complaints go down in -- in communities and departments that are implementing the body-worn cameras, and we see incidents and reports of use of force go down.

LYNCH:  And that's all part of the web that we have to build to rebuild the trust bonds that have -- that have been frayed in some areas.

But I do believe, frankly, that this can be accomplished because I've seen it happen.

KILMER:  Thank you.  Thank you, Mr. Chairman.

CULBERSON:  Thank you very much, Mr. Kilmer.  I'd like to recognize the former district judge from Williamson County, the gentleman from Texas, Mr. Carter.

CARTER:  Thank you, Mr. Chairman.  And welcome, General Lynch. We're glad you're here. It's my first opportunity to be able to speak to you.

I -- as he says, I come from a background of the -- what is the highest trial court in our state, great state of Texas and have some familiarity with the criminal justice system in our state.

REP. JOHN CULBERSON HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

This last Monday, I did what we call a telephone town hall.  We get in touch with roughly 35,000 to 50,000 telephones and we let people get online and ask questions on the phone.  When we -- when we get about 10 or 15 of the same people asking the same question, we take that question.

This question came up; this is a tough one.  People will be saying it's politics, but I told them I would ask you.  Here's the issue.  The State Department has publicly stated that the e-mails sent and received on Hillary Clinton's personal server are classified.  In fact, they refuse to disclose numerous e-mails as they contained top secret information.  The secretary of State, one that is seeking the highest office in the land,  should have known better.

Now If the FBI makes the case that Hillary Clinton mishandled classified information and put America's security at risk, will you prosecute the case?  Do you know of any efforts under way to undermine the FBI investigation, and please look the American people in the eye and tell us what your position is because you are the chief prosecutor of the United States.

**LYNCH**:  Thank you, Judge and Congressman Carter.  With respect to our investigation into how information was handled by the State Department, how they handled classified information, as I'm sure you know, that matter is being handled by career independent law enforcement agents, FBI agents as well as the career independent attorneys in the Department of Justice.  They follow the evidence, they look at the law and they'll will make a recommendation to me when the time is appropriate.  And so beyond that, I'm not able to comment on the specific investigation at this time.

But what I will say is, again, that this will be conducted as every other case and we will review all the facts and all the evidence and come to an independent conclusion as how to best handle it.  And I'm also aware of no efforts to undermine our review or investigation into this matter at all.

**CARTER**:  Well, there were enough people that are concerned about that that you ought to know this is an American public concern that maybe the Justice Department won't do this for political reasons.  I'm not accusing you of that and I certainly would not expect you to comment on the investigation, and I didn't ask for that information. But I promised the questioner that asked me the question, I said no one is above the law in the United States, and if it's -- if -- it should be brought before a grand jury, the right thing to do would be bring somebody before the grand jury.  That's where you are and I hope you remain there.

Another question if I've got -- how much -- do I have enough questions before I run out of time?  A few times in history, it's been difficult to be a police officer.  And as -- and today it is.  You often have belligerent public holding cameras in your face every time the officer wants to make an arrest.  You have civil unrest in high crime communities and police who don't feel that the Department of Justice really supports them.

Most importantly, I'm concerned of the perception among our law enforcement officers that the DOJ is opening investigations as an intimidating tactic to force state and local police to push this administration's soft stance on crime.  What are you doing to change the perception amongst many of the law enforcement agencies that the DOJ is looking over their shoulder, waiting to sue their department every time they make an arrest?

I've heard horror stories of U.S. attorneys refusing to prosecute drug and alien smuggling cases along the border.  And let me tell you, if you get caught with 200 pounds of marijuana in Bell County, one of my counties, or Williamson County, you're going to go to prison.  Yet, I can't say that about the smugglers along our southwest border, and it needs to change.  Would you please comment?

**LYNCH**:  Well, thank you for the opportunity to talk about, I think, the important relationship that the department has with our colleagues in state and local law enforcement, and they're very much our colleagues with respect to the work that we all do for the protection of the American people.

I think the issue, as we've discussed recently, of trust between the communities and law enforcement, particularly law enforcement in the communities that we all serve, is an important one.  And I will tell you that the message that I have heard as I have traveled the country speaking directly to law enforcement officers -- I speak to the rank-and-file officers when I visit cities, I speak to community members -- is how dedicated they are to their jobs and how focused they are on their mission.  And I talk to them about why they came police officers and that mission that they feel and the pressures they feel because this is a time of great change in policing.

REP. JOHN CULBERSON HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

But what I hear is their dedication and commitment to continuing their work in protecting the American people. And so where we have situations where those bonds have been broken and where law enforcement feels under siege as well, and I've had those conversations with officers. We try and engage them also in discussions about why that is and what might be the causes of it.

One of the things I will say, Congressman, is a benefit of having been a prosecutor for over 20 years is that I've noted with a -- with actually a very positive view the way in which we actually do interact with police departments in this current administration.

I've been involved in reviewing police issues in the '90s when I was a U.S. attorney in New York at that time. I've been involved in reviewing them as a U.S. attorney from 2010 on and now as attorney general. And I think one of the benefits of the relationship now is that the department has police departments actually coming to it and asking for assistance through our Community-Oriented Policing program, which people refer to as the COPS program.

As you know, we fund police officers, we have all that information in the budget for you to review to improve that to increase our ability to provide additional local law enforcement support. We also provide what's called collaborative reform. We provide technical assistance. We don't charge departments for this.

So police departments come to us and they say, you know, we're having a problem or an issue, and it may be a community relations issue or it may be a training issue. It may be keeping up with the latest data, it may be finding the resources to, as we always have done, to support them in buying vests, in buying the body worn cameras, as I mentioned.

So I have seen a relationship between law enforcement at the state and local level and the Department of Justice through this. Where we have to look at issues of accountability, we speak directly to those departments and try and engage them so that they can be the first person holding an officer accountable when there has been a problem, because we all know that there will be issues, and the important thing is to make sure that as we deal with those issues, the American people see that we're dealing with them in a transparent way, in a fair way and that everyone is treated equally before the law.

And we've had a great positive response to that. So we provide a great deal of support to our local law enforcement officers, again through the COPS program, as I mentioned. You'll see in our budget a number of other agencies in which we're seeking to provide support to our state and local colleagues. And we also spend a great deal of time trying to get their input.

I have found it, frankly, very positive to have their input in some of the policies that the department is putting forth. Most recently, we promulgated policies on dealing with sexual assault victims and domestic violence victims, and this policy was greatly informed by discussion with our state and local colleagues because they are the first responders to those cases.

And so as we support those types of cases, for example, with grants for training, we rely on them to give us the actual on the ground experience to talk about the best practices and the best policies.

So Congressman, I would say that this Department of Justice is focused and is, in fact, working well with state and local law enforcement. We have a very positive bond with them because we do the same work, we have the same mission. And we all want to improve as we, in fact, carry out our highest duty, which is the protection of the American people.

**CARTER**: Quick follow-up. Yesterday I filed a bill -- and your department has worked with me on it -- to include the active shooter program in the COPS criteria. The small departments around the country wants to train their people up on the active shooter issue, and they don't have the funds. And we -- I know that your office helped us. We appreciate it. Hope you'll support adding the active shooter to the criteria of the COPS grants.

**CARTER**: And finally, the reason I mentioned the 200 pounds, because we are clearly told -- I think the chairman has been told also -- that it has to be over 200 pounds of marijuana on the -- in the Rio Grande Valley and along the border or the Justice Department will not prosecute. And we think 200 pounds is a lot.

Thank you.

**CULBERSON**: Thank you, Judge.

AR-00200

REP. JOHN CULBERSON HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

**LYNCH**:  Thank you.

**CULBERSON**:  Attorney General Lynch, I especially appreciate your response to Judge Carter's question of how important it is that every law enforcement officer out there in America know that the Department of Justice has their back.  That is a message I hope you will continue to speak out loudly and clearly and repeatedly to make sure that all those local law enforcement officers know how dedicated you are and your department is to supporting them and helping them.

Last August, our neighborhood deputy, Darren Goforth (ph), was murdered in my neighborhood, and it was a catastrophic event.  And all of us I know on this committee and across the country are very concerned.  We want every law enforcement officer in the country to know that the members of Congress and particularly the Department of Justice, that we have their back and we support them.  And appreciate you saying that.

We recognize as a part of that relationship that you have with local law enforcement, one of the most critical parts of that successful relationship is the sharing of information, that local and state and federal law enforcement officers have to know -- have to have a complete and open relationship where they share every bit of information possible about criminal defendants.

And a source of great concern to the country and I know from our conversations before the hearing began a concern that you have as well.  And I'm delighted we're headed the same direction is with sanctuary city policies that -- where a state or local jurisdiction refuses to share information with the federal -- whether it be Homeland Security, Judge Carter, or with the Department of Justice because that information sharing is so critical.

And the policies that a lot of these cities and counties and states have where they will refuse to honor a detainer to hand over a criminal defendant in their custody to federal authorities to be deported is just unacceptable and terribly dangerous.

Of course, it's standard procedure if individuals in the Williamson County Jail, if they're in the Polaski County Jail, Mr. Chairman, and they have a -- before they're released from that county jail, it's just longstanding common sense that the Polaski County sheriff is going to check with state authorities, with federal authorities is there an outstanding warrant.  And that individual, when he's served his time in the county jail will not be released onto the streets of Polaski County.  If there is a warrant in Michigan, they're going to call Michigan and say, do you want this guy?  And Michigan, come pick him up.  And that has been the standard policy of every law enforcement agency in the history of this country.

Until you get to these sanctuary cites where they will not release these individuals.  If they've got an illegal alien their custody who is a criminal -- warrant for their arrest, these communities have policies that they will not release them to federal authorities for deportation.  And this is just absolutely unacceptable, it's outrageous and has resulted in the -- in the murder of untold thousands of individuals.

And the one that I know that hangs in everyone's mind with great concern is the young lady shot and murdered in San Francisco, Kate Steinle, who died in her father's arms as a result of a -- she was shot and murdered by a seven-time convicted felon, a five-time deportee who was released on the streets of San Francisco due to their utterly unacceptable and illegal sanctuary policy.  And that refusal to share information, that refusal to cooperate with federal law enforcement authorities is just absolutely unacceptable.

And as we talked about earlier, I'm -- as the new chairman, the rule is going to be in this subcommittee if you want -- if you expect to receive federal money, comply with federal law.  And I want to thank you, Attorney General Lynch, for your timely response to a letter that I sent you earlier this year on sanctuary cities, where in your response to my letter -- to my  expressing the concern that I just outlaid -- laid out here.

**CULBERSON**:  You said in part that where the Department of Justice receives a credible allegation that an entity, state or local, is receiving funds under a department grant or reimbursement program, has -- after they have assured the department that they're in compliance with applicable federal laws, where that entity has -- where you have credible evidence that they violated a specific applicable federal law, the department can potentially seek criminal or civil enforcement options against that entity.

REP. JOHN CULBERSON HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

As we had discussed Title 8, Section 1373 of the U.S. Code specifically prohibits states or localities that have policies that prohibit the sharing of information with ICE about the immigration status of their prisoners. That law says very clearly that local jurisdictions cannot interfere in any way with the sharing of information with federal authorities.

I wanted to ask, if I could, could you assure the committee that the Department of Justice will review grantees with such policies to ensure that they're in compliance with all applicable federal laws?

**LYNCH**: Well certainly, that is a part of our grant review process. And as was also conveyed in the letter, I do want to reiterate the fact that one of the things that we are hopeful will be as effective also and more immediately effective is our policy whereby the Bureau of Prisons is, instead of deferring to the state or local entity detainer and turning an individual, a deportable individual, over to them, that instead Immigration Customs Enforcement, or ICE, will instead have the ability to step in and exercise their detainer first.

We have in the past deferred because, again, we work with our state and local colleagues and we want to make sure that they can, in fact, adjudicate their cases as well. But particularly where we have -- we are dealing with a jurisdiction that essentially is not prone to honoring the ICE detainers -- and those vary across the country; they just vary over time and place -- our policy is going to be that ICE will instead have the first detainer, and that individual go into ICE custody and deportation.

Now this may have the effect that there may be local cases that may not be able to be prosecuted because, again, the person will be taken into ICE custody and then deported. And if a jurisdiction has a concern over that, we will talk to them, but we would have to have assurances that ICE would also then be able to get the individual back at the end of an adjudication so that the deportation process could go under way.

So we are trying to be respectful of our state and local colleagues' desires and goals to prosecute cases but also deal with this issue as well.

**CULBERSON**: I genuinely appreciate that. And I think as an example of the cooperative relationship that the committee has had with the Department of Justice and with you as the new attorney general, I want to express my sincere gratitude to you for this new policy that you've adopted. Yes, Mr. Chairman?

**ROGERS**: Would the chair yield?

**CULBERSON**: Yes.

**ROGERS**: I'm -- I'm not clear. Will the department seek to cease any grants going to a particular so-called sanctuary city if they violate your terms? Will you get -- will you seek to stop a grant program?

**LYNCH**: Well, we are, again, with the grant is tied to the applicable law, again, it has to be a connection between the issue and the grant. For example, you know, a grant for human trafficking would be different from a grant for community policing.

But certainly as part of the audit process, as part of the inspector-general review and as part of the overall grant management review, which the department's civil and criminal division can also take under investigation, if we receive a credible allegation that a grantee has violated a specific applicable federal law, we will make that referral.

Again, there's an audit process in general, but we also have the Office of Inspector General who can step in and do a specific investigation of a specific jurisdiction or municipality and we also have our civil and criminal divisions depending upon how the allegation arises.

**ROGERS**: Is this a new policy?

**LYNCH**: Well, I think it is -- it is in response to the concerns that have been expressed and as -- as part -- and in result with -- of the discussions that we have had with the chairman here as well as other members.

But as I indicated, we feel that a way to deal with this issue immediately is to make sure that individuals who are being released from the Bureau of Prisons, rather than be released into state custody, would go directly into immigration custody and

REP. JOHN CULBERSON HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF
JUSTICE

be dealt with for deportation there.  Because part of the -- of the -- frankly, a large part of the problem has been that as part of our collaborative working relationship with our state and local partners, as, Mr. Chairman, you indicated, if there's a detainer on an individual coming out of federal prison -- certainly when I was a young prosecutor, an individual will be released from federal custody but have to go into New York state custody to either finish a sentence or to be prosecuted.

And then at that point, at the end of the state case, deportation would be an option.  Where a city is not necessarily inclined to work with the Department of Homeland Security -- and frankly as a general matter -- we will instead use the immigration detainer first.  And as I indicated, where jurisdictions indicate this was likely to be a problem, we will talk with them and we will work with them.  But it is an area for us.

**LYNCH**:  It's particularly an area of concern for us, because there is, unfortunately, case law that exists that -- only in one circuit.  But there is case law with a particular holding that in certain circumstances, cities compliance with the requirement that they provide us information may be voluntary.

We're also actively litigating the matter in two other jurisdictions.  And so this matter may be unsettled for some time in the courts.  So we feel that a way to deal with this issue immediately and directly is to have the policy change, as well as to have the review of the grant program that we've been discussing.

**CULBERSON**:  It's really a great example, Mr. Chairman, of the cooperative relationship that this committee has had with the Department of Justice.  I'm very grateful to you.  She's announced today a new policy that, first of all, the Department of -- Bureau of Prisons will first check to see if there's a -- if a criminal alien in the custody of the federal prisons has a deportation order, and where that individual may also, as in the case of this guy that murdered Kate Steinle, San Francisco has a policy they're not going to honor the federal detainer in response to the concerns of -- that this committee -- subcommittee, Mr. Chairman, has addressed to the Department of Justice.

You've changed the policy at the Bureau of Prisons, which we deeply appreciate; that you will not release that individual to San Francisco.  You're going to hand him over to ICE, Chairman Carter, so he can be deported.  We thank you for that change in the policy.  That's very important.

And then secondly, we've also learned today, Mr. Chairman -- and we very much appreciate that -- the department is moving towards -- because this will be litigated forever, and we can't wait on that. Our lives of countless Americans depend on quick and decisive action. And in response to the concerns I've expressed earlier this year, you've responded immediately in a very favorable way, which I really appreciate your moving right away to go look carefully.

And we will provide you with that list of those jurisdictions that do have policies where they will not share information with federal authorities.  They've actually got an explicit policy on the book.  We're not sharing information.  We will not hand over these individuals to ICE for deportation.  We can provide you with that list.

And you've just indicated that you're going to begin an audit process to ensure -- to encourage them.  Because we want them to change the policy.  We're not looking to cut them off from federal money.  We want to give them a chance to change their policy, correct? That's the goal:  Change the policy so you hand these individuals over to federal authorities for deportation.

**ROGERS**:  Mr. Chairman, if I could...

**CULBERSON**:  Yes, please.

**ROGERS**:  ... suggest something.  This is encouraging to hear this.  But I believe that old saying of trusting and verifying.

**CULBERSON**:  Ronald Reagan.

**ROGERS**:  I wonder if you could give us a report on this after a period of time here, say four months.  Give us a report on how many of these instances you have actually had success with, so that we have some way to gauge how things are going, and maybe make corrections as we go.

REP. JOHN CULBERSON HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

This is significant, very important matter for a lot of us. And I'd like to know that it's working. Is that agreeable?

**LYNCH**: Well, certainly, I think that we're all moving to an evidence-based model in a host of things. And certainly, we're happy to work with you and your staff to provide you the information, both with regard to the new BOP policy, which I think would be instructive also, and also any instances, again, where we have -- where these allegations occur.

As you know, however, once the matter goes into an investigation, if we refer to the inspector general, for example, we wouldn't have information about the investigation readily available at that point. But certainly, you know, if these situations do come up, I think we can work with the committee to find a way to keep you informed.

**ROGERS**: Let's do a quarterly report. Let's do that for a while to see how things are going. So we would expect that you would give us a report on how things are going, as much detail as you can give us, at the end of the first quarter.

**CULBERSON**: I think that's a good idea. Would that be agreeable?

**LYNCH**: Thank you, sir.

**CULBERSON**: And this is a very significant change, and we're deeply grateful to you. I know the country's grateful to hear that you're moving in this direction. It's a good time for it, because I know the grant solicitations are just now coming in, Mr. Chairman. The jurisdictions -- local, city and state jurisdictions -- across the country, Madam Attorney General, are just now beginning to send in their applications for Byrne JAG for the various law enforcement grants.

So it's a good time for this change to kick in. As I said, we will provide you and your staff with a list of the jurisdictions that have these policies that refuse to provide information, or refuse to honor detainers. And I deeply appreciate your movement in this direction, and we'll find a way to do this in a cooperative, friendly and supportive way to ensure that these jurisdictions are in compliance with a Title 8, 1373, that may have a chance to change their policy, and try to avoid losing their federal grant money.

But if they insist -- and we'll work with you -- if they insist on paying it out of their policy, and they won't honor detainers, and they won't share information, you know, don't ask for federal money unless you follow federal law. Delighted to hear you're moving in that direction, and we're going to work with you cooperatively and in a supportive way to ensure that that happens, to make sure that the law enforcement communities across the country continue that close, cooperative working relationship that has been so successful in the past. We really appreciate very much your help in this matter, and look forward to working with you. And we'll get quarterly reports, Mr. Chairman.

Mr. (OFF-MIKE).

**HONDA**: Thank you, Mr. Chairman. As the ranking member, I want to request a congressional five minutes, if I may. And I just want to add my congratulations to the attorney general also, and that while you respond to our questions, and because I understand it's very complicated, there's a lot of different chairs (ph) that need to be considered as you move forward on them, this complex issue of criminal justice, and civil rights, and things like that that we have to face. And I, too, would look forward to seeing a quarterly report, because I'm confident that'll be based upon good judgment and laws that we expect to be able to follow.

So, and I think that Mr. Chairman had touched upon some of the other issues on the policies and clarification of -- and the guidelines on the sales and handling of firearms relative to hobbyists and those folks. So I won't take any time to do that. But I do notice that a lot of the concerns that we do have has been based upon the lack of resources, and things like that.

But I just want to say that we, as Congress, have also been part and parcel of the -- providing the appropriate resources in the past. And I'm very glad that this past year, that we've had an increase. And I think that bodes well for all members of this subcommittee. We have an expectation on increasing staffing, increasing training. And I think that that was a lot of concerns around that.

A lot of this is because we're able to hire more folks to do the things that is expected of your department. So I see that we're making progress on (inaudible); college campuses. And with the ATF, there's a lot of clarification on the kinds of priorities and

REP. JOHN CULBERSON HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

policies that is promulgated by the ATF. And also, in terms of law enforcement hiring overall, there's going to be increase in that. So I think there should be an expectation of meeting some of these needs.

And I'm very gratified to see COPS coming back. I think COPS has a basis for improved community and police-force relationships, that they understand working in conjunction with the communities is beneficial for everybody around. And we'll learn a lot from them.

One of the questions I wanted to sort of formulate is around human trafficking and cyber -- cyber systems and cyber stalking. We just finished the Super Bowl in Santa Clara County. And the Super Bowl was the culmination of a lot of work done by different agencies. And I've noticed that each department that's involved in providing services to make sure that we have a safe environment and successful outcome of activities like the Super Bowl -- which, the next one will be in Houston, I believe.

**HONDA**: So over the last couple years, this year, we've been looking at the services that's expected in terms of providing a safe environment. So I would just -- wanted to have some sort of comment about budget, personnel, assignments, in such a way that you can provide those services without having to juggle the different departments' budgets, so that in the next Super Bowl in Houston, it'll be run smooth and seamlessly through our agencies, so that Congressman Culberson can expect Houston Super Bowl to come out well, as it did this past year. I don't care who's the team, but I'll hope it's the 49ers.

But the basic question is, can you give us some feedback on the budgetary approach to providing the necessary resources and personnel to address the kinds of expectations that one would have, having a safe environment at the next Super Bowl? We have a template. We have folks who've been involved in it that we can touch bases with to ask that question. I'll be asking that question of every department -- federal, local, state -- so that Houston will have a good solid preparation for -- in the event that whatever team goes to the Super Bowl, they'll have a good outcome.

And I think there are two things that are very prominent in the planning would be human trafficking and cyber security and cyber stalking. Do you have any comments relative to that?

**LYNCH**: Yes, thank you. Thank you. Those two important issues actually do collide at an event like the Super Bowl or the Olympics, if we were to host it here. Again, it would be a similar situation. Certainly -- and I thank not just you, Congressman, but this committee for your support of the department's efforts in human trafficking. I know it's an important issue for you. And your efforts have really made a difference in the lives of people. So I thank you and the committee for your support over the years, and in this most recent budget as well.

So with respect to human trafficking generally, we are of course looking for -- I think the request is about $89 million, $89.3 million for 2017, with $45 million going for the Victims of Trafficking program. And for cyber, we're asking for a total of $121 million, which would increase positions. The FBI would receive funds to enhance their investigative personnel in a number of cyber investigations, and also attendant money to increase DOJ's internal security, DEA's internal security, and our grants as well.

With respect to a specific event, like the Super Bowl, I would request the opportunity to come back to you and your staff with more specific information on that. But what I can tell you at this point is that for the Super Bowl in particular, and other large events, what happens at the planning stage is regulative coordination between the Department of Justice, Department of Homeland Security, as well as the intelligence community to see if there's any national security threats.

For human trafficking in particular, every U.S. attorney's office now is required to have a human-trafficking coordinator, and be part of a human-trafficking task force. This pulls in our state and local partners, and helps us get information on the current state of affairs involving cases and investigations, but also things that are about to occur as large events, like the Super Bowl, are put together.

So prior to an event, for example, Super Bowl was in New Jersey a few years ago. My office, when I was in the U.S. attorney's office there was involved, along with the U.S. attorney from New Jersey, with the preparations for those events. So months before the actual game is played, the planning for how to both have law enforcement presence, and also protection for

REP. JOHN CULBERSON HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

any victims that we may be able to rescue, begins to occur in terms of every agency involved, looking at the resources they would need.

This is another example, also, of how we work so well with our state and local counterparts. Because so much of the work at an event like that will depend, of course, upon working closely with local law enforcement also, as well as providing resources from FBI, from DEA, if we feel that narcotics will be involved. And where we have had, for example, situations where we have increased funding to our human trafficking task forces, we use the information and the intelligence gathered from them also.

So I'd appreciate the opportunity to give you more specific information about a specific event as that comes to fruition. We do have, as you mentioned, templates for how the security protocols are put together for that. We feel confident that we can take them to Texas and receive as warm a reception as we did in New Jersey and San Francisco, and making sure the event is as safe as possible, and also that it is not used, as these events often are, as a cover for illicit activity, such as human trafficking.

So I'd appreciate the chance, if I could, to come back to you with that; but again, to note that the human trafficking task forces begin to focus on these events months before they actually come into fruition, and specific plans are set in place, and specific operational plans are set in place.

**HONDA**: Thank you. And I also want to add my thanks to the chairman for helping us fund (ph) and put into law the establishment of human trafficking survivors (inaudible), which is going to be very helpful, and also look forward to hanging out with the chairman when that event comes around. Should be a lot of fun. I didn't watch the Super Bowl. I was at the command center watching the other stuff. So I figured, OK, the next Super Bowl, I'll come over and visit with Houston...

**CULBERSON**: We'll be glad to have you, get you out to the Johnson Space Center.

**HONDA**: Thank you. Thank you.

**CULBERSON**: Thank you very much, Mr. Honda. Mr. Jolly?

**JOLLY**: Thank you, Mr. Chairman. Ms. Lynch, just three very specific questions. If any of them need to be taken for the record, that's fine. The Bureau of Prison's stacking (ph) requests is down about $200 million, and there's also, I think, plans to hire a little over 300 positions in F.Y. '17.

We've heard concern from some of the prison locals, some of the employees, about the use of augmentation, and what that means for, frankly, their own security, but also, their own operational abilities. Can you provide some perspective on the decrease in the funding requests, what it means for additional hiring, and the process of using augmentation?

**LYNCH**: With respect to the Bureau of Prisons, the funding, again, as we -- as I think I discussed with another one of your colleagues, I think maybe Mr. Rogers, the budget numbers are certainly lower than the request for last year, because again, we did receive the $444 million for construction funds, that we did not need to ask for again this year. That would not have been an appropriate request.

So the amount may be lower, but those funds are being used to alleviate overcrowding and building the new positions. So the operations of the Bureau of Prisons are not being cut. Our overall numbers are going to be requesting not only additional new positions, but additional funding to support those new positions.

A lot of the new positions will be in the correctional area, but they will also be in the mental health area, because this is a problem that is cutting through all of our prisons. It's a problem that, again, I hear from my state and local colleagues. Also, is that dealing with individuals who present these issues raises safety concerns for the inmates and the officers, as well as operational concerns.

**JOLLY**: The reliance on augmentation, though, to what extent are you relying on that, compared to even more than the 336 positions that may be hired?

**LYNCH**: Can you give me some context? I'm just not sure what you're referring to.

REP. JOHN CULBERSON HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

**JOLLY**: In terms of reassigning duties of individuals to support those of, say, full-time security officers at facilities. We hear from several prison locals about the concern of using employees that perhaps are not as trained, or at least well trained, in certain specific tasks within the prison system, that they are being asked to fill in for those duties. And it's raised concerns of security for some of the prison locals.

**LYNCH**: Well, with respect to that specifically, I don't have information for you at this time. But I'm happy -- if we could have our staffs talk, and perhaps get some perspective on this so we can provide you with some information for it. I will say that I've had the opportunity to meet with the heads of the Correctional Officers Unions, with the Bureau of Prisons, and tremendously happy to work with them on a number of recommendations within the prisons. So their concerns are very important to me, because they do impact safety throughout the institution.

**JOLLY**: Two remaining questions. The next one is, Federal Prison Industries, the program that allows inmates to work in the production of supply goods for other federal agencies in return for a stipend. What is the maturity of that program? Is there additional capacity? Are there additional savings for other federal departments that could perhaps be relying on this? What's the state of (inaudible) for Federal Prison Industries?

**LYNCH**: Well, thank you for the chance to talk about Federal Prison Industries. It's actually one of -- I think one of the ways in which we can not only provide our inmates with job training and job skills, but also help their re-entry platform, out back into the community. Because we've had some situations where employers have connected with Federal Prison Industries, and find that they receive not only well-trained individuals, but incredibly loyal people who appreciate being given a chance to use their skills and become productive members of society. So we're very supportive of that.

As I'm sure that the committee's aware, in general, Federal Prison Industries provides a wide array of services. Frankly, the Department of Defense is a huge purchaser of Federal Prison Industries' products. I think they've been very pleased with their products as well.

**LYNCH**: It's no longer mandatory that federal agencies use them, but certainly we are encouraging our fellow agencies to consider them and looking to actively partner with other agencies to help in that effort.

With respect to the current state of the -- of the operation, we're very, very pleased to note that we've recently brought a new CEO on board who comes with over 20 years of experience in private industry, and he's very excited about the prospects of rebuilding this great program and in, frankly, enhancing this great program. And so I'm tremendously looking forward to working with him as well. And we...

**JOLLY**: OK. I'm about out of time. I want to get one more question on the record. I appreciate that. I look forward to working with your department on that as well.

We provided language in last year's bill regarding digital rights management for information security, secure content management, and I know there have been incidents, including last calendar year, where the identity of FBI agents and some DHS personnel was released.

If you just could provide some perspective on where the department is with secure content management, plans going forward either in your budget or unmet needs.

**LYNCH**: Thank you. You know, with respect to that issue, it's very important to us because you mentioned the -- the release of personal information for anyone, the citizens or someone who is a law enforcement officer, carries with it grave risks. And certainly, with our law enforcement officers, the risks are enhanced, and we, in fact, are involved in prosecuting individuals who've released information at the behest of designated terrorists organizations. And so it's something that we take seriously.

Certainly with respect to the cyber budget overall, we have a larger number in there, $121 million. But what I would note is that within that, we are requesting for $26.4 million to strengthen DOJ's own cybersecurity environment to protect against insider threats and also to bolster literally the physical security of our systems.

REP. JOHN CULBERSON HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

We're all -- when I say we, I now refer to a number of other agencies.  But we are all at a point where we're dealing with the greatest of last century's technology in many ways, well put together, well maintained by dedicated staff.  But systems are approaching end of life, systems are changing.  The costs of maintaining the systems are growing.  And so we're -- I will tell you that the Department of Justice is committed to this but looking for ways to make sure that we have the most efficient systems possible is included in this budget request as well.

**JOLLY**:  Do you have flexibility to move quickly on outside vendors?  You know, I also serve on the V.A. Committee and this is one of the huge issues when it comes to scheduling and how much is done in-house and whether or not there's commercial off-the-shelf available that can quickly be incorporated in an environment that continues to so rapidly change that it creates new vulnerabilities every day.

Is there a balance between what you're doing in-house and relying on solutions, technology solutions, that are out there right now today in corporate America?

**LYNCH**:  Well, we certainly try and find that balance.  Obviously, we have to go through the federal procurement process, but we are allowed to use a variety of vendors if they meet those needs.  The process can be somewhat lengthy, but it's -- it is there for a reason, as I'm sure you know.  I think the V.A. is an excellent example of all of the issues that we're discussing here.

And so I look forward to working with you to ensure that the Department of Justice can also be in that stream of improving our technological capacity.  And whether or not, Congressman, we can use off-the-shelf products really depends upon the type of system that we're talking about also; I will say that.

Certainly when it comes to case management, for example, managing data for the lawyers who are litigating our cases, there are several -- several excellent programs that we're able to incorporate into the Department of Justice systems.

When it comes to managing secure data, you know, our national security data, there are not.  Not to say there are none, but there are just fewer options.  And so a lot of that will depend on the type of system that we're talking about as to our ability to use outside vendors.

**JOLLY**:  All right, thank you.  Thank you, Mr. Chairman.

**CULBERSON**:  Thank you, Mr. Jolly.  I want to recognize at this time our ranking member, the gentlelady from New York, Ms. Lowey.

**LOWEY**:  Well, thank you, Mr. Chairman.  And I'd like to join my colleagues in welcoming our attorney general here with us today.  I apologize, but the secretary of State was next door, so we're moving quite efficiently and I hope effectively.  Thank you so much.

I have a question regarding the ATF funding proposed in the president's budget.  The budget request includes funding for additional ATF agents to help investigate gun crimes and strengthen the firearms background check system to ensure that firearms are not inadvertently sold to persons who are legally prohibited from obtaining one.

In addition, the request includes funding to improve the National Integrated Ballistics Information Network to help law enforcement solve firearm crimes.

Many members of Congress often  express opposition to new gun restrictions by saying that we need to do a better job enforcing the gun laws that are already on the books.  Isn't it fair to say that the budget initiatives that you are requesting for fiscal 2017 are designed to do exactly what so many in Congress say they want to do, and that is to enforce the gun laws already on the books by helping state, local and federal law enforcement prevent gun crime and apprehend and prosecute those who violate the firearm laws?

**LYNCH**:  Thank you for the question, Madam Congresswoman.  Yes, indeed.  Certainly as the Department of Justice was looking at the recommendations to make to the president most recently, our mandate was exactly that -- to view existing firearms law and determine how we could best marshal and leverage department resources to better protect the American people within that framework of laws.

REP. JOHN CULBERSON HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF
JUSTICE

So as you've noted, we've taken some steps and we have some requests for ATF funding that would increase positions as well as increase funding. We would -- this funding would allow us to bring onboard 200 additional personnel, 80 of whom would be agents, 120 would be what are called industry investigators or industry operations investigators to support our new review of -- on the -- on those who are engaged in the business of dealing in firearms.

The special agents would be working on violent crime issues, trafficking cases and the like. They would enhance our efforts in reducing violent crime across the country, again using the existing laws. Certainly the NIBEN network has been of great use to law enforcement over the years. The sharing of information at the federal, state and local level about ballistics being used in crime has been extremely successful.

And the other initiatives that we propose would also enhance our ability to detect when guns are lost or stolen in transit much earlier because those guns tend to be used in crimes. We've seen that in terms of firearms recoveries from crime scenes. And so having the ability to start those investigations earlier would also enhance public safety.

So that -- indeed the recommendations that we made are designed to tackle these difficult issues of both violent crime and also keeping guns out of the hands of those who are not authorized by law to have them. But at the same time strengthening the background checks system, called the NICS systems, so that the licensed dealers who rely on that system to comply with the law have the best and most efficient system that they need.

And so that individuals who are also relying on that system as they go through a routine firearm transaction, purchase transaction will have the best and most efficient system as well to rely upon as they go about their business.

**LOWEY**: I appreciate your mentioning the NICS system because I just want to follow up on that issue. We know that current law prohibits individuals from buying a gun if because of a mental health issue they're either a danger to themselves or others or unable to manage their own affairs.

The Social Security Administration has indicated it will begin the rulemaking process to ensure that the National Instant Criminal Background System, the NICS system, receives all appropriate information on the tens of thousands of persons who are found each year to have a documented mental health issue, receive disability benefits and are unable to manage those benefits because of mental impairment.

If you could just give us an update on this effort, including the Justice Department's efforts to assist the Social Security Administration in helping to ensure that persons with serious mental impairments do not have access to firearms.

**LYNCH**: Well, thank you, Congresswoman for that -- for raising that important issue as well. Certainly the law does prohibit individuals with certain types of mental illnesses from being able to purchase firearms. And there are very specific delineations of the adjudications that are required to meet that. Also, every federal agency is required to provide information into the NICS system that would assist the NICS system in being as complete as possible.

**LYNCH**: The Social Security Administration is engaging in this rulemaking so that they can, in fact, produce a clear, legally consistent definition of which types of individuals and which types of adjudications involving their mental health would be required to be turned over to NICS (ph).

And the department's role, as with all rulemaking, is to provide legal assistance and clarity as the Social Security Administration goes through that process.

They will essentially craft a rule, it will go out for public comment. Those comments are received back, and the agency -- the relevant agency -- in this case, SSA -- would provide a response before any rule would be promulgated.

But it is designed to make sure that those -- that the individuals who fall in that category are those that are clearly connected to the legal prohibition against being able to buy or maintain a firearm.

**LOWEY**: Thank you very much.

**CULBERSON**: Thank you. Judge Carter.

AR-00209

REP. JOHN CULBERSON HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

**CARTER**: Thank you, Mr. Chairman.

You know, I think you can figure out that I'm the chairman of Homeland Security Appropriations Committee by the comments of the -- of the chairman.

DHS has work -- has been doing all we can to catch and investigate criminals, illegal aliens and smugglers that are pouring across our southern border. As the chief law enforcement officer of the land, you must do your part to -- and follow through with the prosecutions and consequences.

The past two years, you have requested and received increased funding for immigration judges. Mind you, these are courts used 99 percent of the time -- foreigners who are seeking an immigration benefit, yet still we fund them through taxpayer dollars.

Why are we not placing these immigration judges on the border, where the rubber actually hits the road? Why do we wait -- our wait times increase, even though we're increasing the number of immigration courts?

And why does my staff report sitting in immigration hearings only to see case after case administratively closed, allowing thousands to circumvent immigration enforcement? Would you like to answer those questions?

**LYNCH**: Well, thank you for raising this important issue, because, as you note, managing the immigration case load is one that's become increasingly challenging for all of us -- those who are involved in interdiction at the border, those of us who are involved in prosecuting the cases that arising from that -- the Department of Homeland Security as well, as they deal with not just deportation, but managing all the issues that flow from that.

And so I thank you, again, for your commitment to that issue as well.

Certainly, with respect to our immigration judges, as you -- as you indicate, we have received increases over the last two years for the hiring of immigration judges. And let me thank this committee for recognizing the need for hiring more immigration judges and express the department's appreciation for your support with that.

Certainly, with respect to the total Office of Immigration Reform, we are in fact requesting additional funding, but no new judges this year, because we have brought judges on board.

We're in the process of hiring more, using the funds that were provided to us. And the additional funding that we're requesting is to make sure those judges are up and running.

As you indicated, there are often long waits, there -- there's often crowded courtrooms. And so we are using the additional funding requests -- or the additional funding requests would be used, I should say -- to support the infrastructure for those judges.

And so we want to be responsible with our requests, and fully integrate those judges, and continue the hiring under the money we already received.

With respect to immigration judges on the border, we've tried to be flexible with regard to that. Certainly within the last year or so -- it may have predated a bit my name as attorney general, but as I'm sure you will recall from dealing with the homeland security issues, we have waves of individuals coming across the border at different times.

And the composition of the groups will change. And so, for example, when we had large numbers of unaccompanied children and very young people coming across the border, in fact what the Department of Justice did was temporarily reassign some immigration judges to the border areas to handle just the influx of cases there.

And we look forward to continuing to be responsive in that way so that we can deploy judges to those areas where their colleagues would be overwhelmed.

AR-00210

REP. JOHN CULBERSON HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

And we hope that the 20 new judges that were hired last year will go a long way towards that -- and I believe we have additional hiring planned. As I mentioned, with the money that was already appropriated. So again, we feel that we can be flexible, and we look forward to continuing to be flexible.

If -- if there were to be a crisis again in another portion of the country, not -- not the border, but maybe the north -- the northwest border, for example, or the northern border -- we would again use that flexibility to make sure we could staff up those judicial offices so that their colleagues would not be overwhelmed.

And so that's -- that's how we would intend to deal with that. Again, but we're requesting additional funding so that we can bring on board the judges, and we do appreciate this committee's support of the efforts of the Office of Immigration Reform.

CARTER: But within the last four months -- and we've had a sudden dropoff this month, but in the last four months, our numbers on the UACs -- unaccompanied children -- have gone right back up to 25,000 or 30,000.

It's really unusual at this time of the year. Those of us who've lived in Texas and know what goes on at the border because we've lived with it all of our lives -- it gets cold, people don't come across the river. When its gets warm, people come across the river. It's just -- pretty simple. It's cold -- to get wet.

And so the -- the situation is this is contrary to what we would expect. This means that there's something driving people up here. If we can't get them before an immigration judge clearly (ph), give them a notice to appear, they are then picked up by another -- another federal agency and transported God knows where in the United States.

Could be all the way to Maine, Washington state or the tip of Florida. We don't (ph) know where they're going. But the -- notice to appear -- chances are -- especially this (ph) -- most of the children that we're calling children are 14 to 17 years old. That's the highest number of category coming up as -- as unaccompanied, quote, "children".

By the time they get resettled (ph), good chance they'll be adults. OK? That's -- we got to fix that. And I know you're trying, and I -- you ask for more money for judges, I'll -- I personally will give it to you, because I truly believe the solution is bringing them before a court of jurisdiction and having a real hearing, not an agency and a bureaucrat.

So thank you for what you're doing. As for -- and I personally will be on your side.

LYNCH: Thank you, sir.

CULBERSON: Thank you, judge.

I recognize the gentleman from New York, Mr. Serrano.

SERRANO: (OFF-MIKE) so much. Thank you for being here with us, and congratulations on being our attorney general.

You know, when I first came from Puerto Rico as a young boy, and I started paying attention to what was being discussed at my house, it was the beginning of the civil rights movement, and it was whether Puerto Ricans could vote or not.

And both movements has something in common, which was voting rights. In our case, it was whether we took a test in English or in Spanish -- that was settled by the courts.

Lately, many of us, as you know, have felt that we're making it harder for people to vote, not easier to vote. And it brings me to the question of what happened with the Election Assistance Commission, where the commissioner wrote to some states and said, "you can't ask for citizenship."

That's always troubled me, because -- you know, in my case, and in the case of so many other people, we don't walk around with proof that we're citizens. That's just the way it is.

In fact, this voting card is probably -- my -- my congressional voting card is probably the only proof I have on me that I'm a citizen, because we would assume that all members of Congress are citizens of this great land. But that's it.

AR-00211

REP. JOHN CULBERSON HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

And so my question to you is what role is the Justice Department playing on that particular issue with that commissioner from the elections commission? Do you feel that he had a right, without giving me a judgment if that's what the case would be, to write that letter?

And lastly, very briefly, what in general are we doing to protect people's rights to vote? Because it seems to me that, at this time in the history of our country, to be fighting the voting rights issue all over again is a very sad state of affairs.

**LYNCH**: Well, Congressman, with respect to the specific case that you raised, it's actually currently in litigation. Typically, it is -- it is the department's responsibility to represent federal agencies.

We do advise all of our client agencies on the applicable laws and issues that are raised by their actions. And with respect to this case, it's currently in litigation, so I'm not able to give you specifics on that.

I think that -- you know, that there's a judge who's gonna be holding a hearing soon to review whether or not there's a legal basis for certain actions. And so I'll -- I'll leave that matter there.

With respect to voting rights in generally -- in general, it is in fact one of the department's priorities to make sure that we fully enforce all of the relevant and applicable laws that protect the rights of everyone to vote.

**LYNCH**: Certainly there have been changes in those laws recently, with respect to the Voting Rights Act itself. Pre-clearance is no longer an option or a tool that we have, but that has not diminished the department's resolve and commitment when issues are brought to us of where we don't have pre-clearance eyes on something, where there's evidence of irregularity or issues arising later in the process, of starting investigations and working there.

And I would note that this is also an important issue in the field, with respect to the U.S. attorney community also. They're very concerned at the local level as to whether or not there would be any irregularities with voting and are very focused on that.

So, we're very committed to protecting the right to vote for all Americans, and making sure that it's exercised in as free and open a way as possible. We provide guidance to states, some states do come to us and ask us questions about changes. We still do that.

And we'll consult with them and have had very positive dialogues on specific issues about the best way in which to ensure an open right to vote. And where necessary, we'll litigate those issues also, and then we'll let a court decide. But we -- where we feel that the right to vote is being infringed in a way that is inconsistent with the values of this country, which is that every American gets to participate in this great democracy of ours, we'll bring those a actions as well.

**SERRANO**: Thank you. In the time I have left, I know you can't comment on litigation, or something that's being litigated. But are you in the belief of the comment on whether it's true or not, about the room over here, that the Justice Department has asked a judge for a stay on this whole issue of -- by the elections commission?

**LYNCH**: Well, I think that the pleading are, the pleadings -- have been filed now, and I think that the plaintiffs did ask the court for an injunction. I think the matter is under consideration now.

**SERRANO**: All right. Thank you so much. And thank you, Mr. Chairman.

**CULBERSON**: Thank you, Mr. Serrano. And I appreciate very much your focusing on making sure that every American has the right to vote. And that means "eligible." And I deeply appreciate that. And that you will also defend, as the department always has, federal agencies, and therefore you'll be defending the Federal Elections Commission.

I think that's very important and I appreciate that very much. Want to recognize Mr. Kilmer, and then I believe we're going to wrap up.

Mr. Kilmer?

AR-00212

REP. JOHN CULBERSON HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

**KILMER**: Thank you, Mr. Chairman. I'm grateful that the president established the task force on 21st century policing to provide a road map on how to build trust and incorporate best practices to reduce crime and make sure everybody is safe.

And I know that the task force made several recommendations that were specific to the LGBTQ community, and making sure that everyone is safe.

I know the department is taking the lead on promoting the adoption of those best practices and recommendations, and was hoping you could just give an update on how that's coming and what the strategy is for getting these measures adopted nationwide?

**LYNCH**: Yes. Thank you. This is an important area. It is essentially an area in which some of our most vulnerable citizens have often either felt that police protection did not extend to them or they were reluctant to seek police protection, because of a view that they wouldn't receive it, frankly.

And so, it's also an area that, frankly, when I talk to law enforcement, they don't want anyone feeling that you can't call on an officer for help. And so, we've tried to provide guidance, we have tried to provide training on how to deal with individuals who are in this vulnerable situation, either under attack or under assault.

We have tried to provide training in dealing with individuals who present issues of gender identity, so that police officers have the training that they need to recognize the issues that come from that, ranging from booking to housing, for example.

And so, one of the things that we have done is -- I may have mentioned, in an earlier response to a question, that we have recently released guidance on sexual assault and domestic violence.

This guidance focused on identifying and preventing gender bias in law enforcement's response to domestic violence and sexual assault. And we've consulted closely with the state and local law enforcement, both with their experiences and the questions that they had also. And so, we have -- that guidance came out in December.

And it does identify and recommend practices that will help law enforcement agencies develop best practices to respond to crimes of violence. Not just what people traditionally view of as domestic violence against women or sometimes men, but also the LGBTQ community also, to recognize those symptoms and to also be able to respond to those individuals.

And the guidance also seeks to make sure we have ways to connect law enforcement with a very, very important part of the community when it comes to all types of domestic violence, which is other agencies and resources. Often, community resources are nongovernmental agencies or NGOs that can provide support for victims of domestic and sexual violence.

**KILMER**: Thank you for that. With the time I have left, I represent a district that has a large Navy base and I think I represent more military veterans than almost anybody in this place and feel very lucky about that. And I just -- I fundamentally believe if you serve, we should have your back.

My state's human rights commission has had, to me, a surprising number of instances where service members or veterans have voiced concerns around housing or employment discrimination. I know the Civil Rights Division under your jurisdiction deals with those issues and I want to just get a sense from you whether it's properly resourced to deal with the needs of service members and veterans in this regard and what sort of demand you're seeing for those services and the ability of the division to -- to meet that demand.

**LYNCH**: Well, I will say that I certainly agree with you in the fact that I think we owe our veterans the greatest support when they -- when they return home, be it an issue of health or be it an issue of services, or the all-important right to vote when they are also stationed overseas.

One of the things we do in the Civil Rights Division also is have a very active practice in making sure that service members who are stationed overseas have the information they need to know how to vote and that that right -- that particular right is not infringed through either a logistical problem or some other issue.

REP. JOHN CULBERSON HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

We do enforce service -- the federal laws that help them also return to their workforce when they come home from military duty.  And also, we've seen a number of disturbing cases that involve financial exploitation of our service members, both when they are coming back and trying to seek housing and also while they're on active duty, of service members and their families. We've seen some unfortunate instances where that type of fraud is growing and that's a matter of grave concern to me as well.

Also -- we also have issues, of course, with many of our service members returning injured.  Some of these injuries are visible and some of them are not visible.  But it presents them with a disability that gives them special needs in terms of housing and employment, and so we -- we take very seriously our responsibility to defend their right to those reasonable accommodations as well.

This -- currently, the FY 2017 budget includes a total of $4.1 million in resources, which is going to plus-up the service members' civil rights cases work by a little over $580,000.  We also have a service members initiative at the Department of Justice that's led by my outstanding associate, Attorney General.  And it really has been instrumental in making sure that we at the department look at all of the issues that our service members present and make sure that, whether -- it's not just civil rights, but other areas also.  I mentioned the fraud cases growing, the criminal division is cognizant of the issues as well.  And so we're trying to look at all of the issues presented by our -- our service members and be responsive.

**KILMER**:  Thanks.  We'd love to follow up with you on that.

**LYNCH**:  Yes.

**KILMER**:  Thanks.  Thank you, Mr. Chairman.

**CULBERSON**:  Mr. Kilmer, thank you.  Committee members, thank you. And above all, Attorney General Lynch, I want to thank you for your service to the country in -- in keeping us all safe and for your cooperative relationship with this committee. It is deeply appreciated in ensuring that Americans can sleep soundly at night knowing that the Department of Justice and their local and state law enforcement officers are working together to protect themselves and their families.

Thank you very much and the hearing is adjourned.

END

## Classification

**Language:** ENGLISH

**Subject:** US REPUBLICAN PARTY (90%); LAW ENFORCEMENT (90%); PUBLIC FINANCE (90%); ATTORNEYS GENERAL (90%); US DEMOCRATIC PARTY (90%); APPROPRIATIONS (90%); US FEDERAL GOVERNMENT (89%); LAWYERS (89%); WITNESSES (78%); JUSTICE DEPARTMENTS (78%); TAX LAW (73%); US PRESIDENTS (73%); TAXES & TAXATION (70%); CYBERCRIME (63%); ESPIONAGE (50%); TERRORISM (50%)

**Industry:** LAWYERS (89%); CYBERCRIME (63%)

**Person:** JOHN ABNEY CULBERSON (90%); LORETTA LYNCH (90%); DAVID JOLLY (79%); DEREK KILMER (79%); JOHN CARTER (78%); NITA M LOWEY (58%); JOSE E SERRANO (58%); MICHAEL M HONDA (58%); HAROLD ROGERS (58%); BARACK OBAMA (50%)

**Geographic:** TEXAS, USA (92%); KENTUCKY, USA (79%); DISTRICT OF COLUMBIA, USA (79%); UNITED STATES (94%)

AR-00214

REP. JOHN CULBERSON HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

**Load-Date:** February 24, 2016

End of Document

AR-00215

Attorney General Lynch Confirms New Sanctuary Cities Policy During Hearing with Cha... Page 1 of 4
Case 1:18-cv-06474-ER Document 36-2 Filed 08/17/18 Page 217 of 376
Case 3:17-cv-04701-WHO Document 96-2 Filed 08/28/18 Page 216 of 368



# PRESS RELEASES

## Attorney General Lynch Confirms New Sanctuary Cities Policy During Hearing with Chairman Culberson

**Washington, February 24, 2016** | comments

**Washington, D.C.** — Today, Representative John Culberson (TX-07) chaired a House Appropriations Subcommittee on Commerce, Justice, Science, and Related Agencies hearing on the Department of Justice's fiscal year 2017 budget with Attorney General Loretta Lynch. In response to concerns from this Committee, the Attorney General confirmed that the Bureau of Prisons (BOP) has implemented a new immigration detainer policy, and that the DOJ has begun a new policy regarding grant requests. First, the Attorney General announced BOP will offer Immigration and Customs Enforcement, instead of states and municipalities, the first opportunity to take into custody and remove an individual. This will help to prevent the release of criminal illegal aliens into the custody of sanctuary cities. The Attorney General also announced that DOJ can take action against jurisdictions that falsely certify that they are in compliance with applicable Federal law. 8 USC 1373 requires local and state jurisdictions to share a criminal defendant's immigration status with federal authorities.

Congressman Culberson released the following statement after the hearing:

*"Sanctuary city policies across the country have contributed to the deaths of thousands of Americans and caused untold suffering. This is unacceptable and intolerable, and it has allowed thousands of criminal aliens to roam freely on American streets.*

*"On February 1, I wrote to Attorney General Loretta Lynch explaining that as the new chairman of the Commerce, Justice and Science Appropriations Subcommittee, I believe local and state jurisdictions should not apply for federal money unless they comply with federal law. I asked Attorney General Lynch to change the federal grant application process*

AR-00216

**JOHN CULBERSON**
7th District of Texas

to require state and local authorities to verify that they are in compliance with federal law, they are not, to deny their application.

"In response to my concerns, today the Attorney General announced that BOP will release criminal illegal aliens to ICE instead of sanctuary cities. This is welcome news. If this had been BOP's policy last summer, Kate Steinle would be alive today. I am grateful Attorney General Lynch made this important change, and I look forward to receiving regular updates from the Department of Justice on the progress they are making implementing this new policy.

"Second, the Attorney General announced that DOJ can take action against jurisdictions receiving grants when they are not in compliance with Federal law. If jurisdictions choose to implement sanctuary policies that prevent them from cooperating with federal immigration authorities, they are putting their federal grant money at risk unless they change their policy to comply with federal law. The Attorney General promised to provide my subcommittee with quarterly reports on their progress on these two new policies, and I intend to zealously oversee their work. I will use every legislative tool at my disposal to help the Attorney General implement these new policies.

"The new policies the Department of Justice announced today will keep our streets safer by ensuring that criminal aliens do not roam freely in our communities, and prevent federal tax dollars from being sent to jurisdictions that refuse to comply with federal immigration laws.

"I am very grateful to Attorney General Lynch for her leadership in making these vital changes which will save lives and make our streets much safer."

Chairman Hal Rogers (KY-05) released the following statement after the hearing:

"I am encouraged by Attorney General Lynch's announcement today, and I commend Chairman Culberson for working with the Department of Justice to get their commitment to stop any grant funding to jurisdictions that are in violation of applicable federal laws. This is a significant matter for a lot of us and I look forward to verifying DOJ's progress each quarter."

Read the full text of the Department of Justice's letter here.

Read the full text of Rep. Culberson's February 1 letter here.

Watch the clip of Rep. Culberson and Chairman Rogers questioning Attorney General Lynch here.

The full video of today's hearing and text of Attorney General Lynch's testimony is available here.

**Tags:** Appropriations

AR-00217

Attorney General Lynch Confirms New Sanctuary Cities Policy During Hearing with Cha...    Page 3 of 4

Case 1:18-cv-06474-ER   Document 33-2   Filed 08/17/18   Page 219 of 376
Case 3:17-cv-04701-WHO   Document 96-2   Filed 05/25/18   Page 228 of 508



### JOHN **CULBERSON**
7th District of Texas

- **Rep. Culberson Supports Vital Defense Funding Bill, Calls for Senate Action**
Posted in Press Releases on January 30, 2018 | Preview ≫
- **ICYMI: PBS NewsHour Interview on Hurricane Harvey**
Posted in In the News on January 29, 2018 | Preview ≫
- **Long-sought Addicks, Barker revamp hinge on congressional politics**
Posted in In the News on January 25, 2018 | Preview ≫
- **Rep. Culberson Statement on Passage of Continuing Resolution to Keep Government Open**
Posted in Press Releases on January 22, 2018 | Preview ≫



## STAY **CONNECTED**

Use the form below to sign up for my newsletter and get the latest news and updates directly to your inbox.

Enter Email Address

**SIGN UP**

## OFFICE **LOCATIONS**

AR-00218

Attorney General Lynch Confirms New Sanctuary Cities Policy During Hearing with Cha...   Page 4 of 4

Case 1:18-cv-06474-ER   Document 33-9   Filed 08/17/18   Page 220 of 376
Case 3:17-cv-04701-WHO   Document 96-2   Filed 03/28/18   Page 299 of 508




JOHN **CULBERSON**                 **WASHINGTON, DC OFFICE**
7th District of Texas              2161 Rayburn HOB
                                   Washington, DC 20515
**HOUSTON OFFICE**                 Phone: (202) 225-2571
10000 Memorial Drive               Fax: (202) 225-4381
Ste 620
Houston, TX 77024
Phone: (713) 682-8828



AR-00219

# SEN. RICHARD C. SHELBY HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

CQ Transcriptions

February 25, 2016 Thursday

Copyright 2016 CQ-Roll Call, Inc            All Rights Reserved

All materials herein are protected by United States copyright law and may not be reproduced, distributed, transmitted, displayed, published or broadcast without the prior written permission of CQ Transcriptions. You may not alter or remove any trademark, copyright or other notice from copies of the content.

## Body

**EVENT DATE:** February 25, 2016

**TYPE:** COMMITTEE HEARING

**LOCATION:** WASHINGTON, D.C.

**COMMITTEE:** SENATE COMMITTEE ON APPROPRIATIONS, SUBCOMMITTEE ON COMMERCE, JUSTICE, SCIENCE, AND RELATED AGENCIES

**SPEAKER:** SEN. RICHARD C. SHELBY, CHAIRMAN

**WITNESSES:**

SEN. RICHARD C. SHELBY, R-ALA. CHAIRMAN

SEN. BARBARA A. MIKULSKI, D-MD. RANKING MEMBER

WITNESSES: ATTORNEY GENERAL LORETTA E. LYNCH

SEN. JAMES LANKFORD, R-OKLA.

SEN. DIANNE FEINSTEIN, D-CALIF.

SEN. SHELLEY MOORE CAPITO, R-W.VA.

SEN. JEANNE SHAHEEN, D-N.H.

SEN. SUSAN COLLINS, R-MAINE

SEN. TAMMY BALDWIN, D-WIS.

SEN. CHRIS COONS, D-DEL.

SEN. CHRISTOPHER S. MURPHY, D-CONN.

SEN. JOHN BOOZMAN, R-ARK.

SEN. LINDSEY GRAHAM, R-S.C.

**SHELBY**: The subcommittee will come to order. Madame Attorney General, welcome again to the Commerce, Justice and Science Appropriations Subcommittee hearing, where we will be examining the Department of Justice fiscal 2017 budget request.

SEN. RICHARD C. SHELBY HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

Today this subcommittee will continue the important responsibility of reviewing spending at the Justice Department to ensure that it has the necessary resources to carry out national security and law enforcement missions.  Last month you testified before this subcommittee about a set of executive actions recently issued by the president regarding gun control.  At that time I, along with other subcommittee members, expressed deep concerns about the constitutionality of key aspects of these executive actions.

The president's 2017 budget request for the Department of Justice submitted a few weeks after that hearing has paid no heed to a lot of our concerns.  The president proposes increased spending at the Department of Justice by $810 million in '17, a new total of $29.9 billion.

This includes $66 million in additional funding for the Bureau of Alcohol, Tobacco, Firearms and Explosives for 200 new positions, 80 special agents, and 120 industry operation investigators.  I continue to have significant reservations about the potential abuses and harassment of law-abiding gun owners and purchasers that could result from bringing on these additional agents and investigators.

In addition, I expressed to you at our hearing in January my apprehension about the president's clemency initiative, given the numerous examples of sentences that had been commuted for criminals with firearms convictions.  You pledged to review the situation and get back to the committee on this troubling topic.  I'm still waiting for your response.

Yet, the department's budget request for the office of pardon attorney includes $2.8 million to increase staffing for pardon and commutation petition reviews.  I find it hard to believe that the president can spotlight his commitment to reducing gun violence in America when his administration is granting clemency petitions for criminals convicted of gun crimes.

In another area, I note that spending at the Bureau of Prisons increases by $238 million above 2016 level, despite another projected reduction in our federal prisoner population, which continues to decline.  I hope you can shed some light this morning on why our present budget continues to increase instead of demonstrating savings and cost reductions at a time hen we have fewer federal prisoners.

When it comes to law enforcement activities, counterterrorism and cyber security remain top priorities of the subcommittee.  The massive recent cyber breach of the Office of Personnel and Management's computer network compromised the personal information of approximately 25 million Americans.  That's an astounding number, and reminds us what's at stake if the federal government is not prepared to combat cyber threats, both offensively and defensively.

The department request to increase of $121 million for combating cyber threats, which includes $85 million for the FBI, $8 million for DEA, and $26 million for the Department of Justice information sharing technology attempt.  Despite the noteworthy funding increases for cyber security, I'm disturbed by proposed cuts to other national security activities.

Finally, when it comes to counterterrorism, I was dismayed by the president's announcement on Tuesday to close the Guantanamo detention facility.  This announcement came on the same day that Spanish and Moroccan police arrested four terrorist recruiters that included former a Guantanamo detainee who once fought with militants in Afghanistan.

Current law prohibits the terrorists held at Guantanamo from being transferred over to U.S. soil, and I am left wondering what advice you can give -- possibly given the president that would make any such move legal.

I will highlight more specific topics in my questions, but I appreciate you being here today and I look forward to your testimony.

Senator Mikulski.

**MIKULSKI**:  Thank you very much, Mr. Chairman, and really a most cordial welcome to the Attorney General Loretta Lynch.  I look forward to hearing the attorney general's testimony about the needs of the Justice Department, and its real impact on meeting the needs of the American people to be safe and to be secure.

When we look at the many demands on the Department of Justice, they range from dealing with international efforts related to terrorism, the practices of organized crime, as much as drugs and cyber security.

SEN. RICHARD C. SHELBY HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

We really want to thank all of the people who work at the Justice Department, those who carry the guns and those who carry the Constitution.  Actually, they all carry the Constitution there.  And really to thank them for what their work, that they do every day in every way.

I know Senator Shelby and I are committed to regular order and trying to move this committee's appropriation, working also with Senator Cochran, that we don't get into sequester or all of those big tensions at the end.  So we look forward to hearing your testimony so that we can move it.

I also want to particularly thank you on behalf of the citizens of Baltimore, and for your leadership during our Baltimore uprisings. Your work with the elected leadership, law enforcement, community leaders and faith leaders was really enormously helpful.  And for really helping provide us with the help of enforcing the law, living by law and order for those who have to live by the law.

A unique way of technical assistance was provided to us that -- our police department, but also helped our citizens, and now also helps our citizens have confidence in the police department.  We really have a long road to go on that, but I am going to particularly thank you as we try to rebuild the trust between police and communities they serve.

And I know that this is being faced in other parts of the country.  That's why in fiscal '16, working with Senator Shelby, we looked at how we could help modernize many of those efforts.  So that's one issue.

The other issue that I'm particularly interested in, and I know my colleagues, particularly Senator Shaheen, is the scourge of heroin in our communities.  As I look here at the hearing, it's excellent bipartisan attendance.  And I would say that every single one of us is facing a heroin crisis in our state.  Whether it's rural states, urban states, etc.  And we really need to come to grips with this.

In my own home state last year, my state, five and a half million people, we had over 507 heroin deaths.  This is just stunning.  So we're whether rural, urban or suburban, we just can't enforce our way out of this crisis.  We need to break the cycle of addiction for drug users.  We need to crack down on the big dealers and traffickers, and we also need to engage in preventive strategies.

I know on February 2nd the president announced a $1.1 billion in funding to tackle the heroin and opioid crisis, with most of the funding going to Health and Human Services and the Justice Department. We look forward to hearing from you on this.

Also, we want to make sure that the FBI has the tools it needs, and we thank you for what has been going on to give them the physical facilities we need.  But this committee believes that we do have to live by the Constitution.  I know we will be talking about guns in this hearing, and I support the Second Amendment.

I also support the Fourth Amendment against unwarranted search and seizure, so I look forward to hearing how voluntarily we might be able to break through this Apple-FBI standoff.  And I also support article 2, section 2 of the Constitution, that says that the president has the authority to nominate a Supreme Court justice up until his last day of office.

Every day we count on the Justice Department to fulfill its vital mission, and I want you to know again, I support all 115,000 employees, many of whom live in my home state of Maryland.  So rather than me talking in more detail, we want to hear from you.  But most of all, we really want to work on a bipartisan basis to keep America safe, and keep it safe under a constitutional government.  That completes my remarks.

**SHELBY**:  Madame Attorney General, your written testimony will be made part of the record in its totality.  Proceed as you wish.

**LYNCH**:  Thank you, Mr. Chairman.  Mr. Chairman and Vice Chairman Mikulski and all the distinguished members of the subcommittee, with whom I have had the pleasure of working on so many important issues, it's an honor to appear before you today to continue our dialogue about how we best protect the American people.

I'm grateful for this opportunity to discuss the president's fiscal year 2017 budget for the Department of Justice.  This budget reflects our enduring commitment to creating a stronger nation and the more empowered communities at every

SEN. RICHARD C. SHELBY HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

American deserves.  In the last year, thanks to the thousands of dedicated men and women who serve the Department of Justice, and thanks to the ongoing support of this distinguished committee, we have taken tremendous steps toward that goal.

We have prosecuted violent extremists and dangerous criminals. We have defended the integrity of our markets and the beauty of our natural resources.  We have worked to end human trafficking, to disrupt the flow of illegal drugs and weapons, and to eradicate international corruption.

We have created more opportunities for second chances in our justice system, and new foundations of trust in our cities and towns. These are real and meaningful achievements, and the request set forth in the president's F.Y. 2017 budget request will allow us to build upon this encouraging progress.

As always, the Justice Department's first and most important priority is the safety and the security of the American people. The president's budget would invest an additional $781 million in our national security capabilities, including in critical measures to address the evolving challenges like homegrown extremism, online radicalization, and increasingly sophisticated encryption.

Now among other items, that request also contains funds for a new state of the art FBI headquarters, which would reduce inefficiencies, it would streamline internal communications, and it would significantly boost our ability to thwart the emerging criminal and terrorist threat.

It devotes an increase of $63 million to reinforcing our intelligence sharing capabilities, allowing us to more rapidly coordinate with both our federal partners and our counterparts overseas.  And it directs $38 million towards developing the tools that we need to lawfully access encrypted data and communications, so that we can successfully investigate and prosecute criminals and terrorists who attempt to hide the evidence of their crimes.

Now as we have seen recently, this is not a theoretical issue. As we have made clear, the growing dark problem is a very real threat to law enforcement's mission to protect public safety and to ensure that criminals are caught and held accountable.

It is a long-standing principle in our justice system that if an independent judge finds reason to believe that a certain item contains evidence of a crime, then that judge can authorize the government to conduct a limited search for that evidence.  If the government needs the assistance of third parties to ensure that the search is actually conducted, judges all over this country and on the Supreme Court have said that those parties must assist if it is reasonably in their power to do so.  That is what we have been asking for.

And we owe it to the victims and the public, whose safety we must protect, to ensure that we have done everything under the law to fully investigate terrorist attacks on American soil.

Now of course, as technology continues to evolve, we are also focused on stepping up our work against those who attempt to use the Internet to attack America's infrastructure, to steal our trade secrets and jeopardize the privacy and property of everyday citizens.

Accordingly, the fiscal year 2017 budget would dedicate $121 million in additional resources to investigating cyber crimes and to fortifying the Justice Department's vital information networks.  Now the majority of those resources, $85 million, would be used to enhance the FBI's capacity to collect and to analyze digital evidence, and to increase the overall number of cyber investigations.

Together, this important funding will allow us to keep pace with the fast-changing landscape of cybercrime.  Our commitment to protecting the American people is matched by our dedication to ensuring that they benefit from a criminal justice system that is fair, efficient and responsive.

The F.Y. 2017 budget requests an increase of $247 million for one of our most successful and groundbreaking undertakings in that area, the Smart on Crime initiative, which encourages alternatives to incarceration for low-level, nonviolent offenders, which eases overcrowding in correctional facilities, and frees precious resources for the prevention and the deterrence of the most serious crimes.

AR-00223

SEN. RICHARD C. SHELBY HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

And of that total Smart on Crime request, $184 million will go to the Bureau of Prisons reentry, rehabilitation and mental health programming, which are all essential components of our work to help formerly incarcerated individuals make the most of their second chance, while also ensuring that our communities stay strong and safe, because those are the kinds of communities that we seek for every American, and they require bonds of trust and respect between law enforcement officers and the people that we serve.

Helping to repair those bonds where they have frayed is one of my top priorities as Attorney General.  And the president's request reflects that focus, with an increase of $25 million in a number of programs designed to foster collaboration between residents and law enforcement, including racial reconciliation and restorative justice initiatives, as well as improved data collection.

It includes additional funds for the department's smart policing program, which encourages local jurisdictions to improve police- citizen interactions, while developing cost effective solutions to crime in their communities.  And it enlarges our investment in the community-oriented policing services hiring program.  This program extends funding to state and local departments to hire or retain officers so they can continue to meet the full range of their constituent needs.

Those of us who work in law enforcement have a special responsibility to protect the most vulnerable among us.  And few crimes prey more savagely on the vulnerable then human trafficking, which destroys families, which weakens communities and erodes our society's basic foundations of decency and security.

The F.Y. 2017 budget sets aside $89.3 million for the department's efforts to combat this scourge, including $45 million for efforts to help the victims of trafficking rebuild their lives and reclaim their futures.

We have also resolved that each and every one of our young people should grow up in safety and security, which is why the budget includes a net increase of over $64 million for the office of justice program grants, or OJP as we call it, focused on juvenile justice and at-risk youth, including an increase of $25 million for the delinquency prevention program, which seeks to prevent young people from entering the criminal justice system in the first place by providing assistance and guidance as early as possible.

I look forward to working with this committee and with Congress to assure the timely passage of the president's budget, which asks for a total of $29 billion in discretionary funding for the department, including $27 billion for federal programs and $2 billion for state, local and tribal assistance programs.

This level of funding will assure that the outstanding men and women of the Department of Justice, whom I am so proud to lead, can continue their tireless work to protect American citizens, to defend America's values, and to strengthen all of America's communities in the months and years ahead.

Thank you once again for the opportunity to appear before you today and to work with you in the future.  I'm happy to answer any questions.  Thank you, Mr. Chairman.

**SHELBY**:  Thank you, Madam Attorney General.  Since President Obama took office, Congress has consistently on a bipartisan basis prohibited the closure of the terrorist detention facility at Guantanamo Bay, through multiple pieces of legislation.  This subcommittee once again included two prohibitions in the fiscal year 2016 spending bill restricting the transfer and housing of these terrorist detainees on U.S. soil, and the president signed that bill into law.

And yet this week, the president has announced a new plan to close the detention facility at Guantanamo Bay.  My questions.  You previously testified that federal law prohibits the transfer of terrorist detainees from Guantanamo Bay to U.S. soil.  How has your legal opinion changed, or has it, to warrant the president's announcement?

**LYNCH**:  Thank you, Mr. Chairman, for the opportunity to address that issue.  The president did submit a proposal to Congress this week regarding the closure of Guantanamo Bay, which has long been a priority of the administration, and which I support, as it does in fact lead to the unfortunate recruitment of additional terrorist individuals overseas.

SEN. RICHARD C. SHELBY HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

And of course, as you note, the most recent legislation continues the prohibition on transferring detainees from Guantanamo Bay to American soil.

SHELBY: That's the law right now, isn't it?

LYNCH: That is the current law and it continues previous iterations of those statutes. And certainly I believe that is why the president's plan calls for him to work with Congress to discuss that particular issue. And that is, I believe, the goal here.

Obviously we will continue to manage the facility as long as it is open, but I believe the president is looking forward to working with Congress to discuss those issues, and that will be something that I am sure will be a matter of discussion between the administration and this body.

SHELBY: Have you advised the president on using the executive actions to close the Guantanamo prison and transfer terrorist detainees to American soil despite the law?

LYNCH: I have neither been asked nor...

SHELBY: You have not done that?

LYNCH: ... because the position is that the president would work with Congress to deal with the statutory limitations before any transfers could be made.

SHELBY: OK. In the area of allowing non-citizens to vote, let me get into this with you a little. Recent press reports have indicated that the Department of Justice has failed in its duty to properly defend the U.S. Election Assistance Commission, or EAC, in a lawsuit involving the right of states to require proof of citizenship for voter registration.

It's my understanding that the Election Assistance Commission has approved the request of states such as my own in Alabama, Georgia and Kansas to require such proof of citizenship, and various outside groups are challenging this approval in court.

Earlier this week a federal court denied a request for a temporary restraining order against the EAC's actions. But I was disturbed, Madam Attorney General, to learn about the conduct of the Department of Justice's lawyers in this case, who took the opposite position of your client, the Election Assistance Commission, instead of defending them.

My question is this. Did you authorize as the attorney general the department's attorneys to argue for a temporary restraining order and possibly even a preliminary injunction against the actions of your own client, the Election Assistance Commission in this case?

LYNCH: Thank you, Mr. Chairman. As you've noted, the department does represent the Election Assistance Commission, as we statutorily do represent virtually all federal agencies and other departments here.

This matter is an open matter. It's in current litigation, and so because it is an active litigation, it's not appropriate for me to comment at this time on those types of discussions. I would note that we did file papers in that matter and our position is best set forth in those pleadings.

SHELBY: Do you personally believe that -- you are the chief law enforcement officer in the country -- that non-citizens should be allowed to vote in U.S. elections although they are not American citizens?

LYNCH: Well, Senator, I believe the law is settled as to who is allowed to vote in terms of citizenship. I believe this particular case focuses on matters of how documents will be prepared. As I indicated, we have filed pleadings in the matter, and I would refer you to those for the department's position.

SHELBY: Goodness. Sanctuary cities, my last question to you. There is an ongoing problem that we all have talked about with sanctuary cities in our country. And I don't believe that your department is addressing this, or the administration.

AR-00225

SEN. RICHARD C. SHELBY HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

My question is, Madam Attorney General, I received -- let me preface this.  I received a letter from Mr. Kadzic (ph), not you, which states that this administration is finally acknowledging and beginning to work on the problem of sanctuary cities. How are you approaching that?  Isn't this a real problem in this country?

**LYNCH**:  Well, thank you, Mr. Chairman, for raising this issue, because it certainly does reflect the numerous strands of tension that arise as we try and carry out our obligations to work with our state and local partners, as well as deal with the issue of the need to remove individuals who are released from federal custody and are deportable, and therefore are usually processed for removal by the Department of Homeland Security.

I know also -- I thank you for your communications on this matter to me several months ago.  Certainly as we have reviewed this issue and looked at policies to best handle it, all of those issues have been important, so I thank you for your attention to this matter as well.

As you note, Mr. Chairman, this has been an issue, and it raises a number of concerns about public safety as well as the comity and relationship between the federal agencies and our state and local counterparts.  And it arises because in many situations when individuals, non-citizens, particularly those who don't have legal status and are therefore going to be deported, are released from federal custody, from the Bureau of Prisons custody.

Traditionally, if there are other law enforcement agencies that have an interest in prosecuting or investigating these individuals, they have filed attainers.  Another state, for example, may need to prosecute that individual for another crime.  And of course we support those citizens' right to justice as well.

And typically we would wait until the end of those other state adjudications before going forward with the Department of Homeland Security ICE removal action, because to remove the defendant would mean the state would not be able to prosecute them.  Those victims would not obtain justice.

However, in situations where at the end of the state proceedings or with the end of state custody we would find that the ICE removal orders were not being honored, this presented a problem, where individuals were being released without the knowledge of the federal government, without our ability to intervene and then eventually move forward with those removal actions.

And it has been further complicated by ongoing litigation in this matter.  The department is currently defending the Department of Homeland Security in two actions where jurisdictions are challenging their obligations to provide information to DHS, whether it is, for example, voluntary or mandatory.  So those matters are ongoing and we've had a ruling against us.

What we have decided to do is to, however, look at this matter from a way of what policy can be best set up that effectuates the goals of, first of all, public safety, as well as respecting our state and local colleagues' needs.

So our current policy, as was outlined to you in your letter, in a letter that we provided to you, has been recently announced, is that instead of the Bureau of Prisons placing the ICE detainer removal last in priority, they now have the right of first refusal. They are now first in priority when someone who is deportable is to be released from federal custody.

What this means is that if the individual is likely to go to a jurisdiction that would not work with us at the end of their adjudication, that gets taken into consideration and the individual can be removed rather than being released, and in fact further harming public safety.

There are many jurisdictions that do work with us, however.  And so we do, as I mentioned, want to make sure that they can adjudicate their cases.  So we want to have essentially the ICE removal detainer (ph) is now first in line, and ICE will have the right of first refusal on removing someone.  And we think that this will help us manage the situation while still letting jurisdictions have those prosecutions.

**SHELBY**:  Do you believe that municipalities in this country, cities that refuse to cooperate with the federal immigration laws, should be allowed to receive federal law enforcement grant funding of any kind?  If they are in defiance of, say, the Department of Homeland Security or the Justice Department.

SEN. RICHARD C. SHELBY HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

**LYNCH**:  Yes, thank you, sir.  And certainly as we advise all grant applications, those who apply for grants, they must comply with applicable federal law.  And certainly where we receive allegations that they are not complying with the federal laws that relate directly to those grants, we refer those matters to our Inspector General for investigation and on.

As I mentioned earlier, one of the issues that has developed, however, and I note that we are defending the Department of Homeland Security in two cases now, challenging whether or not that requirement to cooperate with us with respect to that particular law is mandatory or voluntary.  And in fact, in one circuit there has been a holding that it's not mandatory.

So while we certainly will continue to advance our position in court, we also felt that as a policy matter, having a policy that allowed us to deal first with the removal matter would be more effective.  And frankly more timely

**SHELBY**:  Thank you.

Senator Mikulski.

**MIKULSKI**:  Thank you.

Madam Attorney General, I want to go to the international scene and international organized crime.  From meetings and hearings in both this committee and the Intelligence Committee, we see that there is, number one, a growth of international organized crime.  One of my questions would be, is that valid.

And second, the scope of international organized crime growing. So from either being contract killers for nation states that don't want to get their hands dirty, to human trafficking, to fraud.  So most recently, and I don't know if some of my colleagues, some in this room over the age of 65, got three of the kinds of phone calls I did, which told me that I was being sued by IRS for failure of payment. IRS wanted me.  All I needed to do was give them my credit card and PIN number and all things would be well.  Of course we've taken proper action on that.

But that's pretty scary, which means that they are targeting people of a certain age.  And it's one thing to get unsolicited phone calls to buy home alert systems.  It's another to get this.

So my question to you is, number one, is organized crime growing internationally, and number two, do you have the resources?  Because they are at it in so many other different levels, from terrorism to trafficking to international fraud.  Some very big trying to hack our Medicare system and Social Security, at Social Security Administration, to an individual unsuspecting taxpayer scared to death by a pretty rough and rude phone call.

**LYNCH**:  Thank you, Senator Mikulski.  You've raised some important issues, in particular the fact that transnational organized crime is now cutting across a number of spheres of criminal activity. Just to address initially the last issue that you raised, about the IRS scam phone call that you received, this is in fact the type of scam that we are seeing on the rise.  Many of the calls originate from within the country.  Some originate from outside the country.

They do target our vulnerable populations, in particular our older Americans.  And that's why -- not to focus specifically on transnational organized crime, but in terms of dealing with crime targeting our elderly citizens, one of the things that we are looking at is increased funding there that would give us 10 task forces around the country to focus specifically on elder-related crime.

But to your first point about transnational organized crime, the F.Y. 2017 request does include $1.5 million to fund Ocidefs (ph), priority transnational organized crime initiative, and in fact that's one of the areas in which we see this growing.

The FBI is embarking on a 2016 pilot effort to watchlist a certain number of transnational organized crime individuals, and the goal is to provide a watchlisting capability that the government can operate, similar to our terrorist screening center.  So that just because someone doesn't fall in the terrorist bucket, we can still set up a watchlist program for them that indicates that they are involved in transnational organized crime.

SEN. RICHARD C. SHELBY HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

This cuts across so many areas.  Our cybercrime request, for example, deals with the issue of fraud, and also computer intrusions. Many of the computer hacking that we've experienced, be it on the government level or as directed against individuals or directed against segments of industry, originate from overseas.

And so the cybercrime efforts that we are asking for, essentially for F.Y. 2017 a total of $950 million, would give us the resources that we need within main Justice, with attorneys, with the FBI, with increased agents to deal with that issue.

As it relates to human trafficking, that request is for $89 million, and that would also cover domestic and international efforts to deal with human trafficking that would support the work we do with taskforces with our state and local colleagues, as well as the investigations that we do overseas.

So this area is woven throughout the department's budget, and I thank you for bringing attention to it.

**MIKULSKI**:  Well, it shows just really how big this is, and I encourage my colleagues to look at it.

One last question.  As you know, we are working very hard to establish trust between local law enforcement and the citizens they are sworn to protect.  Do you think that body cameras are important tool to establishing this, not only evidentiary reasons but trust reasons?  Or do you see impediments and potholes to this?

Could you give us what you think about the efficacy of body cameras for both sides, law enforcement and the citizens that you actively engaged in yourself.

**LYNCH**:  Thank you, Senator.  I think that this is one of the most important issues we have facing the country.  That is to say the trust connection between citizens and law enforcement.  I think it's reflective of the bond between citizens and government writ large. And so as we deal with this issue we are strengthening and reinforcing that overall bond as well.

Body cameras are an important tool in this regard as it relates to local law enforcement.  We currently support a number of pilot programs that have enabled several jurisdictions to purchase body cameras and to also deal with the issues of data storage and data retention and privacy issues that also arise therefrom as well.

I certainly think in my travels across the country, as I've talked with law enforcement leaders and community leaders, I meet with them separately, I meet with them together, I talk to people who are actively working on this issue.  And the reason why I think it's still an important tool is that the conversations are helpful, but particularly in situations where the bond of trust is so frayed, having that third-party sort of open eye can be very helpful.

In fact, in jurisdictions that have adopted the use of body cameras so far over the last several years, those jurisdictions almost uniformly have seen a reduction in the number of citizen complaints against police officers.  So citizens feel that essentially they have accountability.

Officers, who initially may be resistant to this -- and it varies throughout the law enforcement community, depending upon the size of the department and the issue that it raises -- but law enforcement who may start out being resistant to this idea, generally are finding it very, very helpful because it also gives them the independent third eye as to what happened, and they have corroboration for their statements and they have that useful evidence.

Of course, it doesn't capture an entire interaction.  It doesn't answer all of the questions, but it does give both sides in the debate something on which to rely, and from that you can also work toward rebuilding the relationship of trust that is so important.

So the jurisdictions that I've been speaking with are looking forward to receiving body cameras; those that have them are finding them extremely useful, and I'm getting very positive comments from community members as well.

**MIKULSKI**:  Thank you.  That was very insightful.

Mr. Chairman.

AR-00228

SEN. RICHARD C. SHELBY HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

**SHELBY**:  Mr. Lankford.

**LANKFORD**:  Thank you, Mr. Chairman.  Good morning, again.

I want to be able to follow up on a quick statement that you made, and I've got multiple questions to go through.  The chairman asked you about sanctuary cities.  You are saying that you have changed the internal processes for the ICE detainers so that it goes first in this, and that DOJ is now attentive to cities that are traditionally cities that are not cooperative with us and making sure that we do our prosecutions or deportations before they get to the city.  Did I get that correctly?

**LYNCH**:  That is correct.  Just to clarify the policies, it is a DHS policy with BOP, but yes, that is correct.

**LANKFORD**:  That is a real help, so I appreciate everyone getting a chance to start working through the process and trying to find some solutions.  Yesterday you also mentioned, or you had a conversation with the House Committee on Appropriations, and this issue of Gitmo came up at that time as well.  You gave very thorough answers, and I appreciate that as well.

One of the statements that you made, though, you were talking about how individuals from Guantanamo Bay could be transferred -- certain individuals, which is not the majority but certain individuals could be transferred to other countries after significant vetting.

You made the statement, "with respect to individuals being transferred to the United States, the law currently does not allow for that."  Doesn't allow individuals currently to be transferred from Guantanamo Bay to the United States.

So my question on that is, is that a current law, meaning Congress would have to pass something to change that, or are you anticipating an expiration of some current law, and so there may be a time people could come?  So just identifying that word "currently" in what you said and trying to identify, is there a new law that needs to be passed before individuals that could be moved from Guantanamo to the United States, or is there some law you are watching for an expiration on?

**LYNCH**:  Well, Senator, I don't have a plan on that.  That's something that I believe the White House is going to speak to Congress about in terms of what should be done statutorily, in terms of how to best close Guantanamo Bay.

Of course, as we have discussed, because the current state of the law, both the most recent NDAA and previous iterations of that, continue prohibition on bringing any of those individuals to U.S. soil.  That is something that would have to be resolved between the administration and Congress.

**LANKFORD**:  So I guess what I'm asking is, do you anticipate the Congress would have to pass something to change that?  Or is there some expiration that you anticipate to say, after this date the NDAA, for instance, currently it's in the law but once NDAA expires this year then maybe we could?  That's what I'm trying to identify.

**LYNCH**:  Well, Senator, there is a number of options, but I certainly am not advocating anything at this point.  I believe that's up for the president to, as he intends to have those discussions, and I intend to let him have those discussions and bring that matter before Congress.

**LANKFORD**:  Again, back to the same issue.  Would Congress have to pass something proactively for that to change?  Or would you anticipate the policy could change based on an expiration?

**LYNCH**:  I hate to give you the lawyer's answer, but it depends. But it certainly depends on the state of the law and when the matter is up for consideration.  Certainly the current state of the law, I anticipate there will be discussions between the White House and Congress about how to best handle that issue.

I don't have any forward thinking on that for you to give, and I'm not looking to get ahead of the president on that issue.

**LANKFORD**:  OK.  During F.Y. '16 and '17, the Department of Justice requested $22 million as a carve-out in the Byrne-JAG funding for the bulletproof vest program.  So instead of having it as its own separate line item, it would be within Byrne-JAG and just would be a carve-out.  That's one that I have supported.  It deals with some of the duplicative issues.

SEN. RICHARD C. SHELBY HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

We had asked in last year's omnibus to have a report on duplication. I've seen the report that's come back. It was due a couple of weeks ago. The report was basically three pages of just very general statements, saying we didn't find much. But there was no real detail, and a more comprehensive report is coming at some point on duplication within programs.

When can we anticipate that that would happen? That would be helpful to us as we make decisions in the days ahead, to have a more complete report on duplication.

**LYNCH**:  Well, thank you for raising that. I certainly appreciate the opportunity to respond to you at the staff level with more information on that. Certainly within this current budget we are looking to avoid duplication, and looking to where we may have had programs in a very general sense that were very similar to focusing on those that we found to be the most effective.

The bulletproof vest program is certainly one that we feel has been very effective. But even within our grant programs we are always looking for ways to make sure that we are focusing on those that are most effective and not simply having...

**LANKFORD**:  Right. Yes, there's a difference between effective and duplicative. There may be several effective programs that we could add the administrative functions together and be able to...

**LYNCH**:  And generate savings.

**LANKFORD**:  Correct. And be able to actually get some of those additional bulletproof vests on the street rather than using it for administrative dollars.

One last thing is, while you made a comment in your budget, F.Y. '17 budget, about the crime victims fund, saying you are estimating $10.2 billion in mandatory program authority was the request, but the actual request to spend was $2 billion in disbursements. About $2.7 billion, two and a half billion is actually coming into that crime victims fund each year.

The $2 billion that you made a request on that, does that meet the needs of all the crime victims, and the issues on crime victims issues? Is that why there is the $2 billion request, when we have a larger amount than that that's actually coming in, a smaller amount that's actually the request? I assume that means all requests have been fulfilled with your budget.

**LYNCH**:  Well, Senator, what I can tell you today, and certainly again, if with respect to the specific numbers -- and I appreciate the opportunity to get back to you at the staff level -- what I can tell you today is that certainly the budget does include the two and a half billion in the mandatory budget authority...

**LANKFORD**:  But only $2 billion in disbursements.

**LYNCH**:  ...$2 billion in disbursements from the crime victim fund, and essentially I know that this budget does have -- does focus on victims programs, and I know that the rest of that money is used in terms of an accounting method called scorekeeping.

But again, I would rather not misstate that before you today. I'd rather not misstate that before you today on the numbers, and would appreciate the chance get back to you.

**LANKFORD**:  Will do. Thank you.

I yield back.

**SHELBY**:  Senator Feinstein.

**FEINSTEIN**:  Thanks very much, Mr. Chairman, and welcome, Attorney General.

I want to begin by thanking you, Sally Ates (ph) and the FBI, for your activity during the Super Bowl in California to counter human trafficking. I've been very impressed with the coordination. San Francisco's FBI division oversaw more than 35 Super Bowl anti- trafficking operations, and they did it very well.

AR-00230

SEN. RICHARD C. SHELBY HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

In LA, the sheriff has constituted a special unit.  The department takes the matter very seriously.  They made 198 arrests.  Only 13 of those were buyers that were booked.  And this is what I wanted to speak with you today.  We've got a huge -- Senator Mikulski spoke about organized crime.  Nothing is more organized than human trafficking.

And I this Senate really stands as unanimously as we ever get to counter this.  I think a greater emphasis has to be placed on demand, and that means arresting and booking buyers, not just citing them. And ensuring that they are prosecuted.

I understand that certain local jurisdictions' enforcement is reluctant to arrest and hold the buyers if they don't believe local prosecutors will actually take the case.  And now we have federal law that's actually stronger than California law.

So I am hopeful that because this is an organized crime effort, because it does go interstate, and even international, that our government will be willing to take a number of these cases as federal cases and actually book and hold the buyers who buy children, as well as adults.  It's just something that I don't think this country can countenance, so I would be very interested in your reaction to that.

LYNCH:  Yes, thank you, Senator, because you certainly have touched on one of my top priorities.  And I know that from your work with California law enforcement you are aware of the efforts, the Herculean efforts, frankly, that they are undertaking to fight this scourge.

We've seen in particular the corridor from California into the Washington state area as one that has been extremely prolific in terms of human trafficking over the years.  I was privileged to be in Seattle late last year to discuss the awarding of some grants we are providing to them to increase enforcement there.

So at the local level we are in fact providing the resources that we hope will generate more prosecutions.  And certainly at the federal level we are looking to do that as well.  We are expanding what's called the anti-trafficking team initiative, that gets local U.S. attorneys involved in these cases also.

Our focus is frankly primarily on rescuing the victims and trying to get them out of this life, and so to do that we partner with a lot of community resources and NGO organizations that can provide that kind of assistance.

But then our focus is also to generate significant prosecutions of the traffickers and the buyers, both to prosecute them and hold them accountable as a deterrent to others who would engage in this particular heinous crime.

So federally, you know, we need certain types of jurisdiction for an individual buyer.  That's why we do support the efforts of our state and local colleagues to generate those prosecutions as well. And as I said before, my local U.S. attorneys are very involved in this.

Every office now is required to be involved in a human trafficking task force.  That's part of the coordination that I hope you saw prior to the Super Bowl, so that before events like the Super Bowl or large-scale events, for example, if the Olympics were to be here again, there would be similar initiatives.

And the U.S. attorneys coordinate and decide, you know, who will take this type of case.  Again, for the individual buyers, those tend to be handled best at the local level, but those discussions are also had in advance so that our local colleagues are prepared to generate those types of cases.

FEINSTEIN:  Thank you.  I really appreciate that.  In California we are trying to develop sympathetic homes for girls that have been held, and the captivity of these young girls, the way the pimps create -- the fact that their survival is dependent upon them is really a very serious thing.  And a lot of them are very young.

So that's a work in progress, but we do need strong enforcement and we do need to say to people who buy young children and do these things that you are going to be arrested and you're going to be booked and you're going to go to jail for it.

And I think that is still missing on a consistent basis.  So anything we can do, because we now have strong federal law, stronger than California's, is very much appreciated.

SEN. RICHARD C. SHELBY HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

**LYNCH**:  Yes, thank you, and we are focused on that.

**FEINSTEIN**:  Thank you.  If I might, I want to talk about the San Bernardino event for a moment.  I recently met with San Bernardino County officials, including the district attorney as well as city officials, who discussed the great financial cost resulting from the December 2nd terrorist attack, and the ongoing public safety needs to reassure people there.

The city has been through bankruptcy, so it doesn't have a lot of money.  And I think in cases of terrorism it would be helpful to local communities if there were a one-stop shop of sorts at the Department of Justice where communities could go to understand all the resources available, and how to apply with them.

We have that in FEMA cases, and I do think having some recourse within the department for that would be helpful.  Can you tell us what sort of assistance your department has already provided to the city and county of San Bernardino in the wake of that terrorist attack, and what you think the department can and should do to help prevent another one.

**LYNCH**:  Certainly.  I will say that I'm not intimately familiar with everything that we may have provide, but we certainly through our office of victims of crime would have been providing assistance to the individual victims' families.

At the municipal level, though, I think you raise an excellent idea of finding the way in which we could collect all of our resources available to municipalities and make sure that they are aware of them. We typically do this through the Joint Terrorism Task Force at the law enforcement level, but there certainly are going to be other issues that I could see could arise from an incident like this that wouldn't necessarily be tied in with the JTTF and might not have access to that information.

**FEINSTEIN**:  Well, it's one place where a county or city or individuals can go, and I'd like to work with you on it if I may. Because San Bernardino is at a loss of where they are going to get the money to buy some of the materials, law enforcement materials they need.  For example, they don't have long guns, and a police force today, that has to be changed.  So I'd be very interested in working with you.

**LYNCH**:  We would appreciate that.

**FEINSTEIN**:  Thank you, and I thank you, Mr. Chairman.

**SHELBY**:  Senator Capito.

**CAPITO**:  Thank you, Attorney General.  I had a couple of questions.  I wanted to ask you first of all about -- because we've heard from a lot of our local, our state police, but some of our local law enforcement, county law enforcement entities regarding the asset forfeiture equitable sharing program.

You know that the funds have been withheld, and some of these local entities, including our state police, these funds are pretty vital to them to move forward with their local law enforcement programs.  Could you give us an update on the budgetary status?  I read that it was considered a pause where money was not going to be forwarded on to the local entities.

What's the status of that?  And how have you been communicating with the local law enforcement agencies to keep them apprised of what's going on?

**LYNCH**:  Well, thank you for raising this issue because, again, it's certainly one of great importance not only to our state and local colleagues but to me, as someone who through the Department of Justice relies very heavily on them for their participation in the work that leads to the funds that go into the asset forfeiture program that we use for equitable sharing.  It is based upon a very strong task force relationship that we have with local police, sheriffs and other offices, and we value that contribution tremendously.

The situation, as you have indicated, is of recent vintage.  We make our equitable sharing payments again reflecting the law enforcement contributions of our state and local colleagues in these actions.  We make these payments out of the asset forfeiture fund, which of course is dependent upon the processes that we receive throughout the year.

SEN. RICHARD C. SHELBY HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

Generally we work to make sure that we stay on track of the proceeds coming in, the proceeds going out. At the end of last calendar year, the finalization of the budget plan in late December, we received information that there was going to be a fairly large rescission from the asset forfeiture plan, larger than in previous years.

And certainly while we typically have gotten rescissions in the $200 million to $300 million range, and always try to plan to be able to make sure that those do not impact our operations, the rescission in late December, early January was about $1.2 billion. So with that rescission coming out of the fund, it left the fund depleted.

What we have indicated and conveyed to our state and local colleagues and to our police organizations is that this is a temporary hold on equitable sharing payments, and that we anticipate, and it is our intention that as the asset forfeiture fund is replenished, to resume those payments.

So we have communicated this by speaking to our law enforcement organizations. Members of my leadership team have had calls and meetings with them. I have communicated directly with the heads of the law enforcement organizations, state and local counterparts with whom I work with, and met with the National Sheriffs Association also and have raised this issue with them, as well as the National District Attorneys Association.

We view this as a temporary cessation because the funds are not in the account at this point in time. We have asked two things of our state and local colleagues. Number one, we have asked that they remain in the task forces because we need them, and they are vital to making sure that we work on public safety. They know this area like no one else does.

But also so that as their work continues, we can in fact process the applications and when the money is available make those payments as soon as possible.

We have also advised them that even though we are not able to make the equitable sharing payments at this time, what's called the JLEO, joint law enforcement operation payments, which primarily cover the overtime costs of state and local officers, are being made. And so we have asked our colleagues to stay in the task forces and to continue to submit all the forms they would ordinarily submit for that.

We have also advised them that we will update them on a monthly basis of this, and we intend to do so. I spoke with them most recently over the course of January and this month, and have gone into detail about how this issue occurred and our regret for it occurring, and stressed the importance of their contribution.

**CAPITO**: Well, as much as we all -- I think they know that they, you know, shouldn't be counting on these funds to run their local departments. You know, the temptation obviously, and of course over years in slim budget times, these become very vital funds for them.

Very quickly, because I'm kind of out of time, ATF, you have an increase. We have that tracing facility in Martinsburg, West Virginia. And the other thing I wanted to talk about was the NIC (ph) system. This is also located in West Virginia. I noticed in the statistics that we are doing twice as many background checks with 33 less people, and that you have asked for additional 200 people, I'm sure to meet the demands of the increasing load there. How is the hiring going with that?

**LYNCH**: Thank you. As you know, this issue is also very important to us, given the importance of the NIC (ph) system to making sure that we can promptly and efficiently respond to the requests that we receive.

Because we are seeking to almost double the size of that facility, federal hiring does take time, so we are initially -- we have begun the hiring already by hiring contractors who are able to come on board within the federal system at a faster pace.

And so while we have not yet been able to totally add the total new number of people that we would like, it is proceeding. At the same time as we are going to begin the work with contractors, we still intend to proceed with the federal hiring process so that we can have full-time federal employees on board as well.

As you know, Senator, the applications for firearms transactions have increased dramatically, and we feel we have an obligation to respond as quickly and efficiently as possible to those dealers who submit information to us, as we ask them to do under the law, and to the individuals who also send us their information, as we ask them to do under the law.

SEN. RICHARD C. SHELBY HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

**CAPITO**: I appreciate that, and I would say, and you noted in your opening statement that you're going to be consolidating and modernizing your FBI headquarters. Since my predecessor, Senator Byrd, was able to get all those great FBI employees in West Virginia, I think you ought to scope it out there. I think it would be a great place to just relocate the whole DOJ -- sorry to the ranking member over there.

**MIKULSKI**: What are you relocating?

**CAPITO**: Anything I can get.

**MIKULSKI**: I don't think I heard you right.

(LAUGHTER)

**CAPITO**: Anyway, thank you very much.

**MIKULSKI**: You know, Senator Byrd relocated everything in West Virginia. Who is ready to relocate Virginia into West Virginia?

**SHELBY**: Senator Shaheen.

**SHAHEEN**: Thank you, Mr. Chairman, and thank you very much, Attorney General Lynch, both for your testimony this morning as well as your leadership at the Department of Justice on a daily basis.

I want to pick up on Senator Capito's questions about the asset forfeiture fund because I have heard from everyone in New Hampshire, from our attorney general to the chiefs of police association to the average cop on the beat about the concerns that they have with what has happened.

I think there are several ramifications for us in New Hampshire. One is, because we are dealing with a crisis in opioid and heroin addiction, any loss of support makes it even more difficult for law enforcement to address that challenge.

They have also expressed concern about the communications and how sudden it was to learn that they were not going to be able to ask -- have the equitable sharing payments that they were expecting, and they've also expressed concern about the -- the formula for those payments and concerned that they're hearing that that formula could change from 80/20 to 50/50.

So can you comment on -- you talked a little about your efforts to communicate on this issue, but can you talk about what more we can do so that local officials aren't surprised by this kind of a dramatic shift.

**LYNCH**: Yes, thank you, Senator.

And, certainly, it highlights the -- the issues that arose at the end of the year as we were absorbing this recession and -- and in terms of my discussions with my local law enforcement counterparts, both the heads of the police organizations and the sheriffs" organizations. I have conveyed my direct apology to them because we typically are able to build in communications with them over the course of -- of policy changes like this. And that did not happen at this -- at this occasion.

And so it has caused an even greater hardship on our colleagues because they -- they didn't know that it was happening.

**SHAHEEN**: Right.

**LYNCH**: And that certainly's not our intent and not our goal. So we've all been working on trying to resolve this issue in a way that restores the payments. Our goal would be to restore the payments to the full formula that we have been using.

**SHAHEEN**: So the 80/20?

**LYNCH**: That -- that (inaudible)...

**SHAHEEN**: There is (inaudible)...

AR-00234

SEN. RICHARD C. SHELBY HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

**LYNCH**:  ...our goal.

**SHAHEEN**:  ... (inaudible) intent to change?

**LYNCH**:  At this point, what we're trying to do -- what we are doing is we are -- we are on a monthly basis keeping our state and local colleagues apprised of the progress of the -- of the asset forfeiture fund and we're doing this through communicating with the various law enforcement groups, major city chiefs, sheriffs, et cetera, as well as the D.A.'s association.

And so we also are -- are awaiting the results on our review of some settlements coming into the asset forfeiture fund because we have to determine how we will essentially manage the victim payments that are required...

**SHAHEEN (?)**:  (inaudible)

**LYNCH**:  ... out of those first.  And, certainly, I know every law enforcement officer knows that the victims are why we do this, and, of course, they -- they take priority here.

But the -- even with that, our goal is to try and restore it to the same program as before.  We -- we have -- we have certainly heard the same concerns and certainly anticipate hearing more and -- and want those concerns.  We want the communication with the law enforcement, with our D.A.s, with our state attorneys general on this. And we are keeping them apprised on a monthly basis of the status.

**SHAHEEN**:  Well, I know you're reluctant to be pinned down to a date when you expect those payments to begin again but are you looking at something that's going to happen within the next couple of months, within the next six months, within the next year, because all of that has an impact, as you know...

**LYNCH**:  Yes.

**SHAHEEN**:  ... at the local level.

**LYNCH**:  It does, it does.  And, certainly -- certainly as Senator Capito has raised, it has an impact on their operations but also these are operations that they're doing in conjunction with...

**SHAHEEN**:  Right.

**LYNCH**:  ... the federal government.  So they're actually -- they're actively helping us and so we certainly do feel the obligation there on that level and for that reason as well.

There -- there has been discussion and certainly I've gotten questions about whether or not the -- the influx of asset forfeiture funds for some of our large settlements which -- which have -- which the settlements have -- have been adjudicated, the monies coming in now can, in fact, restore these payments sooner rather than later.

We are still, as I mentioned, working on dealing with the victim issue in those large settlements and so once we have that formula resolved, we would have a better idea of funds that would be left from the large settlements as well as an idea of how the fund is being replenished on a monthly basis.

But certainly we've -- we've told individuals and -- sorry, I don't mean to say individuals -- we've told our organizational colleagues that we will update them again in mid-March.  At this point, I don't have a date on when the payments would start. But it's not our goal to delay them any longer than necessary and it certainly has never been our goal to stop them totally.

**SHAHEEN**:  Well, thank you.  I appreciate that.  And I think the more information that can be provided at the local level, the more helpful it will be as they're trying to deal with how that compensates for the lack of those payments.

Mr. Chairman, I know that my time is expired but I'm hoping that I can ask one more question.

Senator Mikulski in her opening statement referred to the scourge of heroin and opioid abuse and one of the things that we've seen in New Hampshire in response to that and in our state we're losing a person a day to overdose deaths -- three times

SEN. RICHARD C. SHELBY HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

as many as we lost in traffic accidents last year. So one of the things that's worked -- beginning to work in communities is that law enforcement is working with treatment professionals, with the medical community, with the schools to have a -- a real comprehensive, cooperative approach to how to deal with this issue.

I have been disappointed that, at the federal level, we don't have the same sense of urgency and cooperative approach to deal with this issue where we're working across the agencies and there's a real understanding that -- in 2014 we lost 47,000 people in this country to overdoses. So can you reassure me that there is a sense of urgency and that this is something that across -- across agencies there's an understanding that we've got to do better to address?

LYNCH: Well, Senator, I -- I cannot only reassure you to that, I can tell you that the department is an active participant in a multi- agency opioid taskforce that essentially pulls together the efforts in this to make this an all-administration effort, because we do recognize that it has so many factors. Even within DOJ, our Drug Enforcement Administration -- our DEA -- is -- is dealing with this issue by what's called the 360 program, enforcement, talking also with the manufacturers, you know, at the -- at the corporate level, and the community education level as well. So recognizing that even for an enforcement agency, we have to have a multi-leveled approach.

There is certainly as I mentioned this opioid taskforce that -- that cuts across agencies, not just DOJ, but HHS, Veterans' Affairs heavily involved in this, Office of Narcotics and Drug -- I'm going to forget the OMDCP, all their -- all their various names -- but everyone focusing on this, HHS, in particular, because this issue has to be dealt with at multiple levels.

And so we've found that that is the most effective way to deal with it, so I can assure you that not only is it viewed as an urgent issue, as an epidemic and a crisis, it's being viewed as a multi- agency one in how we have to resolve it.

SHAHEEN: Well, thank you. I appreciate the President's request in the budget for over a billion dollars and I hope that Congress can provide the resources that are needed.

And, thank you, Mr. Chairman.

SHELBY: Thank you.

Senator Collins?

COLLINS: Thank you, Mr. Chairman.

Welcome, Attorney General, and my questions also deal with the opiate and heroin crisis that is epidemic in my state, as well.

Recently, federal law enforcement officials briefed me on the link between straw purchasing of guns and the heroin crisis in my state. What they described to me is a scheme in which out-of-state drug dealers with ties to inner-city gangs or the Mexican drug cartel come to my state with heroin, find addicts with no records -- clean records -- to buy guns and then there's an exchange of guns for heroin.

In response to this problem, Senator Leahy and I have introduced a bill to greatly toughen the penalties for straw purchasing and the illegal firearms trafficking because right now it's essentially treated as a paperwork violation if you don't fill out the forms correctly.

Our bill, I should make clear, fully protects the rights of law abiding gun owners and purchasers. Are you familiar with this link between gun trafficking, straw purchasing and the heroin crisis?

LYNCH: Senator, yes, I am familiar with that. It's a matter of grave concern to us as we look at both of these issues; the firearms issue, but in particular, the -- the heroin crisis. The use of straw purchasers not only inveigles these individuals into crime but it exploits rather vulnerable people and because, as you note, the offenses right now tend to be considered paperwork offenses.

SEN. RICHARD C. SHELBY HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

It can be difficult to obtain cooperation from those individuals to allow us to work a federal case up the chain, so to speak, and, in fact, get those individuals who are really running a -- a drug trafficking ring across several states. And those are our targets -- excuse me -- those are our targets. And so we support the efforts that you've outlined to, in fact, strengthen the statutory authority that we would have to prosecute straw purchases in instances like these.

At this point, it would be extremely useful to have a stronger statute because, first of all, it would hold individuals accountable for this behavior. As I mentioned, yes, they are vulnerable and they are being exploited, but individuals do have to be held accountable for the actions that they take. And it would give us the tools that we need to make those cases part of the larger cases, conspiracy cases and trafficking cases, that would bring in all of that criminal activity.

COLLINS: I look forward to working with you in trying to get our bill enacted into law.

The department's budget for Fiscal Year 2017 zeroes out the funding for the COPS Anti-Heroin Task Force. Congress has appropriated $7 million in each of the last two years for this task force which has funded competitive grants that have enabled law enforcement agencies in areas with high rates of heroin and opiate abuse to purchase drug detection equipment, expand data collections, strengthen information system, all sorts of purposes. And communities in my state from Fort Kent in the north to Portland in the south have reaped the benefits of this funding.

I think it's important to note that the heroin epidemic affects tiny towns, rural areas, as well as our larger cities, and it's literally everywhere. As this epidemic continues to spread, I am very disappointed and, indeed, somewhat shocked that the administration did not include any funding at all for this program, particularly since the Comprehensive Addiction and Recovery Act, CARA, which many of us have cosponsored and which will be on the floor soon, specifically authorizes this task force. That's an indication of strong congressional support as is the funding that it's received in each of the past two years.

Why is the department eliminating funding for this very successful competitive grant program that has been so useful, particularly to small towns that just do not have the resources to combat this epidemic?

LYNCH: Well, thank you for -- for the chance to address this issue because it is of -- one of vital importance and -- and certainly I regret the impression that it's given that we in some way are diminishing the importance of COPS efforts in this area -- the COPS program efforts in this area, their effectiveness, or the need that exists there.

In constructing the current F.Y. 2017 budget in dealing with the heroin epidemic, what the department has done is to include $12.5 million and 42 positions to place them within DEA to create four new heroin enforcement groups. These groups, as with most of our DEA groups, would also draw heavily on local law enforcement for -- as -- for members as well. And so we're trying to deal with the enforcement side of the increased heroin effort that way.

And so it's our hope that having greater federal resources would relieve some of the burden on local law enforcement and, again, allow us to make those cases federally. So that is -- that is the direct answer to -- to the specific issue as to why the COPS program was shifted in that way.

We still, however, will be using the COPS program to support local efforts. For example, the -- the DEA Meth Lab Cleanup Program. Within COPS, in particular, however, we do have an increased funding request for the COPS hiring and training program that would allow jurisdictions to literally hire and retain officers directly. So we're hoping to increase those local efforts through COPS for our jurisdictions. We're hoping to increase the federal cases that we can bring on the heroin level, and we're hoping to continue with the grant program in other areas.

COLLINS: I hope, Mr. Chairman and Ranking Member Mikulski, that this scenario we can look, the small money...

(UNKNOWN): (inaudible)

COLLINS: ... has done a lot of good.

And, finally, yes, just a follow up on Senator Mikulski's point about scams. The Aging Committee which I'm privileged to chair, the Ranking Member Senator McCaskill just put out a resource guide on the top 10 senior scams and that IRS scam is

number one. And we do need a more cooperative and aggressive approach to get after these terrible con artists who are frequently located overseas.

**LYNCH (?)**: Yes.

**COLLINS**: Thank you.

**MIKULSKI**: Mr. Chairman, may I respond just...

**SHELBY**: Go ahead.

**MIKULSKI**: ... one second to the...

**SHELBY**: Go ahead, Senator.

**MIKULSKI**: ... gentlelady from Maine?

First, with that $7 million was when I was the chair of the committee. We kept it going, because chairmen shifted, because it was what I was looking for and I think your description of the way it's been utilized was that it was not only limited to enforcement as enforcement but other aspects related to enforcement.

But I would suggest for those of us who are interested in this, let's review all the programs here as well as the President's initiative and the supplemental. But let's see if we can't really see what we're going to do to maximize this.

I agree, this is I think an issue of such bipartisan focus and cooperation. So I look forward to working with the gentlelady.

**SHELBY**: Senator Baldwin?

**BALDWIN**: Thank you, Mr. Chairman.

And thank you, Attorney General Lynch, for your service.

As the ranking member mentioned in her opening statement, communities across the country have experienced unrest and uprisings, following officer-involved shootings and other deaths in custody, often involving African-Americans.

In response, the President took action to help rebuild trust between law enforcement and local communities and, in December, the Department of Justice's COPS office announced the creation of a new policing practices and accountability initiative. I have to tell you I was very pleased to see the department choose former Madison, Wisconsin, Police Chief Noble Wray to lead this initiative.

Can you tell the committee more about how the department's budget request will support this new initiative and how the program will help advance the recommendations of the President's 21st Century policing taskforce to further improve relations between law enforcement and the communities that they serve across these United States?

**LYNCH**: Well, thank you for the opportunity to talk about certainly what is one of my priorities as attorney general, as well. And we greatly appreciate the efforts of the former Madison, Wisconsin, chief, and all of his colleagues who have been so instrumental in working with the department to help us bring those -- those experiences and ideas from the ground up into Maine (ph) justice to inform our policies, to inform our support of their efforts. It's been tremendously helpful and we have found that that type of peer-to- peer relationship has been very effective as we try and provide support for law enforcement agencies across the board.

With respect to building community trust and community policing for F.Y. 2017, those increases are -- excuse me -- $129.4 million. They include $7.5 million for the body worn cameras, $15 million for the Office of Justice Programs Smart Policing Program, $20 million for the COPS Collaborative Reform Program, and $42 million for the COPS hiring program. Under our community relations services, funding for law enforcement reconciliation of $3.5 million and under our Civil Rights Division, funding for policing and criminal justice of $2.7 million.

SEN. RICHARD C. SHELBY HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

And with all of those efforts, we are trying to take really a holistic approach to this -- this issue and this program. We have -- we, as you note, had a number of incidents that have highlighted this broken trust. But I think we all have to agree that those incidents and the -- the dissent -- the dissent -- the dissenting voices that arise from them are really drawing upon issues, situations that were festering long before the law enforcement officer interacted with the individual and the tragedy resulted.

And so those issues also have to be dealt with. Police accountability and the body worn cameras, something that we found very, very helpful to both law enforcement and the community in making sure there is that -- that -- that vehicle for accountability.

**BALDWIN**: I want to pivot to the collaborative Reform Initiative and, if I might, I certainly continue to hear from my constituents in Wisconsin who are deeply shaken by the deaths of Dontre Hamilton in Milwaukee, Tony Robinson in Madison, among others. And they're also concerned by this growing chasm. It is, you know, the critical trust that must be present between law enforcement and the people that they risk their lives to protect.

So the Milwaukee Police Department and the Department of Justice have joined together on such a collaborative reform initiative to help speak to this problem. I want to just acknowledge that some of the Milwaukee constituents that I hear from believe that it's not a strong enough approach to the allegations of misconduct and I want to be sure that this effort leads to reforms and change.

So you've increased the commitment and the budget for this program, as you've just outlined some $20 million. Can you talk about how those resources will help strengthen the work that they do in the Collaborative Reform Initiative, and -- and how do you respond to those criticisms of collaborative reform that it's not enough to achieve accountability?

**LYNCH**: Thank you. You know, collaborative reform is one of our most important tools and it is a tool that we both will offer to police departments and one that they will come to us and request. And so that's been a very positive development in the interaction on this issue.

And, as always, an important part of it is the community response that you just outlined. In fact, I -- my -- I -- my recollection and my notes indicate that in January, the first listening session, regarding the Milwaukee collaborative reform, we were fortunate enough to have over 500 citizens come and express their views. This is vital.

And I will say that it's important that they continue to provide their views on whether or not collaborative reform is achieving the effects that we all desire. But it is a process and it is one that will take time. The listening is part of it because it gives us an idea of how the community views the police department and -- and whether or not the changes are effective. We are at the beginning of the process with Milwaukee and we -- we hope to continue working with them over the next six to eight months to make those changes.

We've always told all police departments that collaborative reform may, in fact, be the best tool for you. Sometimes there are other tools that end up being more effective, and I've seen situations where communities throughout collaborative reform have continued to hold the view that it hasn't been effective and I've also seen situations where, over time, they -- they do believe that it is becoming effective.

In order to -- for either of those views to be well informed, we have to have the dialogue. So part of the collaborative reform effort is building a process by which community members have insight into the department's current practices, proposed changes and the opportunity to comment on them.

**SHELBY**: Coons?

**COONS**: Thank you, Chairman Shelby and Ranking Member Mikulski, for this hearing.

Thank you, Attorney General Lynch, for your leadership of -- of the department at this most difficult and important time and I'd like to thank everybody in federal law enforcement for their service and their hard work to advance justice.

AR-00239

SEN. RICHARD C. SHELBY HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

There's so many things we could talk about today from your vital work in combatting violent extremism or fighting human trafficking or international corruption or the important work that remains unfinished in terms of healing the real divide between law enforcement and communities of color across our country that Senator Baldwin was just asking about.

Let me focus more narrowly on my home town of Wilmington, Delaware, for a moment, if I might, where I think there's a good news story which is the violence reduction network now in its second year which has proven to be a really effective program for small cities like Flint, Michigan, West Memphis, Little Rock, Camden, Newark and Wilmington, to access cutting-edge tools from law enforcement to partner with other agencies around the region and country and to make progress.

Our own Wilmington Police Department has had their clearance rate for homicides jump from an abysmally low rate to now 50 percent, and they're making real progress in cold cases. I just want to specifically thank OJP's Bureau of Justice Assistance and the team leader in Wilmington, John Skinner.

I -- I hope you can commit to continuing this program; it is vanishingly (ph) small in the scope of your total budget. I think the line item was $5 million and I think we've gotten a real bang for our buck. I hope you will come and visit Wilmington and see its impact and I hope you will continue to support it.

Let me mention one other program, the Victims of Child Abuse Act funding. Two years ago Congress on a bipartisan basis unanimously reauthorized the programs that come under the Victims of Child Abuse Act and the child advocacy centers that are conducted -- that are funded under this law conduct forensic interviews of those who are victims of child abuse in a way that is both respectful of the significant needs of child victims but also meets law enforcement needs.

I was very disappointed to see the President's budget once again request only half of the amount required for these programs, and so I'd like to hear your views on whether these are both of value, the child advocacy centers and the Violence Reduction Network, and whether that you think they're worthy of more robust funding and support in the years ahead.

**LYNCH**: Well, thank you -- thank you for your -- your comments on the work we're doing in Wilmington and thank you also for raising the issue of the child abuse centers.

Certainly it's an important issue for us. We -- we have it contained within a whole host of juvenile justice issues in which that program is housed. That total budget is $334 million which is an increase over the current budget levels, and so we're looking essentially at trying to within those -- within that framework fund a number of programs there. But it does not mean that we in any way view that program as not important or not helpful.

So that's -- that's my comment there.

The -- our -- our request for juvenile justice is going to focus on formula grant programs such as the Part B formula grants and the Juvenile Accountability Block Grant. And we do think that those will be effective as well. But as I indicated before, it does not mean that we're not committed to that program; we're simply trying to work within the funding that we have.

**COONS**: I understand the complexities of a very large agency and lots of different funding streams but the child advocacy centers are a specific law enforcement response to a specific problem of child sexual abuse that I think is worthy of a -- a specific appropriation.

Let me turn to two other things, if I might, the Justice Reinvestment Initiative that has had a -- a strong and positive impact also in my home state of Delaware which is now being looked to as a model for justice reinvestment. It helps states to fully implement reforms and measure their success through data collection and analysis, in particular around reentry and if we're going to continue our journey towards criminal justice reform we have to do a stronger job at managing that reentry and I'm glad you are requesting increases the funding for that.

Last, in access to justice I just want to commend you for the $13 million in funding requests for Access to Justice Initiatives, indigent defense program for juveniles, for adults, a civil legal aid program and one called Answering Gideon's Call that I think is of particular value.

SEN. RICHARD C. SHELBY HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

So I see that my time's about run out but if you had a moment to just tell us how you think these two initiatives, Justice Reinvestment and Access to Justice will strengthen criminal justice and the ties between law enforcement and the community, I'd be grateful.

**LYNCH**:  Thank you so much, and I'm cognizant of the time as well, and I appreciate those comments because the people in the -- in the Department of Justice who work on these issues care very deeply about them as -- as we all care about all of our issues under our purview.

But in order to make sure that our -- our -- our justice system, both criminal and civil, is as fair and responsive to everyone in this country, it's been clear for years that access to that system has to be as open as possible.  If individuals do not have the ability to adjudicate even small disputes, there's a spillover effect in terms of their relationships between and among themselves and within the community.

And so having that ability to know that there is a place that one can go to -- to deal with -- with even small issues is important, and having the resources to -- dedicated to opening that up to everyone be it counsel, be it language issues -- language barriers are a tremendous problem for so many individuals who are simply trying to advance the business or live their lives -- and those issues, I think it essentially helps us ensure that the promise of America remains open and real for everyone and not simply behind a door with a sign on it that people cannot read.

**COONS**:  Thank you, Madame Attorney General.

**SHELBY**:  Senator Murphy?

**MURPHY**:  Thank you very much, Mr. Chairman.

I'm constantly impressed at your ability to handle the remarkable breadth, scope and variety of questions that you get at these hearings.  I -- I have three to add to the list and I appreciate your indulgence.

The first is on a program that I know is very dear to your heart and that is our continued efforts to create gender-responsive juvenile justice systems.  In Connecticut, we have been a national leader in recognizing that girls, more than almost anyone else, tend to get the short end of the stick in our juvenile justice system.  For instance, a lot of status offenders that are girls end up in prison simply because we don't have gender-appropriate alternatives to incarceration.

And in the 2016 Omnibus, there was $2 million for competitive grants focused on girls in the juvenile justice system.  DOJ, you have not requested additional funds for the girls in the juvenile justice program for 2017.  I -- I just wanted to ask you why that is, if you think that we're still in the process of expending those earlier funds or if there are other parts of the budget that may help to seed some of the programming like that in Connecticut, which really has set some national models for how you treat girls in the juvenile justice system.

**LYNCH**:  Well, thank you for that important issue.  It is, indeed, an important issue and I actually don't have that information at my fingertips now and appreciate the opportunity to get back to you on that because it is such an important issue.

I will also note that the issue of -- of how we handle issues of gender is something that we take very seriously.  We've been working with local law enforcement and within our grant making -- with -- with OJP.  We just recently released a guidance for state and local counterparts on reducing and eliminating gender bias in law enforcement.  And that was a collaborative effort, one that we think it going to be very helpful.  And it focuses not just on issues of domestic violence and sexual assault but how law enforcement deals with young people who are dealing with gender issues, particularly our LGBT youth community, as well.

So it is something that we take very, very seriously, and I'd appreciate the chance to respond to your direct question with the specifics that I would like to give you.

**MURPHY**:  I -- I know of your personal commitment to this issue so a response on -- on that line item would be helpful.

SEN. RICHARD C. SHELBY HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

Second, I want to turn to the President's executive actions to reduce gun violence. You and I have spoken about this and one of the most interesting parts of it is the directive to DOJ, DOD and Homeland Security to conduct and sponsor research and to gun safety technology.

My hope is that at the end of that period of research, that there is a (ph) effort to use the procurement ability of the Department of Justice and perhaps other agencies to spur additional private sector research and development into smart gun technology. I understand these types of weapons are not the answer for everyone in law enforcement or in the military but there certainly is an ability to leverage the purchasing power on our side to promote research on the private side.

Just wanted to get an update as to how that research is going and when we may expect some RFP that prompts some private sector research.

LYNCH: Well, thank you. This is a very important issue and has actually been one under consideration within government for some time as law enforcement and -- and, in particular, Department of Defense want to make sure that -- that we remain current in the weapons that we provide to our law enforcement individuals as well as our armed forces individuals.

And so for the -- approximately the past two years there has been research being done and the gun manufacturers have been very effective partners in this in developing what are called the smart gun technology, various ways of making sure that you can limit who can handle a firearm, who can fire a firearm and, of course, issues of safety and reliability are at the forefront of everyone's minds on this.

And with -- with respect to the President's directive that the Department of Justice, Homeland Security and Defense essentially focus on research, that is being done. Just within the past two months our research on the National Institute of Justice has initiated what they are calling a gun safety technology challenge to essentially assess the reliability of firearms that are currently available today, looking at the advanced gun safety that's integrated into the firearm, but also challenging our manufacturers, challenging our end users to really focus on this issue and come up with the best product.

We don't have a timetable yet for when we might at the RFP stage. Certainly we are aware that with the large purchasing power of law enforcement and the Defense Department that we could influence this, but, of course, we want to make sure that those guns are as safe and reliable as possible.

MURPHY: I appreciate that and as -- as you know, manufacturers and retailers in the private sector who have attempted to lead on this issue of gun safety technology have been regularly blacklisted. It's a chilling mechanism on those that want to pursue this without some pressure coming from the federal government, some backstops, some cover from the federal government. So appreciate your work and your seriousness on this.

Thank you very much, Mr. Chairman.

SHELBY: Senator Boozman?

BOOZMAN: Thank you, Mr. Chairman.

And thank you very much for being here and I know that you've got a lot going on but this is really so very important and think this has been a good hearing. We've covered a lot of ground.

I just want to reiterate we talked in January about the equitable sharing fund and I know that several people have brought that up today and I think that really does illustrate that -- that it really is on our minds. Certainly I know that you're working hard to get it straight. Anything that we can do as a committee I think, you know, I speak for all of us that we will certainly be glad to do that.

A couple things that -- that haven't been mentioned that are just kind of things that are of some concern. I understand the U.S. Marshals are requesting funding for an additional regional fugitive task force. Can you explain the importance of the program and explain where it would be located?

LYNCH: Thank you so much.

SEN. RICHARD C. SHELBY HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

The regional task forces have been an important part of our Violence Reduction Program over the past year. We find them to be a very effective counterpart to our state and local efforts as law enforcement.

One of the things that we're looking to do is -- is -- is make sure that we do our part in keeping local communities as safe as possible, and where there are violent fugitives who, frankly, are often hiding in plain sight but the local law enforcement agencies don't have the resources to track or apprehend them, the federal marshal's service will step in. In fact, that was one of the -- one of the main reasons for the creation of the U.S. Marshal's service; they -- they track fugitives, and they're very good at it. I'm very proud of the work that they do.

So where we have been able to do that over the past year, we have seen an effective increase rate in capturing fugitives in communities across the country with the current task forces that we have and we feel that adding this additional task force would help many communities who have this issue.

I'm not exactly sure if I know where that would be located at this time. I -- I will get back to you if I have that information. But, essentially, not just -- it provides not just the manpower but the intelligence, the surveillance, all the information that goes into managing this difficult issue. And, obviously, a dangerous issue.

We -- we have, of course, had some serious officers wounded -- officer wounding situations resulting from these apprehensions but it's a cause they take very seriously. I take it very seriously and I thank you for raising it because I am tremendously proud of the work that they do.

BOOZMAN: (inaudible) very much so.

One of the things we hear a lot about is the National Firearms Act applications and I know that -- and I think you've -- you've addressed it somewhat in the sense of hiring ATF personnel. Can you tell us about how many people that the agency intends to hire? Will they all be special agents? And -- and, specifically, will be any of them -- be used to decrease the -- the waiting period...

LYNCH: Yes, in -- in...

BOOZMAN: ... of the National Firearms Act?

LYNCH: Thank you, sir. The request for the ATF would, in fact, of $54.3 million, would provide 230 positions for ATF, 200 would be a combination of special agents and industry operations investigators, 80 agents, 120 investigators. The investigators are the individuals who primarily work with our -- with our license firearms dealers and community members. They man a booth at a gun show, for example, and provide information.

Special agents will be focused on the enforcement operations involving violent crimes, as I mentioned before, the rise of internet firearms trafficking and providing assistance to our state and local colleagues where they have serious firearms problems also.

The other individuals would be working within the IBIN network, with is our Integrated Ballistics Information Network. It would upgrade the imaging, hardware and software. That's where we share information across law enforcement platforms with state and locals, as well, when we apprehend -- when we apprehend individuals or we -- we come across firearms evidence. And, in fact, 22 positions would support processing of -- of all the license issues which is the firearms licensees, the explosive licensees, as well as the National Firearms Act applications.

And we felt that it was important to increase the individuals who were processing those licenses because, number one, we may be asking more individuals to apply to be license dealers, but also under the National Firearms Act we have had a backlog in recent years in that and so in order to be able to effectively process these, as we ask individuals to essentially apply as individuals, we are requesting those resources.

BOOZMAN: OK, thank you.

Thank you, Mr. Chairman.

SEN. RICHARD C. SHELBY HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

**SHELBY**:  Graham, you have any comments, questions?

**GRAHAM**:  Thank you very much.  I'll try to (inaudible)

**SHELBY**:  Just in time.

**GRAHAM**:  Which is unusual for me.

   Madame Attorney General, how bad is sequestration hurting your ability to defend the nation and protect us domestically and internationally if it goes back into effect?

**LYNCH**:  Well, Senator, the -- the most recent example of sequestration that we saw had the department losing approximately I believe 6,200 people, a combination of agents, attorneys and staff members, as well.  And that is a loss from which we have yet to recover, quite frankly.

**GRAHAM**:  Would there be more losses coming if sequestration kicks back in?

**LYNCH**:  There would be, there would be significant losses occurring, particularly at the investigative law enforcement level if sequestration were to occur.  Again, this would severely limit our ability to deal with the emerging areas and the increasing -- expanding areas of cybercrime, in particular, of international organized crime and it would severely decrease our ability to provide the resources to our state and local counterparts that are so important to them, as well.

   Our grants were cut in half during sequestration, and that was tremendously painful not just for the department, but for those individuals who depend on those grants to fund operations and, frankly, help us with task force-type operations.

**GRAHAM**:  Is the FBI fairly much under siege trying to track all the groups that could penetrate the homeland?

**LYNCH**:  Well, the FBI will -- will tell you that they will respond to every crisis and they do.  I'm tremendously proud of the work that they do.  But the reason we are requesting more resources, particularly in the area of cybercrime, is because this is an area in which we need the resources to keep up with the technological capability of the criminals which, quite frankly, is growing exponentially.

**GRAHAM**:  So let's talk about executive action.  If the President tomorrow issues an executive order to transfer prisoners out of Guantanamo Bay, given the restrictions Congress has placed in the NDAA, would that be appropriate or lawful?

**LYNCH**:  Well, Senator, I don't believe that's the President's intention at this point.

**GRAHAM**:  I know, but does he have that power?

**LYNCH**:  Well, at this point I have not been asked to opine on that by him; certainly haven't provided advice on that (inaudible)...

**GRAHAM**:  Can I ask...

**LYNCH**:  ... at the current...

**GRAHAM**:  ... you to opine for me?  You don't have to do it right this minute.

**LYNCH**:  Well, thank you, sir.  As I have indicated, the current state of the law prohibits those transfers which is why the President is indicating he wants to work with Congress to look at those statutory...

**GRAHAM**:  Right.

**LYNCH**:  ... issues.

**GRAHAM**:  Right.  Did he talk to you -- were you -- did you help draft this proposal that was sent over?

SEN. RICHARD C. SHELBY HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

**LYNCH**: No, sir. That was I believe the Department of Defense.

**GRAHAM**: Did...

**LYNCH**: (inaudible)

**GRAHAM**: ... they talk to you at all?

**LYNCH**: No, I was not involved in those discussions.

**GRAHAM**: OK, interesting. So I'm going to ask you, does he have that authority from the Attorney General's point of view, and you can just write back to me later. Is that fair?

**LYNCH**: Thank you, sir. Thank you.

**GRAHAM**: Executive action. The President has given legal status to how many million people that are here illegally, 5, 6, 7?

**LYNCH**: I'm sorry, sir (inaudible)?

**GRAHAM**: The legal status given...

**LYNCH**: (inaudible)

**GRAHAM**: ... to illegal immigrants. How many people have been affected by his executive orders?

**LYNCH**: Sir, I don't have those numbers at the top of my head right now.

**GRAHAM**: Multiple. There are two groups, there are the DACA kids who came here as small children, right?

**LYNCH**: Well, I believe that they would have deferred status.

**GRAHAM**: Right. And now it's their families, is that right, what he did the second time?

**LYNCH**: Well, I believe that that particular action is currently enjoined, so none of (inaudible)...

**GRAHAM**: But he tried...

**LYNCH**: ... there would've been -- would've -- would've been provided.

**GRAHAM**: But -- but he tried to do it...

**LYNCH**: (inaudible)

**GRAHAM**: ... and the court said slow down. Is that fair to say?

**LYNCH**: What...

**GRAHAM**: That he's been enjoined from doing what he thought he could do?

**LYNCH**: Yes (ph), that injunction is (inaudible)...

**GRAHAM**: He thought he had the legal authority.

What limits would they be -- would -- would they be on a president in terms of just giving legal status to people here legally? Are there any limits that we can -- that you can think of?

SEN. RICHARD C. SHELBY HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

**LYNCH**:  Well, Senator, I certainly think that, as we've discussed previously, when it comes to the immigration laws, ones starts with the statutes and then one looks at the court decisions.  And, as you craft policy, you would have to look at those particular issues as well as any applicable regulations to determine whether or not (inaudible)...

**GRAHAM**:  Is there any court decision that would allow the President of the United States -- any president -- to issue an executive order and say that 3 million people here illegally now have legal status?  Is there any Supreme Court case that would acknowledge Article 1 power to do that that you know of?

**LYNCH**:  Senator, I'm not aware that issue's been presented to the court.  And certainly so would not be able to give you that information then.

**GRAHAM**:  OK, from your point of view, prosecute -- prosecutorial discretion is I could prosecute somebody but I choose not to for a variety of reasons, right?

**LYNCH**:  That's part of it, sir.

**GRAHAM**:  OK.  In that different -- in this different saying, I'm not going to prosecute you because I choose not to versus giving you legal status.  Is that prosecutorial discretion...

**LYNCH**:  Senator...

**GHRAHAM**:  ... to give somebody legal status?

**LYNCH**:  Senator, prosecutors do not have the authority to confer...

**GRAHAM**:  Right.

**LYNCH**:  ... or take away a status regarding immigration or any other legal issue.  That is determined by statute and by the courts.

**GRAHAM**:  What makes the President different than a prosecutor in that regard?  What authority does he or she have to do that because prosecutorial discretion is not the legal basis, I think you're right about that.  Now write (ph) this up.  If you can't do it through prosecutorial discretion, the prosecutor can't, what authority does Chief Executive have inherent, statutory or Supreme Court decision- wise to allow him to do this?

**LYNCH**:  When you say this, sir, what are we referring to?

**GRAHAM**:  What he did?  Give legal status to millions of people by executive action.

**LYNCH**:  Well, Senator, I'm not aware that's the actual result of that.  And, certainly, I'd have to refer you to...

**GRAHAM**:  Well, I don't -- I know...

**LYNCH**:  ... (inaudible)...

**GRAHAM**:  ... my time's up...

**LYNCH**:  (inaudible)

**GRAHAM**:  ... but he did give legal status to millions of people who I'm willing to deal with through the statutory process.  He did that, didn't he?

**LYNCH**:  (inaudible)

**GRAHAM**:  The President?

**LYNCH**:  I'm not able to give you a legal opinion on the effect.

AR-00246

SEN. RICHARD C. SHELBY HOLDS A HEARING ON THE F.Y. 2017 BUDGET FOR THE DEPARTMENT OF JUSTICE

**GRAHAM**:  I'm not asking you legal advice.

**LYNCH**:  As (inaudible)...

**GRAHAM**:  I'm just saying...

**LYNCH**:  (inaudible)

**GRAHAM**:  ... that's what he did.  I mean, he did that.  He issued an executive order saying you can stay here.  Didn't he?

**LYNCH**:  Well, I'd have to refer you to the terms of the executive order.

**GRAHAM**:  OK, all right.  Thank you.

**SHELBY**:  If there are no further questions this afternoon, Senators may submit additional questions for the subcommittee's official hearing record, and we request Madame Attorney General, Department of Justice, responses within 30 days.

The subcommittee now stands in recess until Thursday, March 3, at 10:30 a.m. when we will take the testimony of the Department of Secretary -- Commerce Secretary Penny Pritzker.

Committee's adjourned.

END

## Classification

**Language:** ENGLISH

**Subject:** US REPUBLICAN PARTY (90%); US FEDERAL GOVERNMENT (90%); LAW ENFORCEMENT (90%); PUBLIC FINANCE (90%); LEGISLATIVE BODIES (90%); JUSTICE DEPARTMENTS (90%); ATTORNEYS GENERAL (90%); US DEMOCRATIC PARTY (90%); APPROPRIATIONS (90%); CORRECTIONS (89%); FIREARMS (87%); INVESTIGATIONS (85%); PARDONS (84%); GOVERNMENT BUDGETS (78%); WITNESSES (78%); TESTIMONY (78%); US PRESIDENTIAL CANDIDATES 2016 (77%); SPECIAL INVESTIGATIVE FORCES (72%); GUN CONTROL (72%); PRISONS (67%); CRIMINAL CONVICTIONS (65%); PRISONERS (65%); CRIMINAL OFFENSES (65%); PETITIONS (65%); NATIONAL SECURITY (52%)

**Industry:** BUDGETS (90%); GOVERNMENT BUDGETS (78%)

**Person:** CHRISTOPHER S MURPHY (79%); JAMES LANKFORD (79%); RICHARD SHELBY (79%); SHELLEY MOORE CAPITO (79%); LORETTA LYNCH (73%); LINDSEY GRAHAM (58%); SUSAN COLLINS (58%); JOHN BOOZMAN (58%); JEANNE SHAHEEN (58%); BARBARA MIKULSKI (58%); TAMMY BALDWIN (58%); DIANNE FEINSTEIN (58%); CHRIS COONS (58%)

**Geographic:** NEW HAMPSHIRE, USA (79%); DISTRICT OF COLUMBIA, USA (79%); UNITED STATES (92%)

**Load-Date:** February 26, 2016

AR-00247



**U.S. Department of Justice**

Office of Legislative Affairs

*Office of the Assistant Attorney General*          *Washington, D.C. 20530*

February 25, 2016

The Honorable Richard Shelby
United States Senate
Washington, DC  20510

Dear Senator Shelby:

Last September the Department of Justice (the Department) replied to your inquiry regarding states and localities that do not fully cooperate with federal immigration laws.  Since the Department originally replied to you, there have been recent developments in this area and we would like to provide you with an update.

Your original letter asked that the Department limit the availability of taxpayer funds to only those states and localities that affirmatively certify that they will follow federal immigration laws.  We can advise you that all applicants for Byrne JAG, COPS, and SCAAP funds are required to assure and certify that they are in compliance with all applicable federal laws, and will continue to be required to do so in FY2016 (and presumably thereafter).  Where the Department receives a credible allegation that an entity receiving funds under a Department grant or reimbursement program has, after assuring or certifying compliance with applicable federal laws, violated a specific applicable federal law, the Department can potentially seek criminal or civil enforcement options against the entity.

In addition, we are actively considering ways in which we may most effectively carry out our public safety mission as it regards enforcing the nation's criminal and immigration laws.  In an effort to ensure that criminal aliens are not improperly released onto American streets, we have implemented new procedures when federal inmates with Immigration and Customs Enforcement (ICE) detainers are released from Bureau of Prisons (BOP) custody.  Now, BOP offers ICE, instead of the states and municipalities, the first opportunity to take into custody and remove an individual.  ICE's decision to exercise this right of first refusal is informed, in part, by the state or municipality's willingness to cooperate with federal authorities on ICE detainers.  Thus far, we are pleased with the way in which the new policy is being implemented and are happy to share further developments with you in the coming weeks and months.  We are grateful for your  support for the Department in the pursuit of our shared goal of protecting and serving the American people.

The Honorable Richard Shelby
Page Two

We hope this additional information is helpful.  Please do not hesitate to contact this office if we may provide additional information regarding this or any other matter.

Sincerely,

Peter J. Kadzik
Assistant Attorney General

HAROLD ROGERS, KENTUCKY, CHAIRMAN
RODNEY P. FRELINGHUYSEN, NEW JERSEY
ROBERT B. ADERHOLT, ALABAMA
KAY GRANGER, TEXAS
MICHAEL K. SIMPSON, IDAHO
JOHN ABNEY CULBERSON, TEXAS
ANDER CRENSHAW, FLORIDA
JOHN R. CARTER, TEXAS
KEN CALVERT, CALIFORNIA
TOM COLE, OKLAHOMA
MARIO DIAZ-BALART, FLORIDA
CHARLES W. DENT, PENNSYLVANIA
TOM GRAVES, GEORGIA
KEVIN YODER, KANSAS
STEVE WOMACK, ARKANSAS
JEFF FORTENBERRY, NEBRASKA
THOMAS J. ROONEY, FLORIDA
CHARLES J. FLEISCHMANN, TENNESSEE
JAIME HERRERA BEUTLER, WASHINGTON
DAVID P. JOYCE, OHIO
DAVID G. VALADAO, CALIFORNIA
ANDY HARRIS, MARYLAND
MARTHA ROBY, ALABAMA
MARK E. AMODEI, NEVADA
CHRIS STEWART, UTAH
E. SCOTT RIGELL, VIRGINIA
DAVID W. JOLLY, FLORIDA
DAVID YOUNG, IOWA
EVAN H. JENKINS, WEST VIRGINIA
STEVEN M. PALAZZO, MISSISSIPPI

NITA M. LOWEY, NEW YORK
MARCY KAPTUR, OHIO
PETER J. VISCLOSKY, INDIANA
JOSÉ E. SERRANO, NEW YORK
ROSA L. DeLAURO, CONNECTICUT
DAVID E. PRICE, NORTH CAROLINA
LUCILLE ROYBAL-ALLARD, CALIFORNIA
SAM FARR, CALIFORNIA
CHAKA FATTAH, PENNSYLVANIA
SANFORD D. BISHOP, JR., GEORGIA
BARBARA LEE, CALIFORNIA
MICHAEL M. HONDA, CALIFORNIA
BETTY McCOLLUM, MINNESOTA
STEVE ISRAEL, NEW YORK
TIM RYAN, OHIO
C. A. DUTCH RUPPERSBERGER, MARYLAND
DEBBIE WASSERMAN SCHULTZ, FLORIDA
HENRY CUELLAR, TEXAS
CHELLIE PINGREE, MAINE
MIKE QUIGLEY, ILLINOIS
DEREK KILMER, WASHINGTON

## Congress of the United States
### House of Representatives
### Committee on Appropriations
### Washington, DC 20515–6015

February 26, 2016

WILLIAM E. SMITH
CLERK AND STAFF DIRECTOR

TELEPHONE:
(202) 225–2771

Attorney General Loretta Lynch
U.S. Department of Justice
950 Pennsylvania Ave
Washington, D.C. 20530

Dear Attorney General Lynch:

I want to thank you for the new policies regarding sanctuary cities that you announced during your testimony before the Commerce, Justice, and Science Appropriation Subcommittee hearing this week.

The change you announced to Bureau of Prisons policy is commendable. By offering Immigrations and Customs Enforcement (ICE) the opportunity to deport individuals rather than releasing them to sanctuary cities, your actions will go a long way to preventing further tragedies like the murder of Kate Steinle.

You also testified that you would take steps to ensure that entities receiving Department of Justice grants comply with applicable Federal law. I have attached a list of sanctuary cities from the Center for Immigration Studies. I believe many of these jurisdictions are violating applicable Federal law, and I ask you to review this list to ensure that these jurisdictions are in compliance. I am particularly interested to know if they are complying with 8 U.S.C. 1373, which prohibits jurisdictions from carrying out policies that prohibit the sharing of information regarding the immigration status of individuals in their custody with the Department of Homeland Security. I would expect you to seek advice from ICE on the cooperation they are receiving from those jurisdictions.

I look forward to working with you to ensure that Department of Justice grantees are complying with applicable Federal laws, such as 8 U.S.C. 1373. I also appreciate the efforts of the hard-working men and women of the Justice Department—as well as efforts of your state and local partners—in keeping our nation safe.

Sincerely,

John Culberson
Chairman
Subcommittee on Commerce, Justice, Science,
    and Related Agencies

AR-00250

# Map: Sanctuary Cities, Counties, and States

 **cis.org**/Sanctuary-Cities-Map

Five New Sanctuaries in Kentucky

Related: House Appropriations Boss Initiates Crackdown on Sanctuaries

**Map Updated: January 31, 2016**
*Source: Immigration and Customs Enforcement and CIS Research*
Click on Points to View More Information
View Map in Full Screen - View Image of Map - View Sanctuary Cities Topic Page

Across the U.S., there are over 300 cities, counties, and states that are considered "sanctuary cities". These jurisdiction protect criminal aliens from deportation by refusing to comply with ICE detainers or otherwise impede open communication and information exchanges between their employees or officers and federal immigration agents.

## Update on Sanctuary Jurisdictions

By Jessica Vaughan

In the absence of federal action, sanctuary jurisdictions remain as a significant public safety problem throughout the country. These policies have resulted in the release of more than 10,000 criminal aliens that ICE was trying to deport, allowing these offenders to remain in the community and commit more crimes. In addition, these policies obstruct vital communication between local and federal law enforcement agencies, and interfere with ICE's ability to enforce immigration laws.

Some states wisely have moved to prevent local governments from imposing sanctuary policies. In October, North Carolina Governor Pat McCrory signed a new law prohibiting sanctuary ordinances, requiring full cooperation with ICE, and barring acceptance of unverifiable forms of identification, such as the consular ID cards issued by some foreign governments. Texas Governor Gregg Abbott has said he will withhold certain state law enforcement funding from any jurisdictions in his state that become sanctuaries, and promised to push for legislation in the next session. The most prominent target for the action likely will be Dallas County Sheriff Lupe Valdez, who established a new sanctuary policy on September 1, 2015.

Fed up with the unwillingness of California leaders to reverse sanctuary laws even after a string of violent acts committed by criminal aliens drew national attention to the problem, a California citizens group has launched a new ballot initiative that would overturn the state sanctuary law that went into effect on January 1, 2014. The initiative would direct all law enforcement agencies and jurisdictions to cooperate fully with ICE in a variety of ways. It also would clarify that all law enforcement officers in the state may inquire about a person's immigration status.

Outgoing Philadelphia Mayor Michael Nutter, who had long maintained obstructive sanctuary policies, undid them before leaving office in December 2015. One of the very first acts of new Mayor Jim Kenney, within hours of his swearing-in, and after accepting some homemade bread baked by illegal aliens, was to institute a new sanctuary policy.

In addition to Dallas County, other new sanctuary jurisdictions include the city of Lawrence, Mass., and five counties in Kentucky. In addition, in December, a committee of the Massachusetts legislature approved a strict and far-reaching sanctuary bill.

According to government documents I have obtained through FOIA requests and other channels, and independent research, I have been able to determine that there are over 300 sanctuary jurisdictions in the United States. These

AR-00251

are cities, counties, and states that have laws, ordinances, regulations, resolutions, policies, or other practices that protect criminal aliens from deportation — either by refusing to or prohibiting agencies from complying with ICE detainers, imposing unreasonable conditions on detainer acceptance, or otherwise impeding open communication and information exchanges between their employees or officers and federal immigration officers.

A detainer is the primary tool used by ICE to take custody of criminal aliens for deportation. It is an order or notice to another law enforcement agency that ICE intends to assume custody of an alien, and it includes information on the alien's previous criminal history, immigration violations, and potential risk to public safety or security. ICE currently issues three kinds of detainers. Some jurisdictions pick and choose which kinds of detainers they will accept and respond to

These are the sanctuary jurisdictions I have identified:

**States**

California, Connecticut, New Mexico, Colorado

**Cities and Counties**

**Arizona**
South Tucson

**California** (in addition to all county sheriffs)
Berkeley
Los Angeles
Orange County Probation Department

**Colorado** (in addition to all counties)
Aurora Detention Center

**Connecticut** (in addition to state LEAs)
East Haven
Hartford

**Florida**
Broward County
Hernando County
Hillsborough County
Miami-Dade County
Palm Beach County
Pasco County
Pinellas County

**Georgia**
Clayton County
Fulton County

**Illinois**
Champaign County
Chicago
Cook County

**Iowa**
Allamakee County
Benton County
Cass County

AR-00252

Clinton County
Delaware County
Dubuque County
Franklin County
Freemont County
Greene County
Ida County
Iowa County
Jefferson County
Johnson County
Linn County
Marion County
Monona County
Montgomery County
Polk County
Pottawattamie County
Sioux County
Story County
Wapello County
Winneshiek County

**Kansas**
Butler County
Finney County
Harvey County
Johnson County
Sedgwick County
Shawnee County

**Kentucky**
Campbell County
Franklin County
Kenton County
Scott County
Woodford County

**Louisiana**
Lafayette Parish
Orleans Parish

**Maine**
Portland

**Maryland**
Baltimore City
Montgomery County
Prince George's County

**Massachusetts**
Amherst
Boston
Cambridge
Lawrence
Northhampton

AR-00253

Somerville

**Minnesota**
Hennepin County
Ramsey County

**Nebraska**
Douglas County
Hall County
Lancaster County
Sarpy County

**Nevada**
Clark County
Washoe County

**New Jersey**
Middlesex County
Newark
Ocean County
Union County

**New Mexico** (in addition to all counties)
Rio Arriba

**New York**
Franklin County
Nassau County
New York City
Onondaga County
Rensselaer County
Saratoga County
Suffolk County
St. Lawrence County
Wayne County

**North Dakota**
North Dakota State Penitentiary
South West Multiple County Corrections Center

**Oregon**
Clackamas County
Clatsop, Oregon
Coos County
Crook County
Curry County
Deschutes County
Douglas County
Gilliam County
Grant County
Hood River County
Jackson County
Jefferson County
Lincoln County

AR-00254
2/24/2016 9:56 AM

Case 3:17-cv-04701-WHO Document 96-2 Filed 03/23/18 Page 295 of 508

Linn County
Malheur County
Marion County
Multnomah County
Polk County
Sherman County
Springfield Police Department
Tillamook County
Umatilla County
Union County
Wallowa County
Wasco County
Washington County
Wheeler County
Yamhill County

**Pennsylvania**
Lehigh County
Philadelphia

**Rhode Island**
Rhode Island Department of Corrections

**Texas**
Dallas County
Travis County

**Virginia**
Chesterfield County

**Washington**
Baker County
Benton County
Chelan County
Clallam County
Cowlitz County
Franklin County Jefferson County
Kent City Jail, King County
King County
Kitsap County
Pierce County
Skagit County
Snohomish County
South Correctional Entity (SCORE) Jail, King County
Spokane County
Thurston County
Walla Walla County
Whatcom County
Yakima County

**Washington, DC**

**Wisconsin**
Milwaukee

AR-00255



AR-00256

## Full committee hearing on oversight of the Justice Department. (SD/24)

Federal News Service

March 9, 2016 Wednesday

Copyright 2016 Federal News Service, Inc. All Rights Reserved

**Length:** 29057 words

## Body

Subject: Justice Budget

Witnesses: Attorney General Loretta Lynch testifies

Location: 226 Dirksen Senate Office Building

Time: 09:30:00

Date: 2016-03-09

GRASSLEY: We thank very much the attorney general coming for our oversight hearings that we have fairly regularly. Our founding fathers gave us a Constitution that set up revolutionary system of government. They divided the government between three equal -- coequal branches; legislative, executive, judicial. This separation of powers also comes with checks and balances; this hearing is part of those checks and balances.

Each branch has certain powers and responsibilities to make sure that the other branches don't grow too powerful. Most importantly, the system of checks and balances helps to protect the rights and liberties of our people from the beginning of our country, Congress, the president and the courts have engaged in a very great and worthwhile debate over their proper roles. That debate continues to this very day and I'm glad to be Chairman of this committee to help in that process of debate.

Oversight is just one of the critical functions in constitutional responsibilities of our legislative branch. That's part of that ongoing debate; it's an opportunity for Congress to investigate and question policies and executives of the executive branch. It's an opportunity for the executive branch to take responsibility for them and if there's disagreement to explain those disagreements.

It's an opportunity for Congress to defend constitutional powers on the checks and to check any abuses open overreaching executive branch. When you, Madam Attorney General, when you appeared before this committee last year, I said that there were some serious challenges facing the Department of Justice. I meant it at that time, these challenges go to the heart of our system of government; the Justice Department had become deeply politicized under your predecessor and that it failed to take care that the laws are faithfully executed.

Instead, laws were being rewritten, unilaterally changed and sometimes ignored. Executive agencies were allowing firearms to walk across into the hands of drug cartels, conservative political groups that had spoken out against the government were being targeted and in many ways, the president himself was at the root of the problem because he was carelessly ignoring the rule of law. He was also substituting his own political preferences for the will of the people and their elected representatives.

I think that he ignored Congress and the law when he traded five terrorists from Guantanamo Bay for an American soldier who had walked away from his base and he did so again when he granted amnesty and gave work permits to millions of undocumented workers. And I don't think it has stopped yet; last month he outlined a plan to transfer terrorist from Guantanamo Bay to prisons in the United States so that he could fulfill what he considers a legitimate campaign promise but goes about it even though the law says that he can.

So today, I look forward to ensuring that this president -- as I hope I have regularly any Republican or Democrat president -- isn't abusing his power and ensuring that the rights of the American people are being protected. So I want to discuss whether the president can use his executive authority to empty Guantanamo Bay by sending out Al Qaida terrorists to U.S. prisons. I want to hear about the administration strategy to work with technology providers to solve the going dark problem, especially now that Apple is refusing to provide assistance that your department has requested, even in cases involving dead terrorists.

I want to have a conversation about recent policy changes in your department to investigate and prosecute individuals for corporate wrongdoing, an approach that I have long called for since the 2008 financial and mortgage crISIS. I would explore with you a host of whistleblower issues relevant to the department, including my recent FBI Whistleblower Protection Enhancement Act legislation and also want to discuss with you yet another example of stonewalling -- the administration -- stonewalling Congress and using the Department of Justice as a tool for it's resistance effort.

The American people are now aware that Secretary Clinton used private e-mail address and nongovernment servers for all of her official business during her time at the Department of State. Over 2,000 e-mails contain classified information, with some containing what we call -- described as top secret sensitive, compartmented information and other related to special access programs. But the department and the FBI have refused to officially confirm basic information about the scope and nature of the investigation to this committee.

Apparently, the FBI is conducting an investigation relating to the mishandling of that classified information but given the politics involved, the potential for improper influence over the work of the investigators and career prosecutors is high. The president and his spokesman have commented on the merits of the investigation and some news reports say that investigation includes even the Clinton Foundation, but President Clinton, who was involved in the foundation, appointed you to be U.S. attorney in New York. Now, this doesn't involve anything different than appearances, but given these appearances, more needs to be done to ensure that the public that decisions are being made without any influence from political appointees. If the FBI refers the matter to the Justice Department and it refuses to prosecute, then the public may be kept in the dark about the FBI's findings. But the public has a right to know the facts, even if those facts don't result in prosecution. This controversy isn't just a matter of protecting the sensitive national security information in some of the e-mails, it's also about a systematic effort to avoid freedom of information laws and federal records laws because you've heard me say so many times that the public's business ought to be public.

The records of government business -- I think -- belong to the American people. Simply said, the American people ought to know what their government's doing and must be sure that it's free from the interference of political appointees in the executive branch. So I conclude now by saying I look forward to conducting oversight over these issues and again, thank you for being here, Attorney General Lynch and for engaging in these important parts of our system of checks and balances.

And also, to thank you so many times since you've been attorney general for discussing things with me on the phone one-on-one, I appreciate it very much. Now I call on Senator Leahy.

LEAHY: Thank you very much; I do welcome our nation's top law enforcement officer, Attorney General Loretta Lynch, back to the Senate Judiciary Committee and I commend her for the way she's handling the Department of Justice. Now one of our core responsibilities of our committee is, of course to provide oversight of the Justice Department and that includes holding public hearings for the attorney general.

So the American people will see how she answers our questions, although I would note that on matters of -- classified matters and ongoing matters, the attorney general's always been available to answer questions of members of this committee.

But the American people deserve the opportunity to evaluate themselves and work of the department and I look forward to hearing from attorney general on a range of subjects important to us in Vermont. But public hearings are also a chance for the American people to watch us, their elected officials. American should able to see their government in action. They should know whether we're acting on their behalf, and whether we're keeping their interests, not partisan politics, at the forefront of everything.

I must say that's why it's important that this committee hold public hearings on the next nominee to the Supreme Court, public hearings. It's the Senate's (ph) constitutional duty to provide advice and consent on Supreme Court nominees falls to this committee to initiate. I mentioned that because for a hundred years since we've had this committee, we've done that in public

Full committee hearing on oversight of the Justice Department. (SD/24)

hearings. However, for the next nominee to the Supreme Court would be up to already (ph) single public committee meeting to discuss how to fulfill that constitutional duty. I know the Republican committee members met behind closed doors to unilaterally decide without any input from Democrats who sat at this committee and the Senate as a whole would simply refused to consider a Supreme Court nominee.

Even assuming, as I'm sure he will, the president fulfills his constitutional duty to nominate Supreme Court justices so they're spelled out very clearly in the Constitution. And of course, very clearly, we've taken an oath of office under God to uphold the Constitution, which includes advising and consenting to that nominate. But I think I'm going to have a unilateral decision by some behind closed doors; it's a dereliction of our constitutional duty. More important though it denies the American people the chance to participate in a public discussion of the nominee.

Now we talked about the Justice Department's responsibility keep Americans safe, which we remembered that the Senate Republicans refused to continue next Supreme Court nominee that's going to make the goal harder for the Justice Department. The Republican shutdown of any confirmation process for Supreme Court nominee means the court would be missing a justice for probably year and a half anyway. As several former U.S. attorneys from Ohio and Washington State, and California and Virginia recently wrote, quote "for federal prosecutors, agents and criminal investigations, a year is a lifetime. We've seen real threats, whether it's a heroin epidemic or the threat of ISIS recruitment, based on people in our communities every day. For our law enforcement says ready to protect the public from these threats, they need to know the rules of the road", close-quote.

These former law enforcement officials explained (ph) with the Supreme Court unable to function as the pilot (ph) arbiter of our nation's laws for more and the years (ph) can be a real challenge on our law enforcement community. The Senate's considerations of the next Supreme Court nominee shouldn't be a question of politics, or electoral map. It should be about that solemn (ph) oath. We all took a senator's uphold the Constitution.

And we say so help me God; that's why the American people should expect to see this committee, meeting in the spring (ph) public hearings to consider the next nominate the nation's highest court. The Justice Department to disclose (ph) the general represents the American people every week before the Supreme Court. So our hearing today is not only the Justice Department but what looms large in the horizon. As part of this committee will do its job to fairly consider the next nominee to the Supreme Court.

I hope we will do our job for the good of this country; for entire justice system. Thank you Mr. Chairman.

GRASSLEY: Attorney General Lynch, I believe that you're going to here a little bit about things that are contrary to normal oversight, as you just heard from Senator Leahy, and Senator Leahy has every right to say what he was going to do. I want to react just a minute to what he did because I think tomorrow, if you want to hear a full- blown debate on this issue, I think we'll probably have one before our committee tomorrow, while well we're also considering three or four judges and maybe a piece of legislation as well. So I would respond just very shortly to what Senator Leahy said because whether it's today or tomorrow, or whether it's for the next seven or eight months, this is a very important debate that we ought have about the Constitution and about the not only who's going to be a replacement for Justice Scalia, but about the role of the Marine Corps.

Because I get people coming to my town meetings saying how come you don't impeach those Supreme Court justices? Now they don't realize that we're the jury and the House impeaches, but they're making the law, instead of interpreting the law so you ought to get rid of them. So there's a real -- at the grassroots of America out there -- there's a real feeling what is the Supreme Court doing and what the Constitution requires. So I'll respond one thing that Senator Leahy said, and that's about the caucus that we had of the people around this room when we sent a letter to the whole Republican caucus of whether or not we should wait for the next election or the Senate, act right away when the president makes his nominees, which he has a constitutional responsibility to.

Now, that was caucuses of the Republican members of this committee that we have very, very frequently and I assume that the Democrat members have their caucus, to talk about things that just how do their respective members feel about issues and I've never been invited to a Democratic caucus and I don't think that the Democratic caucus is open for public. And then tomorrow I think we're going to have debate, then, in regard to the constitutional function of the Congress -- you know, most of the time everything that Congress does has to be interacted between the president and the Congress.

Full committee hearing on oversight of the Justice Department. (SD/24)

You know, we pass a bill, he vetoes it, we can override or he can sign it and we everything is good. But you know, there's that relationship; but when it comes to these appointments, its two separate positions. One the president nominates and the Senate consents or withholds consent, and they're entirely separate and I think that I've got some quotes here and I think the other side gets tired of me quoting from peak members of them but I think it's very important that that somehow that we've taken a position ahead of a nominee wrong -- it isn't any different than if the president of the United States notifies Congress well in advance of passing a piece of legislation, he's going to veto it.

So the Constitution makes it clear that it's up to the Senate to decide how we do our job by providing advice and consent and we get to make that determination with each nomination and I want to point to the wisdom of Senator Biden, not in the speech that I've quoted so often but another one made in 2005, quote "I do not work for the president of the United States; none of you, meaning other senators, work for the president of the United States. We're all a coequal branch, equally powerful and important, with specific assigned constitutional responsibilities that only we have a right to determine" end of quote.

And then the last thing I'll say Senator Reid said in 2005, quote "the duties of the Senate are set forth in the U.S. Constitution; nowhere in that document does it say the Senate has a duty to give presidential nominees a vote. Now, you're a long term public servant and you ought to have a long introduction. I would like to give you just a short introduction; you're the 83rd attorney general of the United States. You were sworn in on April 27th, 2015, following your service as U.S. attorney for the Eastern District of New York, a position that you have held twice.

You hail originally from Greensboro, North Carolina, it wouldn't surprise me if you were still living there and you're a distinguished graduate of Harvard College of Harvard law school. We welcome you to the committee and I think -- I think I'd ask you just to sit because I want to swear you but I think you stand up because you get your picture in the paper, so just stay seated.

Do you affirm that the testimony you're about to give before the committee will be the truth, the whole truth and nothing but the truth, so help you God?

LYNCH: I do.

GRASSLEY: Thank you very much, now you make your statement as long you want to make it.

LYNCH: Thank you, Mr. Chairman thank you so much. Good morning, Chairman Grassley, Ranking Member Leahy, distinguished members of this committee. Good to be in front of you again; I'm tremendously grateful for the opportunity to share some of the recent accomplishments of the Justice Department, as well as to outline my priorities of the attorney general and to discuss how we can continue working together to create a stronger and safer nation.

Our first responsibility is to protect the American people and we're working tirelessly to investigate to detect and to disrupt plots to target our citizens, our infrastructure and our values. We have publicly charged approximately 90 individuals since the year 2013 for conduct related to foreign fighter activity our homegrown violent extremism and we remain focused on the danger posed by domestic extremists.

And that includes investigating incidents and attacks, like the one in San Bernardino, using every lawful tool available. And I want to emphasize that the Department of Justice takes our responsibilities extremely seriously. And we understand that all of these issues raise serious issues and questions for consideration by this body and by the American people. At the Department of Justice, we intend to do our duty to protect the American people and to uphold the rule of law.

Now, we are also redoubling our efforts in cyberspace, where as they do in the physical world, wrongdoers seek to steal data, to copy trade secrets and threaten our national security. We're using and supporting a wide range of tools to counter cybercrime and terrorist use of the Internet, including criminal prosecution, the efforts of our U.S. attorneys and partnerships with the private sector. We've created a cyber security unit within our criminal division, we've launched a private-sector outreach initiative under our national security division and we will continue to explore other ways to meet the challenges of law enforcement in the digital age. Now, of course, our first line of defense against terrorism and crime, are the brave police officers and agents who risk their lives to keep us safe. We're grateful for their dedication and for their valor, and we are proud to support them in any way that we can, from training programs, from grant funding, to technical assistance. But as we have

Full committee hearing on oversight of the Justice Department. (SD/24)

seen, in too many communities, these vital relationships between law enforcement officers and the residents that we serve and protect have frayed, amid long simmering tensions that threatened to erupt.

Now, in order to help repair these bonds, I recently launched the second phase of my community policing tour, which will take me to cities that are making significant progress in six areas defined by President Obama's task force on 21st-century policing. I've already visited Miami and around (ph) Florida, and Portland, Oregon and I look forward to highlighting more examples of encouraging innovation and collaboration in the months ahead.

Now, one of the greatest hazards to both law enforcement and the people that we serve is an epidemic of gun violence. In January, I recommended, and President Obama announced important new steps and guidance that will help keep the guns out of the hands of individuals who are not legally allowed to have them. That will enhance the background check system that will combat illegal online firearm dealing and spur cutting-edge, gun safety technology. These commonsense measures will make a difference but addressing gun violence more comprehensively will require assistance from Congress and I look forward to discussing how we can work together to safeguard every American's right to life, liberty and security.

We are also focused on the most vulnerable members of our society, especially those who have fallen victim to human trafficking. Since becoming attorney general, I have expanded a program called the Anti-Trafficking Coordination Team Initiative. Of course, we have to call it by the initials, so it's the ACT team, but this is a collaborative and most importantly a survivor-centered approach to human trafficking investigations and prosecutions. It unites experts and officials from across the federal government to enhance our anti-trafficking efforts.

In last September, I announced that the department would provide $44 million in new grant funding, to support research, to improve care for the survivors of human trafficking and also to bring these traffickers to justice. And I want to thank our partners in Congress many of whom who are on this committee for their support. By tripling human trafficking related funding for office of Justice Programs in fiscal year 2015, Congress played a vital role in this expansion and on behalf of those survivors that we represent every day I thank you for those efforts.

And finally, I want to say a word about criminal justice reform. The Department of Justice has taken steps to build on the success of the Smart On Crime Initiative, which has reduced our use of the harsh mandatory sentences for low-level nonviolent drug offenses and enabled us to focus on the more serious federal crimes. Now among other actions, we introduced the first-ever second chance fellow to advise the reentry counsel, which I'm proud to chair, regarding policies to help the formerly incarcerated individuals stay on the right path. We have forced partnerships across the federal government to tackle problems that lead to crime in the first place.

We invested and will continue to invest in promising federal, state, local and tribal reentry efforts, including a $68 million investment in Second Chance Act grants in F.Y. 2016 and a proposed $100 million investment in F.Y. 2017. Now, these are important steps but as we all know there is so much more to be done, particularly with regard to sentencing reform. I also want to take a moment to thank the members of this committee for your support of the Sentencing Reform and Corrections Act of 2015, which has been embraced by prosecutors, law enforcement officers and legislators of all political ideologies.

And I'm eager to collaborate with you to secure the passage of this important legislation by the full Senate. Mr. Chairman, Mr. Ranking Member, I thank you for the chance to speak with you today and for your ongoing support of the Justice Department's efforts. I look forward to working closely with you in advance of our shared goals and I'm happy to answer questions. Thank you for your time and your attention today.

GRASSLEY: Before we start, I think we'll have seven minute rounds, and I'd like to ask my members, both Republican and Democrat, if you can't get your last question out before the seven minutes are up, don't ask it. Usually, we wait -- if you have one second left and you start the question, then we let you go ahead because we -- I'd like to have two rounds of questioning if we could.

By the way, again, you mentioned the sentencing reform; Senator Durbin and I hope that we have some sort -- we hope that we have an agreement that's sound that will make it possible for our leader to bring this up in the United States Senate. We happened to talk to some of our colleagues now to see if the changes we made are adequate and I know that you, as well as the White House, have been helpful in this effort. I want to thank you.

AR-00261

Full committee hearing on oversight of the Justice Department. (SD/24)

The current law -- I'm going to start my seven minutes now -- current laws prohibits the president from transferring any of the 91 dangerous terrorists currently housed at Guantanamo to prisons in the United States yet the president recently submitted a report to Congress announcing his intentions to do just that. In his report, the president said that the administration will work with Congress to lift and -- I want to emphasize -- unnecessary probations in current law.

These probations from my point of view aren't unnecessary; they're critical to ensuring that this president won't act unilaterally and endanger our public safety and national security. You recently testified that would be against the law for the president to transfer detainees from Guantanamo but the president, staff, and others close to him keep suggesting that he can use his executive authority and I think then ignore the law.

So the question -- does the Department of Justice believe that the president has the authority to violate the NDAA and transfer terrorists from Guantanamo to prisons and can you assure us this will not happen while you are attorney general?

Now, that last question I think I better rephrase; would you be giving advice to the president that he can do it under current law?

LYNCH: Thank you, Mr. Chairman, with respect to the president's policy put forth to close Guantanamo Bay, as has been discussed over several cycles, this is of course an issue of long-standing discussion in interest, both in the administration and with our -- within our intelligence community and our foreign counterparts.

And I certainly support the administration's policy in this. As is noted in what was submitted to Congress, while there certainly are the ongoing efforts to transfer individuals from Guantanamo Bay, individuals are not able to be transferred from Guantanamo Bay to a facility on U.S. soil. That is prohibited by the NDAA, as you have noted Mr. Chairman.

And I believe the president's policy indicates a desire to work with Congress to implement any necessary changes that would have to be taken before this action could be taken. That's my understanding of the president's policy, I believe it is certainly his intention to follow through with that and certainly in the spirit that this committee has worked with me in terms of discussing issues and working to find solutions to issues, i believe that is his plan.

GRASSLEY: And so on the latter question then, it sounds to me like you intend to continue advising the president on what the law is and that the law doesn't allow him to do that.

LYNCH: Yes, the law currently prohibits the transfer to U.S. soil and the president would need to work with Congress. Congress would have to consider any relevant changes that could be made to the law before any transfer could be undertaken.

GRASSLEY: Now I'd like to as you, have you or your department reconciled the president's efforts to close Gitmo while at the same time the U.S. military has launched a complex initiative in Iraq and Syria, to capture, detain and interview ISIS leadership and operates (ph). These are some these are some of the world's most dangerous and savaged terrorists and when they're done interviewing them, then they're simply being released to Iraqi authorities where our ability to keep tabs on them may be in doubt.

So the extent to which you are involved in, explain to the president what the law and the Constitution is, then the question that I ask -- how does -- how do you recognize through your department as adviser to the president, this effort to close at the same time U.S. military has launched these complex initiatives?

LYNCH: Well, Senator, with respect to the president's plan to close Guantanamo Bay, certainly that plan was primarily provided by the department of defense which has jurisdiction over that and manages those individuals who are there. Certainly if we were called upon to provide legal advice as to any changes that might be required in the law, we would work not only with the president but of course with Congress as that was considered.

With respect to the larger issue that you raised of the current campaign that we are waging against ISIS -- in various countries in the middle east but in particular in Syria -- that effort is also one that engages, not just the Department of Justice but the department of defense, department of commerce because, again, this is a whole of administration approach to attack this enemy at various sectors, to attack their economic base of operations, to attack them from a military point of view.

Full committee hearing on oversight of the Justice Department. (SD/24)

And the Department of Justice would be involved if prosecutions were to occur or if we were to, as we often do, send legal advisers to different countries to advise on rule of law issues. We, of course, do not advise on issues involving actual combat. That is not within our area of expertise. With respect to individuals that may be captured or confined in this activity, everyone will be looked at on an individual basis and certainly it would not be just the Department of Justice on how those individuals should be handled.

So I'm certainly not able to give you that comprehensive overview now, I apologize for that. But I would not be able to speak for my other, my fellow agencies on that. But I can assure you that this is really a whole of government approach. Those individuals will be looked at and reviewed on an individual basis and we feel that we will be able to take the appropriate action against them.

GRASSLEY: To not violate my own admonition of my colleagues, I am going to leave out the introduction to this question but it involves going dark and encryption. Is the Department of Justice going to court in asking for a backdoor into Apple iPhones and if not, does Apple's behavior in the New York and the San Bernardino cases suggest that the administration's strategy of trying to engage technology companies is a failure?

LYNCH: Mr. Senator, we do not want a backdoor into Apple or anyone else's technology. What we are asking for in both of the relevant cases, San Bernardino and the one currently being litigated in Brooklyn, New York, is for Apple to comply with a valid court order and provide assistance to its customer in the San Bernardino case, it is requested assistance. And in the New York case, to provide assistance that has been provided hundreds of times before. We are not asking them to break encryption, we are not asking them to weaken encryption; we are asking them to provide a way to remove a password blocker from the San Bernardino phone so the government can try and obtain access to that phone as we feel is our obligation to do.

We do not want to retain or possess anything that they may create in order to help us in that; it would remain with Apple. With respect to the New York case, as I mentioned we are asking Apple to essentially comply with a court order as it has done literally hundreds of times before on those older model phones in which encryption is not the issue at all.

GRASSLEY: Senator Leahy?

LEAHY: Thank you. Madam Attorney General, I have read something the other day where an immigration judge at the Justice Department said that three-year-old children can be taught immigration law and represent themselves in court without a lawyer. I assumed at first that was a misprint and then I thought it actually said it. I have been on this committee for decades -- a lawyer for decades -- I have never heard such a stupid, stupid, stupid thing from a judge or anybody else as that. The immigration laws are complex enough, but anyway, to say a three-year-old child can represent themselves and learn this?

Now, I understand the department issues a statement the judge was somehow speaking in his personal capacity, I think I would have fired him on the spot. But I do know the department regularly pursues immigration cases against children, including toddlers, who don't have lawyers, even though the DOJ has the authority to make sure these children have lawyers.

Would you agree -- does the Justice Department agree -- that a three-year-old child cannot comprehend immigration law?

LYNCH: Well, Senator Lee, again, I share with you your puzzlement over those statements.

LEAHY: I'm not puzzled, it's sheer anger.

LYNCH: And as well as the view that I know we all like to think that our children are precocious but in no way does the department of justice feel that children of that age or even frankly children even older can or should represent themselves individually and I am sure those of you on this committee who are former prosecutors and former judges would find that a surprising occurrence or if they showed up in your court as well.

And I don't have an explanation for those comments other than they were in a personal capacity and I simply don't understand them enough to explain them to you, so I'm not able to provide any clarity there.

LEAHY: Why don't children have -- there are children going into court without lawyers. Why is that happening?

Full committee hearing on oversight of the Justice Department. (SD/24)

LYNCH: Well, we do not take the view that children could represent themselves. Currently, there's no -- in the immigration courts, while the current law does not provide for the right to counsel, as a matter of policy, we do feel that immigration proceedings for all applicants proceed much more smoothly when there is counsel appointed, particularly for unaccompanied children or children in general.

The immigration judges, as they proceed through their matters, have an obligation to actually stop and put matters on hold if the litigant in front of them is not able to comprehend the matter.

LEAHY: But that does not answer my question; DOJ has the authority to make sure that these children have lawyers, and yet children are going before immigration hearings without counsel. Why not just have a blanket policy that they must have counsel? If things go -- you can argue things go smoothly, if people don't know their rights but if you got a child in there, why would they have -- if there's authority to make sure that they have children, why not just exercise that authority and say they have to have lawyers?

LYNCH: Well, we do certainly support that as a policy matter, we support efforts to provide counsel to not just children but others in immigration court who don't have counsel through pro-bono representation, through nongovernmental groups and we also support congressional efforts to strengthen the policies and laws that would enable us to have a lawyer for every individual.

LEAHY: But they do -- they do have the right, now and you have the right to -- DOJ has a right to ensure they do it. Why not just say there won't be a hearing with the child unless they are represented?

LYNCH: Well, Senator, I think you raise an excellent point and we may find ourselves there; I think we're looking to find various ways to support that and we're looking to find various ways to get legal counsel appointed in every situation.

LEAHY: I think that's a mark against this country and if you have children, they can learn the immigration law. Also lawyers around here have a hard time working through the immigration law and frankly, I think -- I think it is a bad, bad image for a judge; would say something that stupid, that reprehensible. To be the face of the United States, now we talk a lot about opioids, I'm hoping we get this opioid bill passed and some money for it.

I've been inspired -- all the hearings I've had around Vermont; Vermonters who respond to health crISIS, they've had comprehensive and community-based Prevention Treatment Recovery Act, everything from law enforcement to the faith (ph) community to teachers, to everybody. But what are -- what's happening at the federal level to support state and local efforts and do you see a connection between the growing opioid crises in illegal firearms trafficking?

LYNCH: Thank you, Senator, I'm going to start with your last question because I think that -- and then move to the federal policies that we are we are implementing and expanding to deal with this crISIS because as you noted, it is a crISIS and it's an epidemic and affects every state with which we interact, every state in the union.

When we look at it -- and not only the increase in firearms dealing, but increase in violence levels overall -- one of the things that we did over the last calendar year, was I directed U.S. attorneys to reach out to state and local counterparts. U.S. attorneys in jurisdictions that see an increase in violence in general, not necessarily limited to firearms, but violent crime in general to see if we could pinpoint the causes in these relevant jurisdictions. And in many jurisdictions, while the causes did vary, drug abuse, particularly heroin, opioid and methamphetamine abuse, were behind upticks in violence as well as violent crime using guns, so there is a connection there as individuals turn to crime to support habit, so we do see that. Certainly at the federal level, we're very concerned about this issue. It's an issue that we feel needs to have also a whole of government approach. There is an opioid task force within the administration, the Department of Justice sits on that task force along with, for example, the Veterans Affairs, Health and Human Services, ONDCP, so that we can look at all of the things that factor into this particular epidemic in ways in which we can combat it, both from a public health issue and a law enforcement issue, because it really is both.

From a law enforcement perspective, DOJ has a very important role to play. DEA has recently enhanced its abilities by adding over 10 more heroin task forces across the country but we know that we cannot prosecute our way out of this problem. And many of the individuals who are caught in the grip of this epidemic, for example, most new heroin users are those who have previously abused prescription drugs before that and that is a clear gateway to the recent uptick in heroin that we're seeing.

Full committee hearing on oversight of the Justice Department. (SD/24)

So we have to also look at prescription drug abuse and the public health issues that that rise. That involves doctor education, that involves prescriber education, it involves working with states, who are doing tremendous work in terms of coming up with systems to record prescriptions so that doctors can check and make sure that the patient is not doctor shopping. So that's an important part of it as well. On our enforcement side, as I mentioned, DEA is expanding our task force groups that focus on heroin.

We are -- we are working to provide grants and supporting efforts to equip state and local law enforcement officers with a lock zone (ph), which is an emergency overdose treatment that can be very, very effective when law enforcement agents come upon someone who is experiencing a heroin overdose. Often that's when family members and friends make that 911 call and the officers arrived someone's an extremist, they can use this new lock zone (ph) and cut down on the risk of death significantly. So our view is this is a public health issue and an enforcement issue. We are using all tools; from enforcement to education and focusing on prevention and supporting our efforts -- our state and local colleagues efforts at the local level, as well.

GRASSLEY: Senator Hatch?

HATCH: Well, thank you Mr. Chairman, as the general mentioned, I have a high opinion of you and I appreciate the work that you're doing down at the Justice Department. I'd like to begin with the going darkish -- let me say this about law enforcement -- about whether law enforcement should have access to encrypted data on cell phones. I'm not convinced; the backdoor keys are specially designed software, is the answer.

Bad actors will exploit any avenue to achieve their goals and this includes encrypted devices and software sold by companies outside the United States. It seems the current dispute is less about one iPhone and more about the precedent that will be established, both here and abroad. What would limit law enforcement the next go around from asking for additional access? Is there a limiting principle here, can you understand why this is really such a difficult issue to?

LYNCH: Yes, thank you, Senator. I think you certainly have highlighted the difficulties of this -- I know that something that you spent a great deal of time studying and writing about as well, and I appreciate your efforts in this field, and the chance we've had to appear before you and other capacities are the DOJ witnesses and talk about this. Senator, I think it goes back to what you just said in your statement; bad actors will exploit anything to achieve their goal and they currently are exploiting our technological ability and the way in which we handle communications and data.

And so we achieve the wonderful advances that American companies have been able to achieve, something that I think we should all be proud of. We have to keep in mind that as we have protected privacy, we have also balanced it with the need for security. That is the role of our Constitution, it is certainly what I see as one the most important roles of the Department of Justice. We protect privacy, but we also have to protect security as well.

What we feel is the appropriate way at this point in time, certainly in the cases before us, is to take a very narrow view of the information that we need and the means in which -- by which we would seek to obtain that information, so that we would not be asking for a major change in, for example, an overall operating system but simply a way to enable the FBI to try and get into a particular phone in the San Bernardino case.

And our view has been -- and certainly our discussions with companies had been informed by the view that every platform is different and presents different issues and that the response to the government should be as narrowly tailored as possible so that the relevant platform can protect its security, but still work with government. And I will say, as I hope has been made clear to you and others on the committee, is that as the attorney general and certainly as a citizen, I support strong encryption.

I think we all have to; we needed to protect our data, our personal data, our financial data, our medical data -- the issue here is warrant-proof encryption and just as we have security in so many other areas of our lives and yet still retain the ability to have a very, very focused response to law enforcement, I certainly believe that our technology companies, the greatest companies in the world, have the ability to work with us and achieve that.

HATCH: OK, I understand your position. I'd like to turn now to the issue of criminal justice reform and specifically to the issue of mens rea. As you know, mens rea -- or criminal intent requirements protects morally innocent actors for being sent to jail accidentally or unintentionally breaking the law. They say that in order to be guilty of a criminal offense, the person must have acted with a guilty mind. I'd like to read a quote from a 1952 Supreme Court case, Morissette v. The United States -- the

opinion in that case is by Justice Jackson, Robert Jackson, who was one of the all-time great justices, which you know. A contention that an injury can amount to a crime only when -- this is his quote, "the contention that an injury can amount to a crime only when inflicted by intention is no provisional (ph) or transient notion. It is as universal and persistent and mature systems of law as belief and freedom of the human will and a consequent ability of the normal individual to choose between good and evil," end quote.

General Lynch, do you agree with Justice Jackson that the notion that a criminal act requires a guilty mind, that it's not a provisional (ph) or passing notion? I think you can answer that yes or no.

LYNCH: Thank you, Senator, and I think you have given one certainly of Justice Jackson's most prescient quotes on this issue and I think that certainly, as a practicing prosecutor for over 20 years, having to prove that element is an important part of many parts of the case. I do recognize also that this body's -- the Congress has seen fit to provide differing levels of intent, and I've worked within those laws as well and look forward to working with Congress as it considers how to handle this issue of mens rea in conjunction with criminal justice reform.

HATCH: Do you agree with Justice Jackson that mens rea is a universal and persistent feature of our legal tradition?

LYNCH: I certainly agree that it is one of the central features of our legal system and certainly it is one of the defining elements as to how we characterize certain types of activity.

HATCH: Do you agree that unless Congress has provided otherwise, a person should not be convicted or sent to prison without proof of criminal intent?

LYNCH: I certainly believe that Congress has taken that responsibility very seriously as it has crafted our criminal code and as I've worked within that criminal code, I've taken that responsibility very seriously as well. I think the Congress has also recognized the need to have, as I mentioned before, varying levels of intent and varying means to prove them and our courts have interpreted that in ways that have been very useful in protecting very important interests, such as our environmental interests and public safety interests and the like.

But as I indicated before, I certainly look forward to working with Congress to explore this issue. I think it's a very important issue and one in which we can certainly look to refine the ways in which we make sure that, as we prosecute offenses, that we are clear in the requirements that are set forth, that the defenders have notice of what is in fact prohibited.

HATCH: OK, I'll accept that. On the topic of trade secrets, this committee recently reported the Hatch-Coons Defend Trade Secrets act by voice vote. Today the bill is co-sponsored by a majority of the Senate, actually in fact, I think, 54 senators. I'm optimistic this legislation can get to the president's desk in the near future. With that said, do you agree with me that a federal right of action will ease some of the pressures that your department faces in prosecute in trade secret cases? LYNCH: Thank you, Senator, I think that I'm very happy to see the progress of that bill throughout and I know that is something that not only impacts prosecutions but also as we look to protect our intellectual property in so many ways, the protection of trade secrets there. We're certainly committed to prosecutions under the current law and look forward to working with you, to advance this bill as well and look forward to the continuing of those discussions and think that, in fact, it's a very important issue.

HATCH: Thank you, Senator Grassley, I just need about 30 seconds.

GRASSLEY: Senator Hatch has asked the privilege to make a short statement I'm going to let him do that.

HATCH: Well, it's really just a closing statement and that is I have one last request for you to take back to the department. It's been nearly two years since the department began working on revisions to the ASCAP (ph) and BMI consent decrees and I'd like to ask you to consider this. Will you please confer with your subject matter experts and circle back with an update on when the revisions are expected and will be completed, I'd appreciate that if you will do that.

LYNCH: Thank you Mr. Senator, we certainly will.

GRASSLEY: Senator Feinstein?

FEINSTEIN: Welcome, Madam Attorney General, it's good to see you again.

Full committee hearing on oversight of the Justice Department. (SD/24)

I want to begin by thanking you by thanking you and hopefully you will thank the head of the FBI for the FBI's strong position on the issue of encryption and a probable cause of court order. It is my deep belief that no American company is above the law and that that particular industry should comply. I wanted to ask you a couple of questions. Google, Microsoft, Dropbox and other e-mail and cloud service providers use forms of encryption to protect customer data.

Their encryption techniques are strong, and that makes them relevantly well-protected against outside attacks. But the reality is that many companies only protect data like your e-mail in ways that they can still use it themselves and profit from it. I believe that the amount of personal information in the hands of private corporations and what some of those corporations are doing with that data is concerning. Isn't it true that private companies can encrypt data so it is protected from outsiders but at the same time those same companies can use our personal content data to target advertisements?

LYNCH: Thank you, Senator, for raising this important issue. It certainly is the case that many companies, those that you mentioned and others, have strong encryption, which we think is a very positive thing, and yet retain the ability to use the data that is transmitted along their systems, both for security purposes as well as for marketing purposes. And so it is certainly the case, as we have seen in our talks with various companies, that strong encryption can be accompanied with the ability to still access the data and use the data in relevant ways.

And we think this is something that's part of the overall debate on this important issue. As we all consider, as you also have noted, how much personal information we willingly turn over to private companies and how we want that information handled. And certainly, as we continue to discuss these issues, I thank you for raising them and making them part of the debate.

FEINSTEIN: Well, thank you very much. With my own devices and I'm not the most hip person when it comes to all of this, I've been amazed to learn what I can't control. And my understanding is that it's private information like web browsing history, e-mail content, and geo-location information, even when encrypted on smart-phones. So I think it is an area of concern as companies want to defy a probable cause warrant that they can use this data for their own profit-making motives and that's of concern.

Second question; as you know, there's a relentless and growing ISIL recruitment effort through social media platforms. Recruitment is repeatedly identified in nearly all of the 80 criminal indictments brought by your department during the past two years regarding ISIL. I understand that civil injunction authority already exists for the attorney general to obtain orders against those who provide material support to a foreign terrorist organization and who unlawfully spy on people. The authority has been used to compel third-party providers to stop their participation in these crimes.

Has the department made any efforts to use its civil authority under the material support law to combat the use of third-party services like financial providers or Internet companies by ISIL?

LYNCH: Well, thank you for raising that important issue. Certainly as we look at the unfortunate spread of violent extremists' thought and the accompanying activity here in the U.S., much of that recruitment, as you note, is online and we do see various platforms being used. We have actually had great success in working with the provider companies in these situations in pointing out to them situations where we feel terrorists are using their platforms to communicate. And for many of the tech companies, that violates their own terms of service. And so they have actually been very helpful in this regard in using their own criteria to remove recruiting material, jihadist material, extremist material and the like. Again, trying to balance the first amendment concerns there, so that's an area in which we actually work well with the tech companies and other companies, and other companies, and that's been a very productive dialogue for us. When it comes to the financial industry, also, as we look at those who use financial services to provide material support, we've also found that industry cooperative in terms of providing information and being responsive to government request for information.

FEINSTEIN: Well, thank you very much. I've been very concerned about some of the material put out by terrorist organizations, which contain pictures of people to kill with their names, where to sit on the plane, to have the best effect from a bomb and also particularly the recipe for a bomb that can go through a magnetometer which is real and when tested it would explode a plane. So I visited with the general counsels of the major tech companies and asked them to remove this material and the answer I got was no, we will not.

That answer has very much struck in my craw. We all know that the Boston bomber used the recipe from one of those magazine how-to-do it of the pressure cooker and got it from one of these magazines. So the fact of the matter is that this

Full committee hearing on oversight of the Justice Department. (SD/24)

doesn't belong in the public domain, is my very strong view, because the safety of our people depend on it. They just passed me a note, would an injunction help you in some cases?

LYNCH: Well, certainly we would look at the facts of every case, and again, start discussions with the relevant companies. I think when we speak to the companies, we do try and balance the First Amendment issues with the security issues there, and as I indicated, many of them, in particular Twitter, has been responsive in removing content...

FEINSTEIN: I found that too, with Twitter and Facebook wants to cooperate, as well. So I think that's helpful. But the others, I got a solid no.

LYNCH: I think that's an unfortunate response. I will say that in my meetings with the same tech companies, we've received requests for more information and guidance that would help them, in fact, identify and be able to classify that material for removal. The videos in particular are an area of concern, not just for us in law enforcement but for the providers, those who have the communication services.

And I think they actually are struggling to differentiate when the bid -- when the video first comes across, something that they can -- they can block under their terms of service. But then, as it turns into a news story or a news reporting, you know -- they're trying, they're actually struggling I think with that balance of how to not promulgate this but still provide news and commentary on something.

FEINSTEIN: Yes, so I'm not really talking about the news stories. I am talking about the how to commit a terrorist act manuals. So thank you and maybe we can talk about that.

LYNCH: Yes, I would look forward to that, thank you.

CORNYN: Good morning, Attorney General Lynch, good to have you here. On the -- ongoing litigation with regard to Apple and the encryption issue, frequently in the press it's cast as a question of the FBI versus Apple. But in fact, the FBI doesn't have authority to go to court and seek a court order to compel Apple to produce the information you've requested, correct? It requires the Department of Justice to do so what you had?

LYNCH: Yes, Senator, and that is what the Department of Justice is doing in this case.

CORNYN: So the FBI doesn't have any authority to go to court on its own?

LYNCH: No, (inaudible). We do take them with us, however. CORNYN: I'm confident of that, I just want to make sure people understand their respective roles of different agencies within the law enforcement community, the FBI and the DOJ. What I intended to start with is your comments about gun violence. And let me come back, then to the other issue in a moment. Do you believe that mental illness plays a role in some of the incidents of mass gun violence that we've experienced in America in the last few years?

LYNCH: Well, certainly I think with respect to specific cases where it's been adjudicated or a finding has been made, we could say that. Otherwise it would be speculation. But I will say that I think -- Senator, mental illness is the issue that I find is cutting across so many law enforcement issues today. Both from how we police to how we look at violent crime, to how we manage our prisons.

And certainly, as it relates to how we manage firearms in this country, you know, essentially making sure that we continue to have the right to have responsible firearm owners and yet, balancing that against those who are not allowed by law to have firearms, because of an adjudication of mental illness of various types.

CORNYN: I couldn't agree more with you and I know that the adjudication issue was a -- in the Virginia Tech shooting for example, the state of Virginia had adjudicated him as mentally ill but the state of Virginia had not uploaded that adjudication on the background check system. So it was missed and I couldn't agree with you more about the intersection of health and the law enforcement.

I met at a major county sheriff's meeting the other day a gentleman who introduced himself as the largest mental health provider in America. He was a sheriff for the Los Angeles county and of course many people who are homeless, living on our

streets, who are not -- don't have recourse to adequate treatment and perhaps even families who need additional resources to help their loved ones comply with their doctors orders, particularly with regard to taking their medication.

I'd ask you to take a look at some legislation that I've introduced called the Mental Health and Safe Communities Act, which includes a lot of the components that you've talked about. Perhaps that is something that we could work on together. I would welcome your input and advice on that.

LYNCH: I look forward to reviewing that, thank you, Senator.

CORNYN: So let me get back to the role of the FBI and the Department of Justice. And I want to talk for a minute about Secretary Clinton's use of her private e-mail server. We've read that the FBI is conducting an investigation of some sort, that secretary Clinton had previously deleted about 30,000 e-mails that she did not send to the state department. She did send another 30,000 to the state department and now courts are going through the process of determining which of these are producible under the Freedom of Information Act.

But recently, the department offered immunity to the Bryan Pagliano, the gentleman who reports -- was the one who helped set up this private e-mail account. It's true, isn't it, that immunity can't be granted by the FBI alone? That it requires the Department of Justice to approve of that grant of immunity, to go to court and to ask the court to grant immunity as part of their ongoing investigation isn't that right?

LYNCH: There's various types of immunity, there is limited use and there's some that are conferred just for an agreement between a lawyer and the defense counsel. There's some that are conferred by the court so certainly, regardless of the various types that is something that is done in conjunction with an agent and an attorney who'd make the decision and also in conjunction with discussions with defense counsel.

CORNYN: In this case, did the Department of Justice approve of the grant of the immunity to him Mr. Pagliano?

LYNCH: Well, Senator, with respect to that specific case as I'm sure you know, we don't discuss the specifics of any ongoing investigation.

CORNYN: Well, I'm not asking about the specifics, I am asking about procedure.

LYNCH: Well, with respect to the procedure relating to any specific witness, I would not be able to comment on interactions between that witness and the department.

(CROSSTALK)

CORNYN: Just as you said earlier, the FBI can't go to court without the Department of Justice's approval and you said you go together. If, in fact, this was immunity granted by a court, that had to be done under the (inaudible) and with the approval of the Department of Justice, which you head, correct?

LYNCH: It would certainly depend upon the type of immunity that was granted. There are various types, sometimes it's an agreement between the attorney and the defense attorney...

(CROSSTALK)

LYNCH: Yes.

CORNYN: So is it -- if in -- let me give you a hypothetical, if the FBI were to make a referral to the Department of Justice to pursue a case by way of indictment and to convene a grand jury for that purpose, the Department of Justice is not required by law to do so, are they, are you?

LYNCH: Well, certainly as part of -- it would not be in operation of law, it would be in operation of our procedures, which is we work closely with our law enforcement partners...

AR-00269

Full committee hearing on oversight of the Justice Department. (SD/24)

(CROSSTALK) LYNCH: It would also be consulting with the agents on all relevant factors of the investigation and coming to a conclusion aspect.

CORNYN: But you would have to make the decision or somebody else working under you in the Department of Justice?

LYNCH: It's done in conjunction with the agents. That's not something that we would want to cut them out of the process. That has not been an effective way of prosecuting, in my experience.

CORNYN: Yes, I'm not suggesting that you would cut them out, I'm just saying, as you said earlier, you and the FBI would do that together, correct? Just like the Apple case?

LYNCH: We -- we handle matters together of all types.

CORNYN: If the FBI makes a referral to the Department of Justice to pursue criminal charges against Mr. Pagliano or anyone else who may have been involved in this affair, does the ultimate decision whether to proceed to court to ask for the convening of a grand journey and to seek an indictment, does that rest with you or someone who works for you at the Department of Justice?

LYNCH: So, Senator, with respect to Mr. Pagliano or anyone who has been identified as a potential witness in any case, I'm not able to comment on the specifics of that matter. So I'm not able to provide you...

(CROSSTALK)

CORNYN: I'm asking about what the standard operating procedure is. And it seems pretty straightforward, that the FBI does a criminal investigation but refers the charges to the Department of Justice, including U.S. attorneys, perhaps in more celebrated cases go higher up the food chain, but my simple question is, doesn't the buck stop with you? In terms of whether to proceed to seek an indictment, to convene a grand jury, and to prosecute a case that is referred to you by the FBI?

LYNCH: There's many levels of review at various stages of a case, and so I would not necessarily be involved in every decision as to every prosecutorial step to make.

CORNYN: Right, it would be you or somebody who works for you, correct?

LYNCH: Everybody in the Department of Justice works for me, including the FBI, sir.

CORNYN: I'm confident of that.

GRASSLEY: Senator Schumer?

(LAUGHTER)

SCHUMER: Well done, Attorney General. Well done.

I want to welcome you here. Thank you for being here. It's nice to see New Yorkers before this committee.

Brooklyn, our home borough, is extremely proud of you and the great work that you're doing. And just speaking for myself, you would have made a great Supreme Court justice and great nominee, I regret you have pulled your name out, but so be it.

So I do want to begin talking a little bit about appointments; the Supreme Court, but it's instructive to discuss the broader issue of confirmations in this committee under the Senate majority.

We have before us, as we all know, someone who went through a long, arduous and at sometimes acrimonious confirmation process to a post for which she was eminently qualified. The acrimony wasn't about her record, about her character. It was entirely about politics.

And it resulted in nearly a six-month delay between nomination and confirmation, as well as the only -- only cloture vote required for an attorney general in the United States history.

AR-00270

But you are far from being the only one to suffer a delay, Madam Attorney General. Many, many others suffer total disregard. We've obviously, today, talked about the majority's refusal, sight unseen, to hold hearings on a Supreme Court nominee. But there are a whole slew of lower court nominees and executive branch appointments, who are languishing in the morass that is the majority-led confirmation process, or I should say, lack thereof.

Republicans have confirmed the fewest civilian nominations of any Senate in decades. These are important posts -- the chief sanctions officer in the Treasury Department, Mr. Szubin, commissioners for the SCC and the FCC, the boards of the Fed and the Ex-Im Bank. And this Senate has confirmed far fewer judges than any recent comparable session.

It's not just with the Supreme Court that the Republican majority is not doing their job. It is about appointments up and down the line.

It's no surprise, then, that the number of judicial emergencies have tripled since Republicans gained the majority in 2015.

Now, we are going to try to get votes on a few judges that have the support, of course, of their home state Republican senators this afternoon. I hope our Republican colleagues won't play politics with them.

The bottom line is, if the Republican Senate doesn't do its job confirming nominees, whether it's for executive or judicial branches, then other branches of government can't do their jobs.

So I want to now focus on the Supreme Court and just ask you a few quick questions.

Your department represents the U.S. government in every court case in which it has an interest, is that correct?

LYNCH: Yes, that is...

SCHUMER: Criminal and civil? That's a lot of cases, isn't it? Probably many times larger than the biggest law firm.

LYNCH: We -- I view us as the largest law firm, really, in the world.

SCHUMER: And don't you rely on the federal courts to be the arbiters of significant legal disputes?

LYNCH: They certainly are important in that process.

SCHUMER: In fact, the United States was part of your filed statement of interest in the vast majority of cases before the Supreme Court last year?

LYNCH: We did indeed.

SCHUMER: OK. So a functioning Supreme Court matters to the executive branch in terms of function?

LYNCH: It certainly matters to the executive branch and the Department of Justice.

SCHUMER: And what happens when the court deadlocks and can't resolve issues because of a tie? We've had it in the past when certain justices have had recuse themselves.

LYNCH: Well, my understanding is that the lower court opinion would stand and that that would remain the relevant law.

SCHUMER: But doesn't it sort of can't (ph) it in many places, both in the Justice Department and in the private sector, sort of paralyze things or just put them on hold? Companies may wait for a decision, your agency may not be able to prosecute or move forward on other cases if there is deadlock or division within the various districts, is that fair to say?

LYNCH: Well, I think everyone would have to evaluate whether this current state of the law allowed them to proceed with the matter or whether they had to wait in a matter.

SCHUMER: And there are times when they can't?

LYNCH: There are times when they would not be able to proceed.

I will certainly say that, from a law enforcement perspective, we will proceed and protect the American people to the best of our ability, regardless of the circumstances.

SCHUMER: Right, but sometimes it would be easier if you had a decision than if it was a deadlock?

LYNCH: I think people want clarity on those important legal issues.

SCHUMER: Right, thank you.

OK, another issue. This is an extradition case, it's a heartbreaking criminal case, and I want to ask your help in bringing the perpetrators to justice.

On March 14, 2009, Vladimir Tolstykh was brutally killed after exiting his shop, The Brighton Bazaar, at the end of a business day. Tolstykh's murder -- this is in Brighton Beach, part of my old assembly district even 30 years ago -- and his murderer stole a payroll bag that contained $32,000, then beat him to death. He left behind a widow, Rita, four beautiful children, the youngest of whom was only an infant when he was killed.

But, unfortunately, the suspects fled the country before they could be prosecuted, and one was arrested in Australia two years ago. The NYPD and the Brooklyn D.A.'s office, D.A. Thompson, have been diligently working to get him extradited to the U.S. so he can be tried for murder and the Tolstykh family can receive justice. But because we have an extradition treaty with Australia, it is within our authority to bring the killer back to the U.S., but they've been waiting for seven years.

So will you try to help look into this and maybe speed up this extradition so they don't have to wait any longer?

LYNCH: Senator, I am aware of the case. I'm aware that our Office of International Affairs has been pursuing this extradition matter for approximately two years, and I look forward to being in consultation with my Australian counterpart soon on the matter to ascertain more as to what might be the issues here.

SCHUMER: OK. We need real help in this issue, because they've been waiting for justice. And I don't think -- I don't know what's holding it up. Whatever you can do to get justice for them would be appreciated.

Last issue for me, Mr. Chairman, is SWATing.

We have a school district in Middletown up in the Hudson Valley, someone is angry at something about this school, and they have been plagued by SWATing attacks.

A caller calls up, makes repeated threats of violence against the school, the school has to be evacuated, and sometimes the kids have stay in school after 3:00 until the law enforcement authorities make sure it's safe. They're disrupting parents and their lives, the kids are scared, some parents are keeping their kids out of school. And it has been repeated times -- 13 instances of SWATing just at this Middletown School District, half of them to the Maple Hill Elementary School alone. You can imagine the fear that the kids and the parents have.

We have a problem, because the caller is hiding behind blocked and spoofed numbers. Now, we've spoken to the local FBI, the local offices in Newburgh, their main offices in Manhattan, and they're helping us. But I understand this is a national problem. So first, I would just ask you to make sure that the resources are there to help find the perpetrator of the school. And second and finally, what more can we be doing to deal with these SWATing incidents, which I think are nationwide now?

My last question.

LYNCH: Thank you, Senator.

Senator, that -- this is actually a nationwide issue. And we do not view these as pranks or childish calls. They're serious. They divert scarce law enforcement resources to incidents that are not, in fact, accurate. As you noted, they terrify particularly children, parents, and cause long-term issues for the school districts that are dealing with this.

We take them very seriously, and where we find these perpetrators, we do intend to prosecute them.

AR-00272

Full committee hearing on oversight of the Justice Department. (SD/24)

And certainly, whatever is being proposed here, either out of this committee or by Congress, we are happy to work with you on any legislation as well that would aid us in those efforts.

But we do take these efforts very, very seriously and it is, actually as you noted, outside of New York state, also.

SCHUMER: Right, and just -- would you just make sure that every resource being used to help find the perpetrators at this Maple Hill school?

LYNCH: Yes, actually it is. Thank you very much for raising that.

SCHUMER: Thank you.

Thank you, Mr. Chairman. Sorry to be a little long.

GRASSLEY: Before Senator Vitter -- just a small rebuttal to a small part of what you said about the court. And that is in regard to your reference -- you didn't go into detail about emergency judicial vacancies. There are 31; we have 12 up here. Just so the public knows, we can't deal with the other 19 until the White House gets them up here.

Senator Vitter?

VITTER: Thank you, Mr. Chairman.

And thank you, Madam Attorney General.

LYNCH: Morning.

VITTER: I'm very concerned about continuing sanctuary city policies in many jurisdictions around the U.S. We've talked about this before. LYNCH: Yes.

VITTER: Often, defenders of those policies couch it in terms of not wanting to dissuade illegals who would be witnesses or who were victims from reporting crime; however, a lot of these policies also apply to not reporting illegals who are arrested or convicted of criminal offenses.

In other words, they're on the criminal end of an event as we saw, of course, tragically in the murder in San Francisco. Do you think it should be disallowed for a local jurisdiction to prohibit hits police force from reporting illegal status of somebody who's arrested or convicted of a crime?

LYNCH: Thank you, Senator. You certainly have raised a very important issue that affects the interaction with the local jurisdictions as you've noted with our federal policies for removal of dangerous aliens, particularly those who are coming out of federal custody.

And your reference again to the tragic murder in San Francisco is one that has lighted this issue. Certainly, with regard to local policies, they vary across the country. And certainly, we actually are in litigation now on two particular matters where we're defending the Department of Homeland Security in their request to have jurisdictions report to them when local illegal immigrants are finished with state cases and therefore removable.

And we currently, actually, have one situation here ...

VITTER: I don't want to cut you off, Attorney General, but my time is limited. Do you agree or disagree with policies that prohibit reporting illegal status of somebody who's arrested or convicted of a crime?

LYNCH: Well, Senator, with the current state of the law and in terms of how local jurisdictions are handling this matter, that is a local matter. What we have done, however, as a policy as we have ...

VITTER: Well, actually, it's not just a local matter and there's ...

AR-00273

Full committee hearing on oversight of the Justice Department. (SD/24)

LYNCH: ... we have a new policy regarding how we deal with cities that have in the past refuse to either turn individuals over to us for deportation or provide us the relevant information.

VITTER: There's federal law on the matter, 8 U.S.C. 1373 says that no government entity including state or local or official may prohibit or in any way restrict any government entity or official from sending to or receiving from the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful of any individual, so it's a federal matter too. Isn't that correct?

LYNCH: Yes. And we are defending that position in court now. VITTER: So based on your defense of that position, you disagree with policies that prevent reporting to ICE to federal authorities illegal status of arrestees or convicted criminals, is that fair to say?

LYNCH: If those policies impact the particular statute that you mentioned, our view would be that they would fall under, again, the laws -- the position that we are currently defending, which is jurisdictions should report. Our issues are when jurisdictions do not report, as you quoted in the statute, to ICE for removal the information that we would need to effectuate the removal of those defendants.

VITTER: Well, in Louisiana that I represent, New Orleans has just announced and expanded sanctuary city policy. They had some elements of sanctuary city policy. They have just finalized and announced a far expanded policy that would include absolutely prohibiting New Orleans Police Department from reporting to ICE or any federal authority, illegal status of someone again, put to the side victims, witnesses, someone who's been arrested and convicted of a crime.

Now, NOPD, through its spokesman Tyler Gamble, said publicly and it was quoted in the press. I'd be happy to give it to you, that Justice Department and the federal Consent Decree Monitor were very involved in discussions leading to this policy and approved the revised policy. Do you know if that's correct?

LYNCH: What I can tell you is that the policy in question was one that the New Orleans Police Department felt that they needed to effectively police New Orleans, but it's my understanding does prohibit them from providing information to the federal authorities when we need that information as part of our ICE responsibilities, so essentially, that is my understanding of that situation, but certainly if you ...

VITTER: Specific question, did the Justice Department approve the policy?

LYNCH: I've given you my understanding of the situation and so I would refer you to the specific terms of our Consent Decree with New Orleans, as you can see what is specifically approved there or not.

My understanding is that ...

VITTER: Does the Justice Department approve the policy of NOPD?

LYNCH: My understanding is that New Orleans provide information to us for removal of illegal immigrants so that we can, in fact, fulfill our ICE responsibilities.

VITTER: Well, this policy specifically prohibits the New Orleans Police Department from reporting illegal status including of folks arrested and convicted of crimes. This policy specifically prohibits the criminal sheriff from telling ICE when it is -- he is releasing from his local prison, somebody who is in illegal status, specifically prohibits that. So that's very troublesome particularly given the statement that the Justice Department approved this policy.

LYNCH: That's not my understanding of the terms of their policy. They would be allowed to provide information as required under the statute that you quoted earlier to ICE authorities, so that we could effectuate our removal responsibilities for those individuals. And that is consistent with the policy ...

VITTER: Including if ICE asked them to do this on a regular basis, to report any arrested person convicted who is illegal status and any person being released from jail who is illegal status?

Full committee hearing on oversight of the Justice Department. (SD/24)

LYNCH: I'm not aware of prohibitions to that, Senator. And as I indicated before, that will be consistent with the policy which we have just recently announced regarding cities that do have a practice of not providing that information of where we have individuals in Bureau of Prisons custody, where who ordinarily would have been released to a state detainer to answer to state charges, which we do take very seriously in situations where those jurisdictions have indicated that they would not return the person to us at the end of a state proceeding or would not provide us information.

In fact, we give ...

VITTER: Attorney General my time is winding down.

LYNCH: We give ICE right of first refusal there.

VITTER: ... has wound down but one last statement. I think if you read the policy and words matter and it's laid out in black and white, in clear words that that's absolutely wrong. Part of it says, "The NOPD," that's the Police Department, "shall not engage in, assist or supporting immigration enforcement except as follows in response to an articulated direct threat to life for public safety or when such services are required to safely execute a criminal warrant or court order issued by a federal judge," close quote.

That means that routinely as I'm describing, they will not tell ICE when they have an arrestee or convicted criminal who's in illegal status, they will not tell ICE when they are releasing that person from a local jail.

WHITEHOUSE: If the attorney general wishes, she should have a chance to respond I think to that before I start my time.

LYNCH: Thank you, Mr. Chairman.

Thank you, Senator Vitter. As I indicated before, New Orleans has indicated they will provide us information, certainly the issues that you've raised about a court order authorizing to do so where issues of public safety do implicate ICE concerns and would allow us to undertake our ICE responsibilities to remove those individuals.

WHITEHOUSE: Thank you. Now, attorney general, the similarities between the mischief of the tobacco industry pretending that science of tobacco is dangerous was unsettled and the fossil fuel industry pretending that the science of carbon emissions is dangerous is unsettled has been remarked on widely, particularly by those who study the climate denial apparatus that the fossil fuel industry has erected.

Under President Clinton, the Department of Justice brought and won a civil RICO action against the tobacco industry for its fraud. Under President Obama, the Department of Justice has done nothing so far about the climate denial scheme.

A request for action by the Department of Justice has been referred by you to the FBI. My question is to you is, other than civil forfeitures and matters attendant to a criminal case, are there other circumstances in which a civil matter under the authority of the Department of Justice has been referred to the FBI?

LYNCH: Senator thank you for that -- raising that issue and thank you for your work in this area. I know your commitment is deep. This matter has been discussed. We have received information about it and have referred it to the FBI to consider whether or not it meets the criteria for what we could take action on. I'm not aware of a civil referral at this time. I will look into that and get back to you, but I'm not aware of a civil referral outside of the one that you just raised.

WHITEHOUSE: Are there any civil cases within the United States as plaintiff within DOJ civil division in which the FBI is preparing the case for the civil division?

LYNCH: Are you -- regarding climate change?

WHITEHOUSE: Regarding any matter.

LYNCH: I'm not -- I couldn't give you that information right now as -- in terms of whether or not ...

WHITEHOUSE: OK. I'll that as a question for the record.

Full committee hearing on oversight of the Justice Department. (SD/24)

LYNCH: Thank you.

WHITEHOUSE: 18 U.S.C. Section 1968 authorizes the attorney general to file a civil investigative demand prior to the institution of a civil RICO proceeding to gather and to protect evidence. In referring this matter to the FBI, did you authorize them to issue civil investigative demands under your authority pursuant to that section?

LYNCH: Senator, I wouldn't be able to give you the specifics on that at this time.

WHITEHOUSE: All right. Question for the record then again.

LYNCH: Thank you.

WHITEHOUSE: Have you designated the FBI or anyone as the document custodian under the statute at issue, document custodian being a term of art in the RICO statute. LYNCH: Senator, I wouldn't be able to provide to that information and actually, Sir, with respect to the FBI's specific steps relating to a referral to them, we would not be able to give you an outline of what had been undertaken at this time.

WHITEHOUSE: So whether or not they were authorized to use the attorney general's authority to file civil investigative demands would not be something you could disclose?

LYNCH: Well, they always have that authority, whether or not it's something that happened in a particular case.

WHITEHOUSE: OK. That's different.

LYNCH: I assume it would not...

WHITEHOUSE: I just want to make sure that they have that authority.

LYNCH: But they have that authority as a general matter.

WHITEHOUSE: Right.

LYNCH: Whether or not it occurred in a particular matter is something that we wouldn't be able to give the ins and outs of while the matter was under review.

WHITEHOUSE: OK. Second topic. The campaign finance environment in America is now as lawless as the wild west. The Federal Election Commission has been blockaded by three commissioners to the point where it is now according to its own chairman and I quote, "Dysfunctional." The IRS has been intimated at the point where it is dysfunctional in the campaign finance area, as the Washington Post recently reported and as I quote, "Thrown in the towel."

The one area where those agencies still operate is in requiring that federal forms be filed and filled in under oath. That's a reporting requirement. When you look at these forms, they show on their face that over and over again the same organization will give one answer under oath on one form and a different answer also under oath on another form.

Let me ask you. Is it true that false statements made under oath are prosecuted by the Department of Justice under 18 U.S.C. Section 1001?

LYNCH: Senator, you cited the relevant statute, that will cover false statements made under oath as forms as you mentioned or orally to federal agents.

WHITEHOUSE: Is it true that these 18 U.S.C. Section 1001 cases are the bread and butter of the Department of Justice?

LYNCH: I'm not sure if that's the characterization that I would use, but they are certainly a tool that we use in a number of different types of investigation. WHITEHOUSE: Frequently, constantly and without the need for agency referral.

LYNCH: We use them frequently, both with lawyers at main Justice and in the field.

Full committee hearing on oversight of the Justice Department. (SD/24)

WHITEHOUSE: The -- can you tell us whether the department has taken any steps of any kind of to inquire into the flagrantly inconsistent statements made by organizations under oath to the IRS and to the Federal Election Commission, and indeed in some cases to state election commissions, again, irreconcilable? It would appear factually with what they said under oath to the IRS.

LYNCH: Yes. I don't have that information for you. I can tell you that we certainly take all allegations of violations of 1001 or any of the relevant statutes governing these important filings very seriously.

WHITEHOUSE: The concern I have from previous conversations that we've had is that the department takes the -- not you and I but the department and I, including even a hearing on this before you were attorney general is that the department has taken the position that unless the IRS makes a referral to it or the Federal Election Commission makes a referral to it, it will not take notice of the open, plain, notorious and evident conflict between public statements made under oath on federal applications and forms.

And that seems to me to be hard to understand given the very simple nature of an 18 U.S.C. 1001 prosecution. It's not as if this is a matter that requires one to delve deep into the arcana of tax law if the statement is false it is false.

And if two statements are irreconcilable, it would seem to me that there is a reasonable likelihood that one is false and if there is an explanation, fine, but I would think that the department will want to try to obtain that explanation rather than simply allow this lawless atmosphere to continue.

My time has expired.

LEE: Thank you, Mr. Chairman.

Thank you, General Lynch for joining us today. The Department of Justice, pursuant to the All Writs Act recently obtained a court order requiring Apple to engineer software, software that doesn't currently exist.

It would enable the government to bypass security mechanisms built into an iPhone, previously used by Syed Farook, one of the San Bernardino terrorists. It -- now importantly, there were several phones that were used by the two San Bernardino terrorists. All of the other phones were destroyed, all of them were crushed and were inaccessible because they didn't physically exist anymore.

This particular phone was a work phone. And some have speculated that perhaps that's why it wasn't destroyed, perhaps it was being used for work purposes, but regardless, this particular phone because it wasn't destroyed is the subject of this effort by the Department of Justice, resulted in this effort by the Department of Justice to require Apple to engineer software that doesn't currently exist.

The All Writs Act importantly provides that the Supreme Court and all courts established by acts of Congress may issue All Writs necessary, were appropriate in the aid of their respective jurisdictions and agreeable to the usages and the principles of law.

So it's not open-ended. It doesn't require the court -- allow the court to demand anything and everything. It still has to be agreeable to the usages and principles of law. Is it nonetheless, your position that the All Writs Act permits courts to compel private parties to engineer software to assist law enforcement?

LYNCH: Senator, as has been laid out in the pleadings and in the relevant case, it's our position that the All Writs Act as interpreted by a variety of courts including the Supreme Court does require third- parties to provide assistance to the government when necessary and when they are capable of doing so to execute lawful court orders.

The specifics of that assistance will vary from case to case and will essentially determine, you know, essentially how the third-party person is able to provide the assistance, under what means and measures. So the All Writs Act provides the legal authority for the court to order this third-party to provide assistance. The type of assistance will vary from case to case.

LEE: But what limiting principles would exist if in fact the All Writs Act permit -- can be read to authorize a court to develop software that doesn't already exist, to enlist the work effort of a tech company, to create something that doesn't yet exist. What

limiting principle is there? And I would add, what limiting principle is there in place that wouldn't also allow the government to use the All Writs Act or some other mechanism to require Apple, for instance, to write other software, perhaps software that would unlock a phone's camera, unlock a phone's microphone, unlock a phone's location services system in order to assist the government there.

Assuming apple or whatever other company is at issue, it doesn't have software that would do that. What limiting principle would stop the government from using -- going into court, using the All Writs Act to compel that kind of work product?

LYNCH: I think in every situation you'd have to look at the type of assistance that was needed. In the relevant case here in San Bernardino, the government is not asking Apple to unlock the phone, but to disable a password blocker that would destroy the evidence and then the FBI will try ...

LEE: Understood. And Apple is saying that that would require the development of new software. They'd have to engineer something that doesn't currently exist.

LYNCH: But that is not Apple unlocking the phone or Apple going into the phone and extracting it or Apple taking certain steps. And so every case as we know just from watching jurisprudence will be developed by the relevant facts.

I think in this -- in this instance it's important to note that this is a customer request for a company to provide assistance to a customer. This request first came from the owner of the phone and so I think that's an issue that's of relevance and important in this case also.

And every case is going to be different. I think what we've tried to do is have a very narrow, very focused inquiry into potential evidence on one device.

LEE: You know it's important to remember that the Supreme Court has stated in Pennsylvania Bureau of Corrections versus U.S. Marshal Service, a case decided by the court in 1985 that the All Writs Act is a residual source of authority to issue writs that are not otherwise covered by statute where a statute specifically addresses the particular issue at hand, it is that authority and not the All Writs Act that is controlling.

Now, importantly, there is a law that deals with issues in this area. The law is, of course, called the Communications Assistance for Law Enforcement Act or CALEA. It explicitly states that the CALEA, quote, "Does not authorize any law enforcement agency or officer to require any specific design or equipment, features or system configurations to be adopted by any manufacturer of telecommunications equipment," close quote.

CALEA further states that, quote, "A telecommunications carrier shall not be responsible for decrypting or ensuring the government's ability to decrypt any communication encrypted by a subscriber or a customer unless the encryption was provided by the carrier and the carrier possesses the information necessary to decrypt the communication," close quote.

Does CALEA apply here?

LYNCH: Senator, I think that the relevant laws that we feel are applicable, are laid out in the pleadings in the San Bernardino case. I'm going to refer -- I would refer you to those briefs rather than have such a limited discussion about one law here.

LEE: I understand. This is a limited discussion and our time is limited, but it's important nonetheless and my understanding is that the Department of Justice is taking the position in those pleadings, in those briefs, that CALEA does not apply and yet that seems odd to me because Apple is in fact, a manufacturer of telecommunications equipment.

And Apple is, in fact, being asked to be responsible for decrypting or ensuring the government's ability to decrypt an item that Apple itself manufactures. I also find it troubling that we've got a situation here in which this administration and many others were calling on Congress for a long time to require by statue that Apple and other similarly situated manufacturers provide a back door and a back door key that could be used by law enforcement. That effort failed, but that effort contemplated changes to CALEA, because that effort failed, it's that much more disturbing that because, you know, there was not enthusiasm in Congress because there were very legitimate public policy concerns expressed in connection with that idea.

AR-00278

Full committee hearing on oversight of the Justice Department. (SD/24)

Congress decline to adopt such legislation. Now that Congress has decline to adopt such legislation then and only then the government goes into court at about the same time it decides not to pursue this remedy in Congress and tries to get through the All Writs Act, the 1789 statute that was intended to not apply in circumstances like this where the area has been addressed by statute. A remedy that it couldn't get through Congress. This is a policy decision. This is not a judicial decision. It should be handled by Congress, not the federal courts.

Thank you, Mr. Chairman. I see that my time has expired.

LYNCH: Just briefly. Mr. Chairman, thank you. Thank you, Senator, for raising these important issues and for your thoughts on them. I agree this is a matter for important public debate and discussion both by this body, hopefully this committee. I know many people here have given great thought to it, the larger Congress and the American people.

In the instant case, however, we have a law enforcement obligation to proceed and I can assure you that as was set forth in prior testimony before this and other committees, we've never asked for a back door. We don't want a back door. We want companies to do what they've been doing for years, which is provide assistance when they can and how they can.

And how they can will be determined and I feel should be determined by the courts in every specific case when there's a valid law enforcement interest to do so. And most respectfully, Sir, we did not wait for Congress to stop considering an issue to bring this court action.

What happened was someone killed 14 people in San Bernardino and in the course of our investigation, a customer asked for assistance to obtain information from a device. The same way if we needed to get into that person's desk or locker, we went to the owner of it.

And they had had to go to the manufacturer to gain access to help us gain access to a locked device in a way that would not destroy what was inside. That's the situation here, so I simply place that before you as part of the consideration of this important issue.

But I thank you for those thoughts. I think that those are important issues and they do require fuller and more fulsome discussion as to how we handle these issues, as to how we continue the constitutional balancing that we have always done in this country, between the essential right to privacy, which I am as committed to protect as anyone here. And also, also, the safety and security rights of every American, which is my sworn duty.

GRASSLEY: Senator.

DURBIN: Madam Attorney General, thank you for being here today. During the course of this presidential campaign there have been statements made on the other side by candidates which have been hateful toward American Muslims. One candidate referred to Syrian refugees as rabid dogs.

Donald Trump, the frontrunner for the Republican nomination, said we should ban all Muslim immigrants from the United States. We held the first hearing ever on anti-Muslim rhetoric and hate crimes in my Subcommittee on the Constitution several years ago.

I'd like your comments on the monitoring of hate crimes and crimes against people of the Muslim faith and your observations when it comes to law enforcement and the need for cooperation from American Muslims to keep America safe.

LYNCH: Well, thank you, Senator. You raised a very important issue and I certainly think the hearing that was held on, that advanced those issues and allowed for a full -- an open airing of the concerns about rhetoric that we are hearing that is hateful towards Muslims or people of any religion or any perceived difference.

And, of course, we enjoy a robust habit and pattern of free speech in this country and we protect that, even hateful speech is protected. My concern as a law enforcement officer is always when that speech crosses the line into incitement of violence and when violence occurs as a result of that. And so, we take it very seriously as something that could be precursor to violence. As I indicated before, protecting that balance of free speech but looking for those situations where people do cross that line and they are inciting others to commit violent acts.

Full committee hearing on oversight of the Justice Department. (SD/24)

We saw that happen after 9/11, unfortunately. We saw several acts of violence against those who were Muslim or who were perceived to be Muslim, wrongly so, that resulted in death and serious harm. And so, we know that it can happen and it's something that's not indicative of the values of our community.

We have found it to be very effective to engage with the Muslim community before there are flashpoint incidents. So -- and it has been my experience both in this chair as Attorney General and as U.S. Attorney that the Muslim community is like any other community in this great country of ours, they have people who are on both sides of the law but they also have the same concerns that we all do.

Their children are concerned about being bullied in school. They're concerned about this perceived discrimination or real discrimination. And so, providing information to the Muslim community about those issues can ease their fears and concerns, and we find it to be very helpful in obtaining and building rapport that can help us as we build law enforcement investigations.

DURBIN: Thank you. Senator Hatch asked earlier about the issue of mens rea and cited an opinion by Justice Jackson. Assistant Attorney General Leslie Caldwell testified before this committee in opposition to Senator Hatch's legislation on mens rea at a recent hearing.

And I'd like to ask you to be more forthcoming if you would and perhaps more specific. It's my understanding, of course, that there are certain crimes where we have said that there's a strict liability standard, food adulteration is an example of that, the notion of killing someone who is law enforcement for the federal government or otherwise, even crimes involving child pornography and sex trafficking.

I used an example in the hearing where we have a crime on the books which says if you're engaged in terrorist activity and kill an American, you are going to be held responsible, criminally responsible. I used the example of the terrorists in Mumbai and the fact that they couldn't have known of their own that there were American tourists who were killed by their terrorist act at that hotel. But under our law, they could be held responsible. So, would you expound a little bit more on this issue of mens rea and whether the line you think should be drawn?

LYNCH: Certainly. And thank you for the opportunity to comment further on this important issue. And as I indicated, we look forward to working with you and other members of the committee as we explore how this will interact with the sentencing reform efforts.

Senator, as you've noted, we have decided as a society and as a statutory body, Congress has decided that there are crimes for which strict liability is important, to ensure the safety of our food and drugs and also to ensure the protection of those who serve us. As you mentioned, the assault or murder of a federal agent, terrorist activity that results in the death of Americans abroad are activities that we as a society and this body as a Congress have deemed to be of such a nature that they should incur liability when they occur and when they can be proven.

And that liability is indeed a strict liability because of the nature of those crimes. But there are also other indicia that we would have to prove in order to find someone guilty there. We would, of course, have to establish that they were responsible for those actions, that they took those actions, you know, for a particular purpose.

So, the absence of the specific mens rea or knowledge of, for example, that there were American tourists in a particular place would still not alleviate the government of its responsibilities to fully and fairly and adequately prove that crime in a crime of law. So, the person would be held accountable for the serious crime and the fact that they did not know, for example, in that -- in that example that Americans were involved would be used appropriately in my view as something to which they could be found liable for and sentenced for.

DURBIN: Last December, the President commuted the sentence of a man named Alton Mills. Alton Mills at the age 24 never having served one day in jail, was found guilty of a third strike for the sale of drugs in the city of Chicago and was given a life sentence -- life sentence. He served 22 years before the President commuted his sentence. I've met him. I've worked with him. It is clearly a sentence which is excessive and way beyond what should have been imposed. There are now 20,000 clemency petitions that are pending before your department. It doesn't appear that you have the capacity to deal with them in a timely way. Tell me I'm wrong.

Full committee hearing on oversight of the Justice Department. (SD/24)

LYNCH: Well, Senator, I think that with respect to clemency, the number of petitions is -- I'm not sure it's quite that high. And we are working, we have put in place -- we have put in place practices to work through the backlog. We have committed the resources that we can consistent with the appropriations issues that we have as well. And we're committed to working through the process. It is part of our larger system of criminal justice reform. It is -- it is part of the many ways in which we're trying to deal with the issues that have been the result of prior decisions that were taken we feel at that time with good intent, with the intent of protecting people, but have had these collateral consequences.

DURBIN: Thank you.

Thanks, Mr. Chairman.

GRASSLEY: Senator Tillis?

TILLIS: Thank you, Mr. Chair.

LYNCH: Good morning.

TILLIS: Madam Attorney General, welcome. I admire your poise and appreciate all the work that you and your staff have done to prepare for this oversight hearing. Article 1 section 9 clause 8 of the United States Constitution prohibits officials from accepting money from foreign government while in office.

The Constitutional Convention of 1787 unanimously adopted the clause to prevent foreign influence on government officials. According to Secretary Clinton's public financial filings, she and former President Clinton appear to have received payments from speeches directly from a foreign government or an instrumentality of a foreign government yet none of the publicly released e-mails suggests the State Department ethics officials analyzed whether their joint income violated the constitutional restriction.

Has the Justice Department analyzed whether the Clintons' income from foreign sources may have violated a provision of the Constitution?

LYNCH: Well, Senator, you certainly raised an interesting issue. I can tell you that the matter that has been under discussion both in this and other proceedings has been the Department's review of how the State Department handled classified information. So, I'm not aware of any other issues along the lines of what you have outlined.

TILLIS: Would it be possible to have the department look into it and report back to this committee?

LYNCH: Well, Senator, certainly if you would provide us information, we would see. I'm not sure that I could promise you a report at this time. I don't know what issues would be implicated. I don't know the timing of the issues that you've mentioned or the amounts that you've mentioned or the relevant rules of the State Department at that time.

TILLIS: We'll follow-up with the formal request, I assume the record is going to be held open so, we'll do that. I do have one final question then. It sounds as though based on the answer to that question that the Justice Department did not play any role in advising the State Department about the ethical or legal questions that may be raised from the former President's speaking engagements.

LYNCH: From President Clinton's speaking engagements?

TILLIS: That's correct, any ethical questions based on the joint filings with Secretary Clinton. Back to the same question, you haven't been consulted by the State Department on this matter?

LYNCH: Well, Senator, with respect -- I'm not sure the timing of when that would be when that would have occurred and so, I simply don't have an answer for you on that. I do not believe that we would have consulted with the State Department. I believe that you may want to raise that with the State Department's internal process.

TILLIS: We will and we'll that in follow-up questions into the record. I wanted to ask a question, during your confirmation hearing last year, I asked a question about the Inspector General's report of, I think, December 2014. And I was curious, I think

part of the report was titled "The DOJ Could Strengthen Procedures for Disciplining Its Attorneys" and at that time I don't think you'd had an opportunity to go through the Inspector General's report.

Now that you've been in the role for a while now, have you had an opportunity to look at that and has the Inspector General's report been instructive in any management decisions you've made as the chief executive of the department?

LYNCH: Well, Senator, what I can tell you is that I have not read that report specifically. I am aware of the changes that the department has made and was making throughout most of 2015 to ensure that the disciplinary procedures were streamlined, were efficient, were consistent including providing more resources to the Office of Professional Responsibility.

TILLIS: I want to move down to a maybe a lower level of detail in terms of the department and it relates to your Public Safety Officers' Benefits program. We know that there's a backlog in the DOJ processing the claims and I believe in your confirmation hearing last year, you may recall I raised the issue with you and whether or not we could place a priority on clearing the PSOB claims backlog.

It looks like that we haven't made much progress and kind of curious, I guess the sheer number claims and also the length of time to process the claims I think in October 30 last year, there were a total of over 1,000 Public Safety Officer Benefits claims outstanding. And from North Carolina, I've got 20 or so active death benefit claims outstanding. Do you think that the backlog is appropriate and the length of time to close the claims and if not, what actions are you taking to reduce the backlog?

LYNCH: Well, Senator, thank you. That's a very important issue and it's on that I have actually had occasion to discuss with the leaders of the various law enforcement group with whom I meet regularly as well as my sheriffs' association with whom I meet regularly.

The Public Safety Officers' Benefit program is one that is managed through the department's Office of Justice Programs and they have been working on that backlog. And I think part of the issue is the nature of the information they received and the questions that they may sometimes have to raise about it.

So, they are -- they are looking to set in place their own system of streamlining that and making sure that they are requesting only what they need and that they are acting as quickly as possible. And I know that they are actually speaking with jurisdictions on an individual basis about those claims to give them status reports and updates on that.

So, it is something that we're aware of. It is something that we have frequent conversations with our law enforcement partners because, of course, it's a matter of great importance to the families that are involved in these tragedies. At every claim that you were referring you in our home state or otherwise there's a tragedy underlying that and we take that responsibility very seriously.

TILLIS: It's really important. We'll clearly be tracking the claims within North Carolina, but the broader question we'll follow-up with any sort of measures and the resource needs, the other things that may be necessary or changes that may be necessary to draw down the backlog. But it seems a bit long, for the reasons that you've said and it's prolonging the closure on a tragedy that these families are dealing with and I think it's very important.

I have a final question. I appreciate your comments in your opening statement about sentencing and criminal justice reform. You might be aware in North Carolina we did some of the Justice Reinvestment Act which has been tremendously successful in terms of reducing recidivism and probation violations. The -- it seems that the concerns with some of our members relate to the retroactive application for certain classes of crimes.

Do you have any -- do you share any concerns with the underlying bill, things that you would like for us to work on? I appreciate the fact that you're going to help us maybe getting support for. I was just curious in my closing seconds. Thank you.

LYNCH: Well, thank you, Senator. Obviously a very important issue and one I really appreciate the efforts of everyone on this committee in working with us on. With respect to I think you're referring to potential changes involving armed career criminals and possibly other firearms offenses, I believe that we have been working at the staff level to have discussions about those as to how we can essentially make sure that we move forward with reform and still deal with the serious issues raised by those particular types of defendants.

Certainly, from the department's point of view, even if those were not the issues when it comes to release of any kind, we do feel that there should be a fulsome presentation to the relevant judge so a decision could be made. And so, I don't believe any decisions have been made about those provisions and we certainly look forward to talking with you further on them. And, again, I will commend North Carolina on its use of the Justice Reinvestment Act because through that, I believe that over the last several years crime is actually down 11 percent in the state for which we are all extremely grateful.

GRASSLEY: Senator Klobuchar?

KLOBUCHAR: Well, thanks very much, Mr. Chairman.

Thank you, Attorney General, for being here and I want to start by thanking you for your focus on sex trafficking and the implementation of the Justice for Victims of Trafficking Act that Senator Cornyn and I and others worked so hard on. And I know that you've had some good results in some of the cities that have been ATC team cities and we are, that stands for Anti-Trafficking Coordination teams.

I know Minneapolis and the twin cities are now one of them. But from what I've read you have 86 percent increase in convictions in those districts compared to 14 percent in non-ATC team districts, 26 percent nationwide. I wondered if could comment on that as well as what's happening with a piece of our bill which was developing the national strategy to combat human trafficking.

LYNCH: Yes. Thank you very much for raising an issue that's of great importance and one of my own priorities as Attorney General. With respect to the ATC team, we have had tremendous success along the lines that you noted in raising the conviction rate and also the ability to open cases in those cities that participate in the ATC teams.

And we recently are bringing six more cities and districts on board. And we hope for similar results there as well. It has been one of the -- one of the tip of our spear so to speak in our victim- centered approach to dealing with human trafficking, that partnership that we have particularly with DHS and the Department of Labor are enabling us to not only bring the cases but also provide real support for the victims of trafficking at the end of those cases, because, of course, their trauma does not end just with the conviction.

And I thank you again for your work along with Senator Cornyn on the bill but also on this important issue. Our national strategy is in progress. What I would say is that as part of that national strategy, you know, the ATC team has been enhancing the federal collaboration between DOJ, Department of Labor and Department of Homeland Security.

We also have been strengthening our collaboration with our state and local colleagues. And just last fall, I announced another $44 million in grants to improve and enhance those local efforts and about $35 million of that is going to go towards organizations that are focused directly on survivors both in terms of empowering them and providing them real assistance at the end of a case.

And so, these collaborations are also going towards training local law enforcement officers in the very important area of recognizing human trafficking victims when they see them. This has been one of the concerns that they have expressed to us, that they know they have a problem in their jurisdiction. They want to work with federal authorities hand-in-hand with us but they're concerned about the ways in which to gain inroads into the victim community, also supporting the NGOs who are often the first people that the survivors turn to. They often don't call law enforcement first.

KLOBUCHAR: Right. OK. Thank you very much for your work. We look forward to continuing that work. As you know we've had a number of cases out of twin cities with Islamic extremism, recruiting of extremists, number of indictments, the number of convictions, Andy Luger, U.S. Attorney and all of our federal law enforcement is working together and doing a good job here.

But this countering violent extremism task force was very important. Senator Franken and I here together with the event in the White House where three areas were featured including the twin cities in terms of the work they're doing. Could you tell me what DOJ has been doing and where it's continuing to try to get more money in the budget for this effort.

Full committee hearing on oversight of the Justice Department. (SD/24)

LYNCH: Yes. Thank you very much. And very, very happy also that the twin cities are one of the pilot cities in our program for combating violent extremism, focusing specifically on those communities, listening to them and what they need, that's going to be very helpful to us as we develop it.

We have obviously have a strong enforcement piece when it comes to combating violent extremism, particularly the home-grown extremists that we see here in the country. Most recently, I'd say over the last two years, we've seen individuals seeking to leave the U.S. to travel overseas. We've prosecuted more than 85 of those individuals so far. And of great concern is the fact that over the years, their age is dropping. They're getting younger and younger, certainly the median age now is around 21 or less. And we're also seeing more and more young women being involved in this, not a majority but those numbers are increasing.

KLOBUCHAR: Right. And I do appreciate the law enforcement piece of it, it's just this concept was to try to intervene early...

LYNCH: Yes.

KLOBUCHAR: ... when schools and others see signs and so far I believe we still have more private money in it than we have some of the federal money in and so, we are really trying to push hard to get the additional funds.

LYNCH: That will be very, very helpful. I think -- and I think the twin cities are going to be a good example of that. One of the things we are doing actually is working with Silicon Valley and the tech industry to help us as well as Madison Avenue to provide assistance from the non-governmental side into combating violent extremism. I think it is fair to say that the government is not necessarily going to be the best messenger for that. We're not going to be the voice that young people who are on the edge are going to listen to first.

KLOBUCHAR: Yes. I would agree and I'm glad we're doing that. It's just that if we actually want to use this model where we're trying to identify kids early and then coordinate the community to kind of circle around them...

LYNCH: Yes.

KLOBUCHAR: ... we probably need funding to get some of that going.

LYNCH: Yes.

KLOBUCHAR: And it's just that the White House featured us -- our area and so, that's what we're continuing to work to try to get that done.

My last question is about the COPS program. Senator Murkowski and I are leading this effort for the reauthorization and I think you know how important as someone who's been a prosecutor the funding on the local level is for community policing. And could you talk about the grants and how an increase in funding would be helpful.

LYNCH: Yes. With respect -- we recently had within our COPS program some grants for local law enforcement to deal -- dealing with the heroin issues, and that program essentially for financial reasons has been taken -- has been shifted I should say -- I don't want to say it's been taken away because it in fact now resides within DEA.

But -- so, DEA is going to have, I believe, six additional heroin-based task forces to deal with this issue. And, obviously, while those do pull in state and local law enforcement officers, we understand that the prior COPS program was a great source of support for local law enforcement as they had those very targeted efforts that were very, very effective as well.

And so, we certainly greatly appreciate your and Senator Mikulski's efforts.

KLOBUCHAR: Ann Murkowski, actually Ann Murkowski of Alaska. So, I think Barbara Mikulski also supports it so we have a good team. The last thing that I wanted to just mention -- I won't ask a question because I'm out of time but it's just on the opioid bill and we know how important that is and we look forward to continuing to work with the Justice Department. Thank you.

LYNCH: Thank you for your efforts in that regard.

Full committee hearing on oversight of the Justice Department. (SD/24)

KLOBUCHAR: Thank you.

GRASSLEY: Senator Sessions?

SESSIONS: Thank you, Mr. Chairman and thank you, Attorney General Lynch.

LYNCH: Good morning.

SESSIONS: Thank you for your courtesies and your even-tempered leadership. We appreciate that. There are a number of questions that I think are important that we won't have time to go into fully today. But I'd like to raise some of them.

First in response to my colleague, Senator Durbin, the leading Republican candidate says we should have a moratorium on immigration from -- Muslim immigration until we've figured out what's happening, not a permanent ban. And I want to say it's critically important that the American people and everybody know that when a person is in our country, they're entitled to have their religion respected. The Constitution guarantees the free exercise of religion and that must be honored.

But I would note that NATO Commander Philip Breedlove testified before the Armed Services Committee not long ago that terrorists are infiltrating refugee flows in Europe where he's the commander and that ISIS is quote " spreading like cancer within this mix." He even said Russia's actions in Syria have wildly exacerbated the problem and it fits into a strategy of using non-military means to divide NATO and the EU. So, this is not a little matter and I know you know that and I won't go into the details about it.

But do you -- with regard to our drug situation, it's happening today and the increase in heroin and the deaths that we are seeing, do you believe law enforcement plays a critical role in reducing the abuse of drugs, of reducing availability of heroin and cocaine and deaths that are now occurring?

LYNCH: Senator, yes, thank you and (inaudible) discuss this epidemic is a grave concern to us. Law enforcement has a very important role to play particularly in the interdiction of heroin trafficking, the apprehension of those who are bringing heroin both into the country and spreading it throughout the country.

SESSIONS: I would agree with that. And the interdiction is probably a key thing for the federal official although that is not all. There are major drug-dealing networks in every major city and throughout this country and rural areas, too. And they need to be attacked by federal officers. But the interdiction, I think, is first. So, I would suggest to you that a more secure border is essential because isn't it true that the majority of the cocaine, heroin and methamphetamine now that we're seeing in America is coming across the border from Mexico?

LYNCH: Well, Senator, with respect to methamphetamine, a lot of it is just made here (inaudible).

SESSIONS: Well, I know a lot of them is made here but isn't the majority of it coming across from Mexico. LYNCH: Yes. I couldn't give you the...

SESSIONS: Well, what about heroin?

LYNCH: Certainly, the Mexican border is a major transshipment point for heroin and cocaine which is a shift from 20 years ago.

SESSIONS: The majority. Right, it is a shift, when I was prosecuting we had airplanes and boats and things of that nature and a lot of different areas being brought in. But the trend has changed and we've seen the movement from the, across the Mexican border, have we not?

LYNCH: We, it has certainly grown to rival other areas although I would hesitate to say that we take our attention away from the ports as you noted, the ships and the boats in American border also.

SESSIONS: Well, the problem is, I think you're in error there. I think it clearly is a majority. But the Center for Disease Control noted that over 47,000 people died from drug overdoses in 2014 and it's still rising. That's one drug overdose death every 12 minutes, 61 percent involve opioids, that the opioid overdoses in the United States have tripled since 2000, 600 percent

Full committee hearing on oversight of the Justice Department. (SD/24)

increase in heroin overdose deaths since 2001. National survey of drug use and health under this administration's leadership released a report saying there were approximately 169,000 new heroin uses in 2013 alone. And I believe those, and they've, the substance abuse in mental health services in 2014 found that 589,000 people in the United States have an opioid disorder.

This is a huge thing. These things destroy lives, not just overdose deaths, people unable to function and work anymore, families are destroyed. People destroy their whole careers. Young people destroy their ability to have a financially secure future. They commit crimes in furtherance of these addictions and uses. DEA Administrator Chuck Rosenberg noted that 120 people die a day of heroin overdose in the United States.

So I guess what I'm saying to you is and you indicate that law enforcement plays a key role, but Tom Frieden, the Center for Disease Control and Prevention noted that law enforcement must intensify its efforts to reduce the availability of heroin, fentanyl and other illegal opioids. Would you agree with that?

LYNCH: Certainly, that's an important goal and it is a goal of ours. I particularly view...

SESSIONS: And Mr. Rosenberg said law enforcement, quote, "must continue to have the tools it needs to attack criminal groups who facilitate drug addiction." Do you agree with that?

LYNCH: Certainly, those criminal groups are a major target of ours both here and, as you noted, overseas. As you also noted, Senator, with the number of new heroin users every year, over 160,000, sadly over 80 percent of those are prior prescription drugs abusers. And so we also continue our efforts both from an enforcement perspective and a prevention perspective in the prior prescription drug abuse issue as well.

SESSIONS: All right, I appreciate that. But are you aware of the fact that the, your own executive office, United States Attorneys that operates under your direction at the end of 2015 found that the six-month average of drug prosecutions by the U.S. Department of Justice was down 21 percent compared to five years ago? Are you aware that excluding prosecutions in federal magistrate courts, the six- month average was nearly 32 percent lower at the end of 2015 than five years ago?

LYNCH: Yes, and the number does not surprise because, as I said, we have moved through a process of focusing less on the low-level individual offenders toward targeting the trafficker networks that you have noted are really the appropriate focus of ours. And we will have, we will have (inaudible) involved more (inaudible).

SESSIONS: Well, well, ma'am, let me say to you that I've heard that argument that we're always focusing on higher people that's why the numbers are down for over 25 years. I do not believe that.

Attorney General Holder has abandoned the equitable sharing of drug proceeds with local law enforcement which is degenerating the cooperation needed to attack these gangs. We're proposing more reductions in sentences after Senator Durbin and I agreed on a reduction plan that passed and did reduced cocaine crack penalties significantly and now we have to have more.

Present population is declining at a rapid rate. It was 5,000 down last year. The budget for the prisons is being reduced as a result of a substantial decline in population. And at the same time, the drug use is surging and death are occurring. And on my opinion, it's going to get worse.

Mr. Chairman, thank you for your leadership and I've enjoyed working with you.

GRASSLEY: To me, like we'd have Coons and then Lindsey Graham or Senator Graham and then Blumenthal and Franken. Let me ask, at noon we're supposed to have a vote. I'd like to go over there right now or soon and vote and come back here because I'd like to have seven more minutes with the attorney general.

UNKNOWN: Would you like me to chair?

GRASSLEY: Would you please?

UNKNOWN: Yes, sir.

AR-00286

Full committee hearing on oversight of the Justice Department. (SD/24)

GRASSLEY: I think you'll be the, you'll be the last one to turn the lights out. So that's the way we'll plan it then. Is that OK with you?

So Senator Coons now.

COONS: Thank you, Chairman Grassley. And, Chairman Grassley, I was encouraged at the beginning of the hearing at your comment that you believe our bipartisan sentencing reform bill may soon be able to move forward and I'm pleased also that the Comprehensive Addiction Recovery Act which is a bipartisan effort to confront the real challenge that heroin and opioid addiction presents to America has also moved forward. It is possible for this committee to make bipartisan progress, although where it is possible.

And I was also, Madam Attorney General, encouraged by your comments in response to the question from Senator Hatch about the Defend Trade Secrets Act which we hope will move forward soon.

Let me start by thanking you, Madam Attorney General, and all the men and women in federal law enforcement for what you do, to tackle very difficult issues facing our country from drug addiction and counterterrorism to healing the relationship between law enforcement in the community that they serve. And let me start with a couple of critical issues that relate to support for state and local law enforcement.

As you know, gun violence has been a significant for my hometown of Wilmington, Delaware. And the department's violence reduction network has had tremendous positive impacts so far. The program's now in its second round of city partnerships and I'm hopeful that the department intends to both continue to support it and extend it and that there is some likelihood that the annual conference will be held in Wilmington. I'd be interested in hearing what sort of improvements you see being implemented in the violence reduction network this year and how you see the program's future.

LYNCH: Well, thank you, Senator, for that. And I thank you and on behalf of the men and women of the Department of Justice, all the law enforcement agencies as well as the staff who work to support them and the lawyers who implement their cases, I thank you for your comments about their service and I greatly appreciate your recognition of them. I'm proud to represent them every day.

The violence reduction network is an important tool and we have found it to be one of the ways in which we have been able to bring focused law enforcement resources really at a very cost-effective way to jurisdictions that have been struggling with historically high crime rates.

And Wilmington, Delaware has been one of our success stories. We have asked for more money in the budget for it for F.Y. 2017. And, you know, $5 million is not a lot compared to other things that we ask for, but certainly the benefits will be great. We currently already have at least 10, I think 10 or 12 cities and we're planning on bringing 5 more cities onboard.

Now, are you know from your experience, to be a VRN city requires a certain level of crime that we don't want every city to aspire to. But the lessons from the VRN we feel could be very useful to other jurisdictions. So one of the things that we're going to be doing this summer, in the summer of 2016 is to convene some about 20 non-VRN cities, those that are not in the network but have similar issues to a conference with OJP to share the ideas and the best practices that we have been able to glean from working with cities like Wilmington, Little Rock, Flint, and the others in the VRN.

So not only do we find it to be a program that we hope has been helpful at the local level, we feel that as with so many efforts that are frankly anchored by our state and local partners, it will be a program that will provide leadership and guidance for other jurisdictions that are struggling with the same issues.

COONS: Thank you, Madam Attorney General. I intend to continue to support the VRN and the appropriations process as well.

Let me turn briefly to two other programs that I think have shown some real positive impact for Delaware and I think can and should more fully supported federally, one is the Justice reinvestment initiative. Delaware participated in it early. Our general assembly made a number of changes to our criminal justice system and have seen some real positive impacts as a result. I'd be interesting in hearing how you see the future of the Justice Reinvestment initiative.

Full committee hearing on oversight of the Justice Department. (SD/24)

And I'd also mention the victims of Child Abuse Act, something Senator Sessions and I worked to get reauthorized. I was somewhat disappointed the president's budget request was half of what we had hoped for and the Bulletproof Vest Partnership Act which provides appropriate bulletproof vests for local law enforcement around the country.

I think all three of these are programs that provide real meaningful assistance to local law enforcement and that help strengthen the Criminal Justice Reform Movement in the case of the Justice Reinvestment initiative. Could you just briefly comment on how these programs fit into your overall objective to improve law enforcement in the country?

LYNCH: Well, thank you, Senator, for the chance to talk about them. And I thank you for raising these three programs together because what they really highlight is that Criminal Justice Reform will, of course, have an anchor that comes from this committee and this body in the form of statutory changes. But it really also is going to be managed by how we interact and support our state and local partners, for example, the bulletproof vest initiative as we support officer safety, officer health and those important issues and also as we, that's how we deal with the victims of child abuse.

The Justice Reinvestment Act is something that's also extremely important to us because those funds are used to support changes both in local laws but also in the probation system. We have states that have been able to literally close prisons, that have seen significant drops in crime.

So criminal justice reform for us is really a long-range view of the entire system. And these programs in particular focus on three specific elements of it, but they show how everything comes together as it were, in a way to sort of support a holistic review of the, of the criminal justice system. And that by supporting victims, by supporting local jurisdictions in their efforts and by supporting local law enforcement, we will all have safer communities. COONS: We have a lot of work to do together in improving public safety and in healing some of the rift between communities and law enforcement. I'm grateful for your leadership in that.

Let me ask the last question, if I might. In the Shelby County decision, the Supreme Court significantly weakened, and some would even say gutted, but I'll say significantly weakened at least the Voting Rights Act. And on a bipartisan basis, 42 of us are trying to advance the Voting Rights Advancement Act. Senator Murkowski is a co- sponsor as well as Senator Leahy and a number of others of us. What difference do you think having this committee take up the Voting Rights Advancement Act might make in terms of voting rights enforcement?

LYNCH: Well, Senator, thank you for your question and thank you for your leadership in this area. And I thank this committee as it, as it takes up this important matter also. Certainly, consideration of this act and the department had been working with the group on this is happy to continue we think would restore, help restore an important part of the department's arsenal in protecting the voting rights of all Americans.

It's vital to us that we look at this from a way in which we protect everyone's rights to vote. The citizens on the street, our service members, our elderly, people who have trouble getting to the polls, all of those individuals are of concern to us. And certainly we thank you for your efforts in looking for a way to provide legislative support to those efforts and look forward to working with you and this committee as it considers the matter.

COONS: Well, the right to vote has been described as the most foundational right to democracy, a nearly sacred right. And I hope that we can find a way to make progress on ensuring that all Americans have access to the ballot and the right to vote.

Thank you for your service and your leadership as Attorney General.

LYNCH: Thank you, Senator.

GRAHAM: Madam Attorney General, welcome to the committee.

LYNCH: Good morning.

GRAHAM: Thank you for the job you do for our country. Have you ever discussed the Clinton e-mail investigation with President Obama or anyone at the White House?

LYNCH: No, sir, I have not.

Full committee hearing on oversight of the Justice Department. (SD/24)

GRAHAM: Do you anticipate that happening?

LYNCH: No, sir, I do not.

GRAHAM: So when Josh Earnest speaks about the investigation and talks about basically to reassure the American people that this is no big deal, do you know where he gets that information from?

LYNCH: Senator, no, I do not, but I can assure you...

GRAHAM: Would you tell him he should probably just stay silent?

LYNCH: But, certainly, it's my hope that when it comes to ongoing investigations that we all would stay silent. And I can assure you that neither I nor anyone from the department has briefed to Mr. Earnest or anyone at the White House about this matter or other law enforcement matters.

GRAHAM: He's just operating sort of on his own I take it.

LYNCH: I'm simply not aware of the source of his information.

GRAHAM: Thank you very much. Have you seen more threats to the homeland more than today in the past? Do you agree with me there are more threats to our homeland today than there've been at any time in recent memory?

LYNCH: Certainly, I think those threats have increased, yes, sir.

GRAHAM: OK. Sequestration. If we go back to the sequestration path next year, what damage will it do to your ability to protect this nation in your lane?

LYNCH: Sir, sequestration would cost significant harm to the department's ability to protect the American people in areas of national security as well as our other law enforcement functions.

GRAHAM: You'll have less FBI agents dealing with counterterrorism. Is that correct?

LYNCH: We would.

GRAHAM: You'll have less capability to deal with the growing cyber threats?

LYNCH: That is correct.

GRAHAM: OK. Thank you. When it comes to the problem with Apple and San Bernardino, are you, would you support legislation requiring Apple and other technology companies to create technological backdoors made available to the government in terrorism cases? Would you support legislation to do that?

LYNCH: Certainly, we would review whatever was proposed and work with this committee or others to talk about the issues and to make sure that whatever was crafted would cover the range of issues that arise. The reason why we have focused on litigation in a case by case basis is because as we've noted, every platform is different, every issue is different. And we have been trying to deal with the situation with our discussions with the tech companies.

GRAHAM: Would you be willing to draft legislation, provide to the committee your ideas of what legislation should look like to accomplish the goals you...?

LYNCH: You know, Senator, I don't think the department's at a point at this point where we are drafting legislation here. But as I indicated, again, we're happy to work with you and others on the committee as you consider proposals.

GRAHAM: OK. If China went to Apple in China and said we want a backdoor key to all iPhones in China, would, what would your response be?

LYNCH: Well, certainly I think the company would have a strong response there. We're...

AR-00289

Full committee hearing on oversight of the Justice Department. (SD/24)

GRAHAM: Would you support Apple's request to say no to China?

LYNCH: Well, we are not asking for backdoor here so I certainly do not see us supporting backdoors elsewhere.

GRAHAM: That's what I'm confused about. It seems to be that the judicial decision basically is requiring Apple to create technological devices or to create a system that would be able to get into the phones, their own phones. That's not true?

LYNCH: Well, what we're asking Apple to do is to, is to essentially effectuate a system that would remove the password blocker. The password blocker destroys information.

GRAHAM: That's not to unlock the phone?

LYNCH: No. We would have to find our own way into the phone. Essentially, the password blocker destroys the information on the device if you get, guess the password incorrectly 10 times. We would like the opportunity for us to try and do that.

GRAHAM: Would you support, would you support the Chinese government's request to do the same thing?

LYNCH: Yes, I don't think that I'd be opining on the Chinese government's request.

GRAHAM: The point I'm making is if we ask our own, if we ask companies here, are we setting a precedent for Russia, China and other countries.

LYNCH: Senator, I think that one of the issues raised by their question, and I thank you for raising it, is that it creates really a false equivalency with our legal systems with other countries, with our moral systems, with the way in which we do business with other countries.

GRAHAM: Well, we're the good guys and they're the bad guys.

LYNCH: Well, we have a system of laws that have worked for a number of years.

GRAHAM: Oh, I agree we're the good guys. LYNCH: Within, with corporate America to allow them to provide information to us from a variety of ways, systems and devices and protect privacy at the same time that have not led to the parade of horribles that's often described whenever those particular changes are made.

GRAHAM: One of the arguments Apple makes if is other, there are other companies that create encryption, so from a terrorist point of view you're not limited to Apple iPhones to communicate, are you?

LYNCH: I think the terrorists use any device they can to...

GRAHAM: So this encryption issue, if you required Apple to unlock that phone, that doesn't deny a terrorist the ability to communicate privately, does it? There are other ways they can do this?

LYNCH: We've certainly seen terrorists using a variety of encrypted platforms for communication.

GRAHAM: The point of the committee is fixing, you know, getting the information of this particular phone doesn't prevent terrorists from using encrypted devices because they exist beyond Apple.

In terms of Apple's point of view, do you think their argument that if you require us to do this that other, it will hurt their market share, it would put them at a disadvantage to other companies that produce products outside the United States?

LYNCH: You know, I haven't seen Apple's marketing analysis for that so I'm not sure, I'm not able to quantify that.

GRAHAM: Does it make sense, I mean some company in Switzerland said, hey, you can buy our phone, we're not going to ever, you don't have to worry about the American government or any other government being able to break the encryption.

LYNCH: Again, I think it would depend upon how people view that and how they rated it as an important feature and how it compared to Apple's devices.

GRAHAM: So we're balancing the information we're trying to get in this individual case. Against the precedent we may be setting that other countries to follow. And we also have to balance the idea that the terrorist can use encryption outside of Apple. And we also have to balance the idea that we may be hurting American companies who are competing globally.

Are those sort of the four things that we're looking at?

LYNCH: Senator, I'm not going to cabin the issues at this time because I think that for us the issue is about a criminal investigation into a terrorist act and the need to obtain evidence.

GRAHAM: And -- but it's just not so simple. And I'll end with this. I thought it was that simple. I was all with you until I actually started getting briefed by people in the intel community and I will say I'm a person who's been moved by the arguments of the precedent we set and the damage we may be doing to our own national security.

So, I have definitely moved to any member of the committee who feels very passionate about this. Introduce some legislation requiring the Apple -- the technology companies to do what you want the judges to do. I'd like to look at it and it's just not enough to complain. If you think these companies should be required to do this, let's sit down, see if you can introduce legislation. I doubt if many people will do that.

Thank you for your fine work on behalf of our country.

LYNCH: Thank you, sir.

CHAIRMAN: Senator Blumenthal?

BLUMENTHAL: Thanks, Mr. Chairman.

Thank you, Madam Attorney General, for the excellent work you've been doing, and your dedicated and energetic work on behalf of law enforcement over many years. I want to ask about the Freedom of Access to Clinic Entrances Act, the so called FACE Act which I was involved in enforcing when I was attorney general of the state of Connecticut.

As you know, it was passed 1994 after a particularly troubling time in our nation's history involving threats and attacks on clinics. It continues to serve a vital role in our nation. Recently, the decades long attack on the exercise of reproductive rights has taken the form of a series of highly edited, deceptive, and extremely inflammatory set of videos targeting Planned Parenthood.

But I wonder if you could tell me whether the FBI has noticed an increase in the number of violent incidents targeting abortion providers since the release of those videos beginning in July of 2015?

LYNCH: So, Senator, you certainly raise important issues and it is an important enforcement area for the department, the FBI, and our civil rights division, and our U.S. attorneys offices. I don't believe I have the statistics on the increase in number of FACE Act violations since those videos have surfaced.

I know certainly we are -- and in connection with the Colorado shooting, while the state investigation is proceeding, we still are reviewing that as a possible FACE Act violation, although that case is proceeding in state court as a murder case. But it is in active area of enforcement, but I don't think I have the information on the data since that particular time period.

BLUMENTHAL: I wonder if I could ask you to provide any data that is available, about the number of incidents and also prosecutions.

LYNCH: Certainly, certainly. BLUMENTHAL: And I wonder if you could also tell the committee whether the Department of Justice is taking any increased enforcement activity with respect to incidents of violence or threatened violence around the clinics.

LYNCH: Well, certainly, I know that with respect to -- and again, not limiting it to the time since the videos were introduced into the public domain, but for the past, I would say five to six years, the number of cases that we have charged under the

FACE statue has increased. I think we've charged a total of 12 cases criminally and nine cases civilly. But again, that's over the entire course of this administration, not limited to just that time period.

So, we have seen that uptick certainly over the last five or six years and we are taking those cases very seriously and pursuing them both criminally and civilly.

BLUMENTHAL: Thank you. The Department of Justice has been very responsive to a number of requests that I've made and I thank you for the responsiveness that it's shown, for example, on the General Motors investigation for deliberate concealment of the ignition switch defect where there has been a prosecution and result.

The Takata airbags where I understand there is an ongoing investigation into deliberate concealment of test results suggesting danger from those airbags; the Trinity guardrail investigation for defective end terminals and faulty testing; Volkswagen for the use of a device to evade emissions testing; recent indications of potential collusion by airlines on so-called capacity discipline; and a number of others.

I hope that you would agree that the public interest is well served by prompt conclusion of these investigations and also that where there are prosecutions potentially against individual corporate officers, there is a profoundly important deterrent effect as the Deputy Attorney General Sally Yates indicated in a memo September 9th of last year, prosecutions against individual corporate officers where there's evidence and where there's proof beyond reasonable doubt will encourage compliance with the law by corporations and those individuals and that will be to the good of not only the public in general, but also the corporations, shareholders, and its employees.

LYNCH: Yes, we certainly do, and we certainly feel that the new individual accountability policy which essentially puts the onus on those corporations wanting to cooperate to also provide information of individual wrongdoing and also requires in a more systematic manner that we make sure that we are considering those issues in every corporate case.

We think that's a very important part in exactly the issues that you raised for corporate accountability as well as public knowledge.

BLUMENTHAL: I have also asked for an investigation of Eversource in connection with potential misuse of H-1B visas and I hope that perhaps you could respond to that request if it is possible to do so.

LYNCH: Certainly, sir.

BLUMENTHAL: I want to ask finally about the so-called Charleston loophole. I know you're familiar with the situation that enabled Dylan Roof to buy the firearm that he used to massacre innocent people in the Charleston church. The Charleston loophole in effect enabled him to get a gun after the expiration of the 72 hours without the completion of the background check. And I wonder if even as we work toward a legislative fix which I have proposed whether the Department has been able to take steps that may enable prompt or completion of background checks.

LYNCH: Yes. And thank you for the opportunity to comment on our work in this area. As I recommended to the President and discussed in prior testimony, one of the things the Department is working on is improving the systems within our background system, the NICS system so to speak. It's currently located in West Virginia and staffed by dedicated employees, all of whom, including all of us were heartbroken at the issues that led to Mr. Roof being able to obtain that firearm.

And currently, the current law is that if the background check is not concluded within that three-day period, the licensed firearm dealer is free to go ahead and conclude the transaction. Now, many do not. Many actually do wait if they haven't gotten a definitive answer, but those -- but they are lawfully allowed to go ahead and sell the firearms and many do. In this case, that is what happened.

The person did submit the information and because of issues of geography and the relevant counties, and the confusion caused therein, the information did not receive the examiner in time to stop that purchase. So, we are undertaking a review of the computer systems of the NICS facility. We are also undertaking to higher, almost double more those individuals -- doubling the number, I should say, of examiners so that we can comply within that three-day period.

Full committee hearing on oversight of the Justice Department. (SD/24)

To extend that period would require Congressional action, of course. Should Congress consider that, we would of course work with you to draft the appropriate legislation and provide our input there. But we are looking to operate as efficiently as possible within the existing laws that we have. That's our framework.

And so, our goal is to essentially strengthen and improve the next system so that it can be fully responsive within the allotted time.

BLUMENTHAL: Thank you. Finally, on the topic of gun violence, as you may know, I've introduced legislation that would in effect repeal the so-called Protection of Lawful Commerce in Arms Act, also known as PLCAA.

The Department of Justice has repeatedly defended the law against challenges to its constitutionality. As you well know, the Department of Justice also has a history of declining to defend laws that it believes are unconstitutional, most recently with the defense of Marijac (ph). And I believe that compelling argument have been made against PLCAA's constitutionality on due process, taking cause grounds, as well as the 10th Amendment and the principle of separation of powers.

I wonder if you would consider and look carefully at the possibility of in effect, declining to defend the constitutionality of PLCAA.

LYNCH: Well, Senator, I haven't been involved in the review of PLCAA on those grounds. And so, I'm not aware of the legal review that we've done to date on it. We may in fact have opinions that have done that review so far. Certainly, if there's more information that you'd like to provide, certainly, more analysis, we will always consider that. But at this point, I don't know the announce that we've done to date on that.

BLUMENTHAL: Thank you and thank you for your service, General.

LYNCH: Thank you, sir.

(UNKNOWN): Mr. Chairman, my team and staff told me to go vote. So, I'll do that. I know you have -- you wanted to ask some more questions.

GRASSLEY: Will you come back afterwards then?

(UNKNOWN): If I run, yes, if you let me go now. Will you let me go now? Thank you.

GRASSLEY: I think it was Senator Cornyn (ph) brought up, but in a little different weight, about Secretary Clinton's e-mail arrangements. Can I say something?

I've often been accused of asking about Secretary Clinton's e- mail since she's running for President, but to make the record clear, in June of 2013, I started asking questions about this as it related to one of her councilors, Aberdeen (ph) and e-mail and conflict of interests and stuff like that. That's where this all started a long time before she was running for President.

So, recently, a senior unnamed law enforcement official told the Washington Post about and immunity agreement with the State Department staffer who maintained her e-mail server. Yet, you, attorney general, have not answered this committee's question about the nature and status of that investigation.

Does the immunity agreement contain a provision requiring that staffer to cooperate with all government inquiries, including committees as I have requested, and if not, why not? Would you provide a copy of that agreement to the committee?

LYNCH: Well, Senator, and again, I thank you for your recent letter on this -- also on this topic. And we are providing a response to your letter in writing. And so, I don't want to get ahead of that as we review the issues that you've raised there. I believe you had asked for a copy of that document.

We typically do not provide copies of documents as part of ongoing investigations, but we are preparing a response to your letter on those issues. Similarly, we don't go into the details of the agreements that we have with any witness in any matter in ongoing investigations.

Full committee hearing on oversight of the Justice Department. (SD/24)

And, Senator, I know as you mentioned, you had raised this issue in the context of reviewing another matter several years ago and you're following through now. And what I will say is that my response to this is the same as my response to other questions about ongoing matters whether now or whether I was U.S. attorney or whether I was a line assistant.

And the consistency with which the Department handles the ongoing matters whether they involve someone with a famous last name or not is something that we take very seriously. And so, our desire not to discuss this matter in open hearings or in the press is not out of a desire to evade your questions or certainly this committee's oversight responsibilities, but it is how we handle ongoing matters. And I certainly hope that it's taken in that way and we treat them the same and that is how the public has confidence in the investigations that we conduct.

GRASSLEY: If that latter comment is about something I said in my opening statement, I said it was the appearance and no accusation.

LYNCH: Certainly.

GRASSLEY: OK. Now, what you just told me about immunity, I'm telling you just what common sense tells me that if there's immunity in certain instances, the only simple question we're asking is does that immunity carry over to Congressional committees because we ask for that immunity. The counsel for Meg Llano (ph) denied it and it seems to me a pretty simple question.

If it covers him for Justice Department matters, why wouldn't it cover him so he could testify before Congress? Now, you don't have to talk to that now, but I hope the letter will address that.

Let me go to FBI whistleblowers. The committee has put a bill on the agenda for tomorrow and this is something that Ranking Member Leahy and I really agree on to provide better protection for FBI whistleblowers.

I'd hoped that we would be able to move forward to the bill earlier. It is truly bipartisan legislation that we need to take up. One problem the bill tackles is protection for FBI employees who report wrongdoing within their chain of command. Director Colmy said in December that he supports those protections. Do you support legal protections for FBI employees who report wrongdoings to their supervisor?

LYNCH: Well, thank you, sir. I think certainly I do support the protection of whistleblowers in general. The situation that you raised I think is also one that we -- all of us in law enforcement have an obligation to support and protect as well.

You're referring to the issues of the incidents of people who report through the chain of command. And I understand that our staffs have been talking about the bill. We appreciate the opportunity to provide comments on it and what I will say is that as we work through this issue, please know that again any concerns that the department raises are not out of a disagreement with the point of view of the protection of whistleblowers, but again just making sure that the FBI's intelligence gathering functions are also protected at the same time.

And we have as I said, appreciate the opportunity to work with your staff on these issues. It's particularly important to all of us in law enforcement because whistleblowers do bring us important information and we often are going to individual citizens and asking them to bring us information. We're going to people who are witnesses outside of government. And so, we try and protect them as well and it's important that we also have strong protections for whistleblowers who are inside government.

GRASSLEY: Yeah. You used one word that's central to my next issue. Why would there be any reason for not providing these protections to FBI including people involved in the intelligence of the FBI, given that every other branch employee even including in the intelligence community has that protection? In other words, what's special about -- something about the FBI as much as we respect the FBI?

LYNCH: Well, I thank you for your statements of respect for the FBI and I appreciate that on their behalf. And certainly, I think that the dialogue that we were having as I indicated hopefully highlights that we certainly support the objective of protecting whistleblowers in every federal agency including the FBI and we certainly support protecting those who report within their chain of command, and as you, yourself, noted within the intelligence community.

Full committee hearing on oversight of the Justice Department. (SD/24)

And our hope is to make sure that we retain the consistencies of treatment on the intelligence community side for those issues also. And I thank you and your staff for working with us on those points.

GRASSLEY: And I thank you for working with us. And let me bring up one of those issues that was brought up in these conversations. One of the issues that your department has raised is that allowing FBI employees to report wrongdoing to their chain of command could lead to too many complaints. You know, what's wrong with too many complaints?

I mean, you got a department of -- I don't know. You got 100,000 or 50,000 employees in it, but you're the attorney general. You can't know what's going on all over. It seems to me you would invite every wrongdoing to be reported to somebody so it could get corrected because you can't know about it.

But, anyway -- but it should be seen as a good thing for FBI employees to report wrongdoing. The judiciary committee held a hearing last March where we looked at the Government Accountability Office report. That report found that in a five-year period, only three whistleblowers won their cases and those cases took between eight years and more than 10 years. Certainly, something is wrong with that process. Last year, the deputy attorney general's office told the Government Accountability Office that it would give whistleblowers updates on their case status but then they told me in a letter that they were just too busy to do that. I'll submit that letter for the record. It does not seem to me like the department has made improving FBI whistleblower protections a priority.

Almost two years ago the department promised it would issue a new regulation. Two years later, we don't even have the proposed regulation. So, question number three, where are the changes at the justice department said it was going to make in April 2014. You weren't even attorney general then. So, I can't blame you. But that's where we are.

LYNCH: Well, certainly, sir, but regardless of when we certainly will endeavor to respond to you on that point. And as I said before, our concerns are always making sure that we protect whistleblowers and also protect the FBI's law enforcement efforts and -- and deal with the issues raised by there also being a member at the intelligence community.

And I think that our staffs are working well together looking at the specific language of the bill and I do thank you again for that opportunity.

GRASSLEY: Here is something I think that -- that you ought to be able to give to us. One of the improvements that Justice said it was making for FBI employees was better training rights and legal protection as whistleblowers. Now, you had a training session on this, there was some sort of a video at that training session and we discovered that that video really didn't say much about how whistleblowers are encouraged or protected and reporting up the chain of command or stuff like that. I'm not sure I remembered exactly.

I requested a copy of that training almost a month ago and I have not received it. So I would like to have you get me a copy of a video, a simple thing, a video. Are you able to supply that? I assume that -- yeah, OK, so not to harass you, but I -- but he's going to come back to ask you questions and then I'll be done.

Recently Deputy Attorney General Sally Yates issued a memo that the department will now focus on prosecuting individuals and not just wringing financing statements from corporations. As a said at that time, the department settlement with HSBC was a missed opportunity to bring criminal charges in an enormous money laundering case and this administration failed to prosecute any Wall Street bankers or criminal executives responsible for our financial meltdown.

So the goal of the Yates memo is a good one. So this is something you and I agree on, but President Obama's former Deputy Attorney General James Cole has said that the Yates is "impractical," not based in reality and will lead to very few actual cases against individuals. Is former Attorney General Holder's Deputy correct that this new policy isn't based on reality and how are you going to ensure that individuals are actually prosecuted? LYNCH: Well, thank you sir. I think that the memo does reflect review within the Department of Justice that individuals have to be held accountable for their actions particularly in the white collar area. I'm not aware of the context for former Deputy A.G. Cole's comments and so I don't know what was said about that. But what I can tell you is that this memo and this policy were the result of thought and a desire to -- to encapsulate into a specific and clear policy guidance, the view that many of us in the department have and have had for some time that we always have to look at individual accountability.

AR-00295

In particular, as we do white collar cases and interact with corporate council, with the white collar bar, making sure that they also were aware that this was a focus of ours. And as you may recall, one facet of the policy that I think is very important is that when we cooperate in corporations, that is to say when corporations cooperate with the government, provide us information about wrongdoing within their ranks or that their company has carried out, we will, of course, provide credit for that should it be reliable and of course accurate, but they will not receive any credit if they do not also provide information about individuals who are involved in wrongdoing.

So it is to both incentivize them to give -- put them on notice, that our investigation will be looking at them also. And of course our investigative officers will have their focus on those individuals as well. So that is something that we think will in fact generate results as we interact with -- with corporations who do want to work with the government.

Where we don't have cooperation, we still will continue our focus on individuals and that memo clearly put together in one clear concise policy statement a directive to all the litigating components as well, lawyers at main, justice and in the field, that when we are working on cases involving into corporations that we have to make sure that we completely consider all of the relevant individuals.

And certainly, this is something that many offices have been doing for some time. If you look at the records of individuals who have been prosecuted, I would note that under our Financial Fraud Enforcement Taskforce over 500 individuals have been prosecuted for financial crimes relating to the housing market, the financial markets and the like. But we wanted to make sure that it was clear, it was consistent, it was in one place and that we were focusing on not just the entity but the individuals.

So again, I'm not sure the basis for former Dep. Cole's comments and I can't comment on them not knowing their context, we believe very strongly in this policy. We believe that it will provide results in our investigations and in our cases. And we think it's an important step and a necessary step at making sure that not only are individuals with whom we interact on notice about what we expect from them, but that publicly people are aware of how we conduct our investigations.

GRASSLEY: Thank you very much. Senator from Minnesota.

FRANKEN: Thank you, Mr. Chairman. First of all, Attorney General Lynch, thank you for -- for waiting for me or I guess I thank the Chairman too, but for your -- your service basically and it's good to see you again.

LYNCH: Thank you, sir.

FRANKEN: I think it's -- there aren't a lot of colleagues here for me to say this to, but I think it's good that we're here doing our job and I think we maybe say that we should continue doing our job when it comes to the -- when the President puts forth a nominee for the Supreme Court and examine the nominee's qualifications and experience.

Attorney General Lynch as I think you're probably aware, I have been a vocal opponent of further consolidation in certain industries particularly in the cable and broadband market. And I appreciate the tough stance that DOJ took on Comcast's proposed acquisition of Time Warner Cable. Now, I know that you cannot discuss the specifics of any deals that are currently being reviewed, but I have a few questions about the way that DOJ analyzes mergers and acquisitions and -- and how DOJ enforce these conditions on when conditions have been -- when mergers have been approved with conditions.

As we saw a file in Comcast acquisition of NBC Universal positions that are placed on deals that are proof can be difficult to endorse and they're not always terribly reliable and also sometimes those conditions expire. In general how can the Department of Justice ensure that merger conditions actually have enough teeth to protect consumers in the long run?

LYNCH: Well, thank you. This is an important area of focus for the Department of Justice. I think sometimes people think of any trust as sort of a dry arcane area of law. I have always found it to be one of the most vital areas of laws because it deals directly with consumer protection issues, the devices and products that people use every day in their lives and have around them in their homes and business and we seek to make sure that they're protected in their dealings as they make purchases and make those decisions with hard- earned dollars.

When it comes to the enforcement of conditions in our merger agreements, the agreements may provide for certain types of conditions, certain types of reporting for example and we will conduct periodic reviews. But certainly if their -- if their

Case 3:18-cv-06674-WHO Document 3692 Filed 06/25/18 Page 298 of 368
Case 1:18-cv-04674-WHO Document 369-2 Filed 06/25/18 Page 297 of 368

Full committee hearing on oversight of the Justice Department. (SD/24)

situations or circumstances where individual -- corporations I should say are not meeting those conditions we would not hesitate to take the appropriate steps and take action there.

And either, depending upon how far along the transaction was, take action or consult with the appropriate company and the appropriate board. When it comes to more specifics, certainly I'm happy to have the staff from any trusted division provide a briefing to you on specifics that we have done in those situations if that would be helpful.

FRANKEN: Well, in some of the cases, I want to talk about this telecom when this Comcast (inaudible) DOJ that has the responsibility of enforcing conditions. And it seems like somewhere they fall into the cracks. And I was wondering how...

LYNCH: That there might be some -- that there might be that middle place that neither entity is really reviewing as closely as they should in that perspective?

FRANKEN: Well, there are a number of (inaudible), it seems like FCC doesn't have the resources to -- to enforce conditions.

LYNCH: We are not able to comment on the FCC's abilities or resources. I haven't had those discussions with them. But as I said, I'm certainly happy to set up a briefing for you (inaudible).

FRANKEN: OK. Well, this is something that the FCC and DOJ kind of work together on whether to allow merger to go on. Very often specific conditions are put on and then we -- as we saw, their conditions aren't followed. So yes. Let me ask about something Amy brought up, Amy Klobuchar's (inaudible) from Minnesota, which is about combating terrorist recruitment in Minnesota and about the -- the program that was put in place where we were one of the three cities for combating -- it's called Combating Violent Extremism. We prefer to call it Strengthening Community Resilience.

And in Minnesota, we have a large Somali population as you know and at first there were some young people who were recruited to Somalia to fight with Shabaab which is an Al Qaeda affiliate, and that kind of stopped, that happened when Ethiopia had come into -- come into Somalia. But now we're seeing -- we've seen -- and it's not all that many, but it's enough to cause a real alarm and it's very alarming within the community obviously to use -- lose sons and as you mentioned some daughters who are -- are going to Syria or Iraq to fight with -- with ISIS.

And Senator Klobuchar brought up the funding. I just want to bring up the approach which is -- and this is -- this is not an easy needle to thread because we don't want the communities to feel that this is simply some kind of just surveillance of trying to find out who is. On the other hand you want -- and you really want to gain the trust of the community. What have you -- is this something that you've looked at a lot, that you've discussed with, say, Andy Luger in -- in Minnesota?

And what can we do to make those communities feel like we're partnering with them and in a good way and not simply using this as a way of monitoring possible -- for possible terrorists, but actually building resilience within the community?

LYNCH: Well, Senator I think you've put your finger on -- on the main issue that really hampers a lot of our -- our CVE efforts, which is that as they have been constructed in the past, they certainly have been taken more as surveillance efforts than this effort to help the community regardless of our intent.

And I think, frankly one of the best things that the twin -- that the twin cities pilot project program did was change the name, as you mentioned from countering violent extremism to strengthening communities. That was one of the number one feedbacks that I have received both as A.G. and as a former U.S. attorney in my interaction with the Muslim community about the nature of the approach, that the initial description cast the program, at least in their eyes, as one more of surveillance in which Muslims were targeted for whatever reason even if it was a positive. And that targeting essentially increased the distrust between them and the government.

So how we approach every -- every distinct community in America is one that I think we have to be -- to think about and seek guidance from, from communities themselves. And I think that the twin cities have done a very, very good job of that.

The other thing that I think and that can be imported to other communities, the other thing that has been happening in the twin cities for a long time now that we are trying to import to other cities is this direct, very, very personal interaction between Federal and local law enforcement and the distinct minority communities. The U.S. Attorney's Office there, Andy Luger, and

Full committee hearing on oversight of the Justice Department. (SD/24)

his predecessor U.S. attorney, have made great personal connections within the Somali community. And without that personal connection and trust, it is very easy to misinterpret our actions and our concerns.

Also, I think we do have to sort of get out of government sometime and realize that the government isn't always the best voice for conveying the appropriate message. As I mentioned earlier, we're working with Madison Avenue as well as Silicon Valley in trying to come up with effective programs to counter violent extremism. So those are the ways...

FRANKEN: And how are you using Silicon Valley?

LYNCH: Well, you know, Silicon Valley is also very concerned. As we've discussed, it's not their goal to be a platform for terrorism and they are concerned that they are being used as recruitment tools and as repositories for material that is being absorbed by this vulnerable disaffected young people of varying backgrounds who are then taking it to a deadly extreme. And so they are trying to figure out can they, on their own, come up with programming that will counter what is coming across the air waves and the computer waves. Can they in fact use their terms of service as we've mentioned to take down some content that's there.

But knowing that all of the content is not going to go away and that it will be replaced also, what can they do to generate content that is supportive and different and -- and...

FRANKEN: Well, again, I think it has a lot to do with interacting with the community. I mean you say that changing the name has been helpful, that could have been done on the front side of that by saying, how do you like this name, you know.

LYNCH: Yeah.

FRANKEN: I mean that was -- it seemed like a pretty logical and easy thing to do. If you're talking about what kind of content, is that where you're going to?

LYNCH: Yes.

FRANKEN: Silicon Valley needs to be talking to the community because -- and I'm sure that's what you're doing, but that if we're going to counter the propaganda that they are offering, I think there has to be a real cultural understanding and sensitivity. But more than anything -- I know I'm over my time, but I think that to tell you the truth, I'm closer to this obviously than -- than you are, the feeling I get is that there's been a frustration in the lack of resources that have been -- that were -- the feeling was there are more promised than delivered and that I think they would rather see a good -- a soccer field, frankly or a, you know, some place to have fun.

LYNCH: An after school venue.

FRANKEN: Yes.

LYNCH: Yes.

FRANKEN: I think that's what we're talking about. And that has very well to do with ISIS propaganda. It has more to do with saying the people of the United States, people in Minnesota or Minnesota Senators are fighting for us and we have some challenges and if our young people had better things to do, that that might be helpful. And that there was a kind of promise of money and resources and instead of, you know, necessarily doing surveillance on this, if you show that you care about our kids and their well-being, that would be -- that would go a really long way to winning over the community.

So there, thank you, Mr. Chairman.

LYNCH: Thank you, sir. I agree with you.

GRASSLEY: Thank you, Attorney General Lynch, the record will stay open for one week and you've been a good witness. Thank you very much. And any correspondents we have is an answer that I'd appreciate, answer as quickly as you can get them to us. Thank you very much. The meeting is adjourned.

Full committee hearing on oversight of the Justice Department. (SD/24)

LYNCH: Thank you, Mr. Chairman.

END

## Classification

**Language:** ENGLISH

**Publication-Type:** Transcript

**Subject:** LEGISLATIVE BODIES (90%); JUSTICE DEPARTMENTS (89%); ATTORNEYS GENERAL (89%); TYPES OF GOVERNMENT (89%); POLITICAL PARTIES (78%); RULE OF LAW (78%); US FEDERAL GOVERNMENT (78%); LAW ENFORCEMENT (78%); WITNESSES (78%); TESTIMONY (78%); POLITICAL ORGANIZATIONS (72%); CONSERVATISM (71%); INVESTIGATIONS (65%); TERRORISM (60%); FOREIGN LABOR (60%); AMNESTY (50%); CARTELS (50%); slug

**Organization:** US DEPARTMENT OF JUSTICE (84%)

**Industry:** BUDGETS (78%)

**Person:** LORETTA LYNCH (58%)

**Geographic:** UNITED STATES (94%); CUBA (88%)

**Load-Date:** March 11, 2016

---

**End of Document**

**SEN. DAVID VITTER—QUESTIONS FOR THE RECORD**

**Senate Judiciary Committee Hearing: Oversight of the U.S. Department of Justice**

**Hearing, March 9, 2016**

<u>Questions to Attorney General Loretta Lynch:</u>

1. Ms. Lynch, during your recent testimony before the Senate Judiciary Committee, I inquired about the policies put in place in New Orleans on February 28, 2016, that effectively make New Orleans a sanctuary city and provide safe haven to criminal illegal immigrants. With regard to the policy, press reports quoted the spokesperson for the New Orleans Police Department (NOPD), Tyler Gamble, as saying, "the updated policy establishes a clear set of guidelines for officers that focus on protecting public safety and building trust between the community and the NOPD. The Department of Justice, the federal consent decree monitor and the federal judge overseeing the consent decree have approved the revised policy."

    a. Can you please confirm whether the Department of Justice approved the policy implemented on February 28, 2016?

    b. If so, were you directly involved in the approval?

    c. If you were not involved, please confirm whether the new policy is in full compliance with all federal laws.

    d. Was anyone at the Department of Homeland Security consulted when approving the policy, since the new policy makes it more difficult for Immigration and Customs Enforcement (ICE) officers to carry out their responsibilities?

2. Under New Orleans' new policy, NOPD officers are prohibited from disclosing the immigration status of an individual except under certain conditions. Specifically, the policy states:

    > Members shall not disclose information regarding the citizenship or immigration status of any person unless:
    > a. Required to do so by federal or state law; or
    > b. Such disclosure has been authorized in writing by the person who is the subject of the request for information; or
    > c. The person is a minor or otherwise not legally competent, and disclosure is authorized in writing by the person's parent or guardian.

    Although federal law does not require local law enforcement officers to disclose an individual's immigration status, 8 U.S. Code § 1373 does prohibit having a policy in place that would "prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual."

In your opinion, is NOPD's new policy limiting officers' ability to disclose the immigration status of illegal immigrants to ICE in violation of federal law?

AR-00301



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

March 18, 2016

The Honorable John A. Culberson
Chairman
Subcommittee on Commerce, Justice,
    Science and Related Agencies
Committee on Appropriations
U.S. House of Representatives
Washington, DC 20515

Dear Mr. Chairman:

    This responds to your letter to the Attorney General, dated February 26, 2016, regarding recently announced Bureau of Prisons (BOP) procedures when federal inmates with Immigration and Customs Enforcement (ICE) detainers are released from BOP custody.   You also requested information about the review of certain specific Department of Justice (Department) awards with regard to compliance with applicable federal law.

    As referenced during the Attorney General's recent hearing before the House Subcommittee on Commerce, Justice, Science and Related Agencies, the Department plans to provide information to you and your staff with regard to the new BOP procedures and information related to the review of the Department's grants.   In furtherance of this commitment, we have recently been in contact with the Department's Inspector General (IG) to discuss the subject of sanctuary cities and the relationship to our grant/reimbursement programs.   We have shared your February 26th correspondence with the IG and plan to work with him as appropriate to enable his review of grantee compliance with 8 U.S.C. § 1373.

    In addition to providing information to the IG, and recognizing our current requirements that awardees assure and certify compliance with all applicable federal laws as part of their applications, the Office of Justice Programs (OJP) will emphasize to prospective applicants under the FY 2016 Byrne Justice Assistance Grant and State Criminal Alien Assistance Programs the importance and requirement of adherence to all applicable federal laws, which could include 8 U.S.C. § 1373.

    Finally, we have been in contact with BOP, and following the completion of the 3rd quarter, we will be in a position to provide you with an update on the implementation of the new BOP and ICE detainer procedures.

    We hope this information is helpful.   Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

AR-00302

The Honorable John A. Culberson
Page 2

Sincerely,

Peter J. Kadzik
Assistant Attorney General

cc:    The Honorable Michael M. Honda
       Ranking Member

AR-00303

| From: | Justice, BJA |
|---|---|
| Subject: | JAG Sanctuary Policy Guidance |
| Date: | Thursday, March 31, 2016 7:00:49 AM |

Attention JAG grantees:

Applicants for state and local Edward Byrne Memorial Justice Assistance (JAG) formula grants are required to certify compliance with all applicable Federal laws at the time of application. In that regard, Members of Congress have asked the Department of Justice to examine whether jurisdictions with "sanctuary policies" (i.e., policies that either prevent law enforcement from releasing persons without lawful immigration status into Federal custody for deportation, or that prevent state or local law enforcement from sharing certain information with Department of Homeland Security (DHS) officials), are in violation of 8 U.S.C. section 1373. For that reason, all applicants should understand that if OJP receives information that indicates that an applicant maybe in violation of 8 U.S.C. section 1373 (or any other applicable federal law) that applicant may be referred to the DOJ Office of Inspector General for investigation; if the applicant is found to be in violation of an applicable federal law by the OIG, the applicant may be subject to criminal and civil penalties, in addition to relevant OJP programmatic penalties, including suspension or termination of funds, inclusion on the high risk list, repayment of funds, or suspension and debarment.

Once released later this Spring, this language will also be found within the Fiscal Year 2016 State and Local JAG solicitations.

Thank you.

| From: | Trautman, Tracey |
|-------|------------------|
| To: | Trautman, Tracey |
| Subject: | Important notification about JAG guidance |
| Date: | Thursday, March 31, 2016 8:23:42 AM |

Good morning SAA partners:

In advance of the release of the FY16 JAG application guidance, I wanted to share some information with you.

Each year, applicants for state and local Edward Byrne Memorial Justice Assistance (JAG) formula grants are required to certify compliance with all applicable Federal laws at the time of application. In that regard, Members of Congress have asked the Department of Justice to examine whether jurisdictions with "sanctuary policies" (i.e., policies that either prevent law enforcement from releasing persons without lawful immigration status into Federal custody for deportation, or that prevent state or local law enforcement from sharing certain information with Department of Homeland Security (DHS) officials), are in violation of 8 U.S.C. section 1373. For that reason, all applicants should understand that if OJP receives information that indicates that an applicant maybe in violation of 8 U.S.C. section 1373 (or any other applicable federal law) that applicant may be referred to the DOJ Office of Inspector General for investigation; if the applicant is found to be in violation of an applicable federal law by the OIG, the applicant may be subject to criminal and civil penalties, in addition to relevant OJP programmatic penalties, including suspension or termination of funds, inclusion on the high risk list, repayment of funds, or suspension and debarment.

This language will also be found within the Fiscal Year 2016 State and Local JAG solicitations. Please let me know if you have any questions.

Thanks!

Tracey

Tracey Trautman
Deputy Director
Bureau of Justice Assistance
U.S. Department of Justice
(202) 305-1491 (desk)
(202) 353-5333 (cell)
Tracey.Trautman@usdoj.gov

AR-00305

OMB No. 1121-0329
Approval Expires 12/31/2018

**U.S. Department of Justice**
Office of Justice Programs
*Bureau of Justice Assistance*



The U.S. Department of Justice (DOJ), Office of Justice Programs (OJP) Bureau of Justice Assistance (BJA) is seeking applications for funding under the Edward Byrne Memorial Justice Assistance Grant (JAG) Program. This program furthers the Department's mission by assisting state, local, and tribal efforts to prevent or reduce crime and violence.

# Edward Byrne Memorial Justice Assistance Grant (JAG) Program
# Fiscal Year (FY) 2016 Local Solicitation
# Applications Due: June 30, 2016

## Eligibility

Eligible applicants are limited to units of local government appearing on the FY 2016 JAG Allocations List. To view this list, go to www.bja.gov/programs/jag/16jagallocations.html. For JAG Program purposes, a unit of local government is a town, township, village, parish, city, county, borough, or other general purpose political subdivision of a state; or, it may also be a federally recognized Indian tribal government that perform law enforcement functions (as determined by the Secretary of the Interior). Otherwise a unit of local government may be any law enforcement district or judicial enforcement district established under applicable state law with authority to independently establish a budget and impose taxes. In Louisiana, a unit of local government means a district attorney or parish sheriff.

## Deadline

Applicants must register in the OJP Grants Management System (GMS) prior to submitting an application for this funding opportunity. Registration is required for all applicants, even those previously registered in GMS. Select the "Apply Online" button associated with the solicitation title. All registrations and applications are due by **due by 5:00 p.m. eastern time on June 30, 2016**.

For additional information, see How to Apply in Section D. Application and Submission Information.

AR-00306

# Contact Information

For technical assistance with submitting an application, contact the Grants Management System Support Hotline at 888-549-9901, option 3 or via email at GMS.HelpDesk@usdoj.gov. The GMS Support Hotline hours of operation are Monday – Friday from 6:00 a.m. to midnight eastern time, except federal holidays.

Applicants that experience unforeseen GMS technical issues beyond their control that prevent them from submitting their application by the deadline must email the contact identified below **within 24 hours after the application deadline** and request approval to submit their application. Additional information on reporting technical issues is found under "Experiencing Unforeseen GMS Technical Issues" in the How to Apply section.

For assistance with any other requirement of this solicitation, contact the National Criminal Justice Reference Service (NCJRS) Response Center: toll-free at 1-800-851-3420; via TTY at 301-240-6310 (hearing impaired only); email grants@ncjrs.gov; fax to 301-240-5830; or web chat at https://webcontact.ncjrs.gov/ncjchat/chat.jsp. The NCJRS Response Center hours of operation are 10:00 a.m. to 6:00 p.m. eastern time, Monday through Friday. You may also contact your State Policy Advisor.

Release date: May 16, 2016

2

BJA-2016-9020

AR-00307

# Contents

A. Program Description ................................................................................................... 4

    Overview ...................................................................................................................... 4

    Program-Specific Information ..................................................................................... 4

    Goals, Objectives, and Deliverables ......................................................................... 7

    Evidence-Based Programs or Practices .................................................................... 7

B. Federal Award Information ........................................................................................ 8

    Type of Award ........................................................................................................... 8

    Financial Management and System of Internal Controls............................................ 9

    Budget Information ...................................................................................................10

    Cost Sharing or Matching Requirement ...................................................................11

    Pre-Agreement Cost (also known as Pre-award Cost) Approvals............................11

    Prior Approval, Planning, and Reporting of Conference/Meeting/Training Costs ..................11

    Costs Associated with Language Assistance (if applicable) .....................................12

C. Eligibility Information.................................................................................................14

    Limit on Number of Application Submissions............................................................14

D. Application and Submission Information ...................................................................14

    What an Application Should Include ..........................................................................14

    How to Apply ............................................................................................................22

E. Application Review Information .................................................................................24

    Review Process ........................................................................................................24

F. Federal Award Administration Information ................................................................25

    Federal Award Notices .............................................................................................25

    Administrative, National Policy, and other Legal Requirements...............................25

    General Information about Post-Federal Award Reporting Requirements ..................26

G. Federal Awarding Agency Contact(s) ......................................................................26

H. Other Information.......................................................................................................26

    Provide Feedback to OJP .........................................................................................26

    Application Checklist .................................................................................................28

BJA-2016-9020

AR-00308

# Edward Byrne Memorial Justice Assistance Grant (JAG) Program: FY 2016 Local Solicitation (CFDA #16.738)

## A. Program Description

### Overview

The Edward Byrne Memorial Justice Assistance Grant (JAG) Program (42 U.S.C. § 3751(a)) is the primary provider of federal criminal justice funding to state and local jurisdictions. The JAG Program provides states and units of local governments with critical funding necessary to support a range of program areas including law enforcement; prosecution and court programs; prevention and education programs; corrections and community corrections; drug treatment and enforcement; crime victim and witness initiatives; and planning, evaluation, and technology improvement programs.

### Program-Specific Information

JAG funds may be used for state and local initiatives, technical assistance, strategic planning, research and evaluation (including forensics), data collection, training, personnel, equipment, forensic laboratories, supplies, contractual support, and criminal justice information systems that will improve or enhance such areas as:

- Law enforcement programs.
- Prosecution and court programs, including indigent defense.
- Prevention and education programs.
- Corrections, community corrections, and reentry programs.
- Drug treatment and enforcement programs.
- Planning, evaluation, and technology improvement programs.
- Crime victim and witness programs (other than compensation).

***Additionally, BJA reminds applicants that the JAG program allows funding for broadband deployment and adoption activities as they relate to criminal justice activities.***

### JAG Priority Areas

BJA recognizes that there are significant pressures on state and local criminal justice systems. In these challenging times, shared priorities and leveraged resources can make a significant impact. In light of this, it is important to make State Administering Agencies (SAAs) and local JAG recipients aware of several areas of priority that may be of help in maximizing the effectiveness of JAG funding at the state and local level. The following priorities represent key areas where BJA will be focusing nationally and encourages each state and local JAG recipient to join us in addressing these challenges as a part of our JAG partnership:

Reducing Gun Violence

Gun violence has touched nearly every state, local, and tribal government in America. BJA continues to encourage states and localities to invest valuable JAG funds in programs to combat gun violence, enforce existing firearms laws, and improve the process for ensuring that persons prohibited from purchasing or owning guns are prevented from doing so by enhancing reporting to the FBI's National Instant Criminal Background Check System (NICS).

4

AR-00309

While our nation has made great strides in reducing violent crime, some municipalities and regions continue to experience unacceptable levels of violent crime at rates far in excess of the national average. In 2014, as part of BJA's longstanding commitment to support effective strategies to reduce violent crime, BJA launched the Violence Reduction Network (VRN). By the end of FY 2016, 10 VRN sites, working with a broad network of federal, state, and local partners, will be implementing data-driven evidence-based strategies to reduce deeply entrenched violent crime in their communities. States and localities can support VRN sites by investing JAG funds in technology, crime analysis, training, and community-based crime reduction programs in VRN communities. For information on VRN, see www.bja.gov/Programs/VRN.html.

Body-Worn Cameras, Storage, and Policies
Law enforcement agencies across the country are equipping their officers with body-worn cameras (BWCs) to increase transparency and build community trust. The important benefits of BWCs, and the challenges in implementing BWC programs, are highlighted in several recent publications: see the Office of Justice Programs' Diagnostic Center report *Police Officer Body-Worn Cameras: Assessing the Evidence,* and the COPS Office and Police Executive Research Forum paper, *Implementing A Body-Worn Camera Program: Recommendations and Lessons Learned*.

JAG funding is an important potential source of funding for law enforcement agencies implementing new BWC programs or enhancing existing programs. JAG funds may be used to purchase BWCs and for costs associated with the BWC program, such as storage and policy development. Similarly, SAAs are encouraged to use either their Variable Pass-Through (VPT) or their "less than $10,000" funding that is added into the state award to set aside funds to assist small departments in implementing BWC programs. Grantees who wish to use JAG funds to purchase BWC equipment, or to implement or enhance BWC programs, must certify that they or the law enforcement agency receiving the BWC funding have policies and procedures in place related to equipment usage, data storage, privacy, victims, access, disclosure, training, etc. A copy of the required BWC certification can be found at www.bja.gov/Funding/BodyWornCameraCert.pdf.

**The BJA BWC Toolkit provides model BWC policies, resources, and best practices to assist departments in implementing BWC programs.**

National Incident-Based Reporting System (NIBRS)
The FBI has formally announced its intentions to establish NIBRS as the law enforcement (LE) crime data reporting standard for the nation. The transition to NIBRS will provide a more complete and accurate picture of crime at the national, state, and local level. Once this transition is complete, the FBI will no longer collect summary data and will only accept data in the NIBRS format and JAG awards will be based on submitted NIBRS data. Transitioning all law enforcement agencies to NIBRS is the first step in gathering more comprehensive crime data. State and local JAG grantees are encouraged to use JAG funds to expedite the transition to NIBRS in their jurisdictions.

Justice System Reform and Reentry
There is growing bipartisan support for Justice Systems Reform and Reentry. A promising approach to justice systems reform is the Justice Reinvestment Initiative (JRI), a public-private partnership between BJA and the PEW Public Safety Performance Project. Currently, 30 states have used the justice reinvestment process to control spiraling incarceration costs and reinvest

5

AR-00310

in evidence-based criminal justice programs and strategies. Strategic investments of JAG funds to implement JRI legislation and policy changes in JRI states can augment federal funds and achieve greater cost savings and reinvestments in programs to promote public safety. For state-by-state information on JRI, please visit the JRI Sites web page.

Over the past seven years, DOJ has partnered with state, local, and tribal agencies and national organizations to support hundreds of reentry programs across the country to provide job training, healthcare, housing, treatment, and other services to individuals returning to our communities from prisons and jails. The demand for effective reentry services remains high. More than 600,000 men and women leave our prisons every year and more than 11 million people cycle through our jails. Investments of JAG funds to support reentry efforts at the state and local level will pay dividends for returning citizens and for public safety in America. A summary of research-based reentry strategies is available on the National Reentry Resource Center's What Works in Reentry Clearinghouse along with a map identifying federally funded Second Chance Act Reentry programs at the state and local level. (See https://csgjusticecenter.org/nrrc).

Public Defense
Another key priority area is support for improving public defense delivery systems. To support this priority in November 2015, BJA established the Right to Counsel National Consortium (www.rtcnationalcampaign.org ) to spearhead a national conversation on how to ensure the Sixth Amendment Right to Counsel for every individual. BJA continues to encourage states and SAAs to use JAG funds to ensure that no person faces the loss of liberty without first having the aid of a lawyer with the time, ability, and resources to present an effective defense. Currently, across the nation public defense reform is being supported by governors, state legislators, chief judges and local communities. Research shows that early appointment of counsel can decrease jail and prison stays and produce better outcomes for defendants and communities. Many of these successes are guided by the American Bar Association's Ten Principles of a Public Defense Delivery System, which are recommendations for government officials and other parties who are charged with improving public defense delivery systems (http://www.americanbar.org/content/dam/aba/administrative/legal_aid_indigent_defendants/ls_sclaid_def_tenprinciplesbooklet.authcheckdam.pdf).

Improving Mental Health Services
Many people with mental illness enter the criminal justice system without a diagnosis or with untreated mental illness. Screening and assessment is critical to identify and provide appropriate referrals to treatment. This is an issue that impacts numerous facets of the criminal justice system. BJA encourages states to utilize JAG funding in support of programs and policy changes aimed at identifying and treating people with severe mental illness to divert when appropriate, treat during incarceration, and engage in appropriate pre-release planning for the provision of community treatment (see JMHCP Resources). BJA provides training and technical assistance (TTA) to grantees and non-grantees (states, jurisdictions) to increase enrollment in health care plans (increase linkages to health care providers) that can increase access to treatment for improved mental health outcomes. Information can be found at www.bjatraining.org.

DOJ Universal Accreditation w/Forensic Service Providers
In 2015, the National Commission on Forensic Science (NCFS) announced recommendations on strengthening the field of forensic science. There are a number of key principles, which include promoting universal accreditation and finding ways to improve upon medical-legal

6

investigative processes. For additional information on these recommendations, please review the New Accreditation Policies to Advance Forensic Science. The JAG program provides broad-based support to states and local jurisdictions across the nation in order to strengthen our criminal justice system, including the forensic sciences. As such, BJA encourages investments of JAG funds for programs and activities related to forensic work, including accreditation of forensic labs.

**Goals, Objectives, and Deliverables**

The Chief Executive Officer (CEO) of an eligible unit of local government or other officer designated by the CEO must submit the application for JAG funds. A unit of local government receiving a JAG award will be responsible for the administration of the funds including: distributing the funds; monitoring the award; submitting quarterly financial status (SF-425), performance metrics reports, and semi-annual programmatic reports; and providing ongoing oversight and assistance to any subrecipients of the funds.

**Evidence-Based Programs or Practices**

OJP strongly emphasizes the use of data and evidence in policy making, program development, and program implementation in criminal justice, juvenile justice, and crime victim services. OJP is committed to:

- Improving the quantity and quality of evidence OJP generates
- Integrating evidence into program, practice, and policy decisions within OJP and the field
- Improving the translation of evidence into practice

OJP considers programs and practices to be evidence-based when their effectiveness has been demonstrated by causal evidence, generally obtained through one or more outcome evaluations. Causal evidence documents a relationship between an activity or intervention (including technology) and its intended outcome, including measuring the direction and size of a change, and the extent to which a change may be attributed to the activity or intervention. Causal evidence depends on the use of scientific methods to rule out, to the extent possible, alternative explanations for the documented change. The strength of causal evidence, based on the factors described above, will influence the degree to which OJP considers a program or practice to be evidence-based. The OJP CrimeSolutions.gov website is one resource that applicants may use to find information about evidence-based programs in criminal justice, juvenile justice, and crime victim services.

1. A useful matrix of evidence-based policing programs and strategies is available through the Center for Evidence-Based Crime Policy at George Mason University. BJA offers a number of program models designed to effectively implement promising and evidence-based strategies through the BJA "Smart Suite" of programs including Smart Policing, Smart Supervision, Smart Pretrial, Smart Defense, Smart Prosecution, Smart Reentry and others (see https://www.bja.gov/programs/crppe/smartsuite.htm). BJA encourages states to use JAG funds to support these "smart on crime" strategies, including effective partnerships with universities and research partners and with non-traditional criminal justice partners.

**BJA Success Stories**

The BJA Success Story web page was designed to identify and highlight projects that have demonstrated success or shown promise in reducing crime and positively impacting communities. This web page will be a valuable resource for states, localities, territories, tribes,

BJA-2016-9020

AR-00312

and criminal justice professionals who seek to identify and learn about JAG and other successful BJA-funded projects linked to innovation, crime reduction, and evidence-based practices. **BJA strongly encourages the recipient to submit annual (or more frequent) success stories.**

If you have a Success Story you would like to submit, sign in to your My BJA account to access the Success Story Submission form. If you do not have a My BJA account, please register. Once you register, one of the available areas on your *My BJA* page will be *"My Success Stories."* Within this box, you will see an option to add a Success Story. Once reviewed and approved by BJA, all success stories will appear on the BJA Success Story web page**.**

# B. Federal Award Information

BJA estimates that it will make up to 1,161 local awards totaling an estimated $86.4 million.

Awards of at least $25,000 are four years in length, and award periods will be from October 1, 2015 through September 30, 2019. Extensions beyond this period may be made on a case-by-case basis at the discretion of BJA and must be requested via GMS no less than 30 days prior to the grant end date.

Awards of less than $25,000 are two years in length, and award periods will be from October 1, 2015 through September 30, 2017. Extensions of up to two years can be requested for these awards via GMS no less than 30 days prior to the grant end date, and will be automatically granted upon request.

All awards are subject to the availability of appropriated funds and to any modifications or additional requirements that may be imposed by law.

Eligible allocations under JAG are posted annually on BJA's JAG web page: www.bja.gov/ProgramDetails.aspx?Program_ID=59.

**Type of Award[1]**
BJA expects that it will make any award from this solicitation in the form of a grant.

JAG awards are based on a statutory formula as described below:
Once each fiscal year's overall JAG Program funding level is determined, BJA partners with the Bureau of Justice Statistics (BJS) to begin a four-step grant award calculation process which consists of:

1.  Computing an initial JAG allocation for each state and territory, based on their share of violent crime and population (weighted equally).

2.  Reviewing the initial JAG allocation amount to determine if the state or territory allocation is less than the minimum ("de minimus") award amount defined in the JAG legislation (0.25 percent of the total). If this is the case, the state or territory is funded at the minimum level, and the funds required for this are deducted from the overall pool of JAG

---

[1] *See generally* 31 U.S.C. §§ 6301-6305 (defines and describes various forms of federal assistance relationships, including grants and cooperative agreements [a type of grant]).

funds. Each of the remaining states receives the minimum award plus an additional amount based on their share of violent crime and population.

3. Dividing each state's final award amount (except for the territories and District of Columbia) between state and local governments at a rate of 60 and 40 percent, respectively.

4. Determining local unit of government award allocations, which are based on their proportion of the state's 3-year violent crime average. If a local eligible award amount is less than $10,000, the funds are returned to the state to be awarded to these local units of government through the state agency. If the eligible award amount is $10,000 or more, then the local government is eligible to apply for a JAG award directly from BJA.

**Financial Management and System of Internal Controls**

Award recipients and subrecipients (including any recipient or subrecipient funded in response to this solicitation that is a pass-through entity[2]) must, as described in the Part 200 Uniform Requirements set out at 2 C.F.R. 200.303:

(a) Establish and maintain effective internal control over the Federal award that provides reasonable assurance that the recipient (and any subrecipient) is managing the Federal award in compliance with Federal statutes, regulations, and the terms and conditions of the Federal award. These internal controls should be in compliance with guidance in "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States and the "Internal Control Integrated Framework," issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

(b) Comply with Federal statutes, regulations, and the terms and conditions of the Federal awards.

(c) Evaluate and monitor the recipient's (and any subrecipient's) compliance with statutes, regulations, and the terms and conditions of Federal awards.

(d) Take prompt action when instances of noncompliance are identified including noncompliance identified in audit findings.

(e) Take reasonable measures to safeguard protected personally identifiable information and other information the Federal awarding agency or pass-through entity designates as sensitive or the recipient (or any subrecipient) considers sensitive consistent with applicable Federal, state, local, and tribal laws regarding privacy and obligations of confidentiality.

In order to better understand administrative requirements and cost principles, applicants are encouraged to enroll, at no charge, in the Department of Justice Grants Financial Management Online Training available here.

---

[2] For purposes of this solicitation (or program announcement), "pass-through entity" includes any entity eligible to receive funding as a recipient or subrecipient under this solicitation (or program announcement) that, if funded, may make a subaward(s) to a subrecipient(s) to carry out part of the funded program.

9

BJA-2016-9020

AR-00314

**Budget Information**

<u>Administrative Funds</u> – Grant recipients may use up to 10 percent of the JAG award, including up to 10 percent of any earned interest, for costs associated with administering funds. Administrative funds (when utilized) must be tracked separately and recipients must report on SF-425s those expenditures that specifically relate to each grant number and established grant period. Additionally, recipients and subrecipients are prohibited from commingling funds on a program-by-program or project-by-project basis. More specifically, administrative funds under JAG are utilized for the same purpose each year (i.e., the administration of JAG funding) and therefore not considered separate programs/projects (commingling is not occurring) when utilized across all active JAG awards.

<u>Disparate Certification</u> – A disparate allocation occurs when a city or municipality is allocated one-and-one-half times (150 percent) more than the county, while the county bears more than 50 percent of the costs associated with prosecution or incarceration of the municipality's Part 1 violent crimes. A disparate allocation also occurs when multiple cities or municipalities are collectively allocated four times (400 percent) more than the county, and the county bears more than 50 percent of the collective costs associated with prosecution or incarceration of each municipality's Part 1 violent crimes.

Jurisdictions certified as disparate must identify a fiscal agent that will submit a joint application for the aggregate eligible allocation to all disparate municipalities. The joint application must determine and specify the award distribution to each unit of local government and the purposes for which the funds will be used. When beginning the JAG application process, a Memorandum of Understanding (MOU) that identifies which jurisdiction will serve as the applicant/fiscal agent for joint funds must be completed and signed by the Authorized Representative for each participating jurisdiction. The signed MOU should be attached to the application. For a sample MOU, go to www.bja.gov/Funding/JAGMOU.pdf.

<u>Supplanting</u> – Supplanting is prohibited under JAG. Applicants cannot replace or supplant non-federal funds that have been appropriated for the same purpose. See the JAG FAQs on BJA's JAG web page for examples of supplanting.

<u>Leveraging of Grant Funds</u> – Although supplanting is prohibited, the leveraging of federal funding is encouraged. For example, a city may utilize JAG and Homeland Security Grant Program (HSGP) money to fund different portions of a fusion center project. In instances where leveraging occurs, all federal grant funds must be tracked and reported separately and may not be used to fund the same line items. Additionally, federal funds cannot be used as match for other federal awards.

<u>Trust Fund</u> – Units of Local Government may draw down JAG funds in advance. To do so, a trust fund must be established in which to deposit the funds. The trust fund may or may not be an interest-bearing account. If subrecipients draw down JAG funds in advance, they also must establish a trust fund in which to deposit funds. This trust fund requirement does not apply to direct JAG award recipients or subrecipients that draw down on a reimbursement basis rather than in advance.

BJA-2016-9020

AR-00315

Prohibited and Controlled Uses – The JAG Prohibited and Controlled Expenditures Guidance represents a combination of BJA-controlled items and those controlled under the Executive Order on "Federal Support for Local Law Enforcement Equipment Acquisition" that was signed on January 16, 2015. The guidance contains:

1. Table of all prohibited expenditures (strictly unallowable expenditures under JAG).
2. Table of all controlled expenditures (expenditures which require prior written approval from BJA under JAG; including UAV guidance checklist).
3. Controlled Expenditures Justification Template (must be completed and submitted for any JAG controlled expenditures request to be considered for approval by BJA).
4. Overall Controlled Expenditure/Equipment Guidance (should be reviewed in conjunction with the template prior to controlled expenditures request(s) being submitted to BJA).
5. Standards for State, Local and Tribal Law Enforcement Agencies for the Acquisition of Controlled Equipment with Federal Resources.

Additional information on JAG controlled and prohibited expenditures, along with the process for requesting prior approval from BJA to expend funds on controlled items, can be found within the JAG FAQs.

**Cost Sharing or Matching Requirement**
This solicitation does not require a match. However, if a successful application proposes a voluntary match amount, and OJP approves the budget, the total match amount incorporated into the approved budget becomes mandatory and subject to audit.

**Pre-Agreement Cost (also known as Pre-award Cost) Approvals**
Pre-agreement costs are costs incurred by the applicant prior to the start date of the period of performance of the grant award.

OJP does not typically approve pre-agreement costs; an applicant must request and obtain the prior written approval of OJP for all such costs. If approved, pre-agreement costs could be paid from grant funds consistent with a grantee's approved budget, and under applicable cost standards. However, all such costs prior to award and prior to approval of the costs are incurred at the sole risk of an applicant. Generally, no applicant should incur project costs before submitting an application requesting federal funding for those costs. Should there be extenuating circumstances that appear to be appropriate for OJP's consideration as pre-agreement costs, the applicant should contact the point of contact listed on the title page of this announcement for details on the requirements for submitting a written request for approval. See the section on Costs Requiring Prior Approval in the Financial Guide, for more information.

**Prior Approval, Planning, and Reporting of Conference/Meeting/Training Costs**
OJP strongly encourages applicants that propose to use award funds for any conference-, meeting-, or training-related activity to review carefully—before submitting an application—the OJP policy and guidance on conference approval, planning, and reporting available at www.ojp.gov/financialguide/DOJ/PostawardRequirements/chapter3.10a.htm. OJP policy and guidance (1) encourage minimization of conference, meeting, and training costs; (2) require prior written approval (which may affect project timelines) of most conference, meeting, and training costs for cooperative agreement recipients and of some conference, meeting, and training costs for grant recipients; and (3) set cost limits, including a general prohibition of all food and beverage costs.

11

BJA-2016-9020

**Costs Associated with Language Assistance (if applicable)**
If an applicant proposes a program or activity that would deliver services or benefits to individuals, the costs of taking reasonable steps to provide meaningful access to those services or benefits for individuals with limited English proficiency may be allowable. Reasonable steps to provide meaningful access to services or benefits may include interpretation or translation services where appropriate.

For additional information, see the "Civil Rights Compliance" section under "Solicitation Requirements" in OJP's Funding Resource Center.

**Other JAG Requirements**

Compliance with Applicable Federal Laws
Applicants for state and local JAG formula grants are required to certify compliance with all applicable federal laws at the time of application. In that regard, Members of Congress have asked the Department of Justice to examine whether jurisdictions with "sanctuary policies" (i.e., policies that either prevent law enforcement from releasing persons without lawful immigration status into federal custody for deportation, or that prevent state or local law enforcement from sharing certain information with Department of Homeland Security [DHS] officials), are in violation of 8 U.S.C. section 1373.

All applicants should understand that if OJP receives information that indicates that an applicant may be in violation of any applicable federal law, that applicant may be referred to the DOJ Office of Inspector General (OIG) for investigation; if the applicant is found to be in violation of an applicable federal law by the OIG, the applicant may be subject to criminal and civil penalties, in addition to relevant OJP programmatic penalties, including suspension or termination of funds, inclusion on the high risk list, repayment of funds, or suspension and debarment.

Law Enforcement Agency Training Information
Any law enforcement agency receiving direct or subawarded JAG funding must submit quarterly accountability metrics data related to training on use of force, racial and ethnic bias, de-escalation of conflict, and constructive engagement with the public that officers have received. **Any grantees that fail to submit this data will have their grant funds frozen.**

Accountability metrics reports must be submitted through BJA's PMT, available at www.bjaperformancetools.org. The accountability measures can be found at: http://www.bjaperformancetools.org/help/jagdocs.html.

Body-Worn Camera (BWC) purchases
Grantees who wish to use JAG funds to purchase BWC equipment, or to implement or enhance BWC programs, must certify that they or the law enforcement agency receiving the BWC funding have policies and procedures in place related to equipment usage, data storage, privacy, victims, access, disclosure, training, etc. A copy of the required BWC certification can be found at www.bja.gov/Funding/BodyWornCameraCert.pdf.

Any grantees that wish to use JAG funds for BWC-related expenses who do not have BWC policies and procedures in place will have funds withheld until a certification is submitted and approved by BJA.

12

**The BJA BWC Toolkit provides model BWC policies, resources, and best practices to assist departments in implementing BWC programs.**

Body Armor
Ballistic-resistant and stab-resistant body armor can be funded through two BJA-administered programs: the JAG Program and the Bulletproof Vest Partnership (BVP) Program. The BVP Program is designed to provide a critical resource to state and local law enforcement through the purchase of ballistic-resistant and stab-resistant body armor. A jurisdiction is able to request up to 50 percent of the cost of a vest with BVP funds. For more information on the BVP Program, including eligibility and application, refer to the BVP web page.

JAG funds may also be used to purchase vests for an agency, but they may not be used to pay for that portion of the ballistic-resistant vest (50 percent) that is not covered by BVP funds. Unlike BVP, JAG funds used to purchase vests do not require a 50 percent match. Vests purchased with JAG funds may be purchased at any threat level, make, or model from any distributor or manufacturer, as long as the vests have been tested and found to comply with the latest applicable National Institute of Justice (NIJ) ballistic or stab standards. In addition, vests purchased must be American-made. Information on the latest NIJ standards can be found at: www.nij.gov/topics/technology/body-armor/safety-initiative.htm.

As is the case in BVP, grantees who wish to purchase vests with JAG funds must certify that law enforcement agencies receiving vests have a written "mandatory wear" policy in effect. FAQs related to the mandatory wear policy and certifications can be found at www.bja.gov/Funding/JAGFAQ.pdf. This policy must be in place for at least all uniformed officers before any FY 2016 funding can be used by the agency for vests. There are no requirements regarding the nature of the policy other than it being a mandatory wear policy for all uniformed officers while on duty. The certification **must** be signed by the Authorized Representative and **must** be attached to the application. If the grantee proposes to change project activities to utilize JAG funds to purchase bulletproof vests after the application period (during the project period), the grantee must submit the signed certification to BJA at that time. A mandatory wear concept and issues paper and a model policy are available by contacting the BVP Customer Support Center vests@usdoj.gov or toll free at 1–877–758–3787.

A copy of the certification related to the mandatory wear can be found at: www.bja.gov/Funding/BodyArmorMandatoryWearCert.pdf.

DNA Testing of Evidentiary Materials and Upload of DNA Profiles to a Database
If JAG Program funds will be used for DNA testing of evidentiary materials, any resulting eligible DNA profiles must be uploaded to the Combined DNA Index System (CODIS, the national DNA database operated by the FBI) by a government DNA lab with access to CODIS. No profiles generated with JAG funding may be entered into any other non-governmental DNA database without prior express written approval from BJA. For more information, refer to the NIJ DNA Backlog Reduction Program, available at www.nij.gov/topics/forensics/lab-operations/evidence-backlogs/Pages/backlog-reduction-program.aspx.

In addition, funds may not be used for purchase of DNA equipment and supplies when the resulting DNA profiles from such technology are not accepted for entry into CODIS.

13

Interoperable Communications
Grantees (including subgrantees) that are using FY 2016 JAG Program funds to support
emergency communications activities (including the purchase of interoperable communications
equipment and technologies such as voice-over-internet protocol bridging or gateway devices,
or equipment to support the build out of wireless broadband networks in the 700 MHz public
safety band under the Federal Communications Commission (FCC) Waiver Order) should
review *FY 2016 SAFECOM Guidance.* The SAFECOM Guidance is updated annually to provide
current information on emergency communications policies, eligible costs, best practices, and
technical standards for state, local, tribal, and territorial grantees investing federal funds in
emergency communications projects. Additionally, emergency communications projects should
support the Statewide Communication Interoperability Plan (SCIP) and be coordinated with the
full-time Statewide Interoperability Coordinator (SWIC) in the state of the project. As the central
coordination point for their state's interoperability effort, the SWIC plays a critical role, and can
serve as a valuable resource. SWICs are responsible for the implementation of the SCIP
through coordination and collaboration with the emergency response community. The U.S.
Department of Homeland Security Office of Emergency Communications maintains a list of
SWICs for each of the 56 states and territories. Contact OEC@hq.dhs.gov. All communications
equipment purchased with grant award funding should be identified during quarterly
performance metrics reporting.

In order to promote information sharing and enable interoperability among disparate systems
across the justice and public safety community, OJP requires the grantee to comply with DOJ's
Global Justice Information Sharing Initiative guidelines and recommendations for this particular
grant. Grantee shall conform to the Global Standards Package (GSP) and all constituent
elements, where applicable, as described at: www.it.ojp.gov/gsp_grantcondition. Grantees shall
document planned approaches to information sharing and describe compliance to the GSP and
appropriate privacy policy that protects shared information, or provide detailed justification for
why an alternative approach is recommended.

# C. Eligibility Information

For eligibility information, see the title page.

For additional information on cost sharing or matching requirements, see Section B. Federal
Award Information.

**Limit on Number of Application Submissions**
If an applicant submits multiple versions of the same application, BJA will review only the most
recent system-validated version submitted. For more information on system-validated versions,
see How to Apply.

# D. Application and Submission Information

**What an Application Should Include**
Applicants should anticipate that if they fail to submit an application that contains all of the
specified elements, it may negatively affect the review of their application; and, should a
decision be made to make an award, it may result in the inclusion of special conditions that

preclude the recipient from accessing or using award funds pending satisfaction of the conditions.

Applicants may combine the Budget Narrative and the Budget Detail Worksheet in one document. However, if an applicant submits only one budget document, it must contain **both** narrative and detail information. Please review the "Note on File Names and File Types" under How to Apply to be sure applications are submitted in permitted formats.

OJP strongly recommends that applicants use appropriately descriptive file names (e.g., "Program Narrative," "JAG Budget and Budget Narrative," "Timelines," "Memoranda of Understanding," "Résumés") for all attachments. Also, OJP recommends that applicants include résumés in a single file.

**Failure to submit the required information will result in an application being returned in the Grants Management System (GMS) for inclusion of the missing information OR the attachment of a withholding of funds special condition at the time of award.**

1. **Information to Complete the Application for Federal Assistance (SF-424)**

The SF-424 is a required standard form used as a cover sheet for submission of pre-applications, applications, and related information. GMS takes information from the applicant's profile to populate the fields on this form.

**Intergovernmental Review:** This funding opportunity is subject to Executive Order 12372. Applicants may find the names and addresses of their state's Single Point of Contact (SPOC) at the following website: www.whitehouse.gov/omb/grants_spoc/. Applicants whose state appears on the SPOC list must contact their state's SPOC to find out about, and comply with, the state's process under Executive Order 12372. In completing the SF-424, applicants whose state appears on the SPOC list are to make the appropriate selection in response to question 19 once the applicant has complied with their state's E.O. 12372 process. (Applicants whose state does not appear on the SPOC list are to make the appropriate selection in response to question 19 to indicate that the "Program is subject to E.O. 12372 but has not been selected by the State for review.")

2. **Project Abstract**
   Applications should include a high-quality project abstract that summarizes the proposed project in 400 words or less. Project abstracts should be:

   - Written for a general public audience and submitted as a separate attachment with "Project Abstract" as part of its file name.
   - Single-spaced, using a standard 12-point font (Times New Roman) with 1-inch margins
   - Include applicant name, title of the project, a brief description of the problem to be addressed and the targeted area/population, project goals and objectives, a description of the project strategy, any significant partnerships, and anticipated outcomes.
   - Identify up to 5 project identifiers that would be associated with proposed project activities. The list of identifiers can be found at www.bja.gov/funding/JAGIdentifiers.pdf.

   As a separate attachment, the project abstract will **not** count against the page limit for the program narrative.

BJA-2016-9020

AR-00320

### 3. Program Narrative

Applicants must submit a program narrative that generally describes the proposed program activities for the two or four year grant period. The narrative must outline the type of programs to be funded by the JAG award and provide a brief analysis of the need for the programs. Narratives must also identify anticipated coordination efforts involving JAG and related justice funds. Certified disparate jurisdictions submitting a joint application must specify the funding distribution to each disparate unit of local government and the purposes for which the funds will be used.

A plan for collecting the data required for this solicitation's performance measures should also be included. To demonstrate program progress and success, as well as to assist the Department with fulfilling its responsibilities under the Government Performance and Results Act of 1993 (GPRA), Public Law 103-62, and the GPRA Modernization Act of 2010, Public Law 111–352, applicants that receive funding under this solicitation must provide data that measure the results of their work done under this solicitation. **Quarterly accountability metrics reports must be submitted through BJA's PMT, available at** www.bjaperformancetools.org**. The accountability measures can be found at:** http://www.bjaperformancetools.org/help/jagdocs.html**.**

BJA does not require applicants to submit performance measures data with their application. Performance measures are included as an alert that BJA will require successful applicants to submit specific data as part of their reporting requirements. For the application, applicants should indicate an understanding of these requirements and discuss how they will gather the required data, should they receive funding.

### Note on Project Evaluations

Applicants that propose to use funds awarded through this solicitation to conduct project evaluations should be aware that certain project evaluations (such as systematic investigations designed to develop or contribute to generalizable knowledge) may constitute "research" for purposes of applicable DOJ human subjects protection regulations. However, project evaluations that are intended only to generate internal improvements to a program or service, or are conducted only to meet OJP's performance measure data reporting requirements likely do not constitute "research." Applicants should provide sufficient information for OJP to determine whether the particular project they propose would either intentionally or unintentionally collect and/or use information in such a way that it meets the DOJ regulatory definition of research.

Research, for the purposes of human subjects protections for OJP-funded programs, is defined as, "a systematic investigation, including research development, testing, and evaluation, designed to develop or contribute to generalizable knowledge" 28 C.F.R. § 46.102(d). For additional information on determining whether a proposed activity would constitute research, see the decision tree to assist applicants on the "Research and the Protection of Human Subjects" section of the OJP's Funding Resource Center. Applicants whose proposals may involve a research or statistical component also should review the "Data Privacy and Confidentiality Requirements" section on that web page.

### 4. Budget Detail Worksheet and Budget Narrative

Applicants must submit a budget detail worksheet and budget narrative outlining how JAG funds, including administrative funds (up to 10% of the grant award) if applicable, will be used to

support and implement the program. Please note that if an applicant submits only one budget document, it must contain **both** narrative and detail information.

**a. Budget Detail Worksheet**
A sample Budget Detail Worksheet can be found at www.ojp.gov/funding/Apply/Resources/BudgetDetailWorksheet.pdf. Applicants that submit their budget in a different format should include the budget categories listed in the sample budget worksheet. The Budget Detail Worksheet should be broken down by year.

**b. Budget Narrative**
The budget narrative should thoroughly and clearly describe every category of expense listed in the Budget Detail Worksheet. OJP expects proposed budgets to be complete, cost effective, and allowable (e.g., reasonable, allocable, and necessary for project activities). **This narrative should include a full description of all costs, including administrative costs (if applicable) and how funds will be allocated across the seven allowable JAG program areas** (law enforcement, prosecution, indigent defense, courts, crime prevention and education, corrections and community corrections, drug treatment and enforcement, planning, evaluation, technology improvement, and crime victim and witness initiatives).

Applicants should demonstrate in their budget narratives how they will maximize cost effectiveness of grant expenditures. Budget narratives should generally describe cost effectiveness in relation to potential alternatives and the goals of the project. For example, a budget narrative should detail why planned in-person meetings are necessary, or how technology and collaboration with outside organizations could be used to reduce costs, without compromising quality.

The narrative should be mathematically sound and correspond with the information and figures provided in the Budget Detail Worksheet. The narrative should explain how the applicant estimated and calculated all costs, and how they are relevant to the completion of the proposed project. The narrative may include tables for clarification purposes but need not be in a spreadsheet format. As with the Budget Detail Worksheet, the Budget Narrative should be broken down by year.

For questions pertaining to budget and examples of allowable and unallowable costs, see the DOJ Grants Financial Guide at www.ojp.gov/financialguide/index.htm.

**c. Non-Competitive Procurement Contracts In Excess of Simplified Acquisition Threshold**
If an applicant proposes to make one or more non-competitive procurements of products or services, where the non-competitive procurement will exceed the simplified acquisition threshold (also known as the small purchase threshold), which is currently set at $150,000, the application should address the considerations outlined in the Financial Guide.

**d. Pre-Agreement Costs**
For information on pre-agreement costs, see "Pre-Agreement Cost Approvals" under Section B. Federal Award Information.

17

5.  **Indirect Cost Rate Agreement (if applicable)**
    Indirect costs are allowed only under the following circumstances:
    (a) The applicant has a current, federally approved indirect cost rate; or
    (b) The applicant is eligible to use and elects to use the "de minimis" indirect cost rate
        described in the Part 200 Uniform Requirements as set out at 2 C.F.R. 200.414(f).

    Attach a copy of the federally approved indirect cost rate agreement to the application.
    Applicants that do not have an approved rate may request one through their cognizant
    federal agency, which will review all documentation and approve a rate for the applicant
    organization, or, if the applicant's accounting system permits, costs may be allocated in the
    direct cost categories. For the definition of Cognizant Federal Agency, see the "Glossary of
    Terms" in the Financial Guide. For assistance with identifying your cognizant agency, please
    contact the Customer Service Center at 1-800-458-0786 or at ask.ocfo@usdoj.gov. If DOJ is
    the cognizant federal agency, applicants may obtain information needed to submit an
    indirect cost rate proposal at www.ojp.gov/funding/Apply/Resources/IndirectCosts.pdf.

    In order to use the "de minimis" indirect rate, attach written documentation to the application
    that advises OJP of both the applicant's eligibility (to use the "de minimis" rate) and its
    election. If the applicant elects the "de minimis" method, costs must be consistently charged
    as either indirect or direct costs, but may not be double charged or inconsistently charged as
    both. In addition, if this method is chosen then it must be used consistently for all federal
    awards until such time as you choose to negotiate a federally approved indirect cost rate.[3]

6.  **Tribal Authorizing Resolution (if applicable)**
    Tribes, tribal organizations, or third parties proposing to provide direct services or assistance
    to residents on tribal lands should include in their applications a resolution, a letter, affidavit,
    or other documentation, as appropriate, that certifies that the applicant has the legal
    authority from the tribe(s) to implement the proposed project on tribal lands. In those
    instances when an organization or consortium of tribes applies for a grant on behalf of a
    tribe or multiple specific tribes, the application should include appropriate legal
    documentation, as described above, from all tribes that would receive services or assistance
    under the grant. A consortium of tribes for which existing consortium bylaws allow action
    without support from all tribes in the consortium (i.e., without an authorizing resolution or
    comparable legal documentation from each tribal governing body) may submit, instead, a
    copy of its consortium bylaws with the application.

    Applicants unable to submit an application that includes a fully-executed (i.e., signed) copy
    of appropriate legal documentation, as described above, consistent with the applicable
    tribe's governance structure, should, at a minimum, submit an unsigned, draft version of
    such legal documentation as part of its application (except for cases in which, with respect
    to a tribal consortium applicant, consortium bylaws allow action without the support of all
    consortium member tribes). If selected for funding, BJA will make use of and access to
    funds contingent on receipt of the fully-executed legal documentation.

7.  **Applicant Disclosure of High Risk Status**
    Applicants that are currently designated high risk by another federal grant making agency
    must disclose that status. This includes any status requiring additional oversight by the
    federal agency due to past programmatic or financial concerns. If an applicant is designated

---

[3] See 2 C.F.R. § 200.414(f).

high risk by another federal grant making agency, the applicant must email the following information to OJPComplianceReporting@usdoj.gov at the time of application submission:

- The federal agency that currently designated the applicant as high risk
- Date the applicant was designated high risk
- The high risk point of contact name, phone number, and email address, from that federal agency
- Reasons for the high risk status

OJP seeks this information to ensure appropriate federal oversight of any grant award. Disclosing this high risk information does not disqualify any organization from receiving an OJP award. However, additional grant oversight may be included, if necessary, in award documentation.

## 8. Additional Attachments

### a. Review Narrative

Applicants **must** submit information documenting that the date the JAG application was made available for review by the governing body of the state, or to an organization designated by that governing body, was not less than 30 days before the application was submitted to BJA. If the 30 governing body requirement cannot be met before the application deadline, a withholding special condition will be placed on the award until the governing body requirement can be met. The attachment must also specify that an opportunity to comment was provided to citizens prior to application submission to the extent applicable law or established procedures make such opportunity available.

**Below are notification language templates that can be utilized in completing this section of the application.**

The (**provide name of State/Territory**) made its Fiscal Year 2015 JAG application available to the (**provide name of governing body**) for its review and comment on (**provide date**); or intends to do so on (**provide date**).

The (**provide name of State/Territory**) made its Fiscal Year 2015 JAG application available to citizens for comment prior to application submission by (**provide means of notification**); or the application has not yet been made available for public review/comment.

### b. Memorandum of Understanding (if applicable)

Jurisdictions certified as disparate must identify a fiscal agent that will submit a joint application for the aggregate eligible allocation to all disparate municipalities. The joint application must determine and specify the award distribution to each unit of local government and the purposes for which the funds will be used. When beginning the JAG application process, a Memorandum of Understanding (MOU) that identifies which jurisdiction will serve as the applicant/fiscal agent for joint funds must be completed and signed by the Authorized Representative for each participating jurisdiction. The signed MOU must be attached to the application. For a sample MOU, go to www.bja.gov/Funding/JAGMOU.pdf.

19

AR-00324

c. **Applicant Disclosure of Pending Applications**

Applicants are to disclose whether they have pending applications for federally funded grants or subgrants (including cooperative agreements) that include requests for funding to support the same project being proposed under this solicitation <u>and</u> will cover the identical cost items outlined in the budget narrative and worksheet in the application under this solicitation. The disclosure should include both direct applications for federal funding (e.g., applications to federal agencies) and indirect applications for such funding (e.g., applications to state agencies that will subaward federal funds).

OJP seeks this information to help avoid any inappropriate duplication of funding. Leveraging multiple funding sources in a complementary manner to implement comprehensive programs or projects is encouraged and is not seen as inappropriate duplication.

Applicants that have pending applications as described above are to provide the following information about pending applications submitted within the last 12 months:

- The federal or state funding agency
- The solicitation name/project name
- The point of contact information at the applicable funding agency

| Federal or State Funding Agency | Solicitation Name/Project Name | Name/Phone/Email for Point of Contact at Funding Agency |
|---|---|---|
| DOJ/COPS | COPS Hiring Program | Jane Doe, 202/000-0000; jane.doe@usdoj.gov |
| HHS/ Substance Abuse & Mental Health Services Administration | Drug Free Communities Mentoring Program/ North County Youth Mentoring Program | John Doe, 202/000-0000; john.doe@hhs.gov |

Applicants should include the table as a separate attachment to their application. The file should be named "Disclosure of Pending Applications."

Applicants that do not have pending applications as described above are to include a statement to this effect in the separate attachment page (e.g., "[Applicant Name on SF-424] does not have pending applications submitted within the last 12 months for federally funded grants or subgrants (including cooperative agreements) that include requests for funding to support the same project being proposed under this solicitation and will cover the identical cost items outlined in the budget narrative and worksheet in the application under this solicitation.").

d. **Research and Evaluation Independence and Integrity**

AR-00325

If a proposal involves research and/or evaluation, regardless of the proposal's other merits, in order to receive funds, the applicant must demonstrate research/evaluation independence, including appropriate safeguards to ensure research/evaluation objectivity and integrity, both in this proposal and as it may relate to the applicant's other current or prior related projects. This documentation may be included as an attachment to the application which addresses BOTH i. and ii. below.

i.  For purposes of this solicitation, applicants must document research and evaluation independence and integrity by including, at a minimum, one of the following two items:

   a. A specific assurance that the applicant has reviewed its proposal to identify any research integrity issues (including all principal investigators and subrecipients) and it has concluded that the design, conduct, or reporting of research and evaluation funded by BJA grants, cooperative agreements, or contracts will not be biased by any personal or financial conflict of interest on the part of part of its staff, consultants, and/or subrecipients responsible for the research and evaluation or on the part of the applicant organization;

OR

   b. A specific listing of actual or perceived conflicts of interest that the applicant has identified in relation to this proposal. These conflicts could be either personal (related to specific staff, consultants, and/or subrecipients) or organizational (related to the applicant or any subgrantee organization). Examples of potential investigator (or other personal) conflict situations may include, but are not limited to, those in which an investigator would be in a position to evaluate a spouse's work product (actual conflict), or an investigator would be in a position to evaluate the work of a former or current colleague (potential apparent conflict). With regard to potential organizational conflicts of interest, as one example, generally an organization could not be given a grant to evaluate a project if that organization had itself provided substantial prior technical assistance to that specific project or a location implementing the project (whether funded by OJP or other sources), as the organization in such an instance would appear to be evaluating the effectiveness of its own prior work. The key is whether a reasonable person understanding all of the facts would be able to have confidence that the results of any research or evaluation project are objective and reliable. Any outside personal or financial interest that casts doubt on that objectivity and reliability of an evaluation or research product is a problem and must be disclosed.

ii. In addition, for purposes of this solicitation applicants must address the issue of possible mitigation of research integrity concerns by including, at a minimum, one of the following two items:

   a. If an applicant reasonably believes that no potential personal or organizational conflicts of interest exist, then the applicant should provide a brief narrative explanation of how and why it reached that conclusion. Applicants MUST also include an explanation of the specific processes and

21

AR-00326

procedures that the applicant will put in place to identify and eliminate (or, at the very least, mitigate) potential personal or financial conflicts of interest on the part of its staff, consultants, and/or subrecipients for this particular project, should that be necessary during the grant period. Documentation that may be helpful in this regard could include organizational codes of ethics/conduct or policies regarding organizational, personal, and financial conflicts of interest.

OR

b.  If the applicant has identified specific personal or organizational conflicts of interest in its proposal during this review, the applicant must propose a specific and robust mitigation plan to address conflicts noted above. At a minimum, the plan must include specific processes and procedures that the applicant will put in place to eliminate (or, at the very least, mitigate) potential personal or financial conflicts of interest on the part of its staff, consultants, and/or subrecipients for this particular project, should that be necessary during the grant period. Documentation that may be helpful in this regard could include organizational codes of ethics/conduct or policies regarding organizational, personal, and financial conflicts of interest. There is no guarantee that the plan, if any, will be accepted as proposed.

Considerations in assessing research and evaluation independence and integrity will include, but are not limited to, the adequacy of the applicant's efforts to identify factors that could affect the objectivity or integrity of the proposed staff and/or the organization in carrying out the research, development, or evaluation activity; and the adequacy of the applicant's existing or proposed remedies to control any such factors.

9.  **Financial Management and System of Internal Controls Questionnaire**
In accordance with the Part 200 Uniform Requirements as set out at 2 C.F.R. 200.205, federal agencies must have in place a framework for evaluating the risks posed by applicants before they receive a federal award. To facilitate part of this risk evaluation, **all** applicants (other than an individual) are to download, complete, and submit this form.

10. **Disclosure of Lobbying Activities**
Any applicant that expends any funds for lobbying activities is to provide the detailed information requested on the form, Disclosure of Lobbying Activities (SF-LLL).

**How to Apply**

Applicants must submit applications through the Grants Management System (GMS), which provides support for the application, award, and management of awards at OJP. Applicants **must register in GMS for each specific funding opportunity.** Although the registration and submission deadlines are the same, OJP urges applicants to **register immediately**, especially if this is their first time using the system. Find complete instructions on how to register and submit an application in GMS at www.ojp.gov/gmscbt/. Applicants that experience technical difficulties during this process should email GMS.HelpDesk@usdoj.gov or call 888-549-9901 (option 3), Monday–Friday from 6:00 a.m. to midnight, Eastern Time, except federal holidays. OJP recommends that applicants **register promptly** to prevent delays in submitting an application package by the deadline.

22

**Note on File Types: GMS does not accept executable file types as application attachments**. These disallowed file types include, but are not limited to, the following extensions: ".com," ".bat," ".exe," ".vbs," ".cfg," ".dat," ".db," ".dbf," ".dll," ".ini," ".log," ".ora," ".sys," and ".zip."

OJP may not make a federal award to an applicant organization until the applicant organization has complied with all applicable DUNS and SAM requirements. Individual applicants must comply with all Grants.gov requirements. If an applicant has not fully complied with the requirements by the time the federal awarding agency is ready to make a federal award, the federal awarding agency may determine that the applicant is not qualified to receive a federal award and use that determination as a basis for making a federal award to another applicant.

All applicants should complete the following steps:

1. **Acquire a Data Universal Numbering System (DUNS) number.** In general, the Office of Management and Budget (OMB) requires that all applicants (other than individuals) for federal funds include a DUNS number in their application for a new award or a supplement to an existing award. A DUNS number is a unique nine-digit sequence recognized as the universal standard for identifying and differentiating entities receiving Federal funds. The identifier is used for tracking purposes and to validate address and point of contact information for federal assistance applicants, recipients, and subrecipients. The DUNS number will be used throughout the grant life cycle. Obtaining a DUNS number is a free, one-time activity. Call Dun and Bradstreet at 866-705-5711 to obtain a DUNS number or apply online at www.dnb.com. A DUNS number is usually received within 1-2 business days.

2. **Acquire registration with the System for Award Management (SAM).** SAM is the repository for standard information about federal financial assistance applicants, recipients, and subrecipients. OJP requires that all applicants (other than individuals) for federal financial assistance maintain current registrations in the SAM database. Applicants must **update or renew their SAM registration annually** to maintain an active status. SAM registration and renewal can take as long as 10 business days to complete.

   Information about SAM registration procedures can be accessed at www.sam.gov.

3. **Acquire a GMS username and password**. New users must create a GMS profile by selecting the "First Time User" link under the sign-in box of the GMS home page. For more information on how to register in GMS, go to www.ojp.gov/gmscbt.

4. **Verify the SAM (formerly CCR) registration in GMS.** OJP requests that all applicants verify their SAM registration in GMS. Once logged into GMS, click the "CCR Claim" link on the left side of the default screen. Click the submit button to verify the SAM (formerly CCR) registration.

5. **Search for the funding opportunity on GMS.** After logging into GMS or completing the GMS profile for username and password, go to the "Funding Opportunities" link on the left side of the page. Select BJA and the **FY 16 Edward Byrne Memorial Local Justice Assistance Grant (JAG) Program.**

6. **Register by selecting the "Apply Online" button associated with the funding opportunity title.** The search results from step 5 will display the funding opportunity title

23

along with the registration and application deadlines for this funding opportunity. Select the "Apply Online" button in the "Action" column to register for this funding opportunity and create an application in the system.

7. **Follow the directions in GMS to submit an application consistent with this solicitation.** Once submitted, GMS will display a confirmation screen stating the submission was successful. **Important:** In some instances, applicants must wait for GMS approval before submitting an application. OJP urges applicants to submit the application **at least 72 hours prior** to the application due date.

**Note: Duplicate Applications**

If an applicant submits multiple versions of the same application, BJA will review only the most recent system-validated version submitted. See Note on "File Names and File Types" under How to Apply.

**Experiencing Unforeseen GMS Technical Issues**

Applicants that experience unforeseen GMS technical issues beyond their control that prevent them from submitting their application by the deadline must contact the GMS Help Desk or the SAM Help Desk (Federal Service Desk) to report the technical issue and receive a tracking number. Then the applicant must email the BJA contact identified in the Contact Information section on page 2 **within 24 hours after the application deadline** and request approval to submit their application. The email must describe the technical difficulties and include a timeline of the applicant's submission efforts, the complete grant application, the applicant's DUNS number, and any GMS Help Desk or SAM tracking number(s). **Note: BJA *does not* approve requests automatically.** After the program office reviews the submission, and contacts the GMS Help Desk to validate the reported technical issues, OJP will inform the applicant whether the request to submit a late application has been approved or denied. If OJP determines that the applicant failed to follow all required procedures, which resulted in an untimely application submission, OJP will deny the applicant's request to submit their application.

The following conditions are generally insufficient to justify late submissions:

- Failure to register in SAM or GMS in sufficient time (SAM registration and renewal can take as long as 10 business days to complete)
- Failure to follow GMS instructions on how to register and apply as posted on the GMS website
- Failure to follow each instruction in the OJP solicitation
- Technical issues with the applicant's computer or information technology environment, including firewalls, browser incompatibility, etc.

**Notifications regarding known technical problems with GMS, if any, are posted at the top of the OJP funding web page at http://ojp.gov/funding/index.htm.**


# E. Application Review Information

**Review Process**

OJP is committed to ensuring a fair and open process for awarding grants. BJA reviews the application to make sure that the information presented is reasonable, understandable,

24

AR-00329

measurable, and achievable, as well as consistent with the solicitation. BJA will also review applications to ensure statutory requirements have been met.

OJP reviews applications for potential awards to evaluate the risks posed by applicants before they receive an award. This review may include but is not limited to the following:

1. Financial stability and fiscal integrity
2. Quality of management systems and ability to meet the management standards prescribed in the Financial Guide
3. History of performance
4. Reports and findings from audits
5. The applicant's ability to effectively implement statutory, regulatory, or other requirements imposed on award recipients

Absent explicit statutory authorization or written delegation of authority to the contrary, the Assistant Attorney General will make all final award decisions.

# F. Federal Award Administration Information

**Federal Award Notices**

OJP sends award notification by email through GMS to the individuals listed in the application as the point of contact and the authorizing official. The email notification includes detailed instructions on how to access and view the award documents, and how to accept the award in GMS. GMS automatically issues the notifications at 9:00 p.m. eastern time on the award date (by September 30, 2016). Recipients will be required to login; accept any outstanding assurances and certifications on the award; designate a financial point of contact; and review, sign, and accept the award. The award acceptance process involves physical signature of the award document by the authorized representative and the scanning of the fully-executed award document to OJP.

**Administrative, National Policy, and other Legal Requirements**

If selected for funding, in addition to implementing the funded project consistent with the agency-approved project proposal and budget, the recipient must comply with award terms and conditions, and other legal requirements, including but not limited to OMB, DOJ, or other federal regulations which will be included in the award, incorporated into the award by reference, or are otherwise applicable to the award. OJP strongly encourages prospective applicants to review the information pertaining to these requirements **prior** to submitting an application. To assist applicants and recipients in accessing and reviewing this information, OJP has placed pertinent information on its Solicitation Requirements page of OJP's Funding Resource Center website.

Please note in particular the following two forms, which applicants must accept in GMS prior to the receipt of any award funds, as each details legal requirements with which applicants must provide specific assurances and certifications of compliance. Applicants may view these forms in the Apply section of OJP's Funding Resource Center and are strongly encouraged to review and consider them carefully prior to making an application for OJP grant funds.

- Certifications Regarding Lobbying; Debarment, Suspension and Other Responsibility Matters; and Drug-Free Workplace Requirements

25

BJA-2016-9020

AR-00330

- Standard Assurances

Upon grant approval, OJP electronically transmits (via GMS) the award document to the prospective award recipient. In addition to other award information, the award document contains award terms and conditions that specify national policy requirements[4] with which recipients of federal funding must comply; uniform administrative requirements, cost principles, and audit requirements; and program-specific terms and conditions required based on applicable program (statutory) authority or requirements set forth in OJP solicitations and program announcements, and other requirements which may be attached to appropriated funding. For example, certain efforts may call for special requirements, terms, or conditions relating to intellectual property, data/information-sharing or -access, or information security; or audit requirements, expenditures and milestones; or publications and/or press releases. OJP also may place additional terms and conditions on an award based on its risk assessment of the applicant, or for other reasons it determines necessary to fulfill the goals and objectives of the program.

Prospective applicants may access and review the text of mandatory conditions OJP includes in all OJP awards, as well as the text of certain other conditions, such as administrative conditions, via OJP's Mandatory Award Terms and Conditions page of OJP's Funding Resource Center.

**General Information about Post-Federal Award Reporting Requirements**
Recipients must submit quarterly financial reports, semi-annual progress reports, final financial and progress reports, an annual audit report in accordance with the Part 200 Uniform Requirements, if applicable, and Federal Funding Accountability and Transparency Act (FFATA) reports through the FFATA Sub-award Reporting System (FSRS) as necessary. Future awards and fund drawdowns may be withheld if reports are delinquent.

Special Reporting requirements may be required by OJP depending on the statutory, legislative or administrative requirements of the recipient or the program.

# G. Federal Awarding Agency Contact(s)

For Federal Awarding Agency Contact(s), see title page.

For contact information for GMS, see title page.

# H. Other Information

**Provide Feedback to OJP**
To assist OJP in improving its application and award processes, we encourage applicants to provide feedback on this solicitation, the application submission process, and/or the application review process. Provide feedback to OJPSolicitationFeedback@usdoj.gov.

---

[4] *See generally* 2 C.F.R. 200.300 (provides a general description of national policy requirements typically applicable to recipients of federal awards, including the Federal Funding Accountability and Transparency Act of 2006 [FFATA]).

26

AR-00331

**IMPORTANT:** This email is for feedback and suggestions only. Replies are **not** sent from this mailbox. If you have specific questions on any program or technical aspect of the solicitation, **you must** directly contact the appropriate number or email listed on the front of this solicitation document. These contacts are provided to help ensure that you can directly reach an individual who can address your specific questions in a timely manner.

If you are interested in being a reviewer for other OJP grant applications, please email your resume to ojppeerreview@lmsolas.com. The OJP Solicitation Feedback email account will not forward your resume. **Note:** Neither you nor anyone else from your organization can be a peer reviewer in a competition in which you or your organization have submitted an application.

AR-00332

**Application Checklist**
**Edward Byrne Memorial Justice Assistance Grant (JAG) Program:**
**FY 2016 Local Solicitation**

This application checklist has been created to assist in developing an application.

**What an Applicant Should Do:**

*Prior to Registering in GMS:*
\_\_\_\_\_ Acquire a DUNS Number (see page 23)
\_\_\_\_\_ Acquire or renew registration with SAM (see page 23)

*To Register with GMS*:
\_\_\_\_\_ For new users, acquire a GMS username and password* (see page 23)
\_\_\_\_\_ For existing users, check GMS username and password* to ensure account access (see page 23)
\_\_\_\_\_ Verify SAM registration in GMS (see page 23)
\_\_\_\_\_ Search for correct funding opportunity in GMS (see page 23)
\_\_\_\_\_ Select correct funding opportunity in GMS (see page 23)
\_\_\_\_\_ Register by selecting the "Apply Online" button associated with the funding opportunity title (see page 23)
\_\_\_\_\_ Read OJP policy and guidance on conference approval, planning, and reporting available at Post Award Requirements (see page 11)
\_\_\_\_\_ If experiencing technical difficulties in GMS, contact the NCJRS Response Center (see page 24)

*Password Reset Notice – GMS users are reminded that while password reset capabilities exist, this function is only associated with points of contacts designated within GMS at the time the account was established. Neither OJP nor the GMS Help Desk will initiate a password reset unless requested by the authorized official or a designated point of contact associated with an award or application.

**General Requirements**:

\_\_\_\_\_ Review Solicitation Requirements web page in the OJP Funding Resource Center.

**Scope Requirement:**

\_\_\_\_\_ The federal amount requested is within the allowable limit(s) of the FY 2016 JAG Allocations List as listed on BJA's JAG web page

**Eligibility Requirement:**
\_\_\_\_\_ State/Territory listed as the legal name on the application corresponds with the eligible State/Territory listed on BJA's JAG web page

28

**What an Application Should Include:**

\_\_\_\_\_ Application for Federal Assistance (SF-424) (see page 15)
\_\_\_\_\_ Intergovernmental Review     (see page 15)
\_\_\_\_\_ Project Abstract (see page 15)
\_\_\_\_\_ Program Narrative (see page 16)
\_\_\_\_\_ Budget (see page 17)
\_\_\_\_\_ Budget Narrative (see page 17)
\_\_\_\_\_ Indirect Cost Rate Agreement (if applicable) (see page 18)
\_\_\_\_\_ Tribal Authorizing Resolution (if applicable) (see page 18)
\_\_\_\_\_ Applicant Disclosure of High Risk Status (If applicable see page 18)
\_\_\_\_\_ Additional Attachments (see page 19)
       \_\_\_\_\_ Review Narrative (see page 19)
       \_\_\_\_\_ Applicant Disclosure of Pending Applications (see page 20)
       \_\_\_\_\_ Research and Evaluation Independence and Integrity (see page 20)
\_\_\_\_\_ Disclosure of Lobbying Activities (SF-LLL) (if applicable) (see page 22)
\_\_\_\_\_ Financial Management and System of Internal Controls Questionnaire (see page 22)

BJA-2016-9020

AR-00334

OMB No. 1121-0329
Approval Expires 12/31/2018

**U.S. Department of Justice**
Office of Justice Programs
*Bureau of Justice Assistance*



The U.S. Department of Justice (DOJ), Office of Justice Programs (OJP) Bureau of Justice Assistance (BJA) is seeking applications for funding under the Edward Byrne Memorial Justice Assistance Grant (JAG) Program. This program furthers the Department's mission by assisting state, local, and tribal efforts to prevent or reduce crime and violence.

# Edward Byrne Memorial Justice Assistance Grant (JAG) Program
# Fiscal Year (FY) 2016 State Solicitation
# Applications Due: June 30, 2016

## Eligibility

Eligible applicants are limited to states, the District of Columbia, the Commonwealth of Puerto Rico, the Northern Mariana Islands, the Virgin Islands, Guam, and American Samoa. The allocations list can be found at: www.bja.gov/Funding/16JAGStateAllocations.pdf.

## Deadline

Applicants must register in the OJP Grants Management System (GMS) prior to submitting an application for this funding opportunity. Registration is required for all applicants, even those previously registered in GMS. Select the "Apply Online" button associated with the solicitation title. All registrations and applications are **due by 5:00 p.m. eastern time on June 30, 2016.**

For additional information, see How to Apply in Section D. Application and Submission Information.

## Contact Information

For technical assistance with submitting an application, contact the Grants Management System Support Hotline at 888-549-9901, option 3 or via email at GMS.HelpDesk@usdoj.gov. The GMS Support Hotline hours of operation are Monday – Friday from 6:00 a.m. to midnight eastern time, except federal holidays.

Applicants that experience unforeseen GMS technical issues beyond their control that prevent them from submitting their application by the deadline must email the BJA contact identified below **within 24 hours after the application deadline** and request approval to submit their application. Additional information on reporting technical issues is found under "Experiencing Unforeseen GMS Technical Issues" in the How to Apply section.

For assistance with any other requirement of this solicitation, contact the National Criminal Justice Reference Service (NCJRS) Response Center: toll-free at 1-800-851-3420; via TTY at 301-240-6310 (hearing impaired only); email grants@ncjrs.gov; fax to 301-240-5830; or web chat at https://webcontact.ncjrs.gov/ncjchat/chat.jsp. The NCJRS Response Center hours of operation are 10:00 a.m. to 6:00 p.m. eastern time, Monday through Friday. You may also contact your State Policy Advisor.

Release date: May 16, 2016

2

# Contents

A. Program Description ...................................................................................................... 4

    Overview ...................................................................................................................... 4

    Program-Specific Information ...................................................................................... 4

    Goals, Objectives, and Deliverables........................................................................... 7

    Evidence-Based Programs or Practices ...................................................................... 7

B. Federal Award Information ........................................................................................... 8

    Type of Award ............................................................................................................. 9

    Financial Management and System of Internal Controls............................................10

    Budget Information .....................................................................................................11

    Cost Sharing or Matching Requirement .....................................................................12

    Pre-Agreement Cost (also known as Pre-award Cost) Approvals...........................12

    Prior Approval, Planning, and Reporting of Conference/Meeting/Training Costs ..................12

    Costs Associated with Language Assistance (if applicable) .....................................12

C. Eligibility Information....................................................................................................16

    Limit on Number of Application Submissions..............................................................16

D. Application and Submission Information .....................................................................16

    What an Application Should Include ...........................................................................16

    How to Apply ..............................................................................................................24

E. Application Review Information....................................................................................26

    Review Process ..........................................................................................................26

F. Federal Award Administration Information ..................................................................27

    Federal Award Notices...............................................................................................27

    Administrative, National Policy, and other Legal Requirements...............................27

    General Information about Post-Federal Award Reporting Requirements ..............28

G. Federal Awarding Agency Contact(s) .........................................................................28

H. Other Information.........................................................................................................28

    Provide Feedback to OJP ...........................................................................................28

    Application Checklist ..................................................................................................30

**BJA-2016-9021**

AR-00337

# Edward Byrne Memorial Justice Assistance Grant (JAG) Program: FY 2016 State Solicitation (CFDA #16.738)

## A. Program Description

**Overview**

The Edward Byrne Memorial Justice Assistance Grant (JAG) Program (42 U.S.C. § 3751(a)) is the primary provider of federal criminal justice funding to state and local jurisdictions. The JAG Program provides states and units of local governments with critical funding necessary to support a range of program areas including law enforcement; prosecution and court programs; prevention and education programs; corrections and community corrections; drug treatment and enforcement; crime victim and witness initiatives; and planning, evaluation, and technology improvement programs.

**Program-Specific Information**

JAG funds may be used for state and local initiatives, technical assistance, strategic planning, research and evaluation (including forensics), data collection, training, personnel, equipment, forensic laboratories, supplies, contractual support, and criminal justice information systems that will improve or enhance such areas as:

- Law enforcement programs.
- Prosecution and court programs, including indigent defense.
- Prevention and education programs.
- Corrections, community corrections and reentry programs.
- Drug treatment and enforcement programs.
- Planning, evaluation, and technology improvement programs.
- Crime victim and witness programs (other than compensation).

***Additionally, BJA reminds applicants that the JAG program allows funding for broadband deployment and adoption activities as they relate to criminal justice activities.***

**JAG Priority Areas**

BJA recognizes that there are significant pressures on state and local criminal justice systems. In these challenging times, shared priorities and leveraged resources can make a significant impact. In light of this, it is important to make State Administering Agencies (SAAs) and local JAG recipients aware of several areas of priority that may be of help in maximizing the effectiveness of JAG funding at the state and local level. The following priorities represent key areas where BJA will be focusing nationally and encourages each state and local JAG recipient to join us in addressing these challenges as a part of our JAG partnership:

Reducing Gun Violence

Gun violence has touched nearly every state, local, and tribal government in America. BJA continues to encourage states and localities to invest valuable JAG funds in programs to combat gun violence, enforce existing firearms laws, and improve the process for ensuring that persons prohibited from purchasing or owning guns are prevented from doing so by enhancing reporting to the FBI's National Instant Criminal Background Check System (NICS).

4

While our nation has made great strides in reducing violent crime, some municipalities and regions continue to experience unacceptable levels of violent crime at rates far in excess of the national average. In 2014, as part of BJA's longstanding commitment to support effective strategies to reduce violent crime, BJA launched the Violence Reduction Network (VRN). By the end of FY 2016, 10 VRN sites, working with a broad network of federal, state, and local partners, will be implementing data-driven evidence-based strategies to reduce deeply entrenched violent crime in their communities. States and localities can support VRN sites by investing JAG funds in technology, crime analysis, training, and community-based crime reduction programs in VRN communities. For information on VRN, see www.bja.gov/Programs/VRN.html.

Body-Worn Cameras, Storage, and Policies
Law enforcement agencies across the country are equipping their officers with body-worn cameras (BWCs) to increase transparency and build community trust. The important benefits of BWCs, and the challenges in implementing BWC programs, are highlighted in several recent publications: see the Office of Justice Programs' Diagnostic Center report *Police Officer Body-Worn Cameras: Assessing the Evidence,* and the COPS Office and Police Executive Research Forum paper, *Implementing A Body-Worn Camera Program: Recommendations and Lessons Learned*.

JAG funding is an important potential source of funding for law enforcement agencies implementing new BWC programs or enhancing existing programs. JAG funds may be used to purchase BWCs and for costs associated with the BWC program, such as storage and policy development. Similarly, SAAs are encouraged to use either their Variable Pass-Through (VPT) or their "less than $10,000" funding that is added into the state award to set aside funds to assist small departments in implementing BWC programs. Grantees who wish to use JAG funds to purchase BWC equipment, or to implement or enhance BWC programs, must certify that they or the law enforcement agency receiving the BWC funding have policies and procedures in place related to equipment usage, data storage, privacy, victims, access, disclosure, training, etc. A copy of the required BWC certification can be found at www.bja.gov/Funding/BodyWornCameraCert.pdf.

**The BJA BWC Toolkit provides model BWC policies, resources, and best practices to assist departments in implementing BWC programs.**

National Incident-Based Reporting System (NIBRS)
The FBI has formally announced its intentions to establish NIBRS as the law enforcement (LE) crime data reporting standard for the nation. The transition to NIBRS will provide a more complete and accurate picture of crime at the national, state, and local level. Once this transition is complete, the FBI will no longer collect summary data and will only accept data in the NIBRS format and JAG awards will be based on submitted NIBRS data. Transitioning all law enforcement agencies to NIBRS is the first step in gathering more comprehensive crime data. State and local JAG grantees are encouraged to use JAG funds to expedite the transition to NIBRS in their jurisdictions.

Justice System Reform and Reentry
There is growing bipartisan support for Justice Systems Reform and Reentry. A promising approach to justice systems reform is the Justice Reinvestment Initiative (JRI), a public-private partnership between BJA and the PEW Public Safety Performance Project. Currently, 30 states have used the justice reinvestment process to control spiraling incarceration costs and reinvest

in evidence-based criminal justice programs and strategies. Strategic investments of JAG funds to implement JRI legislation and policy changes in JRI states can augment federal funds and achieve greater cost savings and reinvestments in programs to promote public safety. For state-by-state information on JRI, please visit the JRI Sites web page.

Over the past seven years, DOJ has partnered with state, local, and tribal agencies and national organizations to support hundreds of reentry programs across the country to provide job training, healthcare, housing, treatment, and other services to individuals returning to our communities from prisons and jails. The demand for effective reentry services remains high. More than 600,000 men and women leave our prisons every year and more than 11 million people cycle through our jails. Investments of JAG funds to support reentry efforts at the state and local level will pay dividends for returning citizens and for public safety in America. A summary of research-based reentry strategies is available on the National Reentry Resource Center's What Works in Reentry Clearinghouse along with a map identifying federally funded Second Chance Act Reentry programs at the state and local level. (See https://csgjusticecenter.org/nrrc).

Public Defense
Another key priority area is support for improving public defense delivery systems. To support this priority in November 2015, BJA established the Right to Counsel National Consortium (www.rtcnationalcampaign.org ) to spearhead a national conversation on how to ensure the Sixth Amendment Right to Counsel for every individual. BJA continues to encourage states and SAAs to use JAG funds to ensure that no person faces the loss of liberty without first having the aid of a lawyer with the time, ability, and resources to present an effective defense. Currently, across the nation public defense reform is being supported by governors, state legislators, chief judges and local communities. Research shows that early appointment of counsel can decrease jail and prison stays and produce better outcomes for defendants and communities. Many of these successes are guided by the American Bar Association's Ten Principles of a Public Defense Delivery System, which are recommendations for government officials and other parties who are charged with improving public defense delivery systems (http://www.americanbar.org/content/dam/aba/administrative/legal_aid_indigent_defendants/ls_sclaid_def_tenprinciplesbooklet.authcheckdam.pdf).

Improving Mental Health Services
Many people with mental illness enter the criminal justice system without a diagnosis or with untreated mental illness. Screening and assessment is critical to identify and provide appropriate referrals to treatment. This is an issue that impacts numerous facets of the criminal justice system. BJA encourages states to utilize JAG funding in support of programs and policy changes aimed at identifying and treating people with severe mental illness to divert when appropriate, treat during incarceration, and engage in appropriate pre-release planning for the provision of community treatment (see JMHCP Resources). BJA provides training and technical assistance (TTA) to grantees and non-grantees (states, jurisdictions) to increase enrollment in health care plans (increase linkages to health care providers) that can increase access to treatment for improved mental health outcomes. Information can be found at www.bjatraining.org.

DOJ Universal Accreditation w/Forensic Service Providers
In 2015, the National Commission on Forensic Science (NCFS) announced recommendations on strengthening the field of forensic science. There are a number of key principles, which include promoting universal accreditation and finding ways to improve upon medical-legal

6

investigative processes. For additional information on these recommendations, please review the New Accreditation Policies to Advance Forensic Science. The JAG program provides broad-based support to states and local jurisdictions across the nation in order to strengthen our criminal justice system, including the forensic sciences. As such, BJA encourages investments of JAG funds for programs and activities related to forensic work, including accreditation of forensic labs.

**Goals, Objectives, and Deliverables**
States and territories are strongly encouraged to use JAG funding in support of their existing statewide strategic plan. Applicants should attach a current version of their state's strategic plan to their application. If such a plan does not now exist, states/territories should develop and undertake a strategic planning process, using a community engagement model, in order to guide spending under this and future fiscal year allocations. Statewide strategic plans should describe the state's strategic planning process that guides its priorities and funding strategy and should include a description of how local communities are engaged in the planning process and the data and analysis utilized to support the plan. It should also identify the stakeholders currently participating in the strategic planning process, the gaps in the state's needed resources for criminal justice purposes, and how JAG funds will be coordinated with state and related justice funds. Training and technical assistance (TTA) is available from BJA's TTA providers to assist states with the development of their strategic planning process and their plan to fund evidence-based projects.

In partnership with the National Criminal Justice Association (NCJA), BJA continues to work with State Administering Agencies (SAAs), State Analytical Centers (SACs), and their research and data analysis partners to assess needs based upon data, develop priorities, invest in strategies that are evidence-based, and address priority needs. To ensure that the impact of JAG funding decisions is considered across the entire criminal justice system, BJA is strongly encouraging state and local jurisdictions to bring **all** system stakeholders together in the strategic planning process. BJA's recommended guidelines are that, at a minimum, the strategic planning process includes law enforcement, courts, prosecutors, indigent defense providers, victim advocates, and corrections and community corrections officials. BJA will continue to provide valuable technical assistance in 2016 through NCJA. For more information, see the National Center for Justice Planning website.

Beginning in FY 2014, BJA posted each state's strategic plan on the BJA website in order to promote transparency in terms of each state's spending priorities, the process by which funding decisions are made, and stakeholders involved in the planning process. In FY 2016, BJA will continue to post each state's strategic plan. If you do not have a strategic plan, BJA will continue to use the program narrative that is submitted with your application. As BJA's website is publicly available (http://www.iir.com/bja-state-fact-sheets), **please ensure that law-enforcement sensitive material is removed prior to submission.**

**Evidence-Based Programs or Practices**
OJP strongly emphasizes the use of data and evidence in policy making, program development, and program implementation in criminal justice, juvenile justice, and crime victim services. OJP is committed to:

- Improving the quantity and quality of evidence OJP generates
- Integrating evidence into program, practice, and policy decisions within OJP and the field
- Improving the translation of evidence into practice

7

OJP considers programs and practices to be evidence-based when their effectiveness has been demonstrated by causal evidence, generally obtained through one or more outcome evaluations. Causal evidence documents a relationship between an activity or intervention (including technology) and its intended outcome, including measuring the direction and size of a change, and the extent to which a change may be attributed to the activity or intervention. Causal evidence depends on the use of scientific methods to rule out, to the extent possible, alternative explanations for the documented change. The strength of causal evidence, based on the factors described above, will influence the degree to which OJP considers a program or practice to be evidence-based. The OJP CrimeSolutions.gov website is one resource that applicants may use to find information about evidence-based programs in criminal justice, juvenile justice, and crime victim services.

1. A useful matrix of evidence-based policing programs and strategies is available through the Center for Evidence-Based Crime Policy at George Mason University. BJA offers a number of program models designed to effectively implement promising and evidence-based strategies through the BJA "Smart Suite" of programs including Smart Policing, Smart Supervision, Smart Pretrial, Smart Defense, Smart Prosecution, Smart Reentry and others (see https://www.bja.gov/programs/crppe/smartsuite.htm). BJA encourages states to use JAG funds to support these "smart on crime" strategies, including effective partnerships with universities and research partners and with non-traditional criminal justice partners.

**BJA Success Stories**
The BJA Success Story web page was designed to identify and highlight projects that have demonstrated success or shown promise in reducing crime and positively impacting communities. This web page will be a valuable resource for states, localities, territories, tribes and criminal justice professionals who seek to identify and learn about JAG and other successful BJA-funded projects linked to innovation, crime reduction, and evidence-based practices. **BJA strongly encourages the recipient to submit annual (or more frequent) success stories.**

If you have a Success Story you would like to submit, sign in to your My BJA account to access the Success Story Submission form. If you do not have a My BJA account, please Register. Once you register, one of the available areas on your *My BJA* page will be *"My Success Stories."* Within this box, you will see an option to add a Success Story. Once reviewed and approved by BJA, all success stories will appear on the BJA Success Story web page**.**

# B. Federal Award Information
BJA estimates that it will make up to 56 State/Territory awards totaling an estimated $188.5 million.

Awards are four years in length, and award periods will be from October 1, 2015 through September 30, 2019. Extensions beyond this period may be made on a case-by-case basis at the discretion of BJA and must be requested via GMS no less than 30 days prior to the grant end date.

All awards are subject to the availability of appropriated funds and to any modifications or additional requirements that may be imposed by law.

Eligible allocations under JAG are posted annually on BJA's JAG web page:
www.bja.gov/ProgramDetails.aspx?Program_ID=59.

**Type of Award[1]**
BJA expects that it will make any award from this solicitation in the form of a grant.

JAG awards are based on a statutory formula as described below:
Once each fiscal year's overall JAG Program funding level is determined, BJA partners with the Bureau of Justice Statistics (BJS) to begin a four-step grant award calculation process which consists of:

1. Computing an initial JAG allocation for each state and territory, based on their share of violent crime and population (weighted equally).

2. Reviewing the initial JAG allocation amount to determine if the state or territory allocation is less than the minimum ("de minimus") award amount defined in the JAG legislation (0.25 percent of the total). If this is the case, the state or territory is funded at the minimum level, and the funds required for this are deducted from the overall pool of JAG funds. Each of the remaining states receive the minimum award plus an additional amount based on their share of violent crime and population.

3. Dividing each state's final award amount (except for the territories and District of Columbia) between state and local governments at a rate of 60 and 40 percent, respectively.

4. Determining local unit of government award allocations, which are based on their proportion of the state's 3-year violent crime average. If a local eligible award amount is less than $10,000, the funds are returned to the state to be awarded to these local units of government through the state agency. If the eligible award amount is $10,000 or more, then the local government is eligible to apply for a JAG award directly from BJA.

**State Administering Agency Responsibilities**
In each state and territory, the Governor or other Chief Executive Officer designates an agency (the State Administering Agency) to apply for and administer these funds. The SAA will be responsible for:

- Preparing and submitting the state JAG application.

- Passing-through a predetermined percentage (variable pass-through[2]) of funds to units of local government, such as a city, county, township, or town. Calculated by BJS, this

---

[1] *See generally* 31 U.S.C. §§ 6301-6305 (defines and describes various forms of federal assistance relationships, including grants and cooperative agreements [a type of grant]).

[2] If an SAA wishes to fund a project that will be administered by the state but be counted as variable pass-through for JAG purposes, it may do so if the project will directly benefit a unit(s) of local government, and if each local jurisdiction to benefit voluntarily signs a waiver. This waiver must certify that the local jurisdiction recognizes that the funds in question are set aside for local government use, believes that the proposed project will provide a direct local benefit, and agrees that funding the project at the state level is in the best interests of the unit of local government. See the JAG FAQs on BJA's JAG web page for an example.

percentage is established by assessing the total criminal justice expenditures by the state and units of local government. If an SAA believes its assessment is incorrect, the SAA may appeal the percentage by providing alternate, verifiable data to BJA. Current Variable Pass-through percentages (VPT), which SAAs are required to use in the administration of FY 2016 JAG awards, can be found at: www.bja.gov/Funding/JAGvpt.pdf.

- Passing-through/distributing funds from the "less than $10,000 jurisdictions" that have been added to the state's award. These less-than $10,000 funds must be awarded by the state to state police departments that provide criminal justice services to units of local government and/or units of local government that have allocations of less than $10,000.

- Ensuring an inclusive planning process, including consultation with tribal representatives and other criminal justice stakeholders.

- Ensuring any court disposition or other records generated by JAG-funded programs are made available to state repositories if they are relevant to NICS determinations.

**Financial Management and System of Internal Controls**

Award recipients and subrecipients (including any recipient or subrecipient funded in response to this solicitation that is a pass-through entity[3]) must, as described in the Part 200 Uniform Requirements set out at 2 C.F.R. 200.303:

(a) Establish and maintain effective internal control over the Federal award that provides reasonable assurance that the recipient (and any subrecipient) is managing the Federal award in compliance with Federal statutes, regulations, and the terms and conditions of the Federal award. These internal controls should be in compliance with guidance in "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States and the "Internal Control Integrated Framework," issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

(b) Comply with Federal statutes, regulations, and the terms and conditions of the Federal awards.

(c) Evaluate and monitor the recipient's (and any subrecipient's) compliance with statutes, regulations, and the terms and conditions of Federal awards.

(d) Take prompt action when instances of noncompliance are identified including noncompliance identified in audit findings.

(e) Take reasonable measures to safeguard protected personally identifiable information and other information the Federal awarding agency or pass-through entity designates as sensitive or the recipient (or any subrecipient) considers sensitive consistent with applicable Federal, state, local, and tribal laws regarding privacy and obligations of confidentiality.

---

[3] For purposes of this solicitation (or program announcement), "pass-through entity" includes any entity eligible to receive funding as a recipient or subrecipient under this solicitation (or program announcement) that, if funded, may make a subaward(s) to a subrecipient(s) to carry out part of the funded program.

10

In order to better understand administrative requirements and cost principles, applicants are encouraged to enroll, at no charge, in the Department of Justice Grants Financial Management Online Training available here.

**Budget Information**

Administrative Funds – Grant recipients may use up to 10 percent of the JAG award, including up to 10 percent of any earned interest, for costs associated with administering funds. Administrative funds (when utilized) must be tracked separately and recipients must report on SF-425s those expenditures that specifically relate to each grant number and established grant period. Additionally, recipients and subrecipients are prohibited from commingling funds on a program-by-program or project-by-project basis. Specifically, administrative funds under JAG are utilized for the same purpose each year (i.e., the administration of JAG funding) and therefore not considered separate programs/projects (commingling is not occurring) when utilized across all active JAG awards.

Supplanting – Supplanting is prohibited under JAG. Applicants cannot replace or supplant non-federal funds that have been appropriated for the same purpose. See the JAG FAQs on BJA's JAG web page for examples of supplanting.

Leveraging of Grant Funds – Although supplanting is prohibited, the leveraging of federal funding is encouraged. For example, a city may utilize JAG and Homeland Security Grant Program (HSGP) money to fund different portions of a fusion center project. In instances where leveraging occurs, all federal grant funds must be tracked and reported separately and may not be used to fund the same line items. Additionally, federal funds cannot be used as match for other federal awards.

Trust Fund – SAAs may draw down JAG funds in advance. To do so, a trust fund must be established in which to deposit the funds. The trust fund may or may not be an interest-bearing account. If subrecipients draw down JAG funds in advance, they also must establish a trust fund in which to deposit funds. This trust fund requirement does not apply to direct JAG award recipients or subrecipients that draw down on a reimbursement basis rather than in advance.

Prohibited and Controlled Uses – The JAG Prohibited and Controlled Expenditures Guidance represents a combination of BJA-controlled items and those controlled under the Executive Order on Federal Support for Local Law Enforcement Equipment Acquisition that was signed on January 16, 2015. The guidance contains:

1. Table of all prohibited expenditures (strictly unallowable expenditures under JAG).
2. Table of all controlled expenditures (expenditures which require prior written approval from BJA under JAG; including UAV guidance checklist).
3. Controlled Expenditures Justification Template (must be completed and submitted for any JAG controlled expenditures request to be considered for approval by BJA).
4. Overall Controlled Expenditure/Equipment Guidance (should be reviewed in conjunction with the template prior to controlled expenditures request(s) being submitted to BJA).
5. Standards for State, Local and Tribal Law Enforcement Agencies for the Acquisition of Controlled Equipment with Federal Resources.

Additional information on JAG controlled and prohibited expenditures, along with the process for requesting prior approval from BJA to expend funds on controlled items, can be found within the JAG FAQs.

**Cost Sharing or Matching Requirement**
This solicitation does not require a match. However, if a successful application proposes a voluntary match amount, and OJP approves the budget, the total match amount incorporated into the approved budget becomes mandatory and subject to audit.

**Pre-Agreement Cost (also known as Pre-award Cost) Approvals**
Pre-agreement costs are costs incurred by the applicant prior to the start date of the period of performance of the grant award.

OJP does not typically approve pre-agreement costs; an applicant must request and obtain the prior written approval of OJP for all such costs. If approved, pre-agreement costs could be paid from grant funds consistent with a grantee's approved budget, and under applicable cost standards. However, all such costs prior to award and prior to approval of the costs are incurred at the sole risk of an applicant. Generally, no applicant should incur project costs before submitting an application requesting federal funding for those costs. Should there be extenuating circumstances that appear to be appropriate for OJP's consideration as pre-agreement costs, the applicant should contact the point of contact listed on the title page of this announcement for details on the requirements for submitting a written request for approval. See the section on Costs Requiring Prior Approval in the Financial Guide, for more information.

**Prior Approval, Planning, and Reporting of Conference/Meeting/Training Costs**
OJP strongly encourages applicants that propose to use award funds for any conference-, meeting-, or training-related activity to review carefully—before submitting an application—the OJP policy and guidance on conference approval, planning, and reporting available at www.ojp.gov/financialguide/DOJ/PostawardRequirements/chapter3.10a.htm. OJP policy and guidance (1) encourage minimization of conference, meeting, and training costs; (2) require prior written approval (which may affect project timelines) of most conference, meeting, and training costs for cooperative agreement recipients and of some conference, meeting, and training costs for grant recipients; and (3) set cost limits, including a general prohibition of all food and beverage costs.

**Costs Associated with Language Assistance (if applicable)**
If an applicant proposes a program or activity that would deliver services or benefits to individuals, the costs of taking reasonable steps to provide meaningful access to those services or benefits for individuals with limited English proficiency may be allowable. Reasonable steps to provide meaningful access to services or benefits may include interpretation or translation services where appropriate.

For additional information, see the "Civil Rights Compliance" section under "Solicitation Requirements" in the OJP Funding Resource Center.

**Other JAG Requirements**

Compliance with applicable federal laws
Applicants for state and local JAG formula grants are required to certify compliance with all applicable federal laws at the time of application. In that regard, Members of Congress have

12

asked the Department of Justice to examine whether jurisdictions with "sanctuary policies" (i.e., policies that either prevent law enforcement from releasing persons without lawful immigration status into federal custody for deportation, or that prevent state or local law enforcement from sharing certain information with Department of Homeland Security [DHS] officials), are in violation of 8 U.S.C. section 1373.

All applicants should understand that if OJP receives information that indicates that an applicant may be in violation of any applicable federal law, that applicant may be referred to the DOJ Office of Inspector General (OIG) for investigation; if the applicant is found to be in violation of an applicable federal law by the OIG, the applicant may be subject to criminal and civil penalties, in addition to relevant OJP programmatic penalties, including suspension or termination of funds, inclusion on the high risk list, repayment of funds, or suspension and debarment.

Law Enforcement Agency Training Information
Any law enforcement agency receiving direct or subawarded JAG funding must submit quarterly accountability metrics data related to training on use of force, racial and ethnic bias, de-escalation of conflict, and constructive engagement with the public that officers have received. **Any grantees that fail to submit this data will have their grant funds frozen.**

Accountability metrics reports must be submitted through BJA's PMT, available at www.bjaperformancetools.org. The accountability measures can be found at: http://www.bjaperformancetools.org/help/jagdocs.html.

Body-Worn Camera (BWC) purchases
Grantees who wish to use JAG funds to purchase BWC equipment, or to implement or enhance BWC programs, must certify that they or the law enforcement agency receiving the BWC funding have policies and procedures in place related to equipment usage, data storage, privacy, victims, access, disclosure, training, etc. A copy of the required BWC certification can be found at www.bja.gov/Funding/BodyWornCameraCert.pdf.

Any grantees that wish to use JAG funds for BWC-related expenses that do not have BWC policies and procedures in place will have funds withheld until a certification is submitted and approved by BJA.

**The BJA BWC Toolkit provides model BWC policies, resources, and best practices to assist departments in implementing BWC programs.**

Body Armor
Ballistic-resistant and stab-resistant body armor can be funded through two BJA-administered programs: the JAG Program and the Bulletproof Vest Partnership (BVP) Program. The BVP Program is designed to provide a critical resource to state and local law enforcement through the purchase of ballistic-resistant and stab-resistant body armor. A jurisdiction is able to request up to 50 percent of the cost of a vest with BVP funds. For more information on the BVP Program, including eligibility and application, refer to the BVP web page.

JAG funds may also be used to purchase vests for an agency, but they may not be used to pay for that portion of the ballistic-resistant vest (50 percent) that is not covered by BVP funds. Unlike BVP, JAG funds used to purchase vests do not require a 50 percent match. Vests

13

purchased with JAG funds may be purchased at any threat level, make, or model from any distributor or manufacturer, as long as the vests have been tested and found to comply with the latest applicable National Institute of Justice (NIJ) ballistic or stab standards. In addition, vests purchased must be American-made. Information on the latest NIJ standards can be found at: www.nij.gov/topics/technology/body-armor/safety-initiative.htm.

As is the case in BVP, grantees who wish to purchase vests with JAG funds must certify that law enforcement agencies receiving vests have a written "mandatory wear" policy in effect. FAQs related to the mandatory wear policy and certifications can be found at www.bja.gov/Funding/JAGFAQ.pdf. This policy must be in place for at least all uniformed officers before any FY 2016 funding can be used by the agency for vests. There are no requirements regarding the nature of the policy other than it being a mandatory wear policy for all uniformed officers while on duty. The certification **must** be signed by the Authorized Representative and **must** be attached to the application. If the grantee proposes to change project activities to utilize JAG funds to purchase bulletproof vests after the application period (during the project period), the grantee must submit the signed certification to BJA at that time. A mandatory wear concept and issues paper and a model policy are available by contacting the BVP Customer Support Center vests@usdoj.gov or toll free at 1–877–758–3787.

A copy of the certification related to the mandatory wear can be found at: www.bja.gov/Funding/BodyArmorMandatoryWearCert.pdf.

DNA Testing of Evidentiary Materials and Upload of DNA Profiles to a Database
If JAG Program funds will be used for DNA testing of evidentiary materials, any resulting eligible DNA profiles must be uploaded to the Combined DNA Index System (CODIS, the national DNA database operated by the FBI) by a government DNA lab with access to CODIS. No profiles generated with JAG funding may be entered into any other non-governmental DNA database without prior express written approval from BJA. For more information, refer to the NIJ DNA Backlog Reduction Program, available at www.nij.gov/topics/forensics/lab-operations/evidence-backlogs/Pages/backlog-reduction-program.aspx.

In addition, funds may not be used for purchase of DNA equipment and supplies when the resulting DNA profiles from such technology are not accepted for entry into CODIS.

Interoperable Communications
Grantees (including subgrantees) that are using FY 2016 JAG Program funds to support emergency communications activities (including the purchase of interoperable communications equipment and technologies such as voice-over-internet protocol bridging or gateway devices, or equipment to support the build out of wireless broadband networks in the 700 MHz public safety band under the Federal Communications Commission [FCC] Waiver Order) should review *FY 2016 SAFECOM Guidance.* The SAFECOM Guidance is updated annually to provide current information on emergency communications policies, eligible costs, best practices, and technical standards for state, local, tribal, and territorial grantees investing federal funds in emergency communications projects. Additionally, emergency communications projects should support the Statewide Communication Interoperability Plan (SCIP) and be coordinated with the full-time Statewide Interoperability Coordinator (SWIC) in the state of the project. As the central coordination point for their state's interoperability effort, the SWIC plays a critical role, and can serve as a valuable resource. SWICs are responsible for the implementation of the SCIP through coordination and collaboration with the emergency response community. The U.S. Department of Homeland Security Office of Emergency Communications maintains a list of

14

AR-00348

SWICs for each of the 56 states and territories. Contact OEC@hq.dhs.gov. All communications equipment purchased with grant award funding should be identified during quarterly performance metrics reporting.

In order to promote information sharing and enable interoperability among disparate systems across the justice and public safety community, OJP requires the grantee to comply with DOJ's Global Justice Information Sharing Initiative guidelines and recommendations for this particular grant. Grantee shall conform to the Global Standards Package (GSP) and all constituent elements, where applicable, as described at: www.it.ojp.gov/gsp_grantcondition. Grantees shall document planned approaches to information sharing and describe compliance to the GSP and appropriate privacy policy that protects shared information, or provide detailed justification for why an alternative approach is recommended.

**Potential Funding Reductions**

Prison Rape Elimination Act
On June 20, 2012, DOJ published the final rule that created the National Prison Rape Elimination Act (PREA) Standards, which were promulgated to prevent, detect, and respond to sexual victimization and abuse in confinement settings. The National PREA Standards are found at 28 C.F.R. Part 115. They took effect on August 20, 2012, and apply to confinement facilities including adult prisons and jails, juvenile facilities, police lockups, and community corrections facilities.

According to the Prison Rape Elimination Act of 2003, if a state's governor does not certify full compliance with the National PREA Standards the state is subject to the loss of 5 percent of certain DOJ grant funds, including JAG, that it would otherwise receive for prison purposes unless the governor submits an assurance to DOJ that no less than 5 percent of such funds will be used solely for the purpose of enabling the state to achieve and certify full compliance with the Standards in future years. 42 U.S.C. § 15607 (c)(2). A 5 percent JAG reduction will be applied each year a jurisdiction does not certify full compliance.

For additional information concerning PREA implementation, send inquiries to the PREA Management Office at PREACompliance@usdoj.gov and/or review the PREA FAQs.

Sex Offender Registration and Notification Act
The Sex Offender Registration and Notification Act (SORNA), Title I of the Adam Walsh Child Protection and Safety Act of 2006, required that the 50 states, District of Columbia (DC), 5 principal territories, and some federally recognized tribes substantially implement SORNA by July 27, 2009. Two full-year deadline extensions have been provided, and a final statutory deadline of July 27, 2011 was established.

SORNA mandates a 10-percent reduction in JAG funding if a state, territory, or DC failed to substantially implement SORNA by the July 27, 2011 deadline. For those jurisdictions, the 10-percent reduction was first applied in FY 2012 and will continue to be applied in each subsequent year until the JAG funding recipient has substantially implemented SORNA. Further, jurisdictions that have substantially implemented SORNA have an ongoing obligation to maintain that status each and every year. A JAG reduction will be applied each year a jurisdiction has failed to have substantially implemented SORNA. The 10-percent reduction will not be applied to the portion of the JAG award that is reserved for local or tribal jurisdictions.

15

AR-00349

For additional information regarding SORNA implementation, including requirements and a list of states/territories that will be impacted in FY 2016 by the 10-percent reduction, contact the Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking (SMART) Policy Advisor Samantha Opong at Samantha.Opong@usdoj.gov or 202-514-9320. Additional SORNA guidance can be found within the SORNA FAQs.

# C. Eligibility Information

For additional eligibility information, see title page.

For additional information on cost sharing or matching requirements, see Section B. Federal Award Information.

**Limit on Number of Application Submissions**
If an applicant submits multiple versions of the same application, BJA will review only the most recent system-validated version submitted. For more information on system-validated versions, see How to Apply.

# D. Application and Submission Information

**What an Application Should Include**
Applicants should anticipate that if they fail to submit an application that contains all of the specified elements, it may negatively affect the review of their application; and, should a decision be made to make an award, it may result in the inclusion of special conditions that preclude the recipient from accessing or using award funds pending satisfaction of the conditions.

Applicants may combine the Budget Narrative and the Budget Detail Worksheet in one document. However, if an applicant submits only one budget document, it must contain **both** narrative and detail information. Please review the "Note on File Names and File Types" under How to Apply to be sure applications are submitted in permitted formats.

OJP strongly recommends that applicants use appropriately descriptive file names (e.g., "Program Narrative," "JAG Budget and Budget Narrative," "Timelines," "Memoranda of Understanding," "Résumés") for all attachments. Also, OJP recommends that applicants include résumés in a single file.

**Failure to submit the required information will result in an application being returned in the Grants Management System (GMS) for inclusion of the missing information OR the attachment of a withholding of funds special condition at the time of award.**

1. **Information to Complete the Application for Federal Assistance (SF-424)**

   The SF-424 is a required standard form used as a cover sheet for submission of pre-applications, applications, and related information. GMS takes information from the applicant's profile to populate the fields on this form.

**Intergovernmental Review:** This funding opportunity **is** subject to Executive Order 12372. Applicants may find the names and addresses of their state's Single Point of Contact (SPOC) at the following website: www.whitehouse.gov/omb/grants_spoc/. Applicants whose state appears on the SPOC list must contact their state's SPOC to find out about, and comply with, the state's process under Executive Order 12372. In completing the SF-424, applicants whose state appears on the SPOC list are to make the appropriate selection in response to question 19 once the applicant has complied with their state's E.O. 12372 process. (Applicants whose state does not appear on the SPOC list are to make the appropriate selection in response to question 19 to indicate that the "Program is subject to E.O. 12372 but has not been selected by the State for review.")

2. **Project Abstract**
   Applications should include a high-quality project abstract that summarizes the proposed project in 400 words or less. Project abstracts should be—

   - Written for a general public audience and submitted as a separate attachment with "Project Abstract" as part of its file name.
   - Single-spaced, using a standard 12-point font (Times New Roman) with 1-inch margins
   - Include applicant name, title of the project, a brief description of the problem to be addressed and the targeted area/population, project goals and objectives, a description of the project strategy, any significant partnerships, and anticipated outcomes.
   - Identify up to 10 project identifiers that would be associated with proposed project activities. The list of identifiers can be found at www.bja.gov/funding/JAGidentifiers.pdf.

   As a separate attachment, the project abstract will **not** count against the page limit for the program narrative.

3. **Program Narrative**
   The following sections should be included as part of the program narrative:

   a. Statement of the Problem – Identify the state's strategy/funding priorities for the FY 2016 JAG funds, the subgrant award process and timeline, and a description of the programs to be funded over the 4-year grant period. States are strongly encouraged to prioritize the funding on evidence-based projects.

   b. Project Design and Implementation – Describe the state's strategic planning process that guides its priorities and funding strategy. This should include a description of how local communities are engaged in the planning process and the data and analysis utilized to support the plan; it should identify the stakeholders currently participating in the strategic planning process, the gaps in the state's needed resources for criminal justice purposes, and how JAG funds will be coordinated with state and related justice funds.

   c. Capabilities and Competencies – Describe any additional strategic planning/coordination efforts in which the SAA participates with other criminal justice criminal/juvenile justice agencies in the state.

   d. Plan for Collecting the Data Required for this Solicitation's Performance Measures – To demonstrate program progress and success, as well as to assist the Department with fulfilling its responsibilities under the Government Performance and Results Act of 1993 (GPRA), Public Law 103-62, and the GPRA Modernization Act of 2010, Public Law 111–

17

352, applicants that receive funding under this solicitation must provide data that measure the results of their work done under this solicitation. **Quarterly accountability metrics reports must be submitted through BJA's PMT, available at www.bjaperformancetools.org. The accountability measures can be found at: http://www.bjaperformancetools.org/help/jagdocs.html.**

BJA does not require applicants to submit performance measures data with their application. Performance measures are included as an alert that BJA will require successful applicants to submit specific data as part of their reporting requirements. For the application, applicants should indicate an understanding of these requirements and discuss how they will gather the required data, should they receive funding.

**Note on Project Evaluations**
Applicants that propose to use funds awarded through this solicitation to conduct project evaluations should be aware that certain project evaluations (such as systematic investigations designed to develop or contribute to generalizable knowledge) may constitute "research" for purposes of applicable DOJ human subjects protection regulations. However, project evaluations that are intended only to generate internal improvements to a program or service, or are conducted only to meet OJP's performance measure data reporting requirements likely do not constitute "research." Applicants should provide sufficient information for OJP to determine whether the particular project they propose would either intentionally or unintentionally collect and/or use information in such a way that it meets the DOJ regulatory definition of research.

Research, for the purposes of human subjects protections for OJP-funded programs, is defined as, "a systematic investigation, including research development, testing, and evaluation, designed to develop or contribute to generalizable knowledge" 28 C.F.R. § 46.102(d). For additional information on determining whether a proposed activity would constitute research, see the decision tree to assist applicants on the "Research and the Protection of Human Subjects" section of the OJP's Funding Resource Center. Applicants whose proposals may involve a research or statistical component also should review the "Data Privacy and Confidentiality Requirements" section on that web page.

**4. Budget Detail Worksheet and Budget Narrative**

Applicants must submit a budget detail worksheet and budget narrative outlining how JAG funds, including administrative funds (up to 10% of the grant award) if applicable, will be used to support and implement the program. Please note that if an applicant submits only one budget document, it must contain **both** narrative and detail information.

**a. Budget Detail Worksheet**
A sample Budget Detail Worksheet can be found at www.ojp.gov/funding/Apply/Resources/BudgetDetailWorksheet.pdf. Applicants that submit their budget in a different format should include the budget categories listed in the sample budget worksheet. The Budget Detail Worksheet should be broken down by year.

**b. Budget Narrative**
The budget narrative should thoroughly and clearly describe <u>every</u> category of expense listed in the Budget Detail Worksheet. OJP expects proposed budgets to be complete, cost effective, and allowable (e.g., reasonable, allocable, and necessary for project

18

activities). **This narrative should include a full description of all costs, including administrative costs (if applicable) and how funds will be allocated across the seven allowable JAG program areas** (law enforcement, prosecution, indigent defense, courts, crime prevention and education, corrections and community corrections, drug treatment and enforcement, planning, evaluation, technology improvement, and crime victim and witness initiatives).

Applicants should demonstrate in their budget narratives how they will maximize cost effectiveness of grant expenditures. Budget narratives should generally describe cost effectiveness in relation to potential alternatives and the goals of the project. For example, a budget narrative should detail why planned in-person meetings are necessary, or how technology and collaboration with outside organizations could be used to reduce costs, without compromising quality.

The narrative should be mathematically sound and correspond with the information and figures provided in the Budget Detail Worksheet. The narrative should explain how the applicant estimated and calculated all costs, and how they are relevant to the completion of the proposed project. The narrative may include tables for clarification purposes but need not be in a spreadsheet format. As with the Budget Detail Worksheet, the Budget Narrative should be broken down by year.

For questions pertaining to budget and examples of allowable and unallowable costs, see the DOJ Grants Financial Guide at www.ojp.gov/financialguide/index.htm.

c. **Non-Competitive Procurement Contracts In Excess of Simplified Acquisition Threshold**
If an applicant proposes to make one or more non-competitive procurements of products or services, where the non-competitive procurement will exceed the simplified acquisition threshold (also known as the small purchase threshold), which is currently set at $150,000, the application should address the considerations outlined in the Financial Guide.

d. **Pre-Agreement Costs**
For information on pre-agreement costs, see "Pre-Agreement Cost Approvals" under Section B. Federal Award Information.

5. **Indirect Cost Rate Agreement (if applicable)**
Indirect costs are allowed only under the following circumstances:
(a) The applicant has a current, federally approved indirect cost rate; or
(b) The applicant is eligible to use and elects to use the "de minimis" indirect cost rate described in the Part 200 Uniform Requirements as set out at 2 C.F.R. 200.414(f).

Attach a copy of the federally approved indirect cost rate agreement to the application. Applicants that do not have an approved rate may request one through their cognizant federal agency, which will review all documentation and approve a rate for the applicant organization, or, if the applicant's accounting system permits, costs may be allocated in the direct cost categories. For the definition of Cognizant Federal Agency, see the "Glossary of Terms" in the Financial Guide. For assistance with identifying your cognizant agency, please contact the Customer Service Center at 1-800-458-0786 or at ask.ocfo@usdoj.gov. If DOJ is

19

the cognizant federal agency, applicants may obtain information needed to submit an indirect cost rate proposal at www.ojp.gov/funding/Apply/Resources/IndirectCosts.pdf.

In order to use the "de minimis" indirect rate, attach written documentation to the application that advises OJP of both the applicant's eligibility (to use the "de minimis" rate) and its election. If the applicant elects the "de minimis" method, costs must be consistently charged as either indirect or direct costs, but may not be double charged or inconsistently charged as both. In addition, if this method is chosen then it must be used consistently for all federal awards until such time as you choose to negotiate a federally approved indirect cost rate.[4]

**6. Tribal Authorizing Resolution (if applicable)**

Tribes, tribal organizations, or third parties proposing to provide direct services or assistance to residents on tribal lands should include in their applications a resolution, a letter, affidavit, or other documentation, as appropriate, that certifies that the applicant has the legal authority from the tribe(s) to implement the proposed project on tribal lands. In those instances when an organization or consortium of tribes applies for a grant on behalf of a tribe or multiple specific tribes, the application should include appropriate legal documentation, as described above, from all tribes that would receive services or assistance under the grant. A consortium of tribes for which existing consortium bylaws allow action without support from all tribes in the consortium (i.e., without an authorizing resolution or comparable legal documentation from each tribal governing body) may submit, instead, a copy of its consortium bylaws with the application.

Applicants unable to submit an application that includes a fully-executed (i.e., signed) copy of appropriate legal documentation, as described above, consistent with the applicable tribe's governance structure, should, at a minimum, submit an unsigned, draft version of such legal documentation as part of its application (except for cases in which, with respect to a tribal consortium applicant, consortium bylaws allow action without the support of all consortium member tribes). If selected for funding, BJA will make use of and access to funds contingent on receipt of the fully-executed legal documentation.

**7. Applicant Disclosure of High Risk Status**

Applicants that are currently designated high risk by another federal grant making agency must disclose that status. This includes any status requiring additional oversight by the federal agency due to past programmatic or financial concerns. If an applicant is designated high risk by another federal grant making agency, the applicant must email the following information to OJPComplianceReporting@usdoj.gov at the time of application submission:

- The federal agency that currently designated the applicant as high risk
- Date the applicant was designated high risk
- The high risk point of contact name, phone number, and email address, from that federal agency
- Reasons for the high risk status

OJP seeks this information to ensure appropriate federal oversight of any grant award. Disclosing this high risk information does not disqualify any organization from receiving an

---

[4] See 2 C.F.R. § 200.414(f).

OJP award. However, additional grant oversight may be included, if necessary, in award documentation.

8. **Additional Attachments**

   a. **Review Narrative**
   Applicants **must** submit information documenting that the date the JAG application was made available for review by the governing body of the state, or to an organization designated by that governing body, was not less than 30 days before the application was submitted to BJA. The attachment must also specify that an opportunity to comment was provided to citizens prior to application submission to the extent applicable law or established procedures make such opportunity available.

   **Below are notification language templates that can be utilized in completing this section of the application.**

   The (**provide name of State/Territory**) made its Fiscal Year 2016 JAG application available to the (**provide name of governing body**) for its review and comment on (**provide date**); or intends to do so on (**provide date**).

   The (**provide name of State/Territory**) made its Fiscal Year 2016 JAG application available to citizens for comment prior to application submission by (**provide means of notification**); or the application has not yet been made available for public review/comment.

   b. **Strategic Plan**
   Attach a current version of your state's strategic plan with this application. DOJ is in the process of assessing the extent to which states are engaged in strategic planning allocation decisions regarding JAG funds, and the extent to which these efforts include all criminal justice stakeholders, to ensure fairness in the criminal justice system. If such a strategic plan or planning process does not currently exist, the program narrative should describe the state's plan and timeline for developing such a process.

   c. **Applicant Disclosure of Pending Applications**
   Applicants are to disclose whether they have pending applications for federally funded grants or subgrants (including cooperative agreements) that include requests for funding to support the same project being proposed under this solicitation and will cover the identical cost items outlined in the budget narrative and worksheet in the application under this solicitation. The disclosure should include both direct applications for federal funding (e.g., applications to federal agencies) and indirect applications for such funding (e.g., applications to state agencies that will subaward federal funds).

   OJP seeks this information to help avoid any inappropriate duplication of funding. Leveraging multiple funding sources in a complementary manner to implement comprehensive programs or projects is encouraged and is not seen as inappropriate duplication.

   Applicants that have pending applications as described above are to provide the following information about pending applications submitted within the last 12 months:

**BJA-2016-9021**

AR-00355

- The federal or state funding agency
- The solicitation name/project name
- The point of contact information at the applicable funding agency

| Federal or State Funding Agency | Solicitation Name/Project Name | Name/Phone/Email for Point of Contact at Funding Agency |
|---|---|---|
| DOJ/COPS | COPS Hiring Program | Jane Doe, 202/000-0000; jane.doe@usdoj.gov |
| HHS/ Substance Abuse & Mental Health Services Administration | Drug Free Communities Mentoring Program/ North County Youth Mentoring Program | John Doe, 202/000-0000; john.doe@hhs.gov |

Applicants should include the table as a separate attachment to their application. The file should be named "Disclosure of Pending Applications."

Applicants that do not have pending applications as described above are to include a statement to this effect in the separate attachment page (e.g., "[Applicant Name on SF-424] does not have pending applications submitted within the last 12 months for federally funded grants or subgrants (including cooperative agreements) that include requests for funding to support the same project being proposed under this solicitation and will cover the identical cost items outlined in the budget narrative and worksheet in the application under this solicitation.").

**d. Research and Evaluation Independence and Integrity**

If a proposal involves research and/or evaluation, regardless of the proposal's other merits, in order to receive funds, the applicant must demonstrate research/evaluation independence, including appropriate safeguards to ensure research/evaluation objectivity and integrity, both in this proposal and as it may relate to the applicant's other current or prior related projects. This documentation may be included as an attachment to the application which addresses BOTH i. and ii. below.

i. For purposes of this solicitation, applicants must document research and evaluation independence and integrity by including, at a minimum, one of the following two items:

    a. A specific assurance that the applicant has reviewed its proposal to identify any research integrity issues (including all principal investigators and subrecipients) and it has concluded that the design, conduct, or reporting of research and evaluation funded by BJA grants, cooperative agreements, or contracts will not be biased by any personal or financial conflict of interest on

the part of part of its staff, consultants, and/or subrecipients responsible for the research and evaluation or on the part of the applicant organization;

OR

b. A specific listing of actual or perceived conflicts of interest that the applicant has identified in relation to this proposal. These conflicts could be either personal (related to specific staff, consultants, and/or subrecipients) or organizational (related to the applicant or any subgrantee organization). Examples of potential investigator (or other personal) conflict situations may include, but are not limited to, those in which an investigator would be in a position to evaluate a spouse's work product (actual conflict), or an investigator would be in a position to evaluate the work of a former or current colleague (potential apparent conflict). With regard to potential organizational conflicts of interest, as one example, generally an organization could not be given a grant to evaluate a project if that organization had itself provided substantial prior technical assistance to that specific project or a location implementing the project (whether funded by OJP or other sources), as the organization in such an instance would appear to be evaluating the effectiveness of its own prior work. The key is whether a reasonable person understanding all of the facts would be able to have confidence that the results of any research or evaluation project are objective and reliable. Any outside personal or financial interest that casts doubt on that objectivity and reliability of an evaluation or research product is a problem and must be disclosed.

ii. In addition, for purposes of this solicitation applicants must address the issue of possible mitigation of research integrity concerns by including, at a minimum, one of the following two items:

a. If an applicant reasonably believes that no potential personal or organizational conflicts of interest exist, then the applicant should provide a brief narrative explanation of how and why it reached that conclusion. Applicants MUST also include an explanation of the specific processes and procedures that the applicant will put in place to identify and eliminate (or, at the very least, mitigate) potential personal or financial conflicts of interest on the part of its staff, consultants, and/or subrecipients for this particular project, should that be necessary during the grant period. Documentation that may be helpful in this regard could include organizational codes of ethics/conduct or policies regarding organizational, personal, and financial conflicts of interest.

OR

b. If the applicant has identified specific personal or organizational conflicts of interest in its proposal during this review, the applicant must propose a specific and robust mitigation plan to address conflicts noted above. At a minimum, the plan must include specific processes and procedures that the applicant will put in place to eliminate (or, at the very least, mitigate) potential personal or financial conflicts of interest on the part of its staff, consultants, and/or subrecipients for this particular project, should that be necessary

23

during the grant period. Documentation that may be helpful in this regard could include organizational codes of ethics/conduct or policies regarding organizational, personal, and financial conflicts of interest. There is no guarantee that the plan, if any, will be accepted as proposed.

Considerations in assessing research and evaluation independence and integrity will include, but are not limited to, the adequacy of the applicant's efforts to identify factors that could affect the objectivity or integrity of the proposed staff and/or the organization in carrying out the research, development, or evaluation activity; and the adequacy of the applicant's existing or proposed remedies to control any such factors.

9. **Financial Management and System of Internal Controls Questionnaire**
   In accordance with the Part 200 Uniform Requirements as set out at 2 C.F.R. 200.205, federal agencies must have in place a framework for evaluating the risks posed by applicants before they receive a federal award. To facilitate part of this risk evaluation, **all** applicants (other than an individual) are to download, complete, and submit this form.

10. **Disclosure of Lobbying Activities**
    Any applicant that expends any funds for lobbying activities is to provide the detailed information requested on the form, Disclosure of Lobbying Activities (SF-LLL).

**How to Apply**

Applicants must submit applications through the Grants Management System (GMS), which provides support for the application, award, and management of awards at OJP. Applicants **must register in GMS for each specific funding opportunity.** Although the registration and submission deadlines are the same, OJP urges applicants to **register promptly**, especially if this is their first time using the system. Find complete instructions on how to register and submit an application in GMS at www.ojp.gov/gmscbt/. Applicants that experience technical difficulties during this process should email GMS.HelpDesk@usdoj.gov or call 888-549-9901 (option 3), Monday–Friday from 6:00 a.m. to midnight, Eastern Time, except federal holidays. OJP recommends that applicants **register immediately** to prevent delays in submitting an application package by the deadline.

**Note on File Types: GMS does not accept executable file types as application attachments.** These disallowed file types include, but are not limited to, the following extensions: ".com," ".bat," ".exe," ".vbs," ".cfg," ".dat," ".db," ".dbf," ".dll," ".ini," ".log," ".ora," ".sys," and ".zip."

OJP may not make a federal award to an applicant organization until the applicant organization has complied with all applicable DUNS and SAM requirements. Individual applicants must comply with all Grants.gov requirements. If an applicant has not fully complied with the requirements by the time the federal awarding agency is ready to make a federal award, the federal awarding agency may determine that the applicant is not qualified to receive a federal award and use that determination as a basis for making a federal award to another applicant.

All applicants should complete the following steps:

1. **Acquire a Data Universal Numbering System (DUNS) number.** In general, the Office of Management and Budget (OMB) requires that all applicants (other than individuals) for federal funds include a DUNS number in their application for a new award or a supplement

24

AR-00358

to an existing award. A DUNS number is a unique nine-digit sequence recognized as the universal standard for identifying and differentiating entities receiving federal funds. The identifier is used for tracking purposes and to validate address and point of contact information for federal assistance applicants, recipients, and subrecipients. The DUNS number will be used throughout the grant life cycle. Obtaining a DUNS number is a free, one-time activity. Call Dun and Bradstreet at 866-705-5711 to obtain a DUNS number or apply online at www.dnb.com. A DUNS number is usually received within 1-2 business days.

2. **Acquire registration with the System for Award Management (SAM).** SAM is the repository for standard information about federal financial assistance applicants, recipients, and subrecipients. OJP requires that all applicants (other than individuals) for federal financial assistance maintain current registrations in the SAM database. Applicants must **update or renew their SAM registration annually** to maintain an active status. SAM registration and renewal can take as long as 10 business days to complete.

   Information about SAM registration procedures can be accessed at www.sam.gov.

3. **Acquire a GMS username and password**. New users must create a GMS profile by selecting the "First Time User" link under the sign-in box of the GMS home page. For more information on how to register in GMS, go to www.ojp.gov/gmscbt.

4. **Verify the SAM (formerly CCR) registration in GMS.** OJP requests that all applicants verify their SAM registration in GMS. Once logged into GMS, click the "CCR Claim" link on the left side of the default screen. Click the submit button to verify the SAM (formerly CCR) registration.

5. **Search for the funding opportunity on GMS.** After logging into GMS or completing the GMS profile for username and password, go to the "Funding Opportunities" link on the left side of the page. Select BJA and the **FY 16 Edward Byrne Memorial State Justice Assistance Grant (JAG) Program.**

6. **Register by selecting the "Apply Online" button associated with the funding opportunity title.** The search results from step 5 will display the funding opportunity title along with the registration and application deadlines for this funding opportunity. Select the "Apply Online" button in the "Action" column to register for this funding opportunity and create an application in the system.

7. **Follow the directions in GMS to submit an application consistent with this solicitation.** Once submitted, GMS will display a confirmation screen stating the submission was successful. **Important:** In some instances, applicants must wait for GMS approval before submitting an application. OJP urges applicants to submit the application **at least 72 hours prior** to the application due date.

**Note: Duplicate Applications**
If an applicant submits multiple versions of the same application, BJA will review only the most recent system-validated version submitted. See Note on "File Names and File Types" under How to Apply.

**Experiencing Unforeseen GMS Technical Issues**

Applicants that experience unforeseen GMS technical issues beyond their control that prevent them from submitting their application by the deadline must contact the GMS Help Desk or the SAM Help Desk (Federal Service Desk) to report the technical issue and receive a tracking number. Then the applicant must email the BJA contact identified in the Contact Information section on page 2 of this solicitation **within 24 hours after the application deadline** and request approval to submit their application. The email must describe the technical difficulties and include a timeline of the applicant's submission efforts, the complete grant application, the applicant's DUNS number, and any GMS Help Desk or SAM tracking number(s). **Note: BJA does not approve requests automatically.** After the program office reviews the submission and contacts the GMS Help Desk to validate the reported technical issues, OJP will inform the applicant whether the request to submit a late application has been approved or denied. If OJP determines that the applicant failed to follow all required procedures, which resulted in an untimely application submission, OJP will deny the applicant's request to submit their application.

The following conditions are generally insufficient to justify late submissions:

- Failure to register in SAM or GMS in sufficient time (SAM registration and renewal can take as long as 10 business days to complete)
- Failure to follow GMS instructions on how to register and apply as posted on the GMS website
- Failure to follow each instruction in the OJP solicitation
- Technical issues with the applicant's computer or information technology environment, including firewalls, browser incompatibility, etc.

# E. Application Review Information

**Review Process**

OJP is committed to ensuring a fair and open process for awarding grants. BJA reviews the application to make sure that the information presented is reasonable, understandable, measurable, and achievable, as well as consistent with the solicitation. BJA will also review applications to ensure statutory requirements have been met.

OJP reviews applications for potential awards to evaluate the risks posed by applicants before they receive an award. This review may include but is not limited to the following:

1. Financial stability and fiscal integrity
2. Quality of management systems and ability to meet the management standards prescribed in the Financial Guide
3. History of performance
4. Reports and findings from audits
5. The applicant's ability to effectively implement statutory, regulatory, or other requirements imposed on award recipients

Absent explicit statutory authorization or written delegation of authority to the contrary, the Assistant Attorney General will make all final award decisions.

# F. Federal Award Administration Information

**Federal Award Notices**

OJP sends award notification by email through GMS to the individuals listed in the application as the point of contact and the authorizing official. The email notification includes detailed instructions on how to access and view the award documents, and how to accept the award in GMS. GMS automatically issues the notifications at 9:00 p.m. eastern time on the award date (by September 30, 2016). Recipients will be required to login; accept any outstanding assurances and certifications on the award; designate a financial point of contact; and review, sign, and accept the award. The award acceptance process involves physical signature of the award document by the authorized representative and the scanning of the fully-executed award document to OJP.

**Administrative, National Policy, and other Legal Requirements**

If selected for funding, in addition to implementing the funded project consistent with the agency-approved project proposal and budget, the recipient must comply with award terms and conditions, and other legal requirements, including but not limited to OMB, DOJ, or other federal regulations which will be included in the award, incorporated into the award by reference, or are otherwise applicable to the award. OJP strongly encourages prospective applicants to review the information pertaining to these requirements **prior** to submitting an application. To assist applicants and recipients in accessing and reviewing this information, OJP has placed pertinent information on its Solicitation Requirements page of OJP's Funding Resource Center website.

Please note in particular the following two forms, which applicants must accept in GMS prior to the receipt of any award funds, as each details legal requirements with which applicants must provide specific assurances and certifications of compliance. Applicants may view these forms in the Apply section of OJP's Funding Resource Center and are strongly encouraged to review and consider them carefully prior to making an application for OJP grant funds.

- Certifications Regarding Lobbying; Debarment, Suspension and Other Responsibility Matters; and Drug-Free Workplace Requirements

- Standard Assurances

Upon grant approval, OJP electronically transmits (via GMS) the award document to the prospective award recipient. In addition to other award information, the award document contains award terms and conditions that specify national policy requirements[5] with which recipients of federal funding must comply; uniform administrative requirements, cost principles, and audit requirements; and program-specific terms and conditions required based on applicable program (statutory) authority or requirements set forth in OJP solicitations and program announcements, and other requirements which may be attached to appropriated funding. For example, certain efforts may call for special requirements, terms, or conditions relating to intellectual property, data/information-sharing or -access, or information security; or audit requirements, expenditures and milestones, or publications and/or press releases. OJP

---

[5] *See generally* 2 C.F.R. 200.300 (provides a general description of national policy requirements typically applicable to recipients of federal awards, including the Federal Funding Accountability and Transparency Act of 2006 [FFATA]).

AR-00361

also may place additional terms and conditions on an award based on its risk assessment of the applicant, or for other reasons it determines necessary to fulfill the goals and objectives of the program.

Prospective applicants may access and review the text of mandatory conditions OJP includes in all OJP awards, as well as the text of certain other conditions, such as administrative conditions, via OJP's Mandatory Award Terms and Conditions page of the OJP Funding Resource Center.

**General Information about Post-Federal Award Reporting Requirements**
Recipients must submit quarterly financial reports, semi-annual progress reports, final financial and progress reports, an annual audit report in accordance with 2 CFR 200, if applicable, and Federal Funding Accountability and Transparency Act (FFATA) reports through the FFATA Sub-award Reporting System (FSRS) as necessary. Future awards and fund drawdowns may be withheld if reports are delinquent.

Additionally, quarterly accountability metrics reports must be submitted through BJA's PMT, available at www.bjaperformancetools.org. The accountability measures can be found at: http://www.bjaperformancetools.org/help/jagdocs.html.

Please note that any law enforcement agency receiving direct or subawarded JAG funding must submit quarterly accountability metrics data related to training on use of force, racial and ethnic bias, de-escalation of conflict, and constructive engagement with the public that officers have received. **Any grantees that fail to submit this data will have their grant funds frozen.**

Special Reporting requirements may be required by OJP depending on the statutory, legislative, or administrative requirements of the recipient or the program.

# G. Federal Awarding Agency Contact(s)

For Federal Awarding Agency Contact(s), see title page.

For contact information for GMS, see title page.

# H. Other Information

**Provide Feedback to OJP**
To assist OJP in improving its application and award processes, we encourage applicants to provide feedback on this solicitation, the application submission process, and/or the application review process. Provide feedback to OJPSolicitationFeedback@usdoj.gov.

**IMPORTANT:** This email is for feedback and suggestions only. Replies are **not** sent from this mailbox. If you have specific questions on any program or technical aspect of the solicitation, **you must** directly contact the appropriate number or email listed on the front of this solicitation document. These contacts are provided to help ensure that you can directly reach an individual who can address your specific questions in a timely manner.

If you are interested in being a reviewer for other OJP grant applications, please email your resume to ojppeerreview@lmsolas.com. The OJP Solicitation Feedback email account will not forward your resume. **Note:** Neither you nor anyone else from your organization can be a peer reviewer in a competition in which you or your organization have submitted an application.

29

**Application Checklist**

**Edward Byrne Memorial Justice Assistance Grant (JAG) Program: FY 2016 State Solicitation**

This application checklist has been created to assist in developing an application.

**What an Applicant Should Do:**

*Prior to Registering in GMS:*
\_\_\_\_\_ Acquire a DUNS Number (see page 24)
\_\_\_\_\_ Acquire or renew registration with SAM (see page 25)

*To Register with GMS*:
\_\_\_\_\_ For new users, acquire a GMS username and password\* (see page 25)
\_\_\_\_\_ For existing users, check GMS username and password\* to ensure account access (see page 24)
\_\_\_\_\_ Verify SAM registration in GMS (see page 25)
\_\_\_\_\_ Search for correct funding opportunity in GMS (see page 25)
\_\_\_\_\_ Select correct funding opportunity in GMS (see page 25)
\_\_\_\_\_ Register by selecting the "Apply Online" button associated with the funding opportunity title (see page 25)
\_\_\_\_\_ Read OJP policy and guidance on conference approval, planning, and reporting available at Post Award Requirements (see page 12)
\_\_\_\_\_ If experiencing technical difficulties in GMS, contact the NCJRS Response Center (see page 26)

\*Password Reset Notice – GMS users are reminded that while password reset capabilities exist, this function is only associated with points of contacts designated within GMS at the time the account was established. Neither OJP nor the GMS Help Desk will initiate a password reset unless requested by the authorized official or a designated point of contact associated with an award or application.

**General Requirements**:

\_\_\_\_\_ Review Solicitation Requirements web page in the OJP Funding Resource Center.

**Scope Requirement:**

\_\_\_\_\_ The federal amount requested is within the allowable limit(s) of the FY 2016 JAG Allocations List as listed on BJA's JAG web page.

**Eligibility Requirement:**
\_\_\_\_\_ State/Territory listed as the legal name on the application corresponds with the eligible State/Territory listed on BJA's JAG web page.

**What an Application Should Include:**

_____ Application for Federal Assistance (SF-424) (see page 16)
_____ Intergovernmental Review     (see page 17)
_____ Project Abstract (see page 17)
_____ Program Narrative (see page 17)
_____ Budget (see page 18)
_____ Budget Narrative (see page 18)
_____ Indirect Cost Rate Agreement (if applicable) (see page 19)
_____ Tribal Authorizing Resolution (if applicable) (see page 20)
_____ Applicant Disclosure of High Risk Status (If applicable see page 20)
_____ Additional Attachments (see page 21)
        _____ Review Narrative (see page 21)
        _____ Strategic Plan (see page 21)
        _____ Applicant Disclosure of Pending Applications (see page 21)
        _____ Research and Evaluation Independence and Integrity (see page 22)
_____ Disclosure of Lobbying Activities (SF-LLL) (if applicable) (see page 24)
_____ Financial Management and System of Internal Controls Questionnaire (see page 24)

BJA-2016-9021

AR-00365

**U.S. Department of Justice**

Office of the Inspector General

The "Law Enforcement Sensitive" markings on this document were removed as a result of a sensitivity review and determination by the U.S. Department of Homeland Security, Immigration and Customs Enforcement.

~~LAW ENFORCEMENT SENSITIVE~~

May 31, 2016 [Re-posted to oig.justice.gov on September 23, 2016, due to a corrected entry in the Appendix, see page 12.]

MEMORANDUM FOR KAROL V. MASON
                        ASSISTANT ATTORNEY GENERAL
                            FOR THE OFFICE OF JUSTICE PROGRAMS

FROM:              MICHAEL E. HOROWITZ
                      INSPECTOR GENERAL

SUBJECT:        Department of Justice Referral of Allegations of Potential Violations of 8 U.S.C. § 1373 by Grant Recipients

    This is in response to your e-mail dated April 8, 2016, wherein you advised the Office of the Inspector General (OIG) that the Office of Justice Programs (OJP) had "received information that indicates that several jurisdictions [receiving OJP and Office of Violence Against Woman (OVW) grant funds] may be in violation of 8 U.S.C. § 1373." With the e-mail, you provided the OIG a spreadsheet detailing Department grants received by over 140 state and local jurisdictions and requested that the OIG "investigate the allegations that the jurisdictions reflected in the attached spreadsheet, who are recipients of funding from the Department of Justice, are in violation of 8 U.S.C. Section 1373." In addition to the spreadsheet, you provided the OIG with a letter, dated February 26, 2016, to Attorney General Loretta E. Lynch from Congressman John Culberson, Chairman of the House Appropriations Subcommittee on Commerce, Justice, Science, and Related Agencies, regarding whether Department grant recipients were complying with federal law, particularly 8 U.S.C. § 1373 (Section 1373). Attached to Chairman Culberson's letter to the Attorney General was a study conducted by the Center for Immigration Studies (CIS) in January 2016, which concluded that there are over 300 "sanctuary" jurisdictions that refuse to comply with U.S. Immigration and Customs Enforcement (ICE) detainers or otherwise impede information sharing with federal immigration officials.[1]

---

[1] Your e-mail also referenced and attached the OIG's January 2007 report, *Cooperation of SCAAP [State Criminal Alien Assistance Program] Recipients in the Removal of Criminal Aliens from the United States.* In that Congressionally-mandated report, the OIG was asked, among other things, to assess whether entities receiving SCAAP funds were "fully cooperating" with the Department of Homeland Security's efforts to remove undocumented criminal aliens from the United States, and whether SCAAP recipients had in effect policies that violated Section

LAW ENFORCEMENT SENSITIVE

The purpose of this memorandum is to update you on the steps we have undertaken to address your question and to provide you with the information we have developed regarding your request. Given our understanding that the Department's grant process is ongoing, we are available to discuss with you what, if any, further information you and the Department's leadership believe would be useful in addressing the concerns reflected in your e-mail.

## OIG Methodology

At the outset, we determined it would be impractical for the OIG to promptly assess compliance with Section 1373 by the more than 140 jurisdictions that were listed on the spreadsheet accompanying your referral. Accordingly, we judgmentally selected a sample of state and local jurisdictions from the information you provided for further review. We started by comparing the specific jurisdictions cited in the CIS report you provided to us with the jurisdictions identified by ICE in its draft *Declined Detainer Outcome Report,* dated December 2, 2014.[2] Additionally, we compared these lists with a draft report prepared by ICE that identified 155 jurisdictions and stated that "all jurisdictions on this list contain policies that limit or restrict cooperation with ICE and, as of Q3 FY 2015, have declined detainers."[3] From this narrowed list of jurisdictions, we determined, using the spreadsheet provided with your e-mail, which jurisdictions had active OJP and OVW awards as of March 17, 2016, the date through which you provided award information, and received fiscal year (FY) 2015 State Criminal Alien Assistance Program (SCAAP) payments. Lastly, we considered, based on the spreadsheet, the total dollars awarded and the number of active grants and payments made as of March 17,

---

1373. As we describe later in this memorandum, the information we have learned to date during our recent work about the present matter differs significantly from what OIG personnel found nearly 10 years ago during the earlier audit. Specifically, during the 2007 audit, ICE officials commented favorably to the OIG with respect to cooperation and information flow they received from the seven selected jurisdictions, except for the City and County of San Francisco. As noted in this memorandum, we heard a very different report from ICE officials about the cooperation it is currently receiving. Additionally, our 2007 report found that the SCAAP recipients we reviewed were notifying ICE in a timely manner of aliens in custody, accepting detainers from ICE, and promptly notifying ICE of impending releases from local custody. By contrast, as described in this memorandum, all of the jurisdictions we reviewed had ordinances or policies that placed limits on cooperation with ICE in connection with at least one of the three areas assessed in 2007.

[2] At the time of our sample selection we only had a draft version of this report. We later obtained an updated copy which was provided to Congress on April 16, 2016. Although it was provided to Congress, this report was also marked "Draft." The updated draft version of the report did not require us to alter our sample selection.

[3] This version of the declined detainer report covered declined detainers from January 1, 2014 through June 30, 2015.

2

AR-00367

**LAW ENFORCEMENT SENSITIVE**

2016, and sought to ensure that our list contained a mix of state and local jurisdictions.

Using this process, we judgmentally selected 10 state and local jurisdictions for further review: the States of Connecticut and California; City of Chicago, Illinois; Clark County, Nevada; Cook County, Illinois; Miami-Dade County, Florida; Milwaukee County, Wisconsin; Orleans Parish, Louisiana; New York, New York; and Philadelphia, Pennsylvania. These 10 jurisdictions represent 63 percent of the total value of the active OJP and OVW awards listed on the spreadsheet as of March 17, 2016, and FY 2015 SCAAP payments made by the Department.

Section 1373 states in relevant part:

(a) **In General**. Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

(b) **Additional authority of government entities.** Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:

(1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.

(2) Maintaining such information.

(3) Exchanging such information with any other Federal, State, or local government entity.

According to the legislative history contained in the House of Representatives Report, Section 1373 was intended "to give State and local officials the authority to communicate with the Immigration and Naturalization Service (INS) regarding the presence, whereabouts, and activities of illegal aliens. This section is designed to prevent any State or local law, ordinance, executive order, policy, constitutional provision, or decision of any Federal or State court that prohibits or in any way restricts any communication between State and local officials and the INS."[4]

---

[4] House of Representatives Report, *Immigration in the National Interest Act of 1995*, (H.R. 2202), 1996, H. Rept. 104-469, https://www.congress.gov/104/crpt/hrpt469/CRPT-

AR-00368

LAW ENFORCEMENT SENSITIVE

For the 10 selected jurisdictions, we researched the local laws and policies that govern their interactions with ICE – particularly those governing the ability of the jurisdictions' officers to receive or share information with federal immigration officials. We then compared these local laws and policies to Section 1373 in order to try to determine whether they were in compliance with the federal statute. We also spoke with ICE officials in Washington, D.C., to gain their perspective on ICE's relationship with the selected jurisdictions and their views on whether the application of these laws and policies was inconsistent with Section 1373 or any other federal immigration laws.

The sections that follow include our analysis of the selected state and local laws and policies.

## State and Local Cooperation with ICE

A primary and frequently cited indicator of limitations placed on cooperation by state and local jurisdictions with ICE is how the particular state or local jurisdiction handles immigration detainer requests issued by ICE, although Section 1373 does not specifically address restrictions by state or local entities on cooperation with ICE regarding detainers.[5] A legal determination has been made by the Department of Homeland Security (DHS) that civil immigration detainers are voluntary requests.[6] The ICE officials with whom we spoke stated that since the detainers are considered to be voluntary, they are not enforceable against jurisdictions which do not comply, and these ICE officials stated further that state and local jurisdictions throughout the United States vary significantly on how they handle such requests.

In our selected sample of state and local jurisdictions, as detailed in the Appendix, each of the 10 jurisdictions had laws or policies directly related to how those jurisdictions could respond to ICE detainers, and each limited in some way the authority of the jurisdiction to take action with regard to ICE detainers. We found that while some honor a civil immigration detainer request when the subject meets certain conditions, such as prior felony

---

104hrpt469-pt1.pdf (accessed May 24, 2016).

[5] A civil immigration detainer request serves to advise a law enforcement agency that ICE seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien. 8 C.F.R. § 287.7(a)

[6] Several courts have reached a similar conclusion about the voluntary nature of ICE detainers. See *Galarza v, Szalczyk et al*, 745 F.3d 634 (3rd Cir. 2014) (noting that all Courts of Appeals to have considered the character of ICE detainers refer to them as "requests," and citing numerous such decisions); and *Miranda-Olivares v. Clackamas County*, 2014 1414305 (D. Or. 2014).

4

AR-00369

LAW ENFORCEMENT SENSITIVE

convictions, gang membership, or presence on a terrorist watch list, others will not honor a civil immigration detainer request, standing alone, under any circumstances. ICE officials told us that because the requests are voluntary, local officials may also consider budgetary and other considerations that would otherwise be moot if cooperation was required under federal law.

We also found that the laws and policies in several of the 10 jurisdictions go beyond regulating responses to ICE detainers and also address, in some way, the sharing of information with federal immigration authorities. For example, a local ordinance for the City of Chicago, which is entitled "Disclosing Information Prohibited," states as follows:

> Except as otherwise provided under applicable federal law, no agent or agency shall disclose information regarding the citizenship or immigration status of any person unless required to do so by legal process or such disclosure has been authorized in writing by the individual to whom such information pertains, or if such individual is a minor or is otherwise not legally competent, by such individual's parent or guardian. *Chicago Code, Disclosing Information Prohibited § 2-173-030.*

The ordinance's prohibition on a city employee providing immigration status information "unless required to do so by legal process" is inconsistent with the plain language of Section 1373 prohibiting a local government from restricting a local official from sending immigration status information to ICE. The "except as otherwise provided under applicable federal law" provision, often referred to as a "savings clause," creates a potential ambiguity as to the proper construction of the Chicago ordinance and others like it because to be effective, this "savings clause" would render the ordinance null and void whenever ICE officials requested immigration status information from city employees. Given that the very purpose of the Chicago ordinance, based on our review of its history, was to restrict and largely prohibit the cooperation of city employees with ICE, we have significant questions regarding any actual effect of this "savings clause" and whether city officials consider the ordinance to be null and void in that circumstance.[7]

---

[7] The New Orleans Police Department's (NOPD) policy dated February 28, 2016, and entitled "Immigration Status" also seemingly has a "savings clause" provision, but its language likewise presents concerns. In your April 8 e-mail to me, you attached questions sent to the Attorney General by Sen. Vitter regarding whether the NOPD's recent immigration policy was in compliance with Section 1373. Paragraph 12 of the NOPD policy is labeled "Disclosing Immigration Information" and provides that "Members shall not disclose information regarding the citizenship or immigration status of any person unless:

(a) Required to do so by federal or state law; or

(b) Such disclosure has been authorized in writing by the person who is the subject of the request for information; or

5

AR-00370

LAW ENFORCEMENT SENSITIVE

In addition, whatever the technical implication of the clause generally referencing federal law, we have concerns that unless city employees were made explicitly aware that the local ordinance did not limit their legal authority to respond to such ICE requests, employees likely would be unaware of their legal authority to act inconsistently with the local ordinance. We noted that in connection with the introduction of this local ordinance the Mayor of Chicago stated, "[w]e're not going to turn people over to ICE and we're not going to check their immigration status, we'll check for criminal background, but not for immigration status."[8] We believe this stated reason for the ordinance, and its message to city employees, has the potential to affect the understanding of

---

  (c) The person is a minor or otherwise not legally competent, and disclosure is authorized in writing by the person's parent or guardian.

Sub-section (a) applies only when an NOPD employee has an affirmative obligation, i.e., is "required" by federal law, to disclose information regarding citizenship or immigration status. Section 1373, however, does not "require" the disclosure of immigration status information; rather, it provides that state and local entities shall not prohibit or restrict the sharing of immigration status information with ICE. Accordingly, in our view, sub-section (a) of the NOPD policy would not serve as a "savings clause" in addressing Section 1373. Thus, unless the understanding of NOPD's employees is that they are not prohibited or restricted from sharing immigration status information with ICE, the policy would be inconsistent with Section 1373. We did not consider selecting the City of New Orleans to evaluate in this memorandum because it was not listed as a grant recipient on the spreadsheet you provided.

Similarly, the City and County of San Francisco, CA administrative code, Section 12H.2, is entitled "Immigration Status" and provides, "No department, agency, commission, officer or employee of the City and County of San Francisco shall use any City funds or resources to assist in the enforcement of federal immigration law or to gather or disseminate information regarding the immigration status of individuals in the City and County of San Francisco unless such assistance is required by federal or State statute, regulation or court decision." As with the NOPD policy, a "savings clause" that only applies when a city employee is "required" by federal law to take some action would not seem to be effective in precluding the law from running afoul of Section 1373, which "requires" nothing, but instead mandates that state and local entities not prohibit, or in any way restrict, the sharing of immigration status information with ICE. Thus, as with the NOPD policy, unless the understanding of San Francisco employees is that they are permitted to share immigration status information with ICE, the policy would be inconsistent with Section 1373. According to news reports, last week the San Francisco Board of Supervisors reaffirmed its policy restricting local law enforcement's authority to assist ICE, except in limited circumstances. Curtis Skinner, "San Francisco Lawmakers Vote to Uphold Sanctuary City Policy," *Reuters*, May 24, 2016, http://www.reuters.com/article/us-sanfrancisco-immigration-idUSKCN0YG065 (accessed May 26, 2016). We did not consider selecting the City and County of San Francisco to evaluate in this memorandum because it was not listed as a grant recipient on the spreadsheet you provided.

  [8] Kristen Mack, "Emanuel Proposes Putting Nondetainer Policy On Books," *Chicago Tribune*, July 11, 2012, http://articles.chicagotribune.com/2012-07-11/news/ct-met-rahm-emanuel-immigrants-0711-2012 (accessed May 24, 2017).

AR-00371

LAW ENFORCEMENT SENSITIVE

local officials regarding the performance of their duties, including the applicability of any restrictions on their interactions and cooperation with ICE.

Similarly, we have concerns that other local laws and policies, that by their terms apply to the handling of ICE detainer requests, may have a broader practical impact on the level of cooperation afforded to ICE by these jurisdictions and may, therefore, be inconsistent with at least the intent of Section 1373.[9] Specifically, local policies and ordinances that purport to be focused on civil immigration detainer requests, yet do not explicitly restrict the sharing of immigration status information with ICE, may nevertheless be affecting ICE's interactions with the local officials regarding ICE immigration status requests. We identified several jurisdictions with policies and ordinances that raised such concerns, including Cook County, Orleans Parish, Philadelphia, and New York City.

For example, the Cook County, Illinois, detainer policy states, "unless ICE agents have a criminal warrant, or County officials have a legitimate law enforcement purpose that is not related to the enforcement of immigration laws, ICE agents shall not be given access to individuals or allowed to use County facilities for investigative interviews or other purposes, and County personnel shall not expend their time responding to ICE inquiries or communicating with ICE regarding individuals' incarceration status or release dates while on duty." Although this policy falls under the heading "Section 46-37 – Policy for responding to ICE Detainers" and does not explicitly proscribe sharing immigration status information with ICE, the portion of the prohibition relating to personnel expending their time responding to ICE inquiries could easily be read by Cook County officials and officers as more broadly prohibiting them from expending time responding to ICE requests relating to immigration status. This possibility was corroborated by ICE officials who told us that Cook County officials "won't even talk to us [ICE]."

In Orleans Parish, Louisiana, Orleans Parish Sheriff's Office (OPSO) policy on "ICE Procedures" states that, "OPSO officials shall not initiate any immigration status investigation into individuals in their custody or affirmatively provide information on an inmate's release date or address to ICE." While the latter limitation applies by its terms to information related to release date or address, taken in conjunction with the prior ban on initiating immigration status investigations, the policy raises a similar concern as to the

---

[9] A reasonable reading of Section 1373, based on its "in any way restrict" language, would be that it applies not only to the situation where a local law or policy specifically prohibits or restricts an employee from providing citizenship or immigration status information to ICE, but also where the actions of local officials result in prohibitions or restrictions on employees providing such information to ICE.

AR-00372

LAW ENFORCEMENT SENSITIVE

limits it places on the authority of OPSO officials to share information on that topic with ICE.

In Philadelphia, Pennsylvania, the Mayor, on January 4, 2016, issued an executive order that states, in part, that notice of the pending release of the subject of an ICE immigration detainer shall not be provided to ICE "unless such person is being released after conviction for a first or second degree felony involving violence and the detainer is supported by a judicial warrant." According to news reports, the purpose of the order was to bar almost all cooperation between city law enforcement and ICE.[10]

In New York City (NYC), a law enacted in November 2014 restricts NYC Department of Corrections personnel from communicating with ICE regarding an inmate's release date, incarceration status, or upcoming court dates unless the inmate is the subject of a detainer request supported by a judicial warrant, in which case personnel may honor the request. The law resulted in ICE closing its office on Riker's Island and ceasing operations on any other NYC Department of Corrections property.

Although the Cook County, Orleans Parish, Philadelphia, and New York City local policies and ordinances purport to be focused on civil immigration detainer requests, and none explicitly restricts the sharing of immigration status with ICE, based on our discussions with ICE officials about the impact these laws and policies were having on their ability to interact with local officials, as well as the information we have reviewed to date, we believe these policies and others like them may be causing local officials to believe and apply the policies in a manner that prohibits or restricts cooperation with ICE in all respects.[11] That, of course, would be inconsistent with and prohibited by Section 1373.[12]

---

[10] Michael Matza, "Kenney restores 'sanctuary city' status," *Philadelphia Inquirer*, January 6, 2016, http://articles.philly.com/2016-01-06/news/69541175_1_south-philadelphia-secure-communities-ice (accessed May 24, 2016) and "Kenney rejects U.S. request to reverse 'sanctuary city' status," *Philadelphia Inquirer, May 4, 2016,* http://www.philly.com/philly/news/20160504_Kenney_rejects_Homeland_Security_s_request_to_reverse_Philadelphia_s__sanctuary_city__status.html (accessed May 24, 2016)

[11] For example, the Newark, NJ police department issued a "Detainer Policy" instructing all police personnel that "There shall be no expenditure of any departmental resources or effort by on-duty personnel to comply with an ICE detainer request." More generally, Taos County, NM detention center policy states: "There being no legal authority upon which the United States may compel expenditure of country resources to cooperate and enforce its immigration laws, there shall be no expenditure of any county resources or effort by on-duty staff for this purpose except as expressly provided herein."

[12] The ICE officials we spoke with noted that no one at DHS or ICE has made a formal legal determination whether certain state and local laws or policies violate Section 1373, and we are unaware of any Department of Justice decision in that regard. These ICE officials were

AR-00373

LAW ENFORCEMENT SENSITIVE

**Effect on Department of Justice 2016 Grant Funding**

We note that, in March 2016, OJP notified SCAAP and JAG applicants about the requirement to comply with Section 1373, and advised them that if OJP receives information that an applicant may be in violation of Section 1373 (or any other applicable federal law) that applicant may be referred to the OIG for investigation. The notification went on to state that if the applicant is found to be in violation of an applicable federal law by the OIG, the applicant may be subject to criminal and civil penalties, in addition to relevant OJP programmatic penalties, including cancellation of payments, return of funds, participation in the program during the period of ineligibility, or suspension and debarment.

In light of the Department's notification to grant applicants, and the information we are providing in this memorandum, to the extent the Department's focus is on ensuring that grant applicants comply with Section 1373, based on our work to date we believe there are several steps that the Department can consider taking:

- Provide clear guidance to grant recipients regarding whether Section 1373 is an "applicable federal law" that recipients would be expected to comply with in order to satisfy relevant grant rules and regulations;[13]

- Require grant applicants to provide certifications specifying the applicants' compliance with Section 1373, along with documentation sufficient to support the certification.

- Consult with the Department's law enforcement counterparts at ICE and other agencies, prior to a grant award, to determine whether, in their view, the applicants are prohibiting or restricting employees from sharing with ICE information regarding the citizenship or immigration status of individuals, and are therefore not in compliance with Section 1373.

- Ensure that grant recipients clearly communicate to their personnel the provisions of Section 1373, including those

---

also unaware of any legal action taken by the federal government against a state or local jurisdiction to require cooperation.

[13] We note that AAG Kadzik's letter to Chairman Culberson dated March 18, 2016, states that Section 1373 "could" be an applicable federal law that with which grant recipients must comply in order to receive grant funds, not that it is, in fact, an applicable federal law.

9

AR-00374

**LAW ENFORCEMENT SENSITIVE**

employees cannot be prohibited or restricted from sending citizenship or immigration status information to ICE.

These steps would not only provide the Department with assurances regarding compliance with Section 1373 prior to a grant award, but also would be helpful to the OIG if the Department were to later refer to the OIG for investigation a potential Section 1373 violation (as the Department recently warned grant applicants it might do in the future).

We would be pleased to meet with you and Department's leadership to discuss any additional audit or investigative efforts by the OIG that would further assist the Department with regard to its concerns regarding Section 1373 compliance by state and local jurisdictions. Such a meeting would allow us to better understand what information the Department's management would find useful so that the OIG could assess any request and consult with our counterparts at the Department of Homeland Security Office of the Inspector General, which would necessarily need to be involved in any efforts to evaluate the specific effect of local policies and ordinances on ICE's interactions with those jurisdictions and their compliance with Section 1373.

Thank you for referring this matter to the OIG. We look forward to hearing from you regarding a possible meeting.

AR-00375