# Exhibit 10

**LAW ENFORCEMENT SENSITIVE**

APPENDIX

**OIG Approach**

At the outset, we determined it would be impractical for the OIG to promptly assess compliance with Section 1373 by the more than 140 jurisdictions that were listed on the spreadsheet accompanying your referral. Accordingly, we judgmentally selected a sample of state and local jurisdictions from the information you provided for further review.  We started by comparing the specific jurisdictions cited in the CIS report you provided to us with the jurisdictions identified by ICE in its draft *Declined Detainer Outcome Report,* dated December 2, 2014.[14]  Additionally, we compared these lists with a draft report prepared by ICE that identified 155 jurisdictions and stated that "all jurisdictions on this list contain policies that limit or restrict cooperation with ICE and, as of Q3 FY 2015, have declined detainers."[15]  From this narrowed list of jurisdictions, we determined, using the spreadsheet that you provided with your e-mail, which jurisdictions had active OJP and OVW awards as of March 17, 2016, the date through which you provided award information, and received fiscal year (FY) 2015 State Criminal Alien Assistance Program (SCAAP) payments.  Lastly, we considered, based on the spreadsheet, the total dollars awarded and the number of active grants and payments made as of March 17, 2016, and sought to ensure that our list contained a mix of state and local jurisdictions. Using this process we selected the 10 jurisdictions listed in the following table for further review.  The dollar figure represents 63 percent of the active OJP awards as of March 17, 2016, and FY 2015 SCAAP payments made by the Department.

| Jurisdiction | Total Award Amounts Reported by OJP |
|---|---|
| State of Connecticut | $69,305,444 |
| State of California | $132,409,635 |
| Orleans Parish, Louisiana | $4,737,964 |
| New York, New York | $60,091,942 |
| Philadelphia, Pennsylvania | $16,505,312 |
| Cook County, Illinois | $6,018,544 |
| City of Chicago, Illinois | $28,523,222 |
| Miami-Dade County, Florida | $10,778,815 |
| Milwaukee, Wisconsin | $7,539,572 |
| Clark County, Nevada | $6,257,951 |
| **TOTAL** | **$342,168,401** |

Source:  OJP

---

[14]  At the time of our sample selection we only had a draft version of this report.  We later obtained an updated copy which was provided to Congress on April 16, 2016.  Although it was provided to Congress, this report was also marked "Draft."  The updated draft version of the report did not require us to alter our sample selection.

[15]  This version of the declined detainer report covered declined detainers from January 1, 2014 through June 30, 2015.

AR-00376

**LAW ENFORCEMENT SENSITIVE**

The following table lists each of the jurisdictions selected for review by the OIG and the key provisions of its laws or policies related to ICE civil immigration detainer requests and the sharing of certain information with ICE, if applicable.

| Jurisdiction | Provisions of Key Local Laws or Policies Related to Civil Immigration Detainer Requests or Information Sharing with ICE [16] |
|---|---|
| State of Connecticut<br><br>**The statement of Connecticut law has been corrected from a prior version of this memorandum. This correction does not affect the analysis or conclusions of this memorandum. We regret the error, and have notified those to whom we sent the memorandum of the correction.** | *Public Act No. 13-155, An Act Concerning Civil Immigration Detainers …*<br><br>(b) No law enforcement officer who receives a civil immigration detainer with respect to an individual who is in the custody of the law enforcement officer shall detain such individual pursuant to such civil immigration detainer unless the law enforcement official determines that the individual:<br>(1) Has been convicted of a felony;<br>(2) Is subject to pending criminal charges in this state where bond has not been posted;<br>(3) Has an outstanding arrest warrant in this state;<br>(4) Is identified as a known gang member in the database of the National Crime Information Center or any similar database or is designated as a Security Risk Group member or a Security Risk Group Safety Threat member by the Department of Correction;<br>(5) Is identified as a possible match in the federal Terrorist Screening Database or similar database;<br>(6) Is subject to a final order of deportation or removal issued by a federal immigration authority; or<br>(7) Presents an unacceptable risk to public safety, as determined by the law enforcement officer.<br><br>(c) Upon determination by the law enforcement officer that such individual is to be detained or released, the law enforcement officer shall immediately notify United States Immigration and Customs Enforcement. If the individual is to be detained, the law enforcement officer shall inform United States Immigration and Customs Enforcement that the individual will be held for a maximum of forty-eight hours, excluding Saturdays, Sundays and federal holidays. If United States Immigration and Customs Enforcement fails to take custody of the individual within such forty-eight-hour period, the law enforcement officer shall release the individual. In no event shall an individual be detained for longer than such forty-eight-hour period solely on the basis of a civil immigration detainer.<br>**Approved June 25, 2013** |

---

[16] Several specific citations to various state and local laws and policies were removed for brevity.

12

AR-00377

**LAW ENFORCEMENT SENSITIVE**

| Jurisdiction | Provisions of Key Local Laws or Policies Related to Civil Immigration Detainer Requests or Information Sharing with ICE [16] |
|---|---|
| State of California | *An act to add Chapter 17.1 (commencing with Section 7282) to Division 7 of Title I of the Government Code, relating to state government....*<br><br>7282.5. (a) A law enforcement official shall have discretion to cooperate with federal immigration officials by detaining an individual on the basis of an immigration hold after that individual becomes eligible for release from custody only if the continued detention of the individual on the basis of the immigration hold would not violate any federal, state, or local law, or any local policy, and only under any of the following circumstances ...<br><br>**Effective Date: October 5, 2013.** |
| Orleans Parish, Louisiana | The Orleans Parish Sheriff's Office (OPSO) shall decline all voluntary ICE detainer requests unless the individual's charge is for one or more of the following offenses: First Degree Murder; Second Degree Murder; Aggravated Rape; Aggravated Kidnapping; Treason; or Armed Robbery with Use of a Firearm.  If a court later dismisses or reduces the individual's charge such that the individual is no longer charged with one of the above offenses or the court recommends declining the ICE hold request, OPSO will decline the ICE hold request on that individual.<br><br>**Orleans Parish Sheriff's Office Index No. 501.15, Updated June 21, 2013.** |
| New York, New York | <u>Title</u>: *A Local Law to amend the administrative code of the city of New York, in relation to persons not to be detained by the department of correction.*<br><br><u>Bill Summary</u>: ... The DOC would only be permitted to honor an immigration detainer if it was accompanied by a warrant from a federal judge, and also only if that person had not been convicted of a "violent or serious" crime during the last five years or was listed on a terrorist database. Further, the bill would prohibit DOC from allowing ICE to maintain an office on Rikers Island or any other DOC property and would restrict DOC personnel from communicating with ICE regarding an inmate's release date, incarceration status, or court dates, unless the inmate is the subject of a detainer request that DOC may honor pursuant to the law.<br><br>**Enacted Date: November 14, 2014, Law No. 2014/058.** |

13

AR-00378

**LAW ENFORCEMENT SENSITIVE**

| Jurisdiction | Provisions of Key Local Laws or Policies Related to Civil Immigration Detainer Requests or Information Sharing with ICE [16] |
|---|---|
| Philadelphia, Pennsylvania | *Executive Order No. 5-16 - Policy Regarding U.S. Immigration and Customs Enforcement Agency Detainer Requests...*<br><br>NOW, THEREFORE, I, JAMES F. KENNEY, Mayor of the City of Philadelphia, by the powers vested in me by the Philadelphia Home Rule Charter, do hereby order as follows:<br><br>SECTION 1. No person in the custody of the City who otherwise would be released from custody shall be detained pursuant to an ICE civil immigration detainer request pursuant to 8 C.F.R. § 287.7, nor shall notice of his or her pending release be provided, unless such person is being released after conviction for a first or second degree felony involving violence and the detainer is supported by a judicial warrant.<br><br>**Signed by Philadelphia Mayor, January 4, 2016.** |
| Cook County, Illinois | *Sec. 46-37- Policy for responding to ICE detainers ...*<br><br>(b) Unless ICE agents have a criminal warrant, or County officials have a legitimate law enforcement purpose that is not related to the enforcement of immigration laws, ICE agents shall not be given access to individuals or allowed to use County facilities for investigative interviews or other purposes, and County personnel shall not expend their time responding to ICE inquiries or communicating with ICE regarding individuals' incarceration status or release dates while on duty.<br><br>**Approved and adopted by the President of the Cook County Board of Commissioners on September 7, 2011.** |
| City of Chicago, Illinois | *Civil Immigration Enforcement Actions – Federal Responsibility §2-173-042 ...*<br><br>(b)(1) Unless an agent or agency is acting pursuant to a legitimate law enforcement purpose that is unrelated to the enforcement of a civil immigration law, no agency or agent shall:<br>    (A) permit ICE agents access to a person being detained by, or in the custody of, the agency or agent;<br>    (B) permit ICE agents use of agency facilities for investigative interviews or other investigative purpose; or<br>    (C) while on duty , expend their time responding to |

14

AR-00379

**LAW ENFORCEMENT SENSITIVE**

| Jurisdiction | Provisions of Key Local Laws or Policies Related to Civil Immigration Detainer Requests or Information Sharing with ICE [16] |
|---|---|
| | ICE inquiries or communicating with ICE regarding a person's custody status or release date … |
| | *Disclosing Information Prohibited § 2-173-030* |
| | Except as otherwise provided under applicable federal law, no agent or agency shall disclose information regarding the citizenship or immigration status of any person unless required to do so by legal process or such disclosure has been authorized in writing by the individual to whom such information pertains, or if such individual is a minor or is otherwise not legally competent, by such individual's parent or guardian. |
| | **Updated November 8, 2012.** |
| Miami-Dade County, Florida | *Resolution No. R-1008-13:  Resolution directing the mayor or mayor's designee to implement policy on responding to detainer requests from the United States Department of Homeland Security Immigration and Customs Enforcement* |
| | NOW, THEREFORE, BE IT RESOLVED BY THE BOARD OF COUNTY COMMISSIONERS OF MIAMI-DADE COUNTY, FLORIDA, that the Mayor or Mayor's designee is directed to implement a policy whereby Miami-Dade Corrections and Rehabilitations Department may, in its discretion, honor detainer requests issued by United States Immigration and Customs Enforcement only if the federal government agrees in writing to reimburse Miami-Dade County for any and all costs relating to compliance with such detainer requests and the inmate that is the subject of such a request has a previous conviction for a Forcible Felony, as defined in Florida Statute section 776.08, or the inmate that is the subject of such a request has, at the time the Miami-Dade Corrections and Rehabilitations Department receives the detainer request, a pending charge of a non-bondable offense, as provided by Article I, Section 14 of the Florida Constitution, regardless of whether bond is eventually granted. |
| | **Resolution passed and adopted by Miami-Dade Mayor, December 3, 2013.** |
| Milwaukee County, Wisconsin | Amended Resolution - File No. 12-135 |
| | BE IT RESOLVED, that the Milwaukee County Board of Supervisors hereby adopts the following policy with regard to detainer requests from the U.S. Department of |

AR-00380

**LAW ENFORCEMENT SENSITIVE**

| Jurisdiction | Provisions of Key Local Laws or Policies Related to Civil Immigration Detainer Requests or Information Sharing with ICE [16] |
|---|---|
|  | Homeland Security - Immigrations and Customs Enforcement: <br><br> 1. Immigration detainer requests from Immigrations and Customs Enforcement shall be honored only if the subject of the request: <br> a) Has been convicted of at least one felony or two non-traffic misdemeanor offenses <br> b) Has been convicted or charged with any domestic violence offense or any violation of a protective order <br> c) Has been convicted or charged with intoxicated use of a vehicle <br> d) Is a defendant in a pending criminal case, has an outstanding criminal warrant, or is an identified gang member <br> e) Is a possible match on the US terrorist watch list <br><br> **Enacted: June 4, 2012** |
| Clark County, Nevada | "Recent court decisions have raised Constitutional concerns regarding detention by local law enforcement agencies based solely on an immigration detainer request from the Immigration and Customs Enforcement (ICE).  Until this areas of the law is further clarified by the courts, effective immediately the Las Vegas Metropolitan Police Department will no longer honor immigration detainer requests unless one of the following conditions are met: <br><br> 1. Judicial determination of Probable Cause for that detainer; or <br> 2. Warrant from a judicial officer. <br><br> … The Las Vegas Metropolitan Police Department continues to work with our federal law enforcement partners and will continue to provide professional services to the Las Vegas community regardless of their immigration status in United States. <br><br> **Via Press Release on: July 14, 2014.** |

16

AR-00381



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

July 7, 2016

The Honorable John A. Culberson
Chairman
Subcommittee on Commerce, Justice, Science and Related Agencies
Committee on Appropriations
U.S. House of Representatives
Washington, DC   20515

Dear Mr. Chairman:

 This supplements the Department of Justice's (the Department) March 18, 2016, letter to you regarding compliance with applicable federal law by certain Department grantees.

 At that time, we notified you that we had been in contact with the Department's Inspector General (IG) to discuss compliance with 8 U.S.C. § 1373 (Section 1373) and the relationship to our grant/reimbursement programs. We made clear that we shared your February 26, 2016, correspondence with the IG and planned to work with him as appropriate to enable his review of grantee compliance with Section 1373. As you know, the Department subsequently provided the IG information necessary for him to conduct his review, and on May 31, 2016, the IG provided a memorandum to the Department describing the results of his review ("IG Memorandum"). On July 7, 2016, the Department responded to the IG. A copy of this response is enclosed for your reference.

 In addition to providing information to the IG, in our correspondence of March 18, 2016, we also told you that we would emphasize to prospective applicants the importance and requirement of adherence to all applicable federal laws under the FY 2016 Edward Byrne Justice Assistance Grant (JAG) Program and State Criminal Alien Assistance Program (SCAAP).

 Consistent with our commitment to you and the recommendations received from the IG, on July 7, 2016, the Department's Office of Justice Programs (OJP)—which has determined that Section 1373 is an applicable federal law for the purposes of JAG and SCAAP— provided the enclosed guidance on the requirements of Section 1373 to all such recipients, including but not limited to those jurisdictions identified in the IG Memorandum.

 To ensure that grantees comply with Section 1373 and all other applicable federal law, OJP already requires all grant applicants electronically to acknowledge and accept the conditions contained in two documents— "General Assurances" and "General Certifications"—as preconditions to a grant award. The General Assurances document (enclosed) currently states: "The applicant hereby assures and certifies compliance with all applicable Federal

The Honorable John A. Culberson
Page Two

statutes, regulations, policies, guidelines, and requirements ...." These assurances and
certifications are required for participation in the SCAAP repayment program as well.

In addition to clarifying the meaning of Section 1373, the guidance includes responses to
other questions received from Bureau of Justice Assistance grantees regarding compliance with
Section 1373. Additionally, OJP has requested that recipients ensure that the Department's
guidance is clearly communicated to their personnel and subrecipients, as well as other relevant
partners and/or other entities. We believe that these steps will help ensure that recipients are
complying with Section 1373.

We hope this information is helpful. Please do not hesitate to contact this office if we may
provide additional assistance regarding this or any other matter.

Sincerely,

Peter J. Kadzik
Assistant Attorney General

Enclosures

cc:     The Honorable Mike Honda
        Acting Ranking Member



**U.S. Department of Justice**

Office of Justice Programs

*Office of the Assistant Attorney General*

*Washington, D.C. 20531*

July 7, 2016

**MEMORANDUM**

TO:            Michael Horowitz
                       Inspector General
                       U.S. Department of Justice

FROM:       Karol V. Mason
                       Assistant Attorney General
                       Office of Justice Programs

SUBJECT:    Response: Department of Justice Referral of Allegations of Potential
                       Violations of 8 U.S.C. § 1373 by Grant Recipients

      We appreciate the review undertaken by the Department of Justice (DOJ or the Department), Office of the Inspector General (OIG) regarding compliance with 8 U.S.C. § 1373 (Section 1373) by the Department's grant recipients. In conducting this review, OIG selected 10 state and local jurisdictions for further review. For these jurisdictions, OIG researched the local laws and policies that govern their interactions with U.S. Immigration and Customs Enforcement (ICE) and compared these local laws and policies with Section 1373. OIG then provided this report to the Department to assist the Department in determining the appropriate next steps to ensure compliance with Section 1373.

      The Office of Justice Programs (OJP) has determined that Section 1373 is an applicable federal law for the purposes of the Edward Byrne Memorial Justice Assistance Grant (JAG) program and the State Criminal Alien Assistance Program (SCAAP). To ensure that grantees comply with Section 1373, OJP has provided the attached guidance to all JAG and SCAAP grantees. Notably, this guidance provides grantees and applicants with clear direction on the requirements of Section 1373:

      Title 8, United States Code, Section 1373 addresses the exchange of information regarding citizenship and immigration status among federal, state, and local government entities and officials. Subsection (a) prevents federal, state and local government entities and officials from "prohibit[ing] or in any way restrict[ing]" government officials or entities from sending to, or receiving from, federal immigration officers information concerning an individual's citizenship or immigration status. Subsection (b) provides that no person or agency may

AR-00384

"prohibit, or in any way restrict," a federal, state, or local government entity from (1) sending to, or requesting or receiving from, federal immigration officers information regarding an individual's immigration status, (2) maintaining such information, or (3) exchanging such information with any other federal, state, or local government entity. Section 1373 does not impose on states and localities the affirmative obligation to collect information from private individuals regarding their immigration status, nor does it require that states and localities take specific actions upon obtaining such information. Rather, the statute prohibits government entities and officials from taking action to prohibit or in any way restrict the maintenance or intergovernmental exchange of such information, including through written or unwritten policies or practices.

To ensure that grantees comply with Section 1373 and all other applicable federal law, OJP already requires all applicants for any grant program electronically to acknowledge and accept the conditions contained in two attached documents titled "Standard Assurances" and "Certifications Regarding Lobbying; Debarment, Suspension and Other Responsibility Matters; and Drug-Free Workplace Requirements" as preconditions to a grant award. The Standard Assurances document currently states: "The applicant hereby assures and certifies compliance with all applicable Federal statutes, regulations, policies, guidelines, and requirements ...." These assurances and certifications are required for participation in the SCAAP repayment program as well.

Accompanying this letter are Q&As in response to questions received from Bureau of Justice Assistance grantees regarding compliance with Section 1373. Additionally, OJP has requested that grantees ensure that the Department's guidance is clearly communicated to their personnel and subrecipients, as well as other relevant partners and/or other entities. We believe that these steps will help ensure that grantees are complying with Section 1373.

Attachments

cc:     The Honorable Peter J. Kadzik
        Assistant Attorney General
        Office of Legislative Affairs

2

## OFFICE OF JUSTICE PROGRAMS GUIDANCE REGARDING
## COMPLIANCE WITH 8 U.S.C. § 1373

### 1. Q. What does 8 U.S.C. § 1373 require?

A. Title 8, United States Code, Section 1373 (Section 1373) addresses the exchange of information regarding citizenship and immigration status among federal, state, and local government entities and officials. Subsection (a) prevents federal, state and local government entities and officials from "prohibit[ing] or in any way restrict[ing]" government officials or entities from sending to, or receiving from, federal immigration officers information concerning an individual's citizenship or immigration status. Subsection (b) provides that no person or agency may "prohibit, or in any way restrict," a federal, state, or local government entity from (1) sending to, or requesting or receiving from, federal immigration officers information regarding an individual's immigration status, (2) maintaining such information, or (3) exchanging such information with any other federal, state, or local government entity. Section 1373 does not impose on states and localities the affirmative obligation to collect information from private individuals regarding their immigration status, nor does it require that states and localities take specific actions upon obtaining such information. Rather, the statute prohibits government entities and officials from taking action to prohibit or in any way restrict the maintenance or intergovernmental exchange of such information, including through written or unwritten policies or practices.

Your personnel must be informed that notwithstanding any state or local policies to the contrary, federal law does not allow any government entity or official to prohibit the sending or receiving of information about an individual's citizenship or immigration status with any federal, state or local government entity and officials.

### 2. Q. May a state make a subgrant to a city that the state knows to be violating an applicable law or regulation (e.g. Section 1373), or a programmatic requirement?

A. No. A JAG grantee is required to assure and certify compliance with all applicable federal statues, including Section 1373, as well as all applicable federal regulations, policies, guidelines and requirements. This requirement passes through to any subgrants that may be made and to any subgrantees that receive funds under the grant.

### 3. Q. Is there a specific report or source BJA is using to determine whether a jurisdiction has violated an applicable Federal law (e.g. Section 1373)?

A. The Office of Justice Programs (OJP) will take seriously credible evidence of a violation of applicable Federal law, including a violation of Section 1373, from any source. In the ordinary course, OJP will refer such evidence to the Department of Justice's Office of the Inspector General for appropriate action.

AR-00386

**4. *Q.  How would a determination that a subgrantee is in violation of federal law affect the state's designation and ability to receive future awards?***

A.  A grantee is responsible to the federal government for the duration of the award. As the primary recipient of the award, the grantee is responsible for ensuring that subgrantees assure and certify compliance with federal program and grant requirements, laws, or regulations (*e.g.* Section 1373).  If a grantee or subgrantee has policies or practices in effect that violate Section 1373, the grantee or subgrantee will be given a reasonable amount of time to remedy or clarify such policies to ensure compliance with applicable law.  Failure to remedy any violations could result in the withholding of grant funds or ineligibility for future OJP grants or subgrants, or other administrative, civil, or criminal penalties, as appropriate. Our goal is to ensure that JAG grantees and subgrantees are in compliance with all applicable laws and regulations, including Section 1373, not to withhold vitally important criminal justice funding from states and localities.

**5. *Q.  Does the "JAG Sanctuary Policy Guidance" notice apply to all active grants?***

A.  The Policy Guidance applies to all JAG grantees and subgrantees.

**6. *Q.  What should a state be doing to ensure that subgrantees are complying with the legal requirements for receiving JAG funds?***

A.  The state must comply with all of the requirements of 2 C.F.R. § 200.331.  See also Section 3.14 (Subrecipient Monitoring) of the Department of Justice Financial Guide.

**7. *Q.  The "JAG Sanctuary Policy Guidance" cited Section 1373.  Are there other components of Title 8 of the United States Code that are required for compliance?***

A.  All grantees are required to assure and certify compliance with all applicable federal statutes, regulations, policies, guidelines, and requirements.  States may wish to consult with their legal counsel if they have any questions or concerns as to the scope of this requirement.



OMB APPROVAL NO. 1121-140
EXPIRES 5/31/2019

## STANDARD ASSURANCES

The Applicant hereby assures and certifies compliance with all applicable Federal statutes, regulations, policies, guidelines, and requirements, including 2 C.F.R. Part 2800 (Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards by the Department of Justice), and Ex. Order 12372 (intergovernmental review of federal programs). The applicant also specifically assures and certifies that:

1. It has the legal authority to apply for federal assistance and the institutional, managerial, and financial capability (including funds sufficient to pay any required non-federal share of project cost) to ensure proper planning, management, and completion of the project described in this application.

2. It will establish safeguards to prohibit employees from using their positions for a purpose that constitutes or presents the appearance of personal or organizational conflict of interest, or personal gain.

3. It will give the awarding agency or the Government Accountability Office, through any authorized representative, access to and the right to examine all paper or electronic records related to the financial assistance.

