UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

STATES OF NEW YORK, CONNECTICUT, NEW JERSEY, RHODE ISLAND, and WASHINGTON, and COMMONWEALTHS OF MASSACHUSSETTS and VIRGINIA,

                          Plaintiffs,

            v.                        No. 18-cv-6471 (ER)

U.S. DEPARTMENT OF JUSTICE; and JEFFERSON B. SESSIONS, III, in his official capacity as Attorney General of the United States,

                          Defendants.

------------------------------------------------------------------------X

CITY OF NEW YORK,

                          Plaintiff,

            v.                        No. 18-cv-6474 (ER)

JEFFERSON B. SESSIONS, III, in his official capacity as Attorney General of the United States, and the UNITED STATES DEPARTMENT OF JUSTICE,

                          Defendants.

------------------------------------------------------------------------X

**DECLARATION OF MICHAEL CHARLES GREEN**

**Michael Charles Green,** pursuant to 28 U.S.C. § 1746, declares that the following is true and correct:

      1.    I am the Executive Deputy Commissioner for the New York State Division of Criminal Justice Services (DCJS).

2. I submit this Declaration in support of the State of New York's litigation against the U.S. Department of Justice (DOJ) regarding the immigration-related conditions on the Edward Byrne Memorial Justice Assistance Grant (Byrne JAG) funds. I am familiar with the matters set forth herein, either from personal knowledge or on the basis of documents that have been provided to and/or reviewed by me.

3. I am the Executive Deputy Commissioner (EDC) and serve as the Acting Commissioner and agency head of the New York State Division of Criminal Justice Services (DCJS) located at 80 South Swan Street, Albany, New York. My educational background includes graduating with a bachelor of science degree from LeMoyne College in 1983. I subsequently graduated with a juris doctor from Western New England College in 1986. I was employed following law school as an Assistant District Attorney in the Office of the Monroe County District Attorney. I served in numerous capacities in that office, including as Capital Crimes Prosecutor, Deputy Chief of the Major Felony Bureau, and Chief of the DWI Bureau. I was elected District Attorney of Monroe County in 2003. Following my time as District Attorney, I was appointed by Governor Andrew Cuomo as EDC of DCJS on March 3, 2012. I have held this position since that date.

4. DCJS is responsible for advising and assisting the Governor in developing policies, plans and programs for improving the coordination, administration and effectiveness of the criminal justice system. DCJS is also the State entity responsible for receiving and disbursing federal funds related to criminal justice, including funding under the Byrne JAG program. Additionally, DCJS maintains the State's criminal history repository and provides criminal history record information to law enforcement and to appropriate vendors for civil background checks as authorized by law. Furthermore, DCJS, in conjunction with the Division of State Police, maintains the DNA identification index. DCJS also houses the Sex Offender Registry and the Missing Persons Clearinghouse, provides statistics and research on criminal justice topics, provides general oversight for the operation of county probation agencies and the use of correctional alternative programs, and approves training programs for police officers, peace officers, and security guards.

5. Prior to 2006, New York State received federal law enforcement block grants under the Anti-Drug Abuse Act of 1986 and, prior to that, under the Omnibus Crime Control and Safe Streets Act of 1968. New York State has received law enforcement block grants for a total of 50 years.

6. New York State and its local governments have been receiving grant monies under the U.S. Department of Justice's Bureau of Justice Assistance (BJA-DOJ) Byrne JAG program annually since the program's inception. New York State applies for and receives these grants through DCJS and a DCJS application for funding through the Byrne JAG program has never been denied by DOJ.

7. As required by the Byrne JAG program, New York State allocates a portion of its Byrne JAG award to localities within the State. For some programs, DCJS selects these subgrantees based upon criminal justice data and other subject matter information. For others, DCJS administers competitive solicitations (Requests for Proposals) to select subgrantees.

