# Exhibit A



ZACHARY W. CARTER
*Corporation Counsel*

THE CITY OF NEW YORK
**LAW DEPARTMENT**
100 CHURCH STREET
NEW YORK, N.Y. 10007-2601

(212) 356-0800
FAX: (212) 356-0809
zcarter@law.nyc.gov

June 27, 2017

Alan R. Hanson
Acting Assistant Attorney General
Office of Justice Programs
U.S. Department of Justice
810 Seventh Street, NW
Washington, DC 20531

Dear Acting Assistant Attorney General Hanson:

Pursuant to Special Condition 53 of its Fiscal Year ("FY") 2016 Edward Byrne Memorial Justice Assistance Grant ("JAG") Program award dated September 6, 2016, the Mayor's Office of Criminal Justice, an agency of New York City ("City"), agreed to "undertake a review to validate its compliance with 8 U.S.C. § 1373." This opinion provides the legal analysis to support the City's validation of compliance with § 1373.

Section 1373 states, in relevant part:

(a) In general. Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

(b) Additional authority of government entities. Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:
    (1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.
    (2) Maintaining such information.

(3) Exchanging such information with any other Federal, State, or local government entity.

According to guidance from the Office of Justice Programs ("OJP") at the U.S. Department of Justice ("DOJ") issued on July 7, 2016, § 1373 is an "applicable Federal law" for the purposes of the JAG program. U.S. Dep't of Justice, Office of Justice Programs, Guidance Regarding Compliance with 8 U.S.C. § 1373.[1] Subsequent OJP guidance released on October 6, 2016 makes clear that "[n]o FY 2016 or prior year Byrne/JAG … funding will be impacted" and encourages JAG recipients to examine relevant policies and procedures in preparation for the FY 2017 grant cycle. U.S. Dep't of Justice, Office of Justice Programs, Additional Guidance Regarding Compliance with 8 U.S.C. § 1373.[2]

Notwithstanding the City's position that § 1373 is not an applicable federal law with respect to the JAG program, and without waiving any of the City's rights or objections to the OJP guidance or to § 1373, the City certifies that its laws and policies comply with and operate within the constitutional bounds of § 1373.

## DETAINER LAWS

The City's laws with respect to civil immigration detainer requests are consistent with § 1373. Section 1373 addresses the sharing of information regarding citizenship or immigration status between government entities or officials and the U.S. Immigration and Naturalization Service, now U.S. Immigration and Customs Enforcement ("ICE"). Section 1373 does not speak to the issue of civil immigration detainer requests, local compliance with which is completely voluntary. Nor does ICE rely upon § 1373 as its statutory authority to issue detainer requests. *See* U.S. Dep't of Homeland Sec., Immigration and Customs Enforcement, Policy No. 10074.2: Issuance of Immigration Detainers by ICE Immigration Officers (effective Apr. 2, 2017).[3] The City's laws pertaining to federal immigration detainers, N.Y.C. Admin. Code §§ 9-131 and 14-154, described below, do not prohibit or restrict communication between City agencies and ICE about an individual's immigration or citizenship status and therefore comply with § 1373. Nevertheless, this legal opinion addresses detainer requests because the Inspector General at the DOJ focused on the handling of these requests in a May 31, 2016 memorandum assessing compliance with § 1373 by various OJP grant recipients, including the City. U.S. Dep't of Justice, Office of the Inspector Gen., Department of Justice Referral of Allegations of Potential Violations of 8 U.S.C. § 1373 by Grant Recipients (May 31, 2016).[4]

---

[1] *Available at* https://www.bja.gov/funding/8uscsection1373.pdf. The Edward Byrne Memorial JAG Program is named for a 22-year-old New York City Police Officer who was killed in the line of duty. Officer Edward Byrne was assigned to protect a Guyanese immigrant who had been threatened repeatedly and whose house had been firebombed twice because he was cooperating with the New York City Police Department and reporting criminal activity in his neighborhood. That is, the JAG program is named after a police officer killed in the course of protecting an immigrant who was trying to make the City safer. It would therefore be ironic to apply § 1373 in a way that strips JAG funds from any jurisdiction with a confidentiality policy that encourages cooperation between law enforcement and immigrants.

