UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, CONNECTICUT, NEW JERSEY, RHODE ISLAND, and WASHINGTON, and COMMONWEALTHS OF MASSACHUSETTS and VIRGINIA,<br><br>                   Plaintiffs,<br><br>          –against–<br><br>UNITED STATES DEPARTMENT OF JUSTICE, and MATTHEW G. WHITAKER, in his official capacity as Acting Attorney General of the United States,<br><br>                   Defendants. | **OPINION AND ORDER**<br><br>18 Civ. 6471 (ER) |
| CITY OF NEW YORK,<br><br>                   Plaintiff,<br><br>          –against–<br><br>MATTHEW G. WHITAKER, in his official capacity as Acting Attorney General of the United States, and UNITED STATES DEPARTMENT OF JUSTICE,<br><br>                   Defendants.[*] | 18 Civ. 6474 (ER) |

Ramos, D.J.:

Since Congress created the modern version of the program in 2006, the Plaintiff States and City of New York have received funding for criminal justice initiatives through the Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") program, named after New York City police officer Edward R. Byrne, who was killed in the line of duty. In 2017, for the first time in

---

[*] Pursuant to Federal Rule of Civil Procedure 25(d), Acting Attorney General Matthew G. Whitaker is automatically substituted as a party in place of former Attorney General Jefferson B. Sessions III.

the history of the program, the U.S. Department of Justice ("DOJ") and Attorney General (collectively, "Defendants") imposed three immigration-related conditions that grantees must comply with in order to receive funding. Plaintiffs bring this suit challenging these new conditions. Consistent with every other court that has considered these issues, the Court concludes that Defendants did not have lawful authority to impose these conditions. For the reasons set forth below, Plaintiffs' motion for partial summary judgment is GRANTED, and Defendants' motion for partial summary judgment or in the alternative to dismiss is DENIED.

## I.      Background

### A.      The Byrne JAG Program

The Byrne JAG program has its origins in the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, tit. I, 82 Stat. 197, which created grants to assist the law enforcement efforts of state and local authorities. After undergoing several amendments, the modern Byrne JAG program was created through the Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, § 1111, 119 Stat. 2960, 3094 (2006). The Byrne JAG program is now codified at 34 U.S.C. §§ 10151–10158.

Under the Byrne JAG program, states and localities may apply for funds to support criminal justice programs in a variety of categories, including law enforcement, prosecution, crime prevention, corrections, drug treatment, technology, victim and witness services, and mental health. 34 U.S.C. §§ 10152(a)(1), 10153(a). The funds are disbursed according to a formula based on the particular jurisdiction's population and violent crime statistics. *Id.* § 10156. Grantees may also make subgrants to localities or community organizations, *id.* § 10152(b), and some state funds are set aside for subgrants to localities, *id.* § 10156(c)(2).

On July 25, 2017, Defendants announced that they were imposing three new

immigration-related conditions on applicants for Byrne JAG funds in fiscal year ("FY") 2017.[1]

According to the press release announcing the change, the conditions were intended to

"encourage . . . 'sanctuary' jurisdictions to change their policies and partner with federal law

enforcement to remove criminals."[2]  Holt Decl. Ex. 17, at AR-00992, Doc. 33-17.[3]

The first condition requires grantees, upon request, to give advance notice to the

Department of Homeland Security ("DHS") of the scheduled release date and time of aliens

housed in state or local correctional facilities (the "Notice Condition").  As stated in the award

documents, the Notice Condition provides:

---

[1] In 2016, Defendants imposed a related but different condition on the City of New York's Byrne JAG grant.  The condition required the City to "undertake a review to validate its compliance with 8 U.S.C § 1373," a statute which prohibits states and localities from restricting their officials from communicating with immigration authorities regarding anyone's citizenship or immigration status (as will be discussed in detail below).  City's FY 2016 Byrne JAG Grant ¶ 53, Trautman Decl. Ex. A, Doc. 53-1.  The City was further required to submit documentation several months after accepting the grant showing that it was in compliance or that it came into compliance.  *Id.*  The City accepted the condition and submitted documents certifying that "its laws and policies comply with and operate within the constitutional bounds of § 1373."  City's June 27, 2017 Letter 2, Soler Decl. Ex. A, Doc. 41-1.  This condition was not imposed on the Plaintiff States.  *See* New York State's FY 2016 Byrne JAG Grant, Trautman Decl. Ex. B, Doc. 53-2; Trautman Decl. ¶ 3, Doc. 53.

[2] The Court notes that the label of "sanctuary" cities or states "is commonly misunderstood."  *City of Chicago v. Sessions*, 888 F.3d 272, 281 (7th Cir. 2018), *vacated in part*, No. 17-2991, 2018 WL 4268814 (7th Cir. Aug. 10, 2018).  Although Defendants claim that "'sanctuary' policies . . . intentionally undermine our laws and protect illegal aliens who have committed crimes," AR-00992, many so-called sanctuary jurisdictions "do[] not interfere in any way with the federal government's lawful pursuit of its civil immigration activities, and presence in such localities will not immunize anyone to the reach of the federal government," *Chicago*, 888 F.3d at 281.  Indeed, many such jurisdictions will cooperate with immigration enforcement authorities for persons most likely to present a threat to the community, and "refuse such coordination where the threat posed by the individual is lesser, reflect[ing] the decision by the state and local authorities as how best to further the law enforcement objectives of their communities with the resources at their disposal."  *Id.*; *see also United States v. California*, 314 F. Supp. 3d 1077, 1105 (E.D. Cal. 2018) ("Standing aside does not equate to standing in the way.").

[3] Unless otherwise indicated, references to "Doc." relate to documents filed in the City's action, No. 18 Civ. 6474.  The motion papers and supporting documents submitted in the two related actions are essentially identical.

> A State statute, or a State rule, -regulation, -policy, or -practice, must be in place that is designed to ensure that, when a State (or State-contracted) correctional facility receives from DHS a formal written request authorized by the Immigration and Nationality Act that seeks advance notice of the scheduled release date and time for a particular alien in such facility, then such facility will honor such request and — as early as practicable . . . — provide the requested notice to DHS.

New York State's FY 2017 Byrne JAG Grant ¶ 55(1)(B), Holt Decl. Ex. 1, Doc. 33-1.

The second condition requires grantees to give federal agents access to aliens in state or local correctional facilities in order to question them about their immigration status (the "Access Condition"). The Access Condition provides:

> A State statute, or a State rule, -regulation, -policy, or -practice, must be in place that is designed to ensure that agents of the United States acting under color of federal law in fact are given to access any State (or State-contracted) correctional facility for the purpose of permitting such agents to meet with individuals who are (or are believed by such agents to be) aliens and to inquire as to such individuals' right to be or remain in the United States.

*Id.* ¶ 55(1)(A).[4]

The third condition requires grantees to certify their compliance with 8 U.S.C. § 1373, which prohibits states and localities from restricting their officials from communicating with immigration authorities regarding anyone's citizenship or immigration status (the "Compliance Condition"). The Compliance Condition provides:

> [N]o State or local government entity, -agency, or -official may prohibit or in any way restrict — (1) any government entity or -official from sending or receiving information regarding citizenship or immigration status as described in 8 U.S.C. 1373(a); or (2) a government entity or -agency from sending, requesting or receiving, maintaining, or exchanging information regarding immigration status as described in 8 U.S.C. 1373(b).

*Id.* ¶ 53(1).

---

[4] While the quoted provisions apply to state jurisdictions, similar terms apply to local jurisdictions. *See* New York State's FY 2017 Byrne JAG Grant ¶ 56(1)(A)–(B).

Grantees are also required to monitor any subgrantees' compliance with the three conditions, and to notify DOJ if they become aware of "credible evidence" of a violation of the Compliance Condition.  *Id.* ¶¶ 53(3), 54(1)(D), 55(2), 56(2).  Grantees must certify their compliance with the three conditions, which carries the risk of criminal prosecution, civil penalties, and administrative remedies.  *Id.* ¶ 1; Holt Decl. Ex. 17, at AR-01031, -01033.

### B.    Plaintiffs

The States of New York, Connecticut, New Jersey, Rhode Island, and Washington, the Commonwealths of Massachusetts and Virginia (collectively, the "States"), and the City of New York (the "City") have received Byrne JAG funds since at least 2006 (and some had received predecessor grants for decades).  Pls.' 56.1 ¶¶ 63, 66, 89, 114, Doc. 23.  Plaintiffs have used these funds to support a broad array of law enforcement, criminal justice, public safety, and drug treatment programs.  *Id.* ¶¶ 64, 115.

On June 26, 2018, DOJ issued award letters to the States requiring their acceptance of the new conditions described above in order to receive their FY 2017 Byrne JAG funds, which collectively totaled over $25 million.  *Id.* ¶¶ 26, 30.  Although the City had also applied for a FY 2017 Byrne JAG grant of over $4 million, the City did not receive an award letter at that time. *Id.* ¶¶ 44, 51, 114.  Instead, in letters sent several months earlier, DOJ informed the City that, "based on a preliminary review, the Department has determined that [the City] appears to have laws, policies, or practices that violate 8 U.S.C. § 1373," DOJ's Oct. 11, 2017 Letter 1, Soler Decl. Ex. B., Doc. 41-2, which could result in the City's "ineligib[ility] for FY 2017 Byrne JAG funds," DOJ's Jan. 24, 2018 Letter 2, Soler Decl. Ex. D, Doc. 41-4.

