# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATES OF NEW YORK, CONNECTICUT, NEW JERSEY, RHODE ISLAND and WASHINGTON, and COMMONWEALTHS OF MASSACHUSETTS and VIRGINIA, | |
| Plaintiffs, | No. 18-cv-6471 (ER) |
| v. | |
| UNITED STATES DEPARTMENT OF JUSTICE; and WILLIAM P. BARR, in his official capacity as Attorney General of the United States of America, | |
| Defendants. | |

| | |
|---|---|
| CITY OF NEW YORK, | |
| Plaintiff, | |
| v. | |
| WILLIAM P. BARR, in his official capacity as Attorney General of the United States of America, and the UNITED STATES DEPARTMENT OF JUSTICE, | No. 18-cv-6474 (ER) |
| Defendants. | |

**STATE AND CITY PLAINTIFFS' LOCAL RULE 56.1
STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Rule 56.1 of the U.S. District Courts for the Southern and Eastern Districts of New York, the Plaintiff States of New York, Connecticut, New Jersey, Rhode Island and Washington, and the Plaintiff Commonwealths of Massachusetts and Virginia ("State Plaintiffs") and Plaintiff the City of New York ("City Plaintiff") submit the following statement of undisputed material facts.

## I.   PARTIES AND CLAIMS FOR RELIEF

204.    Plaintiff the State of New York, represented by and through its Attorney General, Letitia James, is a sovereign State in the United States of America. The Attorney General is New York State's chief law enforcement officer, and is authorized to pursue this action pursuant to N.Y. Executive Law § 63. The New York State Division of Criminal Justice Services ("NYS DCJS") is the state agency responsible for applying for, obtaining, and disbursing funds to the State of New York and its subgrantees under the Byrne JAG program.[1] (Green Decl. ¶ 4, Feb. 28, 2019.)

205.    Plaintiff the State of Connecticut, represented by and through its Attorney General, William Tong, is a sovereign State in the United States of America. The Connecticut Office of Policy Management ("CT OPM") serves as the liaison between Connecticut and the federal government on issues relating to criminal justice. (Pelka Decl. ¶ 2.)

206.    Plaintiff the Commonwealth of Massachusetts is a sovereign State in the United States of America. Massachusetts is represented by Attorney General Maura Healey, who is the chief law enforcement officer of Massachusetts. The Massachusetts Executive Office of Public Safety and Security ("EOPSS") is the state agency responsible for applying for, obtaining, and

---

[1] The last numbered paragraph in the State and City Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts regarding the FY 2017 Byrne JAG program was ¶ 203. (ECF No. 57-1.) As the State and City Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts regarding the FY 2018 Byrne JAG program builds on this information, the State and City Plaintiffs begin the numbering of their Local Rule 56.1 Statement of Undisputed Material Facts regarding the FY 2018 Byrne JAG program with ¶ 204.

disbursing funds to subgrantees under the Byrne JAG program. (Turco Decl. ¶ 1.)

207.    Plaintiff the State of New Jersey, represented by and through its Attorney General, Gurbir S. Grewal, is a sovereign State in the United States of America. As the State's Attorney General, Grewal is the head of the New Jersey Department of Law and Public Safety, N.J. Stat. Ann. § 52:17B-2. The mission of the Department of Law and Public Safety ("NJ LPS") is to protect the safety, security, and quality of life of the people of New Jersey through an integrated and coordinated structure of law enforcement and regulatory agencies. The Department of Law and Public Safety is also the agency responsible for applying for, obtaining, and disbursing funds to subgrantees under Byrne JAG. (Fradel Decl. ¶¶ 2-5, Feb. 7, 2019.)

208.    Plaintiff the State of Rhode Island, represented by and through its Attorney General, Peter Neronha, is a sovereign State in the United States of America. Rhode Island's Public Safety Grant Administration Office is responsible for overseeing the planning, policy implementation, and direction of grants that support public safety programs throughout the State. (Hogan Decl. ¶ 2, Feb. 18, 2019.)

209.    Plaintiff the Commonwealth of Virginia, represented by and through its Attorney General, Mark Herring, is a sovereign State in the United States of America. Virginia's Department of Criminal Justice Services ("VA DCJS") is the Commonwealth's entity responsible for applying for, receiving, and disbursing funds from the Byrne JAG program. (Dion Decl. ¶ 3, Jan. 31, 2019.)

210.    Plaintiff the State of Washington, represented by and through its Attorney General, Robert W. Ferguson, is a sovereign State in the United States of America. The Washington State Attorney General is the chief legal advisor to the State. The Attorney General's powers and duties include acting in federal court on matters of public concern. The

Washington State Department of Commerce ("WA DC") is responsible for applying for, receiving, and disbursing Washington's Byrne JAG allocation. (Klontz Decl. ¶ 2-4, Jan. 31, 2019.)

211.    Plaintiff the City of New York, represented by and through its Corporation Counsel, Zachary W. Carter, is a municipal corporation organized pursuant to the laws of the State of New York. The City is a political subdivision of the State and derives its powers through the New York State Constitution, New York State laws, and the New York City Charter. (Cho Decl. ¶¶ 2-4.) The New York City Mayor's Office of Criminal Justice ("MOCJ") is responsible for managing and overseeing the City's participation in 26 state and federal grant programs, including the JAG program. MOCJ is the City entity that applies for and receives the Byrne JAG program's formula grant funds allocated to New York City. (Soler Decl. ¶ 3, Feb. 26, 2019.)

212.    Defendant United States Department of Justice ("DOJ") is an agency of the United States government and is responsible for implementing the Byrne JAG program.

213.    Defendant William P. Barr is the Attorney General of the United States and is the federal official in charge of the U.S. Department of Justice. The Attorney General is sued in his official capacity.