4. It will comply with all lawful requirements imposed by the awarding agency, specifically including any applicable regulations, such as 28 C.F.R. pts. 18, 22, 23, 30, 35, 38, 42, 61, and 63, and the award term in 2 C.F.R. § 175.15(b).

5. It will assist the awarding agency (if necessary) in assuring compliance with section 106 of the National Historic Preservation Act of 1966 (16 U.S.C. § 470), Ex. Order 11593 (identification and protection of historic properties), the Archeological and Historical Preservation Act of 1974 (16 U.S.C. § 469a-1 et seq.), and the National Environmental Policy Act of 1969 (42 U.S.C. § 4321).

6. It will comply (and will require any subrecipients or contractors to comply) with any applicable nondiscrimination provisions, which may include the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. § 3789d); the Victims of Crime Act (42 U.S.C. §10604(e)); the Juvenile Justice and Delinquency Prevention Act of 2002 (42 U.S.C. § 5672(b)); the Violence Against Women Act (42 U.S.C. § 13925(b)(13)); the Civil Rights Act of 1964 (42 U.S.C. § 2000d); the Indian Civil Rights Act (25 U.S.C. §§ 1301-1303); the Rehabilitation Act of 1973 (29 U.S.C. § 794); the Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12131-34); the Education Amendments of 1972 (20 U.S.C. §§ 1681, 1683, 1685-86); and the Age Discrimination Act of 1975 (42 U.S.C. §§ 6101-07). It will also comply with Ex. Order 13279, Equal Protection of the Laws for Faith-Based and Community Organizations; Executive Order 13559, Fundamental Principles and Policymaking Criteria for Partnerships With Faith-Based and Other Neighborhood Organizations; and the DOJ implementing regulations at 28 C.F.R. Part 38.

7. If a governmental entity—

    a) it will comply with the requirements of the Uniform Relocation Assistance and Real Property Acquisitions Act of 1970 (42 U.S.C.§ 4601 et seq.), which govern the treatment of persons displaced as a result of federal and federally-assisted programs; and

    b) it will comply with requirements of 5 U.S.C.§§ 1501-08 and §§7324-28, which limit certain political activities of State or local government employees whose principal employment is in connection with an activity financed in whole or in part by federal assistance.

Signature                                                Date

AR-00388

Case 8:18-cv-02617-WFR Document 33-10 Filed 08/27/18 Page 355 of 308
Case 8:18-cv-02617-WFR Document 96-10 Filed 08/23/18 Page 369 of 508

Page 1 of 3

U.S. DEPARTMENT OF JUSTICE
OFFICE OF JUSTICE PROGRAMS
OFFICE OF THE CHIEF FINANCIAL OFFICER

CERTIFICATIONS REGARDING LOBBYING; DEBARMENT, SUSPENSION AND OTHER
RESPONSIBILITY MATTERS; AND DRUG-FREE WORKPLACE REQUIREMENTS

Applicants should refer to the regulations cited below to determine the certification to which they are required
to attest. Applicants should also review the instructions for certification included in the regulations before
completing this form. Acceptance of this form provides for compliance with certification requirements under 28
CFR Part 69, "New Restrictions on Lobbying," 2 CFR Part 2867, "DOJ Implementation of OMB Guidance on
Nonprocurement Debarment and Suspension," and 28 CFR Part 83, "Government-wide Debarment and
Suspension," and Government-wide Requirements for Drug-Free Workplace (Grants)." The certifications shall
be treated as a material representation of fact upon which reliance will be placed when the Department of
Justice determines to award the covered transaction, grant, or cooperative agreement.

1. LOBBYING As required by Section 1352, Title 31 of the U.S. Code, and implemented at 28 CFR Part 69,
for persons entering into a grant or cooperative agreement over $100,000, as defined at 28 CFR Part 69, the
applicant certifies that:

(a) No Federal appropriated funds have been paid or will be paid, by or on behalf of the undersigned, to any
person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress,
an officer or employee of Congress, or an employee of a Member of Congress in connection with the making
of any Federal grant, the entering into of any cooperative agreement, and the extension, continuation,
renewal, amendment, or modification of any Federal grant or cooperative agreement;

(b) If any funds other than Federal appropriated funds have been paid or will be paid to any person for
influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer
or employee of Congress, or an employee of a Member of Congress in connection with this Federal grant or
cooperative agreement, the undersigned shall complete and submit Standard Form - LLL, "Disclosure of
Lobbying Activities," in accordance with its instructions;

(c) The undersigned shall require that the language of this certification be included in the award documents for
all subawards at all tiers (including subgrants, contracts under grants and cooperative agreements, and
subcontracts) and that all sub-recipients shall certify and disclose accordingly.

2. DEBARMENT, SUSPENSION, AND OTHER RESPONSIBILITY MATTERS (DIRECT RECIPIENT)

Pursuant to Executive Order 12549, Debarment and Suspension, implemented at 2 CFR Part 2867, for
prospective participants in primary covered transactions, as defined at 2 CFR Section 2867.20(a), and other
requirements:

A. The applicant certifies that it and its principals:

(a) Are not presently debarred, suspended, proposed for debarment, declared ineligible, sentenced to a denial
of Federal benefits by a State or Federal court, or voluntarily excluded from covered transactions by any
Federal department or agency;

(b) Have not within a three-year period preceding this application been convicted of or had a civil judgment
rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting
to obtain, or performing a public (Federal, State, or local) transaction or contract under a public transaction;
violation of Federal or State antitrust statutes or commission of embezzlement, theft, forgery, bribery,
falsification or destruction of records, making false statements, or receiving stolen property;

(c) Have not within a two-year period preceding this application been convicted of a felony criminal violation
under any Federal law, unless such felony criminal conviction has been disclosed in writing to the Office of
Justice Programs (OJP) at Ojpcompliancereporting@usdoj.gov, and, after such disclosure, the applicant has

Case 1:18-cv-06474-WFK   Document 33-10   Filed 08/27/18   Page 16 of 78
Case 8:17-cv-02067-WFK   Document 56-10   Filed 08/23/18   Page 390 of 508

Page 2 of 3

received a specific written determination from OJP that neither suspension nor debarment of the applicant is necessary to protect the interests of the Government in this case.

(d) Are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State, or local) with commission of any of the offenses enumerated in paragraph (b) of this certification; and

(e) Have not within a three-year period preceding this application had one or more public transactions (Federal, State, or local) terminated for cause or default.

B. Where the applicant is unable to certify to any of the statements in this certification, he or she shall attach an explanation to this application.

3. FEDERAL TAXES

A. If the applicant is a corporation, the applicant certifies that either (1) the corporation has no unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability, or (2) the corporation has provided written notice of such an unpaid tax liability (or liabilities) to OJP at Ojpcompliancereporting@usdoj.gov, and, after such disclosure, the applicant has received a specific written determination from OJP that neither suspension nor debarment of the applicant is necessary to protect the interests of the Government in this case.

B. Where the applicant is unable to certify to any of the statements in this certification, he or she shall attach an explanation to this application.

4. DRUG-FREE WORKPLACE (GRANTEES OTHER THAN INDIVIDUALS)

As required by the Drug-Free Workplace Act of 1988, and implemented at 28 CFR Part 83, Subpart F, for grantees, as defined at 28 CFR Sections 83.620 and 83.650:

A. The applicant certifies that it will or will continue to provide a drug-free workplace by:

(a) Publishing a statement notifying employees that the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance is prohibited in the grantee's workplace and specifying the actions that will be taken against employees for violation of such prohibition;

(b) Establishing an on-going drug-free awareness program to inform employees about:

(1) The dangers of drug abuse in the workplace;

(2) The grantee's policy of maintaining a drug-free workplace;

(3) Any available drug counseling, rehabilitation, and employee assistance programs; and

(4) The penalties that may be imposed upon employees for drug abuse violations occurring in the workplace;

(c) Making it a requirement that each employee to be engaged in the performance of the grant be given a copy of the statement required by paragraph (a);

(d) Notifying the employee in the statement required by paragraph (a) that, as a condition of employment under the grant, the employee will

(1) Abide by the terms of the statement; and

(2) Notify the employer in writing of his or her conviction for a violation of a criminal drug statute occurring in the workplace no later than five calendar days after such conviction;

(e) Notifying the agency, in writing, within 10 calendar days after receiving notice under subparagraph (d)(2) from an employee or otherwise receiving actual notice of such conviction. Employers of convicted employees must provide notice, including position title, to: Department of Justice, Office of Justice Programs, ATTN:

AR-00390

Control Desk, 810 7th Street, N.W., Washington, D.C. 20531. Notice shall include the identification number(s) of each affected grant;

(f) Taking one of the following actions, within 30 calendar days of receiving notice under subparagraph (d)(2), with respect to any employee who is so convicted

(1) Taking appropriate personnel action against such an employee, up to and including termination, consistent with the requirements of the Rehabilitation Act of 1973, as amended; or

(2) Requiring such employee to participate satisfactorily in a drug abuse assistance or rehabilitation program approved for such purposes by a Federal, State, or local health, law enforcement, or other appropriate agency;

(g) Making a good faith effort to continue to maintain a drug-free workplace through implementation of paragraphs (a), (b), (c), (d), (e), and (f).

As the duly authorized representative of the applicant, I hereby certify that the applicant will comply with the above certifications.

AR-00391

| From: | GMS Tier 2 Support |
|---|---|
| To: | Trautman, Tracey (OJP) |
| Subject: | OJP Guidance on Compliance with 8 U.S.C. § 1373 |
| Date: | Thursday, July 07, 2016 12:28:48 PM |
| Attachments: | OJP Guidance on Compliance with 8 U.S.C. § 1373.pdf |

Dear JAG grantee:

The following updated guidance on 8 U.S.C. § 1373 is provided for your information.

BJA is providing additional clarification regarding compliance with 8 U.S.C. § 1373 in the attached document, which comprises the questions and answers (Q & As) that have been submitted by fellow grantees and recipients in response to our email of March 31, 2016.  We will continue to update our website with additional questions and answers as we receive them.   The link to BJA's JAG website can be found here:
https://www.bja.gov/ProgramDetails.aspx?Program_ID=59.

Please ensure that the information provided here is clearly communicated to your personnel and subrecipients, as well as other relevant partners and/or other entities.

AR-00392

### OFFICE OF JUSTICE PROGRAMS GUIDANCE REGARDING
### COMPLIANCE WITH 8 U.S.C. § 1373

*1.  Q.   What does 8 U.S.C. § 1373 require?*

A.  Title 8, United States Code, Section 1373 (Section 1373) addresses the exchange of information regarding citizenship and immigration status among federal, state, and local government entities and officials.  Subsection (a) prevents federal, state and local government entities and officials from "prohibit[ing] or in any way restrict[ing]" government officials or entities from sending to, or receiving from, federal immigration officers information concerning an individual's citizenship or immigration status.  Subsection (b) provides that no person or agency may "prohibit, or in any way restrict," a federal, state, or local government entity from (1) sending to, or requesting or receiving from, federal immigration officers information regarding an individual's immigration status, (2) maintaining such information, or (3) exchanging such information with any other federal, state, or local government entity.  Section 1373 does not impose on states and localities the affirmative obligation to collect information from private individuals regarding their immigration status, nor does it require that states and localities take specific actions upon obtaining such information.  Rather, the statute prohibits government entities and officials from taking action to prohibit or in any way restrict the maintenance or intergovernmental exchange of such information, including through written or unwritten policies or practices.

Your personnel must be informed that notwithstanding any state or local policies to the contrary, federal law does not allow any government entity or official to prohibit the sending or receiving of information about an individual's citizenship or immigration status with any federal, state or local government entity and officials.

*2.  Q.   May a state make a subgrant to a city that the state knows to be violating an applicable law or regulation (e.g. Section 1373), or a programmatic requirement?*

A.  No.  A JAG grantee is required to assure and certify compliance with all applicable federal statues, including Section 1373, as well as all applicable federal regulations, policies, guidelines and requirements.  This requirement passes through to any subgrants that may be made and to any subgranteees that receive funds under the grant.

*3.  Q.   Is there a specific report or source BJA is using to determine whether a jurisdiction has violated an applicable Federal law (e.g. Section 1373)?*

A.  The Office of Justice Programs (OJP) will take seriously credible evidence of a violation of applicable Federal law, including a violation of Section 1373, from any source.   In the ordinary course, OJP will refer such evidence to the Department of Justice's Office of the Inspector General for appropriate action.

**4.  Q.  How would a determination that a subgrantee is in violation of federal law affect the state's designation and ability to receive future awards?**

A.   A grantee is responsible to the federal government for the duration of the award. As the primary recipient of the award, the grantee is responsible for ensuring that subgrantees assure and certify compliance with federal program and grant requirements, laws, or regulations (*e.g.* Section 1373).  If a grantee or subgrantee has policies or practices in effect that violate Section 1373, the grantee or subgrantee will be given a reasonable amount of time to remedy or clarify such policies to ensure compliance with applicable law.  Failure to remedy any violations could result in the withholding of grant funds or ineligibility for future OJP grants or subgrants, or other administrative, civil, or criminal penalties, as appropriate. Our goal is to ensure that JAG grantees and subgrantees are in compliance with all applicable laws and regulations, including Section 1373, not to withhold vitally important criminal justice funding from states and localities.

**5.  Q.  Does the "JAG Sanctuary Policy Guidance" notice apply to all active grants?**

A.   The Policy Guidance applies to all JAG grantees and subgrantees.

**6.  Q.  What should a state be doing to ensure that subgrantees are complying with the legal requirements for receiving JAG funds?**

A.   The state must comply with all of the requirements of 2 C.F.R. § 200.331.  See also Section 3.14 (Subrecipient Monitoring) of the Department of Justice Financial Guide.

**7.  Q.  The "JAG Sanctuary Policy Guidance" cited Section 1373.  Are there other components of Title 8 of the United States Code that are required for compliance?**

A.   All grantees are required to assure and certify compliance with all applicable federal statutes, regulations, policies, guidelines, and requirements.  States may wish to consult with their legal counsel if they have any questions or concerns as to the scope of this requirement.

| From: | Trautman, Tracey |
|---|---|
| To: | Trautman, Tracey |
| Subject: | OJP Guidance regarding compliance with 8 U.S.C., Section 1373 |
| Date: | Thursday, July 07, 2016 12:05:35 PM |
| Attachments: | OJP Guidance on Compliance with 8 U S C § 1373.pdf |
| Importance: | High |

Good afternoon SAA Partners:

The following updated guidance on 8 U.S.C. § 1373 is provided for your information.

BJA is providing additional clarification regarding compliance with 8 U.S.C. § 1373 in the attached document, which comprises the questions and answers (Q & As) that have been submitted by fellow grantees and recipients in response to our email of March 31, 2016.  We will continue to update our website with additional questions and answers as we receive them.   The link to BJA's JAG website can be found here:  https://www.bja.gov/ProgramDetails.aspx?Program_ID=59.

Please ensure that the information provided here is clearly communicated to your personnel and subrecipients, as well as other relevant partners and/or other entities.

Thanks—

Tracey

Tracey Trautman
Deputy Director
Bureau of Justice Assistance
U.S. Department of Justice
(202) 305-1491 (desk)
(202) 353-5333 (cell)
Tracey.Trautman@usdoj.gov

AR-00395

### OFFICE OF JUSTICE PROGRAMS GUIDANCE REGARDING
### COMPLIANCE WITH 8 U.S.C. § 1373

**1.  Q.  What does 8 U.S.C. § 1373 require?**

A.  Title 8, United States Code, Section 1373 (Section 1373) addresses the exchange of information regarding citizenship and immigration status among federal, state, and local government entities and officials.  Subsection (a) prevents federal, state and local government entities and officials from "prohibit[ing] or in any way restrict[ing]" government officials or entities from sending to, or receiving from, federal immigration officers information concerning an individual's citizenship or immigration status.  Subsection (b) provides that no person or agency may "prohibit, or in any way restrict," a federal, state, or local government entity from (1) sending to, or requesting or receiving from, federal immigration officers information regarding an individual's immigration status, (2) maintaining such information, or (3) exchanging such information with any other federal, state, or local government entity.  Section 1373 does not impose on states and localities the affirmative obligation to collect information from private individuals regarding their immigration status, nor does it require that states and localities take specific actions upon obtaining such information.  Rather, the statute prohibits government entities and officials from taking action to prohibit or in any way restrict the maintenance or intergovernmental exchange of such information, including through written or unwritten policies or practices.

Your personnel must be informed that notwithstanding any state or local policies to the contrary, federal law does not allow any government entity or official to prohibit the sending or receiving of information about an individual's citizenship or immigration status with any federal, state or local government entity and officials.

**2.  Q.  May a state make a subgrant to a city that the state knows to be violating an applicable law or regulation (e.g. Section 1373), or a programmatic requirement?**

A.  No.  A JAG grantee is required to assure and certify compliance with all applicable federal statues, including Section 1373, as well as all applicable federal regulations, policies, guidelines and requirements.  This requirement passes through to any subgrants that may be made and to any subgranteees that receive funds under the grant.

**3.  Q.  Is there a specific report or source BJA is using to determine whether a jurisdiction has violated an applicable Federal law (e.g. Section 1373)?**

A.  The Office of Justice Programs (OJP) will take seriously credible evidence of a violation of applicable Federal law, including a violation of Section 1373, from any source.   In the ordinary course, OJP will refer such evidence to the Department of Justice's Office of the Inspector General for appropriate action.

**4.  Q.  How would a determination that a subgrantee is in violation of federal law affect the state's designation and ability to receive future awards?**

A.   A grantee is responsible to the federal government for the duration of the award. As the primary recipient of the award, the grantee is responsible for ensuring that subgrantees assure and certify compliance with federal program and grant requirements, laws, or regulations (*e.g.* Section 1373).  If a grantee or subgrantee has policies or practices in effect that violate Section 1373, the grantee or subgrantee will be given a reasonable amount of time to remedy or clarify such policies to ensure compliance with applicable law.  Failure to remedy any violations could result in the withholding of grant funds or ineligibility for future OJP grants or subgrants, or other administrative, civil, or criminal penalties, as appropriate. Our goal is to ensure that JAG grantees and subgrantees are in compliance with all applicable laws and regulations, including Section 1373, not to withhold vitally important criminal justice funding from states and localities.

**5.  Q.  Does the "JAG Sanctuary Policy Guidance" notice apply to all active grants?**

A.   The Policy Guidance applies to all JAG grantees and subgrantees.

**6.  Q.  What should a state be doing to ensure that subgrantees are complying with the legal requirements for receiving JAG funds?**

A.   The state must comply with all of the requirements of 2 C.F.R. § 200.331.  See also Section 3.14 (Subrecipient Monitoring) of the Department of Justice Financial Guide.

**7.  Q.  The "JAG Sanctuary Policy Guidance" cited Section 1373.  Are there other components of Title 8 of the United States Code that are required for compliance?**

A.   All grantees are required to assure and certify compliance with all applicable federal statutes, regulations, policies, guidelines, and requirements.  States may wish to consult with their legal counsel if they have any questions or concerns as to the scope of this requirement.



Office of the Inspector General
<u>United States Department of Justice</u>

Statement of Michael E. Horowitz
Inspector General, U.S. Department of Justice

*before the*

U.S. House of Representatives
Committee on the Judiciary
Subcommittee on Immigration and Border Security

*concerning*

"New Orleans:  How the Crescent City Became a Sanctuary City"

September 27, 2016

Mr. Chairman, Congresswoman Lofgren, and Members of the Subcommittee:

Thank you for inviting me to testify before you today.  Earlier this year, the Department of Justice (Department or DOJ) Office of Justice Programs (OJP) advised the Office of the Inspector General (OIG) that it had received information indicating that several jurisdictions receiving Department grant funds may be in violation of 8 U.S.C. Section 1373 (Section 1373), and asked the OIG to investigate the allegations.  Section 1373 provides that Federal, State, and local government officials cannot prohibit or restrict communication of information regarding the citizenship or immigration status of an individual to Federal immigration officials.  Accompanying its request, the Department provided the OIG with grant-related information for more than 140 state and local jurisdictions that had active grant awards or received State Criminal Alien Assistance Program (SCAAP) payments in 2015.  In addition, OJP provided a letter from Congressman John Culberson to the Attorney General regarding whether Department grant recipients were complying with Federal law, particularly Section 1373, and attached to this letter was a January 2016 study by the Center for Immigration Studies.

We reviewed the matter as requested by the Department and provided OJP with a memorandum advising it of the steps we had taken and summarizing the information we had learned.  We did so expeditiously because, in part, the Department's grant process was ongoing and we found that the Department had not yet provided grant recipients with clear guidance as to whether Section 1373 was an "applicable federal law" that recipients were expected to comply with in order to satisfy relevant grant rules and regulations.  The OIG memorandum can be found on our website at:  https://oig.justice.gov/reports/2016/1607.pdf.

**Summary of OIG Findings**

Based on the large number of jurisdictions referred by OJP and the need to provide our review expeditiously, we judgmentally selected a sample of 10 state and local jurisdictions from the list provided to us by OJP for further review.  For each of these jurisdictions, we researched the local laws and policies that govern their interactions with U.S. Immigration and Customs Enforcement (ICE), assessed these laws and policies, and interviewed ICE officials to gain their perspective on ICE's relationship with the selected jurisdictions.

While a primary and frequently-cited indicator of limitations placed on cooperation by state and local jurisdictions with ICE is how the particular jurisdiction handles immigration detainer requests, we noted that Section 1373 does not specifically address restrictions on cooperation with ICE detainer requests.  We further noted that the Department of Homeland Security has made a legal determination that civil immigration detainers are voluntary in nature and that the ICE officials with whom we spoke told us that they are not enforceable against jurisdictions which do not comply.

Based on our research, we found that each of the 10 jurisdictions had laws or policies that placed limitations on how they could respond to an ICE detainer

2

request.  Some jurisdictions honored a detainer request when the subject had prior felony convictions, gang membership, or listing on a terrorist watchlist, while other jurisdictions did not honor a detainer request under any circumstances.

In addition, we found that the laws and policies of several of the jurisdictions we reviewed went beyond placing limitations on complying with civil immigration detainer requests and potentially limited the sharing of immigration status information with Federal immigration authorities.  For example, one jurisdiction prohibited its employees from providing information about the citizenship or immigration status of any person "unless required to do so by legal process."  This "savings clause" language appeared to us to be inconsistent with the plain language of Section 1373 because, for example, Section 1373 does not require cooperation with ICE through "legal process" but rather is intended to permit employees to provide immigration status information to ICE upon request.  Moreover, to be effective, this "savings clause" provision presumably would have to render the restriction described in the ordinance null and void with respect to ICE requests for immigration status information, even though the very purpose of the ordinance was to restrict cooperation with ICE.

Similarly, we found that the laws and policies of other jurisdictions in our sample group that addressed the handling of ICE detainer requests might have a broader practical impact on the level of cooperation with ICE, and might be inconsistent with the intent of Section 1373.  For example, one jurisdiction's prohibition relating to personnel expending their time responding to ICE inquiries could easily be read by employees and officers as prohibiting them from expending time responding to ICE requests relating to immigration status.  While these policies do not explicitly restrict the sharing of information, they could cause local officials to apply them in a manner that prohibits or restricts cooperation with ICE, which would be inconsistent with Section 1373.  Indeed, this concern was expressed to us by ICE officials.