2

8. New York has used its Byrne JAG funds to support state and local government projects aimed at preventing crime and improving the criminal justice system. For example, DCJS has used Byrne JAG awards to partially fund the Crime Analysis Centers across New York State. These award-winning centers have been recognized for their innovative use of technology that enables state, local, and federal law enforcement to respond to and combat crime across the state. CACs are a critical tool for developing leads in cases, identifying suspects, and connecting crimes that are occurring across jurisdictional boundaries. Having this asset available in real time is a significant advantage for the law enforcement agencies that rely on the state network and another step toward improving public safety across the state.

9. In addition, New York State's subgrantees have used Byrne JAG allocations to support a variety of important criminal justice and related purposes. Noteworthy examples of these programs include:

   a. A $86,147 Byrne JAG award to the Buffalo Veterans Treatment Court to divert 100 veterans from the prison system and provide those veterans with health, education, employment resources to meet the re-adjustment challenges these veterans face when returning from combat,[1] as well as
   b. A $10,000 Byrne JAG award to The Council of Thought and Action Youth in Suffolk County to fund that group's efforts to engage at-risk youth and young adults between the ages of 13 and 24 by connecting them with guidance and mentoring.[2]

10. On August 25, 2017, DCJS timely filed New York State's application for federal fiscal year (FFY) 2017 Byrne JAG program funds. New York requested $8,879,161 in Byrne JAG funds for FFY 2017.

11. New York State plans to use its Byrne JAG allocation for Federal Fiscal Year ("FFY") 2017 to support several critically important criminal justice programs and activities. As indicated in its 2017 Bryne JAG application program narrative, New York plans to use its Byrne JAG allocation to meet several funding priorities, including improving the quality and accuracy of criminal justice records, improving the capabilities on forensic laboratories and DNA identification, and supporting community-based opioid abuse and prevention strategies. The continued delay in the receipt of the FFY 2017 funds threatens to curtail, disrupt, and potentially discontinue many of these efforts.

12. In particular, DCJS plans to use New York's Byrne JAG allocation to support the following criminal justice priorities, among others:

---

[1] Success Story Details: Buffalo Veterans Treatment Court, U.S. Department of Justice Bureau of Justice Assistance, https://www.bja.gov/SuccessStoryDetail.aspx?ssid=11.

[2] Success Story Details: Council of Thought and Action (COTA) Youth, U.S. Department of Justice Bureau of Justice Assistance, https://www.bja.gov/SuccessStoryDetail.aspx?ssid=97.

a. **Crime Analysis Centers (CACs)**: Byrne JAG grants fund roughly one-half of the cost of approximately 30 crime analyst positions in the four CACs that serve the Buffalo, Rochester, Syracuse, and Capital (Albany) regions. While other state and local public safety agencies do assign additional staff to the CACs, the Byrne JAG-funded analysts represent the foundation upon which all other staffing layers are built. The potential loss of one-half of these analysts when current Byrne JAG funding runs out in September 2018 would cripple CAC operations in these four populous jurisdictions.

b. **SNUG**: DCJS administers SNUG ("GUNS" spelled backwards) street outreach programs in eleven jurisdictions across the state that are documented to have elevated levels of shooting incidents. New York's SNUG program has been nationally recognized as an evidence-based model for street outreach programs, in part because New York's program is supported by a full-time project manager and a full-time training director. Both of these positions are 100% Byrne JAG-funded, with current funding set to expire on September 30, 2018.

c. **Non-fatal Shooting Demonstration projects**: Recognizing that non-fatal shooting incident cases are cleared at dramatically lower levels in some jurisdictions than fatal shootings, DCJS recently embarked on a two-year demonstration project in two jurisdictions, with Byrne JAG dollars funding staff positions in police and prosecutorial agencies that were specifically dedicated to the investigation and prosecution of non-fatal shooting cases. Preliminary results in the pilot jurisdictions have been overwhelmingly positive; however, without FFY17 (or later) Byrne JAG funding, DCJS faces immediate difficulties in building on this program in any real or timely manner.