[2] *Available at* https://www.bja.gov/funding/Additional-BJA-Guidance-on-Section-1373-October-6-2016.pdf.

[3] *Available at* https://www.ice.gov/sites/default/files/documents/Document/2017/10074-2.pdf.

[4] *Available at* https://oig.justice.gov/reports/2016/1607.pdf.

The New York City Department of Correction ("DOC") and the New York City Police Department ("NYPD") receive detainer requests from ICE for persons in local custody accused or convicted of committing criminal offenses. *See* 8 C.F.R. § 287.7(d), (e). The U.S. Department of Homeland Security and several courts have determined that the cooperation of local law enforcement with such detainer requests is voluntary. *See, e.g.*, *Galarza v. Szalczyk*, 745 F.3d 634, 645 (3d Cir. 2014). Additionally, courts have held that detaining an individual in response to a detainer request without probable cause may implicate liability under the Fourth Amendment. *See, e.g., Morales v. Chadbourne*, 996 F. Supp. 2d 19, 39 (D.R.I. 2014), *aff'd in part and appeal dismissed in part*, 793 F.3d 208, 215-16 (1st Cir. 2015).

The City has two laws that set out its procedure for responding to detainer requests. Section 9-131 of the New York City Administrative Code states the conditions under which the DOC will hold an individual subject to a detainer request or share certain categories of information with ICE. Section 14-154 imposes similar conditions under which the NYPD will hold an individual subject to a detainer request. The City's laws pertaining to immigration detainers are designed to advance public safety and protect the City's finances.

The DOC may honor a detainer request by holding an individual for up to 48 hours after he or she would otherwise be released only if ICE produces a judicial warrant and the subject has been convicted of a "violent or serious crime," as defined by local law, or is identified as a possible match in the terrorist screening database. N.Y.C. Admin. Code § 9-131(b)(1). The law also provides that DOC personnel shall not expend time or agency resources disclosing to federal immigration authorities information regarding any person's incarceration status, release dates, court appearance dates, or any other information that pertains to the person, unless an enumerated exception applies. *Id.* at § 9-131(h)(1). One such exception authorizes the DOC to respond to an ICE request for release date and time, if the subject of the request is "a person convicted of a violent or serious crime or identified as a possible match in the terrorist screening database." *Id.* at § 9-131(h)(1)(i). DOC policy in such cases is to share such information and participate in an orderly transfer of custody in response to the request if it is supported by specified documentation of probable cause. Moreover, the law explicitly excludes information related to a person's citizenship or immigration status from the category of information that DOC personnel are prohibited from disclosing to federal immigration authorities. *Id.*

The NYPD may honor a detainer request under the same conditions as the DOC. *Id.* at § 14-154(b)(1). The NYPD may also honor a detainer request by holding a person for up to 48 hours beyond the time such person would otherwise be released, in advance of ICE obtaining a judicial warrant, if the person was convicted of a violent or serious crime and has re-entered the country illegally after a previous removal or return, or if the person is identified as a possible match in a terrorist screening database. *Id.* at § 14-154(b)(2). The law does not prohibit or restrict the NYPD from sharing citizenship or immigration status information with federal immigration authorities.

Additionally, both local laws specify that "[n]othing in this local law shall be construed to prohibit any city agency from cooperating with federal immigration authorities when required

under federal law. Nothing in this local law shall be interpreted or applied so as to create any power, duty or obligation in conflict with any federal or state law." *Id.* at §§ 9-131(d), 14-154(d).

Thus, the City's laws pertaining to federal immigration detainers comply with § 1373. To the extent local law restricts the DOC from sharing certain information with federal immigration authorities, the law explicitly excludes from this restriction information related to a person's citizenship or immigration status and does not prohibit or restrict the DOC from sharing such information with federal immigration authorities. Local law also does not prohibit or restrict the NYPD from sharing information regarding citizenship or immigration status with ICE.