DOJ cited, among other things, the City's Executive Order No. 41 as a policy that "appears to . . . violate" § 1373's prohibition on restricting communications between local officials and immigration authorities regarding immigration status.  DOJ's Oct. 11, 2017 Letter

1–2.  Executive Order No. 41, together with Executive Order No. 34, forms the City's "General Confidentiality Policy," which was issued by then-Mayor Michael Bloomberg in 2003.  Pls.' 56.1 ¶ 143.  This policy protects "confidential information," which is defined as including, as relevant here, information concerning an individual's immigration status.[5]  Exec. Order No. 41, § 1 (2003), Negrón Decl. Ex. B, Doc. 42-2.  Under the policy, City employees may not disclose an individual's immigration status except in limited circumstances, such as when the disclosure is authorized by the individual, is required by law, is to another City employee as necessary to fulfill a governmental purpose, pertains to an individual suspected of illegal activity (other than mere status as an undocumented immigrant), or is necessary to investigate or apprehend persons suspected of terrorist or illegal activity (other than mere undocumented status).  *Id.* § 2.  Additionally, police officers may not inquire about a person's immigration status unless investigating illegal activity other than mere undocumented status, and may not inquire about the immigration status of crime victims or witnesses at all.  *Id.* § 4(4).  Other City employees may not inquire about any person's immigration status unless the inquiry is required by law or is necessary to determine eligibility for or to provide government services.  *Id.* § 4(3).

The purpose of the City's General Confidentiality Policy is to assure residents that "they may seek and obtain the assistance of City agencies regardless of personal or private attributes, without negative consequences to their personal lives," because "the obtaining of pertinent information, which is essential to the performance of a wide variety of governmental functions, may in some cases be difficult or impossible if some expectation of confidentiality is not preserved."  *Id.* at 1.  The City maintains that its General Confidentiality Policy, in conjunction

---

[5] "[C]onfidential information" also includes information relating to an individual's sexual orientation, status as a victim of domestic violence or sexual assault, status as a crime witness, receipt of public assistance, or income tax records.  Exec. Order No. 41, § 1.

with other privacy laws and policies, encourages residents to report crimes, seek medical treatment, and use other City services because they can trust that the City will protect their personal information. Pls.' 56.1 ¶ 177. The City believes that these laws and policies are instrumental in maintaining the City's historically low crime rates by promoting trust and cooperation between the New York Police Department and the public, including immigrant communities that otherwise may retreat into the shadows if they believe that the police will share their information with federal immigration authorities. *Id.* ¶¶ 184, 187, 189. Similarly, if people fear that the City could disclose their information to immigration authorities, they may refuse to cooperate with public health investigations or obtain medical services such as immunizations. *Id.* ¶ 194.

### C. Related Litigation

The new conditions on Byrne JAG funding have generated litigation throughout the country. In Chicago, a district court in the Northern District of Illinois issued a nationwide preliminary injunction against the Notice and Access Conditions. *City of Chicago v. Sessions*, 264 F. Supp. 3d 933 (N.D. Ill. 2017). On an interlocutory appeal, the Seventh Circuit affirmed that decision, *City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018), but later stayed the nationwide scope of the injunction pending en banc review, *see generally City of Chicago v. Sessions*, No. 17-2991, 2018 WL 4268814, at *1 (7th Cir. Aug. 10, 2018). The district court, on summary judgment, then permanently enjoined not only the Notice and Access Conditions, but also the Compliance Condition, citing the Supreme Court's intervening decision in *Murphy v. NCAA*, 138 S. Ct. 1461 (2018), and similarly stayed the injunction's nationwide scope. *City of Chicago v. Sessions*, 321 F. Supp. 3d 855 (N.D. Ill. 2018).

In a related case also in the Northern District of Illinois, the City of Evanston and the U.S. Conference of Mayors obtained a preliminary injunction against all three conditions, but the

district court stayed the injunction's "near-nationwide effect" as to the Conference. *City of Evanston v. Sessions*, No. 18 Civ. 4853, slip op. at 11 (N.D. Ill. Aug. 9, 2018), Doc. 23. The Seventh Circuit then lifted the stay as to the Conference given that the injunction was "limited to the parties actually before the court." *U.S. Conference of Mayors v. Sessions*, No. 18-2734, slip op. at 2 (7th Cir. Aug. 29, 2018), Doc. 13. In other words, the injunction applied only to the City of Evanston and those local jurisdictions that are actually members of the U.S. Conference of Mayors.[6]

In Philadelphia, a district court in the Eastern District of Pennsylvania preliminarily enjoined the Attorney General from denying that city FY 2017 Byrne JAG funds on the basis of the challenged conditions. *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579 (E.D. Pa. 2017). Following a bench trial, the district court then permanently enjoined all three conditions. *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289 (E.D. Pa. 2018). The Attorney General has appealed to the Third Circuit.

In California, the state and the City and County of San Francisco sued over the conditions in the Northern District of California, and the district court initially denied California's request for a preliminary injunction against the Compliance Condition. *California ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015 (N.D. Cal. 2018). Subsequently, with the benefit of a full record on summary judgment, the district court then permanently enjoined all three conditions but

---

[6] The City of New York is a member of the U.S. Conference of Mayors. As a result of the *Evanston* litigation, DOJ issued the City's FY 2017 Byrne JAG award on October 10, 2018, and represented that it will not at this time enforce the challenged conditions against the City. The parties agree that (1) the City's claims are not moot because DOJ may in the future enforce the challenged conditions against the City if the preliminary injunction in *Evanston* is dissolved or reversed on appeal, *see N.Y. State Nat. Org. for Women v. Terry*, 159 F.3d 86, 92 (2d Cir. 1998) ("[V]oluntary cessation of misconduct does not engender mootness where the cessation resulted from a coercive order and a threat of sanctions."), and (2) the City's claims under the Administrative Procedure Act are ripe in light of DOJ's reaching a decision on the City's Byrne JAG application. *See* Docs. 65, 72.

stayed the injunction's nationwide scope. *City & County of San Francisco v. Sessions*, Nos. 17 Civ. 04642, 17 Civ. 04701 (WHO), 2018 WL 4859528 (N.D. Cal. Oct. 5, 2018).

### D. This Case

The States and the City brought two related actions on July 18, 2018, and filed amended complaints on August 6, 2018. States' First Am. Compl. ("FAC"), No. 18 Civ. 6471, Doc. 32; City's FAC, No. 18 Civ. 6474, Doc. 15. The States challenge the imposition of the three FY 2017 conditions on five bases: (1) the conditions violate the separation of powers, (2) the conditions are ultra vires under the Administrative Procedure Act ("APA"), (3) the conditions are not in accordance with law under the APA, (4) the conditions are arbitrary and capricious under the APA, and (5) § 1373 violates the Tenth Amendment's prohibition on commandeering. States' FAC ¶¶ 116–150. In addition to these claims, the City also asserts that the conditions violate the Spending Clause and seeks a declaratory judgment that § 1373 is unconstitutional or, in the alternative, that the City complies with § 1373. City's FAC ¶¶ 111–148, 173–179.[7]

The States and the City have moved for partial summary judgment on their claims challenging the FY 2017 conditions. No. 18 Civ. 6471, Doc. 56; No. 18 Civ. 6474, Doc. 21. Defendants have moved to dismiss or, alternatively, for partial summary judgment on those

---

[7] In their amended complaints, the States and the City also assert related claims challenging identical conditions as well as additional conditions attached to FY 2018 funds, which were announced on July 20, 2018. States' FAC ¶¶ 4, 151–173; City's FAC ¶¶ 6, 149–172. According to the amended complaints, in addition to the three conditions imposed on FY 2017 grants, recipients of FY 2018 funds must also certify that they will not (1) violate 8 U.S.C. § 1644, another statute prohibiting restrictions on exchanging immigration status information with federal authorities; (2) violate 8 U.S.C. § 1324(a), which prohibits knowingly or recklessly concealing or harboring aliens; (3) impede federal authorities in the arrest or removal of aliens as authorized by 8 U.S.C. §§ 1226(a), (c), 1231(a)(4); (4) impede federal authorities in the interrogation of aliens as authorized by 8 U.S.C. § 1357(a)(1); or (5) impede the Attorney General's reports on the number of undocumented immigrants incarcerated in federal and state prisons for felonies and efforts to remove them pursuant to 8 U.S.C. § 1366(1), (3). States' FAC ¶ 4; City's FAC ¶ 6. The FY 2018 conditions are not at issue in the instant motions for partial summary judgment.

claims.  No. 18 Civ. 6471, Doc. 88; No. 18 Civ. 6474, Doc. 50.  The motions are fully briefed, and oral argument was held on November 16, 2018.

## II.  Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the governing law.  *Id.*

The party moving for summary judgment is initially responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, the nonmoving party must "come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  *FDIC. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)).  However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture, or surmise.  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  Rather, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor."  *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

In challenges to agency action under the APA, summary judgment is the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review. *Chen v. Bd. of Immigration Appeals*, 164 F. Supp. 3d 612, 617 (S.D.N.Y. 2016). "Where, as here, a party seeks review of agency action under the APA and 'the entire case on review is a question of law,' summary judgment is generally appropriate." *Noroozi v. Napolitano*, 905 F. Supp. 2d 535, 541 (S.D.N.Y. 2012) (quoting *Citizens Against Casino Gambling in Erie Cty. v. Hogen*, No. 07 Civ. 0451 (S), 2008 WL 2746566, at *25 (W.D.N.Y. July 8, 2008)).