214.    Plaintiffs claim that Defendants Barr and DOJ violated the United States Constitution, the Administrative Procedure Act, and other federal statutes. (No. 1:18-cv-6471, ECF No. 32 (State Pls.' Am. Compl.); No. 1:18-cv-06474, ECF No. 43 (City Pls.' Am. Compl.).)

## II.    THE BYRNE JAG PROGRAM AND DEFENDANTS' FISCAL YEAR ("FY") 2018 IMMIGRATION-RELATED BYRNE JAG CONDITIONS

215.    On July 20, 2018, DOJ released the FY 2018 Byrne JAG State and Local award

solicitations (respectively, the "FY 2018 State Solicitation" and the "FY 2018 Local Solicitation," together, the "FY 2018 Solicitations"). In it, DOJ carries forward the "Notice," "Access," and 8 U.S.C. § 1373 conditions imposed in connection with FY 2017 funding that have been enjoined by this Court[2] and others. While certain new statutory justifications were added to the Notice, Access, and Section 1373 conditions imposed in FY 2017 (the "Original Conditions") in their FY 2018 iteration, the practical effect of the original three conditions remains the same.

216.    Defendants also added three new immigration-related items for Fiscal Year 2018, which include the "Communication Prohibition," "Policy Collection and Reporting Condition," and "Certification of Compliance with Additional Statutes" (collectively the "Additional Conditions") described in detail below.

217.    Though DOJ required the Original and Additional Conditions for FY 2018 Byrne JAG funds to be certified at the time of the application in order to consider a Byrne JAG funding application complete, OJP indicated that it would not deny an application for FY 2018 for failure to submit these certifications by the application deadline; instead, a state or locality will not be able to access the awards until it submits these certifications and assurances. (*See* AR01224-AR01280 (FY 2018 State Solicitation at 1, 27-28); *see also* AR01167-AR01223 (FY 2018 Local Solicitation at 1, 27-28).)

218.    Plaintiffs applied for FY 2018 Byrne JAG funding by the August 22, 2018 deadline specified. (*See* Pelka Decl. ¶ 4 (CT); Turco Decl. ¶ 10 (MA); Fradel Decl. ¶ 10, Feb. 7, 2019 (NJ); Green Decl. ¶ 10, Feb. 28, 2019 (NY); Hogan Decl. ¶ 4, Feb. 18, 2019 (RI);  Dion Decl. ¶ 4, Jan. 31, 2019 (VA); Klontz Decl. ¶ 4, Jan. 31, 2019 (WA); Soler Decl. ¶ 8, Feb. 26,

---

[2] ECF Nos. 114 and 122.

2019 (NYC).)

219.    On October 1, 2018, State Plaintiffs received notice that they were eligible to receive their FY 2018 Byrne JAG allocations so long as they accept a number of special conditions, including the conditions challenged in this action. (*See, e.g.*, FY 2018 New York State Award Letter.[3])

220.    State Plaintiffs were given 45 days—until November 15, 2018—to accept the awards and agree to the new conditions. (*Id.*)

221.    On October 22, 2018, as part of this litigation, Defendants agreed not to re-allocate or revert State Plaintiffs' FY 2018 funds for a 60-day period, which will automatically renew every 30 days thereafter, unless Defendants notify State Plaintiffs that it does not intend to renew the agreement. (Stip., ECF No. 105.)

222.    New York City filed its FY 2018 Byrne JAG application on August 22, 2018, but DOJ has yet to issue a determination on the City's application for FY 2018 JAG funding. (Soler Decl. ¶¶ 8-9, Feb. 26, 2019.)[4] On January 28, 2019, Defendants agreed not to re-allocate or revert City Plaintiffs' FY 2018 funds for a 60-day period, which will automatically renew every 30 days thereafter, unless Defendants notify the City Plaintiffs that it does not intend to renew the agreement. (Stip. Jan. 28, 2019, ECF No. 96, No. 1:18-cv-06474.)

### A.  The Notice Condition

223.    The Notice Condition as originally put forward in FY 2017 Special Conditions ¶¶ 55(1)(b) and 56(1)(b) required Plaintiffs to have a statute, rule, regulation, policy, or practice

---

[3] Hereinafter, unless otherwise noted, when referring to a particular FY 2018 special condition, Plaintiffs cite to those found in New York State's FY 2018 Byrne JAG award letter.

[4] Although the City has not yet received an award letter for FY 2018, the City expects that its FY 2018 award would be subject to the new conditions, as stated in the FY 2018 Local Solicitation and FY 2018 Local Solicitation Appendix C ("Certification of Compliance with Additional Statutes"). AR01167-AR01223; AR01634. Based on these documents, the City anticipates any award letter it receives will mirror the award letter received by the States and will include all of the 2018 Conditions described herein.

designed to ensure that local, state, or state-contracted correctional facilities will honor any formal written request from the Department of Homeland Security to a correctional facility seeking advance notice of a particular alien's scheduled release date and time as soon as practicable. (*See supra* at ¶ 39.) FY 2018 Special Condition ¶ 46 requires the same, and mandates that in order to receive Byrne-JAG funds, a State or local government (or government contracted) correctional facility must provide advance notice to the Department of Homeland Security ("DHS") of the scheduled release date and time for a particular alien as early as practicable once it receives formal written request seeking such advance notice pursuant to the Immigration Naturalization Act ("INA") from DHS. (*Compare* FY 2018 Special Condition ¶ 46, *with* ECF No. 32-1 (FY 2017 Special Condition ¶¶ 55(1)(b); 56(1)(b)).)