**Steps for the Department to Undertake**

As we noted in our memorandum to the Department, in March 2016, OJP notified SCAAP and Edward Byrne Memorial Justice Assistance Grant (JAG) applicants about the requirement to comply with Section 1373, and advised them that if OJP received information that an applicant may be in violation of Section 1373, the applicant may be referred for further investigation to the OIG and may be subject to criminal and civil penalties, in addition to relevant OJP programmatic penalties.

In light of the Department's notification to grant applicants, we advised the Department that it should consider taking additional steps, including:

- Providing clear guidance to grant recipients regarding whether they would be expected to comply with Section 1373 in order to satisfy relevant grant rules and regulations;

3

- Requiring grant applicants to provide certifications specifying the applicants' compliance with Section 1373, along with documentation sufficient to support certification; and
- Ensuring grant recipients clearly communicate to their personnel the provisions of Section 1373, especially that employees cannot be prohibited or restricted from sending citizenship or immigration status information to ICE.

In addition, we suggested that the Department consult with ICE and other Federal agencies, prior to awarding a grant, to determine whether applicants are prohibiting or restricting the sharing of this information by employees with ICE.

We believe that these steps would provide the Department with assurances that the grant applicant was operating in compliance with Section 1373 and would also be helpful should the Department refer alleged violations of Section 1373 to the OIG for further investigation.

This concludes my prepared statement, and I will be pleased to answer any questions that the Subcommittee may have.

4

AR-00401

# REP. TREY GOWDY HOLDS A HEARING ON NEW ORLEANS SANCTUARY CITY

CQ Transcriptions

September 27, 2016 Tuesday

Copyright  2016 CQ-Roll Call, Inc          All Rights Reserved

All materials herein are protected by United States copyright law and may not be reproduced, distributed, transmitted, displayed, published or broadcast without the prior written permission of CQ Transcriptions. You may not alter or remove any trademark, copyright or other notice from copies of the content.

## Body

**EVENT DATE:** September 27, 2016

**TYPE:** COMMITTEE HEARING

**LOCATION:** WASHINGTON, D.C.

**COMMITTEE:** HOUSE COMMITTEE ON THE JUDICIARY, SUBCOMMITTEE ON IMMIGRATION AND BORDER SECURITY

**SPEAKER:** REP. TREY GOWDY, CHAIRMAN

**WITNESSES:**

REP. TREY GOWDY, R-S.C. CHAIRMAN

REP. ZOE LOFGREN, D-CALIF. RANKING MEMBER

REP. ROBERT W. GOODLATTE, R-VA. EX OFFICIO

REP. JOHN CONYERS JR., D-MICH. RANKING MEMBER

LOUISIANA ATTORNEY GENERAL JEFF LANDRY

MICHAEL E. HOROWITZ, INSPECTOR GENERAL, DEPARTMENT OF JUSTICE

WITNESSES: VANITA GUPTA, PRINCIPAL DEPUTY ASSISTANT ATTORNEY GENERAL

ZACH BUTTERWORTH, DIRECTOR OF FEDERAL AFFAIRS, CITY OF NEW ORLEANS

REP. CEDRIC L. RICHMOND, D-LA. RES. CMMSR. PEDRO R. PIERLUISI, D-P.R.

REP. RAUL R. LABRADOR, R-IDAHO

REP. LUIS V. GUTIERREZ, D-ILL.

REP. STEVE KING, R-IOWA

REP. SHEILA JACKSON LEE, D-TEXAS

REP. KEN BUCK, R-COLO.

REP. JOHN RATCLIFFE, R-TEXAS

AR-00402

REP. TREY GOWDY HOLDS A HEARING ON NEW ORLEANS SANCTUARY CITY

**GOWDY**:  Good morning. Welcome to the Subcommittee on Immigration and Border Security.  We'll come to order without objection.  Chair is authorized to declare recess to the committee at any time.  We welcome everyone to today's hearing, entitled New Orleans.

How the Crescent City became a Sanctuary City.  I will recognize myself for an opening statement, and then my friend from California, we will -- I will introduce the panelist on BOC, and then recognize you individually for your opening statements.

Closest, I'll ever come to being a judge, but there we have it.

(LAUGHTER)

Time and time and time again, our nation has witnessed the tragic consequences of this administration's failure to enforce immigration law.  Witnessing these tragedies is unsettling enough, but it pales in comparison to the grief and the anguish and the separation experienced by the families of those victimized.

But today, we're not here merely to discuss the fair to enforce the law, that's even more disconcerting than that.  We're here today, because the Department of Justice, the entity that is supposed to be the chief enforcer of the law is aiding and vetting local governments in the failure to enforce the law.

Once again, the temptation to make a political point has transcended the obligation to take care that the law will be faithfully executed.  On the current policy, the New Orleans Police Department prevents its officers and employees from communicating with U.S. Immigration and Customs Enforcement, regarding the immigration status of an arrestee.

In May of 2010, New Orleans Mayor Mitch Landrieu sent a letter to Attorney General Holder requesting DOJ "transform the New Orleans Police Department". Based on the Department of Justice report, current Labor Secretary, then Civil Rights Division Head Thomas Perez filed a lawsuit against the City of New Orleans and the Police Department alleging various civil rights violations.

On the basis of that lawsuit, the party has entered into a consent decree in 2012, which was approved by Federal Court in 2013. This consent decree stated the New Orleans Police Department officers "shall not take law enforcement action on the basis of actual or perceived immigration status, including the initiation of stops or other field contacts".  I'm going to read the salient part of that again, "police officers shall not take law enforcement action on the basis of actual immigration status".

On February 28, 2016, New Orleans Police Department issued a written policy entitled Immigration Status, which number one, prohibits officers from inquiring about an individual's immigration status.  Number two, prohibits officers from assisting or supporting ICE's immigration enforcement.  And number three, mandates any ICE request for support or assistance be declined.

The New Orleans Police Department policy was not only vetted, but "enthusiastically approved and supported" by DOJ Civil Rights Division. It was also reviewed and approved by DHS. The Department of Justice and Department Homeland Security enthusiastically approve and support the failure of law enforcement to take note of federal immigration laws.

In addition to being mind numbingly antithetical to the faithful execution of the law, which is among the primary responsibilities of the executive branch, this New Orleans policy statement appears to violate Section 8 U.S.C. code 1373, which provides no person or agency may prohibit or restrict a federal, state, or local agency from sending, requesting, receiving, or exchanging information with ICE regarding unlawfully present aliens.

On May 28th of this year, Chairman Goodlatte sent a letter to -- now Attorney General Lynch -- demanding that she explain DOJ's role in initiating litigation against the City of New Orleans and the result in consent decree and provide the legal justification for approving the Sanctuary policies enacted by the Police Department.

On May 31st of this year, DOJ Inspector General Michael Horowitz issued a memo to the Assistant Attorney General for Justice Programs and response to a request to investigate allegations that over 140 state and local jurisdictions received DOJ grant funds and they may be in violation of Federal Law.  Specifically, the Inspector General was requested to investigate

REP. TREY GOWDY HOLDS A HEARING ON NEW ORLEANS SANCTUARY CITY

allegations of the 140 jurisdictions, who are recipients of funding from the Department of Justice are in violation titled 8 U.S.C Section 1373.

For those of you who may be struck by the duplicity of the Chief Federal Law Enforcement entity providing grant money to state and municipality, who specifically failed to assist an enforcement of federal law, you are not alone. The Inspector General found the laws and policies in several jurisdictions to go beyond regulating responses to ICE detainers and also address in some way, the sharing of information with federal immigration authorities.

After specifically reviewing the language of the New Orleans Police Department policy and the Inspector General found and I quote in our view, subsection A of the policy would not serve as a "savings clause and addressing Section 1373". Thus, unless the understanding of the Police Department's employees is that they are not prohibited or restricted from sharing information -- sharing immigration status information with ICE, the policy would be inconsistent with Section 1373.

On July 7th, DOJ's Office of Justice Programs determine Section 1373, "applicable federal law" for purposes of determining statutory eligibility for relevant DOJ grant funding. Yet despite the requirement of Section 1373, DOJ awarded the Police Department of New Orleans approximately $2 million in grants for fiscal year 2015. That very same day, July 7th, DOJ responded to Chairman Goodlatte's letter. They outlined the policy, but they failed to explain the New Orleans policies are awful, which was a pretty important part of the letter in the first place.

Then last Friday -- last Friday, September 23rd, just a few days after our hearing was announced, we received a letter from the Department of Justice claiming the revised policy that New Orleans Police Department had issued did comply with 1373. However, this revise policy, makes no mention of Part B of Section 1373. And in addition, DOJ has not provided this committee with any indication of how officers will be trained to implement this revised policy or how seemingly minor changes to the text will ensure New Orleans will not be operating as a Sanctuary City, which leaves us to why we are here today.

Not only does this place, ICE agents and officers at greater risk, when they are forced to arrest criminal aliens who are no longer in a secured jail facility, but instead in public places where they can more readily escape or asses a weapon. But it also prevents officers from accomplishing their ultimate goal, which is public safety.

We already know there are cities more interested in providing sanctuary for criminals and safe haven for our very own citizens. We know there are cities who claimer for the federal government who assort itself into matters that are not inherently federal in nature, but refused to assist federal law enforcement in matters that actually are inherently federal.

And to put this in terms that almost anyone can understand, state and local law enforcement can be trusted to provide security for members of Congress, both here and in our home districts, they can be entrusted to enforce murder laws, child sex laws, kidnapping laws. They can participate in federal task forces on terrorism and narcotics trafficking.

But God forbid they lift a finger to assist in the enforcement of federal immigration laws. But for the Department of Justice to go as far as seek a consent decree to actually inhibit the ability of the federal government to enforce federal law is stunning, even for Department of Justice that has unfortunately become increasingly politicized.

The consent decree can be interpreted to require New Orleans adopt policies that require its officers to actually violate federal law. Let me repeat that one more time.

This administration's Department of Justice is actually requiring New Orleans police officers to break the law in an effort to further their political agenda. We have had multiple hearings on those that have been victimized by sanctuary cities. We heard from their families who are well aware of the tragic consequences, this is not a theoretical conversation and some law school conference room. It's real life with real victims and real grieving family members. The legal immigration is not a victimless crime.

Once you weaken the law, you weaken it forever and once you put politics above the blind application of the law, it is done forever. I want you to decide state and local law enforcement are good enough to protect us when we're back home in our districts, but not good enough to be trusted, to assist in the execution of the law. Good luck reversing that.

REP. TREY GOWDY HOLDS A HEARING ON NEW ORLEANS SANCTUARY CITY

With that, I would recognize the Gentlelady form California.

**LOFGREN**: T hank you, Mr. Chairman.  Today, we're again devoting time to what the majority call sanctuary cities.  It's ironic that my Republican colleagues today argue against local policies in favor of a top down mandate from Washington.

It's a question, why the majority believes that it knows better than several hundred state and local police departments across the country that have embraced community trust policing policies precisely, because they believe that approach makes us all safer.

And for the Republicans to question the need for good community policing approaches at this moment, when reports of tragic police shootings dominate the news seems nonsensical.  The fact is we could have addressed the Republican concerns with sanctuary cities and many other immigration matters, if we had devoted time spent on polemics and diversions instead of - - to fixing our broken immigration system through comprehensive reform.

When it comes to so-called sanctuary cities, this is what Richard Biehl, the Police Chief of Dayton, Ohio -- not a place many think of as a sanctuary city said -- over a year ago, when he testified before the judiciary committee, "these policies allow us to focus our limited resources on our primary mission, crime solving and community safety".  They also send the message that victims of violent crime, human trafficking and other crime should never be afraid to reach out for help due to fear of the immigration status.

I note that in the Department of Justice report, investigating the New Orleans Police Department dated March 16, 2011, it said, "minority groups nearly uniformly said that the police rarely reach out to them for any purpose".  One member of Vietnamese Community Organization reported that quote, a lot of young Vietnamese people who get shot in this community, we know who shot them, but the New Orleans police won't do anything.  They don't talk to us.  They don't build community relationships."

I agree with Chief Biehl and I know from my experience as a County Supervisor and Member of Congress that law enforcement and local officials can work cooperatively with community groups and the federal government to come to a consensus position that preserves community policing and prioritizes serious criminals for immigration enforcement and removal.

I also agree with Secretary Johnson's prior statements to this committee that imposing federal mandates on local law enforcement by withholding funds would be a huge setback in efforts to improve the relationship between DHS, state and local law enforcement and communities around the country.

With respect to New Orleans, the context like most things in the big EZ (ph) is a little bit different.  Upon taking office, Mayor Landrieu requested the Department of Justice Civil Rights Division engage in a review of the police department.  He recognizes that a history of civil rights violations by the New Orleans Police Department had undermined trust with the community and reform was necessary.

Of course, the vast majority of New Orleans Police Department officers honestly and conscientiously performed and continued to perform their duties.  But I hope that my Republican colleagues are not here to defend the actions of a few that cause such great harm over the years in New Orleans.  The history of abuse by the department has been well-documented.  The facts are incontrovertible.

Under Mayor Landrieu and Superintendent of Police Michael Harrison with the support of the Department of Justice and working with the local community.  New Orleans entered into a consent decree and has adopted a bias-free policing policy.  The policy ensures that immigrants can report crimes and service witnesses without retribution.  It also makes clear that information, regarding the citizenship and immigration status will be shared with federal immigration authorities, when required by federal or state law.

Out of an abundance of caution, New Orleans has been working with the Justice Department to revise this language to guarantee its compliance with applicable federal laws.  We now have this revised policy in place.  These policies will not self-identified as sanctuary city policies are examples of smart, effective, community policing tailored by and for the communities in New Orleans.

AR-00405

REP. TREY GOWDY HOLDS A HEARING ON NEW ORLEANS SANCTUARY CITY

Many are hopeful that this hard work done collaboratively with the department and community groups steps New Orleans on a path to safer streets and better police relations with citizens of all backgrounds, but here comes the Republican Congress to the rescue. They are questioning the legality of a policy that is already been revised to ensure that it implies with federal law.

Members who have had nothing to do with New Orleans are here to tell the local police and civil leaders how to do their job, even though the New Orleans Police Department says, the Republican approach will undermine public safety and make their jobs harder. They are pursuing a line of argument that jeopardizes critical funding which supports public safety, community policing and crimes, victim services.

With all due respect, I say to my colleagues on the other side of the aisle, let's let local law enforcement and the elected officials and city government do their job and we should focus on ours. And this Congress, we've gone to the floor to vote on bills, to deport DREAMers, to deport the parents of U.S. citizens, to deport vulnerable children fleeing persecution and sex trafficking and to halt refugee processing amidst the civil war in Syria that has displaced millions.

Thankfully, these proposals have ultimately gone nowhere, but we have the votes to pass comprehensive immigration reform in the last Congress. The bipartisan bill passed in 2013 would not only have grown our economy, helped to shrink our budget deficit, it would have made our community safer. Bringing people out of the shadows and putting them on a path to citizenship with a further enhanced public safety.

If the Republican leadership had given comprehensive immigration reform the same opportunity for a vote, that all of these other measures have received, it would be the law today.

So, let's do the people's business, work to pass immigration reform and I thank the Chairman, I yield back the balance of my time.

**GOWDY**: Gentlelady yields back, the Chairman now recognizes gentlemen from Virginia, the Chairman of full Committee, Mr. Goodlatte.

**GOODLATTE**: Thank you, Mr. Chairman and thank you for holding this important hearing.

Sanctuary cities refused to cooperate with U.S. Immigration and Customs Enforcement in its enforcement of federal immigration laws. The proliferation of sanctuary cities has resulted in thousands of criminal aliens being released into our neighborhoods to commit more crimes. Sanctuary cities violate federal law.

Two decades ago, Congress enacted a provision titled 8 Section 1373 designed specifically to prevent jurisdictions from enacting policy that prohibit their employees from sharing information with ICE about illegally present or criminal aliens. There are more than 300 sanctuary jurisdictions in the United States. One of these is a City of New Orleans.

In 2010, the current Mayor of New Orleans invited the Department of Justice to review the policies of the New Orleans Police Department apparently in part to transform New Orleans into a sanctuary city. Former Attorney General Eric Holder, Former Assistant Attorney General for the Civil Rights Division Thomas Perez, now Secretary of Labor and the Mayor appear to have colluded to have the Department of Justice file a lawsuit against the city and then have DOJ and the city enter into a settlement agreement or consent decree that would forbid the New Orleans Police Department from cooperating with ICE.

The resulting consent decree actually required the New Orleans Police Department to develop a plan that prohibited officers from taking any enforcement action based on an individual immigration status.

In February of this year, pursuant to the consent decree, the New Orleans Police Department issued a policy, prohibiting officer from inquiring about an individual's immigration status. More troubling, it generally prohibited officer from assisting or supporting ICE's immigration enforcement and it required officers to decline all ICE request for support or assistance.

Thus, New Orleans could claim that DOJ's heavy hand, forced it to become a sanctuary city and endanger its residents, when in fact it was a willing participant.

AR-00406

REP. TREY GOWDY HOLDS A HEARING ON NEW ORLEANS SANCTUARY CITY

The consent decree was a shocking action on the part of the Department of Justice. The Chief Law Enforcement Agency of the Federal Government acted to impede the enforcement of federal law. In addition, the policy appears to be in direct violation of Section 1373.

Yet it was -- excuse me -- yet it was reviewed and approved in advance by the Department of Justice Civil Rights Division. This appears to be another example of the current DOJ's cavalier disregard for the constitution and the law.

Chairman Gowdy and I sent a letter to the Attorney General in May, asking that she explain how the New Orleans Police Department policy complies with Section 1373 and requesting that she provides communications with New Orleans concerning the development of the policy. DOJ's response was almost completely non-responsive.

The DOJ Inspector General issued a report in May that expressed concern that ambiguous language in the sanctuary -- in some sanctuary policies may cause local officers to comply with such policies in a way that would violate Section 1373.

The Inspector General noted that unless the understanding of New Orleans Police Department's employees is that they are not prohibited or restricted from sharing immigration status with ICE. The policy would be inconsistent with Section 1373 and "I have asked for the training materials that the New Orleans Police Department gave to its officers to ensure their understanding of Section 1373. I have been provided with nothing".

This leads to a troubling possibility that through a lack of training, the New Orleans Police Department has in practice violated Section 1373.

Finally, just four days before this hearing, after this committee's persistent efforts to expose this disturbing matter and demand action, the Department of Justice inform the committee that the New Orleans Police Department had revised its sanctuary policy.

Specifically, the NOPD policy now states that it is to be construed in accordance with Section 1373 A. On that basis, DOJ has represented to the federal court and this committee that the policy now complies with Section 1373.

Unfortunately, this coordinated effort by DOJ and the City of New Orleans to preserver the patina of legality of their consent decree clearly failed. Section 1373 B prohibits jurisdictions from restricting their employees from requesting information from ICE, maintaining such information and exchanging information with other agencies.

Nowhere does the revised policy require compliance with this subsection. A NOPD officer that arrested individual who is believed to be illegally present is most likely going to contact ICE to request information regarding that individual's immigration status.

However, the revised NOPD policy expressly prohibits the New Orleans Police Department officers from making inquiries into an individual's immigration status. DOJ and NOPD have provided no evidence that NOPD in practice has complied with Section 1373. They have provided no training material showing that officers have or will be properly trained regarding compliance with Section 1373.

The New Orleans Police Department received over $2 million in law enforcement grants from the Department of Justice in fiscal year 2015. As Attorney General Lynch has essentially admitted to John Culberson, Chairman of the House Appropriations Committee, Subcommittee with jurisdiction over the Department of Justice. If the New Orleans Police Department is in violation of Section 1373, it would be disqualified from receiving these grants.

Yet, the Department of Justice has made no effort to cut off grants to New Orleans. Even aside from the likely violation of federal law, the Department of Justice's actions in this case show that the protection of our constituents and the enforcement of federal law no longer seem to be priorities of the department. In fact, the Department of Justice seems to view them as roadblocks impeding its chosen policy preferences.

I want to thank our witnesses for appearing today and I look forward to their testimony and to learning more about how this new New Orleans Police Department policy, including why it still prohibits compliance with Section 1373 B.

Thank you, Mr. Chairman.

AR-00407

REP. TREY GOWDY HOLDS A HEARING ON NEW ORLEANS SANCTUARY CITY

**GOWDY**:  Chairman of Virginia yields back.  The Chair would now recognize the gentlemen from Michigan, the Ranking Member of the full Committee, Mr. Conyers.

**CONYERS**:  Thank you, Chairman Gowdy.  And I join in welcoming all of our witnesses.

I'd like to preface my remarks regarding today's hearing, which deals with community policing policies by observing that our nation's conscience continues to be rot by a series of tragic events, involving law enforcement and the loss of too many black lives.  In our courtrooms, in our streets and on television, we confront a never- ending body count.

Earlier this summer, my congressional colleagues and I staged an unprecedented sit in just to try to get a vote on common sense gun legislation.  And this committee, Chairman Goodlatte and I formed a bipartisan policing strategy working group to begin examining how we can best ensure that Congress takes responsibility for the conversation about race and policing in America.

I believe this working group is one of the best examples of how we can come together at a time when the nation needs our leadership to reduce the levels of violence in our communities.

And just this past week, I joined my congressional black caucus colleagues in for test of yet another series of senseless killings of black men and black children by police in Cleveland, Tulsa and Charlotte.

When you add to this volatile mix that attacks on the police officers in Baton Rouge and Dallas, the nation risk being forced into a battle of whose lives matter most.  We mourn the loss of all of these lives and want to see an end to this violence across the United States including in the iconic American City of New Orleans.

To achieve this first, we need to ensure police accountability, prevent violent attacks on law enforcement and improve the relationship between police officers and the communities that they are sworn to protect and serve.  Community trust police -- community trust policies are integral to smart law enforcement for diverse communities, including those with immigration populations like New Orleans and my district in Michigan.

Secondly, studies show that crime rates actually decreased after localities adopt community trust policies.  Further, these studies find that strong arm policies, such as secure communities failed to lower crime rates, instead they make communities less safe, because residents become more fearful and therefore, less likely to report criminal activity or cooperate with investigations.

We share the common goal of community safety.  To suggest that local leaders and law enforcement officials are purposefully pursuing policies that make their communities less safe is simply false and offensive.

Finally, if we're looking for real solutions, we should be undertaking comprehensive immigration reform.  Unfortunately, this hearing which pejoratively refers to New Orleans community trust policy as a sanctuary city policy is not of a comprehensive immigration reform, it's about anti-immigrant politics and fear mongering.

An immigration reform bill such as imagining that passed the Senate in 2013 or the legislation that had 201 House cosponsors in the last Congress would allow law abiding immigrants to come out of the shadows and get right with the law.  And it would enable immigration customs enforcement to focus its resources on deporting the worst elements.

The kind of solution would help ensure that the City of New Orleans and all communities, citizens and immigrants alike, as well as the brave men and women serving in law enforcement are protected from harm.

And in closing, I thank the Chairman and I look forward to a meaningful discussion in this hearing from our witnesses.

Thank you, Mr. Chairman.

**GOWDY**:  Chairman from Michigan yields back.  We have a very distinguished panel of witnesses and I will begin my swearing, if you would please rise.  You swear the testimony you are about to give is truth, the whole truth and nothing but the truth, so help you God?