d. **Enhanced prosecution and defense services**: For several years, Byrne JAG funding has supported annual grants to the five New York City District Attorneys' offices, New York's Special Narcotics Prosecutor, and public defense offices in New York City, Erie, Monroe, Onondaga, Nassau, and Suffolk counties to support both prosecution and defense services designed to enhance the quality and effectiveness of violent crime and drug prosecution. The prosecutors use the Byrne JAG funding to combat identity theft, violent crime, gangs, and the trafficking of illegal guns and drugs, as well as to support community prosecution programs. The public defense agencies use the Byrne JAG funding to improve defense services for indigent special population groups (drug or alcohol addicted, persons with mental health issues, sex offenders, etc.), including indigent defendants processed through specialty courts (Drug, Domestic Violence, and Veterans courts, for example), and to enhance early defense intervention strategies and representation during initial court proceedings. DCJS has been unable to award those Enhanced Prosecution/Defense sub-grants supported by the FFY 2017 Byrne JAG award.

e. **DCJS Research Consortium**: DCJS plans to announce the creation of a new Criminal Justice Research Consortium in the summer of 2018. Modeled after a similar effort in Ohio that was originally 100% Byrne JAG funded, the Research Consortium will make small grants of Byrne JAG funds available to practitioner agencies (namely law enforcement agencies, prosecutors and

          probation offices) to sponsor targeted research and evaluation projects by nearby college/university researchers. FFY17 (or later) Byrne JAG funding is needed for the consortium to continue to operate.

        f. **Livescan grants**: In each of the last three years, Byrne JAG funds have supported grants to local law enforcement agencies to support 50% of the cost of the purchase and installation of Livescan fingerprint equipment. Not only does this newer fingerprint equipment have superior functionality to older equipment, but much of the Livescan equipment currently in use by local agencies across the state is beyond its useful life and in pressing need of replacement. FY17 Byrne JAG funds are needed to support any additional rounds of Livescan grant funding for local police departments.

        g. **Video Recording of Statements grants**: New provisions were recently added to New York's Criminal Procedure Law requiring that certain custodial interrogations by local law enforcement officials be recorded. Effective April 2018, failure to do so could result in a court determination that a confession, admission, or other statement is inadmissible as evidence. To help local police and prosecutors acquire the necessary equipment to comply with these new requirements, DCJS has used Byrne JAG funds to make competitive equipment grants to 28 local law enforcement agencies in 23 counties. FFY17 funds are needed to support any additional competitive grants to local prosecutors and police departments.

        h. **Critical staff support for Public Safety Information Technology Systems**: Byrne JAG allocations fund, fully or partially, twenty-nine staff positions in the New York State Office of Information Technology Services (ITS). These employees directly support critical public safety IT systems and platforms, including the state's fingerprint identification system, criminal history database, sex offender registry, integrated probation registry, and missing persons clearinghouse. Any significant reduction in technical support for these IT systems would weaken the effectiveness of public safety agencies and programs throughout New York State.

      13.    At least $5,254,667 New York's FFY 2017 Byrne JAG allocation will be granted to units of local government to satisfy the variable pass-through requirements of the Byrne JAG program.

      14.    New York's 2017-2018 enacted state budget included a $10 million appropriation authority to support State and local projects funded from the State's anticipated FFY 2017 Byrne JAG allocation. These funds were re-appropriated in the 2018-2019 enacted State budget.

      15.    On June 26, 2018, New York received a letter from DOJ announcing its Byrne JAG allocation for FFY 2017 in the amount of $8,879,161. DOJ's award letter purports to impose new immigration-related conditions on New York and its subgrantees; these conditions target jurisdictions that lawfully decide not to have law enforcement and other resources diverted for federal civil immigration enforcement

16. The first condition, the so-called access condition, would require the State and its local government subgrantees to ensure that upon request federal agents may access any correctional facility to question suspected aliens about their right to be or remain in the United States. The second condition, the so-called notice condition, would require New York and its local government subgrantees to ensure that their officers respond as soon as practicable to Department of Homeland Security (DHS) request for advance notice of a particular alien's scheduled release from a correctional facility of the State or its local government subgrantee.