## GENERAL CONFIDENTIALITY POLICY

The City's general confidentiality policy complies with § 1373 insofar as § 1373 may constitutionally be applied. The City has identified significant constitutional limits on the application of § 1373 to its general confidentiality policy.

As an initial matter, § 1373 may not properly be construed to abrogate a state or local confidentiality policy that is general both as to the information covered and the disclosures regulated. Before a statute will be understood to alter the usual constitutional balance between the federal government and the States, Congress must make its intent to do so "unmistakably clear." *Gregory v. Ashcroft*, 501 U.S. 452, 460-61 (1991) (quotation marks omitted); *see also Bond v. United States*, 134 S. Ct. 2077, 2083 (2014). This is true even when the proposed incursion may fall within constitutional bounds. *Gregory*, 501 U.S. at 464. *Gregory*'s clear-statement principle applies here to compel a strict construction of § 1373, since a broad reading would sever state and local governments' control over their own employees in a manner that is unprecedented in our federalist tradition.

While it is plain that the statute means to bar state and local laws and policies that are targeted at restricting disclosures of information about citizenship or immigration status to ICE (or other governmental entities), it is not clear that Congress intended to compel that such disclosures receive favored treatment when a state or locality has adopted a general confidentiality policy. Indeed, the DOJ's Office of Legal Counsel has opined that § 1373's legislative history "suggests that a narrow construction is appropriate," noting that Congress's focus appeared to be ensuring that ICE "would not be placed at a comparative disadvantage," rather than "privileging" the agency. Memorandum from Dep't of Justice to General Counsel, Dep't of Commerce, Relationship Between Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") and Statutory Requirement for Confidentiality of Census Information, at 12-13 (May 18, 1999) (citing H.R. Rep. No. 104-469, pt. 1, at 277 (1996)) (hereafter "OLC Memo"). Thus, neither the text nor legislative history indicates clear congressional intent that § 1373 should abrogate a general confidentiality policy such as that of New York City—or that Congress intended to condition the receipt of any federal grants or funds on compliance with this section. *See* Pub. L. No. 104-208, 110 Stat. 3009 (Sept. 1996); *see also* Conference Report, IIRIRA, H.R. Rep. No. 104-828, at 199-252 (1996) (Conf. Rep.) (evincing no Congressional intent to support a funding condition vis-à-vis § 1373).

Since 2003, the City has had a general confidentiality policy that protects all residents' confidential information from disclosure to third parties. N.Y.C. Office of the Mayor, Exec. Order No. 41 (Sept. 17, 2003) (hereafter referred to as the "general confidentiality policy").[5] The general confidentiality policy is an integral part of the architecture of laws, policies, and protocols that protect s ensitive, private, and confidential information in the City, including individuals' personally identifiable information. *See* N.Y.C. Admin. Code § 10-501 (defining "personal identifying information" for purposes of security breaches). Such policies and protocols are deeply embedded in the City's regular business practices, both at a citywide and local agency level, and are essential to efficient day-to-day operations. For instance, under the Citywide Data Privacy and Security Protocol, all City agencies must follow a detailed procedure for handling third-party information requests. Adherence to this Protocol ensures that agencies disclose requested information only when appropriate and comply with all applicable statutory, regulatory, or contractual restrictions on disclosure. Further, City agencies assiduously endeavor to protect sensitive information through policies such as the Department of Information Technology and Telecommunications' Citywide Information Security Policies, which facilitate the overall security of City data.

Situated within this extensive legal and policy architecture, the general confidentiality policy defines "confidential information" broadly to include an individual's sexual orientation, status as a victim of domestic violence, status as a victim of sexual assault, status as a crime witness, receipt of public assistance, immigration status, and information contained in income tax returns. Exec. Order No. 41, at § 1. The City's policy generally prevents disclosure of this information, while allowing for such disclosure in enumerated circumstances. *Id.* at § 2. City officers or employees may disclose confidential information relating to immigration status where: such disclosure has been authorized in writing by the individual to whom such information pertains; such disclosure is required by law; such disclosure is to another City officer or employee and is necessary to fulfill the purpose or achieve the mission of any City agency; the individual to whom such information pertains is suspected of engaging in illegal activity; the dissemination of such information is necessary to apprehend a person suspected of engaging in illegal activity; or such disclosure is necessary in furtherance of an investigation of potential terrorist activity. *Id.* "Illegal activity" is defined as unlawful activity, other than mere status as an undocumented alien. *Id.*