## III.    Discussion

This case challenges the authority of the Executive Branch of the federal government to compel states to adopt its preferred immigration policies by imposing conditions on congressionally authorized funding to which the states are otherwise entitled. As such, this case is fundamentally about the separation of powers among the branches of our government and the interplay of dual sovereign authorities in our federalist system. "The founders of our country well understood that the concentration of power threatens individual liberty and established a bulwark against such tyranny" through limits on concentrated power. *Chicago*, 888 F.3d at 277. "Concentration of power in the hands of a single branch is a threat to liberty," which "is always at stake when one or more of the branches seek to transgress the separation of powers." *Clinton v. City of New York*, 524 U.S. 417, 450 (1998) (Kennedy, J., concurring). "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Gregory v. Ashcroft*, 501 U.S. 452, 458–59 (1991). That balance of power must be maintained "[b]y guarding against encroachments by the Federal Government on fundamental aspects of

state sovereignty." *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 769 (2002).  It is

incumbent on the judiciary "to act as a check on such usurpation of power," whether among the

branches of government or the federal and state governments.  *Chicago*, 888 F.3d at 277.  With

these principles in mind, the Court turns to the legal issues that govern this case.

### A.        Statutory Authority for the Conditions

Under the APA, courts must "hold unlawful and set aside agency action . . . found to be

. . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," "or

otherwise not in accordance with law."  5 U.S.C. § 706(2)(A), (C).  In determining whether an

agency action is ultra vires, "the question . . . is always whether the agency has gone beyond

what Congress has permitted it to do."  *City of Arlington v. FCC*, 569 U.S. 290, 297–98 (2013);

*see also NRDC v. Abraham*, 355 F.3d 179, 202 (2d Cir. 2004) (discussing the "well-established

principle" that "an agency literally has no power to act . . . unless and until Congress confers

power upon it" (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986))).

At the outset, the Court notes that the Byrne JAG grant is "a formula grant rather than a

discretionary grant," *Chicago*, 888 F.3d at 285, which means it is "not awarded at the discretion

of a state or federal agency, but . . . pursuant to a statutory formula," *City of Los Angeles v.

McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989).  Under the Byrne JAG statute, "the Attorney

General *shall* . . . allocate" grant money pursuant to a statutory formula based on the state's

population and violent crime statistics.  34 U.S.C. § 10156(a)(1) (emphasis added).

Because § 10156(a)(1) does not give the Attorney General discretion to award or

withhold Byrne JAG grants or determine the conditions under which they are disbursed, the

authority for the challenged conditions must come from some other statutory provision, if at all.

Defendants point to two potential provisions:  34 U.S.C. § 10102(a)(6) and 34 U.S.C.

§ 10153(a)(5)(D).

Section 10102, which is located in a different subchapter from the Byrne JAG program,

sets out the duties of the Assistant Attorney General for the Office of Justice Programs[8] and

provides as follows:

> The Assistant Attorney General shall—
>
> (1) publish and disseminate information on the conditions and progress of the criminal justice systems;
>
> (2) maintain liaison with the executive and judicial branches of the Federal and State governments in matters relating to criminal justice;
>
> (3) provide information to the President, the Congress, the judiciary, State and local governments, and the general public relating to criminal justice;
>
> (4) maintain liaison with public and private educational and research institutions, State and local governments, and governments of other nations relating to criminal justice;
>
> (5) coordinate and provide staff support to coordinate the activities of the Office and the Bureau of Justice Assistance, the National Institute of Justice, the Bureau of Justice Statistics, the Office for Victims of Crime, and the Office of Juvenile Justice and Delinquency Prevention; and
>
> (6) exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, *including placing special conditions on all grants, and determining priority purposes for formula grants*.

34 U.S.C. § 10102(a) (emphasis added).

Defendants contend that the italicized language permits the Assistant Attorney General to

"prioritize federal grant monies for those state and local jurisdictions that assist in furthering

relevant federal purposes," by imposing "special conditions" such as those challenged here "on

all grants" including the Byrne JAG program.  Defs.' Mem. 15, 18 (emphases omitted), Doc. 51.

---

[8] By statute, DOJ's Office of Justice Programs is headed by this Assistant Attorney General.  34 U.S.C. § 10101.

However, Defendants' "interpretation is contrary to the plain meaning of the statutory language." *Chicago*, 888 F.3d at 284.  The problem for Defendants is that the italicized language begins with the word "including," which "by definition is used to designate that a . . . thing is part of a particular group."  *Id.* (citing *Including*, Oxford English Dictionary (3d ed. 2016)).  Thus, the Assistant Attorney General can only place special conditions or determine priority purposes to the extent that power already "may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General."  34 U.S.C. § 10102(a)(6).  In other words, the italicized language is not a "stand-alone grant of authority to the Assistant Attorney General to attach any conditions to any grants"; rather, such authority must come from elsewhere in the chapter or have been delegated by the Attorney General, who may only delegate it to the extent that he has such power himself.  *Chicago*, 888 F.3d at 285.  Because Defendants cannot cite another provision granting that power to the Assistant Attorney General or the Attorney General, § 10102(a)(6) does not provide authority for imposing any of the challenged conditions.

Moreover, the statutory structure indicates that § 10102(a)(6) is "an unlikely place for Congress to place a power as broad" as Defendants would have it.  *Id.*  The "including" clause is tacked on to a catch-all provision at the end of a list of explicit powers, which "would be an odd place indeed to put a sweeping power to impose any conditions on any grants—a power much more significant than all of the duties and powers that precede it in the listing, and a power granted to the Assistant Attorney General that was not granted to the Attorney General."  *Id.*  It would also be "inconsistent with the goal of the statute to support the needs of law enforcement while providing flexibility to state and local governments" and "at odds with the nature of the Byrne JAG grant, which is a formula grant rather than a discretionary grant."  *Id.*  "[I]t is inconceivable that Congress would have anticipated that the Assistant Attorney General could

abrogate the entire distribution scheme and deny all funds to states and localities . . . based on the

Assistant Attorney General's decision to impose his or her own conditions—the putative

authority for which is provided in a different statute." *Id.* at 286.[9]

### ii.    34 U.S.C. § 10153(a)(5)(D)

Defendants contend that § 10153(a)(5)(D) provides authority for imposing the

Compliance Condition only.  This section provides that applicants for Byrne JAG funds must

submit an application with a number of certifications, assurances, and details, including:

> A certification, made in a form acceptable to the Attorney General and executed
> by the chief executive officer of the applicant (or by another officer of the
> applicant, if qualified under regulations promulgated by the Attorney General),
> that—
>
> > (A) the programs to be funded by the grant meet all the requirements of this
> > part;
> >
> > (B) all the information contained in the application is correct;
> >
> > (C) there has been appropriate coordination with affected agencies; and
> >
> > (D) the applicant will comply with all provisions of this part and *all other
> > applicable Federal laws*.

34 U.S.C. § 10153(a)(5) (emphasis added).

Defendants argue that 8 U.S.C. § 1373 is an "applicable Federal law," with which

applicants must certify compliance.  Defendants contend that § 10153(a)(5)(D) covers all federal

laws applicable to Byrne JAG applicants, i.e., states and localities (as opposed to private

individuals or entities).  Defs.' Mem. 20.  They further contend that the authority to require a

---

[9] The Court need not address whether Defendants' "argument might fail for an additional reason, that the term 'special conditions' is a term of art referring to conditions for high-risk grantees with difficulty adhering to grant requirements" that does not apply to the challenged conditions. *Chicago*, 888 F.3d at 285 n.2 (citing *Philadelphia*, 280 F. Supp. 3d at 617).

"certification, made in a form acceptable to the Attorney General," 34 U.S.C. § 10153(a)(5),[10]

constitutes "a delegation to the Attorney General to determine whether a particular federal law

constitutes an 'applicable Federal law[],'" Defs.' Mem. 19 (alteration in original) (quoting 34

U.S.C. § 10153(a)(5)(D)).

Plaintiffs respond that "applicable Federal laws" refers to only those laws that expressly

apply to federal grants. Pls.' Mem. 26, Doc. 22. For example, prohibitions on discrimination in

"any program or activity receiving Federal financial assistance" would meet this definition, 42

U.S.C. § 2000d, while the provisions concerning communications with immigration authorities

in § 1373 would not. They argue that Congress could not have intended to require applicants to

certify, under threat of criminal prosecution, their compliance with every possible law that could

conceivably apply to them.[11] They argue that such a broad interpretation would be inconsistent

with the structure of § 10153, which sets forth largely technical and ministerial application

requirements pertaining to the grant itself;[12] past practice of DOJ, which understood applicable

laws to have the narrower construction;[13] and the goal of the program to reduce administrative

---

[10] *See also* 34 U.S.C. § 10153(a) (providing that applicants "shall submit an application to the Attorney General . . . in such form as the Attorney General may require").