224.    FY 2018 Special Condition ¶ 46 also references 8 U.S.C. § 1231, 8 U.S.C. § 1226, and 8 U.S.C. § 1366, drawing attention to the following language from each statute:

- **8 U.S.C. § 1231** (for an alien incarcerated by a State or local government, a 90-day "removal period" during which the federal government "shall" detain and then "shall" remove an alien from the U.S. "begins" no later than "the date the alien is released from ... confinement"; also, the federal government is expressly authorized to make payments to a "State or a political subdivision of the State . . . with respect to the incarceration of [an] undocumented criminal alien");

- **8 U.S.C. § 1226** (the federal government "shall take into custody" certain criminal aliens "when the alien is released"); and

- **8 U.S.C. § 1366** (requiring an annual DOJ report to Congress on "the number of illegal alien [felons] in Federal and State prisons" and programs underway "to ensure the prompt removal" from the U.S. of removable "criminal aliens").

(FY 2018 Special Condition ¶ 46.)

### B. The Access Conditions

225.    The Access Condition as stated in FY 2017 Special Conditions ¶¶ 55(1)(a) and 56(1)(a) requires Plaintiffs to have a statute, rule, regulation, policy, or practice designed to

ensure that, upon request, federal agents may access a local, state or state-contracted correctional facility to question suspected aliens about their right to be or remain in the United States. (*See supra* at ¶ 38.)

226.    FY 2018 Special Condition ¶ 45 is identical to the FY 2017 Access Condition in that both the FY 2017 and 2018 conditions require grantees to ensure that the Department of Homeland Security is given permission to enter State and local correctional facilities to question individuals in custody regarding their immigration status. (*Compare* ECF No. 32-1 (FY 2017 Special Conditions ¶¶ 55(1)(a) and 56(1)(a)), *with* FY 2018 Special Condition ¶ 45.)

227.    FY 2018 Special Condition ¶ 45 also refers to 8 U.S.C. 1357(a), describing that:

> "under which certain federal officers and employees "have power without warrant . . . to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States," and 8 C.F.R. 287.5(a), under which that power may be exercised "anywhere in or outside the United States" -- within the funded program or activity, no State or local government entity, -agency, or -official may interfere with the exercise of that power to interrogate "without warrant" (by agents of the United States acting under color of federal law) by impeding access to any State or local government (or government-contracted) correctional facility by such agents for the purpose "interrogat[ing] any alien or person believed to be an alien as to his [or her] right to be or to remain in the United States.""

(FY 2018 Special Condition ¶ 45.)

**C. The Section 1373 Related Conditions**

228.    The "Section 1373 conditions" require Plaintiffs to accept various terms related to 8 U.S.C. § 1373, prohibiting States and localities from restricting "(1) any government entity or -official from sending or receiving information regarding citizenship or immigration status as described in 8 U.S.C. 1373(a); or (2) a government entity or -agency from sending, requesting or receiving, maintaining, or exchanging information regarding immigration status as described in 8 U.S.C. 1373(b)." (*See supra* at ¶ 32 (citing FY 2017 New York Award Letter).)

229.    FY 2018 Special Condition ¶ 42 only alters the original phrasing of the Section 1373 conditions included in the FY 2017 Byrne JAG program to include 8 U.S.C. § 1644 as an additional statute in support of the second prohibited restriction of immigration status disclosure. Specifically, FY 2018 Special Condition ¶ 42 states that "no State or local government entity, - agency, or -official may prohibit or in any way restrict-- (1) any government entity or -official from sending or receiving information regarding citizenship or immigration status as described in 8 U.S.C. § 1373(a); or (2) a government entity or -agency from sending, requesting or receiving, maintaining, or exchanging information regarding immigration status with any other Federal, State, or local government entity as described in either 8 U.S.C. §§ 1373(b) or 1644." (FY 2018 Special Condition ¶ 42.)

### i.    8 U.S.C. § 1373 and 8 U.S.C. § 1644

230.    There is no material difference between Sections 1373 and 1644.

231.    Section 1373 provides, in relevant part:

> **"(a) In general**
> Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.
>
> **(b) Additional authority of government entities**
> Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:
>
> > (1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.
> > (2) Maintaining such information.
> > (3) Exchanging such information with any other Federal, State, or local government entity.
>
> **(c) Obligation to respond to inquiries**

The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

(8 U.S.C. § 1373.)

232.   Section 1644 provides:

"Notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States."

(8 U.S.C. § 1644.)

233.   Section 1373 precludes government entities from prohibiting or restricting information sharing by government entities or officials. Section 1644 similarly precludes any proscription on state or local government entities sharing information with the federal government. Furthermore, the legislative history indicates that Section 1644 was specifically "designed to prevent any State or local law, ordinance, executive order, [or] policy . . . that prohibits or in any way restricts any communication between State and local officials" and federal immigration authorities, in the same way that Section 1373 prohibits such State and local policymaking.[5] (H.R. Rep. No. 104-725, at 383 (1996) (Conf. Rep.).)

### D.  The Communication Prohibition

234.   FY 2018 Special Condition ¶ 44 states that "[n]o public disclosure may be made of any federal law enforcement information in a direct or indirect attempt to conceal, harbor, or

---

[5] The two statutes were enacted just weeks apart; Section 1644 was passed as part of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105, which was enacted on August 22, 1996, and Section 1373 was passed as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, Div. C, Title VI, § 642, 110 Stat. 3009-546, which itself was merely a component of an omnibus appropriations bill enacted on September 30, 1996.

shield from detection any fugitive from justice under 18 U.S.C. ch. 49, or any alien who has come to, entered, or remains in the United States in violation of 8 U.S.C. ch. 12 -- without regard to whether such disclosure would constitute (or could form a predicate for) a violation of 18 U.S.C. §§ 1071 or 1072 or of 8 U.S.C. § 1324(a)" ("Communication Prohibition")." (FY 2018 Special Condition ¶ 44.)

235.   For purposes of the Communication Prohibition, "public disclosure" means *any* disclosure, except a disclosure within the entity receiving the grant or to a subrecipient. (FY 2018 Special Condition ¶ 44.)