REP. TREY GOWDY HOLDS A HEARING ON NEW ORLEANS SANCTUARY CITY

May the record reflect all the witnesses answering in affirmative, you may sit down. We'll introduce you on BOC and then I'll recognize you individually for your opening statements.

First, it's my pleasure to welcome the honorable Jeff Landry, who is the Attorney General from the State of Louisiana. Attorney General Landry joined the Louisiana National Guard in High School taking part in operation Desert Storm and served as both the police officer and sheriff's deputy. General Landry ran successful for Congress in 2010 and served in the 112th Congress.

He became Louisiana's Attorney General on January 11, 2016. He has a Bachelor's of Science degree from the University of Southwestern Louisiana, which is now the University of Louisiana Lafayette. And a law degree from Loyola University of New Orleans Law School. Welcome Attorney General Landry.

The honorable Michael Horowitz is the Inspector General for the Department of Justice. He worked as an Assistant U.S. Attorney for the Southern District of New York, before joining DOJ in 1999, where he served as Deputy Assistant Attorney General and Chief of Staff and (inaudible) justice from 1999 to 2002. General Horowitz also served as Commissioner of the U.S. Sentencing Commission. He was sworn into his current position on April 16th, 2012.

He graduated with highest honors from Brandeis University and earned his law degree with high honors from Harvard Law School. Welcome Inspector General Horowitz.

Next is my pleasure to introduce Ms. Vanita Gupta. She is the Principal Deputy Assistant Attorney General and Civil Rights Division at Department of Justice. Ms. Gupta worked as a Civil Rights Attorney and Deputy Director of the American Civil Liberties Union. She became the Head of the Civil Rights Division in 2014. She earned her under- graduate degree with high honors from Yale University and a law degree from the New York University School of Law. Welcome Madam Attorney General.

And Mr. Zach Butterworth is the Director of Federal Affairs from the City of New Orleans, representing Mayor Mitch Landrieu and the New Orleans Police Department, the international airport and the regional transit authority and water infrastructure system. Mr. Butterworth served as the Legislative Director and Counsel to Senator Mary Landrieu and a Senior Counsel to our friend Congressmen Cedric Richmond. Mr. Butterworth graduated from LSU and Loyola University of New Orleans College of Law.

Welcome to each of you. Attorney General Landry, you are recognized for your five-minute opening.

**LANDRY**: Thank you Mr. Chairman, Madam Ranking Member for the opportunity to address this committee on one aspect of a public crisis of our time, and that's illegal immigration.

As Louisiana's Chief Legal Officer, I am committed to ensuring the rule as followed by everyone. Like each of you, I took note to defend the constitution and I intend to uphold it.

Unfortunately, sanctuary city policies undermine our justice system and our national security. As I am sure, you agree, government's most important function is for providing and securing the safety of our citizens. Sanctuary policies not only jeopardize the ability to protect our citizens, but it also allows illegals to commit crimes then roam free in our communities.

It has been reported that cities with sanctuary policies have seen an increase in crime. One sanctuary city, Los Angeles saw all crimes rise in 2015. Violent crimes were up 20 percent. Homicides up 10 percent. Shootings victims up almost 13 percent. Rapes up almost 9 percent. Robberies up 12 percent. And aggravated assaults up 27 percent.

What is more, ICE recently reviewed that over 1800 illegals released by sanctuary cities were later rearrested almost 4300 times committing almost 7500 new crimes, including rape and child sex abuse. Sanctuary policies encourage further illegal immigration and waste much needed public resources as they force the federal government to find and arrest the portable criminals already taken into custody by local law enforcement.

This spring, I've advocated for legislation in Louisiana that would have increased public safety by incentivizing the government -- government agencies to follow the law. Because of this effort, Lafayette Parish is no longer a sanctuary city Parish.

AR-00409

REP. TREY GOWDY HOLDS A HEARING ON NEW ORLEANS SANCTUARY CITY

As of late Friday, the City of New Orleans has changed its policy allowing NOPD to not allegedly cooperate with federal authorities.  By shining a bright light on their -- on this dangerous procedure, this committee has already provided a catalyst for change.

Let me be clear, I am not trying to become the immigration police, between catching child predators, rooting out public corruption and fighting federal overreach, I have more than enough to do.  But I am here today to push for a change, because the administration has not only decided not to enforce the law, but they also have used their power to coarse local jurisdictions in my state to institute sanctuary city policies.

In a great city of New Orleans, the Justice Department entered into a consent decree with the city that mandated that its police officers not make inquiries into an individual's immigration status or assist ICE unless there is a warrant or court order issue.

As a former police officer and sheriff's deputy, I find it inconsiderable that criminals who are in our country illegally cannot be held unless a warrant -- until a warrant or a court order is issued.  As for all, American citizens can be stopped on reasonable suspicion, arrested on probable cause and may not see a judge for two to three days.

Illegal immigrants should not be given a greater right that we afford our own citizens.  After hearing testimony in the state house in Louisiana, that the Department of Justice -- the U.S. Department of Justice mandated that the City of New Orleans adopt a sanctuary city policy as part of their consent decree.  I wrote a letter to Attorney General Loretta Lynch asking for clarification.  The response that this committee and I received was a lengthy non-answer that we have unfortunately come to expect from the administration.

However, a recent report by the DOJ's own Inspector General confirmed that sanctuary jurisdictions violate federal law, prohibiting communication with ICE officials.  Furthermore, it explicitly declares that local jurisdictions comply with all federal laws in order to receive federal grants.  All the while, the administration has been rewarding sanctuary cities with hundreds of millions of dollars of federal tax money.

I was criticized by the Governor of Louisiana, and the Mayor for allegedly jeopardizing state funding with the legislation that are supported.  The truth is that the U.S. DOJ's mandated policy upon a city is what is jeopardizing their funding.  Besides fiscal and legal issues, there are Homeland Security issues.

Due to sanctuary city policies, foreign terrorists such as members of ICE have the ability to travel to a sanctuary city, commit a minor offense and remain protected from being identified.  And in the current environment, why would we discourage cooperation between state and local law enforcement.

Reducing crime and saving lives are not a partisan issue.  In fact, politics never came up.  When I met with the family of St. John, the Baptist of Parish fire chief, Spencer Chauvin's family.  Chief Chauvin was killed last month in the greater New Orleans area by illegal alien with a lengthy criminal background who was in our country.  The questions were not Republican or Democrat, conservative or liberal.

His grieving family simply ask one thing that this committee, Congress and administration should absolutely answer.  Why do we have to wait for illegals to victimize our citizens in a violent manner before deporting them.  And our policy even humble or one, why cannot the state -- why cannot state and federal law enforcements work collaboratively to prevent these types of actions.

Honorable members, we need sound immigration policy that begins with securing our border and enforcing the immigration laws already on the books.  Congress must act to support those of us at the state and local level who have been fighting these reckless sanctuary city policies.

I am proud that our efforts exposed the actions of DOJ and the City of New Orleans have resulted in substantive changes with the city's policy.  Because of the efforts we made in Louisiana, our state no longer has any jurisdictions prohibiting from -- prohibiting them from communicating with federal immigration authorities.

REP. TREY GOWDY HOLDS A HEARING ON NEW ORLEANS SANCTUARY CITY

Today, Louisiana is safer because of these changes. Thank you very much and I look forward to answering any of your questions.

**GOWDY**: Thank you, Mr. Attorney General. Inspector General Horowitz.

**HOROWITZ**: Mr. Chairman, Ranking Members, Members of the Committee. Thank you for inviting me to testify before you today.

Earlier this year, the Department advised the Office of Inspector General, the dated received information indicating the jurisdictions receiving department grant funds may be in violation of title 8 United States Code Section 1373.

The Department provided the LIG with grant information related to more than 140 state and local jurisdictions and asked our office to review the allegations. We considered the matter as requested and subsequently provided the Department with a memorandum advising it of the steps we had taken and summarizing the information we had learned.

We did so expeditiously because in part the Department's grant process was ongoing and we found that the Department had not provided grant recipients with clear guidance as to whether Section 1373 was an applicable federal law with which recipients were expected to comply in order to satisfy relevant grant rules and regulations.

Based on the large number of jurisdiction cited by the Department and the need for us to review this expeditiously, we judgmentally selected 10 state and local jurisdictions for further review. For each jurisdiction, we research the local laws and policies that govern their interactions with U.S. Immigration and Customs Enforcement and interview ICE officials to gain their perspective on ICE's relationship with the jurisdictions.

Based on our research, we found that the laws and policies of several jurisdictions went beyond placing limitations on complying with civil immigration detainer requests and potentially limited the sharing of immigration status information with federal immigration authorities.

We also found that the laws and policies of some jurisdictions in our sample group that address the handling of ICE detainer requests might have had a broader practical impact on the level of cooperation with ICE and therefore might be inconsistent with the intent of Section 1373.

ICE officials expressed a similar concern to us. With regards of the New Orleans Police Department, we noted that it's then existent policy broadly prohibited officers from disclosing a person's citizenship and immigration status information with an exception where the disclosure was "required by federal level for state law".

This savings clause language appeared to be potentially inconsistent with the plain language of Section 1373, because for example Section 1373 doesn't "require" cooperation with ICE, but rather prevents jurisdictions from prohibiting or restricting employees from providing immigration status to ICE upon request.

In our memorandum, we advise the Department of several steps it could consider taking to the extent, its focus was to ensure grant recipient compliance with Section 1373.

Among the steps were to provide clear guidance, to grant recipients regarding whether they would be expected to comply with Section 1373 in order to satisfy relevant grant rules and regulations to require grant applicants, provide certifications and supporting documentation, regarding compliance with Section 1373 and to consult with the departments law enforcement counterparts that ICE and other agencies regarding such issues prior to grant awards.

We believe the steps that we outlined would provide the Department with assurances that a grant applicant was cooperating in -- was operating in compliance with Section 1373, and also it would be helpful, should the Department later refer alleged violations of Section 1373 by grant recipients to the LIG for our investigation.

This concludes my statement and I will be pleased to answer any questions that the committee may have.

**GOWDY**: Thank you, Mr. Inspector General. Madam Attorney General.

AR-00411

REP. TREY GOWDY HOLDS A HEARING ON NEW ORLEANS SANCTUARY CITY

**GUPTA**: Thank you. Good morning. Good morning, Chairman. Good luck, Chairman Gowdy, Ranking Member Zoe Lofgren and distinguished members of the Subcommittee.

Thank you for the opportunity to speak before you today with about the Justice Department's work to advance public safety and promote effective constitutional and community oriented policing.

Around the country, state and local law enforcement serve as the first line of defense for public safety. They keep our families safe from harm, they fight crime on our streets and as recent events painfully remind us, they do this demanding often dangerous work at great sacrifice at great personal risk.

So, let us make no mistake. The vast majority of men and women who wear the badge serve our communities with professionalism, with integrity and with distinction. They deserve our deepest respect and our steadfast support. Yet when police departments engage in a pattern or practice of unconstitutional policing, their actions can severely erode community trust and profoundly undermine public safety.

In 1994, Congress charged the Justice Department with a responsibility to investigate law enforcement agencies for a pattern or practice of conduct that violates federal law and when necessary to develop remedies to eliminate such misconduct.

Today, I'll discuss our work with the New Orleans Police Department by explaining the problems we found and the reforms that the city agreed to implement.

In May 2010, New Orleans Mayor Mitch Landrieu requested that the Justice Department conduct an independent investigation of NOPD systems and operations. In a letter, Mayor Landrieu stated that he inherited a police force described by many as one of the worst police departments in the country. Following our factor that in comprehensive investigation, we published our findings in a detailed 141-page letter.

Among other violations, we found evidence that NOPD was unfairly enforcing the law or failing to enforce the law, based on race, ethnicity, national origin and other protected characteristics. These discriminatory policing practices eroded trust, crime victims and witnesses, especially in Latino communities, felt afraid to share information and with the police. This hurt public safety.

And the context of reporting crime, one community member told us out of fear, we stay quiet. I know many law enforcement officials and leaders around the country understand these concerns and recognize the very critical and important link between community trust and public safety.

In 2012, New Orleans and the Justice Department entered into a comprehensive negotiated consent decree approved by the federal court in 2013 to resolve our allegations of unlawful police misconduct. The decree requires NOPD to make important changes in policies and practices related to the use of force, stop searches and arrest. The prevention of discriminatory policing and officer training oversight in supervision.

In February of this year, after seeking input from the New Orleans community, the court appointed monitor. The Federal District Court as well as the U.S. Departments of Justice and Homeland Security, NOPD issued a new policy to help officers provide services effectively and fairly to all people in the city regardless of their immigration status or the color of their skin.

Last week, NOPD updated its policy to clarify that it complies with a specific federal statute 8 U.S.C. Section 1373 to ensure that officers understand that they can send and receive information regarding an individual immigration status and to most effectively advanced non-discriminatory policing. The policy also states that NOPD officers can take law enforcement action and assist an immigration enforcement, when there is a threat to public safety, to execute criminal warrants and to safely execute a court order.

By facilitating a culture of trust and cooperation, the policy will help local and federal law enforcement protect public safety. The hardworking men and women of the New Orleans Police Department continue to do precisely that by fighting crime and partnering with federal law enforcement to identify and prosecute people who have committed violent crime.

We strongly believe that this policy will help restore trust with crime victims and witnesses enhance the sharing of information and in so doing, make the entire New Orleans community safer.

REP. TREY GOWDY HOLDS A HEARING ON NEW ORLEANS SANCTUARY CITY

In New Orleans and in any city, the Justice Department works with, real and lasting reform can't happen overnight.  And we recognize the vital role of sustained collaboration with the entire community from police officers to public officials and to community members.  And I want to commend officials from the city and the NOPD for their partnership throughout this process.  And I view our dialogue today here as an important part of that same process about how police reform can help make the residents and officers of New Orleans safer for generations to come.

I look forward to your questions.

**GOWDY**:  Thank you, Madam Attorney General.  Mr. Butterworth.

**BUTTERWORTH**:  Gowdy, Chairman Goodlatte, Ranking Member Lofgren and Congress.

My name is Zach Butterworth, I am the Executive Counsel, Director of Federal Relations for the City of New Orleans.  Thank you for giving me the opportunity to provide testimony before the committee today.

Before I begin, I'd like to thank the panel for their support that Congress has provided to New Orleans, since Katrina 11 years ago. Our recovery would certainly not be where it is today without that support.

I'd also like to thank you for your strong support of the victims of the flooding of Baton Rouge.  I have seen the magnitude of that flood and those people will certainly need your help for years to come.

I want to emphasize three main points from my written testimony and then try to give the panel a little bit of context for how we got here today.  First, public safety is a top priority in New Orleans. Legal or undocumented, whoever commits a crime in New Orleans will be arrested.  Our record shows that every day, the New Orleans Police Department takes violent criminals off the streets.

In 2012, Mayor Landrieu formed the multi-agency gang unit.  That unit alone has arrested 100 of the most violent criminals in New Orleans.  Murder is down in New Orleans.  18 percent from 2011.  At the same time, murder was up 4 percent nationwide.  Violent crime is down in New Orleans.  60 percent dating back to its highs in 1994.

My second point is that New Orleans policy does not make us a sanctuary city.  We are trying to follow federal law.  We have been trying to follow federal law from day one.  It should go without saying that any police department -- any policy a police department adopts follow state, local and federal law.

So, the review process here.  The NOPD, every policy is reviewed by Department of Justice, a federal monitor -- who is appointed by federal judge -- and the NOPD.

In drafting our policy, we asked the experts.  Officials from ICE were brought in and review best practices from around the country. For instance, the Major City Chiefs Association -- which New Orleans is a member -- represents 70 million Americans.  They support policies that foster trust, cooperation between police officers and immigrant communities that we all serve.

And my third point is that NOPD's policy on immigration status will make the city safer.  It frees up our officers to focus on violent crime.  It also allows anyone to report a crime or be a witness or a victim to report a crime.  The policies already bear in fruit.  On the ground, our commanders are seeing better cooperation with immigrant communities.

Quickly going back to 2010, we did invite the Justice Department in, their comprehensive investigation show that we had problems in a way that we treated the immigration -- immigrant community.  We wanted to fix that.  Since 2010, we watched 11 new recruit classes.  We've written 34 of these types of policies, 40 more being drafter right now.  These policies cover K9 use, prisoner transport, taser operations, body worn cameras to name a few.

Now going back to March 2015, we started drafting this policy that -- with the NOPD, the federal monitor and of course the Justice Department.  In September, we brought in ICE, we asked the experts. Then they were brought in both the local and the headquarters level. At the time, ICE told us that the policy complies with all federal ICE requirements for law enforcement.

REP. TREY GOWDY HOLDS A HEARING ON NEW ORLEANS SANCTUARY CITY

Then in December, Judge Suzy Morgan who oversees the consent decree also brought in ICE, where the Chief Counsel from the New Orleans division in her office.  No concerns -- substantive concerns about the policy raised at that time.

So in February of this year, the federal monitor approved the policy.  Immediately, there were some concerns about the policy, so Mayor Landrieu wrote to DHS and DOJ, the leadership there and said, if any one in any of your agencies, any person has a concern about this policy, please contact us.  It wasn't until July that we received a letter back with information about 1373 and general compliance there.

So, when we got that -- when we received that information, we immediately went to work, redrafting the policy with DOJ and as the Chairman noted last week, the federal monitor did approve the updated policy with that we believe fully complies the federal law just as we believe the last policy fully complied with federal law.

So, simply put the NOPD's policy on immigration status is going to make the city safer and it follows federal law.  As required by the consent decree, we will review our policies continuously and I am happy to take any questions.  Thank you.

**GOWDY**:  Thank you, Mr. Butterworth.  The Chair would now recognize the gentlemen from Virginia for his five minutes of questioning.

**GOODLATTE**:  Well, thank you Mr. Chairman.

Mr. Butterworth, let me pick right up where you left off.  I appreciate the work that you've done, but under the revised policy, the New Orleans Police Department officers are prohibited from making inquiries about an individual's immigration status, including to ICE.

Yet Section 1373 B authorizes officers to make request to ICE for such information.  So, doesn't the policy violate federal law Section 1373 B?

**BUTTERWORTH**:  Sir, we believe the policy fully complies with 1373.  If there is anything about the new policy that's unclear, we'd be happy to go back and take a look.

**GOODLATTE**:  Why was there specific reference made to 1373 A and 1373 B was left out of that?

**BUTTERWORTH**:  I think the focus of the concerns that have been raised have been on 1373 A.  I think on behalf of NOPD, we're happy to go back and make sure that there is no misunderstanding about 1373 B. I think as you just heard Miss...

**GOODLATTE**:  Are you aware of any concerns on the part of the Mayor or city officials or the Police Department Chief or others about, authorizing officers to make inquiries about an individual's immigration status?

**BUTTERWORTH**:  So, as you just heard Ms. Gupta testify, this policy allows officers to communicate with ICE.  They're going to help ICE in any sort of public safety event, they're going to help ICE execute criminal warrants and there is no restriction on the communication between an officer and ICE in this policy.

**GOODLATTE**:  Is there any restriction on police officer making a request to ICE for information regarding an individual's immigration status?

**BUTTERWORTH**:  There is no -- so the way the policy is laid out, if a person -- if the officer interacts with member of the public, he -- he or she immediately run that person's name against the NCIC database system, if there is a return that there is a criminal warrant on that person, the person is immediately arrested.

**GOODLATTE**:  Now you noted in your testimony that the New Orleans Police Department takes criminals off the street.  If you find that they are not lawfully present in the United States, what happens after they've been through the judicial process in New Orleans.

**BUTTERWORTH**:  So, thank you for allowing me to clarify that.  New Orleans is a very unique political structure.  The Mayor is elected Parish wide, our counties to lead the NOPD.  Our sheriff is also elected Parish wide and he leads the sheriff department.

REP. TREY GOWDY HOLDS A HEARING ON NEW ORLEANS SANCTUARY CITY

So, I don't represent the sheriff's department and I apologize that I can't speak on behalf of them. But our officers who arrest someone on our criminal warrant deliver the suspect...

**GOODLATTE**: Assuming that they are prosecuted and convicted, incarcerate not all will be, but those who are after they have served their time what does the policy of the New Orleans Police Department in court say about communication with ICE about the fact that someone is about to be released from jail or released from prison, who have been convicted of a crime and is not lawfully present in the United States.

**BUTTERWORTH**: So if a person is convicted of a felony in Louisiana, they're likely sent to Angola, which is a state corrections facility and I would defer to the Attorney General on the operations of the state corrections facility after that.

**GOODLATTE**: And what about the New Orleans jails?

**BUTTERWORTH**: Again, the sheriff from New Orleans operates the jail there and we have no operational control over the sheriff.

**GOODLATTE**: Thank you.

Well, let me turn to the Attorney General. Welcome. We're glad to have you back with us. Attorney General Landry and I want to start by asking you, if you believe as Louisiana Chief Law Enforcement officer that the New Orleans consent decree violates federal law?

**LANDRY**: I believe that prior to substantive changes that they made absolutely violated federal law. The question is whether or not in practice, the new changes will remedy that situation. You know what we have in the country is basically two types of sanctuary city policy, you see the don't ask policy or don't tell.

With the current New Orleans City -- what the prior policy was prior to the change was both, both the don't ask and don't tell. Now the question is whether or not they seem to have remedy the don't tell portion of that policy, but it doesn't seem that they have made any changes in the don't ask portion.

**GOODLATTE**: And it's your intention to make sure that everything within your power to assure that that happens will happen so that they're in full compliance with 1373, not just one subsection of it.

**LANDRY**: Absolutely. We're going to try to take it upon ourselves to go out in that all law enforcement officers around the state know exactly what 1373 states and how they can avoid violating that statute.

**GOODLATTE**: Thank you. And just in general, do you believe inconsistent for a jurisdiction to adopt the sanctuary policy that violates federal law and at the same time request federal law enforcement grant money.

**LANDRY**: I do.

**GOODLATTE**: And what message does that send concerning the rule of law?

**LANDRY**: Well, it -- well, again it's send a terrible one. I think as part of the minds of our criminal justice system and the reason that we have in taking crime across the country, when we allow people to flagrantly violate any law and then we just turned a blind eye to it. All that does is lead to those people committing additional crimes and thinking it's OK to break the law.

**GOODLATTE**: Well, thank you very much. And I heard your testimony that with the correction of this, and hopefully it will soon be completely corrected, there will be no communities in the State of Louisiana that would be characterize as sanctuary cities.

**LANDRY**: Thank you, Mr. Chairman.

**GOODLATTE**: Well, thank you. I wish other states had the same effort to have such a consistent record and I yield back to Chairman.

AR-00415

REP. TREY GOWDY HOLDS A HEARING ON NEW ORLEANS SANCTUARY CITY

**GOWDY**: Chairman from Virginia yields back.  The Chair would now recognize the General from California, Ms. Lofgren.

**LOFGREN**:  Thank you, Mr. Chairman.  Ms. Gupta, I understand that in 2005, the Civil Rights Division was involved in investigating New Orleans policy abuse and misconduct in the aftermath of Hurricane Katrina.  Can you talk briefly about the acts of abuse, your division uncovered as a result of bad investigation?

**GUPTA**:  So we launched our investigation into the New Orleans Police department in 2010 and uncovered very pervasive, wide spread acts of misconduct related to specifically excessive use of force, stop searches and arrest, discriminatory policing, and the like.