17. In addition, DOJ's award letter requires the State to: (1) certify compliance with 8 U.S.C. § 1373; (2) comply with Section 1373 throughout the duration of the award; (3) diligently monitor the compliance of all subgrantees with Section 1373; and (4) notify DOJ in writing when the State becomes aware of credible evidence that a subgrantee has violated Section 1373.

18. Regarding the certification condition, New York would be required to submit three separate certifications of compliance with Section 1373 to receive its Byrne JAG award: one from the State's Chief Executive or Governor, one from its Chief Legal Officer or Attorney General, and one from the State employee who signs the grant award.

19. New York State has already identified over 50 subgrantees that would receive FFY 2017 Byrne JAG funding. In 2016, New York State provided 116 subgrantees with Byrne JAG funding, including several jurisdictions (Albany, Rochester, New York City, and Newburgh) that have lawful policies preventing the diversion of their law enforcement and other resources for federal civil immigration enforcement.

20. The immigration-related conditions will impose substantial burdens on New York and its Byrne JAG subgrantees. For example, to receive and distribute its Byrne JAG allocation, New York would need to evaluate whether its subgrantee jurisdictions are in compliance with the notice and access conditions, as well as whether jurisdictions comply with Section 1373— including compliance with DOJ's broad and shifting interpretation of that statute. The State would then be required to continuously monitor its subgrantees for compliance for the duration of the award. To carry out these tasks, New York would need to implement a monitoring and oversight process and incur potentially significant administrative and financial costs.

21. New York is one of the safest large states in the country. Looking back as far as 1990, reliable data demonstrates that violent crime in New York City, as well as the rest of the state, has dramatically declined. Indeed, statewide data reveals that since 1990, violent crime is down 67% percent and property crime is down 69%. It cannot be disputed, New York is one of the safest large states in the country. I believe that the relationship between law enforcement and the communities they serve was, and is, integral to the sharp decline in crime. In addition to these long-term trends, it must be appreciated that 2017 preliminary data reveals a decline in New York State for the fifth consecutive year. To elaborate, the 360,628 total Index crimes reported for 2017 is the fewest ever reported since statewide reporting began in 1975. The number of homicides during 2017, 546 statewide, is also the lowest on record since reporting began. The Byrne JAG Program funds are used to support a broad range of state and local government projects – including those programs that are designed to prevent crime and improve the criminal justice system. I firmly

believe that there is a nexus between the effective use of these funds and the dramatic decline in crime in New York State.

22. In my professional judgment, I believe that the relationship between law enforcement and the communities they serve was, and is, integral to the sharp decline in crime.

23. In my professional judgment, local communities, in partnership with the state, are in the best position to determine which practices promote public safety in their jurisdictions.

24. Byrne JAG program funds are used to support a broad range of state and local government projects—including programs that are designed to prevent crime and improve the State's criminal justice system. My professional judgment is that there is a strong nexus between the effective use of these funds and the dramatic decline in crime in New York State.

25. I respectfully submit the following documents, all of which are true and correct copies as described and specified below and referred to in the narrative set forth above.

| Exhibit | Description |
|---|---|
| 1 | DOJ-BJA Byrne JAG Award Letter dated June 26, 2018 |
| 2 | NYS DCJS Application for Byrne JAG FFY 2017 Program Narrative |

26. I declare under penalty of perjury under the laws of the State of New York and the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed:   Albany, New York
            August 14, 2018

Michael C. Green
Executive Deputy Commissioner of the
New York State Division of Criminal
Justice Services

7