The City's general confidentiality policy is necessary to the performance of its legitimate municipal functions. In 2001, City voters authorized such a policy, deciding that "it is essential to the workings of city government that the city retain control over information obtained by city employees in the course of their duties." N.Y.C. Charter § 8(g). The voters approved a referendum amending the City Charter to empower the Mayor to "requir[e] that information obtained by city employees be kept confidential to the extent necessary to preserve the trust of individuals who have business with city agencies." *Id.* Pursuant to that authority, the Mayor issued Executive Order 41, which memorializes the City's general confidentiality policy and bars its officers and employees, with narrow exceptions, from disclosing a wide variety of personal information. The general confidentiality policy seeks to "promote the utilization of [the City's]

---

[5] *Available at* http://www.nyc.gov/html/dfta/downloads/pdf/EO41.pdf.

services by all of its residents who are entitled to and in need of them" with the goal of encouraging individuals to "obtain the assistance of City agencies regardless of personal or private attributes, without negative consequences to their personal lives." Exec. Order No. 41, at Whereas Clauses. The preamble notes that the "obtaining of pertinent information, which is essential to the performance of a wide variety of governmental functions, may in some cases be difficult or impossible if some expectation of confidentiality is not preserved, and preserving confidentiality in turn requires that governments regulate the use of such information by their employees." *Id.*

Second Circuit jurisprudence reflects the tension between § 1373 and Tenth Amendment principles of federalism as applied to New York City's general confidentiality policy. *See City of New York v. United States*, 179 F.3d 29, 36 (2d Cir. 1999), *cert. denied*, 528 U.S. 1115 (2000). This conflict with well-accepted notions of federalism should be avoided under Supreme Court doctrine that is particularly salient in the federalism context, by construing § 1373 to reflect a more limited scope of application that accommodates the federalism concerns recognized by the Second Circuit. *See Clark v. Suarez Martinez*, 543 U.S. 371, 381-83 (2005) (invoking the constitutional avoidance principle when interpreting a provision of federal immigration law); *Bond*, 134 S. Ct. at 2086-94 (interpreting a federal statute narrowly to avoid a "dramatic departure" from the federalist structure). Specifically, in *City of New York*, the Second Circuit recognized the importance of preserving residents' expectations that confidential information they provide to the City will be protected. 179 F.3d at 36. The court acknowledged that gathering information "is essential to the performance of a wide variety of state and local governmental functions" and that discharging those essential functions may "be difficult or impossible if some expectation of confidentiality is not preserved." *Id.* Despite the City's "not insubstantial" concerns with respect to control over confidential information, the court upheld the constitutionality of § 1373 as applied to a previous mayoral executive order, which was directed solely towards prohibiting City officers and employees from voluntarily providing federal immigration authorities with information concerning any alien. *Id.*; *see also* N.Y.C. Office of the Mayor, Exec. Order No. 124 (Aug. 7, 1989).[6] The Second Circuit concluded that the City had failed to show that § 1373 impermissibly intruded on local control over information obtained in the course of official business or over its employees' use of such information because the executive order at issue was "not a general policy … [but rather] single[d] out a particular federal policy for non-cooperation while allowing City employees to share freely the information in question with the rest of the world." *City of New York*, 179 F.3d at 36-37. In so holding, the Second Circuit upheld the constitutionality of § 1373 as applied to a confidentiality policy targeted specifically at immigration-related information. New York City petitioned for certiorari, which was denied, and does not concede the facial constitutionality of § 1373.