[11] While vast, presumably the range of applicable laws would be limited by the constitutional principle that the conditions must "bear some relation to the purpose of the federal funds." *Chicago*, 264 F. Supp. 3d at 945 (citing *South Dakota v. Dole*, 483 U.S. 203, 207–08 (1987)).

[12] *See* 34 U.S.C. § 10153(a)(1) (Byrne JAG funds may not be used to supplant state or local funds); *id.* § 10153(a)(2)–(3) (application must be submitted for review and public comment); *id.* § 10153(a)(4) (applicant must report programmatic and financial data during the grant period); *id.* § 10153(a)(6) (applicant must set forth plan for how the funds will be used).

[13] *See* Dep't of Justice Study Grp., *Report to the Attorney General: Restructuring the Justice Department's Program of Assistance to State and Local Governments for Crime Control and Criminal Justice System Improvement* 8–9 (1977) (identifying "over twenty Federal statutes impos[ing] controls and limitations on the use of [Law Enforcement Assistance Administration] grant funds"), Holt Decl. Ex. 22, Doc. 33-25; *see also* New York State's FY 2016 Byrne JAG Grant, Trautman Decl. Ex. B (requiring compliance with certain laws applicable to federal grants, such as those pertaining to nondiscrimination, but not § 1373). Even a certification form currently in use still appears to equate "applicable federal

burdens in the grant process.[14]  Pls.' Mem. 27–29; *see also* ACLU's Amici Br. 3–8, Doc. 71.

Plaintiffs further argue that the Attorney General's authority to determine the "form" of the

application cannot constitute authority to alter the substantive requirements of compliance with

particular laws, 34 U.S.C. § 10153(a)(5), and in any event, Congress could not have intended to

delegate the authority to determine what constitutes an "applicable" law, because otherwise it

would have done so explicitly, as it has done in other statutes.[15]  Pls.' Reply 16–17, Doc. 56.

On this final point, Plaintiffs are surely correct that the Attorney General's authority to

determine the "form" of the application does not include the ability to dictate the "substance" of

which laws an applicant must comply with as a condition of grant funding.  *Form*, Black's Law

Dictionary (10th ed. 2014) (defining "form" as "[t]he outer shape, structure, or configuration of

something, as distinguished from its substance or matter").  "There is no indication that an

acceptable form of the certification would encompass additional substantive compliance with

laws not directly required by Congress."  *San Francisco*, 2018 WL 4859528, at *18; *see*

*Gonzales v. Oregon*, 546 U.S. 243, 262 (2006) (stating that "[i]t would be anomalous for

Congress to have so painstakingly described the Attorney General's limited authority . . . but to

have given him, just by implication," much broader authority).  If Congress wanted to delegate

---

statutes and regulations" with "federal statutes and regulations *applicable to the award*."  Holt Decl. Ex. 17, at AR-01037 (emphasis added) (certifying that "(a) the Applicant will comply with all award requirements and all federal statutes and regulations applicable to the award; (b) the Applicant will require all subrecipients to comply with all applicable award requirements and all applicable federal statutes and regulations").

[14] *See* S. Rep. No. 96-142, at 8 (1979) (listing "reduced red tape" as the first goal of reforms to a predecessor program); *Federal Assistance to State and Local Criminal Justice Agencies: Hearing on S. 1245, S. 1882, S. 3270, and S. 3280 Before the Subcomm. on Criminal Laws and Procedures of the S. Comm. on the Judiciary*, 95th Cong. 383 (1978) (letter of Att'y Gen. Griffin B. Bell) (stating that the bill was "designed" to "simplify[] the grant process"), Holt Decl. Ex. 25, Doc. 33-28.

[15] *See* 26 U.S.C. § 432(e)(9)(E)(iv)(II) (referencing compliance with "other applicable law, *as determined by the Secretary of the Treasury*" (emphasis added)).

this substantive authority to the Attorney General, it would have done so explicitly. "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

However, the question remains as to the scope of "applicable" federal laws with which applicants must certify compliance: Does this mean laws applicable to the state or locality, or laws applicable to the grant? "Both positions are plausible," *Chicago*, 264 F. Supp. 3d at 944, and "the question is a 'close call,'" *Philadelphia*, 280 F. Supp. 3d at 619. On one hand, "Congress could expect an entity receiving federal funds to certify its compliance with federal law, as the entity is—independent of receiving federal funds—obligated to comply." *Chicago*, 264 F. Supp. 3d at 945. And the command that "the applicant will comply with . . . all other applicable Federal laws," by virtue of the proximity of the words, suggests laws that are applicable to the "applicant." 34 U.S.C. § 10153(a)(5)(D). But this does not answer the question of whether this means laws applicable to the applicant as a state or locality, or laws applicable to the applicant *as an applicant for federal grant funding*. The structure of § 10153, which concerns requirements pertaining to the grant and the application, points toward the latter reading. *See San Francisco*, 2018 WL 4859528, at *17 ("[B]ecause all the other conditions in Section 10153(a) apply to the grant itself, the statutory context does not support imposing a condition beyond the grant administration process.").

In any event, it is unclear from the statutory language whether Congress intended to condition Byrne JAG funds on compliance with all federal laws applicable to the state or locality or compliance with all federal laws applicable to federal grants. What is clear, however, is that "if Congress intends to impose a condition on the grant of federal moneys, it must do so

unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). "By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* Under this "clear notice" rule, the Court must view the statute "from the perspective of a state official who is engaged in the process of deciding whether the State should accept [the] funds and the obligations that go with those funds," and "must ask whether such a state official would clearly understand that one of the obligations of the Act is the [purported] obligation," *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006), i.e., to comply with all federal laws "applicable" to the state. "This malleable language does not provide the 'clear notice that would be needed to attach such a condition to a State's receipt of . . . funds.'" *Philadelphia*, 280 F. Supp. 3d at 647 (quoting *Arlington Cent.*, 548 U.S. at 300). Conversely, given the structure of § 10153, which concerns the requirements of the application and the grant, as well as the parties' long history of treating "applicable Federal laws" as encompassing laws applicable to federal grants, grant recipients, and the grant-making process, such a construction gives fair notice of the terms of the funding. Accordingly, the Court concludes that "applicable Federal laws" for purposes of 34 U.S.C. § 10153(a)(5)(D) means federal laws applicable to the grant.

As the parties do not dispute, § 1373 is not one of those applicable laws under this narrower construction of § 10153(a)(5)(D). Accordingly, Defendants did not have statutory authority to condition Byrne JAG funding on compliance with § 1373. But even if Defendants' broader interpretation of § 10153(a)(5)(D) carried the day, § 1373 would still not be an "applicable" law because it is unconstitutional, as will be explained below, and "no matter the breadth of this provision, it will never capture an unconstitutional statute." *Chicago*, 321 F. Supp. 3d at 875.

### B.     Section 1373 and the Tenth Amendment

### i.     The Anticommandeering Doctrine

The Tenth Amendment provides:  "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  U.S. Const. amend. X.  "[T]he Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States."  *New York v. United States*, 505 U.S. 144, 157 (1992).

The Tenth Amendment embodies an "anticommandeering principle," which "withhold[s] from Congress the power to issue orders directly to the States."  *Murphy v. NCAA*, 138 S. Ct. 1461, 1475 (2018); *see Printz v. United States*, 521 U.S. 898, 935 (1997) ("The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program."); *New York*, 505 U.S. at 188 ("The Federal Government may not compel the States to enact or administer a federal regulatory program.").

There are three significant purposes served by the anticommandeering doctrine.  First, by "divid[ing] authority between federal and state governments," it promotes a "healthy balance of power between the States and the Federal Government [that reduces] the risk of tyranny and abuse from either front."  *Murphy*, 138 S. Ct. at 1477 (quoting *New York*, 505 U.S. at 181).  Second, the anticommandeering doctrine supports "political accountability," because "if a State imposes regulations only because it has been commanded to do so by Congress, responsibility is blurred."  *Id.*  And third, the anticommandeering rule "prevents Congress from shifting the costs of regulation to the States," because "if Congress can compel the States to enact and enforce its program, Congress need not" "weigh the expected benefits of the program against its costs."  *Id.*

Most recently, in *Murphy*, the Supreme Court held that the Professional and Amateur Sports Protection Act ("PASPA"), which prohibited states from authorizing sports gambling, violated the anticommandeering rule because it "unequivocally dictates what a state legislature may and may not do." *Id.* at 1478. The Court explained that PASPA operated "as if federal officers were installed in state legislative chambers and were armed with the authority to stop legislators from voting on any offending proposals," which was a "direct affront to state sovereignty." *Id.*

In *Murphy*, the supporters of PASPA argued that commandeering occurs only when Congress "command[s] 'affirmative' action as opposed to imposing a prohibition," but the Supreme Court rejected that distinction as "empty." *Id.* "The basic principle—that Congress cannot issue direct orders to state legislatures—applies in either event." *Id.*

There are two important limits on the anticommandeering doctrine. First, "[t]he anticommandeering doctrine does not apply when Congress evenhandedly regulates an activity in which both States and private actors engage." *Id.* Thus, Congress may enact laws that "appl[y] equally to state and private actors." *Id.* at 1479.