236.   In contrast, the FY 2018 Solicitations more narrowly addressed a general prohibition on State grantees violating 8 U.S.C. § 1324(a), indicating that the receipt of grant funding would "forbid[] any 'person,' in 'knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law,' to 'conceal, harbor, or shield from detection, or attempt to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation' or to 'engage in any conspiracy to commit any of the preceding acts. . .'or aid or abet the commission of any of the preceding acts.'" (*See* AR01224-AR01280 (FY 2018 State Solicitation at 37); *see also* AR01167-AR01223 (FY 2018 Local Solicitation at 36).)

### E.  Policy Collection and Reporting Condition

237.   FY 2018 Special Condition ¶ 47 requires that Plaintiffs collect from subgrantees (including local governments and public institutions of higher education) their policies or practices regarding communications with the Department of Homeland Security ("DHS") and Immigration and Customs Enforcement ("ICE"), maintain those policies, and make them available to federal authorities upon request. (*See* FY 2018 Special Condition ¶ 47 ("Policy

Collection and Reporting Condition").)

238.    The required information, spelled out in Appendix E of the FY 2018

Solicitations, requires grantees to ask subgrantees:

> (1) Does your jurisdiction have any laws, policies, or practices related to whether, when, or how employees may communicate with DHS or ICE?
> (2) Is your jurisdiction subject to any laws from a superior political entity (e.g., a state law that binds a city) that meet the description in question 1?
> (3) If yes to either:
>    - Please provide a copy of each law or policy;
>    - Please describe each practice; and
>    - Please explain how the law, policy, or practice complies with section 1373.

(*See* AR01275; *see also* AR01218 (FY 2018 Solicitations Appendix E).)

## F. Certification of Compliance with 8 U.S.C. § 1373/1644 and Additional Statutes

239.    Across both FY 2017 and FY 2018, Defendants require Plaintiffs to monitor

subgrantee compliance[6] as well as provide three certifications from all recipients. The first, which

must be executed  by a jurisdiction's Chief Executive—e.g., the State's Governor or the City's

Mayor—attests to the  State's or City's compliance with Section 1373 and the other grant

conditions. (*Compare* AR01031 (FY 2017 State Solicitation Appendix I, ¶ 7) *with* AR01264 (FY

2018 State Solicitation Appendix A, ¶ 7).)[7] The second, which  must be executed by the

State's or City's Chief Legal Officer, certifies that the jurisdiction  complies with Section

1373 and that the Legal Officer understands that subgrantees must also  comply with Section

1373. (*Compare* AR01033 (FY 2017 State Solicitation Appendix II) *with* AR01266 (FY 2018

---

[6] *Compare* FY 2017 Special Condition ¶¶ 53(3), 55(2), 56(2) *with* FY 2018 Special Conditions ¶¶ 42(3), 44(2), 45(2), 46 (2).

[7] The FY 2017 and FY 2018 Local Solicitations for Byrne JAG substantively mirror their counterpart State Solicitations regarding the certifications described above. *See* ECF No. 58-39 (FY 2017 Local Solicitation Appendix I, ¶ 7); AR01207 (FY 2018 Local Solicitation Appendix A, ¶ 7).

State Solicitation Appendix B).)[8] The third certification requires the State or City employee who signs the grant award to certify the jurisdiction's compliance with all other grant conditions. Each certification, as it appears in the Administrative Record, carries the risk of personal criminal prosecution, civil penalties, and administrative remedies. (*See supra* at ¶¶ 33-34.) Plaintiffs, in turn, must also collect 1373 subgrantee compliance certifications prior to the disbursement of received funds to subgrantees and notify DOJ in writing if they become aware of "credible evidence" that any subgrantee has violated Section 1373. (ECF No. 32-1 (FY 2017 New York Award Letter ¶¶ 52-54).) FY 2018, in turn, applies these compliance, certification, collection, and notification conditions to 8 U.S.C. § 1373 and 8 U.S.C. § 1644 as well. (FY 2018 Special Conditions ¶¶ 41-43.)

240.    In FY 2018, Defendants included an expansive, second "Certification of Compliance" by an applicant's Chief Legal Officer with a series of statutes *other than* the 8 U.S.C. §§ 1373/1644 referenced above[9]—a certification which the applicant's Chief Executive must also "adopt . . . as my own on behalf of" the applicant. (*Compare* AR1268 (FY 2018 State Solicitation Appendix C (Certification of Compliance with Additional Statutes)) *with* AR01264 (FY 2018 State Solicitation Appendix A, ¶ 8 (Chief Executive Certification)).)

241.    The new, expansive certification conditions require an acknowledgement that Defendants will require grantees and subgrantees "not to violate, or aid or abet any violation of, 8 U.S.C. § 1324(a), and not to impede the exercise by federal officers of authority under 8 U.S.C. § 1357(a) or relating to 8 U.S.C. § 1366(1) & (3) or 8 U.S.C. § 1266(a) & (c)." (AR01268 (FY 2018 State Solicitation Appendix C, ¶ 3 (Certification of Compliance with

---

[8] *See* ECF No. 58-39 (FY 2017 Local Solicitation Appendix II); AR01209 (FY 2018 Local Solicitation Appendix B).

[9] *Compare* FY 2018 Solicitation Appendix C ("Certification of Compliance with Additional Statutes") *with* FY 18 Solicitation Appendix B (Chief Legal Officer Certification) and FY 2018 Solicitation Appendix A, ¶ 8 (Chief Executive Certification).

Additional Statutes)).)

242.    The certification conditions also require the Chief Legal Officer to certify that he or she has "carefully reviewed" the additional statutes and has conducted or caused to be conducted "a diligent inquiry and review" concerning "any laws, rules, policies, or practices potentially applicable" to a grantee or subgrantee "that implicate any of the requirements relating to" these statutes. (*See* AR01268 (FY 2018 State Solicitation Appendix C).)