And one of the goals that we have when we had come in at the invitation of Mayor Landrieu was to ensure that the New Orleans would have -- would be able to carry out its core function of providing effective policing and constitutional policing to keep all residents of New Orleans, safe.

And in our 141 page finding reports we detailed after extensive data, interviews, and a lot of engagement with NOP officers and command staff as well as community members, that these violations had thoroughly undermine the NOPDs ability to solve and prevent crime in New Orleans and in the year since we've enacted the concentric we've working collaboratively with the city and with brave men and women of the new Orleans police department to address these, and to finally give new Orleans police officers the tools that they need have the trust of all their residents and be able to fight violent crime.

**LOFGREN**:  Thank you.  I were pleased to be joined today by a member of the full judiciary committee who is not a member of the subcommittee and that's Mr. Richmond who also represents New Orleans and so I would like to yield the remainder of my time to him so that he might ask questions since this is his territory.

**GOWDY**:  Gentleman from Louisiana's recognized.

**RICHMOND**:  Thank you Mr. Chairman and thank you to the ranking member for allowing me to ask some questions.

Let me just start with a couple of things here and in the opening testimony of our Chairman, he said that he believed that, the consent decree between the city of New Orleans and the Department of Justice was done through collusion.

And I would just tell you that, as an African American male who grew up in New Orleans, who had to deal with the New Orleans Police Department.  The police department went under consent decree because of use of force, failing to investigate it, stop and searches without cause, discrimination against African Americans, failing to investigate sex crimes against females and domestic violence, a pay detail system that invited corruption,  failing to sufficiently embrace community policing and immigration as one of them.

So I just would like to clear up for anyone who thinks that you know we colluded all of that, it's very convenient for a white male from Virginia to talk about collusion and a consent decree.

And Attorney General Landry let me just applaud you for working on sanctuary cities because you believe it's important but I would ask you help our Chairman Goodlatte because he has two sanctuary cities in Virginia and if you're going to start cleaning up, start cleaning up at home.

And while we go down the list, we have four in South Carolina, every Parish in Colorado, we have Sioux City and representative King's district, we have -- well Dallas in Travis -- in Texas.  So if we're going to start talking about sanctuary cities, don't just pick mine that you would like to allege as a sanctuary city.

Let's talk about all of them especially the people who are on the committee.  And the other thing that we talked about was the unfortunate death of a fire chief, a very respected and loved fire chief in Saint John Parish.

And I think that, that incident happened if the person fell through the cracks and that what we should stop, but that has absolutely nothing to do with New Orleans.  The guy didn't live in New Orleans.  He was never arrested in New Orleans, he wasn't -- the company that he worked for was not in New Orleans, that has absolutely no connection to the city of New Orleans.

REP. TREY GOWDY HOLDS A HEARING ON NEW ORLEANS SANCTUARY CITY

Now, the company was operated out of Saint Emily Parish with an elected official as a co-owner which I think is deplorable and I think that, we should be looking at prosecution for, the owners of the company but to just single out New Orleans as some city that decided all of a sudden that we wouldn't enforce the laws just incorrect.

Mr. Zach Butterworth, let me just ask you a question, when did you all initiate trying to make sure that the city's policy was consistent with federal law?

**BUTTERWORTH**: So so we began the drafting of this policy in March of 2015 and we began discussions with ICE in September, those have continued on both the local and headquarters level and at no point did anyone at ICE ever say that this policy didn't comply with federal law.

**RICHMOND**: And Ms Gupta, at what point is it your office's opinion that they did not comply with federal law, if at any time they did not comply with federal law?

**GUPTA**: The justice department believes with the policy, even in February, complied with federal laws.

The revisions that we just put into effect were made after an abundance of caution after we received enquiries from officials in Louisiana as well as we reviewed our Inspector General's memo and in abundance of caution to ensure total clarity about the fact that the policy must comply with 1373, we literally lifted the language of the statute and put it into the policy to make it very clear that NOPD officers can share information with ICE regarding an immigration status or citizenship statues of an individual.

They can assist in operations in response to direct threat to public safety whether there's a independent wrong cause or reason for doing so, they can assist in executing a criminal warrant, they can assist in enforcement of court order so the revision was made to ensure total clarity with compliance of federal law.

**RICHMOND**: So in summary the old policy and the new policy, it's your opinion both were consistent with federal law?

**GUPTA**: Yes.

**RICHMOND**: And Mr. Horowitz, do you have an opinion on that?

**HOROWITZ**: We ultimately, the congressmen didn't reach a final determination as to the legality or not of the issue, primarily because of the fact that we needed to get the report back to the department in its request expeditiously and in order to do that, we really need to be on the ground, go to the city, look at some of the issues that have been previously been raised, talk with folks on the ground there both from the city and from ICE and we haven't taken those steps and I'm not in a position to give a legal determination at this point without taking a full effort in that regard.

**RICHMOND**: Thank you and I yield back.

**GOWDY**: Chairman of the Louisiana yields back and will now recognize the chairman of Idaho, Mr. Labrador.

**LABRADOR**: Thank you Mr. Chairman.

Sanctuary city policies have transformed some of our greatest American cities. I'm increasingly frustrated by these policies are consistently implemented in the name of quote "unbiased and community based" quote -- closed quote, policing as Deputy Attorney General Gupta has said. The ramifications for public safety and the inability for ICE to complete its mission are severe, and not only effect the cities, but the surrounding communities are impacted as well.

While some of the whiteness today including deputy committee general Gupta would like to ignore this fact, the simple truth is that immigration enforcement is a critical function of the United States government and one that must be supported and not undermined in this forum. Much as its base centers around the practical application of 8 USC 1373, and whether a city that has implemented policies can simultaneously comply with this section of law.

Mr. Horowitz, based on your finding what do you believe that 8 USC 1373 requires of local jurisdictions?

REP. TREY GOWDY HOLDS A HEARING ON NEW ORLEANS SANCTUARY CITY

**HOROWITZ**: In sections 1373 A and 1373 B, I'll combine them for the purpose of just mentioning this, it essentially prohibits state, local or federal law from prohibiting -- while restricting in any way -- employees of those entities from sending to, requesting from or receiving from ICE, information about the immigration status of an individual.

**LABRADOR**: So what do you make of the fact that Mr. Butterworth keeps saying that it complies but nothing in their guidance says that they have the ability to request information.

**HOROWITZ**: The new policy that we also received on Friday afternoon and have looked at, doesn't reference the word requesting which is in the B1 of 1373

**LABRADOR**: So it clearly doesn't fully comply, it seems to comply with A but not with B,

**HOROWITZ**: It clearly addresses A. It's process include A which is in B, again without us understanding more, I'm not gonna be in a position to give legal opinion on whether it does or doesn't because...

**LABRADOR**: It's a simple word.

**HOROWITZ**: ... it omits the word request.

**LABRADOR**: There's a miss request, the word request is not in the policy, correct?

**HOROWITZ**: That's correct.

**LABRADOR**: OK and you believe that we may need to clarify this section, correct?

**HOROWITZ**: I think it's an open question I've gotten it -- I got it Friday afternoon as well, I have to do follow up with the absence of the word requesting which is in 1373 B is obviously a reasonable question here.

**LABRADOR**: Attorney General Landry, great to have you here, thank you so much for all the work that you're doing, do you believe that by implementing these sanctuary policies, New Orleans and in particular NOPD are promoting public safety?

**LANDRY**: Implementing the policies of sanctuary?

**LABRADOR**: Yes.

**LANDRY**: Absolutely not, I mean it's a danger of public safety. And what happens is that actually you know when you have -- most of these cities are very large cities.

So you have very large metropolitan footprint, what happens is, it draws, it creates a magnet, a draw for illegal aliens as a sanctuary area for them to operate, it also creates an opportunity for, if you were a member of the drug cartel in Mexico, where would you send those people who are applying illegal trade, you would send them into those cities because the ability for those members to be identified is reduced because it is sanctuary city policies.

**LABRADOR**: Is New Orleans a safer city today than before implementing these sanctuary policies?

**LANDRY**: Well, certainly the subsequent changes that they made on Friday is a step in the right direction, I think that going ahead and clarifying it and then actually determining whether or not there will be a collaborative effort to crack down on illegal immigration, especially those that are in custody that NOPD has arrested and identifies them, is yet to be seen.

**LABRADOR**: So as a law enforcement official, as someone who has served at both the federal and state level, what do you believe is the appropriate relationship between local or state law enforcement and federal immigration enforcement?

**LANDRY**: I believe they have to have extreme collaboration. I believe that you know based upon some of the U.S. Supreme Court holdings, that Congress needs to clarify exactly how law enforcement agents may engage in those types of questioning, and then of course implementing 1373 is certainly a step in the right direction. Making sure that law enforcement agents know that they can ask and they can communicate with ICE in order to get those violent criminals off the street and deportable.

AR-00418

REP. TREY GOWDY HOLDS A HEARING ON NEW ORLEANS SANCTUARY CITY

**LABRADOR**:  Thank you, I yield back my time.

**GOWDY**:  Chairman of Idaho yields back, the Chair will now recognize gentleman from Illinois, Mr. Gutierrez.

**GUTIERREZ**:  Thank you.

I'd like to note that we're not having hearing today about gun violence and 500 people shot dead in Chicago, 3000 this year.

We're not having a hearing about police killing unarmed civilians. We're not having a hearing about the need for immigration reform or detention centers.  We're not having a hearing about any other really important things.

We're having a hearing about a Donald Trump talking point, that one he goes to again and again, the one that says that immigrants are killers, rapists, drug dealers who are here to hurt people not to build up our country like every other immigrant group that's come before them.

Today we're focusing on one of Americas great cities, a city with a troubling past when it comes to respecting civil rights and building trust between the police and the community at large.  And so I would think that we would want to work on building that trust between the police and the people and that the efforts taken by people to build that trust shouldn't be undermined.

Last thing I'm just going to say because doesn't really matter this hearing, it really doesn't.  It's just going to come and go, you guys got somebody paid for your trips to come down here doesn't it's not going to have a impact, it's not going to change anything, this is just another political hearing.

But I just want to say that you know we could have actually spoken to a lot of very important issues people want us to talk about, but it always seems, the majority always says we should listen to people that are not in Washington D.C.

We should listen to local elected officials, that that's where democracy is blooming, but it seems like every time you guys say anything they have an objection or they don't like it.  So having said that, I just want to say to my colleague from New Orleans, I would like to yield the remaining three minutes of my time to Mr. Richmond to ask questions.

**RICHMOND**:  Thank you.

Attorney General Landry, you said that New Orleans policy would invite undocumented immigrants because of its status as a sanctuary city.  New Orleans foreign born population is about six percent, neighboring Jefferson Parish, which is not a sanctuary city, is about an 11 percent.  How do we reconcile that with the notion that New Orleans has become a safe haven for undocumented people?

**LANDRY**:  Let me clarify that, there was a misunderstanding Congressman Richmond.  The metropolitan area, becomes as a whole, invites illegal immigrants into that particular area because again they feel the need that the ability to travel freely, again when you look at not only the actual city that it permits the policies, it affects the surrounding areas.

Just last weekend in Lafayette metropolitan area we had an elderly man get hit on by a illegal immigrant who again had been arrested multiple times and yet was not deportable.  So here we have another family losing another loved one in a met -- an area which had -- previously had a sanctuary city policy.

**RICHMOND**:  And look I don't -- we have a great working relationship, I know you're tough on crime, let me ask about the incident that killed our fire chief, the company was owned by a person in Louisiana in a state rep from Arkansas.

Under Louisiana law, do you have the ability to indict the owners of the company for hiring an undocumented, without a license that was driving when he caused that fatal accident?

**LANDRY**:  In Louisiana, I believe the employment of an illegal is not a criminal offense, it's a civil matter.

**RICHMOND**:  Well if it's done in a very negligent manner and without gross negligence, I think we have some criminal statutes under which -- let me just ask this then, if we can find some criminal statutes under which to charge the owners of the

REP. TREY GOWDY HOLDS A HEARING ON NEW ORLEANS SANCTUARY CITY

company who ultimately are at fault for hiring an undocumented, would you commit to charging them if the facts are fit the statue?  And I don't mind looking myself.

**LANDRY**:  Yes, absolutely, you know congressman, you're right, we have a great working relationship and I certainly respect you and yes, I intend uphold the rule of law, regardless.

You know I would also mention at the sanctuary city legislation that we put forth in a state house just this year passed the state house with large bipartisan persons support.  I think everyone's recognizing that this is a public safety debacle and this is a first step in ensuring that our communities are safe.

**RICHMOND**:  Thank you and I yield back.

**GOWDY**:  Gentlemen from Louisiana yields back, the chair will now recognize gentlemen from Iowa, Mr. King.

**KING**:  Thank you, Mr. Chairman, I thank the witnesses for their testimony here today and I turn first to Attorney General Landry and I'd like to pose a broader concept here and then ask you to comment on that.

Perhaps it will go a little deeper and that is that, as I read federal law and immigration law and, as I understand it after these years on this committee, it envisions in its entirety, essentially vacuuming up the illegal people in United States and all of those who were encountered by law enforcement, it anticipates their removal from the United States and it requires that when the least federal law enforcement officers encounter someone who is unlawfully present in America, that they shall place them in removal proceedings.

Would you agree so far with my characterization of federal law?

**LANDRY**:  I do, I agree with that.

**KING**:  And then when I look at this, this statute 1373 and I read through the details of 1373, shouldn't it be clear to anyone who intends to comply with the intent of federal law, that they are to help facilitate rather than frustrate the intent of federal law?

**LANDRY**:  I agree, you know just placing the type of language just putting the consent decree dealing with immigration frustrates the law.

**KING**:  And I happen to have a little quote here from Mr. Richmond, in a mark up on March 18th 2015 which is about the time of inception of this situation.

He's concerned about the police department and sheriff's office who would have a federal consent decree and that they are complying with, this is a quote "they are complying with a federal consent decree, now it will cause the city of new Orleans to lose valuable federal money in terms of DHS and FEMA funds."

I think this has been known that's there has been a clear violation here of at least the intent of the consent decree -- the intent of 1373 by the consent decree and the underlying policy which is a sanctuary city policy by my reading of it.

Have you had any discussions or have you examined illegal language of this in such a way that you're aware of any loopholes that are being exploited in this process.  It seems to be a collaboration between DOJ and the city of New Orleans.

**LANDRY**:  Well, again its concerning that the Department of Justice would go in and basically insert this type of language in a consent decree that certain that had nothing to do with immigration or illegal immigration policies or enforcement of that by local law enforcement in the city.  Again I think that that language frustrates the entire consent decree.

**KING**:  Would Fire Chief Spencer Chauvin should have been alive today if we didn't force our immigration laws as in intended by this Congress?

Case 1:18-cv-06474-VER Document 33-10 Filed 08/23/18 Page 47 of 78
Case 3:17-cv-04701-WHO Document 96-10 Filed 08/23/18 Page 421 of 508

REP. TREY GOWDY HOLDS A HEARING ON NEW ORLEANS SANCTUARY CITY

**LANDRY**:  That is correct, -- I-- absolutely, in fact you can make that argument that everyone who has been a victim or lost a loved one to someone who has been in this country illegally, has lost that loved one simply because we failed to enforce existing law.

**KING**:  Would you disagree with the statement made by Donald Trump several weeks ago that there are thousands of Americans that are grieving today because of the loss of a family member, a loved one, due to the failure to enforce immigration law in the United States?

**LANDRY**:  I do, I agree with that.

**KING**:  And I would say also reinforce at its thousands and we've had a difficulty in getting apples to apples in 2G area (ph) studies, thank you Attorney General Landry and I turn to Inspector General Horowitz and just ask you this for clarification as I listened to your testimony and I read through your testimony, it doesn't come real clear to me as to on your position on whether you believe that the --- that the sanctuary policy of New Orleans violates 1373.

**HOROWITZ**:  We looked at the policy that pre-existed Friday, and found they had a savings clause in their provision meaning that if -- that employees could comply if required to do so by federal or state law.  Our concern was, how was that thing interpreted and used because section 1373 doesn't require anything.  It simply prevents state and local jurisdiction in the federal jurisdiction from preventing employees from contacting or responding to ICE.

**KING**:  Does the policy prevent them from gathering or inquiring as to immigration status?

**HOROWITZ**:  Parts of the policy -- other parts of the policy did address that.

**KING**:  And that seems to be the loophole that we've identified over some years here that's exploited by the local jurisdiction, as my clock ticks down, I would like to then ask Ms. Gupta as you spoke about this.  Is there any federal law or any statutes that you're aware of that prohibits law enforcement from profiling and when they exercise their job?

**GUPTA**:  Congressman let me just make one thing clear if I could that threes nothing in the NOPD policies that prevents officers from requesting...

**KING**:  But my question is you aware of any law or any statute that prohibits profiling and the enforcement of law?

**GUPTA**:  Yes, there are the constitution obviously prevents the racial profiling in the exercising...

**KING**:  You mean to say that if there happens to be a white haired, light skinned, blue eyed person that has committed a crime and you're on the hunt for them, you can't say that?

**GUPTA**:  Well, there is a direct and articulated reason, reasonable suspicion, probable cause, these are...

**KING**:  Can you characterize -- can you characterize the appearance of a suspect in the enforcement of the law?

**GOWDY**:  Gentlemen's out of time but you may answer.

**GUPTA**:  Sure, well it's against the law to engage in discriminatory policing where...

**KING**:  Mr. Chairman I'd ask your unanimous consent to press this witness till she answers my questions, she's evasive in her responses.

**JACKSON LEE**:  Objection.  The witness has been asked and she has answered.

**KING**:  She's not answered this.

**JACKSON LEE**:  She has answered.

**KING**:  I'd ask unanimous consent for additional minutes.

REP. TREY GOWDY HOLDS A HEARING ON NEW ORLEANS SANCTUARY CITY

**JACKSON LEE**: Mr. Chairman, she has been asked and she has answered.

**GOWDY**: If the gentleman from Texas would yield, I will address the matter but it's hard for me to interrupt and do so.

**GOWDY**: Does the witness feel like she has answered the question as adequately as she's able to do so?

**GUPTA**: I do. I'm happy to finish the sentence or to yield.

**GOWDY**: No, you're welcome to finish the sentence.

**GUPTA**: It is illegal and against the law to engage in discriminatory policing to take policing decisions solely on the basis of one's race or other kind of protecting characteristics, yes.

**GOWDY**: If the gentleman from Iowa has additional questions, we can entertain a second round.

**KING**: I thank the chairman but I would just point out that I don't believe that I did get any answer to my specific question but I think it's obvious to the members of the panel and I would yield back.

**GOWDY**: Gentleman from Iowa yields back, the chair will now recognize the gentlelady from Texas.

**JACKSON LEE**: I thank the chairman very much and I do express my appreciation when any witness comes to share with this law making body. Because we should be problem solvers.

So let me thank all of you, I might say that I would join with the comments of my colleagues that are here on this side of the aisle and particularly my colleague from New Orleans for his pointed and very responsive questioning.

But we should be doing criminal justice reform, that I hope that we will do. We should be doing immigration reform -- comprehensive immigration reform and there is a point to the fact that there are cities around the nation that may need, as you said Mr. Horowitz, the clarification that I think you pointed Inspector General's report has offer us. And I think that's a solution.

So let me first of all ask the Ms. Gupta, thank you again for your service, I don't know where we would be if we did not have the Civil Rights Division and I thank you so very much. Have you made any pronouncement that New Orleans or any city in the state of Louisiana, at this time, is not eligible for federal grants?

**GUPTA**: We have not.

**JACKSON LEE**: You have made no public statement, let me read very quickly into the record, the genesis of the Civil Rights Division coming to New Orleans. This was a request by the Mayor Mitch Landrieu, requested the U.S. Department of Justice to conduct an investigation, his quote is that, "nothing short of complete transformation is necessary and essential to ensure safety for the citizens of new Orleans".

I believe that you are interested in the overall security and safety of all citizens or all individuals in New Orleans. That was the request made by the Mayor, is that my understanding?

**GUPTA**: That's right.

**JACKSON LEE**: And the representative of the mayor, is that my understanding?

**GOWDY**: That's correct.

**JACKSON LEE**: Thank you, I understand that you were looking at use of excessive force, unconstitutional stop searches and arrests, bias policing including racial and ethnic profiling, a systemic failure to provide effective policing, servicing, a systemic failure to investigate sexual assaults and domestic violence. Do you recall that Ms. Gupta?

**GUPTA**: That's right.

REP. TREY GOWDY HOLDS A HEARING ON NEW ORLEANS SANCTUARY CITY

**JACKSON LEE**:  You were overall dealing with the overall civil rights of that community.  So the inspector general offered three points that would help in Section 1373, a clarification I believe, the required grant applicants to provide certification about their interaction with ICE and ensuring the grant is clearly communicated to their personnel about 1373, do you have any opposition to that ?

**GUPTA**: No.

**JACKSON LEE**:  And would you be in compliance or intend to give some guidance to that section?

**GUPTA**:  Yes, the reason why we made the revisions most recently was to clarify very clearly that the policy complies with 1373, that ICE officers -- that NOPD officers can share information regarding the immigration status of an individual with ICE, that there is nothing in the NOPD policies that prevents officers from requesting immigration status from ICE as well.

**JACKSON LEE**:  I just want to clarify there is no -- there is no ban right now that you've offered and that you're not trying to block.

Let me quickly ask this question, I'd like to yield to my colleague from New Orleans, let me -- can you tell me if the sentiment expressed by a chief manager and the policy of the Major Cities Chief Association, in particular people like Tom Manger, that policies like the one in New Orleans will enhance public safety, is that something you heard from other law enforcement agencies, Ms. Gupta?

**GUPTA**:  Yes, thank you for question congresswoman.  We have heard that for a number of leading law enforcement leaders, but also I think very importantly the reason why this policy was undertaken with the hope to help the NOPD fight violent crime.

And we in the course of conducting our investigation in New Orleans, we heard from any number of victims and witnesses who are afraid or refusing to cooperate with the NOPD who had critical vital information about crime and it was undermining the NOPD's ability to solve and prevent violent crime in those communities.

**JACKSON LEE**:  Thank you so much, I'm happy to yield to my distinguished colleague from New Orleans Mr...

**GOWDY**:  The gentlemen from Louisiana is recognized for 36 seconds.

**RICHMOND**:  Let me just quickly put the quote that -- the great quote that I made in context, it had nothing to do with immigration that representative King talked about.

That quote was because New Orleans was under federal consent decree both in the police department and the sheriff department, which was costing us $50 million dollars a year which was preventing us from making the jail or the police department constitutional.

But since representative King brought it, let me just ask you very quickly, Jeff, well Attorney General Landry, can you please coordinate with Attorney General from Iowa to help them with their 23 sanctuary counties that they have in Iowa and maybe you can coordinate -- are you willing to coordinate with representative King to help him with this 23?

**LANDRY**:  I'll be glad, I'll put on a workshop in all 49 of the states.

**RICHMOND**:  With that I yield back.

**JACKSON LEE**:  Mr. Chairman, I have a submission.  I had asked unanimous consent and if I might put into the record following documents, statement from 11 national civilians immigrant rights -- excuse me -- rights organization statement from the National Immigration Project, the National Lawyers Guild, statement from the National Immigration Forum, statement from Church World Services, statement from 20 law professors led by Christopher Lasch, statement from 17 New Orleans based communal organizations and statement from the Law Enforcement Immigration Task Force.  I ask unanimous consent to submit these documents into the record.