The Second Circuit deliberately declined to resolve whether § 1373 "would survive a constitutional challenge" in the context of "generalized confidentiality policies that are necessary to the performance of legitimate municipal functions." *Id.* at 37. The court's reticence on this point echoes a substantially similar observation by the DOJ: "[T]he legislative history may suggest that 8 U.S.C. § 1373(a) is not intended to apply to any provision of law, whether federal,

---

[6] *Available at* http://www.nyc.gov/html/records/pdf/executive_orders/1989EO124.PDF.

state, or local, that imposes a confidentiality requirement that applies to bar disclosures not simply to the INS, but to government agencies generally." OLC Memo, at 13, n.10.

Unlike the executive order analyzed by the court in *City of New York*, the City's current general confidentiality policy protects a broad swath of sensitive information about individuals who happen to come into contact with City employees. The policy prescribes how City employees should interact with members of the public in order to build and maintain civic trust. In so doing, the policy aids the City in protecting the public health, safety, and general welfare of its residents by facilitating access to services by all, including but not limited to immigrants.

Moreover, application of § 1373 to impede the City's general confidentiality policy would not only undermine the integrity of the policy, but also violate the federalist structure of the Constitution by interfering with the City's control over its own officers and employees. *See Reno v. Condon*, 528 U.S. 141, 149 (2000) (noting that the Supreme Court has "held federal statutes invalid, not because Congress lacked legislative authority over the subject matter, but because those statutes violated the principles of federalism contained in the Tenth Amendment"). A government can only exercise power through its officers and employees and it is through this structure "and the character of those who exercise government authority, [that] a State defines itself as a sovereign." *Gregory*, 501 U.S. at 460. Section 1373 specifically targets the City's ability to control its workforce of over 300,000 people by turning City officers and employees, who would otherwise act uniformly in accordance with controlling federal, state, and local laws, into free agents who may or may not report immigration-related information about select individuals to the federal government. If construed to force the City to either aid federal enforcement efforts or give its officers and employees free agency status—a recipe for arbitrariness and inconsistency—application of § 1373 would deliberately and impermissibly interfere with the City's sovereign power. *See Printz v. United States*, 521 U.S. 898, 928 (1997) (explaining that a sovereign government is one that is "independent and autonomous" within its own "sphere of authority"); *see also* The Federalist No. 51, at 323 (Clinton Rossiter ed., 1961) (explaining that out of the "compound republic of America … a double security arises to the rights of the people. The different governments will control each other, at the same time that each will be controlled by itself."). Additionally, application of § 1373 to inhibit control over the manner in which City officers and employees handle sensitive information could lead to misuse of City resources in violation of ethics provisions of the City Charter, for example, where an individual discloses immigration status in furtherance of the employee's private interest. *See* N.Y.C. Charter § 2604(b). It could also create the appearance that City employees are engaged in profiling on the basis of race or national origin, or even lead to unlawful detention in furtherance of federal immigration enforcement, particularly where incomplete or inaccurate information is shared by an unregulated employee. *See Morales*, 996 F. Supp. 2d at 39.

The City does not dispute that the federal government has "broad, undoubted power over the subject of immigration." *Arizona v. United States*, 132 S. Ct. 2492, 2498 (2012). However, § 1373 simply cannot be read to override the City's general confidentiality policy and thereby unconstitutionally interfere with the City's right to control its officers and employees and assign their duties. As the Fifth Circuit has explained, "[w]hatever the outer limits of state sovereignty may be, it surely encompasses the right to set the duties of office for state-created officials." *See Koog v. United States*, 79 F.3d 452, 460 (5th Cir. 1996). The Second Circuit agreed with this

7

sentiment in *City of New York*, noting that broad municipal control over confidential information is necessary to the performance of local governmental functions. 179 F.3d at 37. Any application of § 1373 that wrests away the City's sovereign power to maintain the confidentiality of information obtained by its officers and employees in the regular course of business would violate the system of dual sovereignty that is "grounded in the very structure of the Constitution." *Bond*, 134 S. Ct. at 2091.

  For all of these reasons, New York City validates its compliance with § 1373 and certifies that its laws and policies comply with and operate within the constitutional bounds of that section.

                Sincerely,

                Zachary W. Carter