Second, commandeering does not occur when Congress validly preempts state law through the Supremacy Clause. In preemption, "Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Id.* at 1480. To qualify as a preemption provision, the law "must represent the exercise of a power conferred on Congress by the Constitution," and it "must be best read as one that regulates private actors" because "the Constitution 'confers upon Congress the power to regulate individuals, not States.'" *Id.* at 1479 (quoting *New York*, 505 U.S. at 166). Although a

preemption provision that prohibits contrary state law "might appear to operate directly on the States," in fact, it "confers on private entities . . . a federal right to engage in certain conduct subject only to certain (federal) constraints" and "to be free from any other . . . requirements." *Id.* at 1480–81.  In sum, "every form of preemption is based on a federal law that regulates the conduct of private actors, not the States." *Id.* at 1481.  Thus, the PASPA provision prohibiting state authorization of sports gambling, which did not confer any federal rights nor impose any federal restrictions on private actors, could not be understood "as anything other than a direct command to the States," which put it firmly in the category of impermissible commandeering and not permissible preemption. *Id.*

### ii.    Section 1373

Section 1373 provides, in relevant part:

(a) In general

Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

(b) Additional authority of government entities

Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:

(1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.

(2) Maintaining such information.

(3) Exchanging such information with any other Federal, State, or local government entity.

8 U.S.C. § 1373(a)–(b).

In sum, § 1373 "prohibits any 'government entity or official' from restricting any other 'government entity or official' from exchanging immigration status information" with immigration authorities.[16] *Chicago*, 321 F. Supp. 3d at 868. Plaintiffs contend that this command to state and local governments offends the Tenth Amendment's anticommandeering rule.

The Second Circuit has once before passed on the constitutionality of § 1373, in *City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999), nineteen years before *Murphy* was decided. There, the court rejected the City's facial challenge under the Tenth Amendment to § 1373 and the related provision 8 U.S.C. § 1644, which had conflicted with a mayoral executive order that prohibited City employees from transmitting immigration information to federal immigration authorities specifically, except in certain circumstances.[17] *Id.* at 31–32. Crucially, the court reasoned that through these provisions,

> Congress has not compelled state and local governments to enact or administer any federal regulatory program. Nor has it affirmatively conscripted states, localities, or their employees into the federal government's service. These Sections do not directly compel states or localities to require or prohibit anything. Rather, they prohibit state and local governmental entities or officials only from directly restricting the voluntary exchange of immigration information with [federal immigration authorities].

---

[16] For purposes of this case, subsections (a) and (b) essentially overlap. Subsection (a) applies the prohibition on restricting government communication to any "government entity or official," and subsection (b) applies a similar prohibition to any "person or agency." 8 U.S.C. § 1373 (a)–(b). "Subsection (b) does not meaningfully expand the statute's scope by including 'person[s]': Who but a government actor can restrict the activities of a government entity or official?" *Chicago*, 321 F. Supp. 3d at 868–69 (alteration in original).

[17] The court expressly declined to opine on whether § 1373 "would survive a constitutional challenge in the context of generalized confidentiality policies that are necessary to the performance of legitimate municipal functions and that include federal immigration status." *City of New York*, 179 F.3d at 37. The City's current General Confidentiality Policy repealed and replaced the executive order at issue in *City of New York*. Exec. Order No. 34, § 1 (2003), Negrón Decl. Ex. A, Doc. 42-1.

*Id.* at 35.  The court thus drew a clear distinction "between invalid federal measures that seek to impress state and local governments into the administration of federal programs and valid federal measures that prohibit states from compelling passive resistance to particular federal programs," and concluded that the challenged provisions fell into the latter category.  *Id.*

This Court is, of course, required to follow Second Circuit precedent.  But this Court is also duty bound to follow the U.S. Constitution as authoritatively interpreted by the Supreme Court.  "When 'a subsequent decision of the Supreme Court so undermines [Second Circuit precedent] that it will almost inevitably be overruled,' the District Court is bound by the Supreme Court's ruling and not by the Second Circuit's prior decisions."  *Austin v. United States*, 280 F. Supp. 3d 567, 572 (S.D.N.Y. 2017) (alteration in original) (quoting *United States v. Emmenegger*, 329 F. Supp. 2d 416, 429 (S.D.N.Y. 2004)).

It is clear that *City of New York* cannot survive the Supreme Court's decision in *Murphy*.  *See Chicago*, 321 F. Supp. 3d at 873 ("*Murphy*'s holding deprives *City of New York* of its central support . . . ."); *United States v. California*, 314 F. Supp. 3d 1077, 1108 (E.D. Cal. 2018) ("[T]he Supreme Court's holding in *Murphy* undercuts portions of the Second Circuit's reasoning [in *City of New York*] and calls its conclusion into question.").  *City of New York* rested on the premise that § 1373 does not "affirmatively conscript[] states, localities, or their employees into the federal government's service" or "directly compel states or localities to require or prohibit anything," and rather merely "prohibit[s] state and local governmental entities or officials" from taking certain action.  *City of New York*, 179 F.3d at 35.  In other words, *City of New York* depended on "the distinction it draws between affirmative obligations and proscriptions."  *Chicago*, 321 F. Supp. 3d at 873.  That is precisely the distinction that the Supreme Court in *Murphy* characterized as "empty."  *Murphy*, 138 S. Ct. at 1478.  Whether Congress attempts to

command affirmative action or impose a prohibition, "[t]he basic principle—that Congress cannot issue direct orders to state legislatures—applies in either event." *Id.* Accordingly, this Court is not bound by *City of New York* and must follow the Supreme Court's clear direction in *Murphy*.

It necessarily follows that § 1373 is unconstitutional under the anticommandeering principles of the Tenth Amendment. Section 1373 "unequivocally dictates what a state legislature may and may not do." *Id.* Section 1373's prohibition on states and localities from restricting their officials from communicating with immigration authorities constitutes a "direct order[]" to states and localities in violation of the anticommandeering rule. *Id.*

The purposes served by the anticommandeering rule illustrate why it compels this result. First, § 1373 impinges on Plaintiffs' sovereign authority and their citizens' liberty to be regulated under their preferred state and local policies. Section 1373 requires Plaintiffs "to submit control of their own officials' communications to the federal government and forego passing laws contrary to Section 1373." *San Francisco*, 2018 WL 4859528, at *15. "[T]he statute prevents [Plaintiffs] from extricating [themselves] from federal immigration enforcement," *Chicago*, 321 F. Supp. 3d at 870, and thereby denies Plaintiffs the "critical alternative" required by the Tenth Amendment to "decline to administer the federal program," *New York*, 505 U.S. at 176–77.[18]

Second, § 1373 undermines political accountability because "the statute makes it difficult for citizens to distinguish between state and federal policy in the immigration context by barring states from adopting policies contrary to those preferred by the federal government." *Chicago*,

---

[18] *See also* Jessica Bulman-Pozen, *Preemption and Commandeering Without Congress*, 70 Stan. L. Rev. 2029, 2046 (2018) ("Because states operate through their officials, the power of the state to decline to carry out a federal program entails the power to forbid state officials from carrying out that federal program.").

321 F. Supp. 3d at 870. Faced with the "appearance of a uniform federal/state/local immigration enforcement policy indiscernible to [Plaintiffs'] residents," those residents cannot properly credit or blame their state or local officials when their policies are compelled by the federal government. *San Francisco*, 2018 WL 4859528, at *15.

Third, § 1373 "shifts a portion of immigration enforcement costs onto the States." *Id.* at *16. "The statute . . . forces states to allow their employees to participate in the federal scheme, shifting employee time—and thus corresponding costs—to federal initiatives and away from state priorities." *Chicago*, 321 F. Supp. 3d at 870.

Defendants attempt to save § 1373 by claiming that it is a preemption provision, Defs.' Mem. 38–39, "but it is no such thing," *Murphy*, 138 S. Ct. at 1479. To validly preempt, the provision "must be best read as one that regulates private actors." *Id.* A preemption provision "confers on private entities . . . a federal right to engage in certain conduct subject only to certain (federal) constraints." *Id.* at 1480. Parroting back this language, Defendants claim that "Section 1373 confers upon entities or individuals a federal right to engage in certain conduct (the voluntary transmission of information to federal immigration authorities) subject only to certain federal constraints." Defs.' Mem. 39. Conspicuously absent from this recitation is the key word "*private*." That is because by its own terms, § 1373 confers this purported federal right to transmit information only on "*government* entit[ies] or official[s]." 8 U.S.C. § 1373(a) (emphasis added); *see San Francisco*, 2018 WL 4859528, at *14 ("Section 1373 . . . does not regulate private actors or provide private actors with any additional rights in the [Immigration and Nationality Act]'s statutory scheme."); *Philadelphia*, 309 F. Supp. 3d at 329 ("Given their plain language, neither Section 1373(a) nor Section 1373(b) can be best read as regulating private actors. On their face, they regulate state and local governmental entities and officials,

which is fatal to their constitutionality under the Tenth Amendment."). Defendants have failed to show that § 1373 regulates private actors at all, let alone that it is "best read as . . . regulat[ing] private actors." *Murphy*, 138 S. Ct. at 1479.[19]