243.    The Chief Legal Officer must also certify that neither the applicant nor any of its agencies or officials "has in effect, purports to have in effect, or is subject to or bound by, any law, rule, policy or practice" that would "(1) violate, or aid or abet any violation of, 8 U.S.C. § 1324(A); (2) impede the exercise by federal officers of authority under 8 U.S.C. § 1357(a); (3) impede the exercise by federal officers of authority relating to 8 U.S.C. § 1366(1) & (3); or (4) impede the exercise by federal officers of authority relating to 8 U.S.C. § 1226(a) & (c)." (*Id.*)

244.    Finally, the employee who signs the grant award also must certify the applicant's compliance with all award conditions, including all statutes referenced in the Chief Legal Officer's certification. (*See* AR01259 (FY 2018 State Solicitation at 36); *see also* AR01201 (FY 2018 Local Solicitation at 35).) As in FY 2017, the FY 2018 certifications carry the risk of personal criminal prosecution, civil penalties, and administrative remedies.

### G. State Plaintiffs' Byrne JAG Awards

245.    On October 1, 2018, DOJ sent State Plaintiffs' award letters announcing awards totaling over $25 million in FY 2018 Byrne JAG funding, allocated as follows:

- $8,818,775 for the State of New York (Green Decl. ¶ 16, Feb. 28, 2019);

- $1,639,401 for the State of Connecticut (Pelka Decl. ¶ 4);

- $4,007,716 for the State of New Jersey (Fradel Decl. ¶ 10, Feb. 7, 2019);

- $779,980 for the State of Rhode Island (Hogan Decl. ¶ 4, Feb. 18, 2019);

- $3,334,947 for the State of Washington (Klontz Decl. ¶ 4, Jan. 31, 2019);

- $3,445,701 for the Commonwealth of Massachusetts (Turco Decl. ¶ 11); and

- $3,376,759 for the Commonwealth of Virginia (Dion Decl. ¶ 4, Jan. 31, 2019.)

246.    On October 22, 2018, as part of this litigation, Defendants agreed not to re-allocate or revert State Plaintiffs' FY 2018 funds for a 60-day period, which will automatically renew every 30 days thereafter, unless Defendants notify State Plaintiffs that it does not intend to renew the agreement.

### H.  City Plaintiff's Byrne JAG Applications

247.    New York City filed a timely application for FY 2018 Byrne JAG grant on August 22, 2018. (Soler Decl. ¶ 8, Feb. 26, 2019.)

248.    On January 28, 2019, Defendants agreed not to re-allocate or revert City Plaintiffs' FY 2018 funds for a 60-day period, which will automatically renew every 30 days thereafter, unless Defendants notify the City Plaintiffs that it does not intend to renew the agreement. (Stip. Jan. 28, 2019, ECF No. 96, No. 1:18-cv-06474.)

249.    As of today, DOJ has yet to issue a determination on the City's application for FY 2018 JAG funding. (Soler Decl. ¶ 8, Feb. 26, 2019.)

### I.  The Administrative Record

250.    The Administrative Record for the FY 2018 Byrne JAG program's immigration-related conditions ("Administrative Record") was produced by DOJ and is applicable to City and State Plaintiffs' claims regarding the FY 2018 Byrne JAG program. (*See* AR00001-AR01867.)

251.    The FY 2018 Administrative Record reproduces the FY 2017 Administrative

Record (*see* AR00001-AR01037) and includes additional documents, which consist largely of certifications, solicitations, and award letters for various DOJ grant programs, including the Byrne JAG program. (*See* AR01038-AR01867.)

252. The Administrative Record produced for the FY 2018 Byrne JAG program, like the record produced for the FY 2017 Byrne JAG program, does not contain any study, report, or analysis to support DOJ's assertion of a link between so-called sanctuary jurisdiction policies and increased rates of crime. (*See* AR00001-AR-01867.)

253. The Administrative Record does not provide any legal or other analysis concerning the imposition of the additional conditions or any analysis of the negative effects that those conditions could cause, including negative effects on the Plaintiffs and their governmental operations. (*See* AR00001-AR-01867.)

## III.   THE PLAINTIFFS' USE OF BYRNE JAG FUNDING

### A. State Plaintiffs' Use of Byrne JAG Funding

254. State Plaintiffs have been awarded Byrne JAG funding every year since the program was created.

255. State Plaintiffs and their subgrantees have used funds from Byrne JAG and its predecessor grant programs to support a broad array of critical law enforcement, criminal justice, drug treatment, and other programs tailored to serve local needs.

256. State Plaintiffs apply Byrne JAG funds to a concentrated number of initiatives, some of which do not have another primary funding stream, in an effort to maximize the impact of those funds. *(See, e.g.*, Turco Decl. ¶ 13; Green Decl. ¶ 13, Feb. 28, 2019.)

257. If FY 2018 Byrne JAG funds are not made available to the State Plaintiffs, many programs will go without funding or with reduced funding as there are no alternative State

funds currently budgeted for these programs (*See, e.g.*, Dion Decl. ¶ 8, Jan. 31, 2019; Klontz Decl. ¶¶ 9-10, Jan. 31, 2019.)

### i. New York

258.    On August 22, 2018, New York's relevant state agency, the Division of Criminal Justice Services (DCJS), timely submitted New York's application for FY 2018 Byrne JAG funds. (Green Decl. ¶ 10, Feb. 28, 2019.) New York requested $8,818,775 in Byrne JAG funds for 2018. (*Id.*)

259.    New York plans to use its FY 2018 Byrne JAG allocation to support several criminal justice programs and activities, including improving the quality and accuracy of criminal justice records, improving the capabilities on forensic laboratories and DNA identification, and supporting community-based opioid abuse and prevention strategies, among other priorities. (*Id.* at ¶ 11.)