**GOWDY**:  Without objection, the chair will...

REP. TREY GOWDY HOLDS A HEARING ON NEW ORLEANS SANCTUARY CITY

**JACKSON LEE**:  Well thank you.  I thank the witnesses, I thank you Mr. Chairman.

**GOWDY**:  The Chair will now recognize gentleman from Colorado, former United States Attorney, Mr. Buck.

**BUCK**:  Thank you Mr. Chairman.

    Mr. Landry, have you ever prosecuted a case?

**LANDRY**:  Sir?

**BUCK**:  Have you ever prosecuted a case?

**LANDRY**:  A criminal case?

**BUCK**:  Yes.

**LANDRY**:  Not until I became attorney general.

**BUCK**:  Does your office prosecute cases?

**LANDRY**:  We do.

**BUCK**:  Mr. Horowitz, did you ever prosecute a case?

**HOROWITZ**:  I did.

**BUCK**:  Ms Gupta, have you ever prosecuted a case?

**GUPTA**:  Yes, we prosecute cases, yes.

**BUCK**:  And Mr. Landry, who was your client?

**LANDRY**:  The state of Louisiana.

**BUCK**:  The people of the state of Louisiana?

**LANDRY**:  That's correct, yes, sir.

**BUCK**:  Mr. Horowitz, when you prosecute a case who was your client?

**HOROWITZ**:  The people of the United States.

**BUCK**:  And Ms. Gupta, when you prosecute cases who was your client?

**GUPTA**:  People of the United States.

**BUCK**:  OK, in your opening Ms. Gupta you say police officers -- this is the top of page 4 in your written submission -- police officers cannot solve crimes and therefore cannot help victims prosecute criminals or help federal law deport violent criminals, if victims and witnesses feel afraid to share information.

    Mr. Landry why would a victim or witness feel afraid to share information?

**LANDRY**:  Only because they would be afraid of the suspect.

**BUCK**:  OK, well, how about if they are in this country illegally and they share information and they're asked about their status in this country, would they feel afraid to share information perhaps for that reason, they could be deported or held if they were in the country illegally when they reported the case.

REP. TREY GOWDY HOLDS A HEARING ON NEW ORLEANS SANCTUARY CITY

**LANDRY**: I think if a person is victimized, they will be reported regardless of that, and but we seen as former law enforcement officer I've seen many communities, especially when you get into the poorer communities, that they're a suspect of law enforcement altogether regardless of their immigration status.

**BUCK**: OK, Mr. Horowitz, could someone feel afraid to report a crime because they in fact are committing a crime themselves?

**HOROWITZ**: It's been a while since I prosecuted case, but you could certainly see that being a concern.

**BUCK**: OK well, lets go further because it's been a while since I prosecuted a case also lets dig deep into the recess of our memory here,

Mr. Horowitz let me ask you something, is it a -- a -- allowable part of cross examination to ask a victim or witness, a question that will determine their motive for testifying or reporting a crime?

**HOROWITZ**: It is, and obviously depends on the judge's ruling as to the scope of it.

**BUCK**: OK, but your interpretation laws -- the rules of evidence in a broad sense that would be allowed,

**HOROWITZ**: That's correct.

**BUCK**: ... to question about motive, how about voracity?

**HOROWITZ**: That would also be allowed again to the extent and scope that the judge allowed it.

**BUCK**: OK, and so if somebody were to report a crime and yet they had committed a crime or they had a motive, for example a U Visa, they wanted to stay in the country -- you understand what U Visas are, it allows a prosecutor to apply to immigration authorities, to allow someone to stay in this country if they are a victim or witness of a crime.

It would be -- it would be fair to inquire that of that person whether they had committed a crime themselves by being in the country illegally in order to get a full picture about the prosecutory merits of the case, would it not?

**HOROWITZ**: Presumably. But again, I think it would be depending on the facts and circumstances of the judge ultimately.

**BUCK**: OK. So Mr. Landry, let me ask you something. When the Department of Justice -- the Civil Rights Division decides that they are going to protect one group of individuals who are committing crimes in this country and make sure that we are not prosecuting another group of individuals, are they in fact choosing which type of criminals they want prosecuted in Louisiana -- in New Orleans?

**LANDRY**: That's correct, it's exactly were choosing between which laws we're following and which laws to be broken.

**BUCK**: And why would someone do that politically, what is the political advantage of doing something like that?

**LANDRY**: You have to ask them I wouldn't engage in that type of the activity.

**BUCK**: No, you wouldn't because it's unethical, isn't it?

**LANDRY**: That's correct.

**BUCK**: If you believe that you are in fact not enforcing the laws, so you enter into a consent decree and you are not representing your client, the people of the United States, the people who are being victimized, that would be unethical combat would it not?

**LANDRY**: It would be.

**BUCK**: Mr. Horowitz, would you agree with that?

**HOROWITZ**: Depending on the facts and circumstances, yes.

AR-00425

REP. TREY GOWDY HOLDS A HEARING ON NEW ORLEANS SANCTUARY CITY

**BUCK**:  OK, I yield back.

**GOWDY**:  Gentleman from Colorado yields back, the chair will now yield to gentlemen from Texas, former U.S. attorney, Mr. Radcliffe.

**RATCLIFFE**:  Thank you, Mr. Chairman, for holding this hearing.

But I have to confess that I'm more than just a little bit embarrassed that the American people have to see a Congressional hearing dealing with the absurdity of the subject matter that were dealing with today.

Right now, Mr. Chairman, at schools across America we're hopefully teaching our kids about the Constitution and with all due respect to my colleagues across the aisle who keep saying that were hypocritical for asserting that the federal government has a role here, I hope we're doing a better job of teaching our kids about the Constitution than we apparently did in teaching some of our colleagues.

Because the very first sentence of the constitution in the preamble is where kids learn that the primary role of the federal government is to provide for the common defense and the single most important part of that is ensuring the sovereignty and integrity of our territorial borders.

Mr. Chairman, that's the reason that we have a federal government, that's the one thing that the federal government is supposed to do, that's the business the federal government is supposed to be in.

It's not supposed to be mandating healthcare decisions for Americans, it's not supposed to be interfering with teachers and parents in decisions about kids' education.

We have a federal government to protect Americans against people from outside our borders who might cause us harm, to protect Americans like Kate Steinle in San Francisco and Spencer Chauvin and Germaine Star (ph) in Louisiana and Peter Hacking (ph) and Gracy Hacking (ph) and Elli Bryant (ph) in my district in North East Texas, all of who were killed by illegal aliens who violated the sovereignty and integrity of our territorial borders to come to this country, and tragically these are just five of the countless victims killed by illegal aliens very year.

So Mr. Chairman, if that's the primary role of our federal government, if that's why we have a federal government are we really having a hearing about the facts of instead of enforcing the federal immigration laws, the federal government is doing the exact opposite and as General Landry testified is actually coercing cities into not complying with federal immigration laws?

And then to add insult to injury, the American people tuning to this hearing today, see that the very same Department of Justice that is tying the hands of law enforcement in places like New Orleans, turns around and rewards so called sanctuary cities by handing out federal funds, even though the conditions for those federal funds is that the recipients abide by federal law?

And did I really hear correctly that two thirds of all federal money going to law enforcement is going to ten jurisdictions that refuse to comply with federal immigration laws and that harbor the most violent -- violent criminal aliens and refuse to cooperate with the federal government to deport them, that Mr. Chairman that is as shocking and as it is shameful.

General Landry, you obviously share my frustration, it's why you wrote to Attorney General Loretta Lynch and asked her whether the Department of Justice at the same time they were enthusiastically -- enthusiastically approving and supporting the New Orleans department policy was actually also requiring the city of New Orleans to adopt that sanctuary city policy as part of the consent decree, did the Attorney General Lynch respond to you?

**LANDRY**:  She finally did respond to me some months later with basically a non answer.

**RATCLIFFE**:  Well, if it makes you feel any better, at least she responded to you, I've written her a lot of letters and she hasn't responded to any of mine but we have Ms. Gupta here.

REP. TREY GOWDY HOLDS A HEARING ON NEW ORLEANS SANCTUARY CITY

Ms. Gupta, you've -- you've heard from Mr. Landry and I've heard the exchange between you and Mr. Butterworth and Mr. Richmond about really trying to clear up the record here that with respect to the fact that this policy is and always was in compliance with federal laws but has been pointed out the record really underscores that it hasn't been.

And that's why Congressmen Richmond last year in the mark up thought to remove that provision to prohibit sanctuary cities from receiving federal law enforcement grants because of his stated belief that New Orleans would be barred from receiving grants because of immigration provisions in the consent decree.

Ms. Gupta, given the care of legitimate concerns in the annual new -- on the New Orleans policy, by folks here, did you seek a judicial review of the policy by district court to determine whether or not it complied with section 1373?

**GUPTA**:  The district court at both points, both in February and in issuing this revised policy, had reviewed the policies, yes.

**RATCLIFFE**:  Well my time's expired, but since the attorney general doesn't respond to any of my letters, Ms. Gupta.  I wonder if you might carry a message to her and that message would be on behalf of my constituents and millions of Americans that if she really believes in enforcing the rule of law, then I think she ought to be prosecuting jurisdictions that violate federal immigration policies instead of writing them checks.

And with that I yield back Mr. Chairman.

**GOWDY**:  The gentleman from Texas yield back.  The chair will now recognize Mr. Butterworth, what's the penalty for crossing the border unlawfully?

**BUTTERWORTH**:  I would defer to Department of Justice on any...

**GOWDY**:  Well let's try this way, who has exclusive jurisdiction over immigration cases?

**BUTTERWORTH**:  Again I would say it's outside of my lane but I would say CBP or ICE.

**GOWDY**:  So it be federal?  It's exclusively federal?

**BUTTERWORTH**:  Yes, sir.

**GOWDY**:  And there -- really unless you can think of something I can't think of -- see their crossing the border unlawfully or overstaying,  we see that the only way you could get into a country unlawfully, only two ways I can think of.

Either you cross one of our territorial boundaries or you're invited in and you overstay your visa and those are both exclusively federal.  But I'll think you'll agree with me that almost all of our interactions in life are with State and local law enforcement.

It's not an FBI agent who'll do stuff for speeding, it's not an ATF agent who is working the bar scene so if most of our citizen/police encounters are state local and yet immigration is exclusively federal, how are the federal officers supposed to know about folks who are not here lawfully?

**BUTTERWORTH**:  Sir, the department of Homeland Security has the Pep program, which, I don't -- I'm not at liberty to speak on but I would say that congress as to law that commandeer to every police officer that wanted to pay for that and I think we will welcome it.

**GOWDY**:  When you say -- well commandeer how about if you just say cooperate, now you don't commandeer people for your terrorism task force do you, you don't commandeer people for your narcotics task forces do you? It's called cooperation.

And yet you have a policy that says the New Orleans police department member shall not make enquiries into an individual's immigration status, what do you mean by enquiries?

**BUTTERWORTH**:  Sir if there's a criminal in New Orleans and a officer interacts with that person and there's a criminal warrant...

AR-00427

REP. TREY GOWDY HOLDS A HEARING ON NEW ORLEANS SANCTUARY CITY

**GOWDY**:  See I don't know what you mean by criminal, you mean if the person has -- if there's probable cause to believe that an offense was committed or if there's already an outstanding warrant ?

**BUTTERWORTH**:  If the state, federal or local warrant or probable cause that a officer observes conduct that's criminal, they will arrest the person.

**GOWDY**:  All right. And then, they can enquire as to the person's status?

**BUTTERWORTH**:  Our officers under this policy do not enquire about a person's immigration status.

**GOWDY**:  They can or cannot?

**BUTTERWORTH**:  Under this policy, they do not enquire about a person's immigration status.

**GOWDY**:  Why not?

**BUTTERWORTH**:  Because we believe that ones this follows federal law and --

**GOWDY**:  How are the federal law enforcing officers supposed to know who is here unlawfully if your officers don't enquire?

They're not the ones interacting with them, they're not enforcing traffic laws, they don't respond to domestic violence calls, the FBI doesn't have jurisdiction over that, that would be your state local officers, so how is that supposed to happen?

**BUTTERWORTH**:  Sir, I think your concerns are with the broader system and not with this policy.

In New Orleans we arrest every criminal that we interact with, we bring them to the jail.

**GOWDY**:  I love the way you raised that, you arrest every criminal you interact with, they're only a criminal after they've had a jury trial, Mr. Butterworth, and they're a suspect up until that point.

**BUTTERWORTH**:  Correct.

**GOWDY**:  Mr. Horowitz, if the original policy was OK, why did they revise it?

**HOROWITZ**:  I don't have the answer to that question Mr. Chairman; you have to ask the civil rights (inaudible).

**GOWDY**:  You're a good lawyer Mr. Horowitz, you -- if the original contract was fine, you usually don't draft another one unless you just love paying lawyers, if the original indictment was ok did you -- did you have a superseding indictment?

**HOROWITZ**:  Generally not.

**GOWDY**:  No, you don't. So if the original policy is fine, why did we get this brand new policy?

**HOROWITZ**:  Well, obviously, our memorandum outlining the concerns we had about the provision that then existed may well have triggered the provisions.

**GOWDY**:  I hate to be cynical, but I think you're right. Ms. Gupta, you said you were a prosecutor, here's a question I got way back in time that I never really had a good answer for.

Whenever a family member who had lost a loved one to an act of violence, to just someone who was out on bond and they would ask me why was that person out of jail. I never really had a good answer.

I mean you can cite the constitution that you are really entitle to bond absent some circumstances but that's kind of hollow explanation. So what would the explanation to those who've lost loved ones to violent crimes for people who are here unlawfully and federal government knows it.

**GUPTA**:  There is for somebody who's been accused of a violent crime, the NOPD is absolutely entitled in its authority to prosecute people to the law to the fullest.

REP. TREY GOWDY HOLDS A HEARING ON NEW ORLEANS SANCTUARY CITY

**GOWDY**:  No, no, no you're missing my point inadvertently or you're missing my point intentionally. I realize you prosecute people after the homicide. I'm trying to figure out how to prevent the homicide.  What is the explanation for why the person wasn't dealt with before the murder?

**GUPTA**:  Let me just again make clear that's reason we (inaudible) the policy to ensure that NOPD could fight violent crimes, to get the critical information from victims and witnesses who need to share critical crime information with the NOPD in order to solve and prevent violent crime.

**GOWDY**:  Well, Ms. Gupta, you and I both know that we rely on all sorts of witnesses, some of whom frankly expose themselves to criminal liability in the process of cooperating.

So the notion that you have to give amnesty to people before they will cooperate with law enforcement has not been my experience.

But Attorney General Landry, I'm out of time. You asked the question, how do you answer it when family members ask you why was this person not dealt with before he committed the act of violence. I never really had a good answer to that one.

**LANDRY**:  Unfortunately, I have had to answer that question in Louisiana here lately and the best way I answer them is our system in this country is broken.

**GOWDY**:  With that, I would thank all the witnesses.

**JACKSON LEE**:  Mr. Chairman, can I ask a question for one minute please?

**GOWDY**:  Well, if the gentlemen from -- then I'm sure that the gentleman from Texas and the gentleman from Colorado would want to do it too.

**JACKSON LEE**:  Let me be very brief, Mr. Chairman.

**GOWDY**:  OK, you can have a minute.

**JACKSON LEE**:  Thank you so very much. First of all, I don't want to make it very clear that I don't think there's one member here that does not feel the deep pain for the families who lost loved ones particularly those who died in the terrible crash trying to help others during the Baton Rouge disaster and flooding.

I'm from Texas and I feel for my brothers and sisters in Louisiana and I was there for them in Katrina, so my deepest sympathy, I do want to make sure however General Landry you're not asking for New Orleans to be prevented from getting federal funds is that correct? You're not asking us to block New Orleans from getting federal funds?

**LANDRY**:  I'm asking New Orleans to follow federal law like I would ask all the (inaudible) in New Orleans (ph).

**JACKSON LEE**:  Right, but you're not -- I understand but you're not asking for there to be declaration for New Orleans not to receive federal funds from the department of Justice?

**LANDRY**:  No, I've been asking for the state to withhold funds for New Orleans for violating federal law.

**JACKSON LEE**:  OK, but let me ask Ms. Gupta, is New Orleans violating federal law?

**GUPTA**:  No, New Orleans under this policy -- the policy does not violate federal law and right now we're working with the city of New Orleans to ensure constitutional placement (ph).

**JACKSON LEE**:  That they're communicating with ICE and you're not blocking that because that's what I want to make sure is happening?

**GUPTA**:  That's right, the policy makes clear that NOPD can communicate with ice and request information from ICE about a person's immigration status and citizenship.

AR-00429

REP. TREY GOWDY HOLDS A HEARING ON NEW ORLEANS SANCTUARY CITY

**JACKSON LEE**:  And deal with criminals?

**GOWDY**:  Gentlelady's time has expired.

**JACKSON LEE**:  Thank you so very much for your service all of you, thank you.

**GOWDY**:  And with that I would like to thank all of our witnesses, members are advised, they will have five legislative days to submit additional materials to the record.

    With that I thank you again to the four witnesses and we are adjourned.

    END

## Classification

**Language:** ENGLISH

**Subject:** US REPUBLICAN PARTY (90%); IMMIGRATION (90%); TERRITORIAL & NATIONAL BORDERS (90%); ATTORNEYS GENERAL (90%); US DEMOCRATIC PARTY (90%); NATIONAL SECURITY (89%); US FEDERAL GOVERNMENT (89%); BORDER CONTROL (89%); POLICE FORCES (89%); LAW ENFORCEMENT (89%); SUITS & CLAIMS (89%); IMMIGRATION LAW (89%); JUSTICE DEPARTMENTS (89%); CONSENT DECREES & ORDERS (89%); LITIGATION (89%); LAW COURTS & TRIBUNALS (78%); ARRESTS (78%); JUDGES (78%); LAWYERS (78%); WITNESSES (78%); SANCTUARY SITES (78%); CIVIL RIGHTS (76%); CITY GOVERNMENT (76%); REGIONAL & LOCAL GOVERNMENTS (75%); APPROVALS (73%); GOVERNMENT ADVISORS & MINISTERS (73%); LABOR DEPARTMENTS (60%)

**Industry:** LAWYERS (78%)

**Person:** TREY GOWDY (88%); KEN BUCK (79%); PEDRO PIERLUISI (79%); JOHN RATCLIFFE (79%); THOMAS PEREZ (77%); JOHN CONYERS (73%); JEFF LANDRY (58%); STEVE KING (58%); ZOE LOFGREN (58%); SHEILA JACKSON-LEE (58%); RAUL LABRADOR (58%); LUIS V GUTIERREZ (58%); BOB GOODLATTE (58%); ERIC HOLDER (56%)

**Geographic:** NEW ORLEANS, LA, USA (94%); RICHMOND, VA, USA (58%); TEXAS, USA (92%); CALIFORNIA, USA (92%); IDAHO, USA (79%); LOUISIANA, USA (79%); VIRGINIA, USA (79%); IOWA, USA (79%); COLORADO, USA (79%); DISTRICT OF COLUMBIA, USA (79%); UNITED STATES (79%)

**Load-Date:** October 2, 2016

AR-00430

| From: | GMS Tier 2 Support |
|---|---|
| To: | Allen, Lara (OJP) |
| Subject: | Additional OJP Guidance regarding compliance with 8 U.S.C., Section 1373 |
| Date: | Thursday, October 06, 2016 1:36:59 PM |
| Attachments: | Additional_BJA_Guidance_on_Section_1373_October_6_2016.pdf |

Dear JAG grantee:

The following updated guidance on 8 U.S.C. § 1373 is provided for your information.

BJA is providing additional guidance regarding compliance with 8 U.S.C. § 1373 in the attached document, which includes answers to questions that have been submitted by fellow grantees and recipients in response to our email of July 7, 2016.   The link to BJA's JAG website can be found here:  https://www.bja.gov/ProgramDetails.aspx?Program_ID=59.

Please ensure that the information provided here is clearly communicated to your personnel and subrecipients, as well as other relevant partners and/or other entities.


Tracey Trautman
Deputy Director
Bureau of Justice Assistance
U.S. Department of Justice
(202) 305-1491 (desk)
(202) 353-5333 (cell)
Tracey.Trautman@usdoj.gov

AR-00431

## OFFICE OF JUSTICE PROGRAMS
### ADDITIONAL GUIDANCE REGARDING COMPLIANCE WITH 8 U.S.C. § 1373

**1. Why is OJP using Byrne/JAG grant funds to enforce 8 U.S.C. § 1373?**

Authorizing legislation for the Byrne/JAG grant program requires that all grant applicants certify compliance both with the provisions of that authorizing legislation and all other applicable federal laws. The Office of Justice Programs has determined that 8 U.S.C. § 1373 (Section 1373) is an applicable federal law under the Byrne/JAG authorizing legislation. Therefore, all Byrne/JAG grant applicants must certify compliance with all applicable federal laws, including Section 1373, as part of the Byrne/JAG grant application process.

**2. Does OJP's guidance on 8 U.S.C. § 1373 impact FY 2016 funding?**

No FY 2016 or prior year Byrne/JAG or SCAAP funding will be impacted. However, OJP expects that JAG and SCAAP recipients will use this time to examine their policies and procedures to ensure they will be able to submit the required assurances when applying for JAG and SCAAP funding in FY 2017. As previously stated, our goal is to ensure that our JAG and SCAAP recipients are in compliance with all applicable laws and regulations, including Section 1373, not to withhold vitally important criminal justice funding from states and localities like yours.

**3. What is the process of determining if a recipient of JAG or SCAAP funds is not in compliance with 8 U.S.C. § 1373?**

As OJP has previously stated, our goal is to ensure that JAG and SCAAP recipients are in compliance with all applicable laws and regulations, including Section 1373. If OJP becomes aware of credible evidence of a violation of Section 1373, the recipient must agree to undertake a review to validate its compliance with 8 U.S.C. § 1373. If the recipient determines that it is in compliance with Section 1373 at the time of review, then it must submit documentation that contains a validation to that effect and includes an official legal opinion from counsel (including related legal analysis) adequately supporting the validation. If the recipient determines that it is not in compliance with Section 1373 at the time of review, then it must take sufficient and effective steps to bring it into compliance and submit documentation that details the steps taken, contains a validation that the recipient has come into compliance, and includes an official legal opinion from counsel (including related legal analysis) adequately supporting the validation. Failure to remedy any violations could result in a referral to the Department of Justice Office of the Inspector General, the withholding of grant funds or ineligibility for future OJP grants or subgrants, or other administrative, civil, or criminal penalties, as appropriate.

**4. What will happen if a recipient of JAG or SCAAP funds is found to be out of compliance with 8 U.S.C. § 1373?**

If a recipient is found out of compliance with Section 1373, the recipient must take sufficient and effective steps to bring it into compliance and submit documentation that details the steps taken, contains a validation that the recipient has come into compliance, and includes an official legal opinion from counsel (including related legal analysis) adequately supporting the validation. Failure to remedy any violations could result in a referral to the Department of Justice Inspector

General, the withholding of grant funds or ineligibility for future OJP grants or subgrants, suspension or termination of the grant, or other administrative, civil, or criminal penalties, as appropriate.