Next, Defendants attempt to fit § 1373 into a commandeering carve-out for statutes facilitating "the provision of information to the Federal Government," relying on dicta in *Printz*, 521 U.S. at 918; Defs.' Mem. 40. This argument is similarly unavailing. First, the Supreme Court has never actually held that such an exception to the anticommandeering doctrine exists. *See Printz*, 521 U.S. at 918 ("[Some statutes], which require only the provision of information to the Federal Government, do not involve the precise issue before us here, which is the forced participation of the States' executive in the actual administration of a federal program. We of course do not address these or other currently operative enactments that are not before us; it will be time enough to do so if and when their validity is challenged in a proper case."); *see also id.* at 936 (O'Connor, J., concurring) ("[T]he Court appropriately refrains from deciding whether other purely ministerial reporting requirements imposed by Congress on state and local authorities pursuant to its Commerce Clause powers are similarly invalid."). Second, even if a commandeering exception for certain information reporting did exist, § 1373 would not qualify for it. "Section 1373 is more than just an information-sharing provision," *Chicago*, 321 F. Supp. 3d at 872, because it prevents states and localities from doing anything that "in any way

---

[19] Defendants' reliance on *Arizona v. United States*, 567 U.S. 387 (2012), is misplaced. While the federal government has "broad, undoubted power over the subject of immigration and the status of aliens," *id.* at 394, *Arizona* underscores that federal immigration laws may preempt because they "not only impose federal registration obligations on *aliens* but also confer a federal right to be free from any other registration requirements," *Murphy*, 138 S. Ct. at 1481 (emphasis added) (discussing *Arizona*). Here, Defendants have not shown that § 1373 imposes any obligations or confers any rights on aliens, let alone that it is "best read" as doing so. *Id.* at 1479. To the contrary, "[o]n [its] face, [§ 1373] regulate[s] state and local governmental entities and officials." *Philadelphia*, 309 F. Supp. 3d at 329.

restrict[s]" the flow of certain information to immigration authorities, 8 U.S.C. § 1373(a). As such, § 1373 prevents state and local policymakers from enacting a wide range of information-governance rules, *Chicago*, 321 F. Supp. 3d at 872, and even prevents them from "disciplining an employee for choosing to spend her free time or work time assisting in the enforcement of federal immigration laws," *Philadelphia*, 280 F. Supp. 3d at 651. Section 1373 thus presents a graver intrusion into state sovereignty than merely requiring the reporting of certain data. *San Francisco*, 2018 WL 4859528, at *16; *Chicago*, 321 F. Supp. 3d at 872.[20]

The Court acknowledges Defendants' argument that access to the information covered by § 1373 would assist them in their immigration enforcement duties.[21] Defs.' Mem. 40–41. However, a "federal need for state information does not automatically free the federal government of the sometimes laborious requirement to acquire that information by constitutional means." *Chicago*, 321 F. Supp. 3d at 872. "[T]he federalist diffusion of power necessarily creates political barriers and inefficiencies. But these inefficiencies are part of federalism's intended structure, not imperfections to be remedied by judicially-wrought consolidation of power." *Id.*

---

[20] Defendants also suggest that § 1373 is permissible because it "regulates the States as the owners of data bases," as the Driver's Privacy Protection Act of 1994 ("DPPA") validly did in *Reno v. Condon*, 528 U.S. 141, 151 (2000). But it is clear that the DPPA was constitutional because it "applied equally to state and private actors." *Murphy*, 138 S. Ct. at 1479 (discussing *Reno*); *see Reno*, 528 U.S. at 151 ("The DPPA regulates the universe of entities that participate as suppliers to the market for motor vehicle information—the States as initial suppliers of the information in interstate commerce and private resellers or redisclosers of that information in commerce."). Here, as previously discussed, § 1373 applies only to state actors. *See Chicago*, 321 F. Supp. 3d at 869 ("Section 1373 does not evenhandedly regulate activities in which both private and government actors engage. Thus, the saving grace of *Reno* does not apply here.").

[21] For instance, Defendants claim that this information assists federal officials in interrogating aliens as to their status, 8 U.S.C. § 1357(a)(1), removing certain deportable aliens, *id.* §§ 1227(a), 1228, or detaining certain deportable aliens when they are released from criminal custody, *id.* § 1226(c)(1).

Finally, Defendants contend that the Tenth Amendment does not apply to the challenged conditions here because the Byrne JAG program is a voluntary federal grant, and "a perceived Tenth Amendment limitation on congressional regulation of state affairs d[oes] not concomitantly limit the range of conditions legitimately placed on federal grants." *South Dakota v. Dole*, 483 U.S. 203, 210 (1987); Defs.' Mem. 36–37. To be sure, Congress may offer funds conditioned on compliance with specified conditions to "induce the States to adopt policies that the Federal Government itself could not impose," such as raising the state drinking age to 21. *Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 537 (2012) (citing *Dole*, 483 U.S. at 205–06). But Defendants' point misunderstands the nature of Plaintiffs' challenge. Congress may impose "conditions *legitimately* placed on federal grants," *Dole*, 483 U.S. at 210 (emphasis added), but Defendants—an agency and official of the Executive Branch administering a nondiscretionary formula grant—did not have statutory authority to legitimately place the three conditions here. With respect to the Compliance Condition, Defendants claimed statutory authority on the basis that § 1373 was an "applicable Federal law[]" requiring compliance under § 10153(a)(5)(D). "As an unconstitutional law, Section 1373 automatically drops out of the possible pool of 'applicable Federal laws' described in the Byrne JAG statute." *Chicago*, 321 F. Supp. 3d at 875. "Thus, the Compliance Condition does not fail because it violates the anticommandeering doctrine. It fails because the statutory authority on which it depends sanctions only the imposition of 'applicable' federal laws; because Section 1373 no longer falls within that category, the authority for the Compliance Condition has been stripped away." *Id.* at 876.

Accordingly, the Court holds that 8 U.S.C. § 1373(a)–(b), insofar as it applies to states and localities, is facially unconstitutional under the anticommandeering doctrine of the Tenth

Amendment.[22]  *San Francisco*, 2018 WL 4859528, at *17; *Chicago*, 321 F. Supp. 3d at 872; *Philadelphia*, 309 F. Supp. 3d at 331.

### C.    Separation of Powers

In light of Defendants' lack of authority to impose the three conditions on federal funding, Plaintiffs contend that the conditions violate the separation of powers.  Pls.' Mem. 41–42.

The Constitution vests Congress with the spending power to "provide for the common Defence and general Welfare of the United States."  U.S. Const. art. I, § 8, cl. 1.  "[I]n exercising its spending power, Congress may offer funds to the States, and may condition those offers on compliance with specified conditions."  *NFIB*, 567 U.S. at 537.  Congress may also "delegate such authority to the Executive Branch."  *Chicago*, 888 F.3d at 283.

But for the reasons explained above, Congress has neither conditioned Byrne JAG funds on the three conditions here nor delegated the authority to impose these conditions to the Executive Branch.  The Executive Branch does not have the power of the purse and "does not otherwise have the inherent authority as to the grant at issue here to condition the payment of such federal funds on adherence to its political priorities."  *Id.*; *see also City & County of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) ("Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to

---

[22] This holding, of course, does not disturb § 1373 to the extent it regulates the activities of the federal government. *See* 8 U.S.C. § 1373(a)–(b) (imposing prohibitions on "Federal . . . government entit[ies] or official[s]"); *see also id.* § 1373(c) (requiring that federal immigration authorities respond to inquiries); *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 508 (2010) ("'Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem,' severing any 'problematic portions while leaving the remainder intact.'" (quoting *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 329 (2006))); *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031, 1049 (9th Cir. 2007) (recognizing that "some of the provisions [of a statute] might be facially invalid, and [others] might not").

effectuate its own policy goals.").  The Byrne JAG statute provides "a firm commitment" of funding according to statutorily prescribed criteria, and the Executive Branch does not have "the seemingly limitless power to withhold funds" from grantees who refuse to accept its unilaterally imposed conditions.  *Train v. City of New York*, 420 U.S. 35, 45–46 (1975).

The separation of powers acts as a check on tyranny and the concentration of power.  "If the Executive Branch can determine policy, and then use the power of the purse to mandate compliance with that policy by the state and local governments, all without the authorization or even acquiescence of elected legislators, that check against tyranny is forsaken."  *Chicago*, 888 F.3d at 277.  Because that is what Defendants attempted to do here by imposing the three challenged conditions, these conditions violate the separation of powers.[23]  *Id.*; *San Francisco*, 2018 WL 4859528, at *33; *Philadelphia*, 309 F. Supp. 3d at 321.

### D.      Arbitrary and Capricious Agency Action

Aside from the three conditions' statutory and constitutional flaws, Plaintiffs also contend that the conditions are arbitrary and capricious.  Pls.' Reply 24–28.

Under the APA, courts must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Under this standard, the agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).  When an agency changes its policy, the agency

---

[23] Because the Court concludes that the separation of powers prevents Defendants from imposing the three conditions at all, the Court need not consider Plaintiffs' argument that the conditions are impermissibly unrelated or ambiguous under the Spending Clause.  *See* Pls.' Reply 38–43 & n.34.

must "'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

In support of the decision to impose the three conditions, Defendants point to five documents in the administrative record: (1) a 2007 audit report by DOJ's Office of the Inspector General on the cooperation of jurisdictions participating in the State Criminal Alien Assistance Program in the removal of criminal aliens ("2007 OIG Audit"), Holt Decl. Ex. 9, at AR-00001–109, Doc. 33-9; (2) a May 2016 memorandum from DOJ's Office of the Inspector General regarding alleged violations of § 1373 by grant recipients ("2016 OIG Memo"), Holt Decl. Ex. 9, at AR-00366–375; (3) a July 2016 memorandum from DOJ's Office of Justice Programs responding to the aforementioned memo ("2016 OJP Memo"), Holt Decl. Ex. 10, at AR-00384–391, Doc. 33-10; (4) a one-page "Backgrounder" on the FY 2017 Byrne JAG conditions distributed to the media "on background," Holt Decl. Ex. 17, at AR-00993, Doc. 33-17; and (5) a July 2017 press release announcing the conditions that accompanied the Backgrounder ("Press Release"), Holt Decl. Ex. 17, at AR-00992.[24] *See* Defs.' Mem. 24–28.