260.    In particular, New York plans to use its FY 2018 Byrne JAG award to support the following criminal justice priorities:

> a.  to provide support for roughly one-half of the cost of approximately 30 crime analyst positions at the State's Crime Analysis Centers;
>
> b.  to provide support for staff positons at programs administered to increase the investigation and prosecution of incidents of non-fatal shootings;
>
> c.  to provide support for the creation of DCJS' Research Consortium, designed to sponsor targeted research and evaluation projects in criminal justice by college/university researchers;
>
> d.  to offer funding to improve prosecution and indigent defense services;
>
> e.  to provide grants to local law enforcement agencies to support 50% of

the cost of the purchase and installation of Livescan fingerprint equipment;

    f.  to support efforts to help local law enforcement satisfy requirements to video record custodial interrogations; and

    g.  to provide funding for over thirty staff positions at the State's Office of Information Technology Services dedicated to supporting critical infrastructure programs such as the State's fingerprint identification system, criminal history database, sex offender registry, and other criminal justice databases and systems. (*Id.* at ¶ 13.)

261.    New York further plans to allocate at least $5 million of its FY 2018 Byrne JAG award to units of local government pursuant to the Byrne JAG program's pass-through requirements. (*Id.* at ¶ 14.) New York has already identified over 35 subgrantees to which it plans to provide FY 2018 Byrne JAG funding. (*Id.* at ¶ 25.)

### ii.    Connecticut

262.    Connecticut timely applied for its FY 2018 Byrne JAG award and was notified by OJP on October 1, 2018 that it had been awarded $1,638,401 in FY 2018 Byrne JAG funding pursuant to the State's acceptance of several special conditions, including the challenged conditions relating to immigration. (Pelka Decl. ¶ 4.)

263.    Connecticut has identified two principal subject areas for the use of its FY 2018 Byrne JAG funding, which are (1) the support of State efforts to reduce recidivism in the Connecticut criminal justice system and building and implementing a comprehensive reentry strategy and (2) the development of services and programs to address the opioid and heroin addiction epidemic. (*Id.* at ¶ 6.)

264.    Connecticut also plans to use its FY 2018 Byrne JAG award to provide state agencies and local governments with funding to support law enforcement, crime prevention, community corrections, and technology improvement programs. (*Id.* at ¶ 7.)

265.    Connecticut currently uses Byrne JAG funding, and plans to use its FY 2018 Byrne JAG funds to fund a portion of the salaries of four staff members at its Office of Policy Management. (*Id.* at ¶ 13.)

### iii. Massachusetts

266.    Massachusetts timely applied for its FY 2018 Byrne JAG award and was notified by OJP on October 1, 2018 that it had been awarded $3,445,701 in FY 2018 Byrne JAG funding pursuant to the Commonwealth's acceptance of several special conditions, including the challenged conditions relating to immigration. (Turco Decl. ¶¶ 10-11.)

267.    Massachusetts has planned on using its fiscal year 2018 Byrne JAG grant to fund programs focused on reducing gun, gang, and youth violence; evidence-based reentry programs to reduce recidivism; programs targeting domestic violence and sexual assault offenders; efforts geared toward combating heroin, opioids, and other illegal drugs; and collaborative prosecution and prevention programs. (*Id.* ¶ 12.)

268.    If the fiscal year 2018 Byrne JAG funds are not made available to Massachusetts, many of these programs will go without funding or with reduced funding as there are no alternative state funds currently budgeted for these programs. (*Id.* ¶ 13.)

269.    Massachusetts's Executive Office of Public Safety and Security ("EOPSS") has currently exhausted all of its previously awarded Byrne JAG funds. EOPSS regularly receives inquiries from other law enforcement and government agencies about the available of additional

funds to cover expenses consistent with the Byrne JAG program. Because funding is not currently available, state and local law enforcement agencies are foregoing certain equipment and technology upgrades, enforcement against the sale and distribution of illegal drugs, prevention and intervention programs, and reentry services, among other things. (*Id.* ¶ 14.)

270.    As Massachusetts's direct grantee of Byrne JAG funds, EOPSS is responsible for ensuring compliance with grant terms by subgrantees. Funding for this monitoring comes straight from EOPSS's Byrne JAG Program award. The additional conditions included in the FY 2018 Byrne JAG Program award will necessarily increase EOPSS's time and divert resources to conducting diligent inquiries and monitoring subgrantee compliance. (*Id.* ¶ 15.)

### iv.    New Jersey

271.    New Jersey timely applied for its FY 2018 Byrne JAG award and was notified on October 1, 2018 that it had been awarded $4,007,716 in FY 2018 Byrne JAG funding. (Fradel Decl. ¶ 10, Feb. 7, 2019.)

272.    New Jersey plans to use its FY 2018 Byrne JAG funding to pass through $2,460,000 in funds to the State's 21 county prosecutor officers for the purposes of funding gangs, guns, and narcotics task forces. (*Id.* at ¶ 11.)

273.    New Jersey further intends to pass through $266,500 in FY 2018 Byrne JAG funding to support its county prosecutors' Megan's Law and Local Law Enforcement programs. (*Id.*)

274.    At the State level, New Jersey plans to use its FY 2018 Byrne JAG award to fund its Multi-Jurisdictional Gangs, Organized Crime and Narcotics Task Force, which investigates and prosecutes members of criminal gang organizations, gun traffickers, and gun trafficking organizations whose operations transcend county jurisdictions or operate across state

lines in or out of New Jersey. (*Id.* at ¶ 12.)