As previously stated, our goal is to ensure that our JAG and SCAAP recipients are in compliance with all applicable laws and regulations, including Section 1373, not to withhold vitally important criminal justice funding from states and localities like yours.

### 5. *Does OJP expect State Administering Agencies or their subgrantees to submit additional certifications specific to 8 U.S.C. § 1373?*

No, OJP does not expect grantees to submit additional assurances in FY 2016, nor does OJP expect grantees to require additional assurances from subgrantees, unless the grantees choose to do so. However, OJP expects that JAG grantees and subgrantees will use this time to examine their policies and procedures to ensure they will be able to submit the required assurances when applying for JAG funding in FY 2017.

### 6. *Will a locality risk its entire Byrne/JAG funding if it refuses to certify compliance with federal law, including 8 U.S.C. § 1373?*

Yes, a JAG grantee is required to assure and certify compliance with all applicable federal statutes, including Section 1373, as well as all applicable federal regulations, policies, guidelines and requirements, as a prerequisite to obtaining funding. OJP expects that JAG recipients will use this time to examine their policies and procedures to ensure they will be able to submit the required assurances when applying for JAG funding in FY 2017. By providing this additional guidance and the prior guidance on 8 U.S.C. § 1373, the Department has made clear that its goal is to ensure that our JAG and SCAAP recipients are in compliance with all applicable laws and regulations, including Section 1373, not to withhold vitally important criminal justice funding from states and localities like yours.

### 7. *Will a State risk its entire Byrne/JAG funding if a subgrantee is found to be out of compliance?*

No, only the jurisdiction that fails to comply with Section 1373 is at risk for not being funded after being provided an opportunity to correct its policies or practices. It is the State's legal responsibility as the prime grantee to monitor its subgrantees adequately and take appropriate action if 1) a subgrantee does not certify compliance with Section 1373, or 2) the State becomes aware (after making the subaward) of credible evidence of a violation of Section 1373 by a subgrantee. In general, however, a subgrantee's continuing violation would not ordinarily result in imposition of penalties against the State, or put the State's entire Byrne/JAG funding at risk. If the State disburses funds to an ineligible subgrantee, however, such that the State itself could be said to have participated in the violation (e.g. by having made the subaward knowing that the subgrantee was ineligible) or failed to take appropriate action to remedy a violation, then that State would be responsible for repayment of the dispersed funding.

In addition, if OJP becomes aware of credible evidence that a subgrantee may be in violation of Section 1373, OJP will forward that evidence to the State, and the State will need to take steps to determine if the subgrantee is in violation, and (if it is) to require the subgrantees to take

sufficient and effective steps to bring it into compliance and submit documentation that details the steps taken, contains a validation that the subgrantee has come into compliance, and includes an official legal opinion from counsel (including related legal analysis) adequately supporting the validation.

***Additional guidance regarding compliance with Section 1373 can be found at:***

Question and Answer document provided to all JAG grantees and SCAAP recipients on July 7, 2016:  https://www.bja.gov/ProgramDetails.aspx?Program_ID=59.

DOJ Office of the Inspector General Memorandum posted on July 28, 2016 at: https://oig.justice.gov/reports/2016/1607.pdf.



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

October 6, 2016

The Honorable John A. Culberson
Chairman
Subcommittee on Commerce, Justice,
      Science and Related Agencies
Committee on Appropriations
U.S. House of Representatives
Washington, DC   20515

Dear Mr. Chairman:

        This supplements the Department of Justice's (the Department) July 7, 2016, letter to you regarding compliance with applicable federal law by certain Department grantees.

        At that time, we notified you that the Department's Office of Justice Programs (OJP) – which has determined that 8 U.S.C. § 1373 (Section 1373) is an applicable federal law for the purposes of the Edward Byrne Justice Assistance Grant (JAG) Program and State Criminal Alien Assistance Program (SCAAP) – provided guidance on the requirements of Section 1373 to JAG and SCAAP recipients, and we shared that guidance with you.

        On October 6, 2016, OJP provided the enclosed additional guidance to all JAG and SCAAP recipients.   The additional guidance includes responses to questions received from grantees regarding compliance with Section 1373.

        We hope this information is helpful.   Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

                                                Sincerely,

                                                Peter J. Kadzik
                                                Assistant Attorney General

Enclosure

cc:     The Honorable Mike Honda
        Ranking Member

        The Honorable Michael E. Horowitz
        Inspector General
        Department of Justice

## OFFICE OF JUSTICE PROGRAMS
### ADDITIONAL GUIDANCE REGARDING COMPLIANCE WITH 8 U.S.C. § 1373

### 1. Why is OJP using Byrne/JAG grant funds to enforce 8 U.S.C. § 1373?

Authorizing legislation for the Byrne/JAG grant program requires that all grant applicants certify compliance both with the provisions of that authorizing legislation and all other applicable federal laws. The Office of Justice Programs has determined that 8 U.S.C. § 1373 (Section 1373) is an applicable federal law under the Byrne/JAG authorizing legislation. Therefore, all Byrne/JAG grant applicants must certify compliance with all applicable federal laws, including Section 1373, as part of the Byrne/JAG grant application process.

### 2. Does OJP's guidance on 8 U.S.C. § 1373 impact FY 2016 funding?

No FY 2016 or prior year Byrne/JAG or SCAAP funding will be impacted. However, OJP expects that JAG and SCAAP recipients will use this time to examine their policies and procedures to ensure they will be able to submit the required assurances when applying for JAG and SCAAP funding in FY 2017. As previously stated, our goal is to ensure that our JAG and SCAAP recipients are in compliance with all applicable laws and regulations, including Section 1373, not to withhold vitally important criminal justice funding from states and localities like yours.

### 3. What is the process of determining if a recipient of JAG or SCAAP funds is not in compliance with 8 U.S.C. § 1373?

As OJP has previously stated, our goal is to ensure that JAG and SCAAP recipients are in compliance with all applicable laws and regulations, including Section 1373. If OJP becomes aware of credible evidence of a violation of Section 1373, the recipient must agree to undertake a review to validate its compliance with 8 U.S.C. § 1373. If the recipient determines that it is in compliance with Section 1373 at the time of review, then it must submit documentation that contains a validation to that effect and includes an official legal opinion from counsel (including related legal analysis) adequately supporting the validation. If the recipient determines that it is not in compliance with Section 1373 at the time of review, then it must take sufficient and effective steps to bring it into compliance and submit documentation that details the steps taken, contains a validation that the recipient has come into compliance, and includes an official legal opinion from counsel (including related legal analysis) adequately supporting the validation. Failure to remedy any violations could result in a referral to the Department of Justice Office of the Inspector General, the withholding of grant funds or ineligibility for future OJP grants or subgrants, or other administrative, civil, or criminal penalties, as appropriate.

### 4. What will happen if a recipient of JAG or SCAAP funds is found to be out of compliance with 8 U.S.C. § 1373?

If a recipient is found out of compliance with Section 1373, the recipient must take sufficient and effective steps to bring it into compliance and submit documentation that details the steps taken, contains a validation that the recipient has come into compliance, and includes an official legal opinion from counsel (including related legal analysis) adequately supporting the validation. Failure to remedy any violations could result in a referral to the Department of Justice Inspector

General, the withholding of grant funds or ineligibility for future OJP grants or subgrants, suspension or termination of the grant, or other administrative, civil, or criminal penalties, as appropriate.

As previously stated, our goal is to ensure that our JAG and SCAAP recipients are in compliance with all applicable laws and regulations, including Section 1373, not to withhold vitally important criminal justice funding from states and localities like yours.

### 5. *Does OJP expect State Administering Agencies or their subgrantees to submit additional certifications specific to 8 U.S.C. § 1373?*

No, OJP does not expect grantees to submit additional assurances in FY 2016, nor does OJP expect grantees to require additional assurances from subgrantees, unless the grantees choose to do so.   However, OJP expects that JAG grantees and subgrantees will use this time to examine their policies and procedures to ensure they will be able to submit the required assurances when applying for JAG funding in FY 2017.

### 6. *Will a locality risk its entire Byrne/JAG funding if it refuses to certify compliance with federal law, including 8 U.S.C. § 1373?*

Yes, a JAG grantee is required to assure and certify compliance with all applicable federal statutes, including Section 1373, as well as all applicable federal regulations, policies, guidelines and requirements, as a prerequisite to obtaining funding. OJP expects that JAG recipients will use this time to examine their policies and procedures to ensure they will be able to submit the required assurances when applying for JAG funding in FY 2017.  By providing this additional guidance and the prior guidance on 8 U.S.C. § 1373, the Department has made clear that its goal is to ensure that our JAG and SCAAP recipients are in compliance with all applicable laws and regulations, including Section 1373, not to withhold vitally important criminal justice funding from states and localities like yours.

### 7. *Will a State risk its entire Byrne/JAG funding if a subgrantee is found to be out of compliance?*

No, only the jurisdiction that fails to comply with Section 1373 is at risk for not being funded after being provided an opportunity to correct its policies or practices.  It is the State's legal responsibility as the prime grantee to monitor its subgrantees adequately and take appropriate action if 1) a subgrantee does not certify compliance with Section 1373, or 2) the State becomes aware (after making the subaward) of credible evidence of a violation of Section 1373 by a subgrantee. In general, however, a subgrantee's continuing violation would not ordinarily result in imposition of penalties against the State, or put the State's entire Byrne/JAG funding at risk. If the State disburses funds to an ineligible subgrantee, however, such that the State itself could be said to have participated in the violation (e.g. by having made the subaward knowing that the subgrantee was ineligible) or failed to take appropriate action to remedy a violation, then that State would be responsible for repayment of the dispersed funding.

In addition, if OJP becomes aware of credible evidence that a subgrantee may be in violation of Section 1373, OJP will forward that evidence to the State, and the State will need to take steps to determine if the subgrantee is in violation, and (if it is) to require the subgrantees to take

sufficient and effective steps to bring it into compliance and submit documentation that details the steps taken, contains a validation that the subgrantee has come into compliance, and includes an official legal opinion from counsel (including related legal analysis) adequately supporting the validation.

***Additional guidance regarding compliance with Section 1373 can be found at:***

Question and Answer document provided to all JAG grantees and SCAAP recipients on July 7, 2016:  https://www.bja.gov/ProgramDetails.aspx?Program_ID=59.

DOJ Office of the Inspector General Memorandum posted on July 28, 2016 at: https://oig.justice.gov/reports/2016/1607.pdf.



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

October 6, 2016

The Honorable Richard C. Shelby
United States Senate
Washington, DC   20510

Dear Senator Shelby:

This supplements the Department of Justice's (the Department) July 8, 2016, letter to you regarding compliance with applicable federal law by certain Department grantees.

At that time, we notified you that the Department's Office of Justice Programs (OJP) – which has determined that 8 U.S.C. § 1373 (Section 1373) is an applicable federal law for the purposes of the Edward Byrne Justice Assistance Grant (JAG) Program and State Criminal Alien Assistance Program (SCAAP) – provided guidance on the requirements of Section 1373 to JAG and SCAAP recipients, and we shared that guidance with you.

On October 6, 2016, OJP provided the enclosed additional guidance to all JAG and SCAAP recipients.   The additional guidance includes responses to questions received from grantees regarding compliance with Section 1373.

We hope this information is helpful.   Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

Sincerely,

Peter J. Kadzik
Assistant Attorney General

Enclosure

AR-00439

*OFFICE OF JUSTICE PROGRAMS*
*ADDITIONAL GUIDANCE REGARDING COMPLIANCE WITH 8 U.S.C. § 1373*

### 1. Why is OJP using Byrne/JAG grant funds to enforce 8 U.S.C. § 1373?

Authorizing legislation for the Byrne/JAG grant program requires that all grant applicants certify compliance both with the provisions of that authorizing legislation and all other applicable federal laws. The Office of Justice Programs has determined that 8 U.S.C. § 1373 (Section 1373) is an applicable federal law under the Byrne/JAG authorizing legislation. Therefore, all Byrne/JAG grant applicants must certify compliance with all applicable federal laws, including Section 1373, as part of the Byrne/JAG grant application process.

### 2. Does OJP's guidance on 8 U.S.C. § 1373 impact FY 2016 funding?

No FY 2016 or prior year Byrne/JAG or SCAAP funding will be impacted. However, OJP expects that JAG and SCAAP recipients will use this time to examine their policies and procedures to ensure they will be able to submit the required assurances when applying for JAG and SCAAP funding in FY 2017. As previously stated, our goal is to ensure that our JAG and SCAAP recipients are in compliance with all applicable laws and regulations, including Section 1373, not to withhold vitally important criminal justice funding from states and localities like yours.

### 3. What is the process of determining if a recipient of JAG or SCAAP funds is not in compliance with 8 U.S.C. § 1373?

As OJP has previously stated, our goal is to ensure that JAG and SCAAP recipients are in compliance with all applicable laws and regulations, including Section 1373. If OJP becomes aware of credible evidence of a violation of Section 1373, the recipient must agree to undertake a review to validate its compliance with 8 U.S.C. § 1373. If the recipient determines that it is in compliance with Section 1373 at the time of review, then it must submit documentation that contains a validation to that effect and includes an official legal opinion from counsel (including related legal analysis) adequately supporting the validation. If the recipient determines that it is not in compliance with Section 1373 at the time of review, then it must take sufficient and effective steps to bring it into compliance and submit documentation that details the steps taken, contains a validation that the recipient has come into compliance, and includes an official legal opinion from counsel (including related legal analysis) adequately supporting the validation. Failure to remedy any violations could result in a referral to the Department of Justice Office of the Inspector General, the withholding of grant funds or ineligibility for future OJP grants or subgrants, or other administrative, civil, or criminal penalties, as appropriate.

### 4. What will happen if a recipient of JAG or SCAAP funds is found to be out of compliance with 8 U.S.C. § 1373?

If a recipient is found out of compliance with Section 1373, the recipient must take sufficient and effective steps to bring it into compliance and submit documentation that details the steps taken, contains a validation that the recipient has come into compliance, and includes an official legal opinion from counsel (including related legal analysis) adequately supporting the validation. Failure to remedy any violations could result in a referral to the Department of Justice Inspector

General, the withholding of grant funds or ineligibility for future OJP grants or subgrants, suspension or termination of the grant, or other administrative, civil, or criminal penalties, as appropriate.

As previously stated, our goal is to ensure that our JAG and SCAAP recipients are in compliance with all applicable laws and regulations, including Section 1373, not to withhold vitally important criminal justice funding from states and localities like yours.

### 5. *Does OJP expect State Administering Agencies or their subgrantees to submit additional certifications specific to 8 U.S.C. § 1373?*

No, OJP does not expect grantees to submit additional assurances in FY 2016, nor does OJP expect grantees to require additional assurances from subgrantees, unless the grantees choose to do so. However, OJP expects that JAG grantees and subgrantees will use this time to examine their policies and procedures to ensure they will be able to submit the required assurances when applying for JAG funding in FY 2017.

### 6. *Will a locality risk its entire Byrne/JAG funding if it refuses to certify compliance with federal law, including 8 U.S.C. § 1373?*

Yes, a JAG grantee is required to assure and certify compliance with all applicable federal statutes, including Section 1373, as well as all applicable federal regulations, policies, guidelines and requirements, as a prerequisite to obtaining funding. OJP expects that JAG recipients will use this time to examine their policies and procedures to ensure they will be able to submit the required assurances when applying for JAG funding in FY 2017. By providing this additional guidance and the prior guidance on 8 U.S.C. § 1373, the Department has made clear that its goal is to ensure that our JAG and SCAAP recipients are in compliance with all applicable laws and regulations, including Section 1373, not to withhold vitally important criminal justice funding from states and localities like yours.

### 7. *Will a State risk its entire Byrne/JAG funding if a subgrantee is found to be out of compliance?*

No, only the jurisdiction that fails to comply with Section 1373 is at risk for not being funded after being provided an opportunity to correct its policies or practices. It is the State's legal responsibility as the prime grantee to monitor its subgrantees adequately and take appropriate action if 1) a subgrantee does not certify compliance with Section 1373, or 2) the State becomes aware (after making the subaward) of credible evidence of a violation of Section 1373 by a subgrantee. In general, however, a subgrantee's continuing violation would not ordinarily result in imposition of penalties against the State, or put the State's entire Byrne/JAG funding at risk. If the State disburses funds to an ineligible subgrantee, however, such that the State itself could be said to have participated in the violation (e.g. by having made the subaward knowing that the subgrantee was ineligible) or failed to take appropriate action to remedy a violation, then that State would be responsible for repayment of the dispersed funding.

In addition, if OJP becomes aware of credible evidence that a subgrantee may be in violation of Section 1373, OJP will forward that evidence to the State, and the State will need to take steps to determine if the subgrantee is in violation, and (if it is) to require the subgrantees to take

sufficient and effective steps to bring it into compliance and submit documentation that details the steps taken, contains a validation that the subgrantee has come into compliance, and includes an official legal opinion from counsel (including related legal analysis) adequately supporting the validation.

***Additional guidance regarding compliance with Section 1373 can be found at:***

Question and Answer document provided to all JAG grantees and SCAAP recipients on July 7, 2016:  https://www.bja.gov/ProgramDetails.aspx?Program_ID=59.

DOJ Office of the Inspector General Memorandum posted on July 28, 2016 at: https://oig.justice.gov/reports/2016/1607.pdf.



U.S. Department of Justice
Office of Justice Programs
Bureau of Justice Assistance

Grant

PAGE 1 OF 13

**1. RECIPIENT NAME AND ADDRESS (Including Zip Code)**
New York City Mayor's Office of Criminal Justice
1 Centre Street, Room 1012
New York, NY 10007-1602

**4. AWARD NUMBER.** 2016-DJ-BX-0178

**5. PROJECT PERIOD: FROM** 10/01/2015 TO 09/30/2019

**BUDGET PERIOD: FROM** 10/01/2015 TO 09/30/2019

**6. AWARD DATE** 09/06/2016 | **7. ACTION**

**2a. GRANTEE IRS/VENDOR NO.**
136-000400

**8. SUPPLEMENT NUMBER**
00

Initial

**2b. GRANTEE DUNS NO.**
140135505

**9. PREVIOUS AWARD AMOUNT** $ 0

**3. PROJECT TITLE**
New York City 2016 Justice Assistance Grant

**10. AMOUNT OF THIS AWARD** $ 4,298,245

**11. TOTAL AWARD** $ 4,298,245

**12. SPECIAL CONDITIONS**

THE ABOVE GRANT PROJECT IS APPROVED SUBJECT TO SUCH CONDITIONS OR LIMITATIONS AS ARE SET FORTH
ON THE ATTACHED PAGE(S).

**13. STATUTORY AUTHORITY FOR GRANT**

This project is supported under FY16(BJA - JAG) 42 USC 3750, et seq.

**14. CATALOG OF DOMESTIC FEDERAL ASSISTANCE (CFDA Number)**

16.738 - Edward Byrne Memorial Justice Assistance Grant Program

**15. METHOD OF PAYMENT**

GPRS

**AGENCY APPROVAL** | **GRANTEE ACCEPTANCE**

**16. TYPED NAME AND TITLE OF APPROVING OFFICIAL**

Denise O'Donnell

Director

**18. TYPED NAME AND TITLE OF AUTHORIZED GRANTEE OFFICIAL**

Elizabeth Glazer
Director of Criminal Justice

**17. SIGNATURE OF APPROVING OFFICIAL**

**19. SIGNATURE OF AUTHORIZED RECIPIENT OFFICIAL** | **19A. DATE**

10/14/16

**AGENCY USE ONLY**

**20. ACCOUNTING CLASSIFICATION CODES**

| FISCAL YEAR | FUND CODE | BUD. ACT. | OFC | DIV. REG. | SUB | POMS | AMOUNT |
|---|---|---|---|---|---|---|---|
| X | B | DJ | 80 | 00 | 00 | | 4298245 |

**21. RDJUGT0803**

RECEIVED
OCT 2016
Control Desk
OJP/OCFO

OJP FORM 4000/2 (REV 5-07) PREVIOUS EDITIONS ARE OBSOLETE.

OJP FORM 4000/2 (REV 4-88)

CONTROL DESK
OCT 18 2016
POSTED

AR-00443



| U.S. Department of Justice<br>Office of Justice Programs<br>Bureau of Justice Assistance | AWARD CONTINUATION<br>SHEET<br>Grant | PAGE 2 OF 13 |
|---|---|---|

PROJECT NUMBER    2016-DJ-BX-0178        AWARD DATE    06/06/2016

## SPECIAL CONDITIONS

1. Applicability of Part 200 Uniform Requirements

   The Uniform Administrative Requirements, Cost Principles, and Audit Requirements in 2 C.F.R. Part 200, as adopted and supplemented by the Department of Justice (DOJ) in 2 C.F.R. Part 2800 (together, the "Part 200 Uniform Requirements") apply to this 2016 award from the Office of Justice Programs (OJP)

   The Part 200 Uniform Requirements were first adopted by DOJ on December 26, 2014. If this 2016 award supplements funds previously awarded by OJP under the same award number (e.g., funds awarded in 2014 or earlier years), the Part 200 Uniform Requirements apply with respect to all funds under that award number (regardless of the award date, and regardless of whether derived from the initial award or a supplemental award) that are obligated on or after the acceptance date of this 2016 award.

   For more information and resources on the Part 200 Uniform Requirements as they relate to OJP awards and subawards ("subgrants"), see the Office of Justice Programs (OJP) website at http://ojp.gov/funding/Part200UniformRequirements.htm.

   In the event that an award-related question arises from documents or other materials prepared or distributed by OJP that may appear to conflict with, or differ in some way from, the provisions of the Part 200 Uniform Requirements, the recipient is to contact OJP promptly for clarification.

2. Compliance with DOJ Grants Financial Guide

   The recipient agrees to comply with the Department of Justice Grants Financial Guide as posted on the OJP website (currently, the "2015 DOJ Grants Financial Guide"), including any updated version that may be posted during the period of performance.

3. Required training for Point of Contact and all Financial Points of Contact

   Both the Point of Contact (POC) and all Financial Points of Contact (FPOCs) for this award must have successfully completed an "OJP financial management and grant administration training" by 120 days after the date of the recipient's acceptance of the award. Successful completion of such a training on or after January 1, 2015, will satisfy this condition.

   In the event that either the POC or an FPOC for this award changes during the period of performance, the new POC or FPOC must have successfully completed an "OJP financial management and grant administration training" by 120 calendar days after — (1) the date of OJP's approval of the "Change Grantee Contact" GAN (in the case of a new POC), or (2) the date the POC enters information on the new FPOC in GMS (in the case of a new FPOC). Successful completion of such a training on or after January 1, 2015, will satisfy this condition.

   A list of OJP trainings that OJP will consider "OJP financial management and grant administration training" for purposes of this condition is available at http://www.ojp.gov/training/fmts.htm. All trainings that satisfy this condition include a session on grant fraud prevention and detection.

   The recipient should anticipate that OJP will immediately withhold ("freeze") award funds if the recipient fails to comply with this condition. The recipient's failure to comply also may lead OJP to impose additional appropriate conditions on this award.