---

[24] Defendants also cite a declaration from Francisco Madrigal of Immigration and Customs Enforcement, Doc. 52, but because it was not part of the administrative record, the Court may not consider it for purposes of arbitrary-and-capricious review. *See Citizens Against Casino Gambling in Erie Cty. v. Chaudhuri*, 802 F.3d 267, 279 (2d Cir. 2015) (stating that review is "limited to examining the administrative record" (quoting *NRDC v. Muszynski*, 268 F.3d 91, 97 (2d Cir. 2001))).

Defendants claim that the 2007 OIG Audit described a high level of cooperation on immigration between the federal and state governments, which later deteriorated. The audit concluded that "[t]he 99 jurisdictions that responded to the questionnaire stated almost unanimously that there was no legislation or policy impeding the ability of local officers and agencies to communicate with ICE on immigration-enforcement matters," and noted that "many state, county, and local law enforcement agencies are unwilling to initiate immigration enforcement but have policies that suggest they are willing to cooperate with ICE when they arrest individuals on state or local charges and learn that those individuals may be criminal aliens." AR-00040–41, -00044.

The 2016 OIG Memo reported on information that "differs significantly from what OIG personnel found nearly 10 years ago during the earlier audit." AR-00367 n.1. The memo stated that the 10 jurisdictions reviewed had laws or policies that "limited in some way the authority of the jurisdiction to take action with regard to ICE detainers," and opined that certain policies "may be causing local officials to believe and apply the policies in a manner that prohibits or restricts cooperation with ICE in all respects." AR-00369, -00373. The memo suggested that DOJ "consider," among other things, "[r]equir[ing] grant applicants to provide certifications specifying the applicants' compliance with Section 1373, along with documentation sufficient to support the certification." AR-00374.

The 2016 OJP Memo concluded that "Section 1373 is an applicable federal law for the purposes of the [Byrne JAG] program," and stated that OJP had provided guidance to "grantees and applicants with clear direction on the requirements of Section 1373." AR-00384. The memo noted that "OJP already requires all applicants for any grant program electronically to

acknowledge and accept" a document that "assures and certifies compliance with all applicable Federal statutes, regulations, policies, guidelines, and requirements." AR-00385.

The Backgrounder announced that DOJ would impose the Compliance Condition, Access Condition, and Notice Condition on FY 2017 Byrne JAG grantees, stating that these conditions have "the goal of increasing information sharing between federal, state, and local law enforcement" so that "federal immigration authorities have the information they need to enforce the law and keep our communities safe." AR-00993. The Backgrounder stated that some grantees "have adopted policies and regulations that frustrate the enforcement of federal immigration law, including by refusing to cooperate with federal immigration authorities in information sharing about illegal aliens who commit crimes," and the new conditions will "prevent the counterproductive use of federal funds for policies that frustrate federal immigration enforcement." *Id.* Similarly, the Press Release declared DOJ's intent to "encourage these 'sanctuary' jurisdictions to change their policies and partner with federal law enforcement to remove criminals." AR-00992.

Conspicuously absent from all of these documents is any discussion of the negative impacts that may result from imposing the conditions, and the record is devoid of any analysis that the perceived benefits outweigh these drawbacks. This absence is particularly glaring given that Assistant Attorney General Peter J. Kadzik, in a 2015 letter to Senator Richard Shelby, stated that withholding Byrne JAG funding to jurisdictions that do not meet immigration-related conditions "would have a significant, and unintended, impact on the underserved local populations who benefit from these programs, most of whom have no connection to immigration

policy."[25]  Holt Decl. Ex. 9, at AR-00113.  Defendants did not consider whether the perceived benefits of the conditions outweighed these negative impacts on underserved local populations or whether such impacts could be mitigated.  Even though Defendants were aware of these detrimental effects, they are not addressed anywhere in the administrative record.  While one may well argue about the weight to be given to such evidence relative to other factors, it cannot simply be ignored.  *See El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health & Human Servs.*, 396 F.3d 1265, 1278 (D.C. Cir. 2005) (holding that agency action was arbitrary and capricious where the agency "failed adequately to address relevant evidence before it"); *El Paso Elec. Co. v. FERC*, 201 F.3d 667, 672 (5th Cir. 2000) (holding that the agency could not "rely on the potential advantages of [the action] . . . while ignoring the potential disadvantages").  In addition, the documents proffered by Defendants do not reflect that they in any way considered whether jurisdictions' adherence to the conditions would undermine trust and cooperation between local communities and government, or the extent to which this would harm public welfare or frustrate local law enforcement, which is the very thing that the Byrne JAG program is supposed to assist.  *See Or. Nat. Res. Council v. Thomas*, 92 F.3d 792, 798 (9th Cir. 1996) ("Whether an agency has overlooked 'an important aspect of the problem' . . . turns on what a relevant substantive statute makes 'important.'").

Defendants "entirely failed to consider an important aspect of the problem" by failing to recognize how the conditions would harm local populations, undermine relationships between local communities and law enforcement, and "interfere[] with local policies that promote public

---

[25] Assistant Attorney General Kadzik also noted that "[i]n many cases . . . the Department does not have the discretion to suspend funding at all," because "many Department grant funds are formula-based, with the eligibility criteria (and related penalties, if any) set firmly by statute."  AR-00113.

health and safety." *Philadelphia*, 280 F. Supp. 3d at 625 (quoting *State Farm*, 463 U.S. at 43).

Accordingly, the three challenged conditions are arbitrary and capricious.

### E.     Mandamus Relief

The States seek mandamus relief compelling Defendants to reissue their award letters

without the three unlawful conditions and to disburse their FY 2017 awards without regard to

those conditions.[26]  Pls.' Mem. 47–48.

Under the Mandamus Act, the Court has jurisdiction "to compel an officer or employee

of the United States or any agency thereof to perform a duty owed to the plaintiff."  28 U.S.C.

§ 1361.  Mandamus relief is appropriate only where "(1) the plaintiffs have a right to have the act

performed, (2) the defendant is under a clear nondiscretionary duty to perform the act requested,

and (3) plaintiff has exhausted all other avenues of relief."  *City of New York v. Heckler*, 742

F.2d 729, 739 (2d Cir. 1984).

Defendants object to mandamus relief on the grounds that they are not legally required to

issue the awards.  Defs.' Mem. 51.  They point out that the Byrne JAG statute provides that the

Attorney General "may" make grants for criminal justice programs.  34 U.S.C. § 10152(a)(1).

The full text of this provision reads:

> (a) Grants authorized
>
>> (1) In general
>>
>> From amounts made available to carry out this part, the Attorney General
>> may, in accordance with the formula established under section 10156 of this
>> title, make grants to States and units of local government, for use by the State
>> or unit of local government to provide additional personnel, equipment,
>> supplies, contractual support, training, technical assistance, and information

---

[26] As a result of the preliminary injunction obtained by the U.S. Conference of Mayors, of which the City is a member, the City obtained its FY 2017 Byrne JAG award and intends to withdraw its request for mandamus relief, as it confirmed at oral argument.  *See* City's Oct. 23, 2018 Letter, Doc. 65; *see also U.S. Conference of Mayors*, slip op. at 2; *Evanston*, slip op. at 11.

systems for criminal justice, including for any one or more of the following programs:

> (A) Law enforcement programs.

> (B) Prosecution and court programs.

> (C) Prevention and education programs.

> (D) Corrections and community corrections programs.

> (E) Drug treatment and enforcement programs.

> (F) Planning, evaluation, and technology improvement programs.

> (G) Crime victim and witness programs (other than compensation).

> (H) Mental health programs and related law enforcement and corrections programs, including behavioral programs and crisis intervention teams.

*Id.*

As noted above, the Byrne JAG grant is "a formula grant rather than a discretionary grant." *Chicago*, 888 F.3d at 285. Thus, in the context of the structure of the statute and the nondiscretionary nature of the Byrne JAG formula grant, the single word "may" does not support the proposition that the Attorney General may withhold grants entirely. Rather, this provision means that the Attorney General may issue grants only for the statutorily prescribed purposes.[27] The mandatory nature of this program is clear from § 10156, which provides that "the Attorney General *shall* . . . allocate" funds pursuant to the statutory formula. 34 U.S.C. § 10156(a)(1) (emphasis added); *see San Francisco*, 2018 WL 4859528, at *33 ("The Byrne JAG program is a formula grant that requires the Attorney General to disburse funds annually . . . ."); *Philadelphia*,

---

[27] The subsection heading confirms that the provision is meant to list the particular "[g]rants authorized." 34 U.S.C. § 10152(a); *see Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 893 (2018) ("Although section headings cannot limit the plain meaning of a statutory text, 'they supply cues' as to what Congress intended." (citations omitted)).