275.    In addition, New Jersey has set aside $240,477 in its FY 2018 Byrne JAG award to fund the State's anti-corruption initiative, specifically to pay for the costs associated with employing one Deputy Attorney General and one Detective assigned to the project, which involves criminal cases involving abuses of the public trust and other sensitive matters. (*Id.*)

276.    New Jersey will also dedicate a portion of its FY 2018 Byrne JAG funding to support its Prosecutor Supervision Training initiative, as well as to fund a ballistics lab technician and to purchase new technology to be used by the State Police's Uniform Crime Reporting Unit. (*Id.* at ¶¶ 12-13.)

277.    New Jersey avers that it maintains policies and procedures that may conflict with the challenged immigration conditions DOJ has placed on its FY 2018 Byrne JAG funding. In particular, New Jersey's Attorney General, on November 29, 2018, issued a directive to all state, county, and local law enforcement agencies limiting the types of voluntary assistance that their officers may provide to federal civil immigration authorities, including Immigration and Customs Enforcement. (*Id.* at ¶ 15; *see also* Fradel Decl. Ex. B.) The directive generally prohibits state, county, and local law enforcement in New Jersey from participating in civil immigration enforcement operations and from providing non-public personally identifying information regarding any individual. (*Id.* at ¶ 16.)

278.    New Jersey's legislature has anticipated receiving its FY 2018 Byrne JAG award as a federal resource in the State's most recent appropriations legislation. In addition, New Jersey avers that all of its FY 2018 Byrne JAG subgrantees have planned how they intend to use their pass-through awards and notes that the State has no contingency plans in place to sustain those subgrantee plans should the State not receive its FY 2018 award. (*Id.* at ¶ 19.)

v.      **Rhode Island**

279.    Rhode Island timely applied for its FY 2018 Byrne JAG award and was subsequently notified by OJP that it had been awarded $778,980 in Byrne JAG funding for FY 2018. (Hogan Decl. ¶ 4, Feb. 18, 2019.) Rhode Island's FY 2018 Byrne JAG award contained the challenged immigration special conditions. (*Id.* at ¶ 8; *see also* Rhode Island 2018 Byrne JAG Award Letter.)

280.    Rhode Island plans to fund various programs and personnel with its FY 2018 Byrne JAG award, specifically:

a.  the State's Public Defender's Defender Advocacy Project, which seeks to increase representation for those held or facing incarceration for reasons other than direct criminal prosecutions;

b.  the State Supreme Court's Domestic Violence/Sexual Assault/Child Monitoring Unit, which uses its Byrne JAG funds to supplement its ability to collect data from police arrest forms and prepare reports;

c.  a prosecutor in the Rhode Island Attorney General's office dedicated to Adult Drug Court; and

d.  the State Police's Neighborhood Response Team, which involves joint patrols of state and local police in high crime areas. (*Id.* at ¶ 5.)

281.    In addition, Rhode Island plans to pass through a portion of its FY 2018 Byrne JAG award to fund local efforts for narcotics enforcement, violent crime reduction, technology improvements, and equipment funding. (*Id.* at ¶ 6.)

282.    Rhode Island's administrative manager in its public safety grant administration office avers that because Rhode Island has yet to be able to draw down on its FY 2018 Byrne

JAG award, the State has had to use funding from other sources to pay for staff-time that would have been covered by Byrne JAG funding. (*Id.* at ¶ 7.)

### vi.    Virginia

283.    Virginia timely applied for its FY 2018 Byrne JAG funding on August 22, 2018. (Dion Decl. ¶ 4, Jan. 31, 2019.) On October 1, 2018, OJP issued Virginia its FY 2018 Byrne JAG award in the amount of $3,576,759 pursuant to several special conditions, including the challenged immigration-related special conditions. (Dion Decl. Ex. 1 – FY 2018 Virginia Award Letter.)

284.    Virginia's legislature has adopted a budget that anticipates receiving and distributing its FY 2018 Byrne JAG award. (Dion Decl. ¶ 5.)

285.    Virginia intends to use its FY 2018 Byrne JAG allocation to continue to fund projects to improve community policing, provide training to law enforcement agencies, as well as to fund programs to respond to sexual assault, respond to active-shooter incidents, and address the opioid crisis. (*Id.*)

286.    Virginia also plans to pass through its FY 2018 Byrne JAG funds to 196 of the Commonwealth's localities to fund efforts to prevent and reduce crime, and to help localities cover the costs of personnel, equipment, technical, and information technology systems. (*Id.* at ¶ 7.)

287.    If Virginia should not be able to draw down on its FY 2018 Byrne JAG funding, according to its Department of Criminal Justice Services (VA DCJS), the Commonwealth's ability to fund anti-crime and other law enforcement programs will be reduced. (*Id.* at ¶ 8.)

### vii.    Washington

288.    The State of Washington timely applied for its FY 2018 Byrne JAG allocation in

August of 2018. (Klontz Decl. ¶ 3, Jan. 31, 2019.) In October of 2018, OJP notified Washington that it had been awarded $3,334,947 in FY 2018 Byrne JAG funds pursuant to various special conditions, including the above-referenced immigration-related special conditions. (Klontz Decl. Ex. A – FY 2018 Washington Byrne JAG Award Letter.)

289.    Washington has already devoted significant resources to determine how and where to spend its FY 2018 Byrne JAG award. (Klontz Decl. ¶ 6.) For example, Washington has a Justice Assistance Grant Advisory Committee to identify programs that have statewide applicability and do not have another applicable funding stream. (*Id.*)

290.    Washington plans to use its FY 2018 Byrne JAG funding to support multi-jurisdictional task forces to combat drug trafficking and gang violence. (*Id.*) Washington's drug and gang task forces encourage collaboration among state, local, and federal criminal justice agencies and operate to combat illegal narcotics and gang activity by disrupting and dismantling criminal organizations, maintaining policies to share best practices and implementation strategies, and by providing a base of staffing, training, equipment, and professional services for various investigations. (*Id.* at ¶ 7.)

291.    Washington avers that the immigration-related conditions imposed by DOJ on Byrne JAG funds have "created uncertainty surrounding the continued existence of" its drug and gang task forces. (*Id.* at ¶ 9.) In addition, Washington also believes that any disruption in the FY 2018 Byrne JAG program's funding for its drug and gang task forces "will negatively affect law enforcement programs nationally" as those task forces "engage in law enforcement efforts that share important information with other law enforcement entities, such as the Western States' Information Network and the Northwest High Intensity Drug Trafficking Area programs." (*Id.* at ¶ 10.)

**B. City Plaintiff's Use of Byrne JAG Funding**

292.    *See supra* at ¶¶ 114-119.

## IV.    HARMS TO PLAINTIFFS RESULTING FROM DEFENDANTS' IMPOSITION OF THE IMMIGRATION-RELATED CONDITIONS

**A. Impact on State Plaintiffs**

293.    Representatives from State Plaintiffs or from jurisdictions within those States and others have indicated that requiring local authorities to enforce federal civil immigration laws could interfere with their considered efforts to promote public safety in immigrant communities. (*See, e.g.*, Fradel Decl. ¶¶ 15-18, Feb. 7, 2019 (NJ); Ullmann Decl. ¶¶ 7, Feb. 15, 2019 (WA); Green Decl. ¶¶ 25-30, Feb. 28, 2019 (NY).)

294.    Representatives from the State Plaintiffs have also expressed concerns regarding the burdens to the States that will be caused by having to comply with the original and additional immigration-related conditions that DOJ has imposed on the receipt of Byrne JAG allocations. (*See, e.g.* Green Decl. ¶ 26, Feb. 28, 2019 (NY); Hogan Decl. ¶ 10, Feb. 18, 2019 (RI); Pelka Decl. ¶¶ 11-15 (CT); Dion Decl. ¶ 9, Jan. 31, 2019 (VA).)

**B. Impact on City Plaintiff**

295.    *See supra* at ¶¶ 141-203.

New York, NY                          Respectfully submitted,
Dated: March 1, 2019


                                      **LETITIA JAMES**
                                      *Attorney General*
                                      *State of New York*

                                      By: /s/ Nancy Trasande
Eric R. Haren,[†]                     Matthew Colangelo,[†] Chief Counsel
Special Counsel & Senior Advisor      Lilia Toson,[†] Assistant Attorney General
                                      Nancy Trasande,[†] Assistant Attorney General
*Of Counsel*                          Conor Duffy,[†] Assistant Attorney General
                                      Civil Rights Bureau
                                      28 Liberty St., 20th Floor
                                      New York, NY 10005
                                      Matthew.Colangelo@ag.ny.gov
                                      Lilia.Toson@ag.ny.gov
                                      Nancy.Trasande@ag.ny.gov
                                      Conor.Duffy@ag.ny.gov
                                      Phone: (212) 416-6057


**DEBEVOISE & PLIMPTON LLP**         **ZACHARY W. CARTER**
919 Third Avenue                      Corporation Counsel of the City of New York
New York, NY 10022                    100 Church Street
Tel: (212) 909-6077                   New York, NY 10007
jhamid@debevoise.com                  Tel: (212) 356-2296
                                      dbernhar@law.nyc.gov

By: /s/ Jyotin Hamid
Jyotin Hamid[†]                       By: /s/ Doris Bernhardt
Meryl Holt[†]                         Doris Bernhardt[†]
Dana Rehnquist[†]                     Tonya Jenerette[†]
Alexandra N. Mogul[†]                 Sabita Krishnan[†]
                                      Gail Rubin[†]


*Attorneys for Plaintiff the City of New York*

**MAURA HEALEY**
*Attorney General*
*Commonwealth of Massachusetts*

By: /s/Jonathan Miller
Jonathan Miller,[†] Chief, Public Protection
and Advocacy Bureau
Genevieve C. Nadeau,[†] Chief, Civil Rights
Division
One Ashburton Place
Boston, MA 02108
Jonathan.Miller@state.ma.us
Genevieve.Nadeau@state.ma.us
Phone: (617) 727-2200

**WILLIAM TONG**
*Attorney General*
*State of Connecticut*

By: /s/ Mark F. Kohler
Mark F. Kohler,[‡] Assistant Attorney General
Michael Skold,[‡] Assistant Attorney General
55 Elm St., P.O. Box 120
Hartford, CT 06141-0120
Mark.Kohler@ct.gov
Michael.Skold@ct.gov
Phone: (860) 808-5020

**GURBIR S. GREWAL**
*Attorney General*
*State of New Jersey*

By: /s/ Glenn J. Moramarco
Glenn J. Moramarco[‡]
Assistant Attorney General
Richard J. Hughes Justice Complex
25 Market Street, PO Box 112
Trenton, NJ 08625
Phone: (609) 376-3235
Glenn.Moramarco@njoag.gov

**PETER NERONHA**
*Attorney General*
*State of Rhode Island*

By: /s/ Michael W. Field
Michael W. Field,[‡] Assistant Attorney General
The State of Rhode Island
Office of the Attorney General
150 South Main Street
Providence, Rhode Island 02903
Phone: (401) 274-4400, Ext: 2380
mfield@riag.ri.gov

**MARK R. HERRING**
*Attorney General*
*Commonwealth of Virginia*

By: /s/ Victoria Pearson
Victoria Pearson,[‡]
Deputy Attorney General
202 North 9th Street
Richmond, VA 23219
Phone: (804) 786-4319
VPearson@oag.state.va.us

**ROBERT W. FERGUSON**
*Attorney General*
*State of Washington*

By: /s/ Luke Eaton
Luke Eaton[‡]
Assistant Attorney General
P.O. Box 40100
Olympia, WA 98504-0100
Phone: (360) 753-6200
LukeE1@atg.wa.gov

[†]Admitted in the S.D.N.Y.
[‡]Admitted *pro hac vice*