OJP FORM 4000/2 (REV 4-88)

AR-00444



U.S. Department of Justice
Office of Justice Programs
Bureau of Justice Assistance

AWARD CONTINUATION
SHEET
Grant

PAGE 3 OF 13

PROJECT NUMBER   2016-DJ-BX-0178          AWARD DATE   09/30/2016

## SPECIAL CONDITIONS

4. Requirements related to "de minimis" indirect cost rate

A recipient that is eligible under the Part 200 Uniform Requirements and other applicable law to use the "de minimis" indirect cost rate described in 2 C.F.R. 200.414(f), and that elects to use the "de minimis" indirect cost rate, must advise OJP in writing of both its eligibility and its election, and must comply with all associated requirements in the Part 200 Uniform Requirements. The "de minimis" rate may be applied only to modified total direct costs (MTDC) as defined by the Part 200 Uniform Requirements.

5. Requirement to report potentially duplicative funding

If the recipient currently has other active awards of federal funds, or if the recipient receives any other award of federal funds during the period of performance for this award, the recipient promptly must determine whether funds from any of those other federal awards have been, are being, or are to be used (in whole or in part) for one or more of the identical cost items for which funds are provided under this award. If so, the recipient must promptly notify the DOJ awarding agency (OJP or OVW, as appropriate) in writing of the potential duplication, and, if so requested by DOJ awarding agency, must seek a budget-modification or change-of-project scope grant adjustment notice (GAN) to eliminate any inappropriate duplication of funding.

6. Requirements related to System for Award Management and Unique Entity Identifiers

The recipient must comply with applicable requirements regarding the System for Award Management (SAM), currently accessible at http://www.sam.gov. This includes applicable requirements regarding registration with SAM, as well as maintaining the currency of information in SAM.

The recipient also must comply with applicable restrictions on subawards ("subgrants") to first-tier subrecipients (first-tier "subgrantees"), including restrictions on subawards to entities that do not acquire and provide (to the recipient) the unique entity identifier required for SAM registration

The details of the recipient's obligations related to SAM and to unique entity identifiers are posted on the OJP web site at http://ojp.gov/funding/Explore/SAM.htm (Award condition   System for Award Management (SAM) and Universal Identifier Requirements), and are incorporated by reference here.

This special condition does not apply to an award to an individual who received the award as a natural person (i.e., unrelated to any business or non-profit organization that he or she may own or operate in his or her name).

7. All subawards ("subgrants") must have specific federal authorization

The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable requirements for authorization of any subaward. This condition applies to agreements that — for purposes of federal grants administrative requirements — OJP considers a "subaward" (and therefore does not consider a procurement "contract").

The details of the requirement for authorization of any subaward are posted on the OJP web site at http://ojp.gov/funding/Explore/SubawardAuthorization.htm (Award condition:  Award Condition: All subawards ("subgrants") must have specific federal authorization), and are incorporated by reference here.



OJP FORM 4000/2 (REV 4-88)

AR-00445



U.S. Department of Justice
Office of Justice Programs
Bureau of Justice Assistance

**AWARD CONTINUATION SHEET**

Grant

PAGE 4 OF 13

| PROJECT NUMBER | 2016-DJ-BX-0178 | AWARD DATE | 09/06/2016 |

## SPECIAL CONDITIONS

8. Specific post-award approval required to use a noncompetitive approach in any procurement contract that would exceed $150,000

The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable requirements to obtain specific advance approval to use a noncompetitive approach in any procurement contract that would exceed the Simplified Acquisition Threshold (currently, $150,000). This condition applies to agreements that -- for purposes of federal grants administrative requirements -- OJP considers a procurement "contract" (and therefore does not consider a subaward).

The details of the requirement for advance approval to use a noncompetitive approach in a procurement contract under an OJP award are posted on the OJP web site at http://ojp.gov/funding/Explore/NoncompetitiveProcurement.htm (Award condition: Specific post-award approval required to use a noncompetitive approach in a procurement contract (if contract would exceed $150,000)), and are incorporated by reference here.

9. Requirements pertaining to prohibited conduct related to trafficking in persons (including reporting requirements and OJP authority to terminate award)

The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable requirements (including requirements to report allegations) pertaining to prohibited conduct related to the trafficking of persons, whether on the part of recipients, subrecipients ("subgrantees"), or individuals defined (for purposes of this condition) as "employees" of the recipient or of any subrecipient.

The details of the recipient's obligations related to prohibited conduct related to trafficking in persons are posted on the OJP web site at http://ojp.gov/funding/Explore/ProhibitedConduct-Trafficking.htm (Award condition: Prohibited conduct by recipients and subrecipients related to trafficking in persons (including reporting requirements and OJP authority to terminate award)), and are incorporated by reference here.

10. Compliance with applicable rules regarding approval, planning, and reporting of conferences, meetings, trainings, and other events

The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable laws, regulations, policies, and official DOJ guidance (including specific cost limits, prior approval and reporting requirements, where applicable) governing the use of federal funds for expenses related to conferences (as that term is defined by DOJ), including the provision of food and/or beverages at such conferences, and costs of attendance at such conferences.

Information on the pertinent DOJ definition of conferences and the rules applicable to this award appears in the DOJ Grants Financial Guide (currently, as section 3.10 of "Postaward Requirements" in the "2015 DOJ Grants Financial Guide").

11. Requirement for data on performance and effectiveness under the award

The recipient must collect and maintain data that measure the performance and effectiveness of activities under this award. The data must be provided to OJP in the manner (including within the timeframes) specified by OJP in the program solicitation or other applicable written guidance. Data collection supports compliance with the Government Performance and Results Act (GPRA) and the GPRA Modernization Act, and other applicable laws.

12. OJP Training Guiding Principles

Any training or training materials that the recipient -- or any subrecipient ("subgrantee") at any tier -- develops or delivers with OJP award funds must adhere to the OJP Training Guiding Principles for Grantees and Subgrantees, available at http://ojp.gov/funding/ojptrainingguidingprinciples.htm.

OJP FORM 4000/2 (REV 4-88)



U S Department of Justice
Office of Justice Programs
Bureau of Justice Assistance

AWARD CONTINUATION
SHEET
Grant

PAGE 5 OF 13

---

**PROJECT NUMBER** 2016-DJ-BX-0178  **AWARD DATE** 09/06/2016

## SPECIAL CONDITIONS

13. Effect of failure to address audit issues

The recipient understands and agrees that the DOJ awarding agency (OJP or OVW, as appropriate) may withhold award funds, or may impose other related requirements, if (as determined by the DOJ awarding agency) the recipient does not satisfactorily and promptly address outstanding issues from audits required by the Part 200 Uniform Requirements (or by the terms of this award), or other outstanding issues that arise in connection with audits, investigations, or reviews of DOJ awards.

14. The recipient agrees to comply with any additional requirements that may be imposed by the DOJ awarding agency (OJP or OVW, as appropriate) during the period of performance for this award, if the recipient is designated as "high-risk" for purposes of the DOJ high-risk grantee list.

15. Compliance with DOJ regulations pertaining to civil rights and nondiscrimination - 28 C.F.R. Part 42

The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable requirements of 28 C.F.R. Part 42, specifically including any applicable requirements in Subpart E of 28 C.F.R. Part 42 that relate to an equal employment opportunity program.

16. Compliance with DOJ regulations pertaining to civil rights and nondiscrimination - 28 C.F.R. Part 38

The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable requirements of 28 C.F.R. Part 38, specifically including any applicable requirements regarding written notice to program beneficiaries and prospective program beneficiaries. Part 38 of 28 C.F.R., a DOJ regulation, was amended effective May 4, 2016.

Among other things, 28 C.F.R. Part 38 includes rules that prohibit specific forms of discrimination on the basis of religion, a religious belief, a refusal to hold a religious belief, or refusal to attend or participate in a religious practice. Part 38 also sets out rules and requirements that pertain to recipient and subrecipient ("subgrantee") organizations that engage in or conduct explicitly religious activities, as well as rules and requirements that pertain to recipients and subrecipients that are faith-based or religious organizations.

The text of the regulation, now entitled "Partnerships with Faith-Based and Other Neighborhood Organizations," is available via the Electronic Code of Federal Regulations (currently accessible at http://www.ecfr.gov/cgi-bin/ECFR?page=browse), by browsing to Title 28-Judicial Administration, Chapter 1, Part 38, under e-CFR "current" data.

17. Restrictions on "lobbying"

Federal funds may not be used by the recipient, or any subrecipient ("subgrantee") at any tier, either directly or indirectly, to support or oppose the enactment, repeal, modification or adoption of any law, regulation, or policy, at any level of government.

Should any question arise as to whether a particular use of Federal funds by a recipient (or subrecipient) would or might fall within the scope of this prohibition, the recipient is to contact OJP for guidance, and may not proceed without the express prior written approval of OJP.



AR-00447



U.S. Department of Justice
Office of Justice Programs
Bureau of Justice Assistance

AWARD CONTINUATION
SHEET

Grant

PAGE 6 OF 13

---

PROJECT NUMBER  2016-DJ-BX-0178          AWARD DATE   09/06/2016

## SPECIAL CONDITIONS

18. Compliance with general appropriations-law restrictions on the use of federal funds (FY 2016)

The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable restrictions on the use of federal funds set out in federal appropriations statutes. Pertinent restrictions, including from various "general provisions" in the Consolidated Appropriations Act, 2016, are set out at http://ojp.gov/funding/Explore FY2016-AppropriationsLawRestrictions.htm, and are incorporated by reference here.

Should a question arise as to whether a particular use of federal funds by a recipient (or a subrecipient) would or might fall within the scope of an appropriations-law restriction, the recipient is to contact OJP for guidance, and may not proceed without the express prior written approval of OJP.

19. Reporting Potential Fraud, Waste, and Abuse, and Similar Misconduct

The recipient and any subrecipients ("subgrantees") must promptly refer to the DOJ Office of the Inspector General (OIG) any credible evidence that a principal, employee, agent, subrecipient, contractor, subcontractor, or other person has, in connection with funds under this award – (1) submitted a claim that violates the False Claims Act, or (2) committed a criminal or civil violation of laws pertaining to fraud, conflict of interest, bribery, gratuity, or similar misconduct.

Potential fraud, waste, abuse, or misconduct involving or relating to funds under this award should be reported to the OIG by– (1) mail directed to: Office of the Inspector General, U.S. Department of Justice, Investigations Division, 950 Pennsylvania Avenue, N.W. Room 4706, Washington, DC 20530, (2) e-mail to: oig.hotline@usdoj.gov; and/or (3) the DOJ OIG hotline: (contact information in English and Spanish) at (800) 869-4499 (phone) or (202) 616-9881 (fax).

Additional information is available from the DOJ OIG website at http://www.usdoj.gov/oig.



OJP FORM 4000/2 (REV 4-88)

AR-00448



| | | | |
|---|---|---|---|
| | **U.S. Department of Justice**<br>Office of Justice Programs<br>Bureau of Justice Assistance | **AWARD CONTINUATION<br>SHEET**<br>Grant | **PAGE 7 OF 13** |

| | | |
|---|---|---|
| **PROJECT NUMBER** 2016-DJ-BX-0172 | **AWARD DATE** 09/06/2016 | |

### SPECIAL CONDITIONS

20. Restrictions and certifications regarding non-disclosure agreements and related matters

No recipient or subrecipient ("subgrantee") under this award, or entity that receives a procurement contract or subcontract with any funds under this award, may require any employee or contractor to sign an internal confidentiality agreement or statement that prohibits or otherwise restricts, or purports to prohibit or restrict, the reporting (in accordance with law) of waste, fraud, or abuse to an investigative or law enforcement representative of a federal department or agency authorized to receive such information.

The foregoing is not intended, and shall not be understood by the agency making this award, to contravene requirements applicable to Standard Form 312 (which relates to classified information), Form 4414 (which relates to sensitive compartmented information), or any other form issued by a federal department or agency governing the nondisclosure of classified information.

1. In accepting this award, the recipient--

a. represents that it neither requires nor has required internal confidentiality agreements or statements from employees or contractors that currently prohibit or otherwise currently restrict (or purport to prohibit or restrict) employees or contractors from reporting waste, fraud, or abuse as described above; and

b. certifies that, if it learns that it is or has been requiring its employees or contractors to execute agreements or statements that prohibit or otherwise restrict (or purport to prohibit or restrict), reporting of waste, fraud, or abuse as described above, it will immediately stop any further obligations of award funds, will provide prompt written notification to the federal agency making this award, and will resume (or permit resumption of) such obligations only if expressly authorized to do so by that agency.

2. If the recipient does or is authorized under this award to make subawards ("subgrants"), procurement contracts, or both--

a. it represents that--

(1) it has determined that no other entity that the recipient's application proposes may or will receive award funds (whether through a subaward ("subgrant"), procurement contract, or subcontract under a procurement contract) either requires or has required internal confidentiality agreements or statements from employees or contractors that currently prohibit or otherwise currently restrict (or purport to prohibit or restrict) employees or contractors from reporting waste, fraud, or abuse as described above; and

(2) it has made appropriate inquiry, or otherwise has an adequate factual basis, to support this representation; and

b. it certifies that, if it learns or is notified that any subrecipient, contractor, or subcontractor entity that receives funds under this award is or has been requiring its employees or contractors to execute agreements or statements that prohibit or otherwise restrict (or purport to prohibit or restrict), reporting of waste, fraud, or abuse as described above, it will immediately stop any further obligations of award funds to or by that entity, will provide prompt written notification to the federal agency making this award, and will resume (or permit resumption of) such obligations only if expressly authorized to do so by that agency.



AR-00449



| U.S. Department of Justice<br>Office of Justice Programs<br>Bureau of Justice Assistance | AWARD CONTINUATION<br>SHEET<br>Grant | PAGE 8 OF 13 |
|---|---|---|

| PROJECT NUMBER | 2016-DJ-BX-0175 | AWARD DATE | 09/06/2016 |
|---|---|---|---|

### SPECIAL CONDITIONS

21. Compliance with 41 U.S.C. 4712 (including prohibitions on reprisal; notice to employees)

The recipient must comply with, and is subject to, all applicable provisions of 41 U.S.C. 4712, including all applicable provisions that prohibit, under specified circumstances, discrimination against an employee as reprisal for the employee's disclosure of information related to gross mismanagement of a federal grant, a gross waste of federal funds, an abuse of authority relating to a federal grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a federal grant.

The recipient also must inform its employees, in writing (and in the predominant native language of the workforce), of employee rights and remedies under 41 U.S.C. 4712.

Should a question arise as to the applicability of the provisions of 41 U.S.C. 4712 to this award, the recipient is to contact the DOJ awarding agency (OJP or OVW, as appropriate) for guidance.

22. Encouragement of policies to ban text messaging while driving

Pursuant to Executive Order 13513, "Federal Leadership on Reducing Text Messaging While Driving," 74 Fed. Reg. 51225 (October 1, 2009), DOJ encourages recipients and subrecipients ("subgrantees") to adopt and enforce policies banning employees from text messaging while driving any vehicle during the course of performing work funded by this award, and to establish workplace safety policies and conduct education, awareness, and other outreach to decrease crashes caused by distracted drivers.

23. The recipient agrees to comply with OJP grant monitoring guidelines, protocols, and procedures, and to cooperate with BJA and OCFO on all grant monitoring requests, including requests related to desk reviews, enhanced programmatic desk reviews, and/or site visits. The recipient agrees to provide to BJA and OCFO all documentation necessary to complete monitoring tasks, including documentation related to any subawards made under this award. Further, the recipient agrees to abide by reasonable deadlines set by BJA and OCFO for providing the requested documents. Failure to cooperate with BJA's/OCFO's grant monitoring activities may result in sanctions affecting the recipient's DOJ awards, including, but not limited to, withholdings and/or other restrictions on the recipient's access to grant funds; referral to the Office of the Inspector General for audit review; designation of the recipient as a DOJ High Risk grantee; or termination of an award(s).

24. The recipient agrees to comply with applicable requirements to report first-tier subawards of $25,000 or more and, in certain circumstances, to report the names and total compensation of the five most highly compensated executives of the recipient and first-tier subrecipients of award funds. Such data will be submitted to the FFATA Subaward Reporting System (FSRS). The details of recipient obligations, which derive from the Federal Funding Accountability and Transparency Act of 2006 (FFATA), are posted on the Office of Justice Programs web site at http://ojp.gov/funding/Explore/FFATA.htm (Award condition: Reporting Subawards and Executive Compensation), and are incorporated by reference here. This condition, and its reporting requirement, does not apply to grant awards made to an individual who received the award as a natural person (i.e., unrelated to any business or non-profit organization that he or she may own or operate in his or her name).

25. Program income (as defined in the Part 200 Uniform Requirements) must be used in accordance with the provisions of the Part 200 Uniform Requirements. Program income earnings and expenditures both must be reported on the quarterly Federal Financial Report, SF 425.



AR-00450



U.S. Department of Justice
Office of Justice Programs
Bureau of Justice Assistance

AWARD CONTINUATION
SHEET
Grant

PAGE 9 OF 13

---

PROJECT NUMBER    2016-DJ-BX-0178          AWARD DATE    09/06/2016

### SPECIAL CONDITIONS

26. In order to promote information sharing and enable interoperability among disparate systems across the justice and public safety community, OJP requires the grantee to comply with DOJ's Global Justice Information Sharing Initiative (DOJ's Global) guidelines and recommendations for this particular grant. Grantee shall conform to the Global Standards Package (GSP) and all constituent elements, where applicable, as described at: http://www.it.ojp.gov/gsp_grantcondition. Grantee shall document planned approaches to information sharing and describe compliance to the GSP and appropriate privacy policy that protects shared information, or provide detailed justification for why an alternative approach is recommended.

27. To avoid duplicating existing networks or IT systems in any initiatives funded by BJA for law enforcement information sharing systems which involve interstate connectivity between jurisdictions, such systems shall employ, to the extent possible, existing networks as the communication backbone to achieve interstate connectivity, unless the grantee can demonstrate to the satisfaction of BJA that this requirement would not be cost effective or would impair the functionality of an existing or proposed IT system.

28. The recipient agrees that any information technology system funded or supported by OJP funds will comply with 28 C.F.R. Part 23, Criminal Intelligence Systems Operating Policies, if OJP determines this regulation to be applicable. Should OJP determine 28 C.F.R. Part 23 to be applicable, OJP may, at its discretion, perform audits of the system, as per the regulation. Should any violation of 28 C.F.R. Part 23 occur, the recipient may be fined as per 42 U.S.C. 3789g(c)-(d). Recipient may not satisfy such a fine with federal funds.

29. Grantee agrees to comply with the requirements of 28 C.F.R. Part 46 and all Office of Justice Programs policies and procedures regarding the protection of human research subjects, including obtainment of Institutional Review Board approval, if appropriate, and subject informed consent.

30. Grantee agrees to comply with all confidentiality requirements of 42 U.S.C. section 3789g and 28 C.F.R. Part 22 that are applicable to collection, use, and revelation of data or information. Grantee further agrees, as a condition of grant approval, to submit a Privacy Certificate that is in accord with requirements of 28 C.F.R. Part 22 and, in particular, section 22.23.

31. Award recipients must verify Point of Contact(POC), Financial Point of Contact (FPOC), and Authorized Representative contact information in GMS, including telephone number and e-mail address. If any information is incorrect or has changed, a Grant Adjustment Notice (GAN) must be submitted via the Grants Management System (GMS) to document changes.

32. The grantee agrees that within 120 days of award acceptance, each current member of a law enforcement task force funded with these funds who is a task force commander, agency executive, task force officer, or other task force member of equivalent rank, will complete required online (internet-based) task force training. Additionally, all future task force members are required to complete this training once during the life of this award, or once every four years if multiple awards include this requirement. The training is provided free of charge online through BJA's Center for Task Force Integrity and Leadership (www.ctfli.org). This training addresses task force effectiveness as well as other key issues including privacy and civil liberties/rights, task force performance measurement, personnel selection, and task force oversight and accountability. When BJA funding supports a task force, a task force personnel roster should be compiled and maintained, along with course completion certificates, by the grant recipient. Additional information is available regarding this required training and access methods via BJA's web site and the Center for Task Force Integrity and Leadership (www.ctfli.org).

33. The recipient agrees to participate in BJA-sponsored training events, technical assistance events, or conferences held by BJA or its designees, upon BJA's request.



OJP FORM 4000/2 (REV. 4-88)



U.S. Department of Justice
Office of Justice Programs
Bureau of Justice Assistance

AWARD CONTINUATION
SHEET
Grant

PAGE 10 OF 13

PROJECT NUMBER   2016-DJ-BX-0478          AWARD DATE   09/06/2016

## SPECIAL CONDITIONS

34. Approval of this award does not indicate approval of any consultant rate in excess of $650 per day. A detailed justification must be submitted to and approved by the Office of Justice Programs (OJP) program office prior to obligation or expenditure of such funds.

35. The grantee agrees to assist BJA in complying with the National Environmental Policy Act (NEPA), the National Historic Preservation Act, and other related federal environmental impact analyses requirements in the use of these grant funds, either directly by the grantee or by a subgrantee. Accordingly, the grantee agrees to first determine if any of the following activities will be funded by the grant, prior to obligating funds for any of these purposes. If it is determined that any of the following activities will be funded by the grant, the grantee agrees to contact BJA.

The grantee understands that this special condition applies to its following new activities whether or not they are being specifically funded with these grant funds. That is, as long as the activity is being conducted by the grantee, a subgrantee, or any third party and the activity needs to be undertaken in order to use these grant funds, this special condition must first be met. The activities covered by this special condition are:
a. New construction;
b. Minor renovation or remodeling of a property located in an environmentally or historically sensitive area, including properties located within a 100-year flood plain, a wetland, or habitat for endangered species, or a property listed on or eligible for listing on the National Register of Historic Places;
c. A renovation, lease, or any proposed use of a building or facility that will either (a) result in a change in its basic prior use or (b) significantly change its size;
d. Implementation of a new program involving the use of chemicals other than chemicals that are (a) purchased as an incidental component of a funded activity and (b) traditionally used, for example, in office, household, recreational, or education environments; and
e. Implementation of a program relating to clandestine methamphetamine laboratory operations, including the identification, seizure, or closure of clandestine methamphetamine laboratories.

The grantee understands and agrees that complying with NEPA may require the preparation of an Environmental Assessment and/or an Environmental Impact Statement, as directed by BJA. The grantee further understands and agrees to the requirements for implementation of a Mitigation Plan, as detailed at http://www.ojp.usdoj.gov/BJA/resource/nepa.html, for programs relating to methamphetamine laboratory operations.

Application of This Special Condition to Grantee's Existing Programs or Activities: For any of the grantee's or its subgrantees' existing programs or activities that will be funded by these grant funds, the grantee, upon specific request from BJA, agrees to cooperate with BJA in any preparation by BJA of a national or program environmental assessment of that funded program or activity.

36. The recipient is required to establish a trust fund account. (The trust fund may or may not be an interest-bearing account.) The fund, including any interest, may not be used to pay debts or expenses incurred by other activities beyond the scope of the Edward Byrne Memorial Justice Assistance Grant Program (JAG). The recipient also agrees to obligate the grant funds in the trust fund (including any interest earned) during the period of the grant and expend within 90 days thereafter. Any unobligated or unexpended funds, including interest earned, must be returned to the Office of Justice Programs at the time of closeout.

37. JAG funds may be used to purchase vests for an agency, but they may not be used as the 50% match for purposes of the Bulletproof Vest Partnership (BVP) program.



OJP FORM 4000/2 (REV. 4-88)