309 F. Supp. 3d at 343–44 ("[T]he JAG statute is a formula (rather than discretionary) grant,

[and] the JAG Program enabling statute is couched in mandatory language." (citation omitted)).

Defendants also suggest that they are under no statutory deadline to issue grants. Defs.'

Mem. 51. However, an agency's "unreasonable delay" may be "so egregious as to warrant

mandamus," which the Court assesses in light of several principles:

> (1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

*Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 79–80 (D.C. Cir. 1984) (citations

omitted).

As the district court in *San Francisco* concluded, "[e]ach factor supports mandamus relief

for the Byrne JAG grant":

> For the first two factors, delays beyond a year time frame preclude recipients from receiving their awards when they need them to support more immediate projects or programs. The Byrne JAG program is a formula grant that requires the Attorney General to disburse funds annually . . . . Factor three favors relief because the delay impacts human health and welfare, particularly [because] Byrne JAG funds aid [law enforcement programs]. Similarly, factor five supports relief because the human welfare and community safety [programs] that [Plaintiffs'] grant funding [supports] are at risk of being discontinued for lack of funding and are prejudiced by this delay. Expediting this matter, as discussed in factor four, would not prejudicially affect the federal government's tangentially related interest in federal immigration enforcement. Finally, the sixth factor . . . would favor relief because DOJ is withholding grant funding based on conditions that violate the separation of powers.

*San Francisco*, 2018 WL 4859528, at *33–34 (citations omitted); *see also Philadelphia*, 309 F.

Supp. 3d at 343 ("[I]t bears emphasis that Congress specifically set the JAG Program as an

annual award, and the DOJ's delay has precluded the City from receiving the intended award at such time as the City can make timely use of it.").

Accordingly, the Court will grant the States mandamus relief compelling Defendants to reissue their award letters without the three unlawful conditions and to disburse their FY 2017 awards without regard to those conditions.

## F.  Injunctive Relief

Plaintiffs seek a permanent injunction to bar Defendants from imposing the three unlawful conditions.  Pls.' Mem. 42–47.

A plaintiff seeking a permanent injunction must show "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 733 F.3d 393, 422 (2d Cir. 2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156 (2010)).  Each of these factors is satisfied here.

As to the first two factors, Plaintiffs have demonstrated an irreparable "constitutional injury" that cannot be adequately compensated by monetary damages because Defendants have imposed on them unlawful conditions that violate the separation of powers.  *San Francisco*, 2018 WL 4859528, at *30; *see Scelsa v. City Univ. of N.Y.*, 806 F. Supp. 1126, 1135 (S.D.N.Y. 1992) ("[A] constitutional deprivation constitutes per se irreparable harm.").  Plaintiffs have also demonstrated that complying with the unlawful conditions would undermine trust between immigrant communities and local government, which would discourage individuals from reporting crimes, cooperating with investigations, and obtaining medical services, thereby harming public safety and welfare.  *E.g.*, Pls.' 56.1 ¶¶ 184, 194.  "Trust once lost is not easily

restored, and as such, this is an irreparable harm for which there is no adequate remedy at law." *Chicago*, 321 F. Supp. 3d at 877–78.  Furthermore, "the Hobson's choice that now confronts [Plaintiffs]—whether to suffer this injury or else decline much-needed grant funds—is not a choice at all and is itself sufficient to establish irreparable harm." *Id.* at 878.

As to the third factor, the balance of hardships weighs in favor of Plaintiffs.  As just explained, the unlawful conditions impose an irreparable injury on Plaintiffs and encumber more than $29 million in grant funds that Plaintiffs would otherwise use for law enforcement and public safety purposes.  On the other side of the scale, Defendants "suffer[] little hardship here because the injunction does not strip away any option [they] could otherwise exercise" in pursuit of their claimed goal of increasing cooperation on immigration matters.  *Id.* at 879.  "Though the Attorney General has many tools at his disposal to increase such local cooperation, conditioning the Byrne JAG grant as he has here is not one of them."  *Id.*

Finally, an injunction will serve the public interest in the lawful administration of government consistent with the separation of powers.  "By enjoining the unlawful Conditions, the Court acts as a check on the executive's encroachment of congressional power and thus serves the public interest by constraining the Attorney General's authority in order to preserve the Byrne JAG program as Congress envisioned."  *Id.*  Accordingly, Plaintiffs are entitled to a permanent injunction against the three challenged conditions.

A question remains as to the scope of the injunction.  Plaintiffs seek a nationwide injunction barring Defendants from imposing the conditions on any jurisdiction, contending that unlawful agency action must be completely set aside and forcing other jurisdictions to relitigate issues that are not fact dependent would be inefficient.  Pls.' Mem. 46–47.  Defendants ask that injunctive relief be limited to the parties before the Court, arguing that a broader scope is

unnecessary to accord relief to the parties and would short circuit the percolation of these issues in courts around the country.  Defs.' Mem. 52–55.

"Once a constitutional violation is found, a federal court is required to tailor 'the scope of the remedy' to fit 'the nature and extent of the constitutional violation.'"  *Hills v. Gautreaux*, 425 U.S. 284, 293–94 (1976) (quoting *Milliken v. Bradley*, 418 U.S. 717, 744 (1974)).  Although "the scope of a district court's equitable powers to remedy past wrongs is broad," *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15 (1971), "'injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs' before the court," *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).  Thus, "[w]here relief can be structured on an individual basis, it must be narrowly tailored to remedy the specific harm shown," but "an injunction is not necessarily made over-broad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—if such breadth is necessary to give prevailing parties the relief to which they are entitled."  *Bresgal v. Brock*, 843 F.2d 1163, 1170–71 (9th Cir. 1987) (emphasis omitted).

Here, Plaintiffs have not made a sufficient showing of "nationwide impact" demonstrating that a nationwide injunction is necessary to completely accord relief to them.  *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018).  Moreover, the Court notes that of the courts handling the Byrne JAG litigation around the country, only one has issued a nationwide injunction, which was briefly affirmed by the Seventh Circuit, only to be stayed as to the nationwide scope pending en banc review.  *See generally City of Chicago v. Sessions*, No. 17-2991, 2018 WL 4268814, at *1 (7th Cir. Aug. 10, 2018).  Since then, each district court to consider a nationwide injunction against the Byrne JAG conditions has stayed

the injunction's nationwide scope.  *See San Francisco*, 2018 WL 4859528, at *30; *Chicago*, 321

F. Supp. 3d at 882.  At this juncture, the Court will similarly limit injunctive relief to the parties

before the Court and their political subdivisions.[28]

## IV.    Conclusion

Plaintiffs' motion for partial summary judgment is GRANTED, and Defendants' motion

for partial summary judgment or in the alternative to dismiss is DENIED.  Specifically, the Court

hereby ORDERS as follows:

1. The Notice, Access, and Compliance Conditions are ultra vires and not in accordance with law under the APA.  Summary judgment is GRANTED to the States on their Counts II and III and to the City on its Count II.

2. 8 U.S.C. § 1373(a)–(b), insofar as it applies to states and localities, is facially unconstitutional under the anticommandeering doctrine of the Tenth Amendment. Summary judgment is GRANTED to the States on their Count V and to the City on its Counts V and XI.

3. The Notice, Access, and Compliance Conditions violate the constitutional separation of powers.  Summary judgment is GRANTED to the States on their Count I and to the City on its Count I.  The motions for summary judgment with respect to the City's Count IV (violation of the Spending Clause) are DENIED as moot.

4. The Notice, Access, and Compliance Conditions are arbitrary and capricious under the APA.  Summary judgment is GRANTED to the States on their Count IV and to the City on its Count III.

5. Defendants are MANDATED to reissue the States' FY 2017 Byrne JAG award documents without the Notice, Access, or Compliance Conditions, and upon acceptance,

---

[28] At oral argument, the States requested that, to the extent the Court limits injunctive relief to the parties, such relief also extend to the States' political subdivisions, which may be direct grantees or subgrantees of the Byrne JAG program.  The political subdivisions experience the same injuries described earlier, which necessarily flow to the States by virtue of the subdivisions' position within the States' geographic boundaries and political systems, and which are compounded insofar as the States must make and monitor compliance with subdivisions' subgrants with unlawful conditions.  Accordingly, the Court agrees that in order to accord complete relief to the States, an injunction must protect both the States and their political subdivisions.  *See California ex rel. Becerra v. Sessions*, No. 17 Civ. 04701 (WHO), 2018 WL 6069940, at *1 (N.D. Cal. Nov. 20, 2018) (enjoining the challenged conditions from being imposed on "any California state entity" or "any California political subdivision").

to disburse those awards as they would in the ordinary course without regard to those conditions.

6. Defendants are ENJOINED from imposing or enforcing the Notice, Access, or Compliance Conditions for FY 2017 Byrne JAG funding for the States, the City, or any of their agencies or political subdivisions.

The Clerk of the Court is respectfully directed to terminate the motions, Docs. 56 and 88 in No. 18 Civ. 6471, and Docs. 21 and 50 in No. 18 Civ. 6474, and to update the docket as noted in the caption.

It is SO ORDERED.

Dated: November 30, 2018
New York, New York

Edgardo Ramos, U.S.